**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN PRESIDENT LINES, LLC<br>1667 K Street NW, Suite 400<br>Washington, DC  20006<br><br>APL MARITIME, LTD.<br>6110 Executive Boulevard, Suite 410<br>Rockville, MD  20852<br><br>APL MARINE SERVICES, LTD.<br>6110 Executive Boulevard, Suite 410<br>Rockville, MD  20852<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>MATSON, INC.<br>1411 Sand Island Parkway<br>Honolulu, HI  96819<br><br>MATSON NAVIGATION COMPANY, INC.<br>555 12th Street, Suite 700<br>Oakland, CA  94607<br><br>MATSON LOGISTICS, INC.<br>1855 Gateway Boulevard<br>Concord, CA  94520<br><br>　　　　　　　　　　Defendants. | Case No.: _____<br><br><br><br><br><br><br><br><br><br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

American President Lines, LLC, APL Maritime, Ltd., and APL Marine Services, Ltd. (collectively "APL"), through their counsel, bring this action against Matson, Inc., Matson Navigation Company, Inc., and Matson Logistics, Inc. (collectively "Matson") for injunctive relief, treble damages, and costs of suit under the antitrust laws of the United States for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2. Based on personal knowledge and information and belief, APL alleges as follows:

1

**Introduction**

1.      This is a case about Matson's campaign of anticompetitive tactics to exclude APL from the markets for container cargo shipping services between the mainland United States ("United States" or "U.S.") and Guam so that Matson can achieve and maintain its unlawful containership monopoly power ex the United States mainland and monopoly profits in these markets.

2.      Matson became the dominant container cargo shipper between the United States and Guam in 2011 when its only existing competitor, Horizon Lines, Inc. ("Horizon"), withdrew and was then acquired by Matson. Once unchallenged, and with both practical and legal barriers restricting carriers from servicing Guam, Matson repeatedly hiked its rates for container cargo shipping services with Guam to the detriment of U.S. shippers and residents of the island.

3.      APL began its current containership service between the United States and Guam in December 2015, after the U.S. Maritime Administration ("MARAD") approved the enrollment of APL's Guam service vessel in the Maritime Security Program ("MSP"). While APL initially provided fortnightly (every two weeks) service to Guam, APL eventually added a second vessel and enhanced its services during 2017-18 to provide weekly direct calls to Guam.

4.      With over 170 years of experience as a container cargo carrier, APL's increasing services with Guam presented a real and positive presence for U.S. shippers and island residents who had been victimized by Matson's abusive power. APL's growing presence also jeopardized Matson's monopoly control and profits, particularly after APL enhanced its services to Guam. Reacting to APL's effort to compete, Matson's chief executive threatened APL with an "axe fight", if it continued with its Guam services.

5. Matson is delivering on that threat with a campaign of anticompetitive tactics that is shocking in its scope, audacity, and disregard for the law. These tactics began with Matson disparaging APL's Guam services, and escalated to an array of anticompetitive actions by Matson to exclude APL from the U.S./Guam markets, as explained more fully below.

6. In admitted acts of retaliation for APL entering the U.S./Guam markets, Matson abruptly terminated a long-standing Connecting Carrier Agreement ("CCA") with APL for services in Alaska, declined to renew APL's shop and office lease at Pier II, refused APL access to terminal facilities needed by its tug and barge provider in Kodiak, and then terminated a shared tug charter arrangement with APL. This misconduct was contrary to Matson's own economic interests and caused significant financial harm to both Matson and APL.

7. Matson also launched a scheme to force shippers into unlawful exclusive dealing and bundled pricing arrangements. In addition to Guam, Matson has been the dominant supplier of container cargo shipping services between the United States and Hawaii markets. Matson has exploited its Hawaii dominance to coerce shippers to both Hawaii and Guam into exclusive dealing and bundled pricing arrangements covering both markets. Because most shippers need services to both markets – and because most shippers to Guam also ship a much larger cargo volume to Hawaii – this scheme has been especially effective in economically forcing shippers to do business with Matson in the Guam markets and substantially foreclosing APL from competing in the markets.

8. Matson also unlawfully conditioned or "tied" shipping services as part of its exclusionary scheme. As a condition to continue shipping on favorable terms in other markets where Matson is dominant, Matson, upon information and belief, requires that shippers purchase its container cargo shipping services in the U.S./Guam markets, or at least to refrain from shipping

with APL. This further restricts the services available to shippers and amplifies the foreclosure of competition in the U.S./Guam markets.

9.      In addition, Matson has deployed an offensive of predatory threats to coerce shippers not to do business with APL. For instance, Matson threatened freight forwarders with lowering the rates to their direct competitors shipping in the Hawaii and Guam markets if the freight forwarders dared to ship container cargo to Guam with APL. Similarly, Matson threatened to impose disfavored rates and treatment on shippers to both Hawaii and Guam if they gave container cargo to APL in the U.S./Guam markets.

