IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN PRESIDENT LINES, LLC, APL MARITIME, LTD., APL MARINE SERVICES, LTD., | |
| Plaintiffs, | |
| v. | Civil Action No. 21-2040 |
| MATSON, INC., MATSON NAVIGATION COMPANY, INC., MATSON LOGISTICS, INC., | |
| Defendants. | |

## **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Mark A. Perry, DC Bar No. 438203
MPerry@gibsondunn.com
Joshua M. Wesneski, DC Bar No. 1500231
JWesneski@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Rachel S. Brass, *pro hac vice*
RBrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200

*Counsel for Defendants Matson, Inc., Matson Navigation Company, Inc., and Matson Logistics, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

    I.      The U.S.-Guam Trade ................................................................................. 3

    II.     APL's Allegations Of Purportedly Anticompetitive Conduct ............................... 5

         A.      Matson Delivers Better Service, Drops Prices, And Creates A Loyalty Program ........................................................................... 6

         B.      Matson's Constitutionally Protected Petitioning Efforts ........................... 8

         C.      Matson's Alleged Slot-Charter Offer ............................................... 8

         D.      Matson's Contracts With APL In Alaska ........................................... 9

         E.      Matson's Alleged Interactions With Freight Forwarders And Other Customers ............................................................................. 10

    III.    APL's Unlawful Receipt Of MSP Subsidies ...................................................... 11

STANDARD OF REVIEW ................................................................................................. 12

ARGUMENT ..................................................................................................................... 13

    I.      APL Has Not Plausibly Alleged The Threshold Elements Of A Sherman Act Claim ............................................................................................... 14

         A.      APL Fails To Plausibly Allege Antitrust Injury ................................... 14

         B.      APL Has Not Plausibly Alleged A Relevant Market ............................. 17

         C.      APL Has Not Plausibly Alleged Monopoly Power ............................... 21

    II.     APL Has Not Plausibly Alleged Anticompetitive Conduct ................................. 24

         A.      Matson's Competitive Pricing Is Lawful ........................................... 24

          B.      Matson's Lobbying Activities Are Protected By The First Amendment And The *Noerr-Pennington* Doctrine .................................. 30

         C.      Matson's Alleged Slot-Charter Proposal To APL Was Not Anticompetitive ........................................................................ 31

**TABLE OF CONTENTS**
(continued)

                                                                                                    Page

D.      Matson's Alleged Conduct In Alaska Is Irrelevant And Not
        Anticompetitive............................................................................................ 32

E.      APL's Remaining Allegations Are Vague And Conclusory ................... 34

III.    Matson, Inc. And Matson Logistics, Inc. Are Not Properly Named As
        Defendants ............................................................................................... 37

CONCLUSION.................................................................................................................... 39

# TABLE OF AUTHORITIES

Page(s)

CASES

*Acre v. Spindletop Oil & Gas Co.*,
   No. 09-CV-421, 2009 WL 4016116 (E.D. Ark. Nov. 18, 2009) ............................................20

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
   948 F.2d 536 (9th Cir. 1991) ..............................................................................................29

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
   190 F.3d 1051 (9th Cir. 1999) ............................................................................................16

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*,
   256 F.3d 799 (D.C. Cir. 2001) ............................................................................................14

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990)..................................................................................................15, 26

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
   784 F.2d 1325 (7th Cir. 1986) ............................................................................................23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).............................................................................................13, 32, 34

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979)................................................................................................28

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)............................................................................................................26

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)............................................................................................................14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)............................................................................................................14

*Cargill, Inc. v. Monfort of Colo., Inc.*,
   479 U.S. 104 (1986)............................................................................................................15

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) ...............................................................................25, 26, 28

*City of Columbia v. Omni Outdoor Advert., Inc.*,
   499 U.S. 365 (1991)............................................................................................................30

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
781 F.3d 264 (6th Cir. 2015) ...................................................................................26, 28

*Dial A Car, Inc. v. Transp., Inc.*,
82 F.3d 484 (D.C. Cir. 1996) .................................................................................15

*Discon Inc. v. NYNEX Corp.*,
86 F. Supp. 2d 154 (W.D.N.Y. 2000) ...................................................................20

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961) ...............................................................................................30

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
821 F.3d 394 (3d Cir. 2016) ..................................................................................28

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
663 F.2d 253 (D.C. Cir. 1981) ...............................................................................31

*Fineman v. Armstrong World Indus., Inc.*,
980 F.2d 171 (3d Cir. 1992) ..................................................................................29

*Freedom Watch, Inc. v. Google, Inc.*,
368 F. Supp. 3d 30 (D.D.C. 2019) .........................................................................13

*FTC v. Church & Dwight Co.*,
665 F.3d 1312 (D.C. Cir. 2011) .............................................................................27

*\*FTC v. Facebook, Inc.*,
— F. Supp. 3d —, 2021 WL 2643627 (D.D.C. June 28, 2021) .................................17, 22, 29

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ...............................................................................20

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
423 F.3d 374 (3d Cir. 2005) ..................................................................................21

*In re Hawaiian and Guamanian Cabotage Antitrust Litig.*,
450 F. App'x 685 (9th Cir. 2011) ...........................................................................35

*In re Indep. Serv. Orgs. Antitrust Litig.*,
203 F.3d 1322 (Fed. Cir. 2000) ..............................................................................28

*Int'l Television Prods. Ltd. v. Twentieth Century-Fox Television Div. of Twentieth Century-Fox Film Corp.*,
622 F. Supp. 1532 (S.D.N.Y. 1985) ........................................................................18

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ...................................................................................................25

*Jefferson v. Collins,*
    905 F. Supp. 2d 269 (D.D.C. 2012) ........................................................36

*JES Props., Inc. v. USA Equestrian, Inc.,*
    No. 02-CV-1585, 2005 WL 1126665 (M.D. Fla. May 9, 2005) ..............20

*Kareem v. Haspel,*
    986 F.3d 859 (D.C. Cir. 2021) ...............................................................36

*Kaufman v. Time Warner,*
    836 F.3d 137 (2d Cir. 2016) ...................................................................26

*Keogh v. Chicago & N.W. Ry. Co.,*
    260 U.S. 156 (1922) ...............................................................................35

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.,*
    748 F.3d 160 (4th Cir. 2014) ..................................................................21

*Korea Kumbho Petrochemical v. Flexsys Am. LP,*
    No. 07-CV-1057, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ............22

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003) ...................................................................27

*Matshushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ...............................................................................27

*Matson Navigation Co. v. U.S. Dep't of Transp.,*
    471 F. Supp. 3d 60 (D.D.C. 2020) .........................................................12

*Mizlou Television Network, Inc. v. Nat'l Broad. Co.,*
    603 F. Supp. 677 (D.D.C. 1984) ............................................................21

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,*
    924 F.2d 1484 (9th Cir. 1991) ..........................................................17, 19

*N. Pac. Ry. Co. v. United States,*
    356 U.S. 1 (1958) ...................................................................................25

*Novell, Inc. v. Microsoft Corp.,*
    731 F.3d 1064 (10th Cir. 2013) ..............................................................33

*Ohio v. Am. Express Co.,*
    138 S. Ct. 2274 (2018) ...........................................................................17

*In re Pa. Title Ins. Antitrust Litig.,*
    648 F. Supp. 2d 663 (E.D. Pa. 2009) .....................................................38

*Penn. R.R. Co. v. Dillon*,
335 F.2d 292 (D.C. Cir. 1964) ................................................................. 3

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
886 F.3d 332 (3d Cir. 2018) .................................................................... 16

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) .................................................................... 17

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......................................................... 21, 23

*Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*,
732 F.2d 1403 (9th Cir. 1984) ................................................................ 25

*Sanderson v. Culligan Int'l Co.*,
415 F.3d 620 (7th Cir. 2005) .................................................................. 35

*Schor v. Abbott Labs.*,
457 F.3d 608 (7th Cir. 2006) .................................................................. 28

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) ................................................................................ 13

*Stamatakis Indus., Inc. v. King*,
965 F.2d 469 (7th Cir. 1992) .................................................................. 15

*Sumotext Corp. v. Zoove, Inc.*,
No. 16-CV-1370, 2016 WL 6524409 (N.D. Cal. Nov. 3, 2016) ............ 18

*Syncsort Inc. v. Sequential Software, Inc.*,
50 F. Supp. 2d 318 (D.N.J. 1999) .......................................................... 22

*Synthes, Inc. v. Emerge Med., Inc.*,
No. 11-CV-1566, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012) ............ 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ................................................................................ 39

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
MDL No. 1827, 2010 WL 2629728 (N.D. Cal. June 29, 2010) ............. 39

*In re Title Ins. Antitrust Cases*,
No. 08-CV-677, 2010 WL 1267129 (N.D. Ohio Mar. 31, 2010) ........... 38

*Toumazou v. Turkish Republic of N. Cyprus*,
71 F. Supp. 3d 7 (D.D.C. 2014) ............................................................. 39

*United States v. Bestfoods,*
  524 U.S. 51 (1998) .................................................................................38

*United States v. Conn. Nat'l Bank,*
  418 U.S. 656 (1974) ...............................................................................19

*United States v. E. I. du Pont de Nemours & Co.,*
  351 U.S. 377 (1956) ...............................................................................17

*United States v. Grinnell Corp.,*
  384 U.S. 563 (1966) ...............................................................................13

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001) ..................................................13, 21, 25

*\*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004) ................................................................15, 24, 33

*Virgin Atl. Airways Ltd. v. British Airways PLC,*
  257 F.3d 256 (2d Cir. 2001) .........................................................29, 30

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,*
  382 U.S. 172 (1965) ........................................................................17, 32

*Yellen v. U.S. Bank,*
  301 F. Supp. 3d 43 (D.D.C. 2018) ........................................................39

