**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **AMERICAN PRESIDENT LINES, LLC** *et al.*, |
| Plaintiffs, |
| v. |
| **MATSON, INC.** *et al.*, |
| Defendants. |

Case No. 21-cv-02040 (CRC)

## <u>MEMORANDUM OPINION</u>

Two groups of companies offer container shipping services between the U.S. mainland and Guam: plaintiff American President Lines ("APL") and defendant Matson.  In this Sherman Act case, APL, the newcomer to the market, accuses Matson, the incumbent, of monopolizing, and attempting to monopolize, the mainland-to-Guam route.  Matson has mainly done so, APL claims, by bullying would-be APL customers and unfairly leveraging its dominant position in the busier route between the U.S. mainland and Hawaiʻi, which federal law prevents APL from servicing because it is foreign owned.  Matson moves to dismiss the case.

Finding that APL has adequately alleged an injury to competition, a relevant market, monopoly power, and at least some exclusionary conduct on Matson's part, the Court will permit APL's claims to proceed to discovery, with certain limitations.  The Court will, however, dismiss the Matson group's parent company, Matson, Inc., as a defendant because APL has not attributed any illegal conduct specifically to it.

I.   **Background**[1]

The plaintiffs in this case are a trio of related shipping companies, American President Lines, LLC, APL Maritime, Ltd., and APL Marine Services, Ltd. (collectively, "APL").  As relevant here, APL manages and operates a fleet of ocean vessels that transport container cargo from the west coast of the United States to Guam.  Am. Compl. ¶¶ 16–18, ECF No. 10.  The only other fleet offering U.S.-to-Guam container shipping services is owned or operated by a competing trio of companies—the Matson defendants, consisting of Matson, Inc., Matson Navigation Company, Inc., and Matson Logistics, Inc. (collectively, "Matson").  Id. ¶¶ 19–21, 35.  Matson also transports container cargo from the mainland U.S. to Hawai'i.  Id. ¶ 38.

A.  Statutory and Regulatory Background

Before delving further into the details of the relevant players and markets, a bit of statutory and regulatory background is in order.  A federal statute called the Jones Act governs who may operate trans-ocean cargo container vessels between U.S. ports.  Subject to certain exceptions, the Act permits only American-made and -owned container vessels, manned by an American crew, to transport cargo between any two destinations in the United States.  46 U.S.C. § 55102(b); see also id. §§ 12112, 50101(a).  As a result, only Jones Act vessels may transport cargo between the continental U.S. and Hawai'i.  Am. Compl. ¶ 27.  According to APL's amended complaint, only two companies operate Jones Act vessels that service Hawai'i:  Matson (which APL says controls "at least 70%" of the mainland U.S.-to-Hawai'i market) and The Pasha Group (which controls the remaining 30-or-so percent).  Id. ¶ 38.

---

[1] The Court draws much of this background from the allegations in APL's Amended Complaint, which the Court must accept as true at this stage of the case.  Matson no doubt disputes many of the allegations.

Crucially here, however, the Jones Act exempts from its requirements vessels carrying cargo shipments between the U.S. and Guam.  See 46 U.S.C. § 12111(b).  Those vessels still must be U.S.-flagged, meaning they must be registered in the United States, but they do not have to be U.S.-owned.  Id. § 12111(a), (b); id. § 12103; Am. Compl. ¶ 28.  APL, which is foreign-owned, first secured approval to operate a U.S.-flag vessel with service to Guam in December 2015, Am. Compl. ¶¶ 3, 33, and thereafter began offering services on a fortnightly basis.  Id. ¶ 33.  In 2016, APL added a second U.S.-flagged vessel, which allowed it to expand its Guam service to weekly routes.  Id.

APL obtained approval of these vessels from the U.S. Maritime Administration as part of the Maritime Security Program ("MSP").  Am. Compl. ¶ 3.  That program aims to maintain "a fleet of active, commercially viable militarily useful, privately owned vessels to meet national defense and other security" needs.  See 46 U.S.C. § 53102(a).  In exchange for assisting the U.S. in times of war or other emergencies, the government makes multi-million-dollar payments to owners and operators of MSP vessels.  See Am. Compl. ¶ 32; 46 U.S.C. § 53106(a); see generally id. §§ 53101–53111, 53101(2), 53101, 53107.  Historically, all MSP vessels could carry cargo between the U.S. and Guam.  Am. Compl. ¶ 32.  That was until Congress inserted a provision into the 2018 National Defense Authorization Act ("NDAA") barring MSP vessels from servicing Guam, which APL attributes to Matson's "aggressive lobbying efforts."  Id. ¶ 34.  The change in law eliminated the ability of U.S.-flag vessels enrolled in the MSP to transport cargo between the U.S. and its territories, including Guam, except for those vessels already operating under the MSP prior to the 2018 NDAA's enactment.  Id.; see 46 U.S.C. § 53105(a).

As a result of these laws, only APL's two U.S.-flag ships in the MSP and Matson's Jones Act vessels currently provide container cargo transportation services between the U.S. and Guam.  Am. Compl. ¶ 35.

B.  The Alleged Markets and Conduct at Issue

That legal backdrop frames the alleged markets in the case.  The amended complaint identifies two primary geographic markets:  container shipping services between (1) the U.S. mainland and Guam and (2) the U.S. mainland and Hawaiʻi.  Am. Compl. ¶ 37.  APL further alleges the existence of smaller geographic submarkets "consisting of each departure-destination route" between these locations, id.; for instance, Oakland to Guam is a proposed submarket, as is Seattle to Hawaiʻi.  Id.  APL alleges that "[m]ost if not all container cargo" shipped on the U.S.-to-Guam and U.S.-to-Hawaiʻi routes leave from ports in Los Angeles, Oakland, or Seattle.  Id. ¶ 91.  It appears, however, that APL does not service the Seattle-to-Guam route, id. ¶ 51 n.6; its vessels call on Guam only from L.A. or Oakland.  Id. ¶¶ 39, 51 n.6.  APL also does not compete along the U.S.-Hawaiʻi route, which according to APL is "five to six times larger" than the U.S.-Guam trade.  Id. ¶ 43.

The product (or really, service) market at issue is "container cargo shipping services," Am. Compl. ¶ 36, and APL identifies at least three distinct product-based submarkets for such cargo:  "frozen" containers, "dry" containers, and "chilled" or refrigerated containers.  Am. Compl. ¶¶ 51 n.6, 80.  Although the amended complaint does not make clear what goods or products are shipped in each type of container, Matson explains (and APL does not contest) that chilled containers carry fresh food.  See Defs.' Mot. Dismiss at 1, 22–24.  APL apparently has never competed in the chilled-container submarket because of its "transit time from the U.S. West Coast to Guam."  Am. Compl. ¶ 51 n.6.  But it does transport frozen and dry cargo

containers on the U.S.-Guam route. <u>Id.</u> APL explains that "[s]hipping containers are standard in size," so most vessels can carry any of these containers, whether frozen, dry, or chilled. <u>Id.</u> ¶ 81.

APL alleges that Matson achieved a monopoly in the cargo container shipping market between the U.S. and Guam in 2011, when it acquired "its only existing competitor, Horizon Lines, Inc." Am. Compl. ¶ 2. APL alleges that Matson then jacked up its rates to the detriment of shippers and residents of Guam. <u>Id</u>. Meanwhile, Matson has also remained dominant along the U.S.-to-Hawai'i route. APL asserts that, since 2015–2016, Matson's share of the market on that route has been "at least 70%," with the only other competitor being The Pasha Group. <u>Id.</u> ¶ 38.

