IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN PRESIDENT LINES, LLC, APL MARITIME, LTD., APL MARINE SERVICES, LTD.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>MATSON NAVIGATION COMPANY, INC., MATSON LOGISTICS, INC.,<br><br>　　　　　Defendants. | Civil Action No. 21-2040<br><br>Judge:  Hon. Christopher R. Cooper |

**NON-PARTY RODOLPHE SAADÉ'S REPLY TO DEFENDANT'S OPPOSITION TO NON-PARTY RODOLPHE SAADÉ'S MOTION TO <u>QUASH THIRD-PARTY SUBPOENA</u>**

**TABLE OF CONTENTS**

A.  Matson's Subpoena Should be Quashed Because it Commands an In-Person Deposition in Violation of Rule 45's Geographical Limits ................................................. 2

B.  Matson's Subpoena Should be Quashed Because it Seeks a Deposition of a Third-Party CEO Without Any Showing that He Has Non-Duplicative Information Relevant to the Litigation or that Matson Has Attempted and Failed to Obtain Elsewhere ................................................................................................................. 4

# TABLE OF AUTHORITIES

**CASES**  Page(s)

*Baine v. General Motors Corp.*, 141 F.R.D. 332 (M.D. Ala 1991) .........................................5, 6, 7

*Behrens v. Arconic, Inc.,* 487 F. Supp. 3d 283 (E.D. Pa. 2020) .......................................................3

*Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C 05-4374 MMC (JL), 2007 WL 205067 (N.D. Cal. Jan. 25, 2007) ................................................................................................7

*Colonial Cap. Co. v. General Motors Corp.*, 29 F.R.D. 514 (D. Conn. 1961) ................................8

*Community Fed. Sav. & Loan Ass'n v. FHLBB*, 96 F.R.D. 619 (D.D.C. 1983) .............................4

*Ings v. Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960) .......................................................................3

*Mehmet v. PayPal, Inc.*, No. 5:08 CV 1961, 2009 WL 921637 (N.D. Cal. Apr. 3, 2009) ..............................................................................................................................................6

*Minpeco SA v. Conticommodity Servs. Inc.*, 116 F.R.D. 517 (S.D.N.Y 1987) ...............................4

*Salter v. Upjohn Co.*, 593 F. 2d 649 (5th Cir. 1979) ................................................................5, 6, 7

*WebSideStory, Inc. v. NetRatings, Inc.*, No. 06cv408 WQH(AJBV), 2007 WL 1120567 (S.D. Cal. Apr. 6, 2007) ..................................................................................................5

**STATUTES, RULES, AND REGULATIONS**

French Law no. 68-678 of July 26, 1968 .........................................................................................3

Fed. R. Civ. P. 45(c) ........................................................................................................................2

# INTRODUCTION

Nothing in Matson's opposition to Non-Party Rodolphe Saadé's Motion to Quash calls into question the two fundamental reasons why Matson's subpoena to Mr. Saadé, the Chief Executive Officer of third-party CMA CGM S.A. (CMA CGM) should be quashed:

First, the subpoena is an invalid attempt to force Mr. Saadé to appear for a deposition in Washington, DC, more than 100 miles from where he resides or regularly conducts business, which contravenes Rule 45(c)'s geographic limitations.

Second, Mr. Saadé has little, if any, non-duplicative information relevant to this case, and defendant Matson has not even tried to obtain the information it claims it needs from Mr. Saadé from any of the many more logical and convenient sources of such information, including employees of parties APL and Matson.  Matson claims that it needs to depose the Chief Executive Officer of *CMA CGM* about his purported involvement regarding one of the many issues in this monopolization case – a slot charter agreement that Matson proposed to *APL*.  But Matson's own declarations in support of its Opposition contend only that Mr. Saadé received one preliminary call from Matson regarding the proposal, was one of many attendees at a single lunch at which Matson's slot proposal was allegedly one subject of discussion, and that Mr. Saadé responded to an email from Matson's CEO by referring him to *someone else* to discuss the proposal.  Matson also seeks to justify its extraordinary deposition demand by arguing that Mr. Saadé might have information regarding CMA CGM finances and resources, but Matson does not explain why it cannot obtain that information in any number of other ways, without deposing a non-party CEO.  Finally, Matson claims that it must depose Mr. Saadé regarding a statement to the French legislature and a response to an inquiry from a U.S. Congressional committee, but it

1

never explains why his testimony regarding these matters would even be relevant to this case, much less of sufficient importance to justify deposing a third-party CEO.

The Court should grant Mr. Saadé's Motion to Quash.

