IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN PRESIDENT LINES, LLC, APL MARITIME, LTD., APL MARINE SERVICES, LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>MATSON NAVIGATION COMPANY, INC., MATSON LOGISTICS, INC.,<br><br>Defendants. | Civil Action No. 21-2040<br>Judge: Hon. Christopher R. Cooper |

**APL PLAINTIFFS' BRIEF IN RESPONSE IN OPPOSITION TO
DEFENDANTS' ARGUMENT THAT APL MUST PRODUCE
<u>DOCUMENTS IN THE POSSESSION OF THIRD PARTIES</u>**

Since the Court allowed APL's challenge of Matson's monopoly conduct in the U.S./Guam and U.S./Hawaii markets, Matson has deployed punishing discovery to divert from an examination of *its* conduct at issue—including now seeking to burden APL with a massive fishing expedition for irrelevant "resources" and other documents that might be in the possession of third parties.

In responding to Matson's existing 260-plus discovery demands for literally everything about APL's Guam business, APL is reviewing and processing more than <u>10 million documents</u> at substantial cost. Despite loose language about APL "refusing," Matson does *not* claim APL is withholding its responsive documents about CMA CGM S.A. ("S.A.") or CMA CGM (America) LLC ("CCA").[1] As telling, Matson does *not* identify relevant documents APL is not producing, or information Matson could not obtain through its subpoena on CCA or by serving a subpoena on S.A. (assuming without basis that they have information not duplicative of APL's productions).

Nevertheless, even before APL completes its production, Matson argues that APL must *also* respond to Matson's voluminous requests by *also* searching for documents in the possession of S.A. and CCA. S.A. owns companies employing 150,000 people at 420 locations in more than 160 countries, and CCA has employees in 11 U.S. locations. Matson's demand for APL to gather and produce their documents would multiply APL's discovery burden exponentially—and this burden would be disproportionate because Matson has not shown relevance for their information.

Matson must prove APL can make S.A. and CCA produce their documents for Matson— which necessarily requires the disregard of ordinary corporate structure and function. For S.A., Matson must prove "reverse control," *i.e.*, a small subsidiary (APL) controls its distant parent (S.A.). And for CCA, Matson must prove APL controls a sibling entity not owned by APL,

---

[1] APL did not "stonewall" (Matson Br. 1, 5): APL consistently told Matson that APL is producing S.A.- and CCA-related documents it possesses, but not documents in possession of S.A. or CCA.

operating in a different business with different employees, using different information systems that restricts APL's access, and is managed by different directors and officers (except one individual).

Matson is nowhere close to meeting its burden. Its sweeping argument about APL supposedly controlling both its distant parent and sibling relies on mischaracterized holiday greetings, COVID-19 acknowledgements, *Facebook* and *LinkedIn* posts, scattered emails, routine oversight by parent companies, and the bald claim of "extensive intermingling" of executives—which, in fact, is one CCA individual. Matson also omits material facts that disprove its argument, including APL is separate company distinct from S.A. and CCA, they are engaged in different businesses, and APL does not (and could not) command documents from S.A. or CCA.

## ARGUMENT

It is Matson's burden to prove that APL has "the legal right, authority, or ability to obtain" documents in possession of S.A. and CCA "upon demand" by APL. *ITC v. ASAT, Inc.*, 411 F.3d 245, 254 (D.C. Cir. 2005). Matson also must prove APL can "enforce compliance" with a demand. *Klesch & Co. Ltd. v. Liberty Media Corp.*, 217 F.R.D. 517, 529 (D. Col. 2003) (explaining ability to obtain documents on demand also requires ability "to enforce compliance with that demand").

Matson has not met its burden for S.A. or CCA, which APL addresses separately to clear confusion from Matson referencing them interchangeably, and to show why all the material documents relied upon by Matson fall far short of the exaggerated assertions made about them.

## I.  MATSON HAS NOT PROVEN APL CAN MAKE S.A. PROVIDE DOCUMENTS

Matson relies on cases about parents controlling subsidiaries (Br. 7-9), but the issue here is the *reverse*: Matson must prove a subsidiary (APL) controls a parent (S.A.). That would be an extraordinary result because "[a] subsidiary, by definition, does not control its parent corporation." *Power Integs., Inc. v. Fairchild Semi. Int'l, Inc.*, 233 F.R.D. 143, 145 (D. Del. 2005).

