UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN PRESIDENT LINES, LLC** *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>**MATSON, INC.** *et al.*,<br><br>  Defendants. | Case No. 21-cv-2040 (CRC) |
| **MATSON NAVIGATION COMPANY, INC.** *et al.*,<br><br>  Petitioners,<br><br>  v.<br><br>**CMA CGM AMERICA LLC**,<br><br>  Respondent. | Case No. 23-mc-48 (CRC) |

## OPINION AND ORDER

In this Sherman Act case Plaintiff American President Lines ("APL") accuses defendant Matson of monopolizing, and attempting to monopolize, container shipping routes from the United States to Guam. Discovery is now in full swing. With the fact discovery deadline approaching, the parties seek rulings from the Court on various disputes.

First, APL is part of the CMA CGM Group, which according to Matson is the "world's third largest shipping conglomerate." Def.'s Discovery Brief ("Def.'s Brief") at 1, ECF No. 62. Matson alleges that APL has leveraged the CMA CGM Group's resources and brand to compete in the Pacific cargo trade. As a result, Matson seeks discovery about APL's relationship with

CMA CGM Group members, including APL's ultimate parent company, CMA CGM S.A. ("S.A."), which is based in France, and APL's sister company, CMA CGM America, LLC ("CCA"), headquartered in Virginia.  Id.  In the main litigation, Matson asks the Court, pursuant to its informal discovery dispute procedures, to order APL to respond to document requests for S.A. and CCA records in APL's control.  Id.  Matson has also sought documents from CCA directly, through a third party subpoena under Federal Rule of Civil Procedure 45 and now moves to compel CCA to respond in a related miscellaneous case.  See Mot. Compel, Matson v. CCA (23-mc-48), ECF No. 2.  On July 10, 2023, the Court heard argument from the parties on both disputes.  The Court rules as follows.

I. **Matson's Document Request to APL for S.A. and CCA Documents**

Rule of Civil Procedure 34(a) allows any party to serve a request for documents on another party for those documents in the "possession, custody or control of the party upon whom the request is served."  Norex Petroleum Ltd. v. Chubb Ins. Co. of Canada, 384 F. Supp. 2d 45, 55 (D.D.C. 2005) (citing Fed. R. Civ. P. 34(a)).  "The burden of establishing control over the documents sought is on the party seeking production."  Id.

The parties spar over the proper legal standard for assessing "control."  APL relies on a District of Delaware case which defines "control" narrowly as "the legal right to obtain the documents required on demand."  Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 233 F.R.D. 143, 145 (D. Del. 2005).  APL thus argues that Matson is not entitled to S.A. and CCA documents because Matson has not established that APL is legally entitled to demand documents from its parent or sister companies.  As Matson notes, however, the D.C. Circuit has adopted a more expansive definition of control, which focuses on the practical ability of a subsidiary to obtain documents from its parent.  U.S. Int'l Trade Comm'n v. ASAT, Inc., 411

F.3d 245, 254 (D.C. Cir. 2005) (relating to administrative subpoena). ASAT holds that a subsidiary "has the requisite control of documents that are in a parent company's possession where:

> (1) the alter ego doctrine . . . warranted 'piercing the corporate veil';
> (2) the subsidiary was an agent of the parent in the transaction giving rise to the lawsuit;
> (3) [t]he relationship is such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in litigation;
> (4) [t]here is access to documents when the need arises in the ordinary course of business; and[1]
> (5) [the] subsidiary was [a] marketer and servicer of the parent's product [] in the United States."

Id. (citing Camden Iron & Metal, Inc. v. Marubeni America Corp., 138 F.R.D. 438 (D.N.J. 1991)). Courts have laid out factors to consider when examining "whether a subsidiary and its parent are sufficiently close so that the subsidiary controls the documents in question." In re Subpoena To Huawei Techs. Co., Ltd., 720 F. Supp. 2d 969, 977 (N.D. Ill. 2010). These include: "(1) commonality of ownership; (2) exchange or intermingling of directors; (3) the exchange of documents in the ordinary course of business; (4) the non-party's connection to the transaction at issue; (5) any benefit or involvement by the non-party corporation in the litigation; (6) a subsidiary's marketing and/or servicing of the parent company's products; and (7) the financial relationship between the companies." Id.; see also Meridian Lab'ys, Inc. v. OncoGenerix USA, Inc., 333 F.R.D. 131, 135 (N.D. Ill. 2019).

