**<u>REDACTED PUBLIC VERSION</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN PRESIDENT LINES, LLC,
APL MARITIME, LTD., APL MARINE
SERVICES, LTD.,

              Plaintiffs,

     v.

MATSON NAVIGATION COMPANY,
INC., MATSON LOGISTICS, INC.,

              Defendants.

No. 1:21-cv 2040-CRC

**ORAL ARGUMENT REQUESTED**

**<u>DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT</u>**

<u>**REDACTED PUBLIC VERSION**</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

UNDISPUTED FACTS ....................................................................................... 2

    I.    Matson Offers "Gold Standard" Service To Guam ............................... 2

    II.    APL Launches An "Inferior" Service Hampered By "Sheer Incompetence"........ 4

    III.    Fierce Price Competition Ensues In Matson And APL's "Rate War".................. 6

    IV.    Unable To Win In The Marketplace, APL "Punches Back" With A Lawsuit................. 8

LEGAL STANDARD........................................................................................... 11

ARGUMENT ....................................................................................................... 11

    I.    The Court Should Enter Summary Judgment on APL's Monopolization Claim ........ 12

        A.    Matson Did Not Engage in Exclusionary Conduct.................................. 12

            1.    APL Cannot Show Substantial Foreclosure................................. 13

            2.    APL's Threats And Retaliation Theory Fails .............................. 14

                (a)    There Is No Actionable Threat To Customers ................ 14

                (b)    There Is No Actionable Threat To Pasha......................... 17

                (c)    There Is No Actionable Claim About Trucking Companies..... 18

            3.    APL's Disparagement Theory Fails........................................... 19

            4.    APL's Exclusive Dealing, Bundling, And Tying Theories Fail ........ 23

                 (a)    APL Cannot Prove Anticompetitive Exclusive Dealing....... 23

                 (b)    APL Cannot Prove Anticompetitive Bundling Or Tying....... 29

            5.    Alleged Alaska And Slot Charter Conduct Cannot Prove Exclusion...... 31

                (a)    APL's Attempt To Link Alaska And Guam Fails .......... 31

                (b)    Matson's Slot Charter Proposals Were Not Anticompetitive........ 34

            6.    There Is No Evidence Of Any Wrongful Matson Logistics Conduct....... 35

        B.    APL Cannot Demonstrate Matson Has Monopoly Power...................... 35

            1.    APL Cannot Prove Its Relevant Markets..................................... 35

<u>**REDACTED PUBLIC VERSION**</u>

       2.     Matson Does Not Have Monopoly Power ................................... 38

   C.     APL Cannot Demonstrate Causal Antitrust Injury Or Damages ............. 40

       1.     APL Cannot Establish Harm To Competition ............................ 40

       2.     APL Cannot Establish Causal Antitrust Injury ........................... 41

       3.     APL Cannot Establish A Reasonable Measure Of Damages ....... 43

II.    The Court Should Enter Summary Judgment On APL's Attempt Claim ............ 44

   A.     APL Cannot Show Matson Intended To Monopolize Guam .................. 44

   B.     APL Cannot Show A Dangerous Probability Of Monopolization ........... 45

CONCLUSION ...................................................................................................................... 45

<u>**REDACTED PUBLIC VERSION**</u>

**TABLE OF AUTHORITIES**

<u>**Page(s)**</u>

**Cases**

*3Shape Trios A/S v. Align Tech., Inc.,*
  2019 WL 3824209 (D. Del. Aug. 15, 2019) ........................................................34

*Abcor Corp. v. AM Int'l,*
  916 F.2d 924 (4th Cir. 1990) ...........................................................................44

*In re Adderall XR Antitrust Litig.,*
  754 F.3d 128 (2d Cir. 2014) ............................................................................33

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
  836 F.3d 1171 (9th Cir. 2016) .........................................................................30

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,*
  592 F.3d 991 (9th Cir. 2010) ......................................................................24, 25

*\*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of
  Podiatric Surgery, Inc.,*
  323 F.3d 366 (6th Cir. 2003) ...........................................................................21

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.,*
  521 F.2d 1230 (3d Cir. 1975) ..........................................................................14

*Andrx Pharm., Inc. v. Biovail Corp. Int'l,*
  256 F.3d 799 (D.C. Cir. 2001) .........................................................................18

*Argus Inc. v. Eastman Kodak Co.,*
  801 F.2d 38 (2d Cir. 1986) ..............................................................................43

*Ass'n for Intercollegiate Ath. for Women v. NCAA,*
  735 F.2d 577 (D.C. Cir. 1984) .....................................................................42, 44

*Atl. Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990) ...........................................................................29, 31, 40

*Balaklaw v. Lovell,*
  14 F.3d 793 (2d Cir. 1994) ..............................................................................26

*Barr Labs. v. Abbott Labs.,*
  978 F.2d 98 (3d Cir. 1992) ..............................................................................14

*Barry Wright Corp. v. ITT Grinnell Corp.,*
  724 F.2d 227 (1st Cir. 1983) ......................................................................24, 25

*Behrend v. Comcast Corp.,*
  2012 WL 1231794 (E.D. Pa. Apr. 12, 2012) ..................................................34, 35

*Blue Cross & Blue Shield United v. Marshfield Clinic,*
  65 F.3d 1406 (7th Cir. 1995) ...........................................................................39

<u>**REDACTED PUBLIC VERSION**</u>

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
   49 F.4th 520 (5th Cir. 2022) ............................................................26

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993).........................................................................29

*Brunswick v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977).........................................................................40

*Cascade Health v. Peacehealth*,
   515 F.3d 883 (9th Cir. 2007) .....................................................13, 30

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).....................................................................11, 20

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
   781 F.3d 264 (6th Cir. 2015) ............................................................30

*\*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ...............................................24, 25, 44

*\*Covad Commc'ns Co. v. Bell Atl. Corp.*,
   398 F.3d 666 (D.C. Cir. 2005) ...............................................13, 22, 23

*Dart Drug Corp. v. Parke, Davis & Co.*,
   344 F.2d 173 (D.C. Cir. 1965) ..........................................................19

*Dial A Car, Inc. v. Transp., Inc.*,
   82 F.3d 484 (D.C. Cir. 1996) ......................................................12, 40

*Duty Free Ams., Inc. v. Estée Lauder Cos.*,
   797 F.3d 1248 (11th Cir. 2015) ........................................................19

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992).........................................................................38

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
   821 F.3d 394 (3d Cir. 2016)....................................................22, 27, 30

*\*In re EpiPen Mktg, Sales Practices Antitrust Litig.*,
   44 F.4th 959 (10th Cir. 2022) .................................................12, 16, 28

*FTC v. Church & Dwight Co.*,
   665 F.3d 1312 (D.C. Cir. 2011) ........................................................30

*FTC v. Facebook, Inc.*,
   560 F. Supp. 3d 1 (D.D.C. 2021) ......................................................44

*FTC v. Facebook, Inc.*,
   581 F. Supp. 3d 34 (D.D.C. 2022) ....................................................39

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ..................................................19, 32, 33

<u>**REDACTED PUBLIC VERSION**</u>

*FTC v. Staples*,
190 F. Supp. 3d 100 (D.D.C. 2016) ........................................................... 37

*FTC v. Surescripts, LLC*,
424 F. Supp. 3d 92 (D.D.C. 2020) ............................................................. 24

*FTC v. Surescripts, LLC*,
665 F. Supp. 3d 14 (D.D.C. 2023) ........................................................ 37, 38

*\*Gleklen v. Democratic Congressional Campaign Committee, Inc.*,
199 F.3d 1365 (D.C. Cir. 2000) ........................................................ 11, 15, 20

*Grant v. Trs. of Ind. Univ.*,
870 F.3d 562 (7th Cir. 2017) ..................................................................... 11

*Gross v. Wright*,
185 F. Supp. 3d 39 (D.D.C. 2016) .............................................................. 41

*H B Equipment Co. v. Int'l Harvester*,
577 F.2d 239 (5th Cir. 1978) ..................................................................... 42

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
423 F.3d 374 (3d Cir. 2005) ................................................................. 30, 39

*Innovation Ventures, LLC v. N.V.E., Inc.*,
694 F.3d 723 (6th Cir. 2012) ..................................................................... 22

*Intergraph Corp. v. Intel Corp.*,
195 F.3d 1346 (Fed. Cir. 1999) .................................................................. 19

*Jefferson Parish Hosp. Dist. No. 2. v. Hyde*,
466 U.S. 2 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v.
Indep. Ink*, 547 U.S. 28 (2006) .................................................................. 30

*Kaufman v. Time Warner*,
836 F.3d 137 (2nd Cir. 2016) .................................................................... 31

*Klayman v. Judicial Watch, Inc.*,
6 F.4th 1301 (D.C. Cir. 2021) ................................................................... 16

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
748 F.3d 160 (4th Cir. 2014) ..................................................................... 39

*Lektro-Vend Corp. v. Vendo Corp.*,
660 F.2d 255 (7th Cir. 1981) ..................................................................... 45

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) ...................................................................... 30

*Litton Sys., Inc. v. Honeywell, Inc.*,
1996 WL 634213 (C.D. Cal. July 24, 1996) ................................................ 43

## <u>REDACTED PUBLIC VERSION</u>

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) ........................................................................................................14

*MacDermid Printing Solutions LLC v. Cortron Corp.*,
    833 F.3d 172 (2d Cir. 2016) ....................................................................................23, 40

*Matson Navigation Co. v. U.S. Dep't of Transp.*,
    471 F. Supp. 3d 60 (D.D.C. 2020) ...............................................................................21

*Mazda v. Carfax, Inc.*,
    2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) .................................................................14

*Meijer, Inc. v. Biovail Corp.*,
    533 F.3d 857 (D.C. Cir. 2008) ......................................................................................17

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) .........................................................................................22

*Merit Motors, Inc. v. Chrysler Corp.*,
    569 F.2d 666 (D.C. Cir. 1977) ......................................................................................37

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
    859 F.3d 408 (7th Cir. 2017) .........................................................................................28

*Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*,
    828 F.2d 1033 (4th Cir. 1987) .......................................................................................44

*Morris v. Corr. Corp. of Am.*,
    75 F. Supp. 3d 457 (D.D.C. 2014) (Cooper, J.) ...........................................................15

*N. Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) ..........................................................................................................31

*Neumann v. Reinforced Earth Co.*,
    786 F.2d 424 (D.C. Cir. 1986) ......................................................................................35

*Neumann v. Vidal*,
    1981 WL 2219 (D.D.C. 1981) .......................................................................................38

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021) ............................................................................16, 25

*\*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) ...............................................13, 14, 16, 17, 26, 33

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) .....................................................................................33

*\*OJ Commerce, LLC v. KidKraft, Inc.*,
    34 F.4th 1232 (11th Cir. 2022) .................................................................14, 15, 16, 17

*Omega Env't, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) .................................................................................26, 27

<u>**REDACTED PUBLIC VERSION**</u>

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)............................................................................................33

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.*,
    103 F.3d 42 (7th Cir. 1996) ..............................................................................28

*Penn. R.R. Co. v. Dillon*,
    335 F.2d 292 (D.C. Cir. 1964).............................................................................3

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018)...............................................................................45

*Pool Water Prod. v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001) ...........................................................................41

*R.J. Tobacco Co. Reynolds v. Philip Morris Inc.*,
    199 F. Supp. 2d 362 (M.D.N.C. 2002) .........................................................14, 27

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010).............................................................................23, 28

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    292 F. Supp. 3d 14 (D.D.C. 2017) .................................................................40, 44

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ...........................................................................43

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019) .......................................................................41, 42

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .....................................................................38, 39, 40

*Retina Assocs., P.A. v. Southern Baptist Hosp. of Fla.*,
    105 F.3d 1376 (11th Cir. 1997) .........................................................................14

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016) .............................................................................22

*Richter Concrete Corp. v. Hilltop Concrete Corp.*,
    691 F.2d 818 (6th Cir. 1982) .............................................................................38

*Robert's Waikiki U-Drive, Inc. v. Rent-a-Car Sys.*,
    732 F.2d 1403 (9th Cir. 1984) ...........................................................................31

*\*Roland Machinery Co. v. Dresser Indus.*,
    749 F.2d 380 (7th Cir. 1984) ...........................................................13, 26, 27, 29

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ...........................................................................36

*S. Pac. Commc'ns Co. v. AT&T*,
    740 F.2d 980 (D.C. Cir. 1984) ...........................................................................12