10.     Matson actually followed through on its unlawful threats to shippers. APL understands Matson significantly increased rates specifically to its shippers that placed cargo with APL, and Matson refused to promise on-time deliveries for shippers that booked cargo with APL. Matson's threats and punishment of shippers further disciplined them from doing business with APL, hindering its ability to compete fairly in the U.S./Guam markets.

11.     Along with its sustained offense targeting of APL, Matson sought to negotiate the removal of APL "iron" from Guamanian waters. During 2017-18, Matson's chief executive proposed that APL place its Guam shippers' container cargo as "slots" on Matson's vessels, in exchange for APL terminating its Guam services with its own vessels. Matson's proposed terms, if accepted, would have effectively allocated the U.S./Guam markets to Matson's control, restricted APL's competition to non-threatening levels, and further harmed U.S. shippers and residents of Guam.

12.     As a result of Matson's misconduct, APL has suffered substantial losses and its ability to compete freely and succeed on the merits of its container cargo shipping services between the United States and Guam has been thwarted. APL has been deprived of those opportunities and

profits, and has suffered additional harm to its competitiveness, goodwill, and market capitalization. Matson's conduct has not only harmed APL, it also has caused substantial harm to the competitive process as well as to consumers of container cargo shipping services who have been deprived of the benefits of competition.

13.     Matson's anticompetitive conduct constitutes an attempt to achieve and to maintain its monopoly power in the markets for container cargo shipping services between the United States and Guam in violation of Section 2 of the Sherman Act.

14.     APL brings this suit to stop the anticompetitive conduct undertaken by Matson in violation of Section 2 of the Sherman Act and to recover substantial damages for injuries incurred as a result of such conduct.

### Parties

15.     Plaintiff American President Lines, LLC is an international ocean shipping company organized under the laws of the State of Delaware. American President Lines, LLC's headquarter offices are located in Washington, DC, where its management determines strategies and oversees the company's operations and its employees perform trade, sales, pricing, and customer service functions with respect to containerized shipments with Guam and elsewhere. With its subsidiaries, American President Lines, LLC operates a U.S.-flag ocean container vessel fleet and provides transportation services to major U.S. ports and inland cities through its intermodal network that links the U.S. East Coast, West Coast, and Gulf Coast. APL has serviced Guam with the transportation of container cargo during the times pertinent to this Complaint.

16.     Plaintiff APL Maritime, Ltd. is organized under the laws of the State of Delaware, with its headquarters in Rockville, Maryland and operations in other states. APL Maritime, Ltd.

acts as the ship manager and operator for the APL U.S.-flag ocean vessel fleet that provides container transportation between the United States and Guam among other service routes.

17.    Plaintiff APL Marine Services, Ltd. is organized under the laws of the State of Delaware with its headquarters in Rockville, Maryland and operations in other states. APL Marine Services, Ltd. manages the crew members and operates the APL U.S.-flag ocean vessel fleet that provides container transportation between the United States and Guam among other service routes.

18.    Defendant Matson, Inc. is a corporation organized and existing under the laws of the State of Hawaii, with headquarters in Honolulu and a corporate office in Oakland, California. Matson, Inc. is an international ocean shipping company and a Jones Act carrier and has provided container transportation between major U.S. ports and inland cities through its intermodal network to Hawaii, Guam, Alaska, and other locations during the times pertinent to this Complaint. Matson, Inc. and its subsidiaries provide substantial volumes of shipping services to federal government customers based in Washington, DC and they have been directly involved in the anticompetitive conduct alleged herein.

19.    Defendant Matson Navigation Company, Inc. is a corporation organized and existing under the laws of the State of Hawaii, with its corporate office in Oakland, California. Matson Navigation Company, Inc. is a subsidiary of Matson, Inc. and has provided container transportation between major U.S. ports and inland cities through its intermodal network to Hawaii, Guam, Alaska, and other locations during the times pertinent to this Complaint.

20.    Defendant Matson Logistics, Inc. is a corporation organized and existing under the laws of the State of Hawaii, with its corporate office in Concord, California and employees or agents in other states where Matson Logistics, Inc. solicits sales of warehousing, distribution,

intermodal ocean shipping, and freight management services. Matson Logistics, Inc. is a wholly-owned subsidiary of Matson Navigation Company, Inc.

## Jurisdiction, Venue, and Interstate Commerce

21.    This Court has subject matter jurisdiction over this matter pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

22.    Matson is subject to personal jurisdiction in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, because Matson may be found and transacts business in this district.

23.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c) and Section 12 of the Clayton Act, 15 U.S.C. § 22, because Matson transacts business, can be found, and resides within this district, and has availed itself of the courts in this judicial district.

24.    No other forum would be more convenient for the parties and witnesses to litigate this case. Matson solicits, markets, and sells container cargo shipping services to Guam and Hawaii from major U.S. cities, including for customers that are residents in this judicial district.

25.    Matson moves substantial volumes of cargo across state lines. Matson is engaged in and its activities substantially affect interstate commerce.