**STATUTES**

15 U.S.C. § 2 ...............................................................................................13

15 U.S.C. § 26 .............................................................................................13

46 U.S.C. § 12111(b) .............................................................................3, 12

46 U.S.C. § 12112 ........................................................................................3

46 U.S.C. § 50101(a)(2) ...............................................................................3

46 U.S.C. § 50501 ........................................................................................4

46 U.S.C. § 53102(a) ....................................................................................5

46 U.S.C. § 53105(a)(1)(A) ....................................................................5, 12

46 U.S.C. § 53106(e) ....................................................................................5

46 U.S.C. § 53107(b)(1) ...............................................................................5

46 U.S.C. § 55101 ....................................................................................................3

46 U.S.C. § 55102(b) ..............................................................................................3

49 U.S.C. § 13702(a) .............................................................................................35

49 U.S.C. § 13702(b)(1) ........................................................................................35

**REGULATIONS**

Notice of Agreements Filed,
    85 Fed. Reg. 63,274 (Federal Maritime Comm'n Oct. 7, 2020) ...........................9, 31

**RULES**

Fed. R. Civ. P. 12(b)(6) ...........................................................................................12

**OTHER AUTHORITIES**

3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of
    Antitrust Principles and Their Application (2021) ...........................................27, 29

Timothy K. Borchers, The End of Maritime Liens for Master Leases of
    Containers: How Do You Provide These Fungible Necessaries to A Fleet of
    Vessels?,
    18 Tul. Mar. L.J. 33 (1993) ........................................................................................8

Maritime Transport, Comp. Law Eur. Com.,
    2021 WL 432718, § 12.7 (2021) .................................................................................8

## INTRODUCTION

In the trade lanes between the U.S. West Coast and Pacific islands, Matson Navigation Company, Inc. ("Matson") has consistently offered the fastest, most reliable service for shipping all manner of goods.  Shipping consumers, public and private, have chosen Matson because it delivers the best value.  Over the past twenty-five years and across approximately 1,300 weekly sailings, Matson has missed only one sailing to Guam; Plaintiffs (collectively, "APL") have missed *twenty-two* since they began weekly service in January 2017.  As of September 2021, Matson's "on-time arrival" rate (measured as within 24 hours of the scheduled arrival date and time) for 2021 was 95%; APL's was, at best, 10%.  Due to the circuitous routes through Asia APL has chosen to sail, goods shipped from Southern California to Guam take at least eight days longer to arrive on APL's vessels than they do on Matson's.  Indeed, APL does not even try to compete in a substantial portion of the trade (fresh food) because it is unable to transport chilled containers quickly enough to avoid spoilage.  On the islands, where timely and consistent delivery is critical to everyday life, Matson is known for its reliability; APL is known for its inconsistency.

Apparently frustrated by its inability to gain customers' trust in these trade lanes due to its slower and less reliable service, APL is now trying to save face by making baseless allegations of anticompetitive conduct against Matson.  But all these allegations show is that APL does not like competition—APL complains that Matson lowered its prices when APL entered the trade, that Matson offers its customers more favorable, bundled pricing in competition with APL, and that Matson has declined to use its resources in other trade lanes to subsidize APL's business.  These actions are the very definition of competition; APL cannot stand the antitrust laws on their head to manufacture a lawsuit.

The crux of APL's claims is that Matson has leveraged its supposed monopoly power in the U.S.-Guam trade to preclude APL from competing for shipments to Guam.  But APL admits

that it does not even *attempt* to compete for nearly a third of the containers shipped in that trade, destroying any suggestion of monopoly power by Matson. When those shipments are included in APL's proposed market, its antitrust claims fail as a matter of law.

Beyond the threshold defects in its claims, APL has not plausibly alleged anticompetitive conduct in any relevant market. APL points to Matson's alleged discontinuance of contracts with APL in Alaska, yet APL does not claim that Matson has or is attempting to obtain a monopoly in any Alaska market, nor does it even attempt to define such a market. APL also accuses Matson of petitioning the federal government for legislative change, but the First Amendment forecloses this attempt to condemn protected lobbying activity under the antitrust laws. APL complains that Matson made a routine proposal to share cargo space, but cannot explain how this arrangement (which APL rejected) would have reduced competition or otherwise is unlawful. And above all else, APL complains that Matson's offering of *lower* prices to customers through the use of bundled discounts is unlawful, despite substantial precedent holding that such offerings not only are permissible under the antitrust laws, but are in fact *beneficial* to customers.

This case pits David against Goliath, but not in the way the First Amended Complaint ("FAC") suggests. APL is part of the world's third-largest shipping conglomerate, with vast resources and vessels on every ocean. Matson is a small player whose relatively few ships ply the Pacific trades. APL reentered the U.S.-Guam trade after years of dormancy, relying on subsidies unlawfully obtained from the U.S. government, and sought to leverage its superior resources and economic advantage to take over the market from Matson. It failed. Matson continued to provide superior service (in terms of both reliability and timeliness) at fair prices, through which it has built and maintained an outstanding reputation among its customers. APL's attempt to impugn

that sterling reputation to excuse its own failure should be rejected outright.  The antitrust laws protect competition, not competitors; APL's lawsuit runs counter to that maxim at every turn.

Defendants respectfully request that the Court dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  And because APL has already amended its Complaint once, that dismissal should be with prejudice.

## BACKGROUND

### I.   The U.S.-Guam Trade

Guam is the United States' westernmost territory, situated at the bottom of the Mariana Islands archipelago.  Its residents depend on "container cargo shipping services for critical goods and sustenance."  FAC ¶ 71.  APL could sail to Guam directly (as it did many years ago), but does not; rather, it has chosen to carry cargo to Guam through transshipment at international ports in Japan and South Korea.  *See* Request for Judicial Notice ("RJN") Ex. 1.  Matson sails to Guam through Hawaii, RJN Ex. 2, a faster route than those APL chooses to sail, *see* FAC ¶ 51 n.6.

Trade between points in the United States generally is regulated by the Jones Act, 46 U.S.C. § 55101, a federal statute that limits the vessels that may operate routes between points within the United States.  FAC ¶¶ 27, 29; *see also* 46 U.S.C. §§ 55101, 55102(b).  Designed to stimulate U.S. shipping and shipbuilding and also to ensure a fleet of vessels that can serve in times of war or national emergency, *Penn. R.R. Co. v. Dillon*, 335 F.2d 292, 295 n.5 (D.C. Cir. 1964), the Jones Act generally allows only U.S.-built, -owned, -crewed, and -registered container vessels to sail between two destinations in the United States.  46 U.S.C. § 55102(b); *see also* 46 U.S.C. §§ 12112, 50101(a)(2).  Only Jones Act vessels, for example, are permitted to carry cargo between the U.S. mainland and Hawaii.  FAC ¶ 27.  Domestic cargo shipped to Guam, however, is excepted from the Jones Act, *see* 46 U.S.C. § 12111(b), and thus non-Jones Act vessels may carry cargo between the U.S. mainland and Guam.

3

Although Jones Act vessels are "significantly more costly to build and operate," FAC ¶ 27, Matson operates fifteen of them across the Pacific—including those that carry freight from the West Coast to Alaska, Hawaii, Guam, Northern Mariana Islands, and other ports of call.  RJN Ex. 3.  For the first fifteen years after Matson entered the U.S.-Guam trade (by buying the then-departing APL's ships), it competed with other Jones Act vessels in the trade.  *See* FAC ¶ 66.  That changed in 2011, when Horizon withdrew from the Guam trade, leaving Matson as the main container cargo shipper between the U.S. and Guam.  *Id*. ¶ 2.  APL alleges that Matson responded by "annually rais[ing] its rates substantially," *id.* ¶ 84, claiming that Matson's "rates for 40-foot containers" rose "to $5,500 by 2016" and "for refrigerated 40-foot containers . . . to $7,408," *id.* ¶ 31.  APL calls these increases "significant[]," but does not allege the starting price or the amount of Matson's alleged rate increases, nor how they compared to any change in Matson's costs or economic conditions more generally.  *Id.*

Matson never expected to serve Guam alone; rather, it recognized that a single-shipper trade would be fleeting.  As Matson explained to the Guam community at the time Horizon left the trade, Matson "fully expect[ed] a new entrant" to soon join the fray.  RJN Ex. 4.  APL fulfilled Matson's prediction in 2015 by offering fortnightly service to Guam.  FAC ¶¶ 4, 33.

APL is an international shipping company based out of the United States.  FAC ¶¶ 16–18.  In 1997, however, it was bought by Neptune Orient Lines—a Singapore company, *see* RJN Ex. 5—and was no longer eligible to operate as a Jones Act carrier by virtue of its foreign ownership, *see* 46 U.S.C. § 50501.  In 2016, Neptune Orient Lines was bought by CMA CGM, one of the world's largest shipping conglomerates.  RJN Ex. 5.

APL's own commercial transactions rendered the company ineligible to operate Jones Act vessels; accordingly, it cannot service the trade lanes between the U.S. mainland and Hawaii.  FAC

¶ 27.  Instead, in 2015, APL began servicing the trade lanes between the U.S. mainland and Guam, as well as other Pacific territories and East Asian nations.  *See* FAC ¶¶ 3, 29, 33, 54, 64; *see also* RJN Ex. 6.  APL currently has two vessels in the Guam and Saipan trade, both of which ostensibly operate under the Maritime Security Program (the "MSP").  FAC ¶ 33.  The MSP is a government-sponsored program that provides financial subsidies to certain U.S.-flag vessels operating in foreign commerce.  *See* 46 U.S.C. § 53102(a).  In exchange for receiving annual subsidies of $5 million per vessel, contractors of vessels enrolled in the MSP commit to operate the enrolled vessels exclusively in foreign commerce and to make the enrolled vessels available to the United States in times of national emergency (as other carriers, including Matson, often do).  *See id.* §§ 53105(a)(1)(A), 53107(b)(1).[1]

From the very beginning, APL has admitted that the financial subsidies it receives through the MSP were necessary for it to enter into the U.S.-Guam trade.  As APL stated to its customers, "coming [into Guam] was a commercial decision, but ONLY made possible with the help of Marad [the Maritime Administration] and the US Department of Defense who supported [APL] all along the way."  RJN Ex. 7.  For the last five years, Matson has competed against APL in the U.S.-Guam trade without the assistance of any government subsidies, while also bearing the additional costs associated with owning and operating Jones Act vessels.  *See* FAC ¶¶ 19, 51 & n.6.