As noted, in December 2015, APL entered the U.S.-Guam market with fortnightly service from its Oakland and L.A. ports. <u>Id.</u> ¶ 39. APL alleges that, since its entry, Matson has maintained "at least 70% of the container cargo shipping services between the United States and Guam," based on overall volume. <u>Id.</u> ¶¶ 38, 67.

In response to its market entry, APL alleges that Matson began an onslaught of anticompetitive conduct—what Matson's CEO colorfully called "an 'axe fight.'" <u>See</u> Am. Compl. ¶ 4. APL trains much of its fire at Matson's customer loyalty program. Under that program, shippers receive 25% discounts on both the Guam and Hawai'i routes if they use Matson for 90% of their shipments on both routes. <u>Id.</u> ¶ 41. Or, if customers use Matson for 90% of their shipments on one of those routes, they receive a 20% discount on that route. <u>Id.</u> The discounts apply to the "first dollar," meaning customers risk losing the discount over their entire shipments if they fail to meet the threshold by even a small amount. <u>Id.</u>; Pls.' Opp'n at 26. APL further alleges that when customers nonetheless used APL, Matson notified them that they would lose the rates given "to loyal Matson shippers." <u>Id.</u> ¶ 44. The amended complaint also

alleges "on information and belief" that Matson used "tying arrangements" conditioning its U.S.-to-Hawaiʻi favorable shipping terms "on shippers eliminating or drastically curtailing their Guam dealings with APL." Id. ¶¶ 49–51. Because customers ship much larger volumes along the Hawaiʻi route, APL says, they cannot pass up these discounts or "economically or reasonably use APL services" along the Guam route. Id. ¶ 43.

APL further asserts that Matson threatened, boycotted, and punished shippers to steer them away from doing business with APL. See, e.g., Am. Compl. ¶ 9 ("Matson threatened to impose disfavored rates and treatment on shippers to both Hawaiʻi and Guam if they gave cargo to APL in the U.S./Guam markets."); Id. ¶ 49 (Matson "conditions the availability of shipping services in the U.S./Hawai[ʻ]i market[], or discounts, rebates, and/or other favorable shipping terms in those markets, on shippers eliminating or drastically curtailing their Guam dealings with APL"). APL accuses Matson of retaliating against it directly as well, after APL enhanced its services in Guam. Id. ¶¶ 58–62. APL alleges that Matson "precipitously" terminated an agreement between the two companies relating to APL's use of Matson vessels to service Asian markets from Alaska. Id. ¶ 58. When APL found another carrier, Matson allegedly refused to allow that carrier to use a Matson-leased terminal to ship APL containers. Id. ¶¶ 58–59. And in a purported effort to put "an artificial limit on APL's operation and growth" in the U.S.-Guam trade, id. ¶ 64, APL says that Matson offered it container cargo slots on Matson vessels, but only "if APL would stop calling Guam with its own vessels." Id. ¶ 63.

As APL sees it, Matson did all this to maintain its monopoly power in both the U.S.-Guam and U.S.-Hawaiʻi markets. Matson views things differently, of course, defending its actions as "the very definition of competition." Defs.' Mot. Dismiss at 1.

C.  Procedural Background

The companies are now competitors in court.  APL filed suit in July 2021 and amended its complaint in September 2021.  The amended complaint advances monopoly and attempted-monopoly claims under section 2 of the Sherman Act and seeks an injunction under section 16 of the Clayton Act.  Matson has moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Additionally, Matson filed a Request for Judicial Notice, along with a slew of exhibits, which APL largely opposed.  See ECF Nos. 16, 19.  APL countered with a motion to strike certain portions of Matson's reply brief which Matson opposed.  See ECF Nos. 23, 24.  The Court held a hearing on this array of motions, focusing on the motion to dismiss.  Most recently, APL filed motion for leave to file a supplemental brief in opposition to Matson's Motion to Dismiss which Matson also opposed.  See ECF Nos. 29, 30.

**II.   Legal Standards**

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A court "must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up).  Under Rule 12(b)(6), "a court may ordinarily consider only 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint[,] and matters about which the Court may take judicial notice.'"

<u>Sandoval v. U.S. Dep't of Justice</u>, 322 F. Supp. 3d 101, 104 (D.D.C. 2018) (Cooper, J.) (citation omitted).

### III.   Analysis

####   A.   <u>Monopolization Claim</u>

APL alleges that Matson has maintained a monopoly in the container cargo shipping market along U.S.-to-Guam shipping routes in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, and it seeks an injunction under section 16 of the Clayton Act, 15 U.S.C. § 26, against Matson's alleged anticompetitive conduct.  A monopolization offense in violation of section 2 requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  <u>United States v. Microsoft Corp.</u>, 253 F.3d 34, 50 (D.C. Cir. 2001).  In other words, a section 2 monopolization claim requires both monopoly power and "anticompetitive" or "exclusionary conduct."  <u>Id.</u> at 58.

Matson mounts several lines of attack against the amended complaint.  It argues first that APL has failed to satisfy threshold Sherman Act requirements concerning antitrust injury, market definition, and monopoly power.  It then contends that APL has failed to plausibly allege that Matson has engaged in anticompetitive conduct.  The Court will begin with the threshold issues before turning to Matson's purported conduct.

#### *1.   Threshold Issues*

Matson contends that the amended complaint fails to allege antitrust injury, a properly defined market, and monopoly power.  The Court disagrees on all three counts.

a.   Antitrust Injury

Alleging an "antitrust injury" is "[t]he first prerequisite" of bringing a private antitrust

action.  See Adams v. Pan Am. World Airways, Inc., 828 F.2d 24, 26 (D.C. Cir. 1987).  An

antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows

from that which makes defendants' acts unlawful."  Brunswick Corp. v. Pueblo Bowl-O-Mat,

Inc., 429 U.S. 477, 489 (1977).  "The antitrust laws . . . were enacted for 'the protection of

competition not competitors.'"  Id. at 488 (1977) (quoting Brown Shoe Co. v. United States, 370

U.S. 294, 320 (1962)).  Thus, "a civil antitrust plaintiff bears the burden of proving that the

defendant's action targeted, or had an actual adverse effect on, competition as a whole in the

relevant market."  Gross v. Wright, 185 F. Supp. 3d 39, 49 (D.D.C. 2016) (Cooper, J.) (cleaned

up).  Typical anticompetitive effects "include, but are not limited to, reduction of output, increase

in price, or deterioration in quality."  See 2301 M Cinema LLC v. Silver Cinemas Acquisition

Co., 342 F. Supp. 3d 126, 137 (D.D.C. 2018) (citation omitted).  APL alleges those same injuries

here.

According to the complaint, Matson's anticompetitive behavior forecloses APL—

Matson's sole competitor—from parts of the U.S.-Guam market, depriving shipping customers

of the benefits of competition.  Am. Compl. ¶ 13 ("Matson's conduct has not only harmed APL,

it also has caused substantial harm to the competitive process as well as to consumers of

container cargo shipping services who have been deprived of the benefits of competition.").

Substantial market foreclosure, generally speaking, is a recognized antitrust injury.  See 2A

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 348(d)(3) (5th ed. 2021) (describing

how illegal exclusionary conduct can "unduly 'foreclose' rival suppliers from the market and

ultimately weaken them—to the detriment of competition.").