# ARGUMENT

### A. Matson's Subpoena Should be Quashed Because it Commands an In-Person Deposition in Violation of Rule 45's Geographical Limits.

Rule 45(c) provides that a subpoena may only command a person to appear for a deposition "within 100 miles of where the person resides, is employed, or regularly transacts business in person."  Fed. R. Civ. P. 45(c).  And Rule 45(d)(3) provides that courts "must" quash a subpoena that "requires a person to comply beyond the geographical limits specified in Rule 45(c)."  *Id.*

As detailed in Mr. Saadé's declaration, he lives and works in France and does not reside, work, or regularly transact business within 100 miles of Washington, DC.  Saadé Decl. ¶¶ 1-2. Matson's deposition notice requires Mr. Saadé to appear in Washington, DC, more than 100 miles from where he resides, is employed, or regularly conducts business, and thus should be quashed on its face.  Matson's arguments to the contrary are meritless.

First, while Matson claims to dispute Mr. Saadé's representation that he does not regularly conduct business within 100 miles of Washington, DC, Opp. at 10, it offers no evidence to contradict Mr. Saadé's declaration regarding that fact.  Saadé Decl. ¶ 1.

Second, Matson now argues that the Court should excuse the invalidity of its subpoena because – after Mr. Saadé moved to quash – Matson has become "willing to agree to a modification of the subpoena to permit a virtual deposition of Mr. Saadé rather than requiring his appearance in person in D.C."  Opp. at 11-12.  But Matson's change of heart does not alter the fact that the current subpoena indisputably violates the 100-mile rule and should be quashed for

2

that reason.  If Matson wishes to issue a new subpoena calling for Mr. Saadé to appear virtually, Mr. Saadé will respond to that subpoena, but that is not the subpoena that is currently at issue.

Matson's new proposal, moreover, ignores the implications of Mr. Saadé's status as a dual French/Lebanese citizen located in France.  French Law no. 68-678 of July 26, 1968 (commonly known as the "French Blocking Statute") requires that specific protocols be observed before Mr. Saadé could ever be deposed – in-person or virtually – in France.  Specifically, the French Blocking Statute prohibits a French national, subpoenaed for the purpose of foreign civil proceedings, from providing information (whether by deposition or documentary evidence) of an economic, commercial, industrial, financial, or technical nature.  French Law no. 68-678 of July 26, 1968.  Matson argues that use of the Hague Convention to seek evidence from a French Citizen is "not mandatory."  Opp. at 12-13.  But it ignores the implication of the *French Blocking Statute* for the testimony that Mr. Saadé might be subpoenaed to provide virtually while present in France or the documents in France that he might be subpoenaed to produce.  U.S. courts carefully assess the implications of the French Blocking Statute when evaluating subpoenas for evidence of French citizens and employ the Hague Convention to facilitate discovery consistent with the statute.  *See*, *e.g.*, *Behrens v. Arconic, Inc.,* 487 F.Supp.3d 283, 299-301 (E.D. Pa. 2020) (ordering use of the Hague Convention to address restrictions on obtaining documents from France under French Blocking Statute based on recommendation from "master and expert" regarding French law).  Matson cannot elide the implications of the French Blocking Statute by simply offering to take Mr. Saadé's deposition while he sits in France.  If and when Matson re-issues a subpoena for a virtual deposition in France, the Court and Mr. Saadé and Matson can assess the application of the French Blocking Statute to those circumstances.  *See*, *e.g.*, *Ings v. Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960) ("Upon fundamental principles of international

3

comity, our courts dedicated to the enforcement of our laws should not take such action as may cause a violation of the laws of a friendly neighbor or, at the least, an unnecessary circumvention of its procedures."). That assessment would need to account for, among other things, that Matson has made no showing that it seeks any non-duplicative evidence from Mr. Saadé or has even tried to obtain the evidence it claims it requires from him from more convenient witnesses – including the parties – who are not located in France. *Minpeco SA v. Conticommodity Servs. Inc.*, 116 F.R.D. 517 (S.D.N.Y 1987) (denying motion to compel information protected by Swiss bank secrecy laws in part because other methods of discovery could supply information being sought).

> **B.  Matson's Subpoena Should be Quashed Because it Seeks a Deposition of a Third-Party CEO Without Any Showing that He Has Non-Duplicative Information Relevant to the Litigation and that Matson Has Attempted and Failed to Obtain Evidence Elsewhere.**

Matson subpoenaed for deposition and documents the Chief Executive Officer of a major non-party corporation regarding a single relevant issue – Matson's slot charter proposal – in an antitrust case with myriad issues. And it did so before deposing a single witness in the case, including many witnesses, who will have much more direct and better information regarding Matson's slot charter proposal. The subpoena is transparently for purposes of harassment.