4857-6648-9703.1

There is no dispute that APL is a distant subsidiary of S.A., with four different companies separating them. Ex. 2, 5/29/23 Declaration of Ms. Alexander-Bradley ("Bradley Decl.") ¶7. This fact alone rebuts Matson's counterintuitive argument that APL controls S.A. And Matson ignored the import of cases holding that subsidiaries ordinarily cannot obtain their parents' documents upon demand. *See Power Integs.,* 233 F.R.D. at 145; *Heraeus Electro-Nite Co. v. Mid. Instru. Co.*, 2006 WL 3004877, at *3 (E.D. Pa. Oct. 18, 2005); *Input/Output, Inc. v. Sercel, Inc.*, 2008 WL 1134285, at *2 (E.D. Tex. Aug. 8, 2008); *In re Subpoena to Huawei Techs. Co.*, 720 F. Supp. 2d 969, 976-77 (N.D. Ill. 2010); *Klesch*, 217 F.R.D. at 520-22.

Additional facts reinforce the conclusion that APL does not control S.A. APL was acquired indirectly by S.A. interests a few years ago, after APL already entered the U.S./Guam market. Bradley Decl. ¶¶6-7. After the acquisition, APL continued to have its own directors, officers, employees, offices, financial recording and reporting, business records, and electronic file systems. *Id.* ¶¶8-13. In addition, APL has no directors, officers, or executives shared with S.A., *id.* ¶13— meaning APL has no mechanism to make or enforce orders on S.A. Further, APL's business represents less than 1% of S.A.'s revenues and profits, *id.* ¶9, 14, so APL is not in position to give or enforce orders on S.A. APL does not in the ordinary course of its business obtain S.A.'s documents upon demand, *id.* ¶22-23, nor would APL have the ability to make S.A. give documents for Matson because S.A. considers them protected by French disclosure law, *id.* ¶24.

Not even Matson's cases support a finding of "control" on these facts. *Steele Software* held that a parent controlled its wholly owned subsidiaries—both unremarkable and irrelevant. 237 F.R.D. at 555. *Meridan Labs.* also dealt with a parent's control. 333 F.R.D. at 136 In *Afros*, **all** of the subsidiary's board members were also executives in parent and they managed the subsidiary

3

and controlled its finances, 113 F.R.D. at 131-32—critical facts, not present here, establishing the subsidiary actually could control its parent through full board and management overlaps.

The flimsy "facts" Matson asserts do not support a finding that APL actually controls S.A. Matson's references to S.A. listing APL as one of its "brands," or APL employees displaying CMA CGM logos on their emails (below the more prominent APL logos, Bradley Decl. ¶16 ), or S.A. executives calling on a customer, "cross-selling" its subsidiaries, attending an APL meeting, reorganizing its subsidiary shipping routes, protecting its confidential information from public disclosure, or participating in resolution of litigation involving subsidiaries[2] (Matson Br. 2-4) all might be relevant to whether S.A. controls APL. But Matson must prove the *reverse*, and none of these "facts" reflect, let alone prove, APL control of S.A. At most, Matson describes routine and ordinary attention parent businesses give to their subsidiaries.

Similarly, Matson's desperate reliance on *LinkedIn* and an anonymous *Facebook* posting to allege the known inaccuracy that S.A.'s Mr. Saade is APL's "chairman," or that Mr. Courquin is APL's "CEO," (*id*. 3, 9)[3] cannot prove APL controls S.A. The equally unsupported allegations about APL acting as S.A.'s "arm" and S.A. being "intertwined" in APL business (*id.* 9) also prove nothing about APL's control of S.A. *Cf. U.S. v. Deloitte Touche USA LLP*, 623 F. Supp. 2d 39 (D.D.C. 2009) (rejecting notion that any business interaction between related entities equates to "control"). Matson's arguments, if anything, invite the Court to disregard corporate distinction and "pierce the veil"—which Matson said it is not requesting, (*id*. 1-2).

---

[2] APL objects to Matson's unauthorized disclosure of confidential settlement negotiations.
[3] Mr. Saade is not APL's Chairman and Mr. Courquin is not APL's CEO. Bradley Decl. ¶¶19-20.

4857-6648-9703.1

Matson's argument about S.A. fails to rebut the legal presumption that subsidiaries do not control parents, fails to prove reverse control with facts establishing that APL can make S.A. provide documents for Matson, and fails to overcome APL's evidence that it lacks such control.