Rather than argue that one or more specific ASAT grounds has been neatly satisfied, Matson analyzes several factors relied upon by out-of-circuit cases. These considerations may be instructive in assessing the grounds the D.C. Circuit identified in ASAT. But, for the

---

[1] The statute is read disjunctively. A party need not satisfy every element of the test to establish the requisite control. See e.g., Camden Iron & Metal, Inc. v. Marubeni Am. Corp., 138 F.R.D. 438, 443 (D.N.J. 1991).

3

purposes of this opinion, the Court will adhere to the ASAT test. As the Court finds that the ASAT test has not been met, it denies Matson's request to have APL produce S.A. or CCA documents.

### A. APL's Control Over S.A. Documents

The Court begins with Matson's request to APL for S.A. documents in its control. First, Matson posits that APL is a "wholly owned subsidiary" and an "acting arm" of S.A. in the United States. Def.'s Brief at 9. Matson further suggests that APL and S.A. intermingle directors and officers because APL refers to S.A.'s Chairman, Rudolph Saadé, as "its chairman" and APL's CEO is also the head of CMA CGM Group for Asia and Oceania. Id. at 3. But Matson overstates the corporate and personnel overlap between APL and S.A. APL has submitted a sworn declaration from its Vice President and Chief Financial Officer, who avers that APL and S.A. are separated by four levels of nested corporations and currently share no directors, officers, or executives. Decl. of Mary Alexander-Bradley ("Bradley Decl.") ¶¶ 1, 13.

Matson also insists that APL and S.A.'s businesses are more integrated than APL acknowledges. Although Matson does not say so explicitly, it suggests the second ASAT ground might be met—that APL was "an agent of the parent in the transaction giving rise to the lawsuit." 411 F.3d at 254. The Court has not been provided the full set of Matson's document requests. But the transaction underlying this dispute largely involves Matson's and APL's activities in the cargo shipping routes between the US and Guam and the US and Hawai'i. The question, then, is whether Matson has shown that APL acts as S.A.'s agent in this business.

Although Mr. Saadé is not formally a member of APL's leadership team, Matson nonetheless contends that he directs APL's business decisions. For example, Matson claims that in 2018, its CEO engaged in discussions with Mr. Saadé about a slot charter agreement, which

4

APL alleges was designed to unlawfully allocate trade on U.S.-Guam routes. Def.'s Brief at 4. And Mr. Saadé allegedly intervened personally on at least one occasion to persuade a Matson customer to switch to APL for shipping services. Id. at 3.

Matson further alleges that S.A. markets APL as one of its brands and, in turn, that APL publicly touts its ties to S.A. and cross-sells services with CMA CGM entities, including at locations at issue in this lawsuit. Def.'s Brief at 2–3. Moreover, the charter agreements for both of APL's vessels in the U.S.-Guam trade are said to include "trade secrets and confidential commercial and financial information belonging to," among others, "CMA CGM S.A." Id. at 4. And as part of a supplemental submission, Matson points to documents purportedly showing S.A.'s financial ties and involvement with APL in the Guam trade—namely, a draft credit agreement between S.A. and an APL customer regarding an APL shipment from Singapore to Guam; a "pre-arrival notice" for a shipment from Guam to the United States instructing remission or wire transfer of payment to CCA and CMA CGM Group Treasury S.A.R.L.; and an email chain between APL and S.A. employees regarding approval to ship hazardous materials.