<u>**REDACTED PUBLIC VERSION**</u>

*S. Pac. Commc'ns Co. v. AT&T Co.*,
  556 F. Supp. 825 (D.D.C. 1982) .......................................................................40, 43

*Sanderson v. Culligan Int'l Co.*,
  415 F.3d 620 (7th Cir. 2005) ...................................................................19, 22, 23

*Schachar v. Am. Acad. of Ophthalmology*,
  870 F.2d 397 (7th Cir. 1989) ...........................................................................22, 23

*Scott v. Harris*,
  550 U.S. 372 (2007).................................................................................................18

*Sharp v. Rosa Mexicano, D.C., LLC*,
  496 F. Supp. 2d 93 (D.D.C. 2007).........................................................................11

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993).................................................................................................44

*Standard Oil Co. v. United States*,
  337 U.S. 293 (1949).................................................................................................28

*Sterling Merch., Inc. v. Nestle, S.A.*,
  656 F.3d 112 (1st Cir. 2011) ..................................................................................13

*Sterling Merch., Inc. v. Nestle, S.A.*,
  724 F. Supp. 2d 245 (D.P.R. 2010)........................................................................26

*Taylor Publ'g Co. v. Jostens, Inc.*,
  216 F.3d 465 (5th Cir. 2000) ..................................................................................43

*Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*,
  57 F.3d 1317 (4th Cir. 1995) ..................................................................................26

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
  875 F.2d 1369 (9th Cir. 1989) ................................................................................36

*Twin Cities Baker Workers Health & Welfare Fund v. Biovail Corp.*,
  2005 WL 3675999 (D.D.C. Mar. 31, 2005)...........................................................42

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
  986 F.2d 589 (1st Cir. 1993) ..................................................................................26

*U.S. Steel Corp. v. Fortner Enter.*,
  429 U.S. 610 (1977).................................................................................................44

*U.S.F.L. v. NFL*,
  634 F. Supp. 1155 (S.D.N.Y. 1986).......................................................................21

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919).................................................................................................19

*United States v. Conn. Nat'l Bank*,
  418 U.S. 656 (1974).................................................................................................36

<u>REDACTED PUBLIC VERSION</u>

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)....................................................................................36

*United States v. Google LLC*,
    --- F. Supp. 3d ---, 2023 WL 4999901 (D.D.C. Aug. 4, 2023)....................12, 13, 41

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)....................................................................................35

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)..........13, 16, 17, 24, 26, 28, 29, 30, 31, 34, 35, 38, 39, 40, 44, 45

*United States v. Microsoft Corp.*,
    87 F. Supp. 2d 30 (D.D.C. 2000)....................................................................45

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990)..........................................................................38

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001)....................................................................23, 27, 28, 30

*In re Vitamins Antitrust Litig.*,
    216 F.R.D. 168 (D.D.C. 2003)........................................................................32

*W. Parcel Exp. v. UPS*,
    190 F.3d 974 (9th Cir. 1999)..........................................................................23

*Walgreen Co. v. AstraZeneca Pharm. L.P.*,
    534 F. Supp. 2d 146 (D.D.C. 2008)............................................................20, 22

*In re Wellbutrin XL Antitrust Litig.*,
    868 F.3d 132 (3d Cir. 2017)..........................................................................41

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)..........................................................................30

**Statutes**

15 U.S.C. § 15b.................................................................................................17

46 U.S.C. § 12111(b)..........................................................................................3

46 U.S.C. § 12112.............................................................................................3

46 U.S.C. § 50101(a)(2)......................................................................................3

46 U.S.C. § 55102(b)..............................................................................3, 4, 5, 6, 7, 8, 39

**Rules**

Fed. R. Civ. P. 56(a)..........................................................................................11

<u>**REDACTED PUBLIC VERSION**</u>

**Treatises**

Antitrust Law Developments (9th ed.)............................................................................20

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
Principles & Their Application* (4th & 5th ed. 2018–2023)......................14, 20, 21, 25, 26, 27, 45

<u>REDACTED PUBLIC VERSION</u>

## INTRODUCTION

Matson succeeds in the U.S. to Guam trade because it offers a far superior service at a fair price.  This is not, it turns out, a surprise to anyone at American President Lines ("APL").  Before it reentered the Guam trade, APL knew it would offer ████████████████████████.  APL's subsequent internal assessments were even dimmer: ████████████████████████████

████████████████████████████████████████████████████

██████. The ramifications were predictable. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████      On Guam, customers came to know APL by another name: "Always Plan Late."  Ex. 233 (DHX Decl.) ¶ 9.  The people of Guam deserve, demand, and choose Matson because of its "reliability, shorter transit time, and customer service."  Ex. 55 (Aduana Decl.) ¶ 5.

There are mountains of evidence showing that APL caused its own competitive failures in the Guam trade.  By contrast, there is no evidence that those same failures were the result of anti-competitive conduct by Matson.  As the Court observed, the "meat and potatoes" of this lawsuit is APL's claim that Matson threatened customers out of doing business with APL.  Ex. 487 (Hrg. Tr. (July 10, 2023)) at 51:3 .  Those customers have testified without exception that they "have no idea what APL is referring to."  SUF ¶ 198.  And Matson's actual conduct—loyalty discounts for household goods shippers and volume discounts for others—not only did not implicate, much less foreclose, a large enough share of the market to harm the competitive process, but instead affirm-atively benefitted customers.

This lawsuit has never been about an actual antitrust violation.  In internal discussions, APL admitted it stems from Matson petitioning Congress and the courts to adopt and enforce laws

<u>**REDACTED PUBLIC VERSION**</u>

APL disfavors—speech the Court already found protected by the First Amendment—and Matson's decision to lower prices following APL's entry into the trade, which left APL short of the profits it hoped to reap.  *See* FAC ¶¶ 38, 40.  As APL's then-President explained to Rodolphe Saadé, CMA CGM's Chairman, this lawsuit is meant to ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████.  Goliath has extracted its pound of flesh from Matson in the high cost of litigating this case.  But the ██████ ends there: the antitrust laws cannot be further twisted to condemn the competition they are intended to foster.  Because there is no material dispute of fact on the elements of APL's claims, its crusade to punish Matson should end now.

## UNDISPUTED FACTS

Matson has served Guam for almost thirty years.  SUF ¶ 13.  APL, a subsidiary of CMA CGM, the world's third-largest shipping conglomerate, views Matson as ████████████████████ ██████  SUF ¶ 26.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

The tale told in APL's Complaint, however, is belied by overwhelming, undisputed evidence.

## I.   Matson Offers "Gold Standard" Service To Guam

Guam is the United States' westernmost territory, a small island at the bottom of the Mariana Islands archipelago.  SUF ¶ 1.  It is an "import" trade that depends on shipping.  SUF ¶ 2.  About 75% of cargo originates in the continental United States and the remaining 25% arrives from Asian ports.  SUF ¶ 3.  Each customer's needs are distinct.  SUF ¶¶ 4–11.  Lettuce must be

**REDACTED PUBLIC VERSION**

shipped quickly to avoid spoilage, cars can travel in containers or as non-containerized cargo on roll-on-roll-off vessels, and construction materials often require specialized equipment. *Id.*

Matson is the world's 28th largest carrier, SUF ¶ 12, but the "gold standard" in ocean shipping to Guam. SUF ¶ 25. That begins with its Jones Act vessels: U.S.-built, U.S.-flagged, and U.S.-crewed ships that are more expensive to build and operate but nurture the domestic shipping industry and preserve a maritime fleet for war or national emergency. *Penn. R.R. Co. v. Dillon*, 335 F.2d 292, 295 n.5 (D.C. Cir. 1964); *see also* 46 U.S.C. §§ 12111(b), 12112, 50101(a)(2), 55102(b). Matson sails weekly from the U.S. West Coast to Guam via Honolulu. SUF ¶ 15. To ensure the reliability and speed of its services, Matson invested in dedicated terminals and facilities at each of its mainland ports as well as in Hawaii. SUF ¶ 17. These operational investments give customers more time to get goods to the port, reduce loading/unloading times, and allow Matson to avoid port congestion—including the crippling bottlenecks others faced during the pandemic. SUF ¶¶ 18, 149. As a result, Matson sails to Guam fast and arrives on time. SUF ¶¶ 18, 25, 58.

Matson has also invested heavily in Guam, including by hiring and promoting local leadership. SUF ¶ 20. Customers rave about Matson's ███████████ "superior" customer service and "awesome staff." SUF ¶ 21. Matson's booking and billing systems are █████████ to use. SUF ¶ 22. And Matson always has adequate chassis—the trailers onto which containers are dropped when unloaded—and other specialized equipment. SUF ¶ 23. This ensures Matson can carry any cargo—commercial or military; dry, refrigerated, or chilled; hazardous or non-hazardous—and deliver anywhere on the island. *Id.* Although Matson receives the occasional complaint like any business, APL's senior employees admitted internally that ████████████████ ███████████████████████ SUF ¶ 24. Even APL's sister company, CEVA Logistics, ███████████████████████████ SUF ¶ 150.

3

**REDACTED PUBLIC VERSION**

## II.    APL Launches An "Inferior" Service Hampered By "Sheer Incompetence"

Formerly a Jones-Act-qualified, American-owned company, APL has been a subsidiary of a foreign parent for decades.  SUF ¶ 26.  Today it answers to CMA CGM, the leading member of the largest global shipping alliance.  SUF ¶ 27.  APL is CMA CGM's military-focused arm: ████████████████████████ with the Department of Defense, its ████████████████ SUF ¶ 31.  As the United States eyed a military buildup in Guam, ████████████████ ███████████████████████████████████████████

In 2014, APL commissioned a study to assess a Guam service.  SUF ¶ 33. ██████████ ██████████████████████████████████████████████████████████████ ██████████ SUF ¶ 34.  Those subsidies were indispensable to APL's Guam business as it has explained to other courts in sworn declarations, bulletins to Congress, and testimony in this case. SUF ¶ 35. ████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████

APL chose neither, opting instead for a ████████████████ SUF ¶¶ 37, 40.  APL initially offered a fortnightly "feeder" service that transshipped goods in Asia—unloading containers off one ship and reloading them onto another—before circling back to Guam.  SUF ¶ 37. ████ ██████████████████████████████████████ but for commercial cargo originating in the United States, APL's service was less frequent, slower, more susceptible to delays, and more likely to damage cargo.  SUF ¶ 40.  From Seattle, APL offered no service at all.  SUF ¶ 38.  APL's former CEO testified that ████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████

APL sought to compensate by undercutting Matson's prices ████████████████

<u>**REDACTED PUBLIC VERSION**</u>

███████████████████████  SUF ¶ 42.  But APL found ██████████████████████████

██████████████████████  without fast, reliable service.  SUF ¶ 43.  This goes beyond a simple

desire to have cargo fast.  Some is perishable.  SUF ¶ 44.  And most businesses on Guam have

limited storage space, meaning a delayed shipment leads first to empty shelves and then to too

much inventory when vessels arrive close in time to one another.  SUF ¶ 45.  ████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████  Worse, APL's ships came to Guam late, arriving within 24 hours of their scheduled

windows only ████ of the time in 2018, ████ in 2019, ████ in 2020, ████ in 2021, and ████ in

2022.  SUF ¶ 51.  ████████████  APL sailings was more than a week late, and it missed at least 16

altogether.  *Id.*  APL ███████████████████████████████  SUF ¶ 52.  Its service was *much*

slower and *far* less predictable than Matson's, whose 24-hour on-time rate was 90%.  SUF ¶ 58.[1]

By APL's own assessment, its Guam service was ██████████████ in 2019 (SUF ¶ 60(d)),

██████████████ in 2020 (SUF ¶ 50(e)), and, in May 2022, still ██████████████ (SUF ¶ 60(g)).  Under

oath, APL described its service as ██████████████  SUF ¶ 60(f).  Laments like ██████████████

███████████████████████████████████████████  peppered its internal assessments.  SUF

¶¶ 60(a), (c)–(f); 61(c).  Year after year, customers told APL they were ██████████████████████

████████████████████████████████████████████████████████████████████████████

---

[1] In practice, Matson holds itself to a stricter standard, deeming a vessel late if it arrives more than
one hour after the scheduled berth.  SUF ¶ 58.  By that yardstick, Matson was on time 81% of the
time—surpassing APL's rate every year under the 24-hour measure.  SUF ¶¶ 51, 58.