## Background on Shipping and Guam

26.    Container ocean shipping from the United States and various of its possessions to other U.S. ports and certain U.S. possessions is restricted to Jones Act vessels, with narrow exceptions. The Jones Act, enacted in 1920 and codified as 46 U.S.C. § 55101 *et seq.*, provides that "a vessel may not provide any part of the transportation of merchandise . . . between points in the United States to which the coastwise laws apply" unless the vessel is built in the United States

and owned and crewed by U.S. citizens, or else an exception applies.[1] "[P]oints in the United States" include certain locations outside the continental United States, such as Hawaii, and only Jones Act vessels may transport cargo between the United States and Hawaii. Jones Act vessels are significantly more costly to build and operate because of the U.S. citizen requirements.[2]

27.     Only U.S.-flag vessels are permitted under U.S. laws to transport cargo, including cargo transported in containers, between the United States and Guam. Under U.S. laws, APL U.S.-flag vessels may transport cargo between Guam and other U.S. ports.

28.     U.S. laws generally apply to Guam as a territory of the United States. Guam is an island in the Western Pacific Ocean with an attractive deep-water port that annually accepts thousands of containers from the United States on behalf of shippers. Many of those containers are trans-shipped to other destinations in the Pacific Ocean such as Saipan, Palau, and the Federated States of Micronesia. The U.S. government also maintains military installations and supporting facilities on Guam which depend on container cargo shipping services.

29.     Until 2011, Guam received container cargo services by Matson and Horizon. Both Matson and Horizon were Jones Act carriers and both companies called Hawaii as well as Guam. When Horizon serviced Guam, Matson and Horizon shared the container cargo between the United States and Guam on a roughly 50/50 basis.

30.     In 2011, Horizon withdrew from servicing Guam. Matson subsequently acquired Horizon and Matson became the only provider of container cargo shipping between the United States and Guam. With a monopoly on container cargo services, Matson significantly raised rates. Matson's rates for 40-foot containers, for example, increased to $5,500 by 2016. Similarly, by

---

[1] 46 U.S.C. §55102(b).
[2] *See* Congressional Research Service Report: Shipping Under the Jones Act: Legislative and Regulatory Background at p. 3.

2016 Matson's rates for refrigerated 40-foot containers from the United States to Guam had risen to $7,408.

31.     The MSP is the latest iteration of a longstanding federal effort to maintain a fleet of privately-owned vessels that can assist the United States in times of war or other emergencies. Historically, all MSP vessels have been authorized to transport cargo to and from Guam. Companies enrolled in the MSP are not, however, allowed to call Hawaii with any vessel unless they are also Jones Act carriers.[3]

32.     In 2015, APL secured approval for an MSP vessel that would call Guam on a fortnightly basis. APL expected that its service would inject much needed competition into the U.S./Guam markets, providing major benefits to the Guam shippers and economy, as well as to the U.S. military. Subsequently, in December 2016, APL received approval for a second MSP vessel that would call Guam, allowing for weekly service. Since APL entered the U.S./Guam markets, Matson dropped its rates more than 50% for some lines of container cargo.

33.     Matson engaged in aggressive lobbying efforts to eliminate competition from U.S.-flag MSP vessels. In 2018, following these efforts, U.S. law was revised, through the 2018 National Defense Authorization Act ("NDAA"), to eliminate the right of U.S.-flag vessels enrolled in the MSP to operate in the transportation of cargo between points in the United States and its territories, including Guam, with the exception of vessels already operating under an MSP agreement prior to enactment of the NDAA and replacement vessels permitted under such existing agreements.[4]

---

[3] *See* 46 U.S.C. § 53106(e).
[4] *See* 46 U.S.C. §53105(a)(1)(A) and (B).

34.     At present, there are only two U.S.-flag container vessels enrolled in the MSP that operated between U.S. ports and Guam, both operated by APL. Other than APL's MSP vessels, servicing the Guam markets is legally and commercially viable for Jones Act vessels, and Matson is the only Jones Act provider of containership services between U.S. ports and Guam.

**Relevant Markets and Market Power**

35.     As explained fully below, the broadest product market relevant to this action is container cargo shipping services. The product markets consist of commercial and non-commercial (primarily government) container cargo services. There also are narrower product market lines in which to evaluate Matson's conduct, consisting of dry and chilled or refrigerated cargo containers.

36.     Also as explained fully below, the two geographic markets relevant to this action are the shipping routes between (a) the United States and Guam and (b) the United States and Hawaii. There also are narrower geographic markets in which to evaluate Matson's conduct, consisting of each departure-destination route between U.S. ports and Guam and Hawaii such as Oakland-Guam or Seattle-Hawaii.

37.     Matson also has monopoly power in the United States and Guam container cargo shipping services markets. Beginning in 2011, Matson provided approximately 100% of the container cargo shipping services between the United States and Guam, and even after APL's entry Matson has held at least 70% of the container cargo shipping services between the United States and Guam. Matson also has monopoly power in the United States and Hawaii container cargo shipping services markets. Only one other small Jones Act carrier, The Pasha Group ("Pasha"), services Hawaii. Since APL's entry in the U.S./Guam markets, Matson has provided at least 70% of the container cargo shipping services between the United States and Hawaii.