## II.    APL's Allegations Of Purportedly Anticompetitive Conduct

APL alleges that after it entered the U.S.-Guam trade, Matson described the competitive conditions as "an 'axe fight.'"  FAC ¶ 4.  Far from suggesting any "campaign of anticompetitive

---

[1]  APL incorrectly asserts that "[c]ompanies enrolled in the MSP are not, however, allowed to call Hawaii with any vessel unless they are also Jones Act carriers."  FAC ¶ 32.  The MSP does not restrict vessels' carriage of cargo between Hawaii and non-U.S. ports.  *See* 46 U.S.C. § 53106(e).  And a non-Jones Act vessel cannot service trade lanes between the U.S. mainland and Hawaii, regardless of whether it is enrolled in the MSP.

tactics," *id.* ¶ 1, this colorful phrase accurately described Matson's response to APL's entry: Vigorous competition.  According to APL, Matson dropped prices, delivered superior services, and lawfully lobbied Congress for legislative change.  Matson's competitive response (coupled with its better service and reliability) has given it the upper hand, and by APL's own admission, customers enjoying the benefit of Matson's superior services and prices "cannot economically or reasonably use APL services for container cargo shipments with Guam." *Id.* ¶ 43.  In other words, APL's own allegations demonstrate that Matson has worked hard and invested heavily to provide its customers with the best service at the right price—even though it lacks the multi-million-dollar annual subsidy from which APL has unlawfully benefitted.  APL's inability to compete on reliability and quality of service is a problem of its own making.

### A.     Matson Delivers Better Service, Drops Prices, And Creates A Loyalty Program

Whether by virtue of the commercial transactions making it ineligible for the Jones Act or simply because of the routes it chooses to sail, APL admits that its service to Guam is significantly slower than Matson's.  FAC ¶ 51 n.6.  This reality precludes APL from offering certain services altogether:  APL cannot ship chilled reefer containers, for example, because the contents would spoil in transit.  *See id.*  As APL concedes, this consequence of its own business and routing decisions precludes APL from competing for *30%* of container cargo shipped from the United States to Guam.  *See id.*[2]  By contrast, Matson has chosen to invest in "significantly more costly"

---

[2]  APL alleges that it could compete for only about 70% of the total cargo shipped from the U.S. to Guam as it is unable to timely ship certain perishable cargo.  *See* FAC ¶ 51 n.6.  Accounting for this uncontestable commerce, APL's allegation that Matson "held at least 70% of the container cargo shipping services between the United States and Guam," *id.* ¶ 38, means that Matson allegedly held about 57% of the alleged contestable market, while APL held 43%.

vessels, *id.* ¶ 27—a commercial choice APL did not make—allowing Matson to deliver a broader range of "critical goods and sustenance" at faster speeds, *id.* ¶ 71.

In addition to offering more and superior services, Matson responded to APL's entry with price competition. *See* FAC ¶ 33. As APL concedes, when APL entered the trade, "Matson dropped its rates more than 50% for some lines of container cargo." *Id.* When APL added a second vessel to its U.S.-Guam service, *id.* ¶ 3, Matson allegedly responded with another discount for its customers through a so-called "'loyalty program,'" *id.* ¶ 41. According to APL, "shippers that use[d] Matson for 90% of their container cargo shipments with Hawaii or Guam receive[d] a 20% 'first-dollar' discount on that route, and (b) shippers that use[d] Matson for both 90% of their shipments with Hawaii and 90% of their shipments with Guam receive[d] a 25% percent discount on both routes." *Id.* In other words, Matson allegedly discounted the rates for customers that committed to ship the bulk of their cargo to Hawaii or Guam with Matson, and allegedly offered an even larger discount for customers that agreed to do so for both destinations. *Id.* APL alleges neither that Matson priced its discounted rates below costs for either of the trade lanes nor that any meaningful number of contestable customers availed themselves of Matson's discounts. APL instead complains that Matson's lowered prices deliver "drastic" savings. *Id.* ¶ 47; *see also id.* ¶ 43 (alleging that Matson's loyalty discounts represented more than "a substantial discount" off its "stand-alone rates").

Because APL has disabled itself from operating a Jones Act vessel in trade between the U.S. mainland and Hawaii, it cannot offer customers that aspect of Matson's "loyalty" program. FAC ¶ 50. But APL does not allege to have even attempted to create a competing discount program for Guam alone (where it receives subsidies from the U.S. government), much less for the thousands of trade lanes in which its parent company, CMA CGM, operates. Instead, APL

alleges that it offered "rate reductions to retain and to attract some container cargo"—without specifying what those rates were or to whom they were offered.  *Id.* ¶ 47.  And APL concedes these discounts did not approach the savings delivered to customers by Matson.  *See id.* ¶¶ 43, 47.

### B.    Matson's Constitutionally Protected Petitioning Efforts

APL complains that Matson sought to combat the unfair advantage APL had obtained through unlawful MSP subsidies by "engag[ing] in aggressive lobbying efforts."  FAC ¶ 34.  Purportedly as a result of those efforts, in 2018, Congress enacted the "the 2018 National Defense Authorization Act ('NDAA')," which prospectively "eliminate[d] the right of U.S.-flag vessels enrolled in the MSP to operate in the transportation of cargo between points in the United States and its territories."  *Id*.  Although the amendment precludes future vessels in service to Guam from receiving MSP subsidies, APL does not allege that the NDAA's prospective provisions impaired its ability to service the Guam trade.  *See id.* ¶¶ 34, 65.

### C.    Matson's Alleged Slot-Charter Offer

Although Matson has competed vigorously with APL, it has not refused to do business on fair terms.  APL alleges, for example, that starting in "mid-2017," Matson and APL began negotiating a potential slot-charter agreement.  FAC ¶ 63.  By allowing one carrier to rent space on another carrier's vessels, *see id.*, slot-charter agreements "speed[] service," "reduce the number of vessels needed to service a line," and "increase the number of containers carried on each ship," Timothy K. Borchers, *The End of Maritime Liens for Master Leases of Containers: How Do You Provide These Fungible Necessaries to A Fleet of Vessels?*, 18 Tul. Mar. L.J. 33, 45 n.68 (1993); *see also* Maritime Transport, Comp. Law Eur. Com., 2021 WL 432718, § 12.7 (2021) (observing that slot-charter agreements are "intended to promote containerized transport and more efficient use of vessel capacity").  These agreements are common across the Pacific, and APL has entered

into such agreements with other carriers for routes to Guam and Saipan.  *See* Notice of Agreements Filed, 85 Fed. Reg. 63,274 (Federal Maritime Comm'n Oct. 7, 2020).

According to APL, Matson offered APL dozens of container slots per week; in exchange, it asked that APL "stop calling Guam with its own vessels."  FAC ¶ 63.  At one point, Matson allegedly proposed a reciprocal condition whereby it would purchase slots to Okinawa on APL vessels and would stop calling that port with its own ships.  *Id.* ¶ 64.  While APL says Matson's "slot offers were a pretext to restrict APL's competition to non-threatening levels and would have led to the elimination of competition in the U.S./Guam markets," *id.*, it does not explain the basis for either assertion.  The parties did not consummate an agreement in any event, and "the 'axe fight'" continued.  *Id.*

### D.      Matson's Contracts With APL In Alaska

APL alleges also that Matson refused to renew certain contracts with APL in Alaska, even though these agreements have no apparent relevance to the parties' competition in Guam.  APL notably does not allege a distinct market for Alaska, does not allege that Matson has market or monopoly power in such a market, and does not say what other shipping companies compete in that market.  Other than asserting that Matson's conduct in Alaska was somehow in retaliation for APL's entry into the U.S.-Guam trade, *see* FAC ¶ 54, APL makes no effort whatsoever to connect its allegations regarding Alaska with the U.S.-Guam trade.

To the extent it is even relevant, APL alleges that Matson refused to renew certain contracts between the parties in Alaska.  According to APL, the parties had "for years" operated under a connecting carrier agreement ("CCA") whereby Matson allowed APL to use its vessels to transport cargo from Anchorage, Akutan, and Kodiak to Dutch Harbor, where APL could load the cargo onto an APL vessel bound for Asia.  FAC ¶ 58.  In 2017, Matson allegedly terminated this agreement, and APL found an "alternative service" through which a "tug and barge carrier"

shipped its cargo from Kodiak to Dutch Harbor.  *Id.*  APL alleges that this service was slower and "somewhat more costly," *id.*, and that Matson "refus[ed] to allow the barge company to use [a] Matson-leased terminal," *id.* ¶ 59.  Matson also allegedly "declined to renew APL's shop and office lease," *id.* ¶ 6, or a "tug charter arrangement," *id.* ¶ 60, and discouraged a barge company owner from moving APL containers, *id.*  APL does not allege that Matson breached the parties' agreements in any way, nor does APL claim that the alleged expirations of these agreements had any adverse effects on APL's ability to compete in Guam (or any other alleged relevant market). Aside from a conclusory allegation that Matson's conduct was "patently against its own economic self-interest," *id.* ¶ 62, APL does not identify any net financial or commercial loss that Matson suffered as a result of its decision not to deal with APL in Alaska.[3]

### E.   Matson's Alleged Interactions With Freight Forwarders And Other Customers

Finally, APL sprinkles throughout the FAC vague allegations that Matson threatened nameless shippers or "disparag[ed] APL's Guam services."  FAC ¶ 5.  For example, APL alleges that Matson "complained to one of the world's largest big-box retailers after it agreed to ship even a small percentage of its container cargo between the United States and Guam with APL" and told the retailer "that APL's attempt to enter the U.S/Guam markets would harm [it]."  *Id.* ¶ 46.  APL does not dispute the veracity of Matson's alleged statement, nor does it provide any additional detail about the alleged communication or any purported effect it did (or did not) have on the unnamed company.  *See id.*

---

[3]  APL also implies that Matson scuttled a "joint operation" APL had proposed to an unnamed, "small Jones Act carrier" in the "U.S./Hawaii markets."  FAC ¶ 53.  But APL does not allege how Matson did so—or, indeed, that Matson took any action at all.  *Id.*  Nor does APL allege any other facts about its purported negotiations in Hawaii.