Specifically here, APL alleges that Matson has forced some shippers to accept Matson's more expensive shipping services on the U.S.-Guam route or risk Matson imposing unfavorable rates and terms if a customer chooses to ship any cargo with APL.  Am. Compl.  ¶ 9 ("Matson threatened to impose disfavored rates and treatment on shippers to both Hawai'i and Guam if they gave container cargo to APL in the U.S./Guam markets."); id. ¶ 10 ("Matson refused to promise on-time deliveries for shippers that booked cargo with APL."); id. ¶ 45 ("[O]ne of the world's largest automobile manufacturers rejected APL's offer of a lower rate and awarded its Guam container cargo to Matson because it threatened the shipper's other cargo to Hawai'i with higher rates and unfavorable service.").  And in some instances, Matson allegedly "conditions the availability of shipping services in the U.S./Hawai['i]i market[] . . . on shippers eliminating or drastically curtailing their Guam dealings with APL."  Id. ¶ 49.

These allegations implicate quintessential antitrust injuries.  Taking APL's claims as true, shipping customers face reduced output (i.e., fewer shipping choices), increased prices, and diminished quality of service compared to a market in which APL could fully compete absent Matson's alleged conduct.  See 2301 M Cinema LLC, 342 F. Supp. 3d at 137 (identifying reduced output, increased price, and diminished quality as antitrust injuries).  While APL does not provide much detail about the diminished quality or increased prices that customers have experienced in retaliation for shipping with APL, the complaint plausibly alleges that a shipping customer that would prefer to ship with Matson in Hawai'i, and APL in Guam, would be deterred from doing so by Matson's alleged conduct.  And forcing consumers to make decisions on criteria other than the merits harms competition.  See Ameral v. Connell, 102 F.3d 1494, 1509 (9th Cir. 1996) ("Another form of antitrust injury is '[c]oercive activity that prevents its victims

from making free choices between market alternatives.'" (quoting Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 528 (1983))).

Matson argues that there can be no antitrust injury because the lower prices from its loyalty discounts benefit consumers. Defs.' Mot. Dismiss at 14–16. But even if the Court were to accept that premise, APL's allegations of threats and retaliation would still state a potential antitrust injury. If customers would prefer to ship with APL but instead ship with Matson to avoid retaliation in the form of higher prices or limited services on Hawaiʻi routes, competition plausibly has been harmed. The allegations of diminished or eliminated services—such as restricting access to Matson's Hawaiʻi route for customers that ship with APL to Guam—are sufficient to constitute an antitrust injury regardless of pricing.

Matson retorts that "[n]owhere has APL alleged that Matson's purported conduct has led to slower deliveries or otherwise diminished service." Defs.' Reply at 4. Perhaps. But APL has alleged that Matson "*threatened* customers of container cargo shipping between the United States and Guam with higher rates and *unfavorable service* on Hawaiʻi and Guam shipments, if cargo to Guam were awarded to APL." Am. Compl. ¶ 45 (emphasis added). This is the crux of APL's foreclosure allegation. To the extent Matson disputes the accuracy of those allegations, that raises a factual dispute not fit for resolution on a motion to dismiss.

Reading the complaint in its most favorable light, as required at this stage, APL has sufficiently alleged antitrust injury.

　　　　　　　　　　b.　Market Definition

Another threshold requirement for a valid antitrust claim is a properly defined antitrust market. See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 177 (1965) ("Without a definition of [the relevant] market there is no way to measure [Defendant's]

ability to lessen or destroy competition.").  At its core, an antitrust market is "the area of effective competition."  Ohio v. Am. Express Co., 138 S. Ct. 2274, 2285 (2018) (citation omitted).  To successfully plead an antitrust market, a plaintiff must allege both a relevant product market and a relevant geographic market.  Brown Shoe Co. v. United States, 370 U.S. 294, 324 (1962); FTC v. Facebook, Inc., 560 F. Supp. 3d 1, 13 (D.D.C. 2021).  Those markets should include "all products reasonably interchangeable by consumers for the same purpose[]." Microsoft, 253 F.3d at 52 (cleaned up).

Defining a market often "involves inquiry into economic realities and industry practice." Nat'l Aviation Trades Ass'n v. C.A.B., 420 F.2d 209, 213–14 (D.C. Cir. 1969) (citing Brown Shoe, 370 U.S. at 325).  Thus, market definition is predominantly a factual rather than a legal inquiry.  Facebook, Inc., 560 F. Supp. 3d. at 13 (citing Newcal Indus., Inc. v. Ikon Off. Sol., 513 F.3d 1038, 1045 (9th Cir. 2008)).  For this reason, antitrust complaints generally are dismissed on market definition grounds only if they are "glaringly deficient" and dismissals on such grounds are "relatively rare."  Id. at 16–17 (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 444 (4th Cir. 2011)).  Against this headwind, Matson asserts that APL's defined markets are deficient as a matter of law.  Defs.' Mot. Dismiss at 17–21.  The Court disagrees.

APL alleges two relevant markets:  "container cargo shipping services" between the mainland U.S. and Guam and between the mainland U.S. and Hawaiʻi.[2]  Am. Compl. ¶¶ 36–37.

_____

[2] As the Court reads the complaint, APL describes the U.S.-Guam market as the only market where it is foreclosed from competition by Matson's conduct for purposes of its monopolization and attempted monopolization claims.  By contrast, the complaint appears to define the U.S.-Hawaiʻi market (in which APL cannot compete for other reasons) only to contextualize its allegations that Matson leverages its power in that market to coerce customers in the U.S.-Guam market.

In support of its product market definition, APL alleges that "other forms of shipping are not reasonably interchangeable with container cargo shipping because they are either far more expensive (e.g., airlines), slower and limited in range (e.g., barges), or physically incapable of transporting a range of goods (e.g., tankers)." Id. ¶¶ 80–84 (referencing industry practice, government regulations, and prior conduct in the market to support the proposition that "purchasers of container cargo shipping would not respond to even a large price increase for these services by switching their cargo to other potential providers of trans-ocean cargo shipping such as airliners, barges, or tankers"). In support of its geographic market definitions, APL explains that government regulators and industry participants treat U.S.-Guam and U.S.-Hawai'i as two distinct shipping routes. Id. ¶¶ 87–89 ("For customers moving cargo from the United States to Guam or Hawai['ji, other geographic originations or destinations are not reasonably interchangeable, and customers would not substitute other originations or destinations in response to even large price increases for shipping services [on those routes]."). These product and geographic market allegations are sufficient to plead the boundaries of relevant competition, particularly when reviewed under the lenient standard for market definition at this stage.

Matson contends that APL's inclusion of "other purported geographic markets" is fatal to the complaint because "APL's inability to even *try* to define a single market is enough reason to reject its claims outright." Defs.' Mot. Dismiss at 18 (emphasis in original). Not so. First, APL defines the relevant market in the very first paragraph of its complaint as container cargo shipping services between the mainland United States and Guam, and APL's counsel reaffirmed this market definition at oral argument. Am. Compl. ¶ 1; Tr. of Oral Arg. at 22. Second, while it is true that APL also alleges narrower markets based on the kind of container shipped (chilled, frozen, or dry) and ports of departure (Seattle, Los Angeles, or Oakland), Am. Compl. ¶¶ 85, 91,

the inclusion of these market segments does not sink the complaint because antitrust markets can and often do include submarkets. See Brown Shoe, 370 U.S. at 325 ("[W]ithin this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."); Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co., 81 F. Supp. 3d 1, 10 (D.D.C. 2015) (rejecting arguments concerning inconsistent market definitions because "defendants fail[ed] to acknowledge that a relevant market may include cognizable submarkets which themselves may constitute the appropriate market for antirust analysis" (cleaned up)). At this stage, the Court finds no inconsistency in alleging that there is a market for cargo shipping from the U.S. to Guam and also that some customers may not find every port on the west coast to be a viable substitute for their shipping needs. Whether the alleged markets, including the submarkets, can be supported by economic analysis is a factual question to be answered after discovery. For now, Matson has not shown APL's market definitions to be "glaringly deficient" as a matter of law.[3]