Matson must overcome a high bar to depose the CEO of a third-party witness – namely, showing that Mr. Saadé has important, non-duplicative information, and that Matson has tried and failed to obtain that information from other sources. *See*, *e.g.*, *Community Fed. Sav. & Loan Ass'n v. FHLBB*, 96 F.R.D. 619, 621-22 (D.D.C. 1983) (quashing deposition subpoenas to high-level administrators and holding that deposition of high-level decisionmaker removed from daily subjects of litigation could only be appropriate where deponent has "unique personal knowledge" of matter at issue and information could not be obtained through interrogatories or depositions of

4

others); *WebSideStory, Inc. v. NetRatings, Inc.,* No. 06cv408 WQH(AJB), 2007 WL 1120567, at *2 (S.D. Cal. Apr. 6, 2007) ("When a high-level corporate executive lacks unique or superior knowledge of the facts in dispute, courts have found that good cause exists to prohibit the deposition."); *Baine v. General Motors Corp.*, 141 F.R.D. 332, 335 (M.D. Ala 1991) (prohibiting deposition of Vice President of General Motors after plaintiffs failed to demonstrate that the Vice President has any "superior" or "unique personal knowledge" of the issues in the case).

Here, Matson *concedes* that "discovery in the meantime," before any deposition of Mr. Saadé occurs, may "mean[] that information need not be sought from Mr. Saadé because it was obtained elsewhere." Opp. at 23. Yet, Matson nonetheless subpoenaed Mr. Saadé before it deposed even a single witness in this case, and it still has not deposed any witnesses. As Matson's concession makes clear, the proper course is to quash the subpoena to Mr. Saadé, with Matson reserving the possibility of reissuing a (valid) subpoena if, and when, it can show that it was not able to obtain material information it seeks from Mr. Saadé from APL – a party – or some other source after a diligent effort to do so. At present, the subpoena to Mr. Saadé is indisputably premature. *Salter v. Upjohn Co.*, 593 F.2d 649 (5th Cir. 1979) (requiring plaintiff to depose other employees that defendant indicated had more knowledge of facts before seeking to depose corporate president); *Baine*, 141 F.R.D. 332 (granting protective order quashing deposition of Vice President of General Motors where plaintiff had failed first to depose lower-level employees and finding that deposing the executive at that time would be oppressive, inconvenient, and burdensome). If the Court were not inclined to grant the Motion to Quash, it should in the alternative issue a protective order requiring that before seeking to depose Mr. Saadé, Matson must show that it has unsuccessfully tried to obtain from other sources the information it seeks from him and still must depose Mr. Saadé to obtain important unique

5

information.  *See Salter*, 593 F.2d at 651 (upholding protective order where plaintiff sought to depose company president before deposing lower-level employees); *Baine*, 141 F.R.D. 332; *Mehmet v. PayPal, Inc.*, 2009 WL 921637 (N.D. Cal. Apr. 3, 2009) (granting protective order barring depositions of high-level executives, with leave for requesting party to renew request if it developed evidence that executives had personal knowledge of matters in dispute).

In his declaration accompanying Mr. Saadé's Memorandum in Support of his Motion to Quash, Mr. Saadé stated:  "I have no distinctive or unique information from APL's management regarding APL's affairs."  Saadé Decl. ¶ 8.  Far from disproving that statement regarding the proposed charter slot agreement, the materials that Matson has submitted in support of its Opposition show that Mr. Saadé has, at most, extremely limited involvement in any discussions regarding Matson's slot proposal and has no unique relevant information.  According to the declaration of Matthew J. Cox, Matson's CEO, Mr. Saadé's involvement in discussions over the slot proposal was limited to the following:  (1) one telephone call on March 23, 2017, after which Mr. Saadé directed Mr. Cox to work with *someone else* by "send[ing] a vessel sharing agreement proposal to in-house counsel at CMA CGM" (Cox Decl. ¶ 6); (2) a single alleged general lunch meeting on October 31, 2018, that included Mr. Cox and a Matson colleague and Mr. Saadé, Edward Aldridge, then APL's President, and possibly others from APL, at which a slot charter agreement was purportedly one subject of discussion (*id.* ¶¶ 6-13 & Exs. B-G); (3) an email dated November 10, 2019, in which, responding to a November 7 email from Mr. Cox, Mr. Saadé said, "[w]e are interested in resuming the discussions with you on the trade between USWC and Guam" and again referred Mr. Cox to *someone else*, this time Edward Aldridge (APL's President) for such discussions (*id.* ¶¶ 14-15 & Exs. H-I).  Matson also points to a single email where Mr. Cox thanks Mr. Saadé for "directing" the evaluation of Matson's proposal, but

6

this is merely Mr. Cox's unsupported characterization, and Matson points to no evidence that Mr. Saadé had any involvement with the slot charter proposal beyond the three aforementioned contacts.