## II.   MATSON FAILED TO PROVE APL CAN MAKE CCA PROVIDE DOCUMENTS

Matson also must prove that APL controls a distant sibling entity (CCA), which would be another extraordinary result given the irrelevant and thin "facts" it asserts. *See S.E.C. v. Credit Bancorp, Ltd.*, 194 F.R.D. 469 (S.D.N.Y. 2000) (considering facts similar to parent-subsidiary).

As with S.A., the facts disprove a finding of control. APL has no ownership in CCA (or *vice versa*). Bradley Decl. ¶17. They are distinct companies engaged in different businesses, with APL operating U.S.-Flagged ocean carriers, *id.* ¶¶3,17, and CCA acting as a U.S. agent for import/export of cargo for other companies, *id.* ¶5. It follows that APL and CCA each have their own directors, officers, and executives, and employees; and APL employees do not work in CCA offices, except for two APL employees who work out of a CCA office. *Id.* ¶¶9-10. APL also maintains business records (including servers with electronic data) and financial accounts separate from CCA. *Id.* ¶¶8, 12. APL and CCA each have electronic data systems that restrict access by the other. *Id.* ¶11. In the ordinary course of business, APL does not order documents from CCA, *id.* ¶25, or receive documents from CCA except in connection with an arms-length outsourcing arrangement for certain administrative "back office" and "support" functions, *id.* ¶¶25-27.[4] Consistent with these facts, APL cannot make CCA provide documents. *Id.* ¶22.

---

[4] APL's outsourcing of back office and support services to be performed by CCA and *its employees* does not empower APL to make CCA provide its documents according to Matson's main case. *See ASAT* 411 F.3d at 255 (sharing documents in course of business relationship does not establish practical ability to obtain other documents); *see also Valdez v. Genesis Healthcare LLC*, 2021 WL 5989963, at *9 (C.D. Cal. Sept. 7, 2021) (finding services agreement with third party insufficient to establish ability to make third party provide documents).

Relatedly, in discussing outsourcing, APL counsel *never* told Matson that there are hundreds or thousands of "overlapping ***employees***." Matson Br. 10, n.5. (emphasis added). Also,

Matson omitted these facts because they collectively prove APL cannot make CCA provide documents. With no ownership of CCA, APL lacks authority to make CCA follow orders. *See Klesch*, 217 F.R.D. at 521 (lack of ownership indicates lack of control). Also, with only one "overlap" among directors and officers, APL lacks the practical ability to exercise control of CCA, or means to enforce orders. *See Heraeus Electro-Nite*, 2006 WL 3004877, at *3 (emphasizing lack of multiple overlapping directors in finding lack of control). APL and CCA are engaged in different lines of business and do not comingle business activities and documents in the ordinary course. *See Input/Output*, 2008 WL 11348285, at *3 (relying on fact that sibling entities did not operate as under "common ownership"). The fact that the companies keep separate, restricted-access business documents shows APL cannot simply access CCA's documents. *See Credit Bancorp*, 194 F.R.D. at 473 (separate record keeping shows lack of document access and control). This is further supported by the fact that APL does not access CCA's documents in the ordinary course of business. *See Subpoena to Huawei*, 720 F. Supp. 2d at 977 (finding subsidiary could not make parent provide its documents even though they exchanged some documents in course of business).

Matson makes much about APL and CCA sharing a president (Matson Br. 3, 10), which Matson exaggerates, without support, as constituting "*extensive intermingling*" of officers and employees. (*Id*. 10 (emphasis added). Matson is factually wrong: There are no overlapping officers and employees—with the exception of one individual.[5] In any event, Matson's argument incorrectly presumes that a shared president means APL can make CCA provide documents for Matson—which ignores the separate duties owed by the president to each APL and CCA entity

Matson's requests for "concurrently employed" individuals defined APL and "CMA CGM" to include their related entities—a circular definition literally resulting in all APL employees being "concurrently employed" by others. In conference, APL counsel explained that Matson's poorly formed requests, depending on interpretation, encompasses hundreds or thousands of individuals.
[5] Matson repeats this inaccuracy, after APL corrected it when the Parties contacted the Clerk.

that is engaged in different business, and the practical fact that the president does not control the separate boards and managers for each entity and cannot make them provide documents.