As Matson has shown, S.A. and APL appear to interact with respect to the Pacific cargo trade. Mr. Saadé may very well have engaged occasionally with APL customers or competitors. And S.A. and APL employees might liaise in the logistical, day-to-day workings of the Guam trade. But some involvement by a parent in the affairs of a subsidiary does not prove that the companies are acting in an agency relationship. See Camden Iron & Metal, Inc., 138 F.R.D. at 443 (finding subsidiary had control over parent's documents because parent played "significant role in the transaction [at issue] through its continued participation," the deal was "at all times" subject to parent's final approval, and companies acted "as one" in transaction). On the whole, the evidence here is too thin to show that "the operations, interests, and leadership of the two

corporations are closely intertwined." See Meridian Lab'ys, Inc. v. OncoGenerix USA, Inc., 333 F.R.D. 131, 139 (N.D. Ill. 2019) (finding requisite control where entities had "acted 'as one' with respect to the Agreement and the events material to [] lawsuit").

      The record also lacks proof that APL could access S.A. documents in the ordinary course of business or could otherwise secure the requested documents to meet its own business needs or to aid in litigation. To start, APL disputes Matson's claim that it can obtain S.A. documents on demand. Pl.'s Brief at 3, ECF No. 65. APL's CFO declares that APL maintains its own "file server systems for its offices" and its "email and data systems restrict access to non-APL entities." Bradley Decl. ¶ 11. And, based on her understanding, S.A. and CCA also possess their own systems and restrictions on access. Id. At most, Matson's evidence shows that APL and S.A. may share "some documents during the ordinary course of business." ASAT, Inc., 411 F.3d at 255. But this is not enough to show that APL could access S.A. documents at its pleasure. Id. ("Simply because the [companies] share some documents during the ordinary course of business is insufficient to deem [the subsidiary] as having control over the documents underlying the [litigation] at issue."). The Court is unpersuaded that APL—whose revenue and net profit are less than one percent of the CMA CGM Group's—has the requisite control of S.A. documents. See Bradley Decl. ¶ 14.

      Last, Matson contends that S.A. representatives are involved in the ongoing litigation between APL and Matson. Def.'s Brief at 4. While some out-of-circuit courts do assess "any benefit or involvement by the non-party corporation in the litigation," this factor alone does not warrant compelling APL to produce S.A. documents. See Pitney Bowes, Inc. v. Kern Int'l, Inc., 239 F.R.D. 62, 69 (D. Conn. 2006) (holding that whether parent was true stakeholder of lawsuit did not, alone, establish subsidiary's control over parent's documents).

Grounds one and five of ASAT are also not met here. Matson has not offered evidence that the companies are so intertwined as to be alter egos. ASAT, 411 F.3d at 254. The record also lacks evidence that APL's "principal activities on behalf of its parent," if any, are the sale, marketing and provision of customer services in the United States. Id.

In sum, the Court finds that, as to APL and S.A., Matson has failed to satisfy one of the ASAT grounds.

### B. APL's Control Over CCA Documents

Matson also requests that APL produce CCA documents under its control. While applying the ASAT test to APL and CCA may present a closer question, the Court need not engage in that analysis at this juncture because APL has requested the same documents from CCA directly through a third-party subpoena, as discussed further below. The parties have agreed to work with one another to stage CCA's production, to the extent necessary, following Matson's receipt of documents from APL.

## II. Matson's Motion to Compel Compliance with Rule 45 Subpoena

Matson also moves to compel CCA's compliance with its Rule 45 document subpoena. Matson's Mot. Compel, Matson v. CCA (23-mc-48), ECF No. 3. The Court ruled on most of the disputed issues at the hearing and now memorializes those rulings. Twenty document requests are at issue. To start, the Court understands that requests 3, 23, and 38[2] are now moot, as CCA has agreed to produce the documents relevant to these requests. CCA Opp'n at 1, ECF No. 19.

---

[2] Request 3 concerns documents showing the identities and roles of overlapping management-level employees between CMA CGM and APL; request 23 concerns studies and analyses of competition for cargo shipping markets to and from Guam, Hawaiʻi, Saipan, and Alaska; and request 38 concerns documents submitted to Congress in response to inquiries about CMA CGM's cargo shipping rates.