**REDACTED PUBLIC VERSION**

███████████████████        SUF ¶ 61.

   ██████████████████████        but far from its only problem.  SUF ¶ 62.  APL's cus-

tomer service also was █████████        SUF ¶ 69.  Customers groused about APL's ████████

██████████████████████████        SUF ¶ 64.  APL's billing ████████████████

████████████████████████████████████████████████

███████████        *Id.*  And unlike Matson, APL ████████████████████████

████████████████████████        .  SUF ¶ 71.

   All of this limited APL's market share.  *See* SUF ¶¶ 75–77.  Said one customer, "in Guam,

the risk of lost business and the costs associated with APL's longer transit time and other service

issues is not justified by the lower prices APL sometimes offers."  SUF ¶ 77.  APL's executives

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████        But the service was never there: APL's own sales

staff said that ████████████████████████████        SUF ¶ 77.  Many customers

made that decision, declining to ship much (or any) cargo with APL.  SUF ¶¶ 76–77.

## III.   Fierce Price Competition Ensues In Matson And APL's "Rate War"

   Despite its struggle to establish a reliable service, APL's low-price strategy allowed it to

take share—as much as ████ in 2019—particularly among cargo that was not time sensitive.  SUF

¶ 80.  So while Matson differentiated itself as a premium provider, it still had to compete on price.

SUF ¶ 81.  Guam is a tariff trade, meaning that prices for a particular type of cargo carried from a

specific origin are publicly filed.  SUF ¶ 83.  APL and Matson closely monitor those tariff filings.

SUF ¶ 84.  Their savvy customers do too: Shippers were "constantly reevaluating" APL's and

Matson's offerings to make "both companies … compete for business," SUF ¶ 85, and playing

**REDACTED PUBLIC VERSION**

APL and Matson off one another, asking each to match or beat offers made by the other.  *Id.*  ████

████████████████████████████████████████████████████

One front in the rate war was volume discounting.  SUF ¶ 87.  To attempt to overcome its

reliability issues, ██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████.

SUF ¶ 99.  Confidential contracts have historically not been used in the Guam trade; Matson had

a handful of memoranda of understanding ("MOU") that included volume commitments or other

unique shipping terms, typically terminable on 30-days' notice, and which the industry treats as

unenforceable "gentleman's agreements."  SUF ¶¶ 92–95, 97.  ████  and Matson's sales person-

nel alike agreed MOUs did not stop shippers' cargo from "ebb[ing] and flow[ing]" between carri-

ers.  SUF ¶ 102.  And while Matson pursued additional MOUs in response to APL's confidential

contracts, ████████████████████████████████████.  SUF ¶ 109.[2]

Both APL and Matson also used loyalty programs to compete in the household goods

("HHG") segment.  SUF ¶¶ 127–135.  That segment—moving individuals' "household goods" to

Guam—comprises only ██ of cargo in the Guam trade.  SUF ¶ 127.  In 2017, APL partnered with

a company called DeWitt Guam, to offer HHG customers a 25% discount to Guam.  SUF ¶ 130.

Matson then expanded its pre-existing discount for Hawaii HHG customers to those who also

shipped to Guam.  SUF ¶¶ 132–135.  Those who elected to carry 90% of their tonnage to Hawaii

and Guam received a 15-25% loyalty discount.  SUF ¶¶ 133–134.  No HHG shipper had to join

Matson's program and those who did not could and did ship with Matson at tariff prices.  SUF

¶ 137.  ████████████████████████████████████████████████

---

[2] At a customer's request, Matson entered a single confidential contract with no exclusivity re-
quirement; the customer thereafter shipped the vast majority of its cargo with APL.  SUF ¶ 105.

**REDACTED PUBLIC VERSION**

████████████████████  SUF ¶¶ 140–142.  APL has carried ████████ of HHG cargo to Guam since its reentry, hitting ████ even after Matson's loyalty program.  SUF ¶ 143.

It is undisputed that customers enjoyed the benefits of this competition.  They could choose between differentiated services: a high-quality one that sometimes came with a higher price and a low-quality one that often charged less.  SUF ¶ 79.  Trade-wide, prices are lower.  Since APL began its weekly service in 2017, Matson's prices fell by 8.9% from Los Angeles and 20.6% from Oakland.  SUF ¶ 86.  Customers pay thousands less on each box.  *Id.*  Guam has been and remains, as APL's sales director said, a ████████████████.  SUF ¶ 78.

## IV.    Unable To Win In The Marketplace, APL "Punches Back" With A Lawsuit

By the end of 2020, APL found itself in a precarious position.  Matson's superior service and vigorous competition meant APL's cheap service was less attractive than it had hoped.  SUF ¶¶ 147–157.  APL ████████████████████████████████████████████ ████████████████ at the same time those same subsidies—without which it would not even attempt to serve Guam—were imperiled in an administrative law challenge.  SUF ¶ 147.  And its service was in dire straits: Battered since the outbreak of COVID-19, APL's network was a mess and its vessels were ██████████████████████████████████—while Matson, able to bypass the bedlam with its own terminals, continued to arrive on schedule.  SUF ¶¶ 147–149. ████████████████████████████████████████████

CMA CGM was not pleased.  ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

███████████████████████████   Yet APL spun a story in this Court wherein Matson (including Matson Logistics) threatened customers, retaliated against vendors, disparaged APL, and intimidated APL's potential partners. *See* FAC ¶¶ 44–57.  Discovery has proved this is fiction.  APL's employees admit ████████████████████████████. *See* SUF ¶¶ 156, 159–160, 196, 212–213, 286–287.  APL never identified a single fact tying Matson Logistics to its claims.  SUF ¶¶ 289–296.  And APL chose not to test its claims with customers.  Brass Decl. ¶¶ 4–12.  Matson sought that discovery, and those customers denied APL's allegations without exception.  SUF ¶¶ 113–119, 126, 162–164, 168–169, 171–172, 183, 186, 192, 194, 198–201, 207.

A.  *Threats*.  APL alleged that Matson threatened customers by saying "it was just a matter of time before APL would leave the market" and that they would be charged higher prices or receive less favorable service if they did not support Matson.  SUF ¶ 161.  Of the ten "threatened" customers APL identified, *nine* have submitted declarations disavowing any such threats.  SUF ¶¶ 162–168; *see also* App'x A.  They could not be clearer: Luen Fung is "not aware of any instance of Matson threatening Luen Fung in any way"; "Matson has never threatened retaliation," wrote two others; and a fourth, Ross, said, it was "unaware of Matson ever threatening or coercing Ross in any way."  SUF ¶¶ 118, 162, 168.  Others said the same.  SUF ¶¶ 162, 168–172.  The exception is Home Depot's Tony Bonaparte, who says nothing at all because he died well before this litigation began.  SUF ¶¶ 163–164.  What is more, APL did not seek discovery from Home Depot, nor disclose any Home Depot witness.  SUF ¶ 164.  And it chose not to depose the Matson representative, Tim Kirchhoff, whom APL accused of threatening Home Depot; for his part, Mr. Kirchhoff denies any threat, and Home Depot's correspondence reflects none.  SUF ¶¶ 165, 197(c).

APL also alleges Pasha, a Jones Act Hawaii carrier, "declined to partner" its service with APL's "due to concern of adverse reaction by Matson."  FAC ¶ 53; *see also* Ex. 392 (APL Fourth

Supp. Interrog. Resp.) at 15.  APL sought no discovery from Pasha.  SUF ¶ 177.  Its President &

CEO, George Pasha IV, flatly rejects APL's theory: When it came to whether or not to work with

APL, his "decisions had nothing to do with Matson."  Decl. of G. Pasha ¶ 5; *see also* SUF ¶ 178

███████████████████████████████████████████████████████.

    B.  *Retaliation*.  APL also alleges that Matson retaliated against two of its trucking partners.

FAC ¶¶ 9–11, 54–57.  Two different representatives of the first, DeWitt Guam, testified that Mat-

son never retaliated against it.  SUF ¶ 183.  They further testified that DeWitt shifted business to

APL, dispelling any notion of harm, until ultimately moving back to Matson due to APL's constant

service failures.  SUF ¶¶ 184–185.  Although APL also claims Matson convinced Saipan Shipping

Company to withhold containers from a DeWitt company called Approved Freight (Ex. 392 at 15),

Saipan Shipping's sworn declaration states "APL's allegations concerning Saipan Shipping are

absolutely false" (SUF ¶ 186), and Approved Freight confirmed the same (SUF ¶ 187).

    The second trucking company APL identified, Guam Transport and Warehouse ("GTW"),

testified that it lost its business from Matson in February of 2016—well outside the four-year stat-

ute of limitations.  SUF ¶ 189.  Far from hurting APL, GTW responded by evangelizing APL's

service to drive more customers *to* APL.  SUF ¶ 190.  And although APL alleges that Matson

coerced a supplier, Fastenal, to withhold parts from GTW, Fastenal denied APL's allegation.  SUF

¶ 192.  For his part, GTW's owner admitted that he heard that Matson had merely stockpiled

equipment from Fastenal—a course of action he had previously recommended to APL to ensure

replacement parts would always be on hand.  SUF ¶ 193.

    C.  *Disparagement*.  APL claims Matson disparaged it to five customers—Cost.U.Less,

NAPA, Luen Fung, MidPac, and Home Depot—by telling them APL received unfair subsidies

and would not last in the Guam trade.  *See* FAC ¶ 5; Ex. 392 at 12; Ex. 13 (Warren-Boulton Rep.)

REDACTED PUBLIC VERSION

¶¶ 170–175.  No evidence supports this claim.  SUF ¶¶ 195–198.  Four customers denied dispar-

agement under oath; the lone exception again being Home Depot's long-deceased Bonaparte.  SUF

¶ 198.  APL's largest customer on Guam, Cost.U.Less, testified that "Matson has also never dis-

paraged APL in any way" and "[a]ny reference to APL by Matson has always remained profes-

sional and factual."  SUF ¶ 198(a); *see also* SUF ¶¶ 198(b)–(d), 199–200 (collecting additional

examples).  Nor did any supposed disparagement impact these customers' shipping decisions:

Cost.U.Less now gives APL ███████████████; no empirical evidence connects the claimed

disparagement to customers sending less volume to APL (SUF ¶¶ 207–208); and those who prefer

Matson cite its superior service (*see, e.g.*, SUF ¶¶ 21–22).[3]

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant

"bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the

absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"While a nonmovant is not required to produce evidence in a *form* that would be admissible at trial,

the evidence still must be capable of being converted into admissible evidence."  *Gleklen v. Dem-*

*ocratic Congressional Campaign Committee, Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).

## ARGUMENT

At this "'put up or shut up' moment in a lawsuit," *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562,

568 (7th Cir. 2017), the case APL trumpeted in its Complaint is silent on the facts.  First, there is

no proof of anticompetitive conduct: Customers and Matson witnesses alike deny the threats and

---

[3] APL witnesses accused Matson of misconduct at Guam, Los Angeles, and Oakland ports.  *See*, *e.g.*, Ex. 15 (APL 30(b)(6)) at 121:12–122:12.  Each admits his assertions are hearsay.  SUF ¶ 287.  Moreover, although these alleged events predate this lawsuit, they are absent from APL's plead-ings, discovery responses, and witness disclosures, SUF ¶ 288, and therefore outside the scope of this case.  *See Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007).

disparagement APL alleged without exception; Matson's HHG loyalty program and MOUs offered procompetitive discounts; and there is no evidence of required anticompetitive effects (*i.e.*, no substantial foreclosure) (§ I.A). Second, APL cannot prove its alleged market, and its expert does not even opine that Matson is a monopolist in that market (§ I.B). Third, APL cannot show that Matson harmed competition or injured APL nor quantify its alleged damages (§ I.C). For these reasons—as well as APL's failure to show Matson intended to monopolize the Guam trade or had a dangerous probability of doing so—APL's attempted monopolization claim also fails (§ II).

## I.    The Court Should Enter Summary Judgment on APL's Monopolization Claim

To establish its monopolization claim, APL must show that (1) Matson engaged in anticompetitive conduct; (2) Matson possessed monopoly power in the relevant markets; and (3) APL suffered antitrust injury. *See S. Pac. Commc'ns Co. v. AT&T*, 740 F.2d 980, 1000 (D.C. Cir. 1984); *Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 486 (D.C. Cir. 1996). There is no genuine dispute of material fact on any of these elements.