**Matson's Conduct in Violation of Antitrust Laws**

38.     When Horizon withdrew from its Guam service in 2011, and was later acquired by Matson, Matson became the only container cargo carrier between the United States and Guam. APL entered the U.S./Guam markets in December 2015 with a fortnightly service from ports in Oakland and Los Angeles.

39.     Matson's initial reaction to APL's entry was to reduce its supra-competitive prices somewhat on a few cargo lines or shipments, consistent with Matson not initially deeming APL's entry as a significant threat to Matson's monopoly power. Once APL enhanced its service between the United States and Guam in 2017 to a weekly call and opened an office in Guam, Matson, instead of competing on the merits, embarked on a campaign of anticompetitive, unlawful exclusion, and raising costs to APL in these markets, as well as retaliating in other markets.

40.     Matson introduced a so-called "loyalty program" under which (a) shippers that use Matson for 90% of their container cargo shipments with Hawaii or Guam receive a 20% "first-dollar" discount on that route, and (b) shippers that use Matson for both 90% of their shipments with Hawaii and 90% of their shipments with Guam receive a 25% percent discount on both routes. A U.S./Guam customer with shipments to Hawaii who ships exclusively on Matson thus receives not only a higher discount on its Guam shipments directly, but also a bonus of a larger discount on its shipments to Hawaii.

41.     Matson also has employed variations of the loyalty program when effective. These variations include, upon information and belief, obtaining volume commitments with shippers in either the Guam or Hawaii markets, using long-term contracts with large customers shipping to Guam, or threatening retaliation on the U.S./Hawaii trade if a shipper used APL for shipping Guam cargo.

42.     Because the U.S./Hawaii trade is five to six times larger than the U.S./Guam trade, with most Guam shippers shipping much larger volumes with Hawaii, Matson's loyalty program and "bonus" payment scheme effectively forecloses APL from competing for those shippers in the U.S./Guam markets. They cannot economically or reasonably use APL services for container cargo shipments with Guam, even if offered at a substantial discount off Matson's stand-alone rates, because that would risk losing the additional discount on their much larger U.S./Hawaii shipments.

43.     Matson has enforced its various loyalty programs through threats and punishments. On information and belief, Matson notified shippers that if they placed U.S./Guam container cargo with APL, those shippers would be punished by losing the rates or services accorded to loyal Matson shippers of cargo to Hawaii. Some customers informed APL that after they placed cargo with APL, Matson charged those customers who also needed to ship other cargo with Matson rates from $1,500 to $2,000 higher than APL's rates and would not promise on-time delivery.

44.     As part of maintaining its market power and independent of the loyalty program, Matson has also threatened customers of container cargo shipping between the United States and Guam with higher rates and unfavorable service on Hawaii and Guam shipments, if cargo to Guam were awarded to APL. Upon information and belief, in or about 2018, during its multi-year contract bidding process, one of the world's largest automobile manufacturers rejected APL's offer of a lower rate and awarded its Guam container cargo to Matson because it threatened the shipper's other cargo to Hawaii with higher rates and unfavorable service.

45.     Matson also complained to one of the world's largest big-box retailers after it agreed to ship even a small percentage of its container cargo between the United States and Guam with APL. Although Matson told the big-box retailer that APL's attempt to enter the U.S/Guam

markets would harm the shipper, upon information and belief, Matson's actual concern was that APL's entry would dampen Matson's continued ability to collect monopoly rates.

46.     APL tried to compete with Matson's loyalty program by offering rate reductions to retain and to attract some container cargo for freight forwarders and large beneficial cargo owners ("BCOs") that shipped in both the U.S./Guam and U.S./Hawaii markets.[5] These large shippers were unable to accept APL's offers for U.S./Guam shipments due to the drastic cost increases they would incur if their substantially larger U.S./Hawaii shipments lost Matson's "bonus" discount tied to their using Matson for Guam, or due to multi-year agreements based on committed volumes with Matson. This tactic has enabled Matson to avoid the rate reductions that would otherwise have been necessary to compete with APL and keep those U.S./Guam customers.

47.     Freight forwarders also declined to do business with APL for their U.S./Guam shipments, even when offered discounted rates, because, among other things, Matson threatened them with repercussions in the U.S./Hawaii markets. For example, a freight forwarder indicated that Matson threatened to lower its rates to that freight forwarder's direct competitors in the U.S./Hawaii markets if it shipped its Guam cargo with APL.

48.     Matson has used unlawful customer coercion or tying arrangements to exclude APL from the U.S./Guam markets. As with its various loyalty programs, Matson, upon information and belief, has entered into agreements with container cargo shippers, whereby Matson conditions the availability of shipping services in the U.S./Hawaii markets, or discounts, rebates, and/or other

---

[5] Shippers that purchase container cargo services include BCOs and freight forwarders (which also include NVOCCs). BCOs ship cargo for their own use, such as retail firms and grocery chains. Freight forwarders do not ship for their own benefit, but rather act as intermediaries, providing ocean freight shipping in addition to other services, such as arranging for land transportation and delivery.

favorable shipping terms in those markets, on shippers eliminating or drastically curtailing their Guam dealings with APL.