APL alleges also "[u]pon information and belief" that a large automobile manufacturer "rejected APL's offer of a lower rate and awarded its Guam container cargo to Matson because it threatened the shipper's other cargo to Hawaii with higher rates and unfavorable service." FAC ¶ 45. APL does not elaborate or explain the basis of its purported information and belief (and Matson disputes that it would or even could ever "threaten[]" a shipper with unfavorable rates or service given that its rates are filed in public tariffs). The FAC simply implies that some customers, preferring Matson's superior service, chose to continue shipping with Matson even when APL offered discounts. *See id.* ¶¶ 43–45.

Elsewhere, APL claims that Matson "abruptly and totally cut off its business" with a freight forwarder and trucking company "because it had supported APL in Guam." FAC ¶ 55. APL offers no factual basis for this assertion. Likewise, APL claims that Matson terminated "its ongoing trucking business" with another company, alleging "upon information and belief" that Matson "informed the company that it was terminated because it provided services for APL." *Id.* ¶ 56.

Even though it amended its Complaint to add additional allegations in this vein, APL does not identify by name any of the entities who supposedly were affected by Matson's conduct, and none is a party to this suit.

### III.    APL's Unlawful Receipt Of MSP Subsidies

In the face of Matson's intense competition on the merits, APL's U.S.-Guam business has been kept afloat only through its receipt of multi-million-dollar annual subsidies through the MSP on the two vessels that carry cargo to Guam. As noted above, APL has acknowledged that its entrance into the U.S.-Guam trade "was a commercial decision, but ONLY made possible with the help of [the Maritime Administration] and the US Department of Defense who supported [APL] all along the way." RJN Ex. 7. But APL was never entitled to those subsidies in the first place.

That is because, in addition to servicing Guam, APL's vessels also call Saipan, the largest island in the Northern Mariana Islands. *See* RJN Ex. 6. Unlike domestic trade to Guam, which is expressly permitted under the MSP, trade between the U.S. mainland and Saipan is impermissible domestic trade and therefore off limits to MSP vessels. *See* 46 U.S.C. §§ 12111(b), 53105(a)(1)(A). When APL was first awarded subsidies for its two vessels in the Pacific trade, Matson filed suit challenging that award and the uneven playing field that resulted. *See Matson Navigation Co. v. Dep't of Transp.*, No. 17-1144 (D.C. Cir.). That litigation has continued for several years, and one of APL's vessels was recently ejected from the MSP by court order, *see Matson Navigation Co. v. U.S. Dep't of Transp.*, 471 F. Supp. 3d 60 (D.D.C. 2020), although it was briefly reinstated by MARAD on administrative remand, *see* RJN Ex. 8.

On April 9, 2021, however, MARAD represented to the court that the reinstatement was in error due to the age of the vessel, and asked for permission to correct its error on voluntary remand. *See* Memorandum in Support of Defendants' Motion for a Voluntary Remand, *Matson Navigation Co. v. U.S. Dep't of Transp.*, No. 20-CV-2779, Dkt. 20-1 (D.D.C. Apr. 9, 2021). Although APL has continued to urge that its vessels are eligible to participate in the MSP, it has at the same time requested that MARAD transfer the subsidies to yet another vessel that will operate in the same trade lanes. *See* Defendants' Notice of Application for Vessel Replacement, *Matson Navigation Co.*, No. 20-CV-2779, Dkt. 26 (D.D.C. July 9, 2021). Meanwhile, Matson recently filed a new lawsuit challenging the subsidies awarded to another APL vessel operating in the U.S.-Guam trade, which remains pending. *See Matson Navigation Co. v. U.S. Dep't of Transp.*, No. 21-CV-1606 (D.D.C.). APL filed this lawsuit shortly thereafter.

## STANDARD OF REVIEW

The Court must dismiss a cause of action that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A plaintiff must plead "enough facts to state a claim that is

plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  While the Court "must construe the complaint in the light most favorable" to the plaintiff and "accept as true all reasonable factual inferences drawn from well-pleaded allegations," it need not "accept legal conclusions or mere conclusory statements as true."  *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 36 (D.D.C. 2019).

## ARGUMENT

APL's FAC should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

APL alleges three claims for unlawful monopoly maintenance or unlawful attempt to monopolize under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 16 of the Clayton Act, 15 U.S.C. § 26.  *See* FAC ¶¶ 78–105.  A claim for unlawful monopoly maintenance under Section 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).  Importantly, "merely possessing monopoly power is not itself an antitrust violation."  *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001).  A claim for attempted monopolization has three elements, and requires the plaintiff to prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  Relief under Section 16 of the Clayton Act may be awarded only where the plaintiff shows "threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.  APL has not stated a claim under any theory.

13

Even if APL's antitrust claims could otherwise withstand dismissal, its claims against Matson, Inc. and Matson Logistics, Inc. must be dismissed for failure to allege any wrongful conduct by those entities.

## I. APL Has Not Plausibly Alleged The Threshold Elements Of A Sherman Act Claim

APL has failed to plead several threshold elements of a Section 2 Sherman Act claim: It has failed to plead antitrust injury, a plausible relevant market, or that Matson has monopoly power. And because there is no violation under the Sherman Act, APL can obtain no relief under the Clayton Act. APL's claims can and should be dismissed without even considering its accusations of anticompetitive conduct.

### A. APL Fails To Plausibly Allege Antitrust Injury

APL fails to plausibly allege antitrust injury, a threshold requirement for its claims. APL claims that Matson's alleged conduct "has foreclosed APL from a substantial share of the markets for container cargo shipping services between the United States and Guam," and "has caused, and continues to cause, APL to lose revenues and profits." FAC ¶ 73. But APL's lost revenue and profits do not constitute antitrust injury in these circumstances, because they are the result of *competition*, not a lack thereof.

The antitrust laws "were enacted 'for the protection of competition[,] not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). An antitrust plaintiff must therefore plead antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 812 (D.C. Cir. 2001) (quoting *Brunswick*, 429 U.S. at 489). The alleged injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* (quoting *Brunswick*, 429 U.S. at 489). Injury to "one specific competitor

14

. . . is insufficient to support a finding that the market as a whole is or will be injured." *Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 486–87 (D.C. Cir. 1996).  To the contrary, "[e]ntertaining claims of excessive competition would *undermine* the functions of the antitrust laws," as those laws are intended to "protect consumers from suppliers rather than suppliers from each other." *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) (emphasis added).

APL fails to allege any anticompetitive effect from Matson's alleged conduct on the output or quality of container cargo shipping services in the Pacific trade.  To the contrary, APL concedes that Matson offers faster service between the U.S. mainland and Guam.  *See* FAC ¶ 51 n.6.  And APL's allegations regarding Matson's competitive pricing—that Matson's bundled and other discounts *lowered* prices to *benefit* consumers—also fail to establish antitrust injury.  *See id.* ¶¶ 40 (Matson reduced its prices in response to APL's entry into the market), 41 (Matson gave shippers 20–25% discounts), 45 (APL offered rate reductions to shippers).  The antitrust laws do not "protect competitors from the loss of profits due to such price competition." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition.  Hence, they cannot give rise to antitrust injury.").  APL has alleged only that Matson has outcompeted it on both service and price, not that Matson has *prevented* competition.

The "kind of competition that [APL] alleges here, competition for increased market share, is not activity forbidden by the antitrust laws." *Cargill*, 479 U.S. at 116.  To the contrary, the opportunity to obtain market power, or even a monopoly, through lawful competition is what "induces risk taking that produces innovation and economic growth." *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  And "[t]he Supreme Court has

made clear that injuries which result from *increased* competition or lower (but non-predatory) prices are not encompassed by the antitrust laws." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999). Matson has obtained its advantage over APL through lawful competition over decades—investing in Jones Act vessels, offering discounts and better service, and building a reputation of reliability. That APL has apparently elected to devote its (substantial) resources elsewhere is not enough to show antitrust injury.

APL alleges, as an aside, that if APL left the U.S.-Guam trade "for some reason," FAC ¶ 77, "Matson can be expected to maintain or raise its rates to full monopoly levels, as it did following the exit of Horizon," *id.* ¶ 74. This assertion is conclusory, wholly speculative, and does not plausibly allege antitrust injury to APL. With respect to the alleged rate increases following Horizon's exit from the U.S.-Guam trade, APL alleges only that "Matson's rates for 40-foot containers . . . increased to $5,500 by 2016" and its "rates for refrigerated 40-foot containers . . . had risen to $7,408." *Id.* ¶ 31. But APL does not allege any facts showing what the rates had been previously, whether other carriers also raised rates, whether fuel prices or other increased costs paralleled the increases, or that the prices were supracompetitive in any way. Allegations that Matson raised two of its rates sometime between 2011 and 2016 do not allow for a plausible inference that Matson will raise rates in the future, let alone that those rates will be supracompetitive or harmful to competition.