> c.  Monopoly Power

A final threshold element of a monopolization claim is that the defendant has monopoly power, meaning sufficient power to "control prices or exclude competition." Microsoft, 253 F.3d at 51 (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956)). To allege monopoly power, a plaintiff can allege either (1) direct evidence that the defendant exerts control in the market or (2) that the defendant possesses a dominant share of the relevant

---

[3] The Court analyzes APL's monopoly-power and anticompetitive-conduct allegations in the context of the broadest alleged market: container shipping from the U.S to Guam. Because the complaint sufficiently alleges anticompetitive conduct in that broadest market, the Court will wait to assess the validity and relevance of APL's narrower markets until further development of the factual record.

market that is protected by entry barriers.  Facebook, Inc., 560 F. Supp. 3d at 12–13 (citing

Microsoft, 253 F.3d at 51).  APL alleges both.  Because the Court finds sufficient APL's

allegations that Matson has a dominant share of the relevant market, it need not assess APL's

market-control allegations.

"Courts generally require a 65% market share to establish a prima facie case of market

power."  Image Tech. Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1206 (9th Cir. 1997)

(citing Am. Tobacco Co. v. United States, 328 U.S. 781, 797 (1946)).  In addition, plaintiffs

must allege entry barriers that "prevent new rivals from timely responding to an increase in price

above the competitive level."  Microsoft, 253 F.3d at 51.  Barriers to entry are forces that prevent

a market from "self-correcting," including "entrenched buyer preferences, high capital entry

costs and economies of scale."  Image Tech. Servs., 125 F.3d at 1208 (quotation omitted); see

also ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 284 (3d Cir. 2012) (describing a dominant

firm as "a barrier to entry").

APL alleges that Matson has more than 70% of the overall shipping container volume in

the U.S.-Guam market.  Am. Compl. ¶¶ 67–68.  It further claims that Matson's market position

is preserved by regulatory barriers, substantial costs, and Matson's own anticompetitive

campaign to foreclose competition.  Id. ¶¶ 69–70 (identifying the Jones Act, Maritime Security

Program, "high multi-million dollar costs of purchasing and maintaining an ocean container

transport fleet," "high ratio of fixed to variable costs," and Matson's anticompetitive conduct as

barriers to entry).  By alleging that Matson has sufficient power in the relevant market and

benefits from various market forces which preserve its position, APL has met its burden of

plausibly alleging monopoly power.

Matson contests the sufficiency of APL's monopoly power allegations on several grounds, but none are availing.  First, Matson alleges that APL has offered only "bare assertions" of monopoly power, citing several cases where claims were dismissed for failing to adequately allege monopoly power.  Defs.' Mot. Dismiss at 21–22.  But Matson's cases are not analogous, as those plaintiffs provided little or no factual support for their monopoly power claims.  In Syncsort Inc. v. Sequential Software, Inc., for example, the complaint merely alleged that the defendant "controls the majority of the [market]," which the court found was too cursory to support possession of monopoly power.  50 F. Supp. 2d 318, 330 (D.N.J. 1999).  Likewise in Korea Kumho Petrochemical v. Flexsys Am. LP, the plaintiff offered no factual support for its assertions of market power.  No. 07-1057, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) ("Although Plaintiff need not necessarily quantify Flexsys' market share with precision, Plaintiff must assert some *facts* in support of its assertions of market power that suggest those assertions are plausible. Plaintiff has not done so." (emphasis in original)).  Even Matson's best case, FTC v. Facebook, involved far less detailed allegations than APL offers here.  560 F. Supp. 3d at 17. There, the court rejected the FTC's bare assertions of monopoly power in an "unusual" market, expressing doubt as to what was being measured for the purposes of calculating market share or who else was competing in the market.  Id. at 17–19.  Here, APL has described an easily comprehensible market in which it is one of the two participants and has estimated market shares for each competitor based on shipping volume.  Am. Compl. ¶¶ 35, 67.  APL also alleges facts to explain how Matson came to possess its dominant position in the market and various barriers to

entry that preserve that position.  Id. at ¶¶ 69–70.  These allegations plausibly allege monopoly power in a defined market.[4]

Next, Matson argues that APL cannot show monopoly power because there are portions of the relevant market in which APL does not compete.  Defs.' Mot. Dismiss at 22–23.  The crux of Matson's argument, as the Court understands it, is that APL has chosen not to compete in certain segments of the relevant market and thus the only barrier to entry preventing APL from contesting Matson's market dominance is APL itself.  Id.  Matson grounds its argument in the Ninth Circuit's requirement that an antitrust plaintiff "must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price" to allege barriers to entry sufficient to preserve monopoly power.  Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1439 (9th Cir. 1995) (citation omitted).[5]

Matson is correct that a competitor's ability or inability to expand its capacity is a relevant inquiry when analyzing barriers to entry.  But APL has alleged various market-based barriers that could be plausibly read to restrict its own expansion, including "transit time from the U.S. West Coast to Guam," high investment costs, government regulation, and Matson's

---

[4] Matson correctly observes that APL's references to a "contestable" submarket—a market comprised of only the geographic and product submarkets in which APL actively competes—creates confusion as to which defined market the Court should analyze for market power and anticompetitive effects (or whether such a market is properly defined).  Am. Compl. ¶¶ 51 n.6.  But again, because the Court sustains APL's claims as to the broadest market of container shipping between US-Guam, any contentions regarding this purported submarket do not doom the amended complaint.

[5] Many courts have referenced the Ninth Circuit's detailed discussion of barriers to entry in Rebel Oil, including the D.C. Circuit in Microsoft.  253 F.3d at 51.

efforts to foreclose customers in the Guam market. Am. Compl. ¶¶ 51 n.6, 65–70. Matson dismisses these barriers, contending that APL has voluntarily hamstrung its own ability to compete by "ma[king] a business decision to sail a slower route." Defs.' Mot. Dismiss at 23. But whether APL has excess capacity that it has chosen not to employ to counter Matson's alleged monopoly power is a question of fact appropriately answered with the benefit of market data developed during discovery. See, e.g., Rebel Oil, 51 F.3d at 1441 ("Excess capacity is a technical concept that is difficult to measure without an analysis of a firm's costs.").[6]

The Court therefore cannot say, as a matter of law, that APL has failed to allege sufficient market power and barriers to entry for its claim that Matson possesses monopoly power in the relevant market. To the extent Matson contests the factual support for APL's allegations, it can do so after discovery.