Far from demonstrating that Mr. Saadé has important, non-duplicative information that could remotely justify a deposition of a non-party CEO, Mr. Cox's declaration and the exhibits thereto show that Mr. Saadé has *no* such information and that the key information about discussions regarding the charter slot proposal will come from others.  As to any events surrounding Mr. Cox's purported telephone call to Mr. Saadé on March 23, 2017, Mr. Saadé purportedly directed Mr. Cox to deal with CMA CGM counsel.  As to the alleged lunch meeting on October 31, 2018, there were many others at the table, and Matson has not deposed any of them.  And, as to Mr. Cox's solicitation to Mr. Saadé on November 7, 2019, Mr. Aldridge would be the source of information about any substantive follow-up discussions, yet Matson has not deposed him.

Matson cannot be heard to argue that it requires an extraordinary deposition of non-party CEO Mr. Saadé until and unless it has deposed witnesses affiliated with party APL and others and can show that it has been unable to obtain important evidence that Mr. Saadé would be uniquely able to provide.  *Salter*, 593 F.2d 649; *Baine*, 141 F.R.D. 332.  **And even Matson admits it may well never be in that position.**

Moreover, Matson has not even tried to issue interrogatories inquiring into the scope of any relevant information Mr. Saadé might have before resorting to the drastic step of seeking to depose a third-party Chief Executive Officer.  If Matson is truly acting in good faith – and not for purposes of harassment – that is an approach it could easily take.  *Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C 05-4374 MMC (JL), 2007 WL 205067, at *5 (N.D. Cal. Jan. 25,

7

2007) (requiring good faith effort to extract information sought from interrogatories and depositions of lower-level employees before deposition of CEO and Executive Chairman could ever be permitted); *Colonial Cap. Co. v. General Motors Corp.*, 29 F.R.D. 514, 518 (D. Conn. 1961) (requiring requesting parties to propound interrogatories and have that approach prove unsuccessful before deposition of Chairman and Chief Executive Officer could ever be permitted).

Matson makes a series of irrelevant claims that have nothing to do with whether the deposition of Mr. Saadé could ever be warranted. It contends that APL referred to Mr. Saadé as "our Chairman" or "our Executive Chairman" in public statements, that CMA CGM has referred to APL as a "brand," that certain APL executives also hold high-level positions at CMA CGM, and that CMA CGM has allegedly had some involvement in APL litigations. Opp. at 1, 4-5. But it offers no explanation regarding why any of this could justify a deposition of Mr. Saadé. As demonstrated, if deposing a non-party CEO could ever be appropriate, it would be because he or she has non-duplicative information that is critical to litigation; it would not be because there are some general connections between his or her company and a party to the litigation.

Finally, Matson does not explain why it could ever need a deposition of non-party CEO Mr. Saadé regarding any of its four proposed deposition topics other than the slot charter proposal. Opp. at 15-20. As to CMA CGM's alleged provision of cargo shipping services to or from Guam, Hawaii, Saipan, and/or Alaska and APL's participation in the MSP, including two vessels operated by APL, Matson does not even try to explain why it could not obtain any relevant evidence from a source other than CMA CGM's Chief Executive Officer. Nor does it explain why it needs to depose Mr. Saadé about public statements he has made "regarding CMA CGM's competitive standing," much less what such information has to do with a lawsuit

involving *APL*. Nor does Matson explain why Mr. Saadé's purported statements to the French legislature having nothing to do with the issues in this litigation or response to a letter from a Congressional Select Committee regarding COVID has any relevance to this litigation, much less why an effort to obtain information about this response could justify the deposition of a third-party CEO.

## CONCLUSION

For the forgoing reasons, Mr. Saadé respectfully requests that the Court quash Matson's third-party subpoena dated November 26, 2022, to non-party Rodolphe Saadé.

Dated:  February 6, 2023

*/s/ Thomas Mueller*

Thomas Mueller, DC Bar No. 434459
Thomas.Mueller@wilmerhale.com
Wilmer, Cutler, Pickering, Hale & Dorr LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037

*Counsel for Third-Party Rodolphe Saadé*