The practical reality that a shared president is not enough to prove control is confirmed by Matson's cases—which relied on overlapping *owners* or *multiple* overlapping directors with demonstrated ability to give and *enforce* orders. In *Steele Software*, the same individual wholly owned all the entities in question. 237 F.R.D. at 555. Likewise, in *Meridan*, the same individual *owned* one company and was the founder, investor, and chair of the related company. 333 F.R.D. at 136. In *Afros*, <u>all</u> of a company's board members overlapped with the top executives of the related company. 113 F.R.D. at 131-32. Here, unlike the decisive facts in Matson's cases, the one individual serving as president of APL and CCA, has no ownership or majority control of CCA management. APL's lack of control of CCA is further confirmed by fact that they are different businesses, with different employees, and their own documents that APL cannot access in the ordinary course of business. Bradley Decl. ¶¶3-4, 8-12, 17, 19, 22, 25.

Matson's scattershot, strained "facts" do not prove otherwise. Matson argues a 2020 holiday email thanking APL and CCA personnel for working together through COVID-19 proves "CCA is involved in APL's 'ordinary course of business'" (Matson Br. 10), but APL's argument is refuted by the same email stating APL is "a standalone company," Matson Br., Ex. A. As fanciful, Matson cites an APL email about CCA handling of "street turns," *i.e.*, a practice of interchanging empty containers outside terminals which was a topic in industry press,[6] to leap to the unfounded and unbounded conclusion that APL "seek[s] signoff from CCA on everyday business decisions." (Matson Br. 10 & Ex. D (also inaccurately claiming email references Guam).)

---

[6] *E.g.*, *Street-turn Solution Discovered: It Will Work*, FREIGHTWAVES, *available at* https://www.freightwaves.com/news/street-turn-solution-discovered-it-will-work-expert-advice.

None of Matson's exaggerated arguments, even if credited, prove APL's practical ability to make a distant entity it does not own or control, CCA, provide its documents. *See, e.g., Philippe Charriol Int'l Ltd. v. A'lor Int'l Ltd.*, 2016 WL 7634440, at *2 (S.D. Cal. Mar. 10, 2016) (findings of "control must be firmly placed in reality…not in an esoteric concept…") (citation omitted).

## III. APL'S PRODUCTION OF DOCUMENTS POSSESSED BY S.A. AND CCA IS UNNECESSARY AND WOULD BE DISPROPORTIONATELY BURDENSOME

If, hypothetically, Matson proved APL's ability to make S.A. and CCA provide documents, APL should not be required to handle them. Matson provided no reason to presume S.A. and CCA have relevant documents not duplicative of those APL is producing. Nor has Matson demonstrated that it cannot obtain relevant documents, if any, directly from them. Indeed, Matson already served an expansive subpoena on CCA, it produced documents, and Matson moved to compel more. In these situations, courts sensibly deny requests like Matson's, when demanding parties have not exhausted reasonable efforts to obtain information directly from third parties. *See Input/Output*, 2008 WL 11348285 at *2 (declining to order party to produce parent's documents when parent also was subpoenaed for information); *Power Integs.*, 233 F.R.D. at *146 (finding no justification for compelling subsidiary to produce parent's documents when requesting party had other options to obtain discovery). It should be the same here.

In addition, Matson has not shown that the S.A. and CCA documents it seeks are relevant. Matson's conclusory argument about vague "resources" for APL's ability to "expand capacity" to counter Matson (Matson Br. 6) is irrelevant to APL's claims. APL alleges that Matson is monopolizing the U.S./Guam market by foreclosing APL from freely competing for the finite Guam shipper business. The relevant issue is *Matson foreclosing demand* (Guam shippers). APL's existing Guam fleet is operating well below its cargo carrying capacity, Bradley Decl. ¶28, and

APL's expansion of already excess capacity would be economically irrational, and irrelevant to the case issue of Matson foreclosing demand (Guam shippers) for APL's existing capacity.

Matson's primary authority, read in context, does not support its argument. *Rebel Oil Co., Inc. v. Atlantic Richfield, Co.* is a predatory pricing case, which requires plaintiffs to prove defendants could charge supracompetitive prices in future to recoup losses from past below-cost sales to drive out rivals. 51 F.3d 1433-34 (9th 1995). In that context, *Rebel Oil* considered whether "new rivals are barred from entering" and "existing competitors lack the capacity to expand their output" to counter defendant charging supracompetitive prices to recoup losses. *Id*. at 1439-41.