7

Next, CCA has informed Matson that it possesses few, if any, documents responsive to requests 11, 19, 22, and 37[3] because "it does not engage in the activities that would lead to the creation of such documents." CCA Opp'n at 2. To ascertain this, CCA claims it interviewed certain executives, including Ali Nikkhoo, CCA's General Manager in Hawaiʻi, and Nick Fafoutis, its Chief Commercial Officer. Id. at 4. But as the Court indicated, CCA's response (i.e., that it *may* or *may not* possess the relevant documents) is vague. As a result, the Court ordered the parties to meet and confer regarding the selection of two to four CCA custodians who, based on their seniority, role, or communication with the parent company, might possess the requested documents.

As to these requests, Matson also seeks documents about S.A.'s business that might be in the possession or control of CCA. Mot. Compel at 19–21. As for relevant documents that CCA possesses, it must produce them. As for documents in S.A.'s possession, while CCA has conceded that it is S.A.'s agent in the United States, Mot. Compel Ex. B at 2, Matson has not established that the agency relationship concerns the transactions at issue in this lawsuit. Nor has it shown that CCA can secure the requested documents from S.A. on demand. The Court will not compel CCA's production of S.A. documents not within its possession.

CCA also objects to half of the requests—16, 17, 21, 24, 25, 26, 28, 31, 34, and 35[4]—as duplicative of Matson's document requests to APL. CCA Opp'n at 5. At the hearing, Matson

---

[3] Request 11 concerns studies of CMA CGM's operating margins and costs; request 19 concerns the participation of CMA CGM ships in the Maritime Security Program Fleet; request 22 concerns documents related to attempts to obtain a Jones Act waiver from the U.S. government; and request 37 concerns documents showing CMA CGM's reasons for price changes on Pacific cargo shipping routes.

[4] Requests 16 and 17 concern documents about CMA CGM's and CCA's financial support and pooling of assets with APL; request 21 concerns documents related to attempts by APL to enter into agreement with Jones Act vessels operating cargo shipping services between the United States and Hawaiʻi; requests 24, 25, and 26 concern documents about APL's cargo shipping

agreed to defer production of these documents until it reviewed APL's recent productions. Trial Tr. Rough at 41. The Court will hold these requests in abeyance until Matson has reviewed APL's recent, voluminous productions. Matson and CCA shall then meet and confer regarding any documents that APL did not produce, but that Matson nonetheless believes are in CCA's possession.

Next, the Court turns to request 20, which concerns documents related to attempts by CCA to enter into agreements with Jones Act vessels operating cargo shipping services between the United States and Hawai'i. CCA agreed to produce an existing connecting carrier agreement between APL and the Pasha Group but declined to produce any documents created after July 2021, the discovery cutoff date in the APL v. Matson litigation. CCA Opp'n at 6-7. Matson argues that CCA is not subject to the cutoff date negotiated in the underlying case and seeks documents about a more recent arrangement between APL and the Pasha Group. Because Matson's request is arguably relevant and as the documents are likely in the hands of a small number of custodians, CCA is ordered to fulfill Matson's request, even if the documents post-date the complaint in the underlying litigation.

Finally, in requests 29 and 30, Matson seeks non-privileged communications and documents about the antitrust litigation between APL and Matson. Mot. Compel at 9. The parties mostly dispute whether two in-house attorneys should be designated as custodians. Matson explains that this request, or the resulting creation of a privilege log, would allow it to

---

services to and from Guam; request 28 concerns documents about slot charter agreements entered into by CMA CGM entities; request 31 concerns communications with certain customers about Matson; and requests 34 and 35 concern documents about Matson's alleged termination of contracts with APL in Alaska.

9

identify additional CCA custodians.  For the reasons stated at the hearing, the Court denies Matson's request as to the two lawyers.

### III. Conclusion

For these reasons, it is hereby

**ORDERED** that [2] Matson's Motion to Compel in Matson v. CCA is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:     July 28, 2023