### A.    Matson Did Not Engage in Exclusionary Conduct

APL alleges four forms of exclusionary conduct: (1) threatening customers, intimidating Pasha, and retaliating against truckers; (2) disparaging APL; (3) discounting in a manner that amounts to exclusive dealing, bundling, or tying; and (4) acts outside Guam and unconsummated proposals. *See* FAC ¶¶ 41–50, 53–64; Ex. 392 at 11–19; Ex. 13 (Warren-Boulton Rep.) ¶¶ 85–228. Because this alleged conduct "does not fit within a single paradigm," the Court must "disaggregate the exclusionary conduct into its component parts before applying the relevant law." *In re EpiPen Mktg, Sales Practices Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022); *accord United States v. Google LLC*, --- F. Supp. 3d ---, 2023 WL 4999901, *12–14 (D.D.C. Aug. 4, 2023) (disaggregating alleged exclusionary conduct under the applicable framework at summary judgment). Undisputed evidence confirms none of Matson's actual conduct is anticompetitive.

**REDACTED PUBLIC VERSION**

### 1.    APL Cannot Show Substantial Foreclosure

Without harm to "the competitive process itself," the "welfare of a particular competitor who may be hurt as the result of some trade practice is the concern not of the federal antitrust laws." *Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 394 (7th Cir. 1984); *accord United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001).   APL must therefore meet its burden and prove that Matson's conduct "impairs the health of the competitive process itself" by substantially foreclosing competition in the relevant market.  *Roland*, 749 F.2d at 394.  Each of APL's claims of exclusionary conduct requires proof of "substantial market foreclosure." *N.Y. v. Meta Platforms, Inc.*, 66 F.4th 288, 304 (D.C. Cir. 2023) (threats); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 674 (D.C. Cir. 2005) (disparagement); *Microsoft*, 253 F.3d at 70 (exclusive dealing, tying); *Cascade Health v. Peacehealth*, 515 F.3d 883, 909 (9th Cir. 2007) (bundling).

The alleged conduct does not implicate, much less foreclose, a "substantial" portion of APL's alleged market.  To be clear, because none of this conduct is anticompetitive on its own (as explained below), it cannot be "aggregate[d]" into something "anticompetitive."  *Google*, 2023 WL 4999901, at *12.  But even if APL could stir everything into a monopoly broth, the conduct identified by its economist implicates no more than ███ of the alleged market—and just ███ after excluding customers whose declarations disavow APL's allegations.  SUF ¶¶ 296–297.

No court in this Circuit has ever accepted a claim with such limited potential foreclosure.  Less than 30% foreclosure is presumptively insubstantial as a matter of law.  MTD Order 22; *accord Microsoft*, 253 F.3d at 70.  Thus, the leading antitrust treatise opines that it is "plainly easy" to dispatch cases "where foreclosure of the relevant market is less than 30 percent."  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶ 1822c (4th & 5th ed. 2018–2023).  Other courts agree that such "low numbers make dismissal easy."  *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 124 (1st Cir. 2011) (rejecting

claim with foreclosure below 30%).[4]  Because the numbers don't add up for APL even if *all* its allegations are credited and aggregated, the Court need go no further to grant judgment for Matson—though, as described below, undisputed facts show competition is not foreclosed in Guam.

### 2.    APL's Threats And Retaliation Theory Fails

Contrary to APL's first theory of exclusionary conduct, the voluminous record reveals no evidence that Matson threatened anyone.  APL at most can point to Matson's refusal to deal with particular truckers outside the statute of limitations—conduct with no bearing on ocean shipping to Guam or Hawaii and that benefitted APL.  This does not give rise to a triable antitrust claim.

### (a)    There Is No Actionable Threat To Customers

According to the Complaint, Matson threatened shipping customers to stop them from doing business with APL.  FAC ¶¶ 44–45, 48, 53.  This amounts to a claim that Matson refused to deal with customers unless they abstained from purchasing APL's services.  *See* MTD Order 19–20 (citing *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951)).  To prove this claim, APL must show that (1) Matson made threats conditioning access to its shipping services on not dealing with APL, (2) within the statute of limitations, and (3) the result of which was "substantial market foreclosure."  *Meta*, 66 F.4th at 304; *see also OJ Commerce, LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1247 (11th Cir. 2022).  APL has come up short at all three steps.

**1.**  The biggest problem with APL's theory is that there is no evidence of actual Matson threats.  APL's interrogatory responses identified four allegedly threatened customers.  SUF ¶ 162.  But the customers aver otherwise.  Luen Fung is "not aware of any instance of Matson threatening

---

[4] *See also, e.g.*, *EpiPen* (rejecting claim with foreclosure of 31%); *Retina Assocs., P.A. v. Southern Baptist Hosp. of Fla.*, 105 F.3d 1376, 1385 (11th Cir. 1997) (same at 15%); *Barr Labs. v. Abbott Labs.*, 978 F.2d 98, 110–11 (3d Cir. 1992) (same at 15%); *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1252 (3d Cir. 1975) (same at 14.7%); *R.J. Tobacco Co. Reynolds v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 390–95 (M.D.N.C. 2002) (same at 34%); *Mazda v. Carfax, Inc.*, 2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) (same at less than 30%).

**REDACTED PUBLIC VERSION**

Luen Fung in any way, let alone as it relates to APL." SUF ¶ 162. "Matson has never threatened to refuse to do business with MidPac on account of MidPac's relationship with APL," nor was there "any instance of Matson threatening to charge higher rates … [or] to provide MidPac with unfavorable service if MidPac awarded cargo to APL." *Id.*; *see also* SUF ¶¶ 162, 168 (collecting customer testimony). And there is no evidence of any threat to Home Depot. SUF ¶ 163.

████████████████████████████████████████████████████████████████████████

But the Court had already precluded such sandbagging. *See* Ex. 488 (Hrg. Tr. (Feb. 2, 2023)) at 4:3–5:2, 6:9–19; Ex. 489 (Hrg. Tr. (Aug. 9, 2023)) at 64:21–65:17 (ordering APL to disclose the relevant customers in written discovery and precluding it from relying on undisclosed individuals). Regardless, no evidence supports these allegations either. APL identified Paje Butler—DHX's manager in Guam—as allegedly threatened. Ex. 15 (APL 30(b)(6)) at 281:3–10. But Mr. Butler swears Matson "has never threatened me, or anyone else" even though his companies in fact did "some business with APL in Guam and has experienced no retaliation." Ex. 233 (DHX Decl.) at ¶ 14. Another customer, Aduana, testified that "Matson has never threatened Aduana in any way" let alone "said or implied that if Aduana sent cargo to Guam on APL, Matson would increase Aduana's prices or give it worse service." Ex. 55 (Aduana Decl.) at ¶ 7.

APL's only "proof" is self-serving hearsay. ████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████, for example, and APL's former Guam General Manager Charlie Hermosa testified that he "learn[ed] about the threats … through customer feedback" (Ex. 46 (Hermosa Dep.) at 185:9–11); *see also* SUF ¶¶ 159–160. Disabused hearsay "counts for nothing," *Gleklen*, 199 F.3d at 1369, and "cannot be used to overcome summary judgment," *Morris v. Corr. Corp. of Am.*,

REDACTED PUBLIC VERSION

75 F. Supp. 3d 457, 460 (D.D.C. 2014) (Cooper, J.); *see also Klayman v. Judicial Watch, Inc.*, 6 F.4th 1301, 1315–16 (D.C. Cir. 2021).  There is no admissible evidence of a threat—only an inadequate "hypothesized account."  *OJ Commerce*, 34 F.4th at 1249.

These claims independently fail because the statements APL alleges Matson made aren't threats at all—much less ones that "prohibited [Matson's shipping] customers from also" shipping with APL.  *Meta*, 66 F.4th at 304.  APL alleged that Matson threatened "to punish customers for disloyalty" by cutting off service to those who used APL or "conditioned the availability and quality of [its] service on APL's exclusion."  MTD Order 20.  APL's witness testimony bears no resemblance to those allegations.  For example, APL's Guam GM says Matson "threatened" Luen Fung by "alleging that it was just a matter of time before [APL] left the market."  Ex. 46 (Hermosa Dep.) at 208:12–15.  The alleged "threat" to Home Depot was "confront[ing]" it about APL containers in its yard—which Home Depot shrugged off—and commenting that APL was "[b]ring[ing] down the rates."  *Id.* at 202:21–203:4.  NAPA's owner supposedly complained to APL that Matson charged more than APL's predecessor had.  *Id.* at 215:3–216:6; *see also* SUF ¶ 168 (similar).

These comments are a far cry from *Lorain Journal* or *Microsoft*.  *See* MTD Order 19–20 (likening APL's allegations to the conduct in those cases).  In *Lorain Journal*, the local newspaper "refused to deal with any and all customers unless those customers agreed not to deal with the competitor station."  *N.Y. v. Facebook, Inc.*, 549 F. Supp. 3d 6, 32 (D.D.C. 2021).  Microsoft told Intel to stop developing a cross-platform interface or it would "refuse to distribute Intel technologies bundled with Windows" and support Intel's competitors instead.  *Microsoft*, 253 F.3d at 77.  By contrast, Matson "leaves [customers] entirely free" to decide with whom they ship, *Meta*, 66 F.4th at 304, and many used both companies.  SUF ¶¶ 121, 174; *see also EpiPen*, 44 F.4th at 997 (no coercion where customers dealt with plaintiff).  There is no actionable "threat."

**REDACTED PUBLIC VERSION**

**2.**  APL's theory also fails because it is based on time-barred allegations.  Any alleged conduct prior to July 28, 2017, is outside the four-year remit of this case.  15 U.S.C. § 15b.  APL's hearsay places most of Matson's supposed threats before that cutoff.  *See* SUF ¶ 170.  For example, APL says Macy's turned down its proposal "during January to April 2017," Ross demurred in ████████████, and any threats to Home Depot occurred ████████████.  *Id*.  The other alleged threats transpired ████████████.  *See id*.  All are time-barred.  *See Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 867 (D.C. Cir. 2008) (Section 2 claim untimely where conduct did not "injure[] [plaintiff] during the four year period").

**3.**  APL also failed to adduce any evidence that Matson's threats caused "substantial market foreclosure."  *Meta*, 66 F.4th at 304.  There is *no evidence* that *a single customer's* "reluctance to buy [from APL] resulted from acquiescence in a [Matson] threat."  *OJ Commerce*, 34 F.4th at 1249.  One of the customers APL implicated, for example, testified that it chose Matson because "APL's transit time was too long and inconsistent."  SUF ¶ 77.  Others likewise cited "the risk of lost business and the costs associated with APL's longer transit time and other service issues," "Matson's high quality service," and "Matson's track record of on-time weekly deliveries and reliable customer service" as their reasons for choosing Matson.  SUF ¶¶ 73, 77, 116; Ex. 441.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████—far from a "substantial" segment.  *Microsoft*, 253 F.3d at 70.

### (b)    There Is No Actionable Threat To Pasha

APL also cannot prove Matson scuttled an APL/Pasha partnership.  *See* SUF ¶¶ 175–181.

17

<u>**REDACTED PUBLIC VERSION**</u>

Any such claim is untimely, as Pasha rejected APL's proposal no later than June 2017.  SUF ¶ 175. Regardless, APL never identified anything Matson actually did to intimidate Pasha, and Pasha's President & CEO explains his "decisions had nothing to do with Matson" as he "had no interest" in APL's offer.  Decl. of G. Pasha ¶¶ 4–5; *see also* ███████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████, and Mr. Pasha's testimony cannot be controverted by self-serving speculation from APL's corporate representative.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (a self-serving story, contradicted by percipient testimony, cannot defeat summary judgment).

APL also fails to prove any injury arising from Pasha's decision not to enter a cross-trade partnership.  APL and Pasha failed to win business from Macy's, the one customer they pitched together, because Matson provided better value.  *See* Ex. 387 (Macy's Decl.) ¶ 8.  ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████  APL's failure to show harm to itself or competition dooms any claim related to Pasha.  *See Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 808 (D.C. Cir. 2001).

**(c)      There Is No Actionable Claim About Trucking Companies**

APL's allegations that Matson retaliated against two trucking companies (DeWitt and GTW) and a DeWitt-affiliated freight forwarder (Approved Freight) also are unsupported.  *See* FAC ¶¶ 55–56; Ex. 392 at 15.  Two DeWitt witnesses testified that Matson has never retaliated against it, SUF ¶ 183. And the witness APL disclosed to support its allegations about Approved Freight testified she had "[n]o knowledge of any of [the alleged conduct] happening."  SUF ¶ 186.