49.     Alternatively, as a condition to shipping services or receiving favorable terms in the U.S./Hawaii markets where Matson is dominant, and APL cannot compete by law, Matson, upon information and belief, requires that shippers purchase Matson's shipping services between the U.S./Guam markets, or refrain from purchasing U.S./Guam container cargo shipping services from APL

50.     The intent and effect of each aspect of Matson's loyalty program, exclusive dealing, bundled pricing, and tying scheme is to exclude competitive alternatives by conditioning customer sales of shipping services to drive U.S./Guam shipping business to Matson and away from APL. As a result, APL is excluded from competing for at least 40% to 50% or more of the "contestable" container cargo shipping services in the U.S./Guam markets,[6] upon information and belief.

51.     The effect of Matson's exclusivity arrangements, however, is greater. The future effect of Matson's arrangements is to preempt or exclude competition from the U.S./Guam markets. Matson can leverage its protected power in the U.S./Hawaii markets (70% or more) to continue to induce, tie, threaten, or coerce the many shippers that also ship to Guam to avoid business with APL. Matson also has exploited its market power in both the U.S./Hawaii and U.S./Guam markets to continue to threaten, punish, and hammer shippers that do business with

---

[6] From its entry, APL was not in position to contest or compete with Matson on all the various lines of container cargo in the U.S./Guam trade. For example, APL's transit time from the U.S. West Coast to Guam prevented it from effectively competing for the chilled reefer container business line, although APL could still compete in the frozen reefer and dry cargo container lines because the transit time on APL's route from Los Angeles to Guam was not critical for frozen or dry cargo. APL was also unable to compete for container cargo departing the Pacific Northwest (Seattle) to Guam. APL, however, has had the ability to compete effectively for the majority (70%) of container cargo in the U.S./Guam markets.

APL in the U.S./Guam markets. With Matson's willingness to abuse its dominance to interfere with APL's ability to compete on the merits and pose a threat to Matson's dominance, the impact of Matson's exclusivity arrangements is, and will continue to be, amplified beyond the present share of foreclosed competition.

52.     APL attempted to lessen or avoid the exclusionary effect of Matson's conduct. Because Jones Act restrictions prevent APL from entering the U.S./Hawaii markets, APL proposed a joint operation agreement with a small Jones Act carrier in those markets. This business relationship would have enabled APL to neutralize Matson's threats or match its ability to carry the U.S./Hawaii cargo of its customers that also have Guam shipments. The small carrier declined to partner with APL, however, due to concern of adverse reaction by Matson.

53.     Matson's exclusionary conduct directed at the U.S./Guam markets includes retaliation against APL in Alaska which began shortly after APL enhanced its Guam service. In December 2017, Matson precipitously terminated the CCA that it had with APL for years. The CCA involved APL's use of Matson vessels to transport cargo for shippers in Anchorage, Akutan, and Kodiak to Dutch Harbor, where APL could load the cargo on to an APL vessel for shipment to Asia. The Kodiak harbor facilities could not support the size of the vessel APL used on the service. Following termination, APL was forced to find alternative service, ultimately with a tug and barge carrier that added capacity to its service to transport the cargo from Kodiak to Dutch Harbor. This alternative service was longer in transit time and somewhat more costly.

54.     When it became apparent that APL could maintain service despite Matson's termination of the CCA, Matson further retaliated by refusing to allow the barge company to use the Matson-leased terminal to transship APL empties and laden containers. This caused severe stevedoring problems for APL, and forced it to find temporary terminal facilities to handle its

connecting carrier's barges through the fourth quarter of 2018, after which time the City of Kodiak approved APL's service agreement for a facility. When APL solved the terminal facility issue, Matson retaliated again, this time by terminating its long-term lease for a shop and office at Pier II and a tug charter arrangement with APL in Dutch Harbor.

55.     When APL complained to Matson management in Alaska about these irrational and costly actions, Matson informed APL that it had brought it on itself by calling Guam. Matson's retaliation was not limited to Guam and occurred wherever Matson could injure APL.

56.     Prior to Matson's termination of the CCA, APL moved substantially more than 50% of its inter-Alaska cargo on Matson vessels, APL used Matson's terminal services at Kodiak, leased a shop and office at Pier II, and APL shared the costs of a tug with Matson. As a result of the Matson's pattern of retaliation, APL lost millions of dollars due to increased costs. Matson also lost an estimated $8 million annually since 2018 for its freight and terminal revenue from APL and the shared costs for the tug. The actions taken by Matson were patently against its own economic self-interest (except as a means to punish APL for competing in the U.S./Guam markets) and caused substantial loss to Matson as well as to APL.

57.     Matson also sought to avoid competition with APL by pursuing an allocation of the U.S./Guam markets to Matson. Commencing in mid-2017 and on at least an additional occasion in June 2018 at a lunch with Matson's chief executive, Matson offered APL container cargo "slots" on Matson's vessels, if APL would stop calling Guam with its own vessels. The offer in 2017 was for 90 slots per week subject to a maximum of 60 slots from Long Beach, 30 slots from Oakland, and 15 reefer slots for the U.S. West Coast. The offer required APL to use Matson's containers and other equipment. Matson made clear that its offer was intended to remove APL "iron" from Guamanian waters.