Far from alleging injury to competition, APL merely seeks "to recover lost profits from bolstered competition." *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 344 (3d Cir. 2018). The antitrust laws are not meant to protect competitors from loss based on continued or increased competition, lest they allow plaintiffs, like APL, to squelch legitimate competition. APL's claims should be dismissed for failure to allege antitrust injury.

### B.    APL Has Not Plausibly Alleged A Relevant Market

In addition, APL's FAC fails at the start because APL has not pled a plausible or cognizable antitrust market.  An "accurate definition of the relevant market" is a threshold issue in any antitrust case, for "[w]ithout a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (alterations and quotation marks omitted); *see also Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) (holding the same in context of Section 2).  The relevant market is defined generally as "the area of effective competition."  *Am. Express Co.*, 138 S. Ct. at 2285 (quotation marks omitted).  "An antitrust market includes two components: the product market and the geographic market."  *FTC v. Facebook, Inc.*,— F. Supp. 3d —, 2021 WL 2643627, at *9 (D.D.C. June 28, 2021) (quotation marks omitted).  A proposed product market must include all "commodities reasonably interchangeable by consumers for the same purposes."  *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  The relevant geographic market is the "area of effective competition where buyers can turn to alternate sources of supply."  *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) (alteration and quotation marks omitted).

"Plaintiffs have the burden of defining the relevant market."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).  Accordingly, "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor," the plaintiff's pleaded market "is legally insufficient and a motion to dismiss may be granted."  *Id.*

APL's proposed market definition comprises commercial and non-commercial container cargo services between the United States and Guam.  FAC ¶¶ 36–37.[4]  But APL also (with little explanation) offers as potential markets specific individual trade lanes, claiming that *every* trade lane (Seattle-Guam, Los Angeles-Guam, Oakland-Guam, etc.) constitutes its own, distinct geographic market—although APL does not allege that Matson has monopoly power in any of those narrower markets.  *Id.* ¶¶ 91–94.  APL's explanation for the alleged U.S.-Guam market is that "[f]or customers moving cargo from the United States to Guam or Hawaii, other geographic originations or destinations are not reasonably interchangeable, and customers would not substitute other originations or destinations in response to even large price increases."  *Id.* ¶ 89.  Likewise, APL seeks to justify its route-specific markets by contending that "certain U.S. ports may be closer in distance, easier to access, or less expensive for container shipments to Guam or Hawaii than other alternative routes."  *Id.* ¶ 92.

Each and every one of these proposed markets is facially deficient.  In the first instance, while APL alleges that "[t]he geographic markets relevant to this action are the separate shipping routes between the United States and Guam and the United States and Hawaii," FAC ¶ 87, its subsequent discussion of other purported geographic markets makes it unclear which markets APL *actually* thinks are at issue here.  APL's inability to even *try* to define a single market is enough reason to reject its claims outright.  *See Sumotext Corp. v. Zoove, Inc.*, No. 16-CV-1370, 2016 WL 6524409, at *3 (N.D. Cal. Nov. 3, 2016) (dismissing antitrust claims after finding "the allegations of the relevant market to be unclear"); *Int'l Television Prods. Ltd. v. Twentieth Century-Fox Television Div. of Twentieth Century-Fox Film Corp.*, 622 F. Supp. 1532, 1539 (S.D.N.Y. 1985)

---

[4]  APL alleges that "[t]here also are narrower product market lines in which to evaluate Matson's conduct, consisting of dry and chilled or refrigerated cargo containers," FAC ¶ 36, but does not purport to actually define such markets or allege that Matson has monopoly power in them.

(dismissing antitrust claims because the plaintiffs had "not even attempted to explain [their] vague market definition").

Beyond that, APL's claim that every origin and/or destination constitutes a unique geographic market evinces a misunderstanding of the law. A geographic market is defined by the "area of effective competition where buyers can turn to alternate sources of supply." *Morgan, Strand, Wheeler & Biggs*, 924 F.2d at 1490 (quotation marks and alterations omitted); *see also United States v. Conn. Nat'l Bank*, 418 U.S. 656, 668 (1974) (geographic market "must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for alternatives" (alteration and quotation marks omitted)). The fact that a customer requires shipment to a particular destination does not mean that that location constitutes its own geographic market. Indeed, virtually any customer who purchases products online insists that the product be shipped directly to their address, not to the address of their neighbor down the street. But that does not mean that each household constitutes its own geographic market for parcel deliveries. Likewise, a customer that prefers shipment *from* a particular location due to convenience or other factors is nonetheless sensitive to price, quality, efficiency, service, and many other things—and therefore responsive to competition among potential trade lanes. If APL's reasoning were correct, every shipping route—of which there are *thousands*—would constitute its own geographic market, and any shipper would be a monopolist whenever it charts a new course to a given destination.

Indeed, APL's novel theory of geographic markets is inherently contradictory. If APL is correct that "[f]or customers moving cargo from the United States to Guam or Hawaii, other geographic originations . . . are not reasonably interchangeable," FAC ¶ 89, then Matson and APL do not even compete in the same market. APL services Guam by transshipping cargo (i.e.,

transferring cargo from one vessel to another at an intermediate port) in Korea and Japan before continuing on to Guam.  *See* RJN Ex. 1; *see also* FAC ¶ 51 n.6.  Matson, by contrast, services routes between the U.S. West Coast and Guam, with stops in Hawaii.  *See* RJN Ex. 2.  APL's suggestion that shippers would not change carriers in response to price increase in a route originating at a different port would therefore mean that Matson and APL are not in the same geographic market.  And if Matson and APL do not compete in the same market, APL has no standing to sue.  *See, e.g.*, *JES Props., Inc. v. USA Equestrian, Inc.*, No. 02-CV-1585, 2005 WL 1126665, at *17 (M.D. Fla. May 9, 2005) (rejecting Section 2 claim because plaintiff and defendant did not compete in relevant market).

APL's implausible geographic market is fatal at the pleading stage.  "Where an alleged geographic market seems implausible, a more detailed pleading to justify the alleged geographic market may be required to survive a motion to dismiss."  *Acre v. Spindletop Oil & Gas Co.*, No. 09-CV-421, 2009 WL 4016116, at *7 (E.D. Ark. Nov. 18, 2009).  Yet APL fails to address what actually matters for antitrust purposes: The relative competitive conditions.  Customers in Guam have the same options to fulfill their commercial cargo shipping needs from the United States— Matson or APL.  That is true regardless of whether the goods depart on a containership leaving Oakland, Los Angeles, or Tacoma.  Indeed, APL makes no attempt to address cross-elasticity of demand—"the availability of products that are similar in nature or use and the degree to which buyers are willing to substitute those similar products for one another."  *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 718 n.15 (D.C. Cir. 2001).  APL's failure to offer any factual explanation for why buyers in Guam would not be sensitive to changes in pricing, quality, or convenience simply because carriers ship from different ports is fatal.  Because the alleged geographic markets are thus arbitrarily defined, APL fails to state any claim for relief.  *See Discon Inc. v. NYNEX Corp.*, 86 F.

Supp. 2d 154, 162 (W.D.N.Y. 2000) (rejecting proposed geographic market definition as "arbitrary, irrational and not supported by competent evidence"); *Mizlou Television Network, Inc. v. Nat'l Broad. Co.*, 603 F. Supp. 677, 683 (D.D.C. 1984) (dismissing antitrust claims where the plaintiff's "market definition is unduly narrow").

### C. APL Has Not Plausibly Alleged Monopoly Power

Even more gerrymandered than its proposed market definition(s) are APL's allegations of monopoly power.  In addition to alleging a plausible, relevant market, a plaintiff in a Section 2 case must allege also that the defendant has monopoly power (or a dangerous probability of monopolizing a relevant market for attempted monopolization claims), that is, that the firm "can profitably raise prices substantially above the competitive level," *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001), "without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable," *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005) (quotation marks omitted).  A plaintiff can allege "direct evidence" of monopoly power by pointing to "evidence of restricted output and supracompetitive prices," *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995), or can allege monopoly power based on "a firm's possession of a dominant share of a relevant market that is protected by entry barriers," *Microsoft*, 253 F.3d at 51.  The "Supreme Court has never found a party with less than 75% market share to have monopoly power." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014).

APL has not alleged restricted output or supracompetitive prices during the relevant time period—just the opposite, APL admits that Matson lowered its prices in response to APL's entry into the alleged market.  FAC ¶ 33; *see also id.* ¶ 41 (volume discount allegations).  Instead, APL alleges without further explanation that Matson "has held at least 70% of the container cargo shipping services between the United States and Guam," and "at least 70% of the container cargo

shipping services between the United States and Hawaii" during the relevant period.  *Id.* ¶ 38.  But as one court in this District has recently recognized, "bare assertions" of a particular percentage of market share are "too conclusory to plausibly establish market power in *any* context."  *Facebook, Inc.*, 2021 WL 2643627, at *12 (citing, inter alia, *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-CV-1566, 2012 WL 4473228, at *11 (E.D. Pa. Sept. 28, 2012); *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 330 (D.N.J. 1999); *Korea Kumho Petrochemical v. Flexsys Am. LP*, No. 07-CV-1057, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008)).  APL's empty allegations of market power are insufficient to state a claim.

Even crediting APL's bare allegation of Matson's market share, however, the FAC still fails to plausibly allege monopoly power for one simple reason:  APL *chooses* not to fully compete in either of the two markets in which it alleges Matson has monopoly power.  As to the U.S.-Hawaii trade, APL made a commercial decision that ended its Jones Act eligibility in 1997, when it was purchased by a foreign parent company.  That business decision excluded APL from the U.S.-Hawaii trade—any arguments about purported "barriers to entry" into the U.S.-Hawaii trade cannot form the basis of an antitrust claim given that APL *made itself* legally ineligible for the trade.