2.    <em>Anticompetitive Conduct</em>

Having dispensed with Matson's threshold challenges, the Court turns to whether APL has plausibly alleged that Matson acquired or maintained its market power by anticompetitive means. Microsoft, 253 F.3d at 58 ("A firm violates § 2 only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct[.]"). Recall, APL alleges that Matson engaged in a "campaign of anticompetitive, unlawful exclusion" that

---

[6] The other case Matson relies on, Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc., is similarly unconvincing. There, the Seventh Circuit affirmed the trial court's denial of a request for a preliminary injunction after finding that the defendant did not have power in a market of over 1,000 potential participants with "no barriers to entry" for "a fungible product that other people can and do supply easily." 784 F.2d 1325, 1331–32 (7th Cir. 1986) (analyzing the market for health care financing). Moreover, that holding was reached after a hearing that lasted eleven days in which more than 30 witnesses testified and over 400 exhibits were introduced. Id. at 1331. Thus, this case does not support Matson's contention that the complaint must be dismissed before discovery because Matson disputes whether APL is impeded from expanding in some segments of the relevant market.

foreclosed APL from a substantial share of the relevant market.  Am. Compl. ¶¶ 7, 40, 73.  While APL accuses Matson of engaging in various separate categories of anticompetitive conduct (i.e., threats to customers and suppliers, bundled discounts, tying, lobbying, refusals to deal, attempted market allocation), its monopolization and attempted monopolization claims incorporate all the alleged conduct collectively.  Finding that at least some of Matson's alleged conduct could qualify as exclusionary conduct in violation of the Sherman Act, the Court will allow the amended complaint to proceed as to those allegations.

a.  Threats of Retaliation

APL complains that Matson threatened potential customers and suppliers with adverse consequences for doing business with APL in the Guam market.  See Am. Compl.  ¶ 9 ("Matson threatened to impose disfavored rates and treatment on shippers to both Hawai[']i and Guam if they gave container cargo to APL in the U.S./Guam markets."); Id. ¶ 49 (Matson allegedly "conditions the availability of shipping services in the U.S./Hawai[']i market . . . on shippers eliminating or drastically curtailing their Guam dealings with APL");  Id. ¶ 57 ("Matson's punishing of vendors has become known recently in the ocean shipping community in Guam and, for example, caused fear of retribution by a large consumer of services and supplies in the industry and a necessary carrier to Hawai[']i.  Some large potential customers declined to ship any containers on APL because they could not take the risk of retribution from Matson.").  According to APL, these threats dissuade consumers and suppliers from contracting with APL, contributing to a substantial foreclosure of the market and ongoing harm to competition.  Id. ¶¶ 73, 76.

Similar threats by dominant firms have been held to be exclusionary conduct that violates the Sherman Act.  In the seminal antitrust case Lorain J. Co. v. United States, a dominant local

newspaper was found to have violated section 2 of the Sherman Act by threatening to discontinue advertising for any customer that also advertised with a competitor.  342 U.S. 143, 152–53 (1951).  Likewise, Microsoft was found to have used its monopoly power to stunt competition by threatening to boycott distribution of Intel computer chips if Intel helped develop cross-platform programs for Microsoft's competitors.  Microsoft, 253 F.3d at 78 ("[W]e affirm the conclusion that Microsoft's threats to Intel were exclusionary, in violation of § 2 of the Sherman Act.").  Accordingly, APL's similar allegations constitute exclusionary conduct that, if true, could violate section 2 of the Sherman Act.

Matson counters that it cannot threaten to punish customers for disloyalty because it must file "reasonable *and nondiscriminatory"* rates with one of its regulatory bodies.  Defs.' Mot. Dismiss at 35 (emphasis in original).  But even if it cannot discriminate among customers based on price (which itself is a factual question), APL also alleges that Matson has conditioned the availability and quality of service on APL's exclusion, which plausibly describes anticompetitive conduct even without an effect on price.  Am. Compl. ¶ 49.

Matson further contests APL allegations of threats and retaliation by labeling them "vague and conclusory."  Defs.' Mot. Dismiss at 34–36.  But APL offers considerable factual support for its allegations, including various examples of specific conduct leveled against both customers and suppliers.  Am. Compl. ¶¶ 44–46, 48, 55–56 (alleging that Matson threatened customers and companies providing maintenance, freight-forwarding, and trucking services to APL with worse rates and services).  While APL does not identify the companies that it says were threatened, Matson cites no authority that doing so is required at this stage.[7]

_____

[7] The Court assumes that APL will be able to provide more details supporting its allegations of threatening conduct during discovery.

Accordingly, APL plausibly alleges exclusionary conduct that would give rise to a section 2 violation.  This finding alone is sufficient to progress APL's monopolization claim to discovery.  The Court will proceed to analyze APL's other allegations, however, in an effort to focus the scope of the dispute.  See FTC v. Facebook, Inc., 581 F. Supp. 3d 34, 60–61 (D.D.C. 2022) (permitting a monopolization claim to survive a motion to dismiss but excluding allegations that were "legally infirm" from discovery).

### b.  U.S-Guam Loyalty Program

Besides the "stick" of threats and retaliation, Matson is also alleged to have excluded APL from the market with the "carrot" of sizable customer discounts.  At issue is Matson's "loyalty program," which offers consumers a 20% discount if they ship 90% or more of their cargo with Matson in the U.S.-Guam market.  Am. Compl. ¶ 41.  The discounts are "first dollar," meaning customers risk losing the discount over their entire shipments if they fail to meet the 20% threshold by even a small amount.  Id.; Pls.' Opp'n at 26.  APL characterizes the discount as "*de facto* exclusive dealing" that forecloses it from competing for a substantial portion of the U.S.-Guam market.  Pls.' Opp'n at 26–28 (emphasis in original); Am. Compl. ¶¶ 7, 51.  The Court finds, at least at this stage of the litigation, that the loyalty program could plausibly constitute an impermissible exclusionary practice.

As an initial matter, APL labels the discount program a "de facto" exclusivity arrangement because only 90% of a customer's shipping volume is required for eligibility.  Am. Compl. ¶ 41.  A lack of total exclusivity is not fatal to the allegation, APL explains, because courts look to the "practical effect" of the allegedly exclusive dealings to determine if an exclusionary effect is possible.  Pls.' Opp'n at 27 (citing Tampa Elec. Co. v. Nashville Co., 365 U.S. 320, 326 (1961)).  APL also directs the Court to out-of-circuit precedent holding that total

exclusivity is not required.  Id.; see ZF Meritor, LLC, 696 F.3d at 282–84 (holding that de facto partial exclusive dealing arrangements could be actionable under antitrust law).  For its part, Matson does not cite—and the Court has not independently identified—any federal precedent requiring 100% exclusivity.  Accordingly, the Court finds that the absence of a total exclusivity requirement does not shield Matson's loyalty program from potential liability.

To violate the Sherman Act, an exclusivity program must foreclose a "substantial percentage" of the relevant market from competition, which has often been cited as about 40% of the relevant market.  Microsoft, 253 F.3d at 70–71.  When the defendant is a monopolist, however, an even lower percentage may suffice.  Id. at 70 ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation."); 11 Areeda & Hovenkamp, Antitrust Law, ¶ 1821(c) (4th ed. 2018) ("[S]ingle-firm foreclosure percentages of less than 30 percent in a properly defined market would seem presumptively harmless to competition.").

APL generally alleges that "Matson's anticompetitive conduct has foreclosed APL from a substantial share of the market[] for container cargo shipping services between the United States and Guam."  Am. Compl. ¶ 73.  More to the point, APL states that Matson's conduct has foreclosed "at least 40% to 50% or more of the 'contestable' container cargo shipping services in the U.S./Guam markets[.]" [8]  Id. ¶ 51.  It defines the "contestable" market, in turn, as the portions

_____

[8] APL attributes its "40% to 50% or more" foreclosure figure to more conduct than just Matson's loyalty program.  Am. Compl. ¶ 51 (listing "Matson's loyalty program, exclusive dealing, bundled pricing, and tying scheme" as the cause of its foreclosure).  This is not an issue, however, given that APL does not allege that each action is an independent antitrust violation. It instead describes Matson's activities collectively to support its monopolization and attempted monopolization claims.  The D.C. Circuit has not ruled on the validity of such "course of

of the U.S.-Guam market in which APL actually competes, which APL says accounts for 70% of container cargo in the full U.S-Guam market.  Id. ¶ 51 n.6.  The Court is skeptical that the "contestable" market is the appropriate market for analyzing the foreclosing effects of Matson's alleged conduct.[9]  But it need not resolve that issue now because APL has plausibly, albeit indirectly, alleged substantial foreclosure in the broader U.S.-Guam market.  Read favorably, the complaint alleges that APL is foreclosed from more than 35% of the total relevant market.[10]  An alleged foreclosure of 35% is not defective as a matter of law, particularly in light of the Court's conclusion above that APL has plausibly alleged that Matson has monopoly power in the U.S.-Guam market.