Matson's *Rebel Oil* quotations about "resources" for capacity expansion are unique to pricing cases. *See* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed.) ¶729 (explaining "special relevance" in predatory pricing cases). *Rebel Oil's* capacity expansion rationale has not been applied in this Circuit outside pricing predation or pricing effects in mergers (other than this Court's discussion[7]), or in any other Circuits to APL's knowledge. Contrary to Matson's insinuation that *Microsoft* "approved" *Rebel Oil*, Matson Br. 6, exhaustive *Microsoft* opinions on monopolization through foreclosure did ***not*** apply *Rebel Oil* as Matson proposes. *See U.S. v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000) (considering entry barriers but not capacity expansion); *U.S. v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (same).

Courts in this Circuit also distinguish *Rebel Oil* on "entry barriers," *see FTC v. Surescripts, LLC*, _ F. Supp. 3d _, 2023 WL 2707866, at *21 (D.D.C. Mar. 30, 2023) (declining to apply *Rebel Oil* and explaining that *Microsoft* defines entry barriers more broadly), another subject for which Matson has not shown S.A. and CCA have relevant documents, (Matson Br. 6-7). In this Circuit, entry barriers are factors "that prevent *new rivals* from timely responding" by entering markets.

---

[7] This was an ancillary motion to dismiss issue that did not have the benefit of full briefing.

4857-6648-9703.1

*Microsoft*, 253 F.3d at 51 (emphasis added). APL entered the Guam market in 2015, Bradley Decl. ¶5, so it cannot be a new rival. Neither S.A. nor CCA could be Guam rivals—S.A. is not Jones Act or U.S-Flag eligible for carrying cargo between Guam and the U.S. mainland, and CCA is not a carrier. Bradley Decl. ¶5. Nor would they be expected to have APL information on its 2015 Guam entry, because that occurred prior to S.A. interests acquiring NOL. Bradley Decl. ¶¶6-7.

Matson also has not shown that S.A. or CCA possess relevant or non-duplicative "injury" information. Even if S.A. in 2020 "realigned" APL's Guam trade (Matson Br. 7), APL would have such information. Moreover, Matson ignores that APL organized its routes and entered the U.S./Guam market before the S.A. acquisition, Bradley Decl. ¶¶6-7—undercutting Matson's convoluted argument that decisions by S.A. caused Matson's monopoly conduct to be successful.

Any benefit from the irrelevant information Matson seeks would be outweighed by the burden of responding. *See* Fed. R. Civ. P. 26(b)(1). It would be obviously burdensome to collect information in the possession of S.A. and CCA, with 150,000+ employees in 420 locations, Bradley Decl. ¶4—especially when they are unlikely to possess relevant or non-duplicative information. This is a further reason for rejecting Matson's request. *Valdez*, 2021 WL 5989963, at *11 (considering proportionality for producing documents in third party possession).

## IV.   MATSON'S ARGUMENT INFORMS BUT DOES NOT RESOLVE CCA MOTION

Matson's burden here is proving APL controls CCA, contrasted with Matson's need to prove the opposite (CCA controls APL) in its CCA motion. However, as Matson alleges similar "facts" in filings for both, consideration of them here could inform resolution of the CCA motion.

## CONCLUSION

Matson has not proven APL can make S.A. and CCA provide documents for Matson, or that it is necessary and proportionate for APL to do so. The attached Proposed Order (Ex. A) denying Matson's request should be entered.

10

4857-6648-9703.1

Dated:  May 30, 2023

                        /s/ *John R. Fornaciari*
John R. Fornaciari (DC Bar 152801)
Danyll W. Foix (DC Bar 475503)
Sally Qin (DC Bar 1011432)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC  20036-5403
Tel:    202.861.1500
Fax:    202.861.1783
Email: JFornaciari@Bakerlaw.com
        DFoix@Bakerlaw.com
        SQin@Bakerlaw.com

*Counsel    for    Plaintiffs    American President   Lines,   LLC,   APL   Maritime, Ltd., and APL Marine Services, Ltd.*

11

**CERTIFICATE OF SERVICE**

I, John R. Fornaciari, certify that on this 30th day of May 2023, I caused the foregoing APL PLAINTIFFS' BRIEF IN RESPONSE IN OPPOSITION TO DEFENDANTS' ARGUMENT THAT APL MUST PRODUCE DOCUMENTS IN THE POSSESSION OF THIRD PARTIES to be served on Defendants' counsel via electronic mail.

Dated:  May 30, 2023                                  */s/ John R. Fornaciari*
                                                             John R. Fornaciari (DC Bar 152801)

                                                             *Counsel   for   Plaintiffs   American*
                                                             *President  Lines,  LLC,  APL  Maritime,*
                                                             *Ltd., and APL Marine Services, Ltd.*