That leaves only APL's complaints about GTW, which lost its military trucking business from Matson in February 2016—at least a year outside the statute of limitations.  SUF ¶¶ 188–189. APL's only timely "claim" is that Matson persuaded a parts company, Fastenal, "to stop providing

18

parts to GTW because they were used for APL['s]" equipment.  Ex. 392 at 14.  But like so much of APL's case, there is no actual evidence of that: APL adduced only hearsay from GTW (Ex. 313 (Honda Dep.) at 100:13–21), whereas Fastenal denied it happened (SUF ¶ 192).  At most, Matson bought parts from Fastenal that GTW also wanted—which is not anticompetitive and in fact what GTW had advised APL to do to ensure an adequate parts supply (advice APL ignored).  SUF ¶ 193.

Even if APL could prove its allegations, they would not give rise to a legal claim.  Matson "has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919); *see also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1359 (Fed. Cir. 1999) ("withholding strategic customer benefits from" customer is not exclusionary); *Dart Drug Corp. v. Parke, Davis & Co.*, 344 F.2d 173, 186 n.6 (D.C. Cir. 1965) (similar).  And there is no evidence of harm to competition in any relevant market.  This case is about ocean cargo shipping services to Guam, so any harm to GTW or Approved Freight is "not anticompetitive in the antitrust sense … because [it does] not involve … exclusionary conduct in the area of effective competition."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (cleaned up).  While APL speculated that certain shippers "pull[ed] back" their business because of trucker treatment (Ex. 15 (APL 30(b)(6)) at 283:14–19), nearly every identified customer disclaimed doing so.  SUF ¶ 194.  Rather, APL *benefitted* because GTW's owner made it his "mission to convert as many customers as possible and lead them to APL"—and did just that.  SUF ¶ 190.

### 3.   APL's Disparagement Theory Fails

Disparagement "rarely" gives rise to antitrust liability, *Duty Free Ams., Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1268 (11th Cir. 2015), because even "[f]alse statements about a rival's goods" do not "drive up prices by curtailing output."  *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005) (Easterbrook, J.); *accord* Areeda & Hovenkamp ¶ 782a1.  Thus, a plaintiff must meet a "well-established six factor test" by proving the defendant made

representations that "were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals." Antitrust Law Developments at 322 (9th ed.); *see also Walgreen Co. v. AstraZeneca Pharm. L.P.*, 534 F. Supp. 2d 146, 152 (D.D.C. 2008) (plaintiff must "overcome a presumption that the effect on competition … was de minimis"); Areeda & Hovenkamp ¶ 782b (same). Although discovery uncovered proof that APL disparaged Matson (SUF ¶ 209), no evidence supports APL's accusations.

    **1.** According to APL, Matson made two disparaging remarks to customers: (1) that APL received unfair MSP subsidies and (2) that APL would leave Guam if it lost those subsidies. *See* Ex. 392 at 11; Ex. 15 (APL 30(b)(6)) at 275:16–276:4. But all of the people APL claims made these remarks deny doing so. SUF ¶ 197. And no matter how many customers APL attempts to implicate, none "recall Matson ever engaging in negative selling against APL" or were "aware of any instances" in which Matson "disparag[ed] APL's rates or services." SUF ¶ 200. As one put it: "I have never had a conversation with APL (or anyone for that matter) regarding any of the conduct alleged by APL, and have no idea what APL is referring to." SUF ¶ 198; *see also* SUF ¶¶ 198–200 (describing other customer declarations). There is thus no percipient testimony attesting to disparagement, no documents reflecting it, and the "sheer hearsay" APL musters "counts for nothing." *Gleklen*, 199 F.3d at 1369; *see also* SUF ¶¶ 201–202. APL's "complete failure of proof" is fatal. *Celotex*, 477 U.S. at 323.[5]

    **2.** APL's disparagement claim also fails because, as its own employees recognize, ██████
████████████████████████████████████████████████████████████. Imposing "antitrust

---

[5] APL subpoenaed none of the three customers—Triple B, GFS, and Home Depot—that did not submit declarations. SUF ¶ 201. Nor did it disclose witnesses from these customers that could testify to disparagement. *See* Ex. 430 (APL's Second Am. Initial Disclosures).

**REDACTED PUBLIC VERSION**

liability for merely potentially misleading or 'true but misleading statements' would chill procom-petitive promotional conduct." *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 372 n.7 (6th Cir. 2003).  A plaintiff instead "must present evidence that would permit a jury to conclude that the statements at issue were clearly false." *Id.*; *accord* Areeda & Hovenkamp ¶ 782b.  APL cannot do so as to either of the supposed disparaging statements.

First, it is undisputed that APL *did* receive tens of millions of dollars in MSP subsidies, and Matson's opinion that they were unfair is just that—a matter of opinion, consistent with Mat-son's longstanding legal position that APL's receipt of subsidies to which it has no entitlement created an uneven playing field.  SUF ¶ 202.  So too for Matson's supposed statements that APL would leave Guam if it lost its MSP payments.  Those cannot be "clearly false" when APL *itself* made repeated, public statements that ███████████████████████████████████████ ████████████████████████████████████████  SUF ¶ 204.  And Matson had good reason to believe APL would lose its subsidies: The court overseeing Matson's long-running legal challenge has already vacated the approval of one of APL's ships.  *See Matson Navigation Co. v. U.S. Dep't of Transp.*, 471 F. Supp. 3d 60 (D.D.C. 2020).  "[U]nflattering" truths are not anticompetitive disparagement.  *U.S.F.L. v. NFL*, 634 F. Supp. 1155, 1183 (S.D.N.Y. 1986).

In a vain effort to paint Matson's alleged statements as "inaccurate," ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████.  That opinion exceeds Warren-Boulton's expertise.  *See Daubert* Mot. at 16 n.2.  Nor do the smaller unrelated tax incentives Matson receives make Matson's state-ments false.  SUF ¶ 203.  Whether APL received unfair MSP subsidies does not depend on whether Matson received tax incentives.  *See Podiatric*, 323 F.3d at 372 (statements not "clearly false"

when they were "at worst, true but misleading"). Indeed, "competition [is] only enhanced" where statements like those Matson allegedly made created an incentive for APL to meet them with "its own advertising." *Covad*, 398 F.3d at 674; *see also Sanderson*, 415 F.3d at 623 ("tak[ing] sales away from one's rivals" through "ungentlemanly" means is not proscribed). And it did: ███ ███████████████████████████████████████████████████████████████.

And APL has failed to demonstrate that any "falsity" could not be "dispelled." *Covad*, 398 F.3d at 675. ██████████████████████████████████████████████████ ████████████████████████████████████; *see also Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 741 (6th Cir. 2012) (ability to "counter" false comments "defeat[s] the antitrust claim."). That APL was "free to tout its product . . . and to prove [Matson] wrong with respect to the quality of its services"—with customers "in no way constrained" from shipping with APL—is fatal. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 852 (7th Cir. 2011); *accord Covad*, 398 F.3d at 675; *Schachar v. Am. Acad. of Ophthalmology*, 870 F.2d 397, 400 (7th Cir. 1989).

**3.** Also absent is evidence that Matson's alleged statements induced "reasonable reliance by consumers." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 407 n.40 (3d Cir. 2016) (cleaned up). Without exception, the customers APL says withheld their business because of alleged disparagement testified they in fact made decisions based on the merits. SUF ¶ 207. Economic evidence likewise shows that customers APL claims withheld their volume (Ex. 15 (APL 30(b)(6)) at 275:16–276:4) ███████████████████████████████████ ██████████████████████████████████████████ APL has thus identified no harm attributable to Matson's supposed disparagement, much less one sufficient to meet its burden. *See Walgreen*, 534 F. Supp. 2d at 152 (plaintiff must overcome "the de minimis presumption"); *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 896–97 (5th Cir. 2016)

REDACTED PUBLIC VERSION

(rejecting disparagement claim without proof of causal effect).

**4.** Even if APL could clear every other bar, there is no evidence of "harm to competition." *Covad*, 398 F.3d at 674.  APL's economist did not ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████  Nor did APL attempt to tether the supposed disparagement to a marketwide increase in price or reduction in output.  SUF ¶ 208.  Here, of course, prices *fell* during the relevant time period among the relevant customers.  *Id.*  Without proof of competitive harm, "there is not even the beginning of an antitrust case."  *Schachar*, 870 F.2d at 399; *see also Covad*, 398 F.3d at 674; *MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 187 (2d Cir. 2016) (same); *Sanderson*, 415 F.3d at 623 (same).

### 4. APL's Exclusive Dealing, Bundling, And Tying Theories Fail

APL also challenges Matson's HHG loyalty program and so-called "long-term agreements," which offered certain customers volume or market-share discounts.  *See* FAC ¶¶ 41–52.  Courts have long recognized that such agreements and discounts are often procompetitive.  *See, e.g.*, *W. Parcel Exp. v. UPS*, 190 F.3d 974, 976 (9th Cir. 1999) (volume discounts); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 265 (2d Cir. 2001) (loyalty discounts); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) (exclusive agreements).  They were here as they did not foreclose APL from a substantial portion of the market and in fact drove prices down.  None of APL's theories—exclusive dealing, bundling, and tying—stand up.

### (a) APL Cannot Prove Anticompetitive Exclusive Dealing

APL complains that Matson's so-called "long-term agreements" and HHG loyalty program are anticompetitive exclusive dealing.  FAC ¶¶ 41–52.  But because exclusivity "may serve many useful functions" with "well-recognized economic benefits," APL must show these agreements

REDACTED PUBLIC VERSION

and the loyalty program are anticompetitive in fact with proof that (1) they conditioned the sale of Matson's service on the customer's agreement not to deal with Matson's competitors; (2) there was a "significant degree of foreclosure" in the relevant market as a result; and (3) the anticompetitive harm of exclusion outweighs the procompetitive benefit. *Microsoft*, 253 F.3d at 59, 69–71. Failure to show any factor requires summary judgment, and APL lacks evidence of all three.

**1.** The Court permitted APL to pursue a claim of "*de facto* exclusive dealing," MTD Order 21, under which "the practical effect" of the challenged practice is to prevent customers from dealing with APL. *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 101 (D.D.C. 2020). But the record shows Matson's practices were not "in any way exclusive"—and thus exceed the ambit of exclusive dealing. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000).

Start with the HHG loyalty program. It allowed the few shippers in the household goods segment to obtain a 25% discount if they chose to ship 90% of their total volume to Guam and Hawaii with Matson. SUF ¶ 134. Nothing *required* a customer to ship all of its cargo with Matson. SUF ¶ 137. Customers instead "could choose at anytime to forego the discount," buying what they wanted from APL (or anyone else) while still availing themselves of Matson's normal tariff prices. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 997 (9th Cir. 2010); *see also* SUF ¶¶ 137–138. For those who qualified for the discount, APL was free to pursue the balance of their HHG shipments and entirety of their other cargo. *See* SUF ¶¶ 137–138. Thus, Matson's program did not "flatly eliminate [any] buyer from the market." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983).

APL asserts that Matson's discount is so steep that customers could not "economically or reasonably use APL services" to Guam. FAC ¶ 43; *see also* Ex. 13 (Warren-Boulton Rep.) ¶¶ 86–100. The numbers prove otherwise. Only 82 shippers (out of 144 enrolled in the program) elected

**REDACTED PUBLIC VERSION**

to ship enough with Matson during any period to earn the discount, and ██████████████

███████████████████████████████████████████████████. SUF ¶¶ 139, 143.

The scores of customers declining the discount demonstrates "customers fe[lt] free to take it or

leave it," falling far short of the "85 to 90 percent" acceptance rate required to infer exclusivity.

Areeda & Hovenkamp ¶ 1821a2; *see also Tyco*, 592 F.3d at 997 (rejecting exclusive-dealing chal-

lenge to market-share discounts where rivals "need[ed] only offer a better product or a better deal").