58.     Matson's offer, if accepted, would have imposed an artificial limit on APL's operations and growth for the U.S./Guam markets. The rates offered by Matson were higher and would have required APL to restrict its competition. In one of these offers, Matson also offered to accept slots to Okinawa on APL vessels and cease calling it with Matson vessels. The slot offers were a pretext to restrict APL's competition to non-threatening levels and would have led to the elimination of competition in the U.S./Guam markets. In the alternative, Matson promised to continue exclusionary and retaliatory conduct. In the words of Matson's chief executive, the "axe fight" would continue.

59.     Matson also worked to change the law to its advantage to dampen the threat of meaningful competition in Guam, reflected in its efforts behind the 2018 passage of NDAA. Matson's successful lobbying effort to enact a revision in U.S. law to exclude U.S.-flag MSP vessels from calling on Guam after 2018 also restricts the ability of other U.S.-flag non-Jones Act vessels to enter the U.S./Guam markets. For example, a new U.S.-flag entrant to the MSP operating under an agreement post-dating the 2018 NDAA may not call Guam under MSP. Matson's lobbying effort demonstrates Matson's clear intent to exclude all other carriers and recapture and retain its unchallenged monopoly in container cargo shipping services between the United States and Guam.

60.     The effectiveness of Matson's anticompetitive conduct is demonstrated by recent experience in the U.S./Guam markets. Prior to 2011, Horizon was able to compete effectively in the U.S./Guam markets because it also called Hawaii. Matson was unable to use Hawaii threats, bundling, or conditioning to harm competition, because shippers could refuse those threats or bundles/conditions by switching their Hawaii cargo to Horizon. Because APL is not allowed under U.S. law to call Hawaii from the United States, nor does any carrier other than Matson that also

serves the U.S./Guam markets, Matson's present threats, bundling, conditioning and other tactics involving Hawaii have a substantial exclusionary impact on APL. They block effective competition in the U.S./Guam markets, as shippers cannot practicably risk losing Hawaii services, foregoing lower prices for a bundled discount tied to Hawaii, or incurring higher prices for Hawaii shipments as punishment. This has compelled shippers to continue business with Matson for Guam shipments.

61.     Matson continues to have substantial monopoly power in container cargo shipping services between the United States and Guam. Matson's share of these markets still exceeds 70% of such overall container shipment volume. The most relevant metric, however, is that Matson retains an even larger share of the "contestable" U.S./Guam lines and shipments for which APL has the capacity and service to compete.[7] Absent Matson's anticompetitive conduct, many more of those shippers would have benefited from APL's entry and expansion.

62.     Matson also continues to have monopoly power in the container cargo shipping services between the United States and Hawaii. Matson's share in these markets exceed 70%. Pasha's presence in Hawaii has not prevented Matson from charging supra-competitive rates for container cargo shipping between the United States and Hawaii. Matson's power in the U.S./Hawaii markets has been leveraged as a powerful and effective threat to shippers who might wish to switch to APL to take advantage of its lower rates to Guam, but cannot risk disruption of their container cargo business with Hawaii.

63.     Matson's power in the U.S./Guam and U.S./Hawaii markets has been protected by substantial regulatory barriers to entry in these markets, including legal restrictions imposed by the Jones Act and restrictions on market access by MSP participants. In addition, the high multi-

_____

[7] *See* fn. 6 and related text, *supra*, regarding "contestable" products.

million dollar costs of purchasing and maintaining an ocean container transport fleet and supporting equipment and facilities further bars carriers from entering these markets.

64.     Any carrier that could hypothetically clear the U.S. legal and start-up cost barriers to the U.S./Guam and U.S./Hawaii markets would then face a high ratio of fixed to variable costs and would require a minimum market share to survive. These hypothetically successful entrants would also have to develop a customer base of sufficient magnitude to support the high costs of entry. Matson's loyalty program and long-term and volume commitment conditions with shippers, and other anticompetitive conduct alleged herein, upon information and belief, prevents an entrant from attracting a meaningful number of shipping customers to overcome these barriers.

65.     Customers and residents in Hawaii and Guam are dependent on container cargo shipping services for critical goods and sustenance. This is acknowledged in a 2021 Matson investor presentation that proclaimed it provides "critical supply lifelines to economies throughout the Pacific." This customer critical dependency further deters shippers and customers from switching from Matson, entrenches its market position, and further protects its power.

66.     Matson's bundling, conditioning and tying of the Guam and Hawaii markets is motivated by the desire to maintain its monopoly power in the U.S./Guam markets, to the exclusion of APL. This is confirmed by Matson not offering bundled discounts or conditioning Guam services before the APL entry in Guam or in other markets where APL is not present, and by Matson maintaining supra-competitive rates in the narrower markets where APL does not compete such as containerized cargo originating in the Seattle port or for the chilled container cargo shipments with Guam.