More centrally, APL has chosen not to compete for almost a third of the alleged U.S.-Guam market.  APL admits in a footnote that "[f]rom its entry, APL was not in position to contest or compete with Matson on all the various lines of container cargo in the U.S./Guam trade," acknowledging that "APL's transit time from the U.S. West Coast to Guam prevented it from effectively competing for the chilled reefer container business line" and that "APL was also unable to compete for container cargo departing the Pacific Northwest (Seattle) to Guam."  FAC ¶ 51 n.6.  In other words, by choosing to service Guam through slower routes (and transshipment in Asia),

APL disabled itself from carrying chilled reefer cargo because the contents would spoil en route.

APL then confesses that it only actually competes for approximately "70%" of "container cargo

in the U.S./Guam markets." *Id.*

   This admission dooms APL's claim.  A plaintiff alleging monopoly power based on a

firm's market share "must show that new rivals are barred from entering the market and show that

existing competitors lack the capacity to expand their output to challenge the predator's high

price." *Rebel Oil Co.*, 51 F.3d at 1439.  APL alleges that barriers to entry prevent new competitors

from entering the market, *see* FAC ¶¶ 69–70, but does not explain why *it* cannot compete for this

sizable chunk of the market.  To the contrary, its own pleading shows that APL's decision not to

compete in the chilled reefer container business or the shipping routes from Seattle was a *business*

decision motivated by the routes *APL elected to use* to transport goods between the U.S. West

Coast and Guam.  *See id.* ¶ 51 n.6.  And given APL's size and power in the global shipping market,

*supra* p. 4, there is no plausible allegation that it could not "divert production into the market from

outside" or "convert other productive capacity to the product in question," *Ball Mem'l Hosp., Inc.*

*v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986).  It made a business decision to sail

a slower route, and that decision has cut off its ability to compete for a sizeable share of the market.

   APL attempts to sidestep this issue by alleging that "[t]he most relevant metric . . . is that

Matson retains *an even larger share* of the 'contestable' U.S./Guam lines and shipments for which

APL has the capacity and service to compete."  FAC ¶ 67 (emphasis added).  But APL does not

explain what the significance of a "contestable" market is—that concept is found nowhere in the

Sherman Act jurisprudence, and it makes no sense to define a separate market (if that is what APL

is attempting to do) based on *the plaintiffs'* business decisions.  In any event, simple math shows

that Matson does not hold monopoly power.  If one sets aside that part of the market in which APL

does not compete (e.g., fresh food), Matson's share of the so-called "contestable" market is just 57% (vs. APL's 43%)—a figure too low to establish monopoly power. *See supra* 6 n.2. If this is what APL means when it alleges that Matson has "an even larger share" of the remaining "contestable" segment of the market, that is simply wrong. APL cannot avoid the reality that its allegation of monopoly power is premised on the fact that it has excluded *itself* from almost a third of its alleged market, an admission that torpedoes its case.

## II.     APL Has Not Plausibly Alleged Anticompetitive Conduct

Even were APL able to clear the threshold hurdles of antitrust injury, market definition, and monopoly power—and it cannot—the FAC should nonetheless be dismissed because APL fails to allege any anticompetitive conduct. "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Trinko*, 540 U.S. at 407. APL complains about several disjointed (and sometimes entirely unrelated) aspects of Matson's conduct, namely: (a) Matson's competitive pricing (b) Matson's alleged lobbying efforts, (c) Matson's alleged offer to APL of a slot-charter agreement, (d) Matson's alleged termination of contracts with APL in Alaska, and (e) vague claims of "threats" to or retaliation against its own customers. But none of this alleged conduct, even if it could be proved, amounts to illegal anticompetitive conduct that is actionable under the antitrust laws.

### A.     Matson's Competitive Pricing Is Lawful

The only purportedly anticompetitive conduct alleged by APL with any clarity is its complaint that Matson offers discounts to customer who ship the great majority of their cargo with Matson in the Hawaii or Guam trade lanes (or both). FAC ¶ 41. As with many of APL's other allegations, APL's chief complaint appears to be that Matson offered its customers lower prices

and superior service.  Even if these allegations showed antitrust injury (they do not), they do not state a claim for monopolization or attempted monopolization.

First, APL does not, and could not, allege an unlawful "tie" between the U.S.-Guam and U.S.-Hawaii trade lanes.  A tie occurs when a seller "exploit[s] . . . its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13 (1984).  In other words, the defendant must "afford[] consumers no choice but to purchase the tied product from it." *Microsoft*, 253 F.3d at 85.  Here, however, consumers plainly have a choice:  Matson does not require any of its U.S.-Hawaii shippers to use its U.S.-Guam services; it merely offers some of them an economic incentive to do so.  Offering two products together at a bundled, discounted price while still permitting purchase of the products separately does not constitute unlawful tying.  *See Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984) (affirming dismissal of tying claims where "[a]ll [the plaintiffs'] claims show is the existence of a lower price for two items bought as a package"); *see also N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 n.4 (1958) ("Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price.").  Matson's alleged "bundling" program thus does not constitute a tie—unlawful or otherwise.

Second, to the extent APL argues that the mere "bundling" of two products in two distinct markets is anticompetitive even if it does not constitute a tie, that argument fails as a matter of law.  Several courts of appeals have recognized that "the exclusionary conduct element of a claim arising under § 2 of the Sherman Act cannot be satisfied by reference to bundled discounts unless the discounts result in prices that are below an appropriate measure of the defendant's costs." *Cascade*

*Health Sols. v. PeaceHealth*, 515 F.3d 883, 903 (9th Cir. 2008); *see also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir. 2015) ("In the special case of a tie enforced solely through differential pricing, the tie is not unlawful unless the differential pricing is the economic equivalent of selling the tied product below the defendant's cost."). Under this standard, "the full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products," and "[i]f the resulting price of the competitive product or products is below the defendant's incremental cost to produce them, the trier of fact may find that the bundled discount is exclusionary for the purpose of § 2." *Cascade Health Sols.*, 515 F.3d at 906.

This approach aligns with the Supreme Court's instruction that "a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs," because "the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222–23 (1993); *see also Atl. Richfield Co.*, 495 U.S. at 340 ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition."). Thus, "[i]f a consumer wants to purchase a bundle . . . , the seller is simply satisfying consumer demand and monopolization concerns are irrelevant." *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016); *see also id.* ("Indeed, consumers often benefit from the bundling of separate products, even where the seller has market power in one product."). Accordingly, the cost-based method of analyzing bundling allegations reflects the reality that "[b]undled discounts generally benefit buyers because the discounts allow the buyer to get more for less," *Cascade Health Sols.*, 515 F.3d

at 895, while still preserving the ability of a "hypothetical equally efficient rival" to compete on the merits with an established market participant, *id.* at 906; *see also* 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 749a (2021) ("The great majority of discounting practices are procompetitive.").

Nowhere does APL allege that Matson has priced any of its services below cost.  As noted above, APL alleges only that Matson is vigorously competing by offering certain customers favorable pricing (in addition to better service), a decidedly *procompetitive* response.  *See Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business often is the very essence of competition.").  APL also does not allege what percentage of shippers in the U.S.-Hawaii or U.S.-Guam trade are even *eligible* for Matson's discount pricing, much less what percentage actually take advantage of it.  And, of course, APL and its parent, CMA CGM, operate in scores of trade lanes around the globe (not serviced by Matson), some of which are used by the same customers that ship to Guam; nothing forbids APL from offering a volume incentive of its own.  That APL cannot or will not match Matson's competitive strategy does not demonstrate restraint of competition, but rather reflects that Matson—despite being substantially smaller than APL—is a more efficient shipper and aggressive competitor.  Without any plausible allegations of predatory or below-cost pricing, APL's bundling claim fails at the pleading stage.

To be sure, the Third Circuit has in the past suggested that an alleged monopolist's "bundling" of products may be anticompetitive even if the products are not sold below cost.  *See LePage's Inc. v. 3M*, 324 F.3d 141, 155 (3d Cir. 2003) (en banc).  But the D.C. Circuit has recognized that the Third Circuit's decision in *LePage's* "is of course not the law of this circuit" and "has been roundly criticized."  *FTC v. Church & Dwight Co.*, 665 F.3d 1312, 1316 (D.C. Cir.

2011) (collecting criticism); *see also Collins Inkjet Corp.*, 781 F.3d at 273 ("The Ninth Circuit's analysis in *Cascade Health* is more compelling than that of the Third Circuit in *LePage's*." (citation omitted)); *Cascade Health Sols.*, 515 F.3d at 903 ("[W]e decline to endorse the Third Circuit's definition of when bundled discounts constitute the exclusionary conduct proscribed by § 2 of the Sherman Act."). Even the Third Circuit itself has recognized that *LePage's* "has been the subject of much criticism" and has accordingly not "extend[ed] the rationale of *LePage's*" beyond its particular facts. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 405–06 & n.35 (3d Cir. 2016). This case does not present the same facts as *LePage's*, and in any event, there is no justification for adopting such a "roundly criticized" interpretation of the antitrust laws, particularly one that is contrary to Supreme Court precedent and anathema to the procompetitive goals of the Sherman Act.

Finally, to the extent APL intends to assert that Matson's "bundling" discounts are anticompetitive under the theory of monopoly leveraging, this claim has no merit. *See* FAC ¶¶ 52, 68 (alleging that Matson "leveraged" its alleged power in Hawaii to gain a competitive advantage in Guam). Monopoly leveraging is a highly disfavored theory of antitrust liability, originating in the Second Circuit, that posits that "the use of monopoly power attained in one market to gain a competitive advantage in another is a violation of s[ection] 2, even if there has not been an attempt to monopolize the second market." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 276 (2d Cir. 1979).