Matson contends that APL's exclusive dealing claim necessarily fails because APL did not allege that the discounts used to retain customers would require Matson to set its prices

---

conduct" analysis, but other courts have found it possible to consider a series of separate acts that independently have anticompetitive effect.  See Microsoft, 253 F.3d at 78 (noting course of conduct theory without passing on its validity); LePage's Inc. v. 3M, 324 F.3d 141, 162 (3d. Cir. 2003) ("The relevant inquiry is the anticompetitive effect of 3M's exclusionary practices considered together."); New York v. Facebook, Inc., 549 F. Supp. 3d 6, 28 (D.D.C. 2021) ("To be clear, it is possible that were a monopolist to embark on a concerted scheme of serial refusals to deal with rivals, that scheme or 'course of conduct' could amount to a separate and independent violation of the Sherman Act.").  Accordingly, the Court will assess the validity of the alleged foreclosure without attempting to attribute specific percentages to each alleged activity.

[9] For one, APL uses inconsistent markets to define monopoly power and anticompetitive effects.  Compare Am. Compl. ¶ 67 ("Matson continues to have substantial monopoly power in container cargo shipping services between the United States and Guam. Matson's share of these markets still exceeds 70% of such overall container shipment volume.") with Am. Compl. ¶ 51 ("APL is excluded from competing for at least 40% to 50% or more of the 'contestable' container cargo shipping services in the U.S./Guam markets[.]").

[10] APL alleges it was foreclosed from more than 50% of the "contestable" market, which represents 70% of the total market, meaning it was foreclosed from 35% or more of the total market.  Am. Compl. ¶ 51 n.6.

below cost.  Defs.' Reply at 14–16.  But Matson does not direct the Court to any binding

precedent requiring an allegation of predatory pricing in this context and does not adequately

address a recent case in this district that holds otherwise,  FTC v. Surescripts, LLC, 424 F. Supp.

3d 92 (D.D.C. 2020).  In denying a motion to dismiss, the court in Surescripts rejected the

defendant's theory that discounts used to enforce de facto exclusive dealing contracts must be set

below cost to constitute exclusionary conduct in violation of section 2.  Id. at 102 ("Like the

behavior at issue in Microsoft, Surescripts's alleged practice of charging loyal pharmacies and

[pharmacy benefit managers] less, and paying loyal [electronic health record systems] greater

incentives, do not need to constitute predatory pricing for Surescripts's exclusionary practices to

constitute illegal maintenance of a monopoly.").  The Court agrees with Surescripts's reasoning

and finds that predatory pricing allegations are not necessary for APL to plausibly allege that

Matson's loyalty program constitutes anticompetitive exclusive dealing.

Accordingly, APL has plausibly alleged that Matson's U.S.-Guam loyalty program

constitutes anticompetitive conduct in violation of section 2 of the Sherman Act.

### c.  Bundled Discounts

APL next alleges that Matson impermissibly bundles its Hawai'i and Guam market

discounts to foreclose competition in both markets.  Am. Compl. ¶ 41.  As part of Matson's

loyalty program, customers that place at least 90% of their cargo business with Matson in *both*

markets receive an additional 5% discount in both markets.  Id.  As a result, APL alleges,

customers who ship in both markets "cannot economically or reasonably use APL services for

container cargo shipments with Guam, even if offered at a substantial discount off Matson's

stand-alone rates," because "most Guam shippers ship[] much larger volumes with Hawai['i]i."

Am. Compl. ¶ 43.

Because "[b]undled discounts generally benefit buyers," antitrust law is wary of attaching liability to a firm that offers customers more for less.  See Cascade Health Sols. v. PeachHealth, 515 F.3d 883, 895 (9th Cir. 2008).  In support of its claim, APL directs the Court to LePage's, 324 F.3d at 154–57 where the Third Circuit found a bundled discount to be anticompetitive.[11]  Pls.' Opp'n at 29.  As the D.C. Circuit has noted, however, Lepage's bundled discount holding has been "roundly criticized."  FTC v. Church & Dwight Co., 665 F.3d 1312, 1316–17 (D.C. Cir. 2011); see also Surescripts, 424 F. Supp. 3d at 102.  That said, no binding precedent appears to foreclose a bundled discount claim entirely.

Given that APL's monopolization claim may proceed, the Court need not decide if APL's bundled discount claim is sufficient alone for antitrust liability.  And given the unique market conditions alleged—that a lone monopolist in two two-competitor markets is bundling substantial discounts in exchange for near exclusivity in both markets—the Court will permit discovery as to the bundled discount claims and reserve further judgment until a later stage of the case.[12]

### d.  Lobbying

The Amended Complaint alleges that Matson successfully lobbied Congress to "exclude U.S.-flag MSP vessels from calling on Guam after 2018," restricting potential new entrants from the Guam market.  Am. Compl. ¶ 65.  APL maintains that these lobbying efforts, while not

---

[11] APL also claims that Surescripts was a bundled products case, but this is incorrect. Pls.' Opp'n at 29.  While Surescripts did offer discounts in two separate but complementary markets, the discounts were independent.  Surescripts, 424 F. Supp. 3d at 95.

[12] Because the Court permits discovery on both the U.S.-Hawai'i and U.S.-Guam loyalty programs, the Court need not rule on APL's tying or monopoly leveraging claims arising from the same facts.

alleged as a standalone antitrust violation, tend to show that Matson had an intent to monopolize the U.S.-Guam market.  Pls.' Opp'n at 36.  It is well-established, however, that lobbying is immunized from antitrust liability by the <u>Noerr-Pennington</u> doctrine, "regardless of [its] intent or purpose."  <u>United Mine Workers of Am. v. Pennington</u>, 381 U.S. 657, 670 (1965) ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition."); <u>E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127, 135 (1961) ("[N]o violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws.").  Lobbying efforts are not illegal, either "standing alone or as part of a *broader scheme* itself violative of the Sherman Act."  <u>Pennington</u>, 381 U.S. at 670 (emphasis added).[13]  The Court thus finds that APL's allegations concerning Matson's lobbying conduct cannot be used to support an inference of anticompetitive conduct.  This determination does not affect APL's monopolization and attempted monopolization claims because, as discussed above, APL has already plead sufficient facts to support both.

e.  <u>Slot Proposal</u>

APL further alleges that on two occasions, "Matson offered APL container cargo 'slots' on Matson's vessels, if APL would stop calling on Guam with its own vessels."  Am. Compl. ¶ 63.  APL claims the slots were capped a specific number (90) and that "[t]he rates offered by Matson were higher."[14]  <u>Id.</u> ¶¶ 63, 64.  Although APL declined the proposal, it alleges that the

---

[13]  APL does not claim that Matson's lobbying activities fall under the "mere sham" exception to <u>Noerr-Pennington</u>.  <u>See E. R.R. Presidents Conf.</u>, 365 U.S. at 144 (noting that application of the Sherman Act is justified where advocacy is a "mere sham" to cover an "attempt to interfere directly with the business relationships of a competitor").