There similarly is no merit to APL's attempt to label Matson's "long-term agreements" as

exclusive deals. *See* FAC ¶ 42. Many MOUs did not include a 100% volume commitment, and

none were exclusive in fact. *See* SUF ¶¶ 93–94. Witnesses from both Matson and APL agreed

that in Guam MOUs provide "flexibility more so than a contract," and ███████████████████

████████████████████████████████████████████████████████████████

SUF ¶ 94. Rather, carriers █████████████████████████████████████████████████

██████████████████████████ *Id.* Far from "conditioning the sale of a product on the buyer's

agreement not to deal with [APL]," *Facebook*, 549 F. Supp. 3d at 32, the commercial reality was

that cargo "ebbed and flowed" between carriers "even with the MOUs." SUF ¶ 102. Because

Matson's MOUs were not in fact exclusive, they cannot be condemned as *de facto* exclusive deal-

ing. *See Barry Wright*, 724 F.2d at 237; *Concord Boat*, 207 F.3d at 1059.[6]

**2.** APL's challenge to Matson's HHG loyalty program and long-term agreements inde-

pendently fail because there is no evidence of foreclosure. Matson's cross-trade HHG discounts

could reach at most only 1.3% of the Guam trade. SUF ¶ 136. █████████████████████

████████████████████████████████████████████████████████████████

---

[6] Nor can Matson's one contract be deemed exclusive, as it lacked a volume term and the customer
shipped the majority of its cargo with APL anyways. SUF ¶ 105, 119–120.

███████████████████████████████████████████████████████

████████████████████████████████—leaving plenty of customers for APL to "easily find"

outlets for its shipping services.  Areeda & Hovenkamp ¶ 1821d2; *see also Microsoft*, 253 F.3d at

70; *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 530 (5th Cir. 2022).

Importantly, these estimates *overstate* the potential foreclosure.  Deals with short duration

or easy escape hatches "negate substantially their potential to foreclose competition," *Omega Env't,*

*Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997), because "a competitor can simply wait

for the contracts to expire or make alluring offers to initiate termination," *EpiPen*, 66 F.4th at 988;

*see also* Areeda & Hovenkamp ¶ 1821d3 (explaining that "true foreclosure" is half the amount of

cargo covered by the agreements when "contracts become available for bidding" every two years).

The HHG program had no term at all, and Matson's agreements were generally one-to-three years

with mutual 30-day termination provisions that could be "breached" without consequence.  SUF

¶¶ 93, 138.  That means the amount of even theoretically affected cargo was vanishingly small—

far below the level that could raise competitive concern.  *See* Ex. 75 (Langer Rebuttal Rep.) ¶ 33.[7]

APL also cannot show that "opportunities for other traders" were "significantly limited,"

*Microsoft*, 253 F.3d at 69, because APL—Matson's only "significant competitor" in the alleged

relevant market—was not in fact prevented "from doing business."  *Roland*, 749 F.2d at 394; *see*

*also* Areeda & Hovenkamp ¶ 1821d2 ("[A] high foreclosure percentage creates no injury to

---

[7] Recognizing this economic reality, courts have frequently rejected exclusive dealing claims challenging practices with features similar to Matson's.  *See, e.g.*, *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1326 (4th Cir. 1995) (exclusive contracts terminable after 30 days were incapable of inflicting substantial anticompetitive effects); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir. 1993) (same); *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (same for three-year exclusive agreements with six-month termination provisions); *Sterling Merch., Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245, 261, 265–66 (D.P.R. 2010) (same for one-to-three year agreements covering less than 30% of alleged market).

**REDACTED PUBLIC VERSION**

competition if no one is being excluded in fact by the challenged arrangement.").[8]

The absence of exclusion is particularly stark in the HHG segment. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████  APL's ability to "successfully compete" is irreconcilable with the

notion that Matson's HHG discounts "foreclosed [APL] from a substantial share of the relevant

market."  *R.J. Reynolds*, 199 F. Supp. 2d at 390; *see also Omega*, 127 F.3d at 1170 (similar);

*Roland*, 749 F.2d at 394 (similar); *Western Parcel*, 190 F.3d at 976–77 (similar).

Similarly, no customer has suggested Matson's MOUs precluded APL from competing for,

much less obtaining, its business.  SUF ¶¶ 113–123. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  Customers ex-

plained why:  Macy's did "not and would not lock itself into a long-term exclusive agreement that

forecloses alternative options," selecting Matson after competitive bidding because its shipping

network aligned with Macy's needs while APL would have "require[d] Macy's to change how

---

[8] To the extent that APL alleges that it could not compete with Matson's "substantial discounts," FAC ¶ 43, price-cutting is the alleged "mechanism of exclusion," *Eisai*, 821 F.3d at 408–09.  Matson therefore maintains that the Court should apply a price-cost test as a "specific application of the rule of reason."  *Id.*; *see also Virgin Atl.*, 257 F.3d at 266–72 (rejecting challenge to incentive payment scheme given absence of below-cost pricing).  APL has no evidence that Matson's prices were below cost.  SUF ¶¶ 104, 146.  The Court need not revisit whether to apply the price-cost test, however, because APL's claim fails under any standard.

**REDACTED PUBLIC VERSION**

they did their business." SUF ¶¶ 114–115.  And while APL argues ████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████ ; *see also id.* ¶¶ 116–120 (collecting similar evidence for other cus-

tomers).  That APL lost on the merits and sometimes had to wait for customers to rebid "is a form

of competition that antitrust laws protect rather than proscribe." *Paddock Publ'ns, Inc. v. Chicago

Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996); *see also Race Tires Am.*, 614 F.3d at 76 (affirming

summary judgment on exclusive dealing claim because "competition to be an exclusive supplier

may constitute a vital form of rivalry . . . which the antitrust laws encourage rather than suppress.");

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 411 (7th Cir. 2017) (same

where defendant won "competition-for-the-contract" due to its "broader and deeper range of ser-

vices").

    **3.**  Finally, APL cannot "demonstrate that the anticompetitive harm" of Matson's alleged

exclusive dealing "outweighs the procompetitive benefit." *Microsoft*, 253 F.3d at 59.  Exclusivity

provisions can carry well-known procompetitive benefits, including discounts that "[r]eward[]

customer loyalty" and "promote[] competition on the merits." *Virgin Atl.*, 257 F.3d at 265; *see

also Standard Oil Co. v. United States*, 337 U.S. 293, 306 (1949).  That both ████ and Matson

offered volume discounts (SUF ¶ 87) shows these customer advantages were at play for Guam—

████████████████████████████ ; *see EpiPen*, 44 F.4th at 989 (plaintiff's use of similar

discounts shows they were "normal competitive tool[s]" to "stimulate price competition").

    It is undisputed that this price competition delivered lower prices to the relevant subset of

customers (SUF ¶ 112)—another well-accepted "procompetitive benefit." *EpiPen*, 44 F.4th at 986;

*accord Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990). ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████ APL thus lacks any proof that "the anticompetitive effects (if any) of the [speculated]

exclusion … will be to raise prices above (and therefore reduce output below) the competitive

level" to a degree that outweighs customers' savings. *Roland*, 749 F.2d at 394.

### (b) APL Cannot Prove Anticompetitive Bundling Or Tying

APL cannot repackage its defective exclusive dealing theory into bundling or tying claims.

FAC ¶¶ 49 (tying) & 52 (bundling). According to APL, Matson's HHG program, and the subset

of its agreements covering both Hawaii and Guam, amount to unlawful bundling or tying. *See* Ex.

13 (Warren-Boulton Rep.) ¶¶ 85–130. This is anticompetitive, APL claims, because customers'

Hawaii shipments force them to use Matson—preventing APL from competing for shipping to

Guam. *See id.* ¶¶ 96–100, 116–120. ███████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ That does not threaten competition, *see Microsoft*, 253 F.3d

at 70, nor is there any evidence of actual exclusion here. *See supra* 13–14.

APL's bundling and tying theories also fail because there is no evidence that Matson's

cross-trade discounts were in fact anticompetitive. To begin, cross-trade discounts are common in

shipping, sought by customers, and promise lower prices. SUF ¶¶ 88–91. They delivered such

low prices here. SUF ¶¶ 112, 125. As "a plaintiff seeking to establish competitive injury resulting

from a rival's low prices," APL must show that Matson's prices "are below an appropriate measure

of its rival's costs." *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222–23

**REDACTED PUBLIC VERSION**

(1993); *accord Cascade Health*, 515 F.3d at 903; *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781

F.3d 264, 272 (6th Cir. 2015).  APL does not—and cannot—make that showing here.  SUF ¶¶ 104,

146.  This too is fatal.  *See*, *e.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1186

(9th Cir. 2016); *Cascade Health*, 515 F.3d at 910–11; *Virgin Atl.*, 257 F.3d at 269.[9]

There are yet more problems with APL's tying theory.  A tie occurs when a seller "ex-

ploit[s] … its control over the tying product to force the buyer into the purchase of a tied product."

*Jefferson Parish Hosp. Dist. No. 2. v. Hyde*, 466 U.S. 2, 13 (1984), *abrogated on other grounds*

*by Ill. Tool Works Inc. v. Indep. Ink*, 547 U.S. 28 (2006).  APL falters twice at the threshold.  First,

██████████████████████████████████████████████████████████

█████████████████; *see also Microsoft*, 253 F.3d at 85 (requiring power over

tying product); *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 385 (3d Cir. 2005) (af-

firming summary judgment for failure to prove such power).  Second, APL has not specified what

the tie is, and there is not a single policy, contract, or systematic discount allegedly tying Matson's

Hawaii service to its Guam service (the allegedly tied product).  SUF ¶ 126; *see also Aerotec*, 836

F.3d at 1178 (affirming summary judgment where plaintiff failed to establish existence of a tie).

Setting these defects aside, APL cannot show Matson somehow "coerce[d] purchasers,"

*Jefferson Parish*, 466 U.S. at 13, by giving customers "no choice but to purchase the tied product,"

---

[9] APL previously argued it need not show below-cost pricing under *LePage's Inc. v. 3M*, 324 F.3d 141, 155 (3d Cir. 2003) (en banc).  But this aspect of *LePage's* "has been 'roundly criticized.'" MTD Order 24 (quoting *FTC v. Church & Dwight Co.*, 665 F.3d 1312, 1316–17 (D.C. Cir. 2011)); *see also, e.g.*, *Collins*, 781 F.3d at 273.  And even the Third Circuit has retreated from *LePage's*, which it now has limited to its facts, *Eisai*, 821 F.3d at 405–06 & n.35, and recognized as inconsistent with Supreme Court precedent, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 275 n.11 (3d Cir. 2012).  Nor does this case involve "a lone monopolist in two two-competitor markets" that was able to obtain exclusivity from "customers who ship in both markets."  MTD Order 24–25, as the evidence is that there are more than two carriers to Hawaii, and no evidence Matson is a monopolist there.  SUF ¶ 133. The Court should adopt the majority position—supported by prevailing economic scholarship—and require APL to prove below-cost pricing.

**REDACTED PUBLIC VERSION**

*Microsoft*, 253 F.3d at 85.   APL identified no instance in which Matson refused to ship a cus-
tomer's cargo to Guam unless it also used Matson for Hawaii cargo.   *See* SUF ¶ 126.   All but one
of the five customers APL claims purchased tied services has disclaimed any coercion.   *See* SUF
¶ 126. ███████████████████████████████████████████████████████

███████████████████████; *see Kaufman v. Time Warner*, 836 F.3d 137, 142 (2nd Cir. 2016)
(no tie where customer demand, not coercion, leads to bundle).   Because undisputed evidence
shows that customers were always free to buy service for Hawaii and Guam separately (SUF
¶¶ 126, 137), "there is no tying problem even though the seller may also offer the two items as a
unit at a single price." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 n.4 (1958).

In sum, all APL has shown is "the existence of a lower price for two items bought as a
package." *Robert's Waikiki U-Drive, Inc. v. Rent-a-Car Sys.*, 732 F.2d 1403, 1407 (9th Cir. 1984);
*see also* SUF ¶¶ 112, 125 (customers paid less via Matson's cross-trade discounts).   That "benefit[s]
consumers" and does "not threaten competition." *Atl. Richfield*, 495 U.S. at 340.   As this Court
observed, there is no "liability [for] a firm that offers customers more for less."   MTD Order 25.

**5.     Alleged Alaska And Slot Charter Conduct Cannot Prove Exclusion**

APL littered its Complaint with other allegations, from Matson halting relationships with
APL in Alaska to proposing an unconsummated slot charter agreement that would "have led to the
elimination of competition" in Guam.   FAC ¶¶ 6, 58–64. █████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████ The undisputed evidence does not bear out an actionable claim.