67.     Matson's anticompetitive conduct has foreclosed APL from a substantial share of the markets for container cargo shipping services between the United States and Guam. In a market

free of such anticompetitive conduct, APL would have had substantially greater sales and a market share closer to that once enjoyed by Horizon. Matson's anticompetitive conduct has caused, and continues to cause, APL to lose revenues and profits in an amount to be determined at trial.

68.     If the effect of Matson's conduct were to force APL to exit or reduce service in the U.S/Guam markets, Matson can be expected to maintain or raise its rates to full monopoly levels, as it did following the exit of Horizon.

69.     A reduction or end to APL's service with Guam would have severe anticompetitive effects on non-commercial (government) container cargo, and particularly military shipments to Guam, because non-commercial container cargo is carried on the same vessels that also carry commercial container cargo. A withdrawal by APL from the U.S./Guam markets will result in Matson imposing substantial rate increases in the non-commercial container cargo markets, as it did when Horizon withdrew.

70.     Matson's efforts to exclude and foreclose APL in the U.S./Guam markets has distorted the proper functioning of competitive forces in the markets and has hindered APL's ability to compete vigorously for customers in the markets. As a result, customers of U.S./Guam container cargo shipping services have been deprived of choice of providers competing freely. This has decreased competition substantially to the detriment of consumers in Guam who rely upon container shipments and shippers in the United States who are dependent on container shipping services for the delivery of goods.

71.     Currently and for the foreseeable future, given both commercial and legal restraints, only Matson and APL under U.S. law may transport container cargo between Guam and U.S. ports on a regular basis. If for some reason, APL left the Guam trade, Matson would be the only remaining ocean carrier providing container cargo service between Guam and the United States.

APL's exit would eliminate any actual competition and allow Matson to fully regain the monopoly it had prior to APL's re-entry into the United States to Guam trade in 2015 – without even the practical threat of entry by another carrier that might constrain Matson's conduct.

### Count One

72.     APL repeats and realleges paragraphs 1 through 71 as set forth herein.

73.     Matson has monopolized and maintained its monopoly of the relevant markets in violation of section 2 of the Sherman Act.

74.     The broadest product market relevant to this action is container cargo shipping services. The product markets consist of both commercial and non-commercial (primarily government) container cargo services. There also are narrower product lines in which to evaluate Matson's conduct, consisting of refrigerated reefer containers, frozen or chilled reefer containers, or non-ventilated (dry) containers for commercial and non-commercial cargo.

75.     It is standard commercial practice in the United States and internationally to ship cargo in large, heavy-duty containers for ocean and intermodal transportation. Shipping containers are standard in size, usually 20- or 40- or 45-foot lengths, making them compatible with carriers and ports that handle containers. Most container ocean vessels are capable of carrying standard size containers, whether dry, refrigerated, or chilled, making any container vessel a potential substitute for any other in carrying containers for shippers.

76.     Government regulators, including MARAD and U.S. Homeland Security, categorize container shipping as distinct from other forms of ocean transportation such as tanker ships. Matson's SEC reports also identify container shipping services as distinct from the other forms of trans-ocean shipping such as airliners, barges, and tanker vessels. These other forms of shipping are not reasonably interchangeable with container cargo shipping because they are either

far more expensive (e.g., airlines), slower and limited in range (e.g., barges), or physically incapable of transporting a range of goods (e.g., tankers).

77.     Commercial container cargo shipping does not include non-commercial cargo services. Non-commercial cargo is cargo that is owned by and/or procured for the U.S. government including the Department of Defense, government agencies and contractors under U.S. government contracts or Task/Work Orders and shipped under government-issued bills of lading, under the laws and regulations relating to government contracts, or by the shipper-owned or shipper-chartered vessels. Commercial container cargo rates are not constrained by non-commercial cargo rates, and a sole provider of commercial container shipping could impose monopoly prices without also having a monopoly over non-commercial container shipping. Matson has more than 70% of the non-commercial container cargo shipping in each of the U.S./Guam and U.S./Hawaii markets.

78.     Purchasers of container cargo shipping would not respond to even a large price increase for these services by switching their cargo to other potential providers of trans-ocean cargo shipping such as airliners, barges, or tankers, or non-commercial carriers. In fact, Matson annually raised its rates substantially after Horizon had withdrawn in 2011 from the U.S./Guam markets, without significant switching by shippers to other forms of transportation or to other origins and destinations, indicating both the presence of monopoly power and a relevant market in which that monopoly power is being exerted.

79.     There also are narrower product markets in which to evaluate Matson's conduct. Reefer containers are a distinct line of container because they carry certain atmosphere- and temperature-sensitive products (e.g., fruits, vegetables). As explained herein Matson charges higher rates for chilled reefer container shipping services, compared to other lines of container

shipping (e.g., dry containers), without causing shippers to switch to APL, which offers frozen but not chilled reefer container lines of service. Matson's ability to charge a higher price for chilled reefer cargo indicates that it is a separate product market.

80.    Matson's ability to control prices in, and exclude competition from, container cargo shipping services, as described herein, confirms that it has monopoly power in a relevant market.