This Circuit has never recognized monopoly leveraging as a viable theory of antitrust liability, and at least two other circuits have expressly rejected this theory. *See Schor v. Abbott Labs.*, 457 F.3d 608, 613 (7th Cir. 2006) (rejecting this "undisciplined monopoly-leveraging principle"); *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1326–27 (Fed. Cir. 2000)

(rejecting theory of monopoly leveraging outside of tying).  Indeed, the leading antitrust treatise states that following developments in the Supreme Court, "there no longer exists a freestanding monopoly leveraging claim."  3 Phillip E. Areeda & Herbert Hovenkamp, *supra*, ¶ 652b.

Even those circuits that have adopted a theory of monopoly leveraging have rejected the Second Circuit's free-ranging approach that requires only a "competitive advantage" in the second market.  *See Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 205 (3d Cir. 1992) ("*Berkey Photo*'s formulation of monopoly leveraging to proscribe unilateral restraints of trade does violence to the text of the Sherman Act . . . ."); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991) ("We now reject *Berkey*'s monopoly leveraging doctrine as an independent theory of liability under Section 2.").  And the Second Circuit itself has acknowledged that "uncertainty exists as to the continued scope of a monopoly leveraging claim as an independent cause of action."  *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001).  In light of the absence of any textual, statutory, or precedential basis for this theory, APL cannot proceed on a claim of monopoly leveraging.

Even if monopoly leveraging were a viable theory of antitrust liability, however, APL has failed to allege such a claim.  To state a monopoly leveraging claim, a plaintiff must allege that the defendant "(1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage over [the plaintiff] in another distinct market; and (3) caused injury by such anticompetitive conduct."  *Virgin Atl. Airways*, 257 F.3d at 272.  APL has not adequately pled that Matson has monopoly power in the alleged U.S.-Hawaii market:  APL alleges in conclusory fashion that "Matson has provided at least 70% of the container cargo shipping services between the United States and Hawaii," FAC ¶ 38, which, as noted above, is insufficient to establish monopoly power, *see Facebook, Inc.*, 2021 WL 2643627, at *12.  And even were APL's bare

29

allegation of market share plausible, the "barriers to entry" it alleges are implausible and irrelevant in light of the fact that APL admits that *there is already another competitor* in the U.S.-Hawaii trade. *See* FAC ¶ 38. APL also does not address the fact that carriers that are *not* qualified under the Jones Act can still compete with Matson by shipping goods from *outside* the United States to Hawaii (as APL and CMA CGM do today, *see* RJN Ex. 9). And finally, any allegation of monopoly leveraging would simply be a repackaging of APL's bundling and predatory pricing allegations, which for the reasons discussed above, do not state a viable claim for relief.

At bottom, APL complains that Matson won the competition with customer-benefiting discounts. While APL objects that Matson's pricing structure "has enabled Matson to avoid the rate reductions that would otherwise have been necessary to compete with APL," FAC ¶ 47, its grievance is with Matson's competitive strategy to offer rate reductions. In fact, APL elsewhere complains that Matson "dropped its rates more than 50% for some lines of container cargo" in the U.S.-Guam trade after APL entered the market. *Id.* ¶ 33. APL simply is dissatisfied that Matson has offered lower prices, but that is not exclusionary conduct and cannot form the basis for a monopolization claim under Section 2.

### B. Matson's Lobbying Activities Are Protected By The First Amendment And The *Noerr-Pennington* Doctrine

In an apparent effort to distract from any serious allegations of anticompetitive conduct, APL takes issue with Matson's "lobbying efforts" with respect to certain provisions in the 2018 National Defense Authorization Act. FAC ¶¶ 34, 65. Those lobbying efforts fall squarely within the protection of the *Noerr-Pennington* doctrine. It is well settled that "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws." *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961); *see also City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 379–80 (1991) ("The federal

antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government."). It is irrelevant whether the "persons engaged in lobbying" had "[a]nticompetitive intent." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 262 (D.C. Cir. 1981).

Matson's efforts to influence legislation are categorically protected from antitrust scrutiny pursuant to the *Noerr-Pennington* doctrine. In fact, antitrust law's preservation of First Amendment rights—including the right to petition the government—is so well entrenched that APL's exercise in rhetoric and calumny serves only to highlight that the FAC as a whole is devoid of substance.

### C.     Matson's Alleged Slot-Charter Proposal To APL Was Not Anticompetitive

Equally meritless are APL's allegations that Matson's offers to ship APL's cargo comprise anticompetitive conduct. APL alleges that in 2017 and 2018, Matson "offered APL container cargo 'slots' on Matson's vessels, if APL would stop calling Guam with its own vessels," and that the 2017 offer "was for 90 slots per week subject to a maximum of 60 slots from Long Beach, 30 slots from Oakland, and 15 reefer slots for the U.S. West Coast." FAC ¶ 63. APL contends that the offer "would have imposed an artificial limit on APL's operations and growth for the U.S./Guam markets." *Id.* ¶ 64. Essentially, APL alleges that Matson proposed a slot-charter agreement, an arrangement so common and lawful that APL *itself* has entered into such agreements with other carriers in connection with its routes to Guam and Saipan. *See* Notice of Agreements Filed, 85 Fed. Reg. 63,274 (Federal Maritime Comm'n Oct. 7, 2020).

Simply extending an offer—one that APL was not pressured or threatened into accepting, and that APL did not in fact accept—does not constitute anticompetitive behavior or signal an attempt to monopolize the trade. That is because if the proposal been accepted, APL and Matson would have remained in competition for cargo, even if they were not operating separate ships.

Moreover, APL does not allege any facts suggesting that the proposal would have actually impeded APL's competitive standing or resulted in any diminution of APL's U.S.-Guam business, meaning no antitrust injury is alleged.  The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  But APL does not allege how many containers it was shipping to Guam on a weekly basis in 2017 or 2018 (much less how that compared to the number of slots Matson offered), nor does it allege that the proposed partnership would have resulted in increased prices for consumers in Guam, or decreased output or quality of cargo shipping services.  And APL concedes that customers would have received *faster* service shipping on a Matson vessel.  *See* FAC ¶ 51 n.6.  Matson's alleged proposal cannot form the basis of any claimed antitrust violation.

### D.    Matson's Alleged Conduct In Alaska Is Irrelevant And Not Anticompetitive

Straying even further from any cogent theory of liability, APL's allegations as to Matson's conduct in Alaska do not come close to plausibly alleging a violation of the antitrust laws.  Indeed, these allegations are entirely irrelevant.  APL alleges that Matson ended certain business arrangements with APL in Alaska in "retaliation for APL entering the U.S./Guam markets."  FAC ¶ 6.  In particular, APL alleges that Matson terminated an agreement involving APL's use of Matson vessels, declined to renew APL's lease of certain facilities, and terminated a cost-sharing arrangement for tug charters.  *Id.* ¶¶ 6, 58–61.

These allegations are irrelevant to APL's only alleged relevant markets: container cargo shipping services from the U.S. to Guam and from the mainland U.S. to Hawaii.  *See* FAC ¶¶ 36–37.  APL does not allege any relevant market in Alaska, a threshold requirement for any allegation of monopolization or attempted monopolization.  *See Walker Process Equip., Inc.*, 382 U.S. at 177.  Nor does it allege that Matson has any market power—let alone monopoly power—in any

alleged market in Alaska.  On these grounds alone, APL's claim regarding Matson's alleged conduct in Alaska should be dismissed.

Even setting aside this threshold defect, APL's allegations fail to state a claim.  To the extent APL has attempted to plead a refusal-to-deal claim for Matson's alleged termination of its contracts with APL, such a claim fails at the starting gate.  It is well-settled that the Sherman Act generally "does not restrict the long recognized right of [a] trader or manufacturer . . . freely to exercise his own independent discretion as to parties with whom he will deal." *Trinko*, 540 U.S. at 408 (quotation marks omitted).  A firm is generally under no obligation to "cooperate with rivals," except under certain very narrow circumstances*. Id.*  That is in part because "experience teaches that the process of firms investing in their own infrastructure and intellectual property and competing rather than colluding normally promotes competition and consumer gains—and the intent to undo a competitor in this process should hardly surprise." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013).  Thus, to plausibly allege a duty to deal, a plaintiff must allege (1) a "preexisting voluntary and presumably profitable course of dealing between the *monopolist* and rival with which the monopolist later refuses to deal," (2) that the refusal to deal involves "products that the defendant already sells in the existing market to other similarly situated customers," and (3) that the "*monopolist's* discontinuation of the preexisting course of dealing must suggest a willingness to forsake short-term profits to achieve an anti-competitive end rather than to advance a valid business purpose." *New York v. Facebook, Inc.*, — F. Supp. 3d —, 2021 WL 2643724, at *11 (D.D.C. June 28, 2021) (quotation marks and citations omitted and emphases added).

APL's apparent attempt to allege a cognizable refusal to deal in Alaska fails on multiple fronts.  First, APL has not alleged an Alaska market, nor that Matson is a monopolist in it.  Second,

APL does not allege that Matson has refused to deal with APL in the sale of services that it "already sells in the existing market to other similarly situated customers." *Facebook, Inc.*, 2021 WL 2643724, at *11 (quotation marks omitted).  And third, there is no allegation that Matson has forsaken "short-term profits" in Alaska.  *Id.*  APL alleges that Matson has lost revenue from its deal with APL, *see* FAC ¶ 62, but that is true of every lease or cost-sharing agreement that expires. APL does not consider or address whether Matson is able to recoup those losses from more lucrative business deals with *other* customers.  *See Twombly*, 550 U.S. at 557 (plaintiff must allege facts that "plausibly suggest[]," and are "not merely consistent with" the alleged conduct).  APL has therefore failed to state a refusal-to-deal claim in multiple respects.

At bottom, APL's allegations regarding Matson's conduct in Alaska are simply noise, unmoored from any cogent theory of antitrust liability.  They should be disregarded and dismissed out of hand.