[14] The complaint does not explain what "rates" APL is referring to, or the basis for its comparison to other rates.

arrangement would have "effectively allocated the U.S./Guam markets to Matson's control, restricted APL's competition to non-threatening levels, and further harmed U.S. shippers and residents of Guam." Id. ¶ 12.

The Court struggles to cabin Matson's alleged slot proposal. APL labels it as horizontal market allocation (or at least attempted market allocation), Pls.' Opp'n at 33 n.14, which is presumptively anticompetitive. United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972) (holding that "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition" is a per se violation). Matson, on the other hand, dismisses the proposal as a benign "slot-charter" arrangement where one competitor agrees to ship another competitor's containers on its vessels—which Matson suggests is a common practice in the industry. Defs.' Mot. Dismiss at 31. Neither characterization is satisfying, at least based on the current pleadings.

Typical horizontal market allocation schemes involve two competitors agreeing to stay out of each other's territory or avoid encroaching into each other's product offerings. Matson's proposal, by contrast would enable both APL and Matson to continue to service U.S.-Guam routes, albeit using only Matson vessels and with caps on APL's capacity. But the alleged proposal is not an arm's length slot-rental arrangement either, as Matson suggests. Importantly, Matson ignores that the proposal would have required APL to stop servicing Guam with its own boats.

As the Court sees it, APL has alleged an unconsummated proposal to divide capacity in the U.S.-Guam market without requiring APL to exit altogether. Such an arrangement could raise antitrust concerns to the extent that APL would have been limited in the way that it expands and innovates. See 12 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 2030(c) (4th

ed. 2019).  It could also be viewed as a proposed output restriction, although APL offers no allegations concerning the overall market volume or its capacity compared to Matson's offer of 90 slots.  Without additional briefing on how the proposal should be treated under the antitrust laws—including whether it would constitute attempted monopolization—the Court hesitates to opine further on how the allegation fits with APL's two claims.  In the meantime, the facts concerning Matson's purported slot offer will be fair game for discovery.

f.   <u>Conduct in Alaska</u>

As further claimed evidence of Matson's retaliation and specific intent to monopolize, APL points to actions taken by Matson in Alaska.  The complaint describes how APL's entry into Guam led Matson to precipitously terminate a long-standing Connecting Carrier Agreement between the parties, which had enabled APL to use Matson vessels in Alaska.  Am. Compl. ¶¶ 6, 58.  Matson also retaliated, APL claims, by declining "to renew APL's shop and office lease at Pier II" in Alaska, refusing "APL access to dock and terminal facilities" in Kodiak, Alaska, and terminating a "shared tug charter agreement."  <u>Id.</u> ¶ 6.

APL asserts that Matson's Alaska-related conduct is relevant to the U.S.-Guam market because it constitutes retaliation for APL's entry and continued presence in Guam, confirming Matson's exclusionary conduct and intent.  Pls.' Opp'n at 35.  Threats and retaliation, even if they occur in a separate market, might reasonably produce an anticompetitive effect in the relevant market.  Whether the conduct is of such magnitude that it might drive a competitor from the relevant market is a question best decided after discovery.  The financial impact felt in Alaska by both parties—which APL has estimated at millions of dollars for itself and eight million dollars for Matson annually—could bear on whether Matson acted with the aim to exclude APL from the Guam market.  Am. Compl. ¶ 62.  And purported comments by Matson

28

management in Alaska in response to APL's complaints for alleged retaliation could reveal specific intent, as required for attempted monopolization claims.  In any case, as the Court has already found sufficient allegations of anticompetitive conduct to support APL's section 2 claims, it need not decide at this stage whether the alleged retaliation in Alaska also constitutes anticompetitive conduct in the Guam market.

Matson is correct, however, that its alleged activities in Alaska do not constitute a standalone antitrust claim—APL has neither plead a relevant market in Alaska nor alleged monopoly power in such a market.  See New York v. Facebook, Inc., 549 F. Supp. 3d 6, 23 (D.D.C. 2021) (noting that a monopoly maintenance claim requires "the possession of monopoly power in the relevant market"); see also Microsoft, 253 F.3d at 81 ("A court's evaluation of an attempted monopolization claim must include a definition of the relevant market.").

So for now, the Court reserves judgment on whether Matson's Alaska-related activity could be used as evidence of Matson's anticompetitive conduct in *Guam*.  Since Matson's actions in Alaska are only relevant to the extent they result in anticompetitive effects in the relevant market—the U.S.-Guam container cargo shipping market—discovery relating to the Alaska activities will be accordingly cabined.

### B.  Attempted Monopolization Claim

The Court now turns to APL's attempted monopolization claim.  To succeed on an attempted monopolization claim under section 2, plaintiffs must prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  Microsoft, 253 F.3d at 80 (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)).  Failing to prove any element of the inquiry defeats the claim.  Id.  Because the Sherman Act neither defines the elements of

attempted monopolization nor "identif[ies] the activities" constituting the offense, courts "must examine the facts of each case"—ultimately, what constitutes an offense is "a question of proximity and degree." Spectrum Sports, 506 U.S. at 454–55 (quotation omitted); Microsoft, 253 F.3d at 80 (quoting United States v. Am. Airlines, Inc., 743 F.2d 1114, 1118 (5th Cir. 1984)).

As explained above, APL has plead sufficient facts to allege an antitrust injury, a relevant market, and anticompetitive conduct for a claim for monopolization, related to Matson's conduct in the U.S.-Guam market.  APL maintains that this same conduct supports an attempted monopolization claim.  See Am. Compl. ¶ 97; Pls.' Opp'n 22–23.  The relevant questions, then, are whether APL has adequately alleged that Matson engaged in the alleged conduct with a "specific intent" to monopolize and that it reached a "dangerous probability" of success.

Courts can infer specific intent to monopolize from "conduct that has no legitimate business justification but to destroy or damage competition." City of Moundridge v. Exxon Mobil Corp, 471 F. Supp. 2d 20, 42–43 (D.D.C. 2007) (citation omitted).  A plaintiff adequately pleads specific intent where "it is otherwise apparent from the character" of the alleged anticompetitive actions—as with actions that "eliminat[e] a viable means of competition" or "channel[] customers away from the competition." Id. at 43 (citation omitted).  But conclusory allegations won't do; specific intent must be supported by factual assertions. See id. (finding no specific intent because plaintiff alleged intent "in a conclusory fashion," without any facts to support the claim).

APL attempts to show specific intent through its allegations that Matson threatened to punish numerous potential APL customers.  For instance, Matson allegedly threatened shippers, including freight forwarders, with higher rates and reduced services for their Hawai'i cargo if

they placed container cargo with APL along the U.S.-Guam route.  Am. Compl. ¶¶ 44–48.

Maintaining market power by employing threats lacks a "business justification," and therefore

reflects an intent to restrict competition.  APL also points to comments by Matson officials to

show specific intent.  Matson's chief executive allegedly threatened APL with an "axe fight" if it

continued to operate in Guam.  Id. ¶ 4.  And, in responding to a complaint by APL about

allegedly exclusionary actions in Alaska, Matson management in that state supposedly said that

APL "had brought it on itself by calling Guam."  Id. ¶ 61.  These comments, if they were made,

may well have been rhetorical or taken out of context.  But because intent may be inferred from a

defendant's words, APL's allegations in this regard are sufficient at this stage of the case.  Tops

Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 101 (2d Cir. 1998) (finding specific intent where

defendants' "officials frequently affirmed their stated goal of preventing" plaintiff's entrance

into market").