**(a)     APL's Attempt To Link Alaska And Guam Fails**

Even though Guam and Alaska are separated by 4,000 miles—with few overlapping

<u>**REDACTED PUBLIC VERSION**</u>

customers—APL challenged several Matson decisions about Alaska, from declining to renew a Connecting Carrier Agreement ("CCA") and denying APL access to a terminal in Kodiak, to terminating a lease, a shared tug charter agreement, and an operational support agreement with APL. *See* Ex. 392 at 14–17.  But as this Court recognized, "Matson's actions in Alaska are only relevant to the extent that they result in anticompetitive *effects in the [alleged] relevant market*—the U.S.– Guam container shipping market."  MTD Order 29 (emphasis added); *see also Qualcomm*, 969 F.3d at 992–93 ("anticompetitive impacts outside of the relevant market" are irrelevant).  They did not: ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  That testimony binds APL. *In re Vitamins Antitrust Litig.*, 216 F.R.D. 168, 174 (D.D.C. 2003).  Alaska is irrelevant.

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  This speculation is not alleged, absent from APL's discovery responses, nowhere in Warren-Boulton's reports, and devoid of economic analysis.  *See Daubert* Mot. § I.C.  It is also baseless, relying only on *speculation* (Ex. 354 (Warren-Boulton Dep.) at 60:17–61:13) and unsupported by the record.  SUF ¶¶ 210–216.  ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

At end, Matson's business decisions in Alaska were, at most, inactionable refusals to deal.

**REDACTED PUBLIC VERSION**

*See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013) (discontinuation of agreement to share resource is analyzed as a refusal to deal). ████████████████████ ████████████████████, a refusal to deal is anticompetitive only if the defendant possesses monopoly power in the market in which it refuses to deal. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009). APL doesn't allege Matson is a monopolist in Alaska, MTD Order 29, and there is no evidence of monopoly power there. SUF ¶¶ 210, 216.

Moreover, APL cannot establish any of the other prerequisites to an anticompetitive refusal to deal—terminating a profitable course of dealing, sacrificing short-term profits, and offering the refused product to similarly situated customers. *See Meta*, 66 F.4th at 305; *Qualcomm*, 969 F.3d at 993–94. Each of Matson's decisions instead kept with its long-term plan to invest in its own resources, expand its operations, and address space, safety, and reliability issues:

➢ Matson did not terminate the CCA; it expired by its own terms. SUF ¶¶ 218–225; *see also In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) (rejecting refusal-to-deal claim where defendant "did not terminate any prior course of dealing"). Adopting a new connecting carrier agreement, or renewing the old one, would have inhibited Matson's intent to begin an international service from Alaska in competition with APL. SUF ¶ 231.

➢ Continuing to share a tug became an "intolerable safety condition" after Matson was unable to safely dock a ship because APL had been using the tug elsewhere. SUF ¶¶ 253–254.

➢ Leasing terminal and office space to APL no longer made sense when Matson needed that space for its own, expanding operations. SUF ¶ 242.

These procompetitive justifications "redeem[]" Matson's conduct. *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990); *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 987 (9th Cir. 2023) (crediting "quality, service, safety" justifications).

33

REDACTED PUBLIC VERSION

Nor can APL carry its burden to rebut these justifications as pretextual.  *See Microsoft*, 253 F.3d at 59.  APL chiefly relies on its then-President's claim that Matson's CEO said at an October 2018 lunch meeting that ███████████████████ including ████████████████ ███████   SUF ¶ 276.  Nobody else at the meeting recalls that statement, and Matson denies making it.  *Id.*  In any event, that vague statement could not demonstrate pretext: It does not show a CCA was inconsistent with Matson's own service plans, that two tugs are less safe than one, or that Matson couldn't use office space to improve its own operations.  *See* SUF ¶¶ 231, 242, 253–54.  And Matson in fact launched its international service in Alaska in 2020, SUF ¶ 231, and uses the space previously leased to APL for its own operations, SUF ¶ 242.  For all of these reasons, APL cannot create a material question of fact about pretext.  *See, e.g., Behrend v. Comcast Corp.*, 2012 WL 1231794, at *23 (E.D. Pa. Apr. 12, 2012) (granting summary judgment where pretext arguments were "unsupported by any evidence").

### (b)      Matson's Slot Charter Proposals Were Not Anticompetitive

APL also accuses Matson of seeking to "avoid competition" in Guam by proposing "slot-charter" agreements.  FAC ¶¶ 64–65.  This is a red herring because the parties never reached an agreement, and both APL's and Matson's economists agree that ████████████████████ █████████████████.  SUF ¶¶ 284–285; *see 3Shape Trios A/S v. Align Tech., Inc.*, 2019 WL 3824209, at *6 (D. Del. Aug. 15, 2019) (an "'attempt' to enter into an [allegedly anticompetitive] arrangement" does not "qualif[y] as anticompetitive conduct").  Regardless, slot charters are common in the shipping industry—██████████████████████ ████████████████████████████████████████ █████████████████.  Matson contemplated nothing else here.

APL's allegation that Matson's proposals sought "to remove APL 'iron'" from Guam, FAC ¶ 63, comes from its then-President Ed Aldridge who testified that this impression was ████████

**REDACTED PUBLIC VERSION**

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████. Matson's proposals said no such thing, ████████████████

███████████████████████████████████████████████████; *see also* SUF ¶¶ 260–261 (collecting evidence showing Mr. Aldridge's belief was "absolutely not part of [Matson's] understanding"). ██████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

### 6.    There Is No Evidence Of Any Wrongful Matson Logistics Conduct

The Court said "Matson can renew its request to dismiss Matson Logistics" if discovery showed it was not "involved" in alleged retaliation in Guam or the challenged conduct in Alaska. MTD Order 34.  APL did not pursue discovery related to such a theory.  SUF ¶¶ 291–292.  And in response to an interrogatory asking APL to "[d]escribe all facts regarding any conduct by Matson Logistics, Inc. that [APL] contend[s] gives rise to a violation of the antitrust laws," APL identified none, never supplemented that answer, and ████████████████████████████████ ████████████████████. SUF ¶¶ 293–296.  There is no basis to keep Matson Logistics in this case.

### B.    APL Cannot Demonstrate Matson Has Monopoly Power

APL's claims independently fail because it cannot demonstrate "the possession of monopoly power in the relevant market."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966). APL's proposed markets are a confused morass. ████████████████████████████████ ████████████████████████████████ These defects compel summary judgment.

### 1.    APL Cannot Prove Its Relevant Markets

APL "bears the burden of establishing the relevant market."  *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 429 (D.C. Cir. 1986); *accord Microsoft*, 253 F.3d at 51–52, 81███████████████

**REDACTED PUBLIC VERSION**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ This formulation sounds unwieldy because it is—the product of no discernible analysis, let alone reliable economics.  *See Daubert* Mot. § III.  APL's alleged markets fail for at least three reasons.

*First*, APL's proposed markets do not include all "commodities reasonably interchangeable by consumers for the same purposes."  *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  Although this inquiry turns on "the degree to which a similar product will be substituted for the product in question," *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986), ████████████████████████████████████████

████████████████████████████████████████████████████████

███ That includes shipments to and from Asia: About 25% of goods carried to Guam are foreign imports, and shippers have told Matson that they would consider "cargo originating in Asia as an alternative to [Matson's] cargo originating in the U.S. mainland because … of price factors."  Ex. 345 (Good Dep.) at 51:20–52:13; *see also* Ex. 75 (Langer Rebuttal Rep.) ¶¶ 273–278.  APL's failure to grapple with this evidence, much less prove these services belong outside the relevant market, precludes it from showing the U.S. West Coast is the sole field in "which the purchaser can practicably turn for alternatives."  *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 668 (1974); *see also Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (summary judgment where plaintiff did not "counter" evidence of potential substitution).

*Second*, APL's claims of monopoly power and anticompetitive effects rest on an improperly defined "cluster market" of all shipments from the U.S. to Guam.  Cluster markets "allow items that are not substitutes for each other to be clustered together" when "subject to the same

**REDACTED PUBLIC VERSION**

competitive conditions." *FTC v. Staples*, 190 F. Supp. 3d 100, 117, 123 (D.D.C. 2016).  But APL's

"overall cluster market" for U.S. to Guam shipments ████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████████████ APL thus improperly ████████████████████████████

████████████████████████████████████████████████████████████████

*Third*, ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████ APL cannot overcome summary judgment

with expert testimony that all "evidence in the record contradict[s]." *Merit Motors, Inc. v. Chrysler

Corp.*, 569 F.2d 666, 673 (D.C. Cir. 1977); *see also FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14,

40–41 (D.D.C. 2023) (summary judgment where market included non-substitute products).

**REDACTED PUBLIC VERSION**

### 2.       **Matson Does Not Have Monopoly Power**

APL also cannot prove monopoly power in its asserted relevant market.  A plaintiff must

provide "direct evidence" of monopoly power by pointing to "evidence of restricted output and

supracompetitive prices," *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.

1995), or offer indirect proof of "a firm's possession of a dominant share of a relevant market that

is protected by entry barriers," *Microsoft*, 253 F.3d at 51.  APL can do neither.

1. 

, eliding

the central question of where "actual competition lies … based on the current state of play."

*Surescripts*, 665 F. Supp. 3d at 39; *see also Neumann v. Vidal*, 1981 WL 2219, at *1 (D.D.C. 1981)

("[M]onopoly power must exist at the time the allegedly illegal actions took place.").  This is not

direct evidence Matson "possess[es] monopoly power" (*Microsoft*, 253 F.3d at 51) it used "to

foreclose competition," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992).

Matson's lack of monopoly power is amply demonstrated by

That is competition, not monopoly.  *See*

*United States v. Syufy Enters.*, 903 F.2d 659, 665–66 (9th Cir. 1990) (no monopoly power where

rival "ha[d] steadily been eating away" at defendant's share); *Richter Concrete Corp. v. Hilltop*

**REDACTED PUBLIC VERSION**

*Concrete Corp.*, 691 F.2d 818, 826 (6th Cir. 1982) (similar); *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174–75 (4th Cir. 2014) (similar).[10]

      **2.** ████████████████████████████████████████████████

████████████████████████████████████ High shares do not alone "indicate monopoly power," and they are "misleading" here. *Microsoft*, 253 F.3d at 54. That is in part because Matson is not "protected by significant barriers to entry." *Id.* at 82. APL points to the Jones Act. FAC ¶ 69. But APL admitted it *could* sail directly from the U.S. to Guam but *chose* not to for business reasons. SUF ¶¶ 36–39; *see also* 46 U.S.C. § 55102(b) (U.S. flag ships can service Guam from the U.S.). That choice is not a barrier, nor did it ensure "durable" power. *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 43 (D.D.C. 2022). A defining feature of the shipping industry is that competitors "timely respond[] to an increase in price above the competitive level," *Microsoft*, 253 F.3d at 51, by increasing capacity and reconfiguring their services. SUF ¶ 28. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

      What is more, APL admits "capacity to expand [its] output"—defeating any "barriers to expansion." *Rebel Oil*, 51 F.3d at 1439. It concedes ████████████████████████

████████████████████████████████████████████████████████████. The

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[10] That Matson's average rates remained higher than APL's is not direct evidence of monopoly power because "a firm's comparatively high price may simply reflect a superior product." *Harrison Aire*, 423 F.3d at 381; *see also Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) ("Generally you must pay more for higher quality."). That Matson's and APL's services are differentiated is undisputed. SUF ¶ 79. ████████████████████ ████████████████████████████████, APL cannot equate premium and supracompetitive prices. *See Harrison Aire*, 423 F.3d at 381 (rejecting same).

**REDACTED PUBLIC VERSION**

██████████████████████████████████████████████████████████████████

█████████████████████████████ APL's capacity keeps Matson from "control[ling] output and

prices," *Rebel Oil*, 51 F.3d at 1441, leaving no triable issue of monopoly power.

### C.    APL Cannot Demonstrate Causal Antitrust Injury Or Damages

APL also must show that it suffered "antitrust injury" and "measurable damages."  *In re*

*Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 89 (D.D.C. 2017).  This requires

APL to prove (1) that Matson's conduct harmed competition marketwide, *Dial a Car*, 82 F.3d at

486; (2) that APL suffered harm from the "competition-reducing aspect" of Matson's challenged

conduct, *Atl. Richfield*, 495 U.S. at 344; and (3) a "reasonably ascertainable amount" of damages,

*S. Pac. Commc'ns Co. v. AT&T Co.*, 556 F. Supp. 825, 870 (D.D.C. 1982).  APL cannot prove any

of these elements, each an independent failure that warrants summary judgment.