81.    The geographic markets relevant to this action are the separate shipping routes between the United States and Guam and the United States and Hawaii. Containers that originate anywhere in the United States can be transported to ports – mostly, if not always, on the U.S. West Coast – and then transferred to ocean container vessels for transportation to Guam or Hawaii.

82.    Government regulators and industry participants recognize the United States to Guam and Hawaii as two separate and distinct shipping routes. Shippers, including Matson, offer different rates for service between U.S. origins and Guam and Hawaii. Similarly, the Jones Act defines shipping services between ports in the United States and Guam and Hawaii. Matson's SEC reports also identify its U.S. West Coast to Guam and Hawaii services as distinct from the other geographic areas serviced by the company.

83.    For customers moving cargo from the United States to Guam or Hawaii, other geographic originations or destinations are not reasonably interchangeable, and customers would not substitute other originations or destinations in response to even large price increases for shipping services between the United States and Guam or Hawaii.

84.    Matson is the only ocean carrier transporting container cargo from the United States to both Guam and Hawaii, and Matson is the only ocean container carrier that has monopoly power in the United States (from any origin) to both Guam and Hawaii.

85.     There also are narrower geographic markets in which to evaluate Matson's conduct. Most if not all container cargo from the United States to Guam or Hawaii has departed from ports in Los Angeles, Oakland, or Seattle during times relevant to this complaint. Each of these departure and destination routes for container cargo shipments constitutes a narrower relevant geographic market.

86.     Depending on where within the United States container shipments originate, certain U.S. ports may be closer in distance, easier to access, or less expensive for container shipments to Guam or Hawaii than other alternative routes, precluding container shipping options on different routes from meaningfully competing with each other. To illustrate, the Seattle/Guam route would not be a reasonable substitute for the Los Angeles/Guam route for containerized shipments of products produced in Southern California, since shippers would not be expected to switch to shipping to Guam via Seattle in response to a small but significant increase in the price of shipping to Guam from Los Angeles.

87.     Each of these container shipping routes – Los Angeles, Oakland, and Seattle to Guam and to Hawaii – constitutes a narrower geographic shipping market because a monopolist of container shipping from Seattle to Guam could, for example, charge supra-competitive prices on that route without also having a monopoly over container shipping to Guam from Los Angeles or Oakland.

88.     Matson's ability to control prices in, and exclude competition from, the shipping routes between the United States and Hawaii and Guam, as well as the shipping routes between Los Angeles, Oakland, and Seattle and Guam and Hawaii, confirms that each is a separate and distinct geographic market

89.     Through the conduct alleged above, and other conduct likely to be revealed in discovery, Matson has willfully and unlawfully maintained and enhanced its monopoly power in violation of Section 2 of the Sherman Act. Matson's monopoly power has been stable or has increased as a result of Matson's anticompetitive conduct. Matson's anticompetitive conduct as described herein constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

90.     As a result of Matson's conduct, and the harm to competition caused by the conduct, APL has suffered substantial and continuing injuries.

### Count Two

91.     APL repeats and realleges paragraphs 1 through 71 and 74 through 88 as set forth herein.

92.     Matson has attempted to monopolize the relevant markets in violation of Section 2 of the Sherman Act.

93.     Matson is violating Section 2 of the Sherman Act by attempting to implement the anticompetitive conduct set forth above with the specific intent to monopolize the relevant markets. Matson's anticompetitive conduct constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

94.     There is a dangerous probability that Matson would succeed in monopolizing the relevant markets through its anticompetitive conduct.

95.     As a result of Matson's conduct, and the harm to competition caused by the conduct, APL has suffered substantial continuing injuries.

**Prayer for Relief**

WHEREFORE, APL respectfully prays the Court enter a judgment against Matson and in favor of APL as follows:

    a.   award APL money damages, trebled pursuant to law in an amount to be proven at trial;

    b.   award APL costs of this lawsuit, including its reasonable attorney fees and court costs;

    c.   declare Matson's anticompetitive conduct unlawful and in violation of the above-referenced statutes;

    d.   enter appropriate preliminary and permanent injunctive relief barring Matson from continuing its anticompetitive conduct; and

    e.   ordering such other relief as the Court may deem just, proper and equitable.

**Trial by Jury Demanded**

APL demands a trial by jury for all issues triable by a jury.

Dated:  July 28, 2021

                                       */s/ John R. Fornaciari*
                                       John R. Fornaciari (DC Bar 152801)

                                       */s/ Danyll Foix*
                                       Danyll Foix (DC Bar 475503)

                                       */s/ Sally Qin*
                                       Sally Qin (DC Bar 1011432)

                                       BAKER & HOSTETLER LLP
                                       Washington Square, Suite 1100
                                       1050 Connecticut Avenue, NW
                                       Washington, DC  20036-5403
                                       Tel:   202.861.1500
                                       Fax:   202.861.1783
                                       Email: JFornaciari@Bakerlaw.com
                                                               DFoix@Bakerlaw.com
                                                               SQin@Bakerlaw.com

                                     *Attorneys for Plaintiffs*