### E.    APL's Remaining Allegations Are Vague And Conclusory

With all other allegations of anticompetitive conduct stripped away as legally insufficient, APL is left with a smattering of accusations that seem intended more to impugn Matson's reputation than to state a plausible claim for anticompetitive conduct.  At best, these allegations restate or reframe APL's other deficient claims of anticompetitive conduct; at worst, they are mere distraction.

Some of APL's allegations do not even allege misconduct by Matson.  APL alleges, for example, that it proposed a joint operation agreement with a small Jones Act carrier to potentially service the alleged U.S.-Hawaii market, but that the carrier refused "due to concern of adverse reaction by Matson."  FAC ¶ 53.  That assertion does not allege any exclusionary conduct by Matson—or, indeed, any conduct at all by Matson—but only suggests a perception from one carrier about Matson's potential response.  Elsewhere, APL alleges that Matson discouraged a

shipper from using APL in the U.S.-Guam trade by contending that switching to APL would harm the shipper, *id.* ¶ 46, but Matson advising the shipper of its view that it could provide better service than APL is not exclusionary conduct—it is a procompetitive response to a new entrant to the market. *See Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005) ("False statements about a rival's goods do not curtail output in either the short or the long run.  They just set the stage for competition in a different venue: the advertising market.").  APL's speculation that "Matson's actual concern was that APL's entry would dampen Matson's continued ability to collect monopoly rates," FAC ¶ 46, is just that—a baseless accusation devoid, unsupported by any plausible factual allegations and thus lacking any legal significance.

Other allegations are so vague and transparently contrived that they fail to state a plausible claim.  APL alleges, "[o]n information and belief," that "Matson notified shippers that if they placed U.S./Guam container cargo with APL, those shippers would be punished by losing the rates or services accorded to loyal Matson shippers of cargo to Hawaii."  FAC ¶ 44.  This allegation appears to be a repackaging of APL's "bundling" argument, recharacterizing the loss of a bundling discount if shippers divert their cargo elsewhere as a "punish[ment]" for disloyalty.  *Id.*  In that respect, this allegation fails for the same reasons APL's other bundling allegations fail.

Any alternative reading would not be plausible.  Carriers like Matson engaging in noncontiguous domestic trade are required to file their rates with the Surface Transportation Board. *See* 49 U.S.C. § 13702(b)(1); *see also In re Hawaiian and Guamanian Cabotage Antitrust Litig.*, 450 F. App'x 685, 688 (9th Cir. 2011).  Those rates must be reasonable *and nondiscriminatory*. *See* 49 U.S.C. § 13702(a); *see also Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 161 (1922) (dismissing antitrust claims where "the carriers were at liberty to establish or maintain even unreasonably low rates, provided they were not discriminatory").  In this filed-rate context, it is

unsurprising that APL's allegation is made on "information and belief," with no assertion of the who, what, when, where, or why of actual fact. There would be no reason or basis for Matson, a common carrier, to make this kind of threat, much less for a customer to credit it.

And even beyond that, the allegations are insufficient. "[P]leadings on information and belief are permitted when the necessary information lies within defendants' control," so long as the plaintiff includes "a statement of the facts upon which the allegations are based." *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) (quotation marks omitted); *see also Jefferson v. Collins*, 905 F. Supp. 2d 269, 288–89 (D.D.C. 2012) (same). But information about Matson's treatment of APL's potential customers is not uniquely within Matson's control, and even if it were, APL must state the facts upon which its allegations are based. It has not done so. APL alleges that "[s]ome customers informed APL that after they placed cargo with APL, Matson charged those customers who also needed to ship other cargo with Matson rates from $1,500 to $2,000 higher than APL's rates and would not promise on-time delivery," FAC ¶ 44, but that allegation says nothing about "threat[ening]" or retaliating against shippers, nor that Matson treated any particular set of customers less favorable than others.

APL makes other allegations of the same ilk, alleging "[u]pon information and belief" that "one of the world's largest automobile manufacturers rejected APL's offer of a lower rate and awarded its Guam container cargo to Matson because it threatened the shipper's other cargo to Hawaii with higher rates and unfavorable service." FAC ¶ 45. But again, APL does not provide a factual basis for its allegation. Likewise with APL's allegation that Matson, "upon information and belief, has entered into agreements with container cargo shippers, whereby Matson conditions the availability of shipping services in the U.S./Hawaii markets, or discounts, rebates, and/or other favorable shipping terms in those markets, on shippers eliminating or drastically curtailing their

Guam dealings with APL." *Id.* ¶ 49.  The same is true for APL's claims that "Matson abruptly and totally cut off its business with [a trucking] company because it had supported APL in Guam," *id.* ¶ 55, or that, "upon information and belief," Matson "terminated its ongoing trucking business with" a different company, *id.* ¶ 56.  If APL has a factual basis for these allegations—such as an actual account from any of the allegedly affected, unnamed entities—beyond its musings "upon information and belief," it should have offered one.  The fact that it did not, even while amending its Complaint to make more allegations along this vector, underscores that APL's conclusory allegations of threats and intimidation by Matson are without any plausible basis.

* * *

A review of APL's allegations of purportedly anticompetitive conduct by Matson reveals that this lawsuit does not present cognizable claims under the antitrust laws, but rather appears to be a platform for APL to air its commercial grievances with Matson.  APL does not plausibly allege antitrust injury, a relevant antitrust market, or monopoly power by Matson.  Even if it could clear those hurdles, APL does not allege any anticompetitive conduct by Matson.  Just the contrary, the facts it alleges show that Matson *competes* with APL on price and service (including both speed and reliability)—the precise conduct the Sherman Act is intended to *encourage*.  APL has failed to effectively compete with Matson, and that failure is a consequence of its own business decisions.  The antitrust laws offer no relief for APL's inability to compete in the marketplace.

## III.   Matson, Inc. And Matson Logistics, Inc. Are Not Properly Named As Defendants

In addition to the fatal deficiencies in the FAC generally, APL has alleged no facts regarding the purported role of defendants Matson, Inc. and Matson Logistics, Inc. in any antitrust violation whatsoever.

Matson, Inc. is a holding company that owns two subsidiary companies relevant here: Matson Navigation Company, Inc. and Matson Logistics, Inc.  *See* RJN Ex. 10.  While Matson

Navigation Company, Inc. provides freight transportation in the Pacific trade, Matson Logistics, Inc. "is an asset-light business that provides a variety of logistics services to its customers," such as "multimodal transportation brokerage of domestic and international rail intermodal services," "less-than-container load ('LCL') consolidation and freight forwarding services," and "warehousing and distribution services." *See id.*  Put differently, Matson Logistics, Inc. does not itself operate any vessels in any trade lanes; it merely brokers logistical support for customers wishing to transport goods, and it may or may not recommend the use of Matson Navigation Company, Inc. vessels in doing so.

There is no basis for APL to indiscriminately lump Matson, Inc. and Matson Logistics, Inc. with Matson Navigation Company, Inc. for purposes of this lawsuit.  It is well settled that a mere parent-subsidiary relationship is insufficient to establish joint liability for alleged violations of law. *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." (quotation marks omitted)); *see also In re Title Ins. Antitrust Cases*, No. 08-CV-677, 2010 WL 1267129, at *1 (N.D. Ohio Mar. 31, 2010) (dismissing antitrust claims against corporate parent); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 689 (E.D. Pa. 2009) (same).  Thus, the fact that these three entities share a common corporate family does not justify naming all as defendants in this lawsuit relating only to the carriage of cargo by vessel between the U.S. West Coast and the Pacific islands, activity in which (of the three named defendants) only Matson Navigation Company, Inc. participates.

APL cannot avoid the force of this precedent simply by defining all three defendants collectively as "Matson."  *See* FAC at 1.  A plaintiff must identify the allegedly wrongful conduct

of *each* named defendant.  *See, e.g.*, *Yellen v. U.S. Bank*, 301 F. Supp. 3d 43, 48 (D.D.C. 2018) (dismissing under Rule 8 where the plaintiff "group[ed] all of the Bank Defendants together and collectively allege that the Banks' conduct constitutes unfair and deceptive practices" (alteration and quotation marks omitted)); *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) ("[A] plaintiff cannot satisfy the minimum pleading requirements under Rule 8 of the Federal Rules of Civil Procedure by lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct." (quotation marks omitted); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, 2010 WL 2629728, at *7 (N.D. Cal. June 29, 2010) ("[A]n antitrust plaintiff must specifically plead how each individual defendant joined the alleged price-fixing conspiracy.").  This requirement coincides with the more basic rule that pursuant to Rule 8, "the complaint must say enough to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quotation marks omitted).  That goes for *each* defendant.  As currently pled, APL does not impute any conduct at all to either Matson, Inc. or Matson Logistics, Inc., much less wrongful conduct, leaving those entities unable to determine what acts *they* are alleged to have taken in violation of the antitrust laws.

Because the FAC fails to allege any wrongful acts by Matson, Inc. or Matson Logistics, Inc., the FAC should be dismissed as to each of them.

## CONCLUSION

For the foregoing reasons, the FAC should be dismissed with prejudice for failure to state a claim.

Dated:     October 4, 2021                                    /s/ Rachel S. Brass
                                                              Rachel S. Brass, *pro hac vice*
                                                              RBrass@gibsondunn.com
                                                              GIBSON, DUNN & CRUTCHER LLP
                                                              555 Mission Street, Suite 3000
                                                              San Francisco, CA 94105
                                                              (415) 393-8200

                                                              Mark A. Perry, DC Bar No. 438203
                                                              MPerry@gibsondunn.com
                                                              Joshua M. Wesneski, DC Bar No. 1500231
                                                              JWesneski@gibsondunn.com
                                                              GIBSON, DUNN & CRUTCHER LLP
                                                              1050 Connecticut Avenue, N.W.
                                                              Washington, D.C. 20036
                                                              (202) 955-8500

                                                              *Counsel for Defendants Matson, Inc., Matson
                                                              Navigation Company, Inc., and Matson Logistics,
                                                              Inc.*