 The third element of an attempted monopolization claim—a "dangerous probability of

success"—is met here too.  In this fact-intensive inquiry, the plaintiff must (1) "define the

relevant market" and (2) "demonstrate that substantial barriers to entry protect that market."

Microsoft, 253 F.3d at 81.  As noted earlier, plaintiffs have defined a relevant market—U.S.-

Guam cargo shipping routes—and have demonstrated substantial barriers to entry.  See id.

("Defining a market for an attempted monopolization claim involves the same steps as defining a

market for a monopoly maintenance claim.").

 Although the D.C. Circuit does not appear to have established a threshold market share

percentage that plaintiffs must meet to establish dangerous probability of success, other courts

have.  See Neumann v. Reinforced Earth Co., 786 F.2d 424, 428 (D.C. Cir. 1986) (suggesting

that a "share of 30% or less presumptively disproves requisite power" but deciding the case on

other grounds).  The market share attributed to Matson here—at least 70% of the relevant

market—easily meets the requirement established by those courts.  See Tops Mkts., 142 F.3d at

100 (holding that market share exceeding 72% "at the time when defendants took other

anticompetitive actions is sufficient . . . to create a genuine factual issue as to whether there was

a dangerous probability"); McGahee v. N. Propane Gas Co., 858 F.2d 1487, 1506 (11th Cir.

1988) (holding that a 60% to 65% market share could "create a genuine issue of material fact as

to whether there was a dangerous probability of success"); see also M & M Med. Supplies &

Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 168 (4th Cir. 1992) ("[C]laims involving

greater than 50% share should be treated as attempts at monopolization when the other elements

for attempted monopolization are also satisfied.").  The Court thus finds that APL's allegations

are "sufficient to put the [defendants] on notice of the nature of [plaintiff's] claim

for attempted monopolization in the market[.]"  WAKA LLC v. DC Kickball, 517 F. Supp. 2d

245, 252 (D.D.C. 2007).

## IV.   Motion to Dismiss Matson, Inc. and Matson Logistics, Inc.

In addition to moving to dismiss APL's claims, Matson seeks dismissal of two of the

three named defendants:  Matson, Inc. and Matson Logistics, Inc.

The complaint does not attribute specific conduct to the three corporate defendants; it

simply lumps them all together as "Matson."  The parties appear to agree that Matson, Inc. is the

group's parent holding company; Matson Navigation Company, Inc. is a direct subsidiary that

provides the ocean shipping services mainly at issue in this case; and Matson Logistics, Inc. is a

second-level subsidiary that provides logistical ground support to Matson Navigation.  See Am.

Compl. ¶¶ 19–21; Defs.' Mot. Dismiss at 37–39; see also Matson, Inc., Annual Report (Form 10-

K at 9) (Feb. 25, 2022); Mintz v. FDIC, 729 F. Supp. 2d 276, 278 n.2 (D.D.C. 2010) (taking

judicial notice of the relationship between two corporate entities since it is a "highly relevant and easily verifiable fact").

A complaint should "say enough to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 319 (2007) (quoting Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346 (2005)).  This principle applies to each named defendant.

APL's complaint does not meet that standard with respect to Matson, Inc.  "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." United States v. Bestfoods, 524 U.S. 51, 61 (1998) (quotation omitted).  Each corporation is treated as a "distinct juridical entity," even if it is owned by another individual or entity. Alkanani v. Aegis Def. Servs., LLC, 976 F. Supp. 2d 1, 8 (D.D.C. 2013).  A parent corporation can be held directly liable if (a) the alleged wrong can be traced back to the parent corporation, or (b) the parent directly participates in the alleged wrong. Doe v. Bank of Am. Corp., 273 F. Supp. 3d 203, 209 (D.D.C. 2017) (citation omitted).

The complaint fails to allege facts indicating that any of the alleged anti-competitive conduct was undertaken by, or can be traced to, Matson, Inc. specifically.  APL's sole argument to the contrary centers on two allegations:  first, that "Matson's" CEO threatened APL with an "axe fight" if APL continued servicing Guam, Am. Compl. ¶ 4, and, second, that he either made the slot-charter proposal discussed above or was "at a lunch" where it was discussed, id. ¶¶ 12, 63.  Matson contends that these alleged actions may be imputed to Matson, Inc.  Pls.' Opp'n at 43 (citing United States v. Cadillac Overall Supply Co., 568 F.2d 1078 (5th Cir. 1978)).

Neither allegation suffices.  As an initial matter, the complaint does not identify "Matson's" CEO as the CEO of Matson, Inc.  Moreover, even if all three defendants share the same CEO (as appears to be the case), the complaint provides no basis to infer that the CEO engaged in any of his alleged conduct on behalf of Matson, Inc. as opposed to its operational shipping business.  And in any case, promising a proverbial "axe fight" may (or may not) be evidence of anti-competitive intent, but it does not constitute standalone anti-competitive conduct.  (The slot proposal is more complicated, as previously discussed).

The Court reaches a different conclusion with respect to Matson Logistics, Inc.  While APL does not attribute conduct to that entity specifically, the complaint alleges a number of threats and retaliatory acts implicating the ground-support portion of Matson's shipping business. For instance, Matson allegedly retaliated "against a trucking company in Guam," punished a "warehouse and trucking company in Guam," coerced "a parts distributor in Guam," prohibited the "use of terminal, docks, and storage areas in Alaska in retaliation against APL," and "terminated a shop and pier lease in Alaska."  Pls.' Opp'n at 43; see also ¶¶ 55–56, 59–60.  It can be reasonably inferred from the context of the complaint that these acts were allegedly undertaken by, or at least involved, Matson Logistics.  If discovery proves otherwise, Matson can renew its request to dismiss Matson Logistics from the case.  In the meantime, the Court will retain it as a defendant alongside Matson Navigation.

**V.   Motion for Judicial Notice, Motion to Strike, Motion for Leave**

Finally, APL moves to strike portions of Matson's brief that rely on extrinsic material and factual assertions.  Mot. Strike, ECF No. 23-1.  APL also moves to file a supplemental brief in opposition to Matson's Motion to Dismiss.  Mot. for Leave to File Suppl. Br., ECF No. 29. Separately, Matson asks the Court to take judicial notice of exhibits filed in support of its Motion

to Dismiss.  Mot. Judicial Notice, ECF No. 16.  At the motion to dismiss stage, a court is "limited to the 'four corners of the complaint, as well as any documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies[,]'" as well as facts "of which the Court may take judicial notice."  Brown v. Gov't of District of Columbia, 390 F. Supp. 3d 114, 122 (D.D.C. 2019) (quoting Tyson v. Brennan, 306 F. Supp. 3d 365, 369 (D.D.C. 2017); Ashbourne v. Hansberry, 245 F. Supp. 3d 99, 103 (D.D.C. 2017), aff'd, 894 F.3d 298 (D.C. Cir. 2018)).  The Court has not relied on Matson's exhibits, or any extrinsic factual assertions made by Matson in its motions.  The Court has also not relied on APL's supplemental brief in support of its opposition.  These motions will therefore be denied as moot.

**VI.  Conclusion**

For the reasons explained above, the Court will deny Matson's motion to dismiss as to APL's monopolization and attempted monopolization claims against defendants Matson Navigation Company, Inc. and Matson Logistics, Inc., and grant it as to APL's claims against Matson, Inc.  Because the Court has not relied on any of the contested material in the request for judicial notice, the Court will deny as moot Matson's request for judicial notice, APL's motion to strike filed in response to that request, and APL's motion for leave to file a supplemental brief. A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  September 30, 2022