### 1.    APL Cannot Establish Harm To Competition

Because the antitrust laws protect "competition not competitors," *Brunswick v. Pueblo*

*Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977), harm to "one specific competitor . . . is insufficient

to support a finding that the market as a whole is or will be injured," *Dial A Car*, 82 F.3d at 486–

87.  Thus APL must show that Matson's challenged conduct "harm[ed] the competitive process

and thereby harm[ed] consumers," *Microsoft*, 253 F.3d at 58—such as through a "reduction of

output, increase in price, or deterioration in quality."  MTD Order 9 (quotation marks omitted).

There is no evidence suggesting that ████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████; *see also MacDermid*, 833 F.3d at 184 ("disruption" to a plaintiff's business does not reduce

output unless it "reduce[s] the number of [relevant services] from the perspective of consumers").

Moreover, ████████████████████████████████████████████████████████

████████████████████████████████████████████; *see also supra* 13–14.

APL has not—and cannot—offer any alternative foreclosure figure.  *See* SUF ¶ 296.

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████  It is not enough to

suggest prices "'might' or 'could potentially'" increase, *Google*, 2023 WL 4999901, at *22; anti-

trust violations turn on proof of "actual adverse effect[s]."  *Gross v. Wright*, 185 F. Supp. 3d 39,

49 (D.D.C. 2016) (Cooper, J.). ████████████████████████████████

████████████████████████████████████████████████; *see*

*also Pool Water Prod. v. Olin Corp.*, 258 F.3d 1024, 1035 (9th Cir. 2001).

### 2.  APL Cannot Establish Causal Antitrust Injury

APL independently fails to show the anticompetitive aspects of Matson's challenged con-

duct injured its business.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623

(D.C. Cir. 2019).  APL stakes its proof of injury on ████████████████████████

████████████████████████████████████████████████████

████████████████  Setting aside its methodological defects (*Daubert* Mot. § II), ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  So even if admissible, Warren-Boulton's infirm

opinions cannot forestall judgment as a matter of law.  *See, e.g., In re Wellbutrin XL Antitrust*

*Litig.*, 868 F.3d 132, 167 (3d Cir. 2017) (evidence must show "that it is more likely than not that"

<u>**REDACTED PUBLIC VERSION**</u>

injury occurred due to absent anticompetitive conduct); *Twin Cities Baker Workers Health & Welfare Fund v. Biovail Corp.*, 2005 WL 3675999, at *5 (D.D.C. Mar. 31, 2005) (rejecting claim where expert's analysis was "too speculative to forge the chain of causation" required).

Nor can APL prove a "causal relation" between Matson's challenged conduct and APL's supposed lost share. *Rail Freight*, 934 F.3d at 623. 

Matson, by contrast, "live[d] and die[d] by [its] schedule" (SUF ¶ 16) and was even in APL's CEO's estimation (SUF ¶ 24). Testimony and contemporaneous records from APL, Matson, and customers alike confirm shippers opted for Matson because of its premium service. SUF ¶¶ 75–77. And the trends in APL's commercial performance mirror the suffered in its military business—where APL alleges no anticompetitive conduct—

APL has no evidence to disentangle the effects of "direct competition," including Matson's "superior product," from the challenged conduct. *Ass'n for Intercollegiate Ath. for Women v. NCAA*, 735 F.2d 577, 587 (D.C. Cir. 1984).

APL's failure of proof is most striking where it matters most. "When the plaintiff chooses to rely on specific lost sales," as it has done here, "it does so subject to the peril that the proof may show an independent reason why the plaintiff's bid would not have been accepted." *H B Equipment Co. v. Int'l Harvester*, 577 F.2d 239, 247 (5th Cir. 1978) (citations omitted). The customers APL claims were coerced into using Matson testified at every turn that they simply preferred its premium product. SUF ¶¶ 77, 115–118, 122, 171. And the "conclusory statements by [APL's] officers and employees" offered against this—"unsupported by documentary or other concrete evidence"—"is simply not enough to create a genuine issue of fact in light of the evidence to the

REDACTED PUBLIC VERSION

contrary." *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986); *see also Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 485 (5th Cir. 2000) (no antitrust injury where losses "due to [plaintiff's] service problems rather than due to [defendant's] anticompetitive behavior").

### 3. APL Cannot Establish A Reasonable Measure Of Damages

For similar reasons, APL cannot prove damages as a matter of law.  In an antitrust case, a damages model must allow the factfinder to determine "whether each of the particular actions alleged to form an antitrust violation 'materially contributed' to plaintiffs' injury" and "'filter[] out' . . . other causes of plaintiffs' injury." *S. Pac. Commc'ns*, 556 F. Supp. at 1090.  Like the inadequate offer of proof in *Southern Pacific*, ██████████████████████████████████████ ██████████████████████████████—without "calculat[ing] the amount of damage, if any, that resulted to its business in the real world from each of the challenged acts of defendants." *Id.*; *see also* Ex. 75 (Langer Rebuttal Rep.) ¶ 331.  This means APL's model is "unable to calculate damages" if *any* of the challenged conduct is unproven or lawful (as it is here, as discussed above).  *S. Pac. Commc'ns*, 556 F. Supp. at 1093; *see also Litton Sys., Inc. v. Honeywell, Inc.*, 1996 WL 634213, at *3 (C.D. Cal. July 24, 1996) (rejecting similar lost-share model that failed to disaggregate effect of eight challenged acts, six of which were found unproven).

Worse, APL's model conflates the effects of legitimate competition and anticompetitive conduct: ████████████████████████████████████████████ ████████████████████████████████████████; *see also Daubert* Mot. § II.D. ████████████████████████ ████████████████████████████████████████████ ████████████████████████████—false positives that render a model useless and bespeak no "measurable damages." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013); *see also Daubert* Mot. § V.A.  Because damages is an element

REDACTED PUBLIC VERSION

of APL's claims, *Rail Freight*, 292 F. Supp. 3d at 89, this too is fatal to APL's case.  *See*, *e.g.*, *Concord Boat*, 207 F.3d at 1057 (rejecting claim because plaintiff's damages study "did not separate lawful from unlawful conduct"); *Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, 828 F.2d 1033, 1044 (4th Cir. 1987) (same).[11]

## II.  The Court Should Enter Summary Judgment On APL's Attempt Claim

APL's failure to establish anticompetitive conduct, properly define a relevant market, or prove injury and damages are each fatal to its attempt claim.  *Microsoft*, 253 F.3d at 80.  APL also cannot establish two other essential elements of an attempted monopolization claim: "a specific intent to monopolize" and "a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

### A.  APL Cannot Show Matson Intended To Monopolize Guam

To establish an unlawful attempt to monopolize, APL must prove Matson had "a purpose to acquire monopoly power by driving one's rival from the market by exclusionary or predatory means."  *Ass'n for Intercollegiate Ath. for Women*, 735 F.2d at 585.  There is no such evidence here. ██████████████████████████████████████████████████████████████████████

████████████████████████████████—the mere "desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not sufficient." *Abcor Corp. v. AM Int'l*, 916 F.2d 924, 927 (4th Cir. 1990); *accord U.S. Steel Corp. v. Fortner Enter.*, 429 U.S. 610, 612 n.1 (1977).  Particularly in concentrated industries, "the intent to maintain or improve one's own market position always entails the knowledge that rivals must suffer." *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 23 (D.D.C. 2021); *see also* Areeda & Hovenkamp ¶ 805.

---

[11] As Matson explains in its concurrent *Daubert* Motion, there are several other fundamental flaws in APL's injury and damages model that render it inadmissible and incapable of carrying APL's burden at summary judgment.  *See Daubert* Mot. §§ II, V.A.

███████████████████████████████, and Matson sought to win by being the best. *See* SUF ¶¶ 15–25.  Condemning that would stand antitrust law on its head.

Matson's conduct in Alaska and slot charter proposals do not bridge the chasm to anticompetitive intent.  As explained above, Alaska was wholly separate from the Guam trade.  *See supra* 32–34.  Nor is there evidence Matson *intended* to use slot charters to monopolize Guam; Matson's executives believed their offers gave APL "a lot of potential additional room to grow."  SUF ¶ 278.  Matson long understood the Guam trade "wants and expects to have two independent carriers serving the market," which a slot charter allows.  SUF ¶ 260.  That APL not only thoroughly considered Matson's offers but actively invited them (SUF ¶¶ 258, 262–275, 279–284) belies the suggestion they were anticompetitive.  No evidence shows Matson intended to induce APL to "abandon the field."  *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 45 (D.D.C. 2000).  That APL prioritized collaboration in Alaska, while Matson didn't, also cannot establish intent.  *See Lektro-Vend Corp. v. Vendo Corp.*, 660 F.2d 255, 273 (7th Cir. 1981).

### B.     APL Cannot Show A Dangerous Probability Of Monopolization

The record is also devoid of evidence that Matson is likely to monopolize *any* market.  SUF ¶¶ 297–298.  ███████████████████████████████████████████████████████████████████████████████████  And its successful entry into Guam—with a significant presence since 2017—dispels any notion that "competing [carriers] would be unable to enter."  *Microsoft*, 253 F.3d at 83; *see also Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 342 (3d Cir. 2018) ("historical evidence of entry" militates against probability of monopoly).

### CONCLUSION

For the reasons set forth above, Matson respectfully requests that this Court grant Matson's motion for summary judgment and enter judgment for Defendants.

**REDACTED PUBLIC VERSION**

Dated:   March 1, 2024

Respectfully submitted,

*/s/ Rachel S. Brass*

Rachel S. Brass, *pro hac vice*
RBrass@gibsondunn.com
Caeli A. Higney, *pro hac vice*
CHigney@gibsondunn.com
Julian W. Kleinbrodt, *pro hac vice*
JKleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
(415) 393-8200

Matthew S. Rozen, DC Bar No. 1023209
MRozen@gibsondunn.com
Amalia Reiss, DC Bar No. 241775
AReiss@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

David Salant, *pro hac vice*
DSalant@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

*Counsel for Defendants Matson Navigation*
*Company, Inc. and Matson Logistics, Inc.*

<u>**REDACTED PUBLIC VERSION**</u>

**APPENDIX A**

| Third Party | APL Allegation | Sworn Declaration |
|---|---|---|
| Cost.U.Less | Implicitly threatened future consequences if it did business with APL | "Nor in my experience has Matson ever threatened Cost.U.Less in any way." (Ex. 341) |
| NAPA | Implicitly threatened future consequences if it did business with APL | "[N]o one from Matson ever coerced or attempted to coerce anyone at [NAPA]." (Ex. 429) |
| MidPac | Implicitly threatened future consequences if it did business with APL | "Matson has never retaliated, or threatened retaliation, against MidPac." (Ex. 427) |
| Luen Fung | Implicitly threatened future consequences if it did business with APL | Luen Fung is "not aware of any instance of Matson threatening Luen Fung in any way." (Ex. 425) |
| Toyota | Threatened Toyota's other cargo that Matson carried to Hawaii | ██████████████████ (Ex. 343) |
| Macy's | Macy's was forced to maintain its Guam cargo with Matson in order to avoid losing ability to ship to Hawaii | "If a cargo shipping service provider, including APL, was offering Macy's better value than its current provider as part of a bid process or RFP, Macy's would select the provider offering the best value and would switch providers." (Ex. 387) |
| DeWitt & Royal Hawaiian | Threatened with repercussions in the U.S./Hawaii markets | "Matson has never threatened retaliation against the DeWitt Companies." (Ex. 398) |
| Ross | Ross did not want to risk upsetting the cargo it needed Matson to carry to Hawaii | Ross is "unaware of Matson ever threatening or coercing Ross in any way." (Ex. 342) |
| Fastenal | Matson forced Fastenal to withhold parts from APL's business partner | "Nor would it matter if Matson did in fact ask Fastenal to stop providing parts to a third party, as Fastenal would never comply with such a demand." (Ex. 435) |

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Civil Rule 5.3, I hereby certify that, on March 1, 2024, I caused to be served on Plaintiffs the foregoing Memorandum in Support of Motion for Summary Judgment via CM/ECF.

Dated:    March 1, 2024

*/s/ Rachel S. Brass*
Rachel S. Brass, *pro hac vice*