**REDACTED PUBLIC VERSION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN PRESIDENT LINES, LLC, APL MARITIME, LTD., APL MARINE SERVICES, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> MATSON NAVIGATION COMPANY, INC., MATSON LOGISTICS, INC., <br><br> Defendants. | No. 1:21-cv-2040-CRC |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACT**

<u>**REDACTED PUBLIC VERSION**</u>

**TABLE OF CONTENTS**

**PAGE**

I.      Matson Offers "Gold Standard" Service To Guam ................................................. 1

II.     APL Launches An "Inferior" Service Hampered By "Sheer Incompetence"........ 9

III.    Fierce Price Competition Ensues In Matson And APL's "Rate War"................. 40

        A.      "Long-Term Contracts" ...................................................... 43

        B.      Household Goods Loyalty Discounts ...................................... 56

IV.     Unable To Win In The Marketplace, APL "Punches Back" With A
        Lawsuit.................................................................................. 60

        A.      Alleged Threats To Customers ............................................... 65

        B.      Alleged Threats To Pasha ..................................................... 73

        C.      Alleged Retaliation Against Truckers And Other Third Parties............. 74

                1.      DeWitt................................................................ 74

                2.      GTW ................................................................. 76

        D.      Alleged Disparagement....................................................... 78

        E.      APL's Other Allegations..................................................... 88

                1.      Alaska ............................................................... 88

                2.      Slot Charter Proposals................................................. 96

                3.      Other Untimely And Unalleged Complaints............................ 103

                4.      No Evidence Implicates Matson Logistics .............................. 103

V.      Even Aggregated, The Cargo Implicated By APL's Allegations Is Not
        Substantial...................................................................................... 105

**REDACTED PUBLIC VERSION**

Pursuant to Civil Rule 7(h) of the Rules of the United States District Court for the District of Columbia, Defendants Matson Navigation Company, Inc. and Matson Logistics, Inc. (collectively, "Matson") hereby submit the following statement of material facts as to which it contends there is no genuine issue.  This statement is being submitted in support of Matson's motion for summary judgment as to all claims asserted by Plaintiffs American President Lines, LLC, APL Maritime, Ltd., and APL Marine Services, Ltd. (collectively, "APL").[1]

## I.     Matson Offers "Gold Standard" Service To Guam

1.      Guam is the United States' westernmost territory, a small island situated at the bottom of the Mariana Islands archipelago.  Ex. 1 (APL001983161) at slide 2.

2.      Guam is an import trade in which residents and businesses—and the large U.S. military bases—depend on shipping.  *See* Ex. 2 (APL012350447) at -0448 ███████████████ ███████████████████);  Ex. 3 (SELLECK_00001467) at -1467 (same);  Ex. 4 (MAT_GUAM_0157373) at -7374 ("Guam and Okinawa have a large military presence, with *significant* US defense strategies and construction activities centered on these two islands.").

3.      Approximately ███ of cargo originates in the continental United States and the remaining ███ arrives from Asian ports.  Ex. 5 (Langer Rpt.) ¶ 72; Ex. 6 (APL001884239) at -4250; *see also* Ex. 2 (APL012350447) at -0448.

4.      The method by which customers on Guam receive their cargo varies based on need: Cargo is carried to and from Guam by ocean shipping carriers, barges, ferries, tankers, and airfreight, as well as other means, and customers choose between these shipment options.  *See* Ex. 7 (APL009126986) at -6986 ████████████████████████████████; Ex. 8 (Metzger Dep. Tr.) at 90:16–91:7 (acknowledging that customer did in fact use airfreight); Ex. 9

---

[1] Appendix A to this Statement provides a chart detailing the names and corporate affiliations of individuals mentioned in this Statement.

**REDACTED PUBLIC VERSION**

(Pangelinan Dep. Tr.) at 197:12–17 (acknowledging customers use airfreight); Ex. 10 (Valencia Dep. Tr.) at 122:12–18 (providing examples of cargo that can be carried via airfreight); Ex. 11 (Matson 30(b)(6) Dep. Tr.) at 56:5–14 (recognizing certain cargo is shipped to Guam on roll-on-roll-off ("RORO") ships); Ex. 12 (APL003900982) at -0985 (███████████████ ███████████████████████████████); *see also* Ex. 13 (Warren-Boulton Rpt.) ¶ 29; Ex. 5 (Langer Rpt.) ¶ 38.

5.      Within the broader category of ocean cargo shipping, the equipment required varies by the commodity shipped, with certain goods requiring configurations that are not suitable for other customers' needs.  *See* Ex. 14 (Santos Dep. Tr.) at 23:2–13 (explaining that perishable cargo requires specialized equipment); Ex. 8 (Metzger Dep. Tr.) at 257:4–258:14 (explaining that oversized cargo requires specialized equipment); *see also* Ex. 13 (Warren-Boulton Rpt.) ¶¶ 23, 29; Ex. 5 (Langer Rpt.) ¶ 42.

6.      For example, climate-controlled containers referred to as "reefers" are required anytime goods susceptible to spoilage are being shipped.  *See* Ex. 15 (APL 30(b)(6) Dep. Tr.) at 82:14–84:20.   Reefers are temperature-controlled containers that allow carriers to adjust the temperature based on the cargo being shipped, ranging from below freezing for certain frozen foods to various above-freezing temperatures for other food items.  *See id.*; Ex. 14 (Santos Dep. Tr.) at 23:2–13.

7.      In addition to requiring specialized equipment, some cargo is perishable and must be shipped quickly so that it doesn't spoil.   Ex. 16 (APL011719319) at -9321; Ex. 17 (APL010785729) at -5730; Ex. 18 (Dianora Dep. Tr.) at 141:2–141:18; Ex. 9 (Pangelinan Dep. Tr.) at 263:12–18; Ex. 19 (Mensing Dep. Tr.) at 200:5–16; *see also* Ex. 20 (APL000271650) at -1651 (█████████████████████████████████████████████████████████████

**REDACTED PUBLIC VERSION**

██████████████████████ ).

8.      In other instances, non-containerized, flat-rack configurations are required for oversized cargo incapable of fitting within a container, such as construction materials or large vehicles.  *See* Ex. 9 (Pangelinan Dep. Tr.) at 226:18–228:19; Ex. 8 (Metzger Dep. Tr.) at 257:4–258:14.

9.      As additional examples, customers shipping hazardous materials ████████ ████████████████████████ (Ex. 21 (APL001126215) at -6222) ████████ ████████████████████████████████████████████ ████████████████ (Ex. 22 (APL001389533) at -9533). ████████████ ████████████████████████████████████████████ .   Ex. 23 (APL013199060) at -9060.

10.     Certain other customers ship vehicles employing a range of different configurations. *See* Ex. 11 (Matson 30(b)(6) Dep. Tr.) at 56:5–14 (recognizing certain cargo is shipped to Guam on RORO ships); Ex. 25 (MAT_GUAM_CFR_00000001) ¶ 3 (noting vehicles are shipped on occasion using specialized "racks"); Ex. 8 (Metzger Dep. Tr.) at 259:18–262:5 (explaining certain vehicles are shipped in containers, though APL was purposefully not competitive for such vehicles because it had a rate with the military that it could not go below for commercial customers).

11.     Each customer has its own unique expectations and requirements for the shipment of its cargo. Ex. 9 (Pangelinan Dep. Tr.) at 40:4–19; *see also* Ex. 19 (Mensing Dep. Tr.) at 202:10–22; Ex. 8 (Metzger Dep. Tr.) at 257:4–258:14; *see, e.g.*, Ex. 24 (APL000173219) at -3220 ( ██████████████████████████████ ).

12.     Matson is the world's 28th largest ocean shipping carrier.  *See* Ex. 26 (Alphaliner TOP 100, *available at* https://alphaliner.axsmarine.com/PublicTop100/ (accessed Feb. 24, 2024)).

<u>REDACTED PUBLIC VERSION</u>

13. Matson has served Guam for almost thirty years. Ex. 27 (MAT_GUAM_0096056) at -6057.

14. Jones Act vessels are U.S.-built, U.S.-flagged, and U.S.-crewed ships that comply with the requirements of the Jones Act. *See* 46 U.S.C. § 55101 *et seq.* In general, Jones Act vessels are more expensive to build and operate than foreign-built, foreign-flagged, and/or foreign-crewed ships. Ex. 11 (Matson 30(b)(6) Dep. Tr.) at 182:8–183:6; Ex. 28 (Cox Dep. Tr.) at 222:14–224:20; Ex. 5 (Langer Rpt.) ¶¶ 46, 56. The Jones Act, however, supports the domestic shipping industry and preserves a maritime fleet for use in war or national emergency. *See* Ex. 29 (MAT_GUAM_003539691) at -9278–31; Ex. 5 (Langer Rpt.) ¶¶ 32, 54–57.

15. Using "[f]ive vessels in rotation" (Ex. 30 (MAT_GUAM_000615283) at -5292), all of which are Jones Act vessels, Matson sails from the U.S. West Coast to Guam via Honolulu (as shown below). Ex. 5 (Langer Rpt.) ¶¶ 58, 76, 88 & Ex. 1; *see also id.* ¶ 110 ("Matson chooses to take a shorter and more direct route to Guam than APL."); Ex. 31 (APL008221954) at slide 4. Matson's vessels arrive in Guam weekly. Ex. 4 (MAT_GUAM_0157373) at -7374; *see also, e.g.*, Ex. 32 (MAT_GUAM_000253196) at -3196–98 (exemplar Matson vessel schedule).



Exhibit 1
Matson's CLX and CLX+/AAX services

Source: Matson, "Shipping to Asia," available at https://www.matson.com/asia.html, accessed on November 16, 2023.

**REDACTED PUBLIC VERSION**

16.     Matson "live[s] and die[s] by [its] schedule."  Ex. 10 (Valencia Dep. Tr.) at 217:22–218:6.

17.     To ensure the reliability and speed of its business, Matson invested in dedicated terminals and facilities at each of its mainland ports as well as in Hawaii.  Ex. 33 (Lauer Dep. Tr.) at 38:17–39:10 ("And in all three ports we also have dedicated terminals.  We are the only ones in the terminal.  It's – it's different than anything that any other shipping company has.  So with that we have more control of the – of the assets."); Ex. 34 (MAT_GUAM_0027620) at -7631; Ex. 35 (MAT_GUAM_003737852) at -7854; Ex. 36 (MAT_GUAM_003747851) at -7558; Ex. 37 (MAT_GUAM_0103584) at -3592; Ex. 38 (MAT_GUAM_002333458) at -3460; Ex. 39 (APL000020756) at slides 5–10; Ex. 40 (APL009983339) at -3340; Ex. 41 (Stefanik Dep. Tr.) at 107:8–22.  Matson has also invested in a large, 15-acre off-dock container yard in Guam to facilitate smooth and efficient transportation of containers.  Ex. 42 (MAT_GUAM_003451759) at -1784; *see also* Ex. 43 (APL012935225) at -5227 (███████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████); *id.* at -5225 (similar).

18.     Matson's operational investments give customers tangible benefits, including more time to get their goods to the port before Matson's vessels depart, shorter loading/unloading times, and the ability to bypass logjams that sometime arise at congested ports (which were particularly prevalent during the COVID-related global shipping crisis in 2020 and 2021).  Ex. 39 (APL000020756) at slides 5–10 (████████████████████████████████████ ████████████████████████████████████████████████████████████████); Ex. 44 (MAT_GUAM_003691957) at -1970 (recognizing Matson's dedicated terminals allowed it to continue service unabated by congestion that affected other carriers during the COVID pandemic);

**REDACTED PUBLIC VERSION**

Ex. 45 (Theberge Dep. Tr.) at 274:18–275:4 (acknowledging that Matson's turn times are faster than APL's and that Matson "do[es] an excellent job"); Ex. 9 (Pangelinan Dep. Tr.) at 189:5–15 (similar); Ex. 46 (Hermosa Dep. Tr.) at 146:4–21 (similar).

19.     Both APL and third-party analysts recognized that Matson's operational investments gave Matson a "meaningful competitive advantage," "allow[ing] Matson to maintain its service times when other carriers cannot."  Ex. 44 (MAT_GUAM_003691957) at -1970; *see also* Ex. 9 (Pangelinan Dep. Tr.) at 189:5–15 (acknowledging the superior speed, reliability, and efficiency of Matson's dedicated terminals); Ex. 46 (Hermosa Dep. Tr.) at 146:4–21 (same); Ex. 47 (APL000489038) at -9038 ████████████████████████████████████████████████ ████████████████████████████████████████ ); Ex. 48 (APL008582745) at -2746 (████████████████████████████████████████ ████████████████████████████████ ); Ex. 49 (Magnusson Dep. Tr.) at 156:24–158:1 (████ ).

20.     Matson also has "invested a lot in developing [its] local talent," including developing and supporting employees who grew up on Guam, to build a strong customer service and sales team in Guam with local leadership.  Ex. 50 (V. Angoco Dep. Tr.) at 199:5–200:6; *see also* Ex. 51 (Peddicord Dep. Tr.) at 314:20–315:2; Ex. 52 (MAT_GUAM_003381981) at -1992. Similarly, Matson has invested heavily in Guam itself by supporting numerous charitable community events and organizations—including by, among other things, providing free shipping services to charitable organizations during times of crises.  *See* Ex. 50 (V. Angoco Dep. Tr.) at 200:1–6;  Ex. 53  (MAT_GUAM_000674284)  at  -4288  (recognizing  Matson  as  an "OUTSTANDING Corporate Partner in our community most especially in times of disaster").

21.     Matson also has invested in establishing first-class customer service.  *See* Ex. 43 (APL012935225) at -5225 ████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████; Ex. 54 (APL013747027) at -7027 (███████

███████████████████████████████████); Ex. 55

(MAT_GUAM_ADUANA_000000001) ¶ 5 ("the ease of doing business with Matson is superior

to its competitors").   Customers "rave[] about Matson's superior customer service" (Ex. 56

(MAT_GUAM_002801510)    at    -1515),    and    its    "awesome    staff"    (Ex.    53

(MAT_GUAM_000674284) at -4288).  As APL's Guam General Manager wrote in June 2017,

███████████████████████████████████████████████

████████████████████████████  Ex. 57 (APL012717128) at -7128

(emphasis added).

22.    Customers viewed Matson's booking system as ██████████████  Ex. 54

(APL013747027) at -7027–28; *see also* Ex. 58 (APL005868165) at -8167████████████

███████████████████████████████████); Ex. 55

(MAT_GUAM_ADUANA_000000001) ¶ 5 ("[T]he ease of doing business with Matson is

superior to its competitors.").

23.    Matson always has on hand adequate chassis, the trailers onto which containers are

dropped when unloaded, among other specialized equipment.  Ex. 9 (Pangelinan Dep. Tr.) at

142:15–143:3, 274:13–275:22; *see also* Ex. 59 (APL008495994) at -5997 ████████████

███████████████████████████); Ex. 19 (Mensing Dep. Tr.) at 286:13–18

("Matson had an independent terminal with their own chassis fleet and seemed to avoid"

congestion issues); Ex. 41 (Stefanik Dep. Tr.) at 85:2–5 (acknowledging that owning your own

chassis is a competitive advantage); Ex. 9 (Pangelinan Dep. Tr.) at 273:6–275:9 (████████

**REDACTED PUBLIC VERSION**

██████████████████████████████████████████████████████████████).
This ensures Matson can carry any cargo—commercial or military; dry, refrigerated, or chilled; hazardous or non-hazardous—and deliver anywhere on the island. Ex. 60 (MAT_GUAM_0061196) at -1217; Ex. 10 (Valencia Dep. Tr.) at 218:20–219:3 ("[W]e take pride in owning our own equipment. Because we have full control of our equipment, we can make sure that we have this equipment for customers so they can get their cargo on time."); *see also* Ex. 61 (APL000149262) at -9262 (███████████████████████████████████████████████████████████████████████████████████████████████████); Ex. 62 (APL010865143) at -5144 (███████████████████████████████████████████████████████████████████████████████████████████████).

24. Senior APL employees have acknowledged that Matson offers superior, high-quality ocean shipping services to Guam: One APL director, for example, admitted Matson is ████████ than APL and ████████████████████████ and ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████ (Ex. 63 (APL011593592) at -3592–93); *see also* Ex. 19 (Mensing Dep. Tr.) at 197:2–11 (APL's CEO testifying that Matson was "really good" in "[c]hassis, customer service, ops, sales, advertising, et cetera"); Ex. 64 (APL009815885) at -5886 (APL's General Manager for Guam stating that, ██████████████████████████████ is one and the same); Ex. 9 (Pangelinan Dep. Tr.) at 153:2–11 (APL's Sales Director admitting Matson's on-time "record was good"); Ex. 65 (APL004994933) at -4933 (APL's Sales Director observing that Matson will continue to ████████████████████████████████); Ex. 5 (Langer Rpt.) ¶¶ 110, 115–17, 134; Ex. 13 (Warren-Boulton Rpt.) ¶¶ 22, 24.

**REDACTED PUBLIC VERSION**

25.     In all, customers and APL employees alike have recognized that Matson's ocean shipping ████████████████████████ Ex. 67 (APL000061514) at -1514; *see also* Ex. 67 (APL000061442) at -1442 ████████████████████████████████.

## II.     APL Launches An "Inferior" Service Hampered By "Sheer Incompetence"

26.     Formerly an American company qualified for the Jones Act, APL has been a subsidiary of a foreign parent for decades.  Ex. 68 (APL013405470) at -5475; Ex. 49 (Magnusson Dep. Tr.) at 16:13–17:1.  APL is a larger company than Matson, which it views as "a flea on an elephant's heinie."  Ex. 69 (Jameson Dep. Tr.) at 226:17–227:7.

27.     ████████████████████████████████████████████████
████████████.  Ex. 70 (APL_CUL_000000285) at -0286; Ex. 71 (Saadé Dep. Tr.) at 10:11–16.  ████████████████████████████████████.     Ex. 70 (APL_CUL_000000285) at -0286; Ex. 72 (APL002616488) at 4; Ex. 73 (Fafoutis Dep. Tr.) at 84:10–16, 103:25–104:2, 104:15–20, 115:7–20.  ████████████████████████████ ████████████████████████████████████.  Ex. 73 (Fafoutis Dep. Tr.) at 282:20– 283:1; Ex. 71 (Saadé Dep. Tr.) at 14:15–18; Ex. 46 (Hermosa Dep. Tr.) at 25:11–13; Ex. 74 (APL000437445) at -7446.  In 2022, CMA CGM Group ████████████████████████████ ████████.  Ex. 71 (Saadé Dep. Tr.) at 11:18–21; Ex. 75 (Langer Rebuttal Rpt.) ¶ 70.

28.     The CMA CGM Group's size and profitability have redounded to APL's benefit: APL received support and efficiencies from the CMA CGM Group, including in logistics and economies of scale.  *See* Ex. 76 (APL013745391) at -5397 (APL's CEO writing that ████████ ████████████████████████████████████████████████████████████████ ████████████████████████); Ex. 77 (APL013582626) at 4; Ex. 78 (Thomas Dep. Tr.) at 102:10–17; Ex. 73 (Fafoutis Dep. Tr.) at 65:22–66:14, 153:20–154:3, 175:2–176:23, 177:14–179:16, 188:5–18, 196:5–197:11; Ex. 79 (APL013497605) at -7605; Ex. 9 (Pangelinan

**REDACTED PUBLIC VERSION**

Dep. Tr.) at 30:19–31:7; *see also* Ex. 80 (APL003199873) at 1–14 (█████████

███████████████████████████████████████████████████████████████

█████████████████████). ████████████████████████████████████████

█████████████████████████████████████████████████████████. Ex. 76

(APL013745391) at -5400.

      29.    ████████████████████████████████████████

████████████████████████████████████████████████████████. Ex. 81

(APL002910951) at 11–13; *see also* Ex. 82 (APL008935507) at -5508 (████████

█████████████████████). APL also obtained tangible cost savings:

- ███████████████████████████████████████████████████████████████

  ███████████████████████████████████████████████████████████████

  ████. Ex. 15 (APL 30(b)(6) Dep. Tr.) at 326:8–346:5; Ex. 73 (Fafoutis Dep. Tr.) at 184:6–

  185:4, 283:23–284:20; Ex. 49 (Magnusson Dep. Tr.) at 79:5–81:5; Ex. 75 (Langer Rebuttal

  Rpt.) ¶ 310.

- ███████████████████████████████████████████████████████████████

  ████. Ex. 71 (Saadé Dep. Tr.) at 62:5–24.

- ███████████████████████████████████████████████████████████. Ex. 83

  (APL013537846) at -7849.

- ███████████████████████████████████████████████████████████████

  ███████████████████████████████████████████████████████████████

  ███████████████████████████████████████████████████████████████

  Ex. 6 (APL001884239) at -4257; *see also* Ex. 5 (Langer Rpt.) ¶ 126; Ex. 75 (Langer

  Rebuttal Rpt.) ¶ 35(c).

**REDACTED PUBLIC VERSION**

30.  ███████████████████████████████████████████████████████████████.  Ex.
73 (Fafoutis Dep. Tr.) at 26:16–27:14, 49:12–50:14, 283:2–284:13.

31.  APL is the U.S. military-focused arm of the CMA CGM Group:  Its former CEO
testified that the Department of Defense is APL's "most important customer" and "[e]verything
starts and stops" with the Pentagon.  Ex. 19 (Mensing Dep. Tr.) at 116:6–10, 241:16–19; *see also*
Ex. 73 (Fafoutis Dep. Tr.) at 216:3–11; Ex. 69 (Jameson Dep. Tr.) at 147:7–16; Ex. 84
(APL003640638) at 5 █████████████████████████████████████████████████
██████ (emphasis in original).

32.  As the United States eyed a military buildup in Guam, it asked APL to enter the
Guam trade so that it could carry cargo from Asia to the island.  Ex. 85 (APL010057840) at -7840;
Ex. 19 (Mensing Dep. Tr.) at 98:22–100:19; Ex. 86 (Aldridge Dep. Tr.) at 150:5–13; Ex. 87
(APL013759832) at -9839; Ex. 88 (APL013345038) at -5039.  In response to the United States
military's request, APL agreed to launch a Guam service.  Ex. 19 (Mensing Dep. Tr.) at 100:1–5;
*see also* Ex. 89 (APL013322633) at -2633 (APL Senior Vice President: ██████████████
███████████████████████████████████).

33.  In 2014, APL commissioned a study to assess a potential Guam service.  Ex. 6
(APL001884239) at -4239–40; Ex. 90 (SELLECK_00000853) at 1–17 (pre-study preliminary
slide deck); Ex. 91 (SELLECK_00000142) at -0142–44 (proposed study).

34.  ███████████████████████████████████████████████████████████
█████████████████████████████.  Ex. 92 (APL013406882) at -6886; Ex. 6 (APL001884239)
at -4241 ████████████████████████████████████████████████████████████;
Ex. 93 (APL001884205) at -4207 ██████████████████████████████████████
███████████████████████████████████████████.  The MSP provided cargo carriers

**REDACTED PUBLIC VERSION**

with annual, multi-million-dollar subsidies per ship in the program: █████████████

███████████████████████████████████████████████████████████████. Ex.

94 (APL013545853) at 9.  MSP Participation also conferred tax benefits to APL.  Ex. 94

(APL013545853) at 11; Ex. 95 (APL007638681) at -8681–82. ████████████████

█████████████████████████████████████████████████████████████████████████

█████████████. *See* Ex. 92 (APL013406882) at -6886; Ex. 96 (APL013644614)

at -4621–22; Ex. 97 (APL013636896) at -6916; Ex. 98 (APL009246364) at 8–9.

35.    These MSP subsidies were indispensable to APL's Guam business:  As APL's

former President and CEO explained, APL's entry into the Guam trade was "ONLY made possible

with the help of Marad"—the Federal Maritime Administration, responsible for the MSP program.

Ex. 99 (Email from E. Mensing to P. Jaenichen) at 2, Dkt. 52-12.  APL repeated in sworn

declarations, bulletins to Congress, other internal and external communications, and testimony in

this case that APL's ability to serve Guam was dependent on its receipt of MSP subsidies and that

APL would not stay in the Guam trade without the MSP subsidy.  Ex. 73 (Fafoutis Dep. Tr.) at

272:23–273:2; Ex. 100 (Jellies Dep. Tr.) at 50:9–22, 134:10–138:7; Ex. 19 (Mensing Dep. Tr.) at

81:9–19, 83:3–22, 85:2–86:13, 88:7–13; Ex. 9 (Pangelinan Dep. Tr.) at 119:12–120:4; Ex. 101

(APL013447994) at -7995; Ex. 102 (APL013767588) at -7589 (former APL President/CEO to

Admiral Peter Clarke, U.S. Department of Defense: ███████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████████) (emphasis added); Ex. 103 (APL007759095) at -9095

(former APL President/CEO: █████████████████████████████████████████

████████████); Ex. 104 (APL013459482) at -9482. █████████████████████████

█████████████████████████████████████████████████████. Ex.  84

12

**REDACTED PUBLIC VERSION**

(APL003640638) at 5 ██████████████████████████████████████████████

██████████████████████████████; Ex. 105 (APL013345034) at -5034 ████████

████████████████; Ex. 106 (MAT_GUAM_003541001) at -1001 (APL lobbying talking

points stating "Removing APL from MSP to Guam/CNMI would force us to end our service").

     36.    ██████████████████████████████████████████

███████████████████████████████████████████████████.  Ex. 6

(APL001884239) at -4240; *see also* Ex. 19 (Mensing Dep. Tr.) at 202:2–5; Ex. 107

(SELLECK_00000726) at -0774 ("Clearly our best revenue and support will come from the direct

service especially if [we are] able to be last sail west coast and first arrival in Guam.").  As a U.S.

Flagship, APL could make that sailing.  Ex. 46 (Hermosa Dep. Tr.) at 335:12–13, 336:1–2; Ex. 19

(Mensing Dep. Tr.) at 18:1–7; Ex. 100 (Jellies Dep. Tr.) at 19:9–13; Ex. 45 (Theberge Dep. Tr.)

at 250:21–251:9.  That is the route that Horizon, which served Guam until 2011, took, using a U.S.

Flagship rather than a Jones Act vessel.  Ex. 10 (Valencia Dep. Tr.) at 44:7–25, 209:13–21.  ███

████████████████████████████████████████████████████████████████████

████████████.  Ex. 6 (APL001884239) at -4265.

     37.    APL chose neither a direct service to Guam from the U.S. West Coast nor a weekly

service manned by two vessels.  Ex. 45 (Theberge Dep. Tr.) at 294:7–21; Ex. 19 (Mensing Dep.

Tr.) at 170:2–17; Ex. 108 (APL013244097) at -4101–02 ████████████████████████

████████████████████████████████; Ex. 109 (APL004420019) at -0021.  APL

instead chose to operate a fortnightly "feeder" service that transshipped goods in Asia (Yokohama,

Japan) before circling back to Guam every two weeks.  Ex. 15 (APL 30(b)(6) Dep. Tr.) at 64:1–

15; Ex. 110 (APL009442142) at 16.  Transshipment "means the unloading of goods from one ship

and its loading into another to complete a journey to a further destination, even when the cargo

**REDACTED PUBLIC VERSION**

may have to remain ashore some time before its onward journey." *See* Ex. 111 (Transshipment Definition, Eurostat, (accessed Feb. 24, 2024) available at https://ec.europa.eu/eurostat/statistics-explained). ████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Ex. 110 (APL009442142) at 16. ████████████████████████████

████

████████████

Ex. 110 (APL009442142) at 16.

38.    APL offered no sailings at all from the Pacific Northwest.  Ex. 9 (Pangelinan Dep. Tr.) at 161:19–163:9, 262:3–17; Ex. 8 (Metzger Dep. Tr.) at 161:13–162:17; Ex. 112 (APL009489909) at -9910 ████████████████████████████████████

████████████████████████████████████████

████████

39.    APL's transshipment-based feeder service to Guam gave the military the route from Asia it wanted.  Ex. 19 (Mensing Dep. Tr.) at 100:6–19.

40.    For commercial cargo originating in the United States, however, APL knew this service was an inferior, "second-class" option that "was always going to be an issue" and would "limit[]" it "in the market."  Ex. 19 (Mensing Dep. Tr.) at 116:11–119:8, 170:2–22; Ex. 113 (APL006415975) at -5975 (former APL President and CEO writes: ████████████████

████████████████████████████████████████

**REDACTED PUBLIC VERSION**

████████████████████████████████████████████████████

████████████████████████████████████████████████. In

particular, APL's longer route, with its transshipment through Asia, was slower, more prone to

delays, more likely to incur damage, and less flexible for customers due to shorter port windows

in which to drop off outbound cargo.  Ex. 19 (Mensing Dep. Tr.) at 98:20–100:5, 116:11–21; Ex.

114 (APL010865170) at -5171; Ex. 51 (Peddicord Dep. Tr.) at 285:10–286:12.

     a.     For one, APL's chosen route added thousands of nautical miles onto the

distance sailed between Los Angeles and Oakland to Guam.  *Compare* Ex. 115

(APL012205148) at -5149 (████████████████████████████

████████████████████████████████████████████

████████████████████████████████) *and* Ex.

116 (APL009746319) at -6319 (████████████████████████), *with*

Ex. 117 (MAT_GUAM_000326284) at -6288 (5,299 nautical miles between Matson's

Long Beach Terminal and Guam).

     b.     Transshipping adds additional ████████ to offload cargo from the U.S.-

origin vessel and reload cargo onto the Guam-bound feeder vessel that is avoided altogether

by sailing a direct route to Guam.  Ex. 118 (APL002616836) at 6; Ex. 119 (APL011046601)

at -6602; *see also* Ex. 120 (APL011047045) at -7047–48.

     c.     As a result, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████.  Ex. 121 (APL007764532) at -4534.

     d.     ████████████████████████████████████

████████████████████████████████████████████████.

15

**REDACTED PUBLIC VERSION**

Ex. 122 (APL013751504) at -1530; Ex. 19 (Mensing Dep. Tr.) at 191:9–15. ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████. Ex. 19 (Mensing Dep. Tr.) at 266:20–267:4; Ex. 123

(APL013611414) at -1415; Ex. 124 (APL006582516) at -2516 (APL salesperson

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████); Ex. 125 (APL009997479) at -7480 (APL Director

of Business Development warning ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████).

     e.     ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████. Ex. 126 (APL009997493) at -7500

(APL consultant writes ██████████████████████████████████████

██████████████████████████████████████); Ex. 127

(APL002512028) at -2030 (████████████████████████████████████

████████████).

41.    APL encountered service issues from the start:  While it planned to introduce its

Guam service ████████████████████████████████████. Ex. 128 (APL012530605) at

-0606; Ex. 129 (APL010284360) at -4364; Ex. 130 (APL011648901) at -8901–02.  APL initially

████████████████████████████. Ex. 130 (APL011648901) at -8901 (████████████

████████████████████).  Then it ████████████. Ex. 131 (APL009998569) at -8573 (████████

**REDACTED PUBLIC VERSION**

██████████████████████████████████████████████████████).
And again. Ex. 132 (APL005971455) at -1455 (████████████████████████████).
APL executives understood that ████████████████████████████████

████████████████████████████████████████████████████

███████████████████. Ex. 133 (APL008580159) at -0160. ███████████████████

█████████████████████████████████████████. Ex. 134 (APL008580616) at -0641
████████████████████████████████████████████; Ex. 135 (APL009998576)
at -8577 ████████████████████████████████████████████████; Ex.
120 (APL011047045) at -7051 (███████████████████████████████████

████████████████████████████████████████████████████).

42.     To compensate for its inferior service, APL sought to undercut Matson's prices—

████████████████████████████████████. Ex. 136 (APL010212610) at -2617; Ex.
137 (APL009997281) at -7281; *see also* Ex. 138 (APL011370430) at -0430 (██████████
██████████████████████████████████). APL quickly moved to offering █
██  discounts from Matson's rates in response to ████████████████████████
████████████████████████████ Ex. 139 (APL009559575) at -9575; Ex. 140
(APL013676860) at -6864 ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████; *see also* Ex. 141
(APL009962393) at 23 ████████████████████████████████████████████
████; Ex. 142 (APL011915935) at -5941 ████████████████████████████████
████████████████████████████████████████████████████████; Ex.
143 (APL012036793) at -6796 (████████████████████████████████████).

**REDACTED PUBLIC VERSION**

Even then, APL's price undercutting strategy did not work as well as the company hoped or predicted.  Ex. 54 (APL013747027) at -7027 ███████████████████████████

████████████████████████████████████████████████████████████████

██████; Ex. 144 (APL009461700) at -1701 ████████████████████████████

███████████████████████.

43.    Still, APL found "a lot of customer resistance" because for many customers "[p]rice [did] not matter" without fast, reliable service.  Ex. 19 (Mensing Dep. Tr.) at 170:2–17, 188:12–22; Ex. 145 (APL011077228) at -7229; *see also* Ex. 146 (APL012500316) at -0316 (████████

████████████████████████████████████████████████████████████████

████████); Ex. 107 (SELLECK_00000726) at -0774 (admitting customers were "not going to support a fortnightly service with high value freight as they need the cargo on their shelves"); Ex. 147 (Holm Dep. Tr.) at 233:18–22 (████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████).   APL's service was neither fast nor reliable:  In 2016, one APL employee compared APL's Guam schedule to ███████████████████ Ex. 148 (APL012527372) at -7373; *see also* Ex. 5 (Langer Rpt.) ¶ 26 (showing longer transit times and worse reliability for APL's Guam service as compared to Matson's).

a.    For example, some customers explained to APL that they would not ship with APL because it was ████████████████████████████████████████████████

████████████████████████████ Ex. 149 (APL000620579) at -0579; *see also* Ex. 150 (APL010782824) at -2830 ██████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████; Ex. 151 (APL012998061) at

18

-8061 

█████; Ex. 152 (APL_DHX_000000050) at -0068 (calling APL's offerings "insulting" because APL was "attempting to[] look like a competitor to Matson when, in fact, given the transit times, they are not"); *id.* at -0050 (similar); *id.* at -0053 (similar).

b.      Other customers cited APL's decision to call on Guam fortnightly as an impediment to doing business with APL.  Ex. 153 (APL009997387) at -7390 ████

███████████████; Ex. 152 (APL_DHX_000000050) at -0055 ("Some customers do not have control of when their orders will be ready, so if they miss the sailing, they have to wait another two weeks, pushing their transit time to 5 weeks.  Currently they are accustom[ed] to weekly sailings, so they do not even have to think about it."); Ex. 19 (Mensing Dep. Tr.) at 170:2–17 (similar); Ex. 45 (Theberge Dep. Tr.) at 294:7–21 (similar); Ex. 154 (APL008533188) at -3189 █████████████████

███████████████████.

44.     In particular, "APL's transit time from the U.S. West Coast to Guam prevented it from effectively competing for the chilled reefer container business line."  Am. Compl. 10 at 14 n.6; Ex. 5 (Langer Rpt.) ¶ 117 ("APL struggled to sell this service because the risk of spoilage of chilled containers is high on the slower route they take to Guam (via Asia).").

45.     Moreover, many businesses on Guam have limited storage space.  Ex. 155 (APL008238436) at -8436 (former APL CEO/President: █████████████████

█████████████████████); *see also* Ex. 153 (APL009997387) at -7390 (recognizing the █████████████████

█████████).  As a result, a delayed shipment leads to empty shelves and then too much inventory when the late boat arrives close in time to the next call.  Ex. 17 (APL010785729) at -

**REDACTED PUBLIC VERSION**

5730 ( ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ ); Ex. 433 (APL012086253) at -6253 ( ████████

██████████████████████████████ ); Ex. 156 (APL000110659) at -0659 ( █████████

████████████████████████████████████████████████

████████████████████████████████████ ); Ex. 157 (APL009168314) at -8316 ████████

████████████████████████████████████████████████

████████ ); Ex. 8 (Metzger Dep. Tr.) at 93:10–16 ("Q And as we discussed, delays can also cause

inventory issues for customers, correct?  A Yes.  Q Have you experienced a situation where delays

have resulted in a customer having too much product at one time?  A Yes."); Ex. 9 (Pangelinan

Dep. Tr.) at 188:16–19 ("Q. On Guam, did some customers experience a shortage of storage space?

A. Yes. There were customers here on Guam that experienced."); Ex. 158 (APL000177428) at -

7428; Ex. 46 (Hermosa Dep. Tr.) at 43:20–44:1 ("Q. There is a lack of storage space that a

customer has if it was to get inundated with multiple loads of cargo at the same time?  A. Their

cargo flow would be disrupted. Yes.").

46.     APL understood that its long-term success in Guam therefore depended on

establishing a reliable service.  Ex. 78 (Thomas Dep. Tr.) at 97:10–98:12; Ex. 69 (Jameson Dep.

Tr.) at 137:8–138:17; *see also* Ex. 159 (APL009753781) at -3781 ( ████████████████████████

████████████████████████ ); *id.* at -3786 ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ ; Ex. 155 (APL008238436) at -8436

<u>**REDACTED PUBLIC VERSION**</u>

(APL's CEO acknowledging ███████████████████████████████).

      a.     APL's Guam team said in internal emails that █████████

███████████████████████ (Ex. 160 (APL013747023) at -7023), █████████

███████████████████████████████████ (Ex.

161 (APL009229486) at -9488), and ███████████████████████████

███████████████████████████████████████████

████████████████████ (Ex. 162 (APL010801987) at -1987).

      b.     At an April 2016 ██████ call about APL's Guam service, APL's

Director of Business Development reported ████████████████████████

█████████████████████████ Ex. 163 (APL008737941)

at -7943; *see also* Ex. 164 (APL009299847) at -9847 (APL's COO admitting the company

███████████████████████████████████████████

████████████████).

      c.     Analyses conducted by APL in 2016 similarly concluded the █████

███████████████████████████████ Ex. 165

(APL009463721) at 1; *see also* Ex. 166 (APL009463838) at 2 ███████████████

███████████████████████████████████████████

██████████.

47.     Unwilling to change its ████████████████████████████

███ obtained another MSP subsidy—allowing it to add a second vessel to its service and call on

Guam weekly.  Ex. 167 (APL011628468) at -8468 ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████; Ex.

**REDACTED PUBLIC VERSION**

19 (Mensing Dep. Tr.) at 98:20–100:19; Ex. 8 (Metzger Dep. Tr.) at 108:19–109:9; Ex. 15 (APL

30(b)(6) Dep. Tr.) at 70:6–12; Ex. 168 (APL010459769) at -9769–70; Ex. 169

(MAT_GUAM_004840317) at -0317 (APL letter to MARAD requesting approval of the *APL*

*Saipan* to the Maritime Security Program); Ex. 170 (APL013461260) at -1260 (███████████

████████████████████████████); Ex. 171 (APL009299717) at -9722

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████; Ex. 172 (APL010863473) at -

3473; *see generally* Ex. 173 (APL011635544) (███████████████████████).

48.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████.

Ex. 174 (APL009299100) at 9.

████████████████

*Id.*

49.    Despite promising customers a weekly service, this approach nonetheless ████████

████    out of some at APL because their feeder still relied on a ████████████ between

APL's EX1 service (from the West Coast to Asia) and the GSX feeder line (sailing from Asia to

Guam).  Ex. 175 (APL011967109) at -7110; *see also* Ex. 176 (APL012499864) at -9864; Ex. 177

(APL010809522) at -9529.

50.    Even after APL's move to a weekly schedule, it remained a "second-class service."

Ex. 19 (Mensing Dep. Tr.) at 117:3–12; *see also* Ex. 178 (APL007769072) at -9072; Ex. 113

(APL006415975) at -5975; Ex. 179 (APL009980698) at -0698.   APL admitted ████████

<u>**REDACTED PUBLIC VERSION**</u>

████████████████████████████████████████████████████████████████████.

Ex. 180 (APL009817398) at -7398.

51.   ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████.  Ex. 5

(Langer Rpt.) ¶ 26.  APL's vessels arrived in Guam within 24-hours of their scheduled windows

only ███ of the time in 2018, ███ in 2019, ███ in 2020, ███ in 2021, and ███ in 2022.  Ex.

181 (APL003383145) at -3145 (2018); Ex. 182 (APL003630528) at -0528 (2019); Ex. 183

(APL008890560) at -0560 (2020); Ex. 184 (APL002662988) at -2988 (2021); Ex. 185

(APL000152649) at -2649 (2022).  ███ of APL's L.A.-Guam sailings and ███ of its Oakland-

Guam sailings reached the island more than a week late.  Ex. 5 (Langer Rpt.) ¶ 26.  APL also

missed 16 sailings altogether.  Ex. 186 (MAT_GUAM_001018738) at -8728.

52.   APL's then-Director of Sales in Guam testified that APL "couldn't keep a . . .

standard schedule."  Ex. 9 (Pangelinan Dep. Tr.) at 231:16–232:1; *see also* Ex. 8 (Metzger Dep.

Tr.) at 154:12–17; Ex. 78 (Thomas Dep. Tr.) at 57:8–13; Ex. 41 (Stefanik Dep. Tr.) at 96:2–5; Ex.

45 (Theberge Dep. Tr.) at 225:22–226:4; Ex. 160 (APL013747023) at -7023.

53.   As many at APL had feared when it began its weekly service, ████████████████

████████████████████████████████████████████████████████.  Ex. 187

(APL012751402) at -1402 ███████████████████████████████████████████████

██████; Ex. 188 (APL005713144) at -3149 ███████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████; Ex. 189 (APL012207795)

at -7796 ████████████████████████████████████████████████████████████

████████████████████████████████████████████, Ex. 190 (APL011916639) at -

**REDACTED PUBLIC VERSION**

6640 (discussing customers being ███████ that their cargo was ███████████████

███ ).

     54.     Another ███████ was APL's use of the Global Gateway South (or "GGS")

terminal in Los Angeles (Ex. 191 (APL010635938) at -5938), which experienced ████████

███ that created ██████████ for shipping Guam.  Ex. 192 (APL013541690) at -1692; Ex.

193 (APL008116757) at -6757; *see also* Ex. 194 (APL002167851) at slide 41.  This was in contrast

to Matson, which operated out of its own terminal—creating a ██████████ between Matson

and APL.  Ex. 195 (APL013534845) at -4845.

     55.     Congestion at other ports along APL's route to Guam, such as those in Asia where

APL transshipped, often created a ████████████████████████████████████████

████████████████████████ .  Ex. 196 (APL010803657) at -3657; *see also* Ex. 9 (Pangelinan

Dep. Tr.) at 184:12–19 (describing "the snowball effect" created by "congestion in one

place . . . that would just exacerbate that issue all along the chains of every port that we touched").

     56.     ███████████████████████████████████████████████ (Ex. 197

(APL001287333) at -7335; Ex. 198 (APL013732488) at -2488; Ex. 199 (APL012891513) at -

1513)—and ██████████████████████████████████████ (Ex. 200 (APL010753702)

at -3707)—APL did not invest in its own terminals (as Matson had done) and, instead, CMA CGM

*divested* its dedicated terminals in the Pacific trade (including in Los Angeles in 2017).  Ex. 9

(Pangelinan Dep. Tr.) at 223:16–224:7, 225:2–22; Ex. 201 (APL001263360) at 7; Ex. 202 (APL,

*Equity sale of APL's Global Gateway South Terminal*, July 10, 2017,

https://www.apl.com/news/775/equity-sale-of-apl-s-global-gateway-south-terminal (accessed Feb.

24, 2024)); Ex. 203 (APL007183469) at -3469 (██████████████████████████████████

██████████████ ).

**REDACTED PUBLIC VERSION**

57.     Another problem was that APL sailed to Guam with vessels that had ████████

████████████████████. Ex. 204 (APL013650911) at -9014; *see also* Ex. 205

(APL011716259) at -6259 (████████████████████████████████████); Ex.

206 (APL009999323) at -9323 ████████████████████; Ex. 207 (APL010802100) at -

2100 ████████████████████████████████; Ex. 208

(APL013641116) at -1119 ████████████████████

████████████████████████████████; Ex. 209 (APL013652648) at -2650 ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████; Ex. 210 (APL013737044) at -7050 (████

████████████████████████████████████████

████████████████████); Ex. 19 (Mensing Dep. Tr.) at 277:12–13 (conceding

the "APL Guam had issues"); Ex. 138 (APL011370430) at -0430 (████████████████

████████████████████████████████); Ex. 211

(APL006405033) at -5033 (████████████████████████████); Ex. 212

(APL008380089) at -0089 (similar); Ex. 213 (APL013000048) at -0048; Ex. 214 (APL013362312)

at -2323 (similar in 2019); Ex. 215 (APL013276161) at -6161 (similar in 2020); Ex. 216

(APL012811790) at -1792 (similar in 2021); Ex. 217 (APL012087031) at -7034 (similar).  That

was not for lack of other options: ████████████████████████████████████████

████████████████████████████████. Ex. 71 (Saadé Dep. Tr.) at 59:23–60:3.  And

even when APL could have sailed faster, it chose ████████████████████████████

████████████████████. Ex. 218 (APL002855519) at -5519; Ex. 219 (APL012500103) at

-0104 (APL Director of Business Development explaining ████████████████████████████

<u>REDACTED PUBLIC VERSION</u>

██████████████████████████████████████████████████████████

███████████████████████████████████████████ ).

58.     Ultimately, APL's service was often much slower and far less predictable than
Matson's, which never dipped below 90% arrivals within 24 hours.    Ex.   220
(MAT_GUAM_0066757) at -6757 (2017); Ex. 221 (MAT_GUAM_0017382) at -7382 (2018); Ex.
222 (MAT_GUAM_0092186) at -2186 (2019); Ex. 223 (MAT_GUAM_0147462) at -7462 (2020);
Ex. 224 (MAT_GUAM_0089482) at -9482 (2021).  Year-over-year, Matson's on-time arrival rate
in Guam—measured as arriving within 24 hours of the scheduled time—surpassed APL by no less
than 28% (and up to 91%):

**24-Hour On-Time Arrival Rates USWC[2] to Guam**

|          | APL | Matson |
|----------|-----|--------|
| **2017** | 60% | 88%    |
| **2018** | 35% | 88%    |
| **2019** | 59% | 87%    |
| **2020** | 57% | 90%    |
| **2021** | 5%  | 96%    |

*See* Ex. 220 (MAT_GUAM_0066757) at -6757 (2017); Ex. 221 (MAT_GUAM_0017382) at -
7382   (2018);   Ex.   222   (MAT_GUAM_0092186)   at   -2186   (2019);   Ex.   223
(MAT_GUAM_0147462) at -7462 (2020); Ex. 224 (MAT_GUAM_0089482) at -9482 (2021).
Even under Matson's stricter internal standard—which deems a vessel late if it fails to arrive within
one hour of the scheduled berth—Matson was on time 81% of the time (averaged over 2017 to

---

[2] Oakland and L.A. departures combined.

**REDACTED PUBLIC VERSION**

2021).     Ex.  225  (MAT_GUAM_0003882)  at  -3883  (2017 – 83%);  Ex.  226

(MAT_GUAM_0006245) at -6245 (2018 – 81%); Ex. 227 (MAT_GUAM_003572934) at -2934

(2019 – 75%);  Ex.  228  (MAT_GUAM_0125772)  at  -5773  (2020 – 81%);  Ex.  229

(MAT_GUAM_0012948) at -2950 (2021 – 83%).

     59.     Similarly, APL's actual transit time to Guam—from both Los Angeles and

Oakland—was consistently longer than Matson's:

██████████

Ex. 5 (Langer Rpt.) Exs. 6 & 7.

     60.     Year after year, APL recognized internally that its performance in the Guam trade

was hampered by service that was unreliable, slow, and inferior to Matson's:

     a.     As noted above, in 2016 APL compared its Guam schedule to ██████

██████ (Ex. 148 (APL012527372) at -7373) and recognized it offered a slower,

inferior "second-class service" that limited its market share. Ex. 19 (Mensing Dep. Tr.) at

117:3–12; *see also* Ex. 178 (APL007769072) at -9072; Ex. 113 (APL006415975) at -5975;

Ex.  179  (APL009980698)  at  -0698.    APL  also  made  ████████████  with

customers. Ex. 230 (APL009999403) at -9403; *see also* Ex. 120 (APL011047045) at -7051

(██████████████████████████████████████████████████████

██████████████████████████).

     b.     In 2017, APL's CEO admitted the company continued to make ██████

██████████████ Ex. 231 (APL013368941) at -8941.  That was a problem:

Given its strategic decision to offer an inferior service, APL had to ████████████

████████████ *Id.*; *see also id.* at -8942 (██████████████████████

██████████████████████████); Ex. 159 (APL009753781) at -3786

**REDACTED PUBLIC VERSION**

(█████████████████████████████████████████████

███████████████████████████████████████████████

███████████). APL's service was so unreliable that its own sales team heard ████████

███████████████████████████████████████████ Ex. 232

(APL009370812) at -0812; *see also* Ex. 233 (MAT_GUAM_DHX_000000001) ¶ 9

("APL's lack of consistency is well known at DHX and in the industry. I jokingly refer to

APL as 'Always Plan Late.'"). ███████████████████████████

██████████████████████████████. Ex. 234 (APL007177044) at -7044;

Ex. 235 (APL006393205) at -3205–06. APL acknowledged that until it ████████████

███████████████████████████████████████████ Ex.

164 (APL009299847) at -9847.

      c.      By 2018, APL acknowledged customers were aware that its weekly service

was ███████████ Ex. 236 (APL010586955) at -6955. APL's Guam service was still █

████████ wrote APL's Guam General Manager, and customers were █████████ with APL's

pervasive delays and service shortcomings. Ex. 237 (APL013286603) at -6603. A Senior

Director at APL likewise noted the company █████████████████████████████████

Ex. 238 (APL009300728) at -0731. As a result, APL sales representatives fielded ██████

██████████████████████████████████████████████████

████████ Ex. 8 (Metzger Dep. Tr.) at 92:21–93:3; Ex. 239 (APL003789451) at -9453; *see*

*also* Ex. 240 (APL013570147) at -0151 ██████████████████████████████████

██████████████████████████. APL recognized that Matson

was █████████████ because of APL's own delays. Ex. 241 (APL007500959)

at -0964.

28

**REDACTED PUBLIC VERSION**

d.      In 2019, APL's executives admitted the company's Guam service remained

███████████████████████ Ex. 242 (APL007182372) at -2372.  ██████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████      Ex. 243 (APL000038120) at -8120 (emphasis in original).  APL admitted it

███████████      by Matson's service.  *Id.*   After receiving an October 2019 on-time

performance report for APL's Guam service, APL's CEO wrote, ██████████████ Ex. 244

(APL006550404) at -0404; *see also* Ex. 245 (APL010465095) at -5095 (██████████████

██████████████).  And in November 2019, APL's Sales Director wrote his colleagues

███████████████████████ Ex. 65 (APL004994933) at -4933; *see also* Ex. 8

(Metzger Dep. Tr.) at 158:7–14 (███████████████████████████████████████████

██████████████████████).

e.      By APL's own lights, its Guam business remained ███████ (Ex. 246

(APL000043701) at -3702) and ██████████ in 2020 (Ex. 247 (APL010474786) at -4786).

APL admitted it was in ███████████████████████████████████████████

███████████████  but found APL's Guam service to be ███████████████████████████

Ex. 248 (APL007408169) at -8169; Ex. 249 (APL013612244) at -2244.  As he had the year

before, APL's CEO reacted to a November year-to-date reliability report by commenting,

██████████████████      Ex. 250 (APL010646834) at -6834.   After another delay, the

President of APL and CMA CGM (America) simply remarked ███████████      Ex. 155

(APL008238436) at -8436.  APL's CEO agreed: ███████████████████████████████

███████      *Id.*

f.      APL's assessment of its Guam service did not change in 2021:  Executives

**REDACTED PUBLIC VERSION**

conceded the service was ███████████████████████████████████████

Ex. 251 (APL000040133) at -0133–34; *see also* Ex. 89 (APL013322633) at -2633–34

(████████████████████████████).  APL's employees admitted the service was

"really crappy" (Ex. 45 (Theberge Dep. Tr.) at 261:25–262:4), as they lamented their own

company's ████████████████ (Ex. 63 (APL011593592) at -3594).  APL's Senior Sales

Director observed: ███████████████████████████████████████

███████████████████████████████████████████████████

██████████ Ex. 89 (APL013322633) at -2633; *see also* Ex. 200 (APL010753702)

at -3707 (██████████████████████████████████████████████

███████████████████████████████████); Ex. 113 (APL006415975) at

-5975 (similar); Ex. 252 (APL004966523) (similar).

       g.    In 2022, APL's employees continued to describe APL's service as

████████████ Ex. 253 (APL000436494) at -6494; *see also* Ex. 254 (APL000393479)

at -3480 ███████████████████████████████████████████████; Ex. 255

(APL000335352) at -5352 (██████████████████████████████).

61.    Year after year, customers told APL the same thing:  They were ████████████

████████████████████████████████████████████████████████ Ex.

256 (APL007445710) at -5711; Ex. 257 (APL000370199) at -0199–200; Ex. 258 (APL000030213)

at -0213; Ex. 259 (APL010387272) at -7280.  As one summed up:  "We'll never use APL to Guam.

A nightmare.  Unsubscribe."  Ex. 260 (APL_DHX_0000000166) at -0166.

       a.    For example, in 2017, customers portrayed APL's ████████████████ as

███████████████████████████████████████████████████████

██████████████████████ Ex. 261 (APL011416044) at -6044; Ex. 262 (APL006606207) at

**REDACTED PUBLIC VERSION**

-6207.

b.    In response to APL's constant delays in 2018, one shipper suggested to APL,

███████████████████████████████████████████ Ex. 263

(APL011796623) at -6623; *see also* Ex. 264 (APL006516791) at -6791–92 (██████

████ ; Ex. 177 (APL010809522) at -9533 (APL's Guam General Manager reporting to

APL's CEO, ██████████████████████████████████████

████████████████████████████████████████████

████████████ ).

c.    In 2019, customers told APL its service ████████████████████

████████████████████████████████████████████

Ex. 265 (APL005070867) at -0867; Ex. 266 (APL005865692) at -5693; *see also* Ex. 245

(APL010465095) at -5097 (admitting ███████████████████████████

████████████████████████████████ ); Ex. 267 (APL_DHX_000000153)

at -0153 (customer explaining in 2019 that "[w]e do not use APL because of the much

longer long transit times").

d.    In 2020, a customer remarked that a ████████████████████

██████████████ while another commented that their ████████████████

████████████ Ex. 268 (APL006560004) at -0005; Ex. 269 (APL006853795)

at -3800.  Another customer registered ████████████████████████

████████████████████████████████ Ex. 158 (APL000177428) at -7429.

e.    Pervasive customer complaints continued into 2021:  Upon learning that

their cargo would be rolled, one customer exclaimed █████████████████

████████████████████████████████████████████

**REDACTED PUBLIC VERSION**

███████████████████████████████████████████ Ex. 217

(APL012087031) at -7031.  After another delay, a different customer said that he was ██

███████████████████████████████████████ Ex. 270

(APL010638839) at -8840–42.  Yet another exasperated customer ████████████████████

████████ after yet another delay by APL.  Ex. 271 (APL000713053) at -3054.  One

customer simply asked APL if ██████████████████████ Ex. 272

(APL000140035) at -0035.

       f.     Customers registered similar complaints in 2022: ████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ Ex. 273 (APL012436648) at -6648; *see also* Ex. 274

(APL000094675) at -4676 (customer complaining in September 2022 that APL's ████████

████████████████).

62.    Service was APL's ██████████ Ex. 275 (APL011510827) at -0828; *accord*

Ex. 276 (APL008581379) at -1379.

63.    As APL's Senior Sales Manager for Guam admitted in 2019, ████████████

████████████████ Ex. 277 (APL010406697) at -6697.  But APL had █████████████

███████████████████████████████████████████████████████

Ex. 195 (APL013534845) at -4845 (████████████████████████████████); Ex. 243

(APL000038120) at -8120 (similar).

64.    Another weakness was APL's ██████████ billing system.  Ex. 278

(APL013538123) at -8125–26.  A ████████████████ with APL's difficult system was that it

**REDACTED PUBLIC VERSION**

frequently resulted in billing and accounting ██████ Ex. 279 (APL008580867) at -0868; Ex. 280 (APL010267226) at -7231 (former APL Guam General Manager: ██████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████). APL's own sales director admitted that ██████████████

██████████████████████████████ Ex. 9 (Pangelinan Dep. Tr.) at 252:1–4.

   a.   ████████████████████████████████████████████████████

██████████████████████████████ Ex. 281 (APL000277797) at -7797.

   b.   Another customer receiving a ██████████ bill asked if someone at APL ████████████████████████████████████████████████████ Ex. 282 (APL013745156) at -5160–61.

   c.   ████████████████████████████████████████████████████████████.

*See* Ex. 283 (APL008812515) at -2517 (██████████); Ex. 281 (APL000277797) at -7797 (██████████); Ex. 284 (APL_CUL_000002253) at -2256 (██████████████); Ex. 285 (APL006380935) at -0937 (██████████████); Ex. 280 (APL010267226) at -7231 (██████████████████████); Ex. 286 (APL000673042) at -3042 (████████████████████

██████████████).

65.   APL's billing made customers ██████████████ even ██████████████ because they did not receive their bills in a timely fashion so they could, in turn, bill the end-shippers. Ex. 287 (APL013538070) at -8070; Ex. 278 (APL013538123) at -8125–26; Ex. 288 (APL013492133) at -2135. In short, APL's ██████████████████████████ Ex. 289 (APL013745072) at -5072; *see also* Ex. 290 (APL009195976) at -5976 (██████████████

**REDACTED PUBLIC VERSION**

████████████████████████████████████████).

66.     █████████████████████████████████████████████████████████.
Ex. 8 (Metzger Dep. Tr.) at 131:18–21; Ex. 291 (APL000040268) at -0268 ███████████████████████

████; Ex. 292 (APL012230183) at -0183 ████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

█████████. ████████████████████████████ APL shifted to a new freight management

system, LARA, around 2018 ██████████████████████████. Ex. 8 (Metzger Dep. Tr.)

at 276:13–15; Ex. 293 (APL012319562) at -9564 ██████████████████████████████

████████████████████████████████████████████████; Ex. 294

(APL004797600) at -7614 ████████████████████; Ex. 100 (Jellies Dep. Tr.) at 123:1–10

(admitting "difficulties" with transitioning to LARA); Ex. 239 (APL003789451) at -9453 ████

███████████████████████████████████████████.

67.     By contrast, customers told APL that Matson had █████████████████ and used

their ███████████████████████████████████████████████████████████ Ex. 295

(APL010803574) at -3575; *see also* Ex. 291 (APL000040268) at -0268 (████████████████████

████████████████████████████████████████████).

68.     Customers similarly complained about APL's claims process, calling it so "long"

and "tedious" that ████████████████████████████████ Ex. 8 (Metzger Dep. Tr.) at 54:7–55:4;

Ex. 296 (APL000387016) at -7016; Ex. 297 (APL001153541) at -3541.  One customer █████

that APL was ████████████████████████████████████████████████████

██████████████████████████████████ Ex. 298 (APL000137164) at -7166.

69.     Another persistent problem for APL was customer service, which it characterized

internally as █████████ Ex. 299 (APL012226851) at -6851.  At one point in 2017, APL's General

**REDACTED PUBLIC VERSION**

Manager in Guam ███████████████████████████████████████████████████

Ex. 300 (APL008313242) at -3245.  When an APL executive inquired into why ███████████

███████████████████████████████████████████████████████████████████████

███████████████████████████. Ex. 301 (APL009860363) at -0363.

    70.    Customers in Guam likewise harped on APL's poor customer service:

        a.    In 2017, one described APL as ████████████████████—likening

it to ███████ Ex. 302 (APL012716677) at -6678.

        b.    In 2018, a key APL client opined ████████████████████████████

███████████████████████████████████████████████████████████ (Ex.

303 (APL010630744) at -0744), while another customer claimed APL had ████████

███████████████ (Ex. 304 (APL008115096) at -5107); *see also* Ex. 305

(APL007294312) at -4313 (████████████████████████████████████████████

█████████████████████████████████); Ex. 256 (APL007445710) at -5710–

11 (████████████████████████); Ex. 306 (APL013528700) at 8702–03 (same).

        c.    Customers continued to complain in the years thereafter: ████████████

███████████████████████████████████████████████████████████████████████

███████████████████ Ex. 307 (APL011460191) at -0191 (2019); *see also* Ex. 308

(APL002565127) at -5127 (████████████████████████).

    71.    Unlike Matson, APL also frequently encountered equipment shortages ████████

███████████████████████████████████████████████████████████████████████

███. Ex. 8 (Metzger Dep. Tr.) at 257:4–258:14; Ex. 309 (APL011949101) at -9107; Ex. 310

(APL012506347) at -6349; Ex. 311 (APL000324087) at -4088; Ex. 312 (APL010864462) at -4464;

Ex. 287 (APL013538070) at -8071.  For instance, APL was continuously beleaguered by a

**REDACTED PUBLIC VERSION**

shortage of chassis, the truck trailers on which cargo containers are loaded to be pulled into or out of ports.  Ex. 313 (Honda Dep. Tr.) at 45:18–46:3; Ex. 175 (APL011967109) at -7111 (███████ ███████████); Ex. 314 (APL009326282) at -6306 (███████████); Ex. 315 (APL011392275) at -2287 (███████████); Ex. 316 (APL010564268) at -4273 (███████████); Ex. 293 (APL012319562) at -2018 (███████████); Ex. 317 (APL009734232) at -4234 (███████████); Ex. 318 (APL000622402) at -2405 (███████████); Ex. 319 (APL_CUL_000006723) at -6725 (███████████); Ex. 320 (APL012861386) at -1386 (███████████). ██████████████████ ███████████████████████████████████████████████████████.  Ex. 83 (APL013537846) at -7849.

72.   APL also experienced ███████████████ as well as a dearth of ███████████ ███████████.   Ex. 321 (APL011488791) at -8800 (███████████████████); Ex. 322 (APL012798952) at -8955 (███████████████); Ex. 9 (Pangelinan Dep. Tr.) at 227:8–228:19; Ex. 323 (APL000449673) at -9674 (███████████████████████████████████████ █████████████████████████████).

73.   █████████████████████████████████████████████████████ █████████████████████.  Ex. 324 (APL013171880) at 1889; Ex. 325 (APL007676971) at -6971; Ex. 326 (APL008890278) at -0278; Ex. 327 (APL000354626) at -4626; Ex. 257 (APL000370199) at -0199–0200; Ex. 328 (APL000171704) at -1704; Ex. 156 (APL000110659) at -0659; Ex. 274 (APL000094675) at -4676; *see also* Ex. 55 (MAT_GUAM_ADUANA_000000001) ¶ 6 ("[I]n Guam, the risk of lost business and the costs associated with APL's longer transit time and other service issues is not justified by the lower prices APL sometimes offers.").

74.   Also significant was APL's decision not to sail out of the Pacific Northwest:  By

36

**REDACTED PUBLIC VERSION**

APL's contemporaneous approximation ███████████████████████████

███████████████████████████████████████████. Ex. 329 (APL010459924) at

-9924 ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████. Even after APL ████████████████████

████████████████████████████████—APL's service remained ███████████

██████████. Ex. 8 (Metzger Dep. Tr.) at 161:16–162:17; *see also* Ex. 9 (Pangelinan Dep. Tr.)

at 262:3–17; Ex. 330 (APL000178799) at -8799; Ex. 331 (APL000395767) at -5767 (APL

salesperson to customer in 2022: ████████████████████████████████████

██████████████████████). Ex. 331 (APL000395767) at -5767 (similar); Ex. 332 (APL010739719)

at -9720 (similar).

75.      All of this limited APL's market share.  Ex. 100 (Jellies Dep. Tr.) at 92:16–94:5;

Ex. 333 (APL012124145) at -4145; Ex. 9 (Pangelinan Dep. Tr.) at 214:16–20, 222:1–223:15.

███████████████████████████████████████████████████████████████

████████████ APL's then-president wrote in 2020, █████████████████ Ex. 210

(APL013737044) at -7047. ████████████████████████████████████████ wrote

another. Ex. 334 (APL013528335) at -8335; *see also* Ex. 63 (APL011593592) at -3592–94 (APL

director writing that ██████████████ and that customers ████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████); Ex. 335 (APL012246338) at -6339

(APL's president admitting ███████████████████████████████████████████

█████████████████); Ex. 336 (APL013528662) at -8663 (APL executive reporting that █████

37

REDACTED PUBLIC VERSION

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ );

Ex. 245 (APL010465095) at -5095 ████████████████████████████

███████████████ ; Ex. 5 (Langer Rpt.) ¶¶ 148–151.

76.    APL's ███████████—and its witnesses admitted—that numerous customers who tried APL's Guam service were unimpressed and subsequently switched back to Matson.  Ex. 337 (Berking Dep. Tr.) at 69:12–19; Ex. 45 (Theberge Dep. Tr.) at 175:4–8, 314:1–11; Ex. 8 (Metzger Dep. Tr.) at 54:7–18, 58:13–17, 80:16–81:8, 93:4–22; Ex. 41 (Stefanik Dep. Tr.) at 104:21–105:2; Ex. 9 (Pangelinan Dep. Tr.) at 190:16–191:7; Ex. 338 (APL000393581) at -3581 (████████████████████████████████████████████████████

████████████████████████████ ).

77.    As APL's own sales representative wrote, ██████████████████████

████████████████    Ex. 339 (APL010873902) at -3903 (emphasis added).  Several customers submitted sworn declarations agreeing with this assessment:

- **Aduana**:   "Matson is Aduana's preferred carrier to Guam . . . because of its reliability, shorter transit time, and customer service"; "Aduana may lose customers if cargo is not timely delivered" so "working with Matson helps Aduana meet its customers' needs" because "Matson offers the fastest transit time and most reliable service from the U.S. to Guam"; "Aduana could ship its consolidated cargo with APL" but "in Guam, the risk of lost business and the costs associated with APL's longer transit time and other service issues is not justified by [APL's] lower prices"; "Aduana knowingly pays Matson's rates because it prefers the advantages of Matson's services."  Ex. 55 (MAT_GUAM_ADUANA_0000000001) ¶¶ 5–7.

38

**REDACTED PUBLIC VERSION**

- **DHX**: "DHX needs to partner with a carrier that is dependable," and "[f]or shipping cargo to Guam, that is Matson"; "DHX and its customers are often willing to pay" the higher rates "for the quality and reliability that comes with choosing Matson"; DHX "does not believe that shipping all of its cargo with APL would be in its financial self-interest even if it saved a bit on cargo shipping because it would impair" DHX's own business; DHX "does not do significant business with APL from the [U.S.] to Guam because of its lack of timeliness" and this "lack of reliability is usually untenable for DHX and its customers"; DHX "cannot count on [APL's Guam] service, especially for time-sensitive goods"; DHX "previously declined APL's offers to carry its shipments to Guam at a [lower rate than Matson]" given that DHX's "customers preferred to stick with Matson, despite the higher price, because APL's transit time was too long and inconsistent"; APL's inconsistency is "well known . . . in the industry" and so pronounced that DHX "jokingly refer[s] to APL as 'Always Plan Late.'"  Ex. 233 (MAT_GUAM_DHX_000000001)  ¶¶ 3–4, 6–9; *see also* Ex. 340 (APL_DHX_000000009) at -0009 (contemporaneous emails from DHX declining to ship with APL because APL's service was a "joke" and not competitive with Matson's "based on the transit time[s]"); Ex. 267 (APL_DHX_000000153) at -0153 (2019 email explaining, "We do not use APL because of the much longer long transit times."); Ex. 260 (APL_DHX_0000000166) at -0166 (2021 email explaining, "We'll never use APL to Guam.  A nightmare.  Unsubscribe.").

- **North West Company Inc.**:  North West "utilize[s] a network of ocean cargo shipping service providers . . . [including] Matson and [APL]" and uses Matson for

REDACTED PUBLIC VERSION

shipping "fresh produce and other date sensitive refrigerated goods" due to Matson's better "transit time and schedule reliability."   Ex.   341 (MAT_GUAM_NORTHWEST_00000440) ¶¶ 3, 8.

- **Ross**: Ross's "decision to utilize Matson for cargo shipping services has always been based primarily on Matson's high quality service."   Ex.   342 (MAT_GUAM_ROSS_00000016) ¶ 4.

- **Toyota**: ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████   Ex.   343
(MAT_GUAM_TOYOTA_00000001) ¶¶ 9, 12.

## III.   Fierce Price Competition Ensues In Matson And APL's "Rate War"

78.     Guam has been and remains, as APL's sales director said, a "very competitive" trade in which both APL and Matson "[f]ight for every box."  Ex. 9 (Pangelinan Dep. Tr.) at 89:17–90:3, 149:1–6.

79.     Matson and APL competed by offering differentiated services:  On the one hand, Matson offered a premium service that sometimes carried a higher price; on the other hand, APL offered a lower-quality service that was sometimes cheaper.  Ex. 5 (Langer Rpt.) ¶¶ 100–135; Ex. 13 (Warren-Boulton Rpt.) ¶¶ 22–25.

80.     Notwithstanding its relative low quality (*i.e.*, transit time, reliability, and customer service), some customers preferred APL's cheap offerings.  *See* Ex. 5 (Langer Rpt.) ¶ 137 (████████████████████████████████).  APL saw particular success competing for

40

**REDACTED PUBLIC VERSION**

cargo that was not time sensitive.  Ex. 344 (APL010233947) at -3948 ███████

███████████████████████████████.  As a result, APL grew its share from ███ in 2015 to ███

in 2016, ███ in 2017, ███ in 2018, and ███ in 2019.  Ex. 5 (Langer Rpt.) ¶ 137.  In segments

such as HHG and frozen, which are less time-sensitive, APL obtained as much as ███ and ███

███ share, respectively.  Ex. 5 (Langer Rpt.) ¶ 162; Ex. 13 (Warren-Boulton Rpt.) ¶ 50.

81.    In addition to competing on service quality, Matson competed with APL on price.
Ex. 9 (Pangelinan Dep. Tr.) at 126:9–127:14; Ex. 41 (Stefanik Dep. Tr.) at 47:4–13; Ex. 18
(Dianora Dep. Tr.) at 33:2–34:3; Ex. 11 (Matson 30(b)(6) Dep. Tr.) at 49:4–50:1; *see also* Ex. 5
(Langer Rpt.) ¶ 146 (███████████████████████████████████████████

███████████████████████); Ex. 75 (Langer Rebuttal Rpt.) ¶ 322 (same).

82.    Prices in the shipping industry are commonly referred to as "rates."  Ex. 18
(Dianora Dep. Tr.) at 38:11–19; Ex. 41 (Stefanik Dep. Tr.) at 26:7–17.

83.    Certain shipping rates are made available to the public by filing the rates in a "tariff,"
which can be viewed by customers and competitors alike.  Ex. 41 (Stefanik Dep. Tr.) at 37:19–
38:1; Ex. 345 (Good Dep. Tr.) at 177:22–178:5; Ex. 18 (Dianora Dep. Tr.) at 22:10–13; Ex. 346
(Matson, "Review Rates/Tariffs," *available at* https://www.matson.com/ocean-services/online-
services/review-rates-tariffs.html (accessed Feb. 24, 2024)); Ex. 347 (APL, "Rates & Tariffs,"
*available at* https://www.apl.com/resource-center/rates-tariffs (accessed Feb. 24, 2024)).  Guam is
a tariff trade, meaning tariffs have been overwhelmingly used to post prices for shipping cargo
between the U.S. and Guam.  Ex. 11 (Matson 30(b)(6) Dep. Tr.) at 31:16–19.

84.    APL and Matson followed each other's tariff filings as did customers.  Ex. 41
(Stefanik Dep. Tr.) at 37:6–38:5, 40:8–13, 285:20–286:4; Ex. 348 (Rubin Dep. Tr.) at 127:10–
128:1; Ex. 69 (Jameson Dep. Tr.) at 247:12–21; *see also* Ex. 233

**REDACTED PUBLIC VERSION**

(MAT_GUAM_DHX_000000001) ¶ 17 (customer observing that "Matson generally sticks to the rates in its tariffs").

85.     Following APL's entry to Guam, customers often negotiated APL and Matson off against one another, asking them to match or beat offers the other had made.  Ex. 9 (Pangelinan Dep. Tr.) at 126:9–127:4 (recognizing that customers used rates from either Matson and APL against the other); Ex. 8 (Metzger Dep. Tr.) at 167:11–168:1, 176:20–177:17 (██████████████████ ████████████████████████████████████████████████); *see also* Ex. 349 (APL000621148) at -1148 (████████████████████████████████████████████████ ██████████████████); Ex. 350 (APL006193060) at -3060 (similar);  Ex. 351 (MAT_GUAM_003408707) at -8707 (████████████████████████████████████████████ ██████████████████); Ex. 352 (APL_DHX_000000170) at -0175–76 (same).  As one customer put it, shippers were "constantly reevaluating" APL's and Matson's offerings to make "both companies . . . compete for [their] business."  Ex. 341 (MAT_GUAM_NORTHWEST _00000440) ¶ 8.

86.     APL's Director of Projects and Military Household Goods testified that price competition between Matson and APL created a "rate war" in Guam.  Ex. 69 (Jameson Dep. Tr.) at 252:10–253:12.  As a result, APL's and Matson's prices for shipping between the United States West Coast and Guam nearly "equalized" at "the bottom."  Ex. 19 (Mensing Dep. Tr.) at 117:13–19 (explaining how the "rates tanked" and dropped by "40 percent"); Ex. 353 (APL013380205) at -0206 (████████████████████████████████████████████████).  Since APL began its weekly service to Guam in 2017, Matson's prices fell by 8.9% from Los Angeles and 20.6% from Oakland.  Ex. 5 (Langer Rpt.) ¶ 124, 146, Ex. 12; Ex. 13 (Warren-Boulton Rpt.) Figs. 5, 7, 9, 11; Ex. 75 (Langer Rebuttal Rpt.) ¶¶ 41, 174–75, 189.  As a result,

42

**REDACTED PUBLIC VERSION**

customers on average pay ████████████████ to ship containers between the United States West Coast and Guam.  Ex. 5 (Langer Rpt.) ¶ 146 & Ex. 12; *see also* Ex. 354 (Warren-Boulton Dep. Tr.) at 113:10–21 (████████████████████████████████████ ███████ ).

87.     As part of their price competition, both APL and Matson offered volume discounts. *See* Ex. 5 (Langer Rpt.) ¶¶ 164, 169–70.

A.     **"Long-Term Contracts"**

88.     Written agreements are frequently used in the shipping industry—including in the United States to Guam trade.  Ex. 41 (Stefanik Dep. Tr.) at 33:19–34:3.  Although these written documents can take different forms, and have different duration terms, APL's economist, Dr. Warren-Boulton, refers to those used in the Guam trade collectively as ████████████  Ex. 13 (Warren-Boulton Rpt.) § VII.D.

89.     Some ocean cargo shipping customers prefer written agreements that provide for longer commitments, multiple trades, and/or exclusivity or near exclusivity—and the attendant discounts such commitments bring.  Ex. 355 (MAT_GUAM_0111508) at -1508–09 (Cost.U.Less requesting Matson enter into a multi-trade contractual agreement with a volume incentive that lasts multiple years); Ex. 356 (MAT_GUAM_HD_00000592) at -0593 (███████████████ ████████████████████████████████████████████████████████ ███████████ ); *see also* Ex. 41 (Stefanik Dep. Tr.) at 34:4–17 (APL's Head of Pricing in the Guam trade testifying that in the Guam and Hawaii trades, shippers have sought to negotiate long-term agreements, often based on shipping volume commitments, in exchange for lower prices and rate consistency).

90.     Some of these customers—████████████████████████████████ ████████████████████████████████████████████████████████

43

████████████████████████████████████████████████████████████████

███████████████████████████████████████.  Ex. 75 (Langer Rebuttal Rpt.) ¶ 56; Ex. 357

(APL013765254) at -5254; Ex. 358 (APL012131030) at -1030–01.

91.     Long-term agreements, volume commitments, and exclusive or quasi-exclusive

contracts can benefit both customers and competition.  Ex. 5 (Langer Rpt.) ¶¶ 164–67, 177–78,

180, 185.

a.     Long-term agreements can protect buyers from fluctuations in price,

allowing buyers to plan based on a known cost structure; facilitate competition via

competition for the contract, whereby sellers compete more than once for each sale,

benefitting buyers by putting downward pressure on the price of each sale; reduce

transaction costs for buyers; and incentivize investment by sellers in the specific capital

required by buyers.  Ex. 5 (Langer Rpt.) ¶ 178; Ex. 18 (Dianora Dep. Tr.) at 21:18–22:2.

b.     Minimum volume commitments, whereby the sellers agree to exchange

more volume at a discounted rate if the buyer commits to purchasing a higher volume,

allow buyers to achieve lower prices compared to what sellers set without a volume

commitment.  Ex. 5 (Langer Rpt.) ¶¶ 164–67; *see also* Ex. 9 (Pangelinan Dep. Tr.) at

127:15–128:15.

c.     Exclusive or quasi-exclusive provisions can provide both buyers and sellers

with certainty over volumes and prices, help facilitate investments in the buyer-seller

relationship, confer steeper discounts to the benefit of customers, and provide the benefit

of "one-stop shopping" whereby a buyer reduces transaction costs or management costs by

placing all of its shipments with a single seller.  Ex. 5 (Langer Rpt.) ¶ 180; Ex. 9

(Pangelinan Dep. Tr.) at 209:16–210:9.

**REDACTED PUBLIC VERSION**

92.     In the Guam and Hawaii trades, Matson's written agreements for ocean shipping services were called memoranda of understanding or customer service agreements with public rates (collectively "MOUs").  Ex. 11 (Matson 30(b)(6) Dep. Tr.) at 35:9–16; *contra id.* at 38:9–17 (illustrating the difference between a MOU and a "confidential contract"); Ex. 18 (Dianora Dep. Tr.) at 18:21–23 (same).  MOUs offer a rate structure over a certain period of time in exchange for the shipper hitting certain volume thresholds—such as a certain quantity of containers or percentage of their tonnage shipped to or from Guam.  Ex. 11 (Matson 30(b)(6) Dep. Tr.) at 35:9–36:11.  The rates in MOUs are filed in the public tariff.  *Id.* at 35:9–16.

93.     MOUs had no uniform price, duration, or volume threshold; they differed based on negotiations with individual shippers.  Ex. 345 (Good Dep. Tr.) at 79:6–17; Ex. 18 (Dianora Dep. Tr.) at 170:2–9; *see also* Ex. 9 (Pangelinan Dep. Tr.) at 124:22–126:8, 127:15–18; *see also* Ex. 355 (MAT_GUAM_0111508) at -1508–09 (reflecting Cost.U.Less's preferences in negotiations); Ex. 356 (MAT_GUAM_HD_00000592) at -0593 (███████████████████████████).

    a.     In particular, Matson's MOUs in the Guam trade generally provided for service for one to three years.  Ex. 18 (Dianora Dep. Tr.) at 20:6–12 ("The majority of our contracts are for one-year term."); *see also* Ex. 359 (MAT_GUAM_003962069) at -2069; Ex. 360 (MAT_GUAM_002460140) at -0140; Ex. 361 (MAT_GUAM_004336960) at -6964.

    b.     Matson's agreements also had varying volume commitments.  *Compare* Ex. 362 (MAT_GUAM_002455988) at -5988 (agreement with a stated 100% volume commitment), *with* Ex. 361 (MAT_GUAM_004336960) at -6964 (agreement with a non-exclusive minimum volume commitment).

    c.     Some of Matson's MOUs provide for ocean shipping services to both Guam

**REDACTED PUBLIC VERSION**

and Guam/Hawaii; others provide for ocean shipping services in only one trade. *Compare*

Ex. 362 (MAT_GUAM_002455988) at -5988 (Guam and Hawaii) *with* Ex. 363

(MAT_GUAM_004784057) at -4066 (Guam only).

        d.      Many of Matson's MOUs include a 30-day termination provision. *See*, *e.g.*,

Ex. 364 (MAT_GUAM_003702219) at -2219 ("Either party may terminate this Agreement

for any reason at any time upon thirty (30) days prior written notice to the other party").

94.      MOUs provide "flexibility more so than a contract." Ex. 345 (Good Dep. Tr.) at

155:16–24. They are perceived within the shipping industry as "gentleman's agreement[s]" that

customers can breach without facing repercussions. Ex. 49 (Magnusson Dep. Tr.) at 51:11–52:4;

Ex. 345 (Good Dep. Tr.) at 194:9–195:4; Ex. 10 (Valencia Dep. Tr.) at 82:16–24; *see also* Ex. 41

(Stefanik Dep. Tr.) at 336:6–13 (APL's Head of Pricing in the Guam trade testifying that ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ ); Ex. 49 (Magnusson Dep. Tr.) at

51:11–52:4 (recalling no instances where any carrier "t[ook] any action against a customer who

didn't meet the minimum quantities").

95.      Matson had a handful of MOUs in the U.S. to Guam trade prior to APL's entry. Ex.

75 (Langer Rebuttal Rpt.) ¶¶ 50–52 and Ex. R-4; *see also* Ex. 13 (Warren-Boulton Rpt.) Ex. 6.

That included MOUs entered when it was the only carrier in the trade.

96.      The market feasibility study APL commissioned prior to its reentry into the Guam

trade recommended ████████████████████████████████ . Ex. 6 (APL001884239)

at -4245. But APL prefers confidential service contracts to public tariff rates. Ex. 41 (Stefanik

Dep. Tr.) at 34:22–35:10. Confidential contracts are written contracts that also often offer volume

**REDACTED PUBLIC VERSION**

discounts, but, unlike MOUs, the rates in confidential contracts are not publicly filed in a carrier's tariff.  Ex. 11 (Matson 30(b)(6) Dep. Tr.) at 38:9–17; Ex. 18 (Dianora Dep. Tr.) at 18:21–23.

97.  ██████████████████████████████████████████████

██████.  Ex. 365 (APL011913566) at -3567.

98.  Starting in 2017, however, ████████████████████████

██████████████████████████████████████████████████

██████████  *See, e.g.*, Ex. 366 (APL000000210) at -0219–20 (███████████████

██████████████); Ex. 367 (APL000000125) at -0125 (████████████████

███████); Ex. 368 (APL000000462) at -0469–70 & Ex. 369 (APL000000471) at -0471 (██

█████████████████████████); Ex. 370 (APL000000400) at -0407–08 & Ex. 371

(APL000000409)  at  -0409  (██████████████████████████);  Ex.  372

(APL000000410) at -0417–18 & Ex. 373 (APL000000419) at -0419 (███████████████

████████████); Ex. 374 (APL000000011) at -0018–19 & Ex. 375 (APL000000020) at -0020

(████████████████████████████); Ex. 376 (APL000000339) at -0346–47 & Ex. 377

(APL000000348)  at  -0348  (███████████████████████);  Ex.  378

(APL000000294) at -0301–03 & Ex. 379 (APL000000305) at -0305 (███████████████

███████████); Ex. 380 (APL000000086) at -0093–95 & Ex. 381 (APL000000096) at -0096

(███████████████████████████); Ex. 382 (APL000000033) at -0040–41 &

Ex. 383 (APL000000042) at -0042 (██████████████████████████).

99.  APL's stated strategy was to "lock in" customers using confidential contracts.  Ex. 46 (Hermosa Dep. Tr.) at 133:4–20, 134:15–22; Ex. 384 (APL004244245) at -4254.  Charlie Hermosa, APL's then-General Manager in Guam, testified that APL was able to "bring[] a lot of customers onboard" with confidential and off-tariff service contracts during this time.  Ex. 46

REDACTED PUBLIC VERSION

(Hermosa Dep. Tr.) at 133:4–20, 134:15–22; *see also* Ex. 41 (Stefanik Dep. Tr.) at 33:19–34:3 (testifying that the majority of APL's business—both in terms of volume and revenue—in the U.S. to Guam trade now moves on confidential contracts as opposed to tariff prices).

100.    APL targeted customers even if they had an agreement with Matson.  *See*, *e.g.*, Ex. 366 (APL000000210) at -0219–20 (



); Ex. 385 (APL011271615) at -1615 (

).

101.    

. Ex. 75 (Langer Rebuttal Rpt.) ¶¶ 41–42, 53–54 & Ex. R-2; *see also* Ex. 386 (APL012125400) at -5400–01 (

).

102.    Sales directors from both APL and Matson testified that customers' cargo "ebbed and flowed" between APL and Matson even when customers had an MOU with a particular carrier. Ex. 345 (Good Dep. Tr.) at 194:9–195:4 (recalling "a number of times" where customers renegotiated MOUs and agreeing that business with customers "ebbed and flowed" despite the agreement); Ex. 9 (Pangelinan Dep. Tr.) at 246:9–15; *see also* Ex. 387 (MAT_GUAM_MACYS_00000001) ¶ 8 ("If a cargo shipping service provider, including APL, was offering Macy's better value than its current provider as part of a bid process or RFP, Macy's would select the provider offering the best value and would switch providers.").

103.    Around July 2017, Matson recognized that a "change [was] happening in the market" as a result of APL's aggressive pursuit of confidential contracts in the U.S. to Guam trade.  Ex.

**REDACTED PUBLIC VERSION**

388 (MAT_GUAM_0014084) at -4086.  In response, Matson sought to expand its use of MOUs

in the U.S. to Guam trade.  Ex. 389 (MAT_GUAM_003537709) at -7720; Ex. 345 (Good Dep.

Tr.) at 153:3–10.  Dr. Warren-Boulton testified that █████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████   Ex. 354 (Warren-Boulton Dep. Tr.) at 334:18–335:7.

104.    Matson's MOUs offered discounts at competitive rates; Matson's prices were not

below cost.  Ex. 10 (Valencia Dep. Tr.) at 83:14–84:14; Ex. 5 (Langer Rpt.) ¶ 182; *see also* Ex.

354 (Warren-Boulton Dep. Tr.) at 243:3–10 (███████████████████████████████████████

██████████████████████████████████████████).

105.    Matson ultimately entered into MOUs with a small number of additional customers

in the United States to Guam trade.  *See* Ex. 13 (Warren-Boulton Rpt.) Ex. 6.  At Cost.U.Less's

request, Matson also entered a single confidential contract in the Guam and Guam/Hawaii services

after APL's entry in Guam.  Ex. 361 (MAT_GUAM_004336960) at -6964; Ex. 18 (Dianora Dep.

Tr.) at 19:13–21.

106.    Matson approached additional customers with the opportunity to enter into an MOU.

After negotiations with Matson, many of these customers did not enter into an MOU with Matson.

Pay-Less is one such customer.  Ex. 390 (MAT_GUAM_0091044) at -1044 (draft MOU to Pay-

Less); Ex. 18 (Dianora Dep. Tr.) at 15:20–21 (testimony from Matson's Vice President of Pricing

that Matson does not have an MOU with Pay-Less); *see also* Ex. 345 (Good Dep. Tr.) at 153:3–

16 (describing Matson's success securing MOUs was "mixed" and "[t]hat there were some

customers who were interested and others who were not").

**REDACTED PUBLIC VERSION**

107.    APL's expert identified six customers with MOUs with Matson in the Guam or Guam/Hawaii service before APL's entry.  *See* Ex. 13 (Warren-Boulton Rpt.) Ex. 6; Ex. 75 (Langer Rebuttal Rpt.) ¶¶ 50–52 and Ex. R-4.  These MOUs encompassed no more than 3.99% of the volume in APL's proposed "overall" West Coast to Guam market.  Ex. 75 (Langer Rebuttal Rpt.) ¶¶ 11(b), 52(a) and Ex. R-4.

108.    APL's expert identified ten customers with whom Matson had long-term agreements in the Guam or Guam/Hawaii service after APL's entry.  *See* Ex. 13 (Warren-Boulton Rpt.) Ex. 6; Ex. 75 (Langer Rebuttal Rpt.) ¶¶ 50–52 & Ex. R-4.  In other words,



*See* Ex. 13 (Warren-Boulton Rpt.) Ex. 6; Ex. 75 (Langer Rebuttal Rpt.) ¶¶ 50–52 & Ex. R-4.

109.

Ex. 13 (Warren-Boulton Rpt.) Ex. 6.

.  Ex. 75 (Langer Rebuttal Rpt.) ¶¶ 11(b), 52(a) & Ex. R-4.[3]

110.                                                                              *See* Ex. 13 (Warren-Boulton Rpt.) Ex. 6.  Matson did not execute an MOU with Pay-Less.  Ex. 18 (Dianora Dep. Tr.) at 15:20–21. The document cited by APL's expert is a *draft* Pay-Less agreement with placeholders

---

[3] APL's expert also identified Matson MOUs outside of his proposed market.  For example, he

*See* Ex. 13 (Warren-Boulton Rpt.) Ex. 6.

REDACTED PUBLIC VERSION

and no rate structure.  Ex. 390 (MAT_GUAM_0091044) at -1044.  Pay-Less's cargo represents

███ of the volume in APL's proposed overall market.  Ex. 75 (Langer Rebuttal Rpt.) Ex. R-4.

Subtracting Pay-Less's cargo, the long-term agreements identified by APL's expert represented

███ of the volume in APL's proposed overall market.  *Id.*

111.    Because Matson's allegedly anticompetitive long-term agreements implicate no

more than ███ of the volume in APL's proposed overall market, or ███ when excluding Pay-

Less, that is the theoretical maximum degree of foreclosure that could be attributed to Matson's

allegedly anticompetitive long-term agreements.  Ex. 75 (Langer Rebuttal Rpt.) Ex. R-4; *see also*

*id.* ¶ 50 (APL's expert "does not establish that a substantial portion of his proposed overall market

was affected by the challenged conduct").

112.    The customers that APL and its expert identified as being foreclosed by an MOU

also paid "lower prices" in the U.S. to Guam and U.S. to Hawaii trades as a result of the alleged

conduct—a well-acknowledged procompetitive benefit.  Ex. 75 (Langer Rebuttal Rpt.) ¶¶ 196–

197.

113.    To date, no shipper has signed a declaration or testified at a deposition that

Matson's agreements precluded APL from competing for that customer's business.  Instead,

multiple customers have signed sworn declarations denying APL's allegations.  *See, e.g.*, Shimizu

Decl. ¶ 11 ("Ambros has never felt locked into doing business with Matson as a contractual or

informal matter . . . Ambros has never come to any agreement with Matson that Ambros believed

forced it to ship with Matson").  And APL's expert admitted ██████████████████████

████████████████████████████████████████████████████.  Ex.

354 (Warren-Boulton Dep. Tr.) at 343:5–344:16.  *See also id.* at 57:23–58:11 (APL's expert

admitting ████████████████████████████████).

**REDACTED PUBLIC VERSION**

114.     One customer APL claims it was foreclosed from was Macy's.  Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 12–13; Ex. 13 (Warren-Boulton Rpt.) ¶ 139 & Ex. 6.  But Macy's has "never heard of [itself] declining any offer from a cargo shipping service provider on account of an agreement or conversation with Matson" and "does not and would not lock itself into a long-term exclusive agreement that forecloses alternative options, especially those at 'substantially lower rates.'"  Ex. 387 (MAT_GUAM_MACYS_00000001) ¶¶ 7–8.

115.     Rather, Macy's puts its cargo out for competitive bidding and stated in a declaration that "[i]f a cargo shipping service provider, including APL, was offering Macy's better value than its current provider as part of a bid process or RFP, Macy's would select the provider offering the best value and would switch providers."  Ex. 387 (MAT_GUAM_MACYS_00000001) ¶ 8; *see also* Ex. 357 (APL013765254) at -5254 (April 2017 email from Macy's to APL stating, ███

████████████████████████████████████████████████████████

████████████████████████████████████████).

Macy's chose to ship with Matson because Matson's shipping network aligns with Macy's business needs, which require cargo to stop in Hawaii between the West Coast of the United States and Guam.  Ex. 387 (MAT_GUAM_MACYS_00000001) ¶ 8; *see also* Ex. 45 (Theberge Dep. Tr.) at 103:22–104:3.  Shipping with APL, by contrast, would have "require[d] Macy's to change how they did their business" because APL does not ship from the West Coast of the United States to Guam.  Ex. 45 (Theberge Dep. Tr.) at 103:22–105:1.

116.     Ross is another customer from which APL claims it was foreclosed.  Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 13; Ex. 13 (Warren-Boulton Rpt.) ¶ 139 & Ex. 6.  But in its declaration, Ross stated that it elected not to "solicit[] bids for cargo shipping services to or from Guam since 2015, in large part because Ross is happy with the quality of service Matson provides"

and that "Ross's decision to utilize Matson for cargo shipping services has always been based primarily on Matson's high quality service and has never been the result of threats from Matson or a fear of retaliation."  Ex. 342 (MAT_GUAM_ROSS_00000016) ¶ 4.

117.    As early as 2015, Ross informed APL that, 

Ex. 365 (APL011913566) at -3567; *see also* Ex. 151 (APL012998061) at -8061

.  Ross also explained to APL in 2019 that

.  Ex. 393 (APL009086687) at -6687.

118.    Ross also stated in its declaration that "for shipping in both the Hawaii and Guam trades, Ross has been free to choose its business partners—for ocean shipping and otherwise—as it sees fit," it is "unaware of Matson ever threatening or coercing Ross in any way, let alone as it relates to APL," and that "Ross's choices between Matson and APL have always been its own, and Ross would not hesitate to switch cargo shipping providers if it felt Matson's services or rates did not align with Ross's values and needs."  Ex. 342 (MAT_GUAM_ROSS_00000016) ¶ 6.

119.    Cost.U.Less is a third customer from which APL claims it was foreclosed.  Ex. 13 (Warren-Boulton Rpt.) ¶ 136 & Ex. 6.  The contract between Matson and Cost.U.Less, however, was the result of negotiations led by Cost.U.Less; Cost.U.Less requested a multi-trade contractual agreement with a volume incentive that lasts multiple years.  Ex. 355 (MAT_GUAM_0111508) at -1508–09.  Accordingly, Cost.U.Less stated in its declaration that its decision to enter into a contact with these commitments were business decisions that "have belonged to Cost.U.Less, and have always been strictly the result of the balancing of Cost.U.Less' needs."   Ex. 341 (MAT_GUAM_NORTHWEST_00000440) ¶ 8.  Cost.U.Less added that "Matson has also never

**REDACTED PUBLIC VERSION**

coerced or attempted to coerce Cost.U.Less into ceasing its business with APL, shifting any portion of its business to Matson, or keeping its business with Matson." *Id.* ¶ 11.

120.    Despite executing an agreement with Matson whereby Cost.U.Less received a volume incentive discount if it booked at least 350 containers with Matson a year, Cost.U.Less shipped more cargo with APL than Matson after entering into the contract with Matson. *See* Ex. 361 (MAT_GUAM_004336960) at -6964; Ex. 386 (APL012125400) at -5400–01.

121.    Home Depot is yet another customer from which APL claims it was foreclosed. Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 11–12; Ex. 13 (Warren-Boulton Rpt.) ¶ 139 & Ex. 6. But the Home Depot Contract ███████████████ was the result of a competitive bidding process whereby Home Depot sought, and executed, contracts with ████████ Matson. Ex. 359 (MAT_GUAM_003962069) at -2069 & Ex. 360 (MAT_GUAM_002460140) at -0152–53 (MOU between Matson and Home Depot in the U.S. Guam and U.S. to Hawaii trades effective January 8, 2017 for a purported 94% of Home Depot's Guam volumes); ████████████████ ████████████████████████████████████████████ ████████████████████.

122.    Contemporaneous emails produced by Home Depot demonstrate ████████████ ████████████████████████████████████████████ ████████████████ Ex. 394 (MAT_GUAM_HD_00000713) at -0713. ████████████ ████████████████████████████████████████████ ████████████████ Ex. 395 (MAT_GUAM_HD_00000610) at -0610; Ex. 396 (MAT_GUAM_HD_00001188) at -1188; Ex. 397 (APL011496724) at -6724.  In fact, ████ ████████████████████████████████████████████ ████████████████. Ex. 433 (APL012086253) at -6253.

**REDACTED PUBLIC VERSION**

123.    Notwithstanding the MOU between Home Depot and Matson calling for 94% of its freight in the U.S. to Guam trade, Home Depot in fact shipped as little as ████ of its quarterly cargo with Matson during the MOU's term.  Ex. 75 (Langer Rebuttal Rpt.) ¶¶ 41–42, 53–54 & Ex. R-2.

124.    When a customer decides to enter an exclusive or quasi-exclusive agreement after bidding out its business, that agreement does not reflect any degree of anticompetitive foreclosure or exclusion; it reflects a customer's preference and the competitive process.  Ex. 75 (Langer Rebuttal Rpt.) ¶ 56; *see also* Ex. 387 (MAT_GUAM_MACYS_00000001) ¶ 8.

125.    In addition, customers who signed MOUs with Matson paid lower prices than customers that did not have MOUs.  Ex. 75 (Langer Rebuttal Rpt.) ¶ 197 & Ex. R-14, R-15; Ex. 13 (Warren-Boulton Rpt.) Ex. 5.

126.    To the extent APL claims that some subset of Matson's agreements providing for service in Guam and Hawaii represent a tie, neither APL nor its expert have pointed to a single policy, contract, or systematic discount allegedly tying Matson's Hawaii service to its Guam service.  Ex. 75 (Langer Rebuttal Rpt.) ¶ 39.  Similarly, APL has identified no instance in which Matson refused to ship a customer's cargo to Guam unless it also shipped cargo to Hawaii on one of Matson's boats.  ████████████████████████████████████████████ ████████████████████████████████████████ four have disclaimed any notion of coercion. *See*   Ex.   55   (MAT_GUAM_ADUANA_000000001);   Ex.   341 (MAT_GUAM_NORTHWEST_00000440); Ex. 398 (MAT_GUAM_DEWITT_00000001); Ex. 343 (MAT_GUAM_TOYOTA_00000001).  ███████████████████████████████ ████████████████████████████████████████████████.  Ex. 75 (Langer Rebuttal Rpt.) ¶ 197 & Ex. R-14, R-15; Ex. 13 (Warren-Boulton Rpt.) Ex. 5.

**REDACTED PUBLIC VERSION**

B.     **Household Goods Loyalty Discounts**

127.    The household goods ("HHG") segment involves shipping individuals' household goods, such as personal effects, furniture, and the like.  Ex. 5 (Langer Rpt.) ¶ 156.  The HHG segment comprised ██ of all containers carried by either Matson or APL in the U.S.-Guam trade since 2016.  Ex. 399 (Langer Workpaper FN 304) (████████████████████████████ ████████████████████████████████████████████ ██████████████████████████); *see also* Ex. 5 (Langer Rpt.) ¶ 156 (████████████████████████████████████████████ ████████████████████████).

128.    Matson's and APL's customers in the HHG segment are generally third-party shippers, which help arrange the transport of household goods.  Ex. 345 (Good Dep. Tr.) at 55:4–13; Ex. 69 (Jameson Dep. Tr.) at 39:4–41:4.

129.    Before 2017, APL entered ████████████████████████.  Ex. 41 (Stefanik Dep. Tr.) at 287:16–288:16; *see also* Ex. 33 (Lauer Dep. Tr.) at 14:13–16:12.  DeWitt and Coleman are two of the biggest movers of household goods between the U.S. West Coast and Guam.  Ex. 33 (Lauer Dep. Tr.) at 14:17–25.

130.    In 2017, APL expanded its partnership with DeWitt by first entering an additional agreement that offered DeWitt's affiliated shippers a 25% discount off APL's base shipping rates if they chose to ship household goods to Guam with APL.  Ex. 400 (Burrows Dep. Tr.) at 50:3–51:1; Ex. 401 (MAT_GUAM_003452227) at -2228–29.  ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████.  Ex. 402 (APL011107705) at -7705; Ex. 41 (Stefanik Dep. Tr.) at 293:15–299:14.

**REDACTED PUBLIC VERSION**

131.    By 2018, APL had secured more than ███ of westbound HHG shipments to Guam from Oakland and Los Angeles.  Ex. 13 (Warren-Boulton Rpt.) Fig. 10; *see also* Ex. 5 (Langer Rpt.) ¶ 162 & Ex. 13.

132.    In response, Matson announced on May 15, 2018 that it would expand its existing HHG Loyalty Program to Guam and increase the corresponding discount.    Ex. 403 (MAT_GUAM_002840576) at -0576; Ex. 33 (Lauer Dep. Tr.) at 21:23–23:10.

133.    In response to ███████ competition from Pasha in Hawaii (Ex. 354 (Warren-Boulton Dep. Tr.) at 253:17–24; *see also* Ex. 28 (Cox Dep. Tr.) at 17:12–18:1, 147:8–15; Ex. 345 (Good Dep. Tr.) 45:1–46:19 (explaining that Matson also faces "formidable" competition in Hawaii from a third carrier; a barge service operating from the West Coast of the United States to Hawaii)), Matson had first introduced an HHG Loyalty Program in August 2016 for the U.S.-Hawaii trade.  Ex. 404 (MAT_GUAM_002798375) at -8375; Ex. 348 (Rubin Dep. Tr.) at 88:12–90:10; *see also* Ex. 405 (MAT_GUAM_003070603) at -0603 (announcing continuation of Hawaii HHG Loyalty Program into 2017).  Matson's HHG Loyalty Program initially provided a 15% discount off the "port-to-port base rate" for HHG shippers who placed 90% or more of their Hawaii cargo with Matson.  Ex. 404 (MAT_GUAM_002798375) at -8375.

134.    When expanded to Guam in 2018, Matson's HHG Loyalty Program offered a 20% discount off the base ocean freight rate for those trades to HHG shippers who placed more than 90% of their Guam or Hawaii business with Matson; shippers who placed more than 90% of their shipments in both trades with Matson could earn a 25% discount off those rates.  Ex. 403 (MAT_GUAM_002840576) at -0576; Ex. 33 (Lauer Dep. Tr.) at 11:23–12:17; Ex. 348 (Rubin Dep. Tr.) at 109:14–25.

**REDACTED PUBLIC VERSION**

135.    Matson viewed its expansion of the HHG program to Guam as a competitive response to APL's agreements with TSPs.  Ex. 33 (Lauer Dep. Tr.) at 21:23–23:6.  Matson priced its HHG Loyalty Program to be "equal to the rates that APL was offering" HHG shippers in Guam. Ex. 11 (Matson 30(b)(6) Dep. Tr.) at 228:12–19.

136.    Customers who ship household goods with Matson to both Guam and Hawaii were responsible for only 1.3% of all U.S. West Coast to Guam commerce between 2018 and 2022. Ex. 75 (Langer Rebuttal Rpt.) ¶ 33.a.  That means that Matson's HHG Loyalty Program's cross-trade discounts affected (and thus theoretically foreclosed) at most 1.3% of APL's alleged market. Ex. 75 (Langer Rebuttal Rpt.) ¶ 34.

137.    No HHG shipper had to join Matson's loyalty program; shippers voluntarily opted into it by completing an online form.  *See* Ex. 403 (MAT_GUAM_002840576) at -0576; *see also* Ex. 33 (Lauer Dep. Tr.) at 24:6–8.  Shippers who opted in but did not ship sufficient volume with Matson would not receive a discount (*id.* at 24:22–25:12); those shippers—as well as those who did not opt in—could ship with Matson at normal tariff prices.  Ex. 50 (V. Angoco Dep. Tr.) at 97:19–98:2 (explaining tariff rates apply to all customers).

138.    The HHG program did not have a term; in other words, shippers who opted into the program did not commit to ship any amount of cargo with Matson for any particular duration of time.  *See* Ex. 403 (MAT_GUAM_002840576) at -0576.

139.    In total, 144 shippers had opted into Matson's HHG Loyalty Program by August 2021.  Ex. 406 (MAT_GUAM_0013300).  Of those, 82 shippers earned an HHG discount from Matson in at least one performance period.  Ex. 75 (Langer Rebuttal Rpt.) ¶ 33.b.

140.    In January 2018, after learning about Matson's planned HHG Loyalty Program for Guam, APL ███████████████████████████████████████████ HHG

58

**REDACTED PUBLIC VERSION**

shippers that ████████████████████████████████ Ex. 407 (APL008647328) at -7328.

141.    In February 2018, ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Ex. 408 (APL013550902) at -0902–03; Ex. 41 (Stefanik Dep. Tr.) at 303:1–308:20.

142.    Following the announcement of Matson's HHG Loyalty Program, in May 2018, ████████████████████████████████████████████

██████████████████████████████████████████.

Ex. 69 (Jameson Dep. Tr.) at 187:10–188:9; Ex. 409 (APL000021831) at -1831–32. ████████

████████████████████████████████████████████

████ Ex. 69 (Jameson Dep. Tr.) at 183:7–14; *see* Ex. 410 (APL013573131) at -3132.

143.    During the time period in which APL and Matson's HHG loyalty discounts went head-to-head (2018–2022), APL carried over ████ of HHG cargo from the U.S. West Coast to Guam.  Ex. 75 (Langer Rebuttal Rpt.) ¶ 33.c.  That included ████ of all HHG cargo shipped from the U.S. West Coast to Guam between 2018 and 2019 and ████ between 2018 and 2022.  *Id.*

144.    Matson's average rates for HHG shipments to Guam have fallen steadily since APL reentered the Guam trade:



Ex. 75 (Langer Rebuttal Rpt.) ¶ 34.c, Ex. R-1; *see also* Ex. 13 (Warren-Boulton Rpt.) Fig. 9.

**REDACTED PUBLIC VERSION**

145.    Since 2018, APL's average rates for shipments of HHG to Guam for customers that ship to both Guam and Hawaii have been ███████ than Matson's.  Ex. 75 (Langer Rebuttal Rpt.) ¶ 34.b, Ex. R-1.

146.    APL's expert claims ████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████.  Ex. 13 (Warren-Boulton Rpt.) ¶ 107.  But APL's expert did not show that Matson's discounting harmed competition in any way.  Ex. 75 (Langer Rebuttal Rpt.) ¶¶ 32–36.b.  Indeed, Dr. Warren-Boulton opined in his rebuttal report that no one ███████████ ████████████████████████████████████████████████ ████████████████████████████████████ Ex. 411 (Warren-Boulton Rebuttal Rpt.) ¶ 127.  And Dr. Warren-Boulton admitted that ████████████████████████████████ ████████████████████████████████████████████.  Ex. 354 (Warren-Boulton Dep. Tr.) at 310:15–311:21; *see also* Ex. 75 (Langer Rebuttal Rpt.) ¶ 32 ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████.  Dr. Warren-Boulton also testified that he has no opinion as to ████████████████████████████ ████████████████████████████████████████████.  Ex. 354 (Warren-Boulton Dep. Tr.) at 243:3–245:11.

## IV.    Unable To Win In The Marketplace, APL "Punches Back" With A Lawsuit

147.    By the end of 2020, APL found itself in a precarious competitive position because:

a.      Congress in 2017 passed the National Defense Authorization Act for Fiscal Year 2018 amending the Maritime Security Fleet Program.  Pub. L. No. 115-91 § 3503, 131 Stat. 1283, 1911 (2017) (codified at 46 U.S.C. § 53105(a)(2)).  ████████████████

**REDACTED PUBLIC VERSION**

████████████████████████████████████████████████████████. *See* Ex. 412

(APL009248438) at -8438 (████████████████████████████████████████

████████████).

       b.     APL's continued receipt of existing MSP subsidies was imperiled by a lawsuit Matson brought against the Department of Transportation in 2018 challenging the improper award of those subsidies.  *See* Ex. 413 (Complaint, *Matson Navigation Co. v. Dep't of Transp.*, No. 18-cv-2751 (D.D.C. Nov. 27, 2018) (ECF No. 1)).  Before the courts could issue a ruling on the merits, APL replaced one of the vessels at issue—the APL Guam—thereby avoiding an adverse ruling as to that vessel.  Ex. 414 (Ltr. from T. Hudson, Jr. to E. Mensing, *Matson Navigation Co. v. Dep't of Transp.*, No. 21-cv-1606 (D.D.C. June 14, 2021), ECF 1-25) (replacing APL Guam before court could rule on eligibility).  Matson's challenge to the other vessel—the APL Saipan—prevailed, as it was found too old to participate in the MSP and found ineligible to receive subsidies.  Ex. 415 (Ltr. from K. Tokarski to E. Mensing, *Matson Navigation Co. v. Dep't of Transp.*, No. 22-cv-01975 (D.D.C. July 8, 2022), ECF 7-25) (finding APL Saipan ineligible for MSP due to age).

       c.     APL's schedule integrity was at a nadir.  *See supra* Section II; *see also* Ex. 5 (Langer Rpt.) ¶ 115, Ex. 8 (summarizing APL's service struggles in 2021).

148.    In particular, the outbreak of COVID-19 had resulted in historic congestion at the public ports along the U.S. West Coast and in Asia.  *See* Ex. 8 (Metzger Dep. Tr.) at 109:3–12; Ex. 49 (Magnusson Dep. Tr.) at 157:13–158:1; Ex. 71 (Saadé Dep. Tr.) at 71:2–9; Ex. 45 (Theberge Dep. Tr.) at 108:19–109:12.  APL's service was severely impacted by the pandemic, with the majority of its shipments departing the West Coast behind schedule.  Ex. 49 (Magnusson Dep. Tr.) at 156:24–158:1 (████████████████████████████████████████████████████████

**REDACTED PUBLIC VERSION**

███████████████████████████████████████████); Ex. 8 (Metzger

Dep. Tr.) at 204:17–206:21 (███████████████████████████████████

██████████████████████████); Ex. 9 (Pangelinan Dep. Tr.) at 184:7–11; Ex.

78 (Thomas Dep. Tr.) at 91:10–92:9.

     149.    Because it owns its own terminals on the West Coast, Matson was far less impacted

by the congestion caused by COVID-19, and was able to remain on schedule.  *See* Ex. 19 (Mensing

Dep. Tr.) at 286:7–18 ("Matson had an independent terminal with their own chassis fleet and

seemed to avoid it all."); Ex. 8 (Metzger Dep. Tr.) at 153:15–154:3 (noting Matson was ████

██████████████████████ because it owns its own terminal).

     150.    APL's own sister logistics company, CEVA Freight, had to switch its cargo to

Matson during this time ████████████████████████████████.  Ex. 147 (Holm

Dep. Tr.) at 49:1–21.  Similarly, members of APL's sales team could not even get their own

spouses to ship with APL.  Ex. 8 (Metzger Dep. Tr.) at 53:11–21, 61:7–62:4; Ex. 9 (Pangelinan

Dep. Tr.) at 223:2–10.

     151.    APL's severe reliability problems affected its market position: ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████  Ex. 47

(APL000489038) at -9038; *see also* Ex. 49 (Magnusson Dep. Tr.) at 78:13–19 (recognizing lost

volume to Matson); Ex. 210 (APL013737044) at -7047 (███████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████).

     152.    APL's severe reliability problems coincided with a decline in its share of Guam

**REDACTED PUBLIC VERSION**

trade. *See* Ex. 5 (Langer Rpt.) Ex. 10; Ex. 13 (Warren-Boulton Rpt.) ¶ 111 & Fig. 20. They also

paralleled ███████████ APL suffered in its military business—where APL alleges no

anticompetitive conduct—as ████████████████████████████████

███████████████████. Ex. 416 (APL011241571) at -1571–72; *see also* Ex. 417

(APL013568936) at -8945 (███████████████████████████████████

████████████████████████████████████████████

████████). ).

153.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. Ex. 48

(APL008582745) at -2746. ████████████████████████████

████. *Id.*

154.    APL's CEO observed among his colleagues at APL that ████████████

████████ Ex. 418 (APL004971735) at -1735; *see also* Ex. 419 (APL011719307) at -9308 (██

████████████████████████████████████████████

████████████████████████████). ).

155.    By November 2020, APL decided to ████████████████████████ at

Matson ███████████████████████ Ex. 210 (APL013737044) at -7050; *see also* Ex. 85

(APL010057840) at -7840 (████████████████████████████████

████████████████████████████████████). Shortly before filing

this case, APL's President, Ed Aldridge, explained to Rodolphe Saadé, Chairman of the CMA

CGM Group, that APL's lawsuit was meant to make Matson ████████████████████

████████████████████████████████████████████

<u>**REDACTED PUBLIC VERSION**</u>

Ex. 420 (MAT_GUAM_CCA_00000550) at -0551.

156.    APL's employees testified that there was no contemporaneous record of the threats, retaliation, or disparagement alleged in this case.  Ex. 9 (Pangelinan Dep. Tr.) at 289:7–19 (in response to a question of whether he created any contemporaneous documents concerning Matson's alleged anticompetitive conduct:  "No. I don't recall ever creating anything written or something that would leave a paper trail"); 215:2–22 (unable to recall ever creating a report that mentions Matson threatening a customer).

157.    

███████████: In February 2021, APL's Guam Sales Director identified ███████████ Ex. 252 (APL004966523) at -6523. ████████ Ex. 63 (APL011593592) at -3594; *see also supra* Section II, ¶ 60 (collecting additional admissions from APL in late 2020 and 2021). ███████████. Ex. 158 (APL000177428) at -7428–29; Ex. 421 (APL000444513) at -4513–14; Ex. 422 (APL011480141) at -0143; Ex. 423 (APL009120328) at -0328–29; Ex. 424 (APL012805364) at -5364–65; *see also* Ex. 9 (Pangelinan Dep. Tr.) at 163:11–164:13, 165:11–15, 216:8–19.

158.    In its interrogatory responses, APL averred that Matson engaged in threats, retaliation, and disparagement.  Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 11–16.

**REDACTED PUBLIC VERSION**

159.     APL's Guam Trade Director, Kevin Theberge, certified this interrogatory response. *See* Ex. 45 (Theberge Dep. Tr.) at 42:18–43:22.  During his deposition, Mr. Theberge was asked for the basis of those allegations.  *Id.* at 44:9–163:4 (going through every APL allegation and asking for the basis of each).  Mr. Theberge testified that for nearly every single allegation, the source behind those allegations was APL's then-General Manager in Guam, Charlie Hermosa.  *Id.* In almost no instance did Mr. Theberge independently verify the information Mr. Hermosa provided him supposedly supporting APL's allegations; Mr. Theberge simply relied on the word of Mr. Hermosa.  *Id.*  For those few allegations where Mr. Hermosa was not the source, Mr. Theberge admitted that he relied solely on hearsay to verify the claims.  *Id.*

160.     Mr. Hermosa and the other current and former APL employees identified in APL's interrogatory responses as knowledgeable about the threats, retaliation, and disparagement alleged in APL's Amended Complaint testified that they did not have personal knowledge supporting APL's allegations. Ex. 46 (Hermosa Dep. Tr.) at 140:2–5, 181:4–16, 184:16–21, 185:5–11, 191:20, 196:2–5, 206:18–21, 219:5–7, 227:16–18, 230:20–231:6; Ex. 9 (Pangelinan Dep. Tr.) at 279:8–13; Ex. 19 (Mensing Dep. Tr.) at 335:12–15; Ex. 8 (Metzger Dep. Tr.) at 30:17–32:19; Ex. 45 (Theberge Dep. Tr.) at 44:17–163:4; Ex. 49 (Magnusson Dep. Tr.) at 86:3–87:9, 117:3–23; Ex. 100 (Jellies Dep. Tr.) at 106:8–11; Ex. 73 (Fafoutis Dep. Tr.) at 297:25–298:16; 300:24–301:21; Ex. 86 (Aldridge Dep. Tr.) at 100:23–101:20, 248:11–18.

## A.      Alleged Threats To Customers

161.     APL alleged that Matson threatened customers by telling them "it was just a matter of time before APL would leave the market" and that they would be charged higher prices and receive less favorable service if they did not support Matson.  *See* Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 11–16; Ex. 46 (Hermosa Dep. Tr.) at 139:1–141:15, 198:2–4, 202:21–203:4, 208:12–15, 215:3–216:6, 220:4–221:6, 269:7–21, 331:4–12.

**REDACTED PUBLIC VERSION**

162.    In its interrogatory responses, APL identified four customers—Luen Fung, MidPac, NAPA, and Cost.U.Less—that Matson allegedly threatened. Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 11.   In sworn declarations, Luen Fung's principals stated they are "not aware of any instance of Matson threatening Luen Fung in any way, let alone as it relates to APL."  Ex. 425 (MAT_GUAM_LFE_00000016) ¶ 10; Ex. 426 (MAT_GUAM_LFE_00000019) ¶ 10.   MidPac stated: "Matson has never threatened to refuse to do business with MidPac on account of MidPac's relationship with APL," nor was there "any instance[] of Matson threatening to charge higher rates . . . [or] to provide MidPac with unfavorable service if MidPac awarded cargo to APL."  Ex. 427 (MAT_GUAM_MIDPAC_00000011) ¶¶ 6–8; *see also* Ex. 428 (APL_MIDPAC_000000001) ¶ 8 ███████████████████████████████████████████████████████████.  NAPA similarly stated:  "[N]o one from Matson ever coerced or attempted to coerce anyone at [NAPA]."  Ex. 429 (MAT_GUAM_NAPA_00000003) ¶ 8.   And a representative of the fourth customer, Cost.U.Less, averred, "[n]or in my experience has Matson ever threatened Cost.U.Less in any way."  Ex. 341 (MAT_GUAM_NORTHWEST_00000440) ¶ 10.

163.    The only customer APL identified in its interrogatory response that did not disavow its threat allegations is Home Depot.  Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 11–12.  Specifically, APL claimed that Matson's sales director threatened Home Depot's manager, Tony Bonaparte, *id.*, by "confront[ing]" him about APL containers in its yard and making comments that APL was "[b]ring[ing] down the rates."  Ex. 46 (Hermosa Dep. Tr.) at 202:21–204:15.

164.    Mr. Bonaparte died well before this litigation was filed.  Ex. 46 (Hermosa Dep. Tr.) at 197:19–198:1; *see also* Ex. 15 (APL 30(b)(6) Dep. Tr.) at 277:13–16.   APL did not serve a subpoena on Home Depot.  Brass Decl. ¶ 4.  APL did not disclose any putative witness from Home Depot.  Ex. 430 (APL's Second Amended Initial Disclosures) at 3–4.  None of Mr. Bonaparte's

66

emails produced by Home Depot in response to Matson's subpoena reflect any threats or suggest Matson ever threatened Home Depot.

165.    Tim Kirchhoff was Matson's regional sales director during the relevant period of time alleged in APL's complaint.  Kirchhoff Decl. ¶ 1.  He was responsible for the Home Depot account.  *Id.* ¶ 3.  He met with Mr. Bonaparte multiple times in 2018.  *Id.*  Mr. Kirchhoff did not threaten Home Depot or disparage APL at that meeting or any other with Home Depot.  *Id.* ¶ 4.

166.    Nor did any other current or former Matson employee threaten Home Depot or anyone else.  *See, e.g.*, Ex. 345 (Good Dep. Tr.) at 157:8–158:24; Ex. 348 (Rubin Dep. Tr.) at 264:13–18.  Further belying APL's allegations, on January 31, 2024, Home Depot named Matson its Offshore Provider of the Year.  Ex. 438 (Matson, "The Home Depot Names Matson its Offshore Provider of the Year," available at  https://www.matson.com/corporate/inside-matson/the-home-depot-names-matson-its-offshore-provider-of-the-year.html (accessed Feb. 26, 2024)).

167.    At APL's corporate deposition, its representative for the first time named additional customers/shipping partners that allegedly experienced threats or disparaging comments from Matson.  Ex. 15 (APL 30(b)(6) Dep. Tr.) at 275:1–281:19, 292:18–20.  APL never amended its interrogatory responses to include these non-parties.  Brass Decl. ¶ 2.

168.    But nine of the ten customers APL identified in its interrogatory responses, corporate representative deposition, or expert report—again, with the lone exception of Home Depot—have submitted declarations disavowing any such threat:

REDACTED PUBLIC VERSION

| Customer | Alleged Threat | Identified in APL's Interrogatory Response | Identified by APL's Corporate Witness | Identified by APL's Expert | Customer Testimony |
|---|---|---|---|---|---|
| Cost.U.Less | Implicitly threatened future consequences following APL's announcement of Guam service in October 2015 if they did business with APL. | × | | | "[I]n [Cost.U.Less's] experience Matson [has never] threatened Cost.U.Less in any way. Matson has always relied on its strengths in selling its service, and has always done so in a professional manner." Ex. 341 (MAT_GUAM_NORTHWEST_00000440) ¶ 10 (Declaration of Matthew LeClair, Director, Logistics and Distribution). |
| MidPac | Implicitly threatened future consequences following APL's announcement of Guam service in October 2015 if they did business with APL. | × | | | "Matson has never retaliated, or threatened retaliation, against MidPac as a result of MidPac conducting business with APL." "Matson has never threatened to refused to do business with MidPac on account of MidPac's relationship with APL. MidPac has done and continues to do business with Matson, as well as APL." Ex. 427 (MAT_GUAM_MIDPAC_00000011) ¶¶ 4, 6 (Declaration of John Calvo, President and General Manager). |
| Luen Fung | Implicitly threatened future consequences following APL's announcement of Guam service in October 2015 if they did business with APL. | × | × | | "[Luen Fung is] not aware of any instance of Matson threatening Luen Fung in any way." Ex. 425 (MAT_GUAM_LFE_00000016) ¶ 10 (Declaration of Cindy Guevara, Administration Manager); Ex. 426 (MAT_GUAM_LFE_00000019) ¶ 10 (Declaration of Joly Wu, CFO). |

**REDACTED PUBLIC VERSION**

| Customer | Alleged Threat | Identified in APL's Interrogatory Response | Identified by APL's Corporate Witness | Identified by APL's Expert | Customer Testimony |
|---|---|---|---|---|---|
| NAPA Auto Parts | Implicitly threatened future consequences following APL's announcement of Guam service in October 2015 if they did business with APL. | × | | | "No one at Matson has ever threatened [NAPA Auto Parts] in any way, and [it] ha[s] never witnessed Matson threaten anyone else."<br><br>Ex. 429 (MAT_GUAM_NAPA_00000003) ¶ 7 (Declaration of Craig Wade, CFO). |
| Toyota | Explicitly threatened higher rates and unfavorable service on Hawaii cargo if it did business with APL in Guam. | × | | | ██████████████████████████<br><br>Ex. 343 (MAT_GUAM_TOYOTA_00000001) ¶ 20 (Declaration of Genevieve Batchelder, Procurement Logistics Manager). |
| Home Depot | Implicitly threatened future consequences following APL's announcement of Guam service in October 2015 if they did business with APL. | × | | × | None.  *See supra* ¶¶ 163–66 (describing absence of evidence concerning alleged threats). |

**REDACTED PUBLIC VERSION**

| Customer | Alleged Threat | Identified in APL's Interrogatory Response | Identified by APL's Corporate Witness | Identified by APL's Expert | Customer Testimony |
|---|---|:---:|:---:|:---:|---|
| Ross | Implicitly threatened future consequences if they did business with APL. | × | | | "Matson has never . . . threatened retaliation, against Ross as a result of Ross conducting business, or considering conducting business, with APL." <br><br>Ex. 342 (MAT_GUAM_ROSS_00000016) ¶ 6 (Declaration of Janet Harris, VP, Transportation, Strategy and Support). |
| Macy's | Macy's was forced to maintain its Guam cargo with Matson in order to avoid losing ability to ship to Hawaii. | × | | | "I am not aware of Matson ever threatening or attempting to coerce Macy's in any way, as it relates to APL or otherwise." <br><br>Ex. 387 (MAT_GUAM_MACYS_00000001) ¶ 12 (Declaration of Mark Negri, Sr. Director of Transportation). |
| Approved Freight | Explicitly threatened unfavorable service and to give direct competitors lower rates if it did business with APL. | × | × | × | "Matson has never threatened retaliation against the [Approved Freight] as a result of the [Approved Freight] conducting business with APL." <br><br>Ex. 398 (MAT_GUAM_DEWITT_00000001) ¶ 4 (Declaration of John Burrows, CEO and President). |
| Royal Hawaiian Movers | Explicitly threatened to give direct competitors lower rates in Hawaii if it did business with APL in Guam. | × | | | "Matson has never threatened retaliation against the [Royal Hawaiian Movers] as a result of the [Royal Hawaiian Movers] conducting business with APL." <br><br>Ex. 398 (MAT_GUAM_DEWITT_00000001) ¶ 4 (Declaration of John Burrows, CEO and President). |

**REDACTED PUBLIC VERSION**

169.    Additional customers have also submitted sworn declarations attesting that Matson did not threaten them or other customers. *See* Ex. 55 (MAT_GUAM_ADUANA_000000001) ¶ 7 ("Matson has never threatened Aduana in any way."); Ex. 431 (MAT_GUAM_PEPSI_00000001) ¶ 8 ("Matson has not threatened Pepsi Guam in any way"); Ex. 432 (APL_PEPSI_000000001) ¶ 8 ███████████████████████████████████████████████████████████████; Ex. 233 (MAT_GUAM_DHX_000000001) ¶ 14 ("Matson also has never threatened me, or anyone else at DHX"); Ex. 25 (MAT_GUAM_CFR_00000001) ¶ 6 (CFR has "no knowledge of Matson's threatening of Toyota"); Ayuyu Decl. ¶ 12 ("Matson has never punished, harmed, harassed, retaliated, threatened, or otherwise treated McDonald's of Guam and Saipan negatively in reaction to its use of APL."); Shimizu Decl. ¶ 6 ("Matson has never threatened Ambros in any way, either explicitly or implicitly"); *see also* Ex. 434 (MAT_GUAM_AK_00000064) ¶¶ 11–12 (Atkins Kroll "was not directly involved in [Toyota's] decision making process" and "Matson has not threatened or retaliated against" Atkins Kroll).

170.    Even in APL's witnesses' hearsay recitations, APL says Macy's turned down its proposal "during January to April 2017" (Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 12–13); Ross demurred in February 2017 (Ex. 46 (Hermosa Dep. Tr.) at 220:4–221:6); and any threats to Home Depot occurred in or before 2016 (Ex. 46 (Hermosa Dep. Tr.) at 198:2–4). Other alleged threats transpired even earlier—shortly after Horizon left the Guam trade in 2011. Ex. 46 (Hermosa Dep. Tr.) at 180:9–181:16, 208:12–211:5, 214:7–216:11.

171.    None of the customers APL identified as the target of Matson's threats testified that they declined to ship with APL *because* of Matson's supposed threats. *See*, *e.g.*, Ex. 343 (MAT_GUAM_TOYOTA_00000001) ¶ 10 (████████████████████████████████ ████████████████████████████████); Ex. 342 (MAT_GUAM_ROSS_00000016) ¶ 6

**REDACTED PUBLIC VERSION**

(Ross's decisions had nothing to do with alleged threats); Ex. 387 (MAT_GUAM_MACYS_00000001) ¶ 8 (Macy's chooses "the provider offering the best value").

172.    Customers testified that their decisions about which carrier to choose was their decision alone to make and Matson never improperly influenced that decision:   Ex. 398 (MAT_GUAM_DEWITT_00000001) ¶ 5 ("The DeWitt Companies' choices between Matson and APL have always been their own."); Ex. 427 (MAT_GUAM_MIDPAC_00000011) ¶ 5 ("MidPac has been free to choose its business partners—for ocean shipping and otherwise—as it sees fit, and has never felt threatened or coerced by Matson in any away, let alone as it relates to APL. MidPac's choices between Matson and APL have been its own."); Ex. 342 (MAT_GUAM_ROSS_00000016) ¶ 6 (similar); Ex. 426 (MAT_GUAM_LFE_00000019) ¶ 9 (similar); Ex. 435 (MAT_GUAM_ FASTENAL_00000166) ¶ 8 (similar); Ex. 429 (MAT_GUAM_NAPA_00000003) ¶ 4 (similar); Ex. 341 (MAT_GUAM_NORTHWEST_00000440) ¶ 8 (similar).

173.    Further, APL's then-General Manager in Guam admitted that Matson's alleged threats had no impact on Home Depot.  Ex. 46 (Hermosa Dep. Tr.) at 203:9–14 (Home Depot outwardly disagreed with Matson's statement).  Matson's contemporaneous correspondence with Home Depot reflect that ████████████████████████████████████████████. *See* Ex. 436 (MAT_GUAM_HD_00000117) at -0117 (█████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████).  And in its communications with APL, Home Depot told APL ████████████████████████████████████████████████████████ ████████████████████████████████████.  Ex. 395 (MAT_GUAM_HD_00000610) at -0610–11; Ex. 396 (MAT_GUAM_HD_00001188) at -1188–89; Ex. 397 (APL011496724) at -6724; Ex. 433 (APL012086253) at -6253.

REDACTED PUBLIC VERSION

174.   Several of the allegedly threatened customers in fact shipped with both Matson and APL—some of which provided APL with the majority (or virtually all) of their cargo.  *See, e.g.*, Ex. 437 (APL012606729) at -6731 (████████████████████████████ ████████████████████████); Ex. 341 (MAT_GUAM_NORTHWEST_00000440) ¶ 3–4   (acknowledging   that   they   use   both   APL   and   Matson);   Ex.   427 (MAT_GUAM_MIDPAC_00000011) ¶ 6 (similar); Ex. 429 (MAT_GUAM_NAPA_00000003) ¶ 5 (similar).  And APL's expert admitted that ████████████████████████ ████████████████████████.  Ex. 354 (Warren-Boulton Dep. Tr.) at 359:4–15.

**B.     Alleged Threats To Pasha**

175.   APL also alleges Matson threatened The Pasha Group ("Pasha"), "a small Jones Act carrier" that APL says "declined to partner" its Hawaii service with APL's Guam line no later than 2017 "due to concern of adverse reaction by Matson."  Am. Compl. ¶ 53; *see also* Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 15–16, 28; Ex. 15 (APL 30(b)(6) Dep. Tr.) at 436:17–437:4.

176.   APL's interrogatory responses do not describe how Matson supposedly intimidated Pasha into declining to partner with APL.  Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 15–16.

177.   APL did not serve a subpoena on Pasha.  Brass Decl. ¶ 8.

178.   APL's representatives that attended meetings with Pasha admitted that ██████████ ████████████████████████.  Ex. 15 (APL 30(b)(6) Dep. Tr.) at 440:5–12; *see also* Ex. 86 (Aldridge Dep. Tr.) at 192:21–209:9.

179.   Pasha's President & CEO George Pasha IV states in his declaration that, when it came to whether or not to work with APL, his "decisions had nothing to do with Matson."  Pasha Decl. ¶ 5.  He declined APL's offers because he "had no interest" in them.  *Id.* ¶ 4.

180.   APL employees themselves recognized the fault, at least in part, for its failure to form a partnership with Pasha belonged with its own parent company, CMA CGM.  Ex. 439

**REDACTED PUBLIC VERSION**

(APL012638955) at -8956 (

); *see also* Ex. 440 (APL013590672)

at -0672 (

); Ex. 86 (Aldridge Dep.

Tr.) at 204:9–15 (testifying that Mr. Pasha was "not interested" in APL's initial overture involving

"an acquisition from CMA CGM").

181.    Neither APL nor its expert identified any additional business it would have obtained

if it had partnered with Pasha.  Ex. 13 (Warren-Boulton Rpt.) ¶¶ 115–120 (

).

### C.    Alleged Retaliation Against Truckers And Other Third Parties

182.    APL claims that Matson retaliated against two trucking companies:  DeWitt Guam

(erroneously described in APL's interrogatory responses as Approved Freight, which is a different

DeWitt company that does no trucking in Guam) and Guam Transport & Warehouse ("GTW").

Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 14–15.

### 1.    DeWitt

183.    APL identified two DeWitt Guam employees as knowledgeable about APL's

allegations that Matson retaliated against DeWitt Guam:  John Burrows and Cori Berking.  Ex.

392 (APL Fourth Supp. Interrog. Resp.) at 15.  Each disclaimed any retaliation by Matson—for

working with APL or otherwise.  Ex. 337 (Berking Dep. Tr.) at 63:18–22 ("But just to be clear,

you have no firsthand knowledge of why Matson stopped allocating military trucking to DeWitt

Guam.  Correct? . . . THE WITNESS:  Yes."); *id.* at 89:17–21 (testifying she had "[n]o knowledge

of any of [the alleged conduct] happening"); Ex. 400 (Burrows Dep. Tr.) at 117:17–21 ("Q Are

you aware of any instances, whether in writing or verbally, in which Matson refused to do business

with DeWitt Guam on account of DeWitt Guam's relationship with APL?  A No."); *see also* Ex.

**REDACTED PUBLIC VERSION**

337 (Berking Dep. Tr.) at 64:14–22, 65:19–66:1; Ex. 400 (Burrows Dep. Tr.) at 120:1–4; Ex. 398

(MAT_GUAM_DEWITT_00000001) ¶¶ 4–16.

184.     Rather, there had been an overall deterioration in the relationship between Dewitt

and Matson over several years.  *See* Ex. 345 (Good Dep. Tr.) at 164:21–165:12 (noting Matson's

"rocky history" with DeWitt went back "many, many years").  That included service failures by

DeWitt Guam.  Ex. 337 (Berking Dep. Tr.) at 26:8–17.  Because of those failures, Dewitt Guam

began performing less military trucking business for Matson around 2017.  *Id.*

185.     As Matson awarded less trucking business to DeWitt Guam, Dewitt Guam—which,

in addition to providing trucking service, also is a shipper that works with carriers to ship cargo—

shifted *more* of its ocean cargo business to APL.  Ex. 337 (Berking Dep. Tr.) at 18:5–19:8

(explaining that in 2017 DeWitt Guam made the decision to switch most of its cargo to APL).  In

2021, however, Dewitt Guam shifted back to using Matson for ocean cargo due to APL's constant

service failures.  Ex. 337 (Berking Dep. Tr.) at 69:12–19; *see also* Ex. 338 (APL000393581)

at -3581 (█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████).   Dewitt  Guam  and  Matson  continue  to  work  together  today.   Ex.  398

(MAT_GUAM_DEWITT_00000001) ¶ 6.

186.     APL  also  claims  Matson  convinced  Saipan  Shipping  Company  to  withhold

containers from Approved Freight, a DeWitt company.  Ex. 392 (APL Fourth Supp. Interrog. Resp.)

at 15.  APL did not subpoena Saipan Shipping.  Brass Decl. ¶ 7.  In a sworn declaration, Darlene

Cabrera,  General  Manager  of  Saipan  Shipping,  stated  "APL's  allegations  concerning  Saipan

Shipping are absolutely false."  Ex. 441 (MAT_GUAM_SS_00000796) ¶ 11.

187.     The DeWitt Companies' President confirmed the same regarding Approved Freight,

**REDACTED PUBLIC VERSION**

noting Matson has never refused to "conduct business with Approved Freight Forwarders or any of the DeWitt Companies." Ex. 398 (MAT_GUAM_DEWITT_00000001) ¶ 16; *see also* Ex. 337 (Berking Dep. Tr.) at 89:4–19 (disclaiming any knowledge of APL's allegations regarding Saipan Shipping); Ex. 400 (Burrows Dep. Tr.) at 88:12–19 (similar).

           **2.**      **GTW**

188.    APL also asserts that in early 2016, shortly after GTW was awarded a contract to provide APL chassis repair services, Matson ceased allocating military trucking to GTW. Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 14, 23.

189.    GTW testified that it lost its trucking business with Matson in February of 2016. Ex. 313 (Honda Dep. Tr.) at 68:5–15; *see also* Ex. 442 (MAT_GUAM_GTW_00000001) at -0004–05 (February 2016 email from GTW to Matson asking why it was not receiving military trucking); Ex. 313 (Honda Dep. Tr.) at 59:5–60:7 (testifying that GTW was notified in February 2016 that it was not receiving further trucking business).

190.    GTW responded by using ███████████████████████████████████████ █████████████████████████████████ Ex. 443 (APL009731739) at -1739. As GTW's CEO explained, ██████████████████████████████████████████████ ████████████████ *Id.* GTW was successful in its efforts to convince customers to switch over to APL, including Tokyo Mart, UNK Wholesale, Pacific Produce, and Ambus. Ex. 313 (Honda Dep. Tr.) at 80:21–84:9.

191.    Also as a result of Matson and GTW no longer working together, GTW had excess trucking capacity that it made available to APL for its use. Ex. 313 (Honda Dep. Tr.) at 76:1–15, 89:12–21. APL ultimately stopped doing trucking business with GTW after its sister company, CEVA Freight, started providing trucking services on Guam. *Id.* at 88:5–14.

192.    APL also alleges that Matson coerced a supplier, Fastenal, to withhold repair parts

**REDACTED PUBLIC VERSION**

from GTW.  Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 14.  In a sworn declaration, Fastenal said:

> I have no knowledge or recollection of APL's allegations involving Fastenal, and am confident they did not in fact take place.  In my experience, Matson has always operated with professionalism and I have never heard of anyone at Matson acting in the manner suggested above. . . .  Nor would it matter if Matson did in fact ask Fastenal to stop providing parts to a third party, as Fastenal would never comply with such a demand. Fastenal ships considerable volume throughout the world, and its shipments to Guam represent a small fraction of both Fastenal's overall shipping business and its business with Matson.  If Matson were to attempt to strong arm Fastenal in the way APL alleges, Fastenal would simply take its business elsewhere.

Ex. 435 (MAT_GUAM_FASTENAL_00000166) ¶¶ 7–8; *see also* Ex. 313 (Honda Dep. Tr.) at 95:18–96:5, 96:7–97:12, 100:13–101:7 (testimony from GTW's President that he had no firsthand knowledge of Matson coercing Fastenal).

193.    Mr. Honda said that he had heard Matson may have purchased repair parts in large quantities from Fastenal.  Ex. 313 (Honda Dep. Tr.) at 96:2–97:9.  Given that chassis repair parts on Guam sometimes sell out, Mr. Honda had in fact previously suggested to APL that they purchase large quantities of repair parts when available to ensure repair services were not interrupted should there be a shortage.  Ex. 313 (Honda Dep. Tr.) at 79:10–18; 97:22–100:9; Ex. 444 (APL011349575) at -9578.

\*   \*   \*

194.    Nearly all of the shippers that APL identified may have "pull[ed] back" their business as a result of one or more of these alleged acts of retaliation (Ex. 15 (APL 30(b)(6) Dep. Tr.) at 283:14–19) disclaimed that any supposed retaliation affected their shipping decisions.  Ex. 429 (MAT_GUAM_NAPA_00000003) ¶ 5; Ex. 425 (MAT_GUAM_LFE_00000016) ¶¶ 9, 11. And APL's expert admitted that he did not ████████████████████████████████████ ██████████████████████████████████████████████████████████.  Ex. 354 (Warren-Boulton Dep. Tr.) at 361:11–362:3; 367:10–368:1.

### D.    Alleged Disparagement

195.    APL claims three people made disparaging remarks about APL: Phil Santos, Gina Angoco, and Tim Kirchhoff.  Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 11–12.  APL claims these individuals made disparaging comments about APL to five customers—Cost.U.Less, NAPA, Luen Fung, MidPac, and Home Depot—by telling them APL received unfair subsidies and would not last in the Guam trade.  Am. Compl. ¶ 5; Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 11–12; Ex. 15 (APL 30(b)(6) Dep. Tr.) at 275:16–276:4; Ex. 45 (Theberge Dep. Tr.) at 44:24–45:23.

196.    None of APL's witnesses personally observed the alleged disparagement.  Ex. 45 (Theberge Dep. Tr.) at 47:14–48:15; 57:20–65:23, 346:8–349:3; Ex. 46 (Hermosa Dep. Tr.) at 140:2–141:2, 211:6–13, 212:17–213:19, 242:2–243:9; *see also supra* ¶ 160.

197.    All three individuals identified by APL provided sworn testimony that they never made comments disparaging APL:

a.    Mr. Santos is a Matson Account Executive.  Ex. 14 (Santos Dep. Tr.) at 10:2–3.  He testified to having no recollection of discussing APL receiving subsidies with customers.  *Id.* at 150:16–151:22.  Rather, he merely answered customers' questions by confirming that Matson had filed a lawsuit challenging APL's receipt of subsidies.  *Id.*

b.    Ms. Angoco is not a Matson employee; she is the Operations Manager at V. Angoco Trucking.  Ex. 445 (G. Angoco Dep. Tr.) at 32:9–14.  She testified APL's allegations were not true and never happened.  Ex. 445 (G. Angoco Dep. Tr.) at 173:21–174:17.

c.    Mr. Kirchhoff is a Matson regional sales director.  Kirchhoff Decl. ¶ 1.  APL elected not to depose Mr. Kirchhoff.  Brass Decl. ¶ 13.  Mr. Kirchhoff states under oath that he did not disparage APL to Home Depot or any other customer.  Kirchhoff Decl. ¶¶ 4–6.

**REDACTED PUBLIC VERSION**

198.    Four of the five customers identified by APL in its interrogatory response (again, with the lone exception of Home Depot's deceased representative) also have disclaimed any disparagement:

a.    Cost.U.Less's Director, Logistics & Distribution, Matthew LeClair, stated in his declaration:  "Matson has also never disparaged APL in any way" and "[a]ny reference to APL by Matson has always remained professional and factual."  Ex. 341 (MAT_GUAM_NORTHWEST_00000440) ¶ 13.  APL did not depose Cost.U.Less.  Brass Decl. ¶ 10.

b.    NAPA's Chief Financial Officer, Craig Wade, stated in his declaration:  "I have no knowledge of anyone at BMI Auto telling APL that Matson personnel disparaged APL and its services and rates or implicitly threatened shippers who might do business with APL."  Ex. 429 (MAT_GUAM_NAPA_00000003) ¶ 6.  APL did not subpoena or depose NAPA.  Brass Decl. ¶ 6.

c.    Both Joly Wu, Chief Financial Officer, and Cindy Guevara, Administration Manager, submitted declarations on behalf of Luen Fung.  Ex. 426 (MAT_GUAM_LFE_00000019); Ex. 425 (MAT_GUAM_LFE_00000016).  Ms. Wu stated:  Luen Fung's dealings with Matson and APL "have always remained professional" and "I am not aware of any instances of Matson otherwise disparaging APL's rates or services."  Ex. 426 (MAT_GUAM_LFE_00000019) ¶¶ 8, 14.  Similarly, Ms. Guevara stated:  "I have not experienced any Matson conduct that was unfair with respect to APL" and "I am not aware of any instances of Matson otherwise disparaging APL's rates or services."  Ex. 425 (MAT_GUAM_LFE_00000016) ¶¶ 8, 14.  She added that she "never had a conversation with APL (or anyone for that matter) regarding any of the conduct

**REDACTED PUBLIC VERSION**

alleged by APL, and have no idea what APL is referring to."   Ex. 425 (MAT_GUAM_LFE_00000016) ¶ 7.  APL did not depose Luen Fung.  Brass Decl. ¶ 11.

       d.     MidPac's President and General Manager, John Calvo, stated:  "I am not aware of any instances of Matson otherwise disparaging APL's rates or services."  Ex. 427 (MAT_GUAM_MIDPAC_00000011) ¶ 16.  APL did not depose MidPac.  Brass Decl. ¶ 12.

199.    At its corporate deposition, APL's representative again tried to expand the list of customers to whom Matson supposedly made disparaging comments.  Ex. 15 (APL 30(b)(6) Dep. Tr.) at 275:16–276:4.

200.    One such customer stated that she did not "recall Matson ever engaging in negative selling against APL" and that "Matson has never said or implied that if Aduana sent cargo to Guam on APL, Matson would increase Aduana's prices or give it worse service." Ex. 55 (MAT_GUAM_ADUANA_000000001) ¶¶ 7, 9.  Other similarly stated "Matson representatives" never "disparaged APL's rates or services" (Ex. 233 (MAT_GUAM_DHX_000000001) ¶ 12); had "no knowledge . . . that Matson personnel disparaged APL" (Ex. 429 (MAT_GUAM_NAPA_00000003) ¶ 6); "never once heard or experienced Matson disparaging APL" (Ex. 341 (MAT_GUAM_NORTHWEST_00000440) ¶ 7); and had "no knowledge of Matson attempting to unfairly compete through threats, retaliation, or disparagement" (Ex. 441 (MAT_GUAM_SS_00000796) ¶ 13).  All told, ten of the thirteen customers identified by APL as the recipient of Matson's alleged disparagement have contradicted APL's allegation under oath:

REDACTED PUBLIC VERSION

| Customer | Alleged Disparagement | Identified in APL's Interrogatory Response | Identified by APL's Corporate Representative Witness | Identified by APL's Expert | Customer Testimony |
|---|---|---|---|---|---|
| Cost.U.Less | Disparaged APL's rates and services. | ✕ | | | "Matson has also never disparaged APL in any way. Any reference to APL by Matson has always remained professional and factual." Ex. 341 (MAT_GUAM_NORTHWEST_00000440) ¶ 13 (Declaration of Matthew LeClair, Director, Logistics & Distribution). |
| Home Depot | Disparaged APL's services to customer after it agreed to do business with APL in Guam, and the customer did less business with Guam as a result. | ✕ | ✕ | ✕ | None.  See supra ¶¶ 163-65, 197 (describing absence of evidence concerning alleged disparagement). |
| Luen Fung | Disparaged APL's rates and services. | ✕ | | | "I am not aware of any instances of Matson otherwise disparaging APL's rates or services." Ex. 425 (MAT_GUAM_LFE_00000016) ¶ 14 (Declaration of Cindy Guevara, Administration Manager); Ex. 426 (MAT_GUAM_LFE_00000019) ¶ 14 (Declaration of Joly Wu, Chief Financial Officer). |
| MidPac | Disparaged APL's rates and services. | ✕ | | | "[MidPac is] not aware of any instances of Matson otherwise disparaging APL's rates or services. Matson representatives do, from time to time, |

**REDACTED PUBLIC VERSION**

| Customer | Alleged Disparagement | Identified in APL's Interrogatory Response | Identified by APL's Corporate Representative Witness | Identified by APL's Expert | Customer Testimony |
|---|---|---|---|---|---|
| | | | | | mention in sales pitches that Matson's on time delivery rates are higher than those of APL. MidPac views this as a competitive practice." Ex. 427 (MAT_GUAM_MIDPAC_00000011) ¶ 16 (Declaration of John Calvo, President and General Manager). |
| NAPA Auto Parts | Disparaged APL's rates and services. Indicated APL had to misuse MSP to remain in Guam, and the customer refused to do business with APL in Guam as a result. | ✕ | ✕ | ✕ | "[NAPA has] no knowledge . . . that Matson personnel disparaged APL and its services and rates . . .[.]" Ex. 429 (MAT_GUAM_NAPA_00000003) ¶ 6 (Declaration of Craig Wade, Chief Financial Officer). |
| Aduana | Disparaged APL's services to customer and indicated APL had to misuse MSP to remain in Guam, and the customer did less business with APL in Guam as a result. | | ✕ | ✕ | "Matson [has n]ever disparaged APL in [Aduana's] experience . . . I do not recall Matson ever engaging in negative selling against APL." Ex. 55 (MAT_GUAM_ADUANA_000000001) ¶ 9 (Declaration of Maria Lourdes Austria, President). |

REDACTED PUBLIC VERSION

| Customer | Alleged Disparagement | Identified in APL's Interrogatory Response | Identified by APL's Corporate Representative Witness | Identified by APL's Expert | Customer Testimony |
|---|---|---|---|---|---|
| DGX/DHX | Disparaged APL's services to customer, indicated APL had to misuse MSP to remain in Guam, and the customer did less business with APL in Guam as a result. | | × | × | "While Matson representatives may stress Matson's strengths, they do not talk poorly about APL or its weaknesses." Ex. 233 (MAT_GUAM_DHX_000000001) ¶ 13 (Declaration of Paje Butler, General Manager). |
| GFS | Disparaged APL's services to customer after it agreed to do business with APL in Guam, and the customer did less business with APL in Guam as a result. | | × | × | None. *See infra* ¶ 201 (explaining the lack of evidence related to any alleged disparagement). |
| Macy's | Disparaged APL's services to customer, indicated APL had to misuse MSP to remain in Guam, and the customer refused to do business with APL in Guam as a result. | | × | × | "[Macy's] never experienced, nor recall hearing any current or former colleague mention, Matson engaging in any of the conduct alleged in APL's Am. Compl. or listed in APL's discovery response noted above." Ex. 387 (MAT_GUAM_MACYS_00000001) ¶ 10 (Declaration of Mark Negri, Sr. Director of Transportation). |

**REDACTED PUBLIC VERSION**

| Customer | Alleged Disparagement | Identified in APL's Interrogatory Response | Identified by APL's Corporate Representative Witness | Identified by APL's Expert | Customer Testimony |
|---|---|---|---|---|---|
| McDonald's | Disparaged APL's services to customer and it refused to do business with APL in Guam as a result. | | × | × | "McDonald's of Guam and Saipan has never experienced Matson disparaging APL's rates and services, or otherwise speaking negatively about APL." Ayuyu Decl. ¶ 13. |
| Ross | Disparaged APL's services to customer, indicated APL had to misuse MSP to remain in Guam, and the customer refused to do business with APL in Guam as a result. | | × | × | "[Ross is] not aware of any instances of Matson otherwise disparaging APL's rates or services." Ex. 342 (MAT_GUAM_ROSS_00000016) ¶ 13 (Declaration of Janet Harris, Vice President, Transportation, Strategy and Support). |
| Toyota | Disparaged APL's services to customer and indicated APL had to misuse MSP to remain in Guam, and the customer did less business with APL in Guam as a result. | | × | × | ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ Ex. 343 (MAT_GUAM_TOYOTA_00000001) ¶ 17 (Declaration of Genevieve González Batchelder, Procurement Logistics Manager). |

| Customer | Alleged Disparagement | Identified in APL's Interrogatory Response | Identified by APL's Corporate Representative Witness | Identified by APL's Expert | Customer Testimony |
|---|---|---|---|---|---|
| Triple B | Disparaged APL's services to customer, and indicated APL had to misuse MSP to remain in Guam, and the customer did less business with APL in Guam as a result. | | × | × | None. *See infra* ¶ 201 (describing absence of evidence concerning alleged disparagement). |

**REDACTED PUBLIC VERSION**

201.   APL subpoenaed none of the remaining three customers that it identified:  Triple B, GFS, and Home Depot.  Brass Decl. ¶¶ 4, 5, 9.  Of these, only Home Depot and Triple B are disclosed in APL's initial disclosures.  Ex. 430 (APL's Second Amended Initial Disclosures) at 3–4.  As noted above, Home Depot's relevant representative is deceased.  *See supra* ¶ 164.

202.   As to APL's allegation that Matson disparaged APL by telling customers that APL received unfair subsidies, APL in fact received tens of millions of dollars in MSP subsidies.  Ex. 5 (Langer Rpt.) ¶ 121.  Matson's long-running legal position in litigation concerning APL's MSP subsidies has been that APL's vessels have been ineligible for the subsidies and that APL's receipt of them was unlawful and unfair.  *See supra* ¶ 147.

203.   Matson receives tax incentives under programs such as Capital Construction Fund and others that allow Matson flexibility in terms of *when* it pays certain taxes, but those programs are distinct from and pale in value to the MSP subsidies APL receives.  *Compare* Ex. 28 (Cox Dep. Tr.) at 187:13–191:7 (explaining that participation in the Capital Construction Fund does not result in any tax reduction), *with* Ex. 5 (Langer Rpt.) ¶ 121 (███████████████████████████████████████████████████████
██████████████████████).

204.   As to APL's allegation that Matson disparaged APL by suggesting APL would leave Guam, APL also made repeated, public statements that ███████████████████████████
██████████████████████████████████████████████████████ Ex. 446 (APL010857525) at -7526; *see also* Ex. 447 (Supplemental Submission on Remedy, Declaration of Eric L. Mensing, *Matson v. Department of Transportation*, 1:18-cv-02751, ECF 43-1 (D.D.C.); Ex. 448 (Declaration of Nick Fafoutis, *Matson v. Department of Transportation*, 1:22-cv-01975, ECF 24-2 (D.D.C.)); Ex. 9 (Pangelinan Dep. Tr.) at 119:12–120:4; *supra* ¶ 35 (collecting additional statements by APL about the indispensability of MSP subsidies to APL's Guam service).

**REDACTED PUBLIC VERSION**

And, as noted above, APL's MSP subsidies have been imperiled in litigation since 2018. *See supra* ¶ 147.

205.    APL recognizes that disparagement is not always an effective sales tactic. Ex. 49 (Magnusson Dep. Tr.) at 93:18–94:6 (APL's COO advising against negative selling because it often "backfires"); Ex. 9 (Pangelinan Dep. Tr.) at 100:3–7 (APL's former sales director testifying that whether "negative selling is an effective sales tactic . . . depends on who you're talking to").

206.    APL's sales personnel in fact discussed these issues with customers affirmatively and persuaded them of their commitment to the Guam trade. Ex. 46 (Hermosa Dep. Tr.) at 135:12– 137:15. ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████. Ex. 46 (Hermosa Dep. Tr.) at 288:20– 289:9, 296:17–297:3; Ex. 9 (Pangelinan Dep. Tr.) at 110:3–8, 111:6–8; Ex. 45 (Theberge Dep. Tr.) at 95:9–17, 108:1–7, 321:5–322:12.

207.    Cost.U.Less, NAPA, Luen Fung, and MidPac explained in their declarations that they did business with APL, unaffected by any supposed disparagement (which they denied). Ex. 427 (MAT_GUAM_MIDPAC_00000011) ¶ 4; Ex. 426 (MAT_GUAM_LFE_00000019) ¶ 8; Ex. 429 (MAT_GUAM_NAPA_00000003) ¶ 5; Ex. 341 (MAT_GUAM_NORTHWEST_00000440) ¶ 8. Indeed, Cost.U.Less, one of the customers APL implicates, ████████████████████ ██████. Ex. 437 (APL012606729) at -6731 (███████████████████████████████ ██████████████████████████████████); *see also* Ex. 45 (Theberge Dep. Tr.) at 234:2–16 (acknowledging that the majority of Cost.U.Less's cargo shifted to APL); Ex. 391 (APL010353035) at -3035 ███████████████████████████████████████████.

208.    There is no evidence that Matson's supposed disparagement led to a market-wide

**REDACTED PUBLIC VERSION**

increase in price or reduction in output.  Ex. 75 (Langer Rebuttal Rpt.) ¶¶ 60–63.  The customers to whom Matson allegedly directed its disparagement in fact enjoyed lower prices during the relevant time period.  Ex. 75 (Langer Rebuttal Rpt.) ¶ 176 & Ex. R-13.

209.    Discovery did unearth evidence that APL disparaged Matson, however, ████



████.  *See*, *e.g.*, Ex. 449 (MAT_GUAM_TORRES_00000319) (executed social media advertising agreement between Charlie Hermosa and Troy Torres of Kandit, Inc.), Ex. 450 (HERMOSA_000083) at -0083 (██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████).

### E.    APL's Other Allegations

#### 1.    Alaska

210.    APL does not allege that Alaska is an independently relevant geographic market, or that Matson exercises monopoly power in such a market.  Am. Compl. ¶¶ 36–38; MTD Order 29.  Similarly, APL does not allege, or attempt to substantiate through its expert, that Matson monopolized the U.S. West Coast to Guam market through its actions in Alaska.  Ex. 354 (Warren-Boulton Dep. Tr.) at 232:7–10.

211.    APL complains about four commercial events in Alaska:    (1) the alleged termination by Matson of a Connecting Carrier Agreement between Matson and APL in Alaska; (2) the end of a Shop and Office Lease between Matson and APL in Kodiak, Alaska; (3) the end of a lease between Matson and APL in Kodiak, Alaska for a terminal facility at Womens' Bay in Kodiak, Alaska; and (4) the end of an informal shared tug charter arrangement between Matson and APL in Dutch Harbor, Alaska.  Ex. 392 (APL Fourth Supp. Interrog. Resp.) at 16–19.

**REDACTED PUBLIC VERSION**

212.   At the outset, APL's corporate representative witness testified that Matson's conduct in Alaska did not affect the Guam trade:

| APL's Corporate Representative Witness Testimony | |
|---|---|
| **Question** | **Answer** |
| ████████████████████ | ████████████████████ |
| ████████████████████ | ████████ |
| ████████████████████ | ████████ |
| ████████████████████ | ████████████ |
| ████████████████ | ████████ |
| "Did it alter your carrying capacity to Guam?" | "It did not, Ma'am." |
| "You sailed the same vessels on the GSX before and after that lease – shop and office lease were canceled. Correct?" | "That is correct, Ma'am." |
| "Is there any customer who altered its business with APL in Guam because Matson terminated the Pier Two shop and office lease in Alaska?" | "There was no – no customer, Ma'am." |
| "As a result of the change in APL's access to terminal facilities in Alaska, did APL alter the price it charged any customer in the Guam trade?" | "We did not, Ma'am." |
| "Did it cause APL to change the amount of capacity available on the GSX service to Guam?" | "It did not, Ma'am." |
| "Is there any customer that stopped doing business with APL in the Guam trade as a result of the change in terminal access in Alaska?" | "No, Ma'am." |

Ex. 15 (APL 30(b)(6) Dep. Tr.) at 322:20–326:6.

**REDACTED PUBLIC VERSION**

213.    APL's General Manager of Alaska from 1998–2021, Eugene Makarin, also testified

that ███████████████████████████████████████████████████

| **Eugene Makarin Testimony** | |
|---|---|
| **Question** | **Answer** |
| "We've talked a lot today about different actions that Matson took, vis-à-vis, APL and Alaska in this, you know, late 2017 and early 2018 time period . . . . In your view, did any of those actions taken by Matson impact APL's ability to serve markets outside of Alaska?" | "I'm not aware of any.  If – I'm not aware of – of any outside markets being affected.  My focus was Alaska." |
| ████████████████████████████ | ████████████████████████ |

Ex. 451 (Makarin Dep. Tr.) at 159:12–23; 204:1–25.

214.    APL's expert likewise testified that ███████████████████████

██████████████████████████████████████████. Ex. 354 (Warren-Boulton

Dep. Tr.) at 45:5–25, 217:20–24, 263:10–265:1.

215.    And APL has failed to identify any contemporaneous business records or

documents concerning the challenged conduct in Alaska that bespeak an effect on Guam. *See* Ex.

451 (Makarin Dep. Tr.) at 181:23–182:5, 214:18–219:14 (███████████████████████

██████████████████████████████████████████).

216.    As of November 2021, CMA CGM continued to enjoy a 70% market share in

Alaska.  Ex. 451 (Makarin Dep. Tr.) at 24:16–22.

REDACTED PUBLIC VERSION

(a)     **The Connecting Carrier Agreement**

217.    APL began operating in Alaska no later than the 1980s.  Ex. 451 (Makarin Dep. Tr.) at 22:2–4. ████████████████████████████████████████████. Ex. 13 (Warren-Boulton Rpt.) ¶ 178; *see also* Ex. 354 (Warren-Boulton Dep. Tr.) at 264:20–264:19.

218.    Prior to Matson's 2015 entry into the Alaska trade, APL was party to a Connecting Carrier Agreement ("CCA") with Horizon Lines.  Ex. 451 (Makarin Dep. Tr.) at 26:18–22.  A CCA is a contract between a container shipping provider, such as APL, and a barge carrier for the purpose of moving cargo between agreed-upon locations at an agreed-upon rate.  Ex. 451 (Makarin Dep. Tr.) at 26:12–22. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *See* Ex. 13 (Warren-Boulton Rpt.) ¶¶ 180–81.

219.    The APL-Horizon CCA ran from January 1, 2014 through December 31, 2015.  *See* Ex. 451 (Makarin Dep. Tr.) at 26:18–28:5; *see also* Ex. 452 (MAT_GUAM_002456062) at -6065.

220.    Matson began service in the Alaska trade in 2015 when it acquired Horizon Lines' Alaska business and assets.  *See* Ex. 13 (Warren-Boulton Rpt.) ¶ 180; Ex. 28 (Cox Dep. Tr.) at 22:5–23:19.

221.    From January 1, 2016 to December 31, 2016, APL and Matson operated under an extension of the CCA, pursuant to which Matson offered APL weekly service between Kodiak, Alaska and Dutch Harbor, Alaska.  *See* Ex. 451 (Makarin Dep. Tr.) at 29:19–30:18; Ex. 13 (Warren-Boulton Rpt.) ¶ 183.

222.    The APL-Matson CCA expired on December 31, 2016 and did not have an automatic renewal provision.  Ex. 451 (Makarin Dep. Tr.) at 30:16–31:25.  Thus, the CCA could be renewed or extended beyond December 31, 2016, only if APL and Matson reached a new agreement to do so.  *See* Ex. 451 (Makarin Dep. Tr.) at 30:16–31:25.

**REDACTED PUBLIC VERSION**

223.    In 2017, APL and Matson negotiated several short-term extensions to the CCA.  Ex. 451 (Makarin Dep. Tr.) at 31:22–33:6; 38:18–20.

224.    APL and Matson both understood that none of the short-term extensions automatically renewed.  Ex. 451 (Makarin Dep. Tr.) at 41:17–20.

225.    After multiple temporary short-term extensions in 2017, APL and Matson ultimately did not renew the CCA due to APL's preference at the time not to commit to carrying a certain minimum percentage of its freight with Matson.  Ex. 453 (MAT_GUAM_002711573) at -1574–77; Ex. 454 (MAT_GUAM_000630196) at -0198; Ex. 33 (Lauer Dep. Tr.) at 95:10–97:17; Ex. 451 (Makarin Dep. Tr.) at 36:20–37:7; Ex. 13 (Warren-Boulton Rpt.) ¶ 184.

226.    
. Ex. 13 (Warren-Boulton Rpt.) ¶ 188.

227.    

. Ex. 451 (Makarin Dep. Tr.) at 90:23–91:10.

228.    In 2017, APL enjoyed a           share of cargo coming in and out of Kodiak, Alaska. Ex. 451 (Makarin Dep. Tr.) at 91:6–10.

229.    

. Ex. 451 (Makarin Dep. Tr.) at 91:24–92:7.

230.    . Ex. 451 (Makarin Dep. Tr.) at 93:21–99:17.

231.    Matson's decision not to renew a long-term CCA with APL without a minimum volume commitment from APL was in part due to the fact that adopting a new connecting carrier

REDACTED PUBLIC VERSION

agreement would have inhibited Matson's intent to begin an international service from Alaska in competition with APL. Ex. 33 (Lauer Dep. Tr.) at 146:9–147:10. Matson launched its international service in Alaska in 2020. *Id.* at 147:7–9; Ex. 28 (Cox Dep. Tr.) at 54:23–55:20 (Matson did not renew CCA in part because it was planning to launch—and did launch—an international service).

### (b)   LASH Dock

232.   The LASH dock at Womens' Bay terminal is a flat, waterfront docking facility in Kodiak, Alaska. Ex. 28 (Cox Dep. Tr.) at 85:1–88:24. Beginning August 27, 2015, APL subleased a portion of the LASH dock at the Womens' Bay terminal in Kodiak from Samson. *Id.* 101:15–102:13.

233.   The purpose of APL's sublease from Samson was to allow APL to deliver its loads to Samson's barge and operate out of the LASH dock without violating the jurisdictional boundaries and union rules of MEBA and ILWU. Ex. 451 (Makarin Dep. Tr.) at 102:14–103:9; *see* Ex. 455 (Baggen Dep. Tr.) at 21:6–22:13, 29:10–30:21.

234.   Specifically, Samson's workers were unionized under MEBA, and APL's workers under ILWU. Ex. 451 (Makarin Dep. Tr.) at 102:14–103:9; *see* Ex. 455 (Baggen Dep. Tr.) at 21:6–22:13, 29:10–30:21. So that APL workers did not infringe on areas operated by workers protected by a different union, APL workers would deliver APL loads to a "DMZ zone," from which Samson would pick them up and load them. Ex. 451 (Makarin Dep. Tr.) at 102:14–103:9; *see also* Ex. 455 (Baggen Dep. Tr.) at 21:6–22:13, 29:10–30:21. In turn, Samson would deliver APL empties when they arrived to the "DMZ zone," and APL workers would pick them up and "bound them on the chassis and bring them back." Ex. 451 (Makarin Dep. Tr.) at 102:14–103:9; *see also* Ex. 455 (Baggen Dep. Tr.) at 21:6–22:13, 29:10–30:21.

REDACTED PUBLIC VERSION

235.    APL's sublease from Samson was subject to the lease between Samson and the LASH terminal owner.  Ex. 455 (Baggen Dep. Tr.) at 104:1–105:19.

236.    Matson acquired ownership of the LASH terminal in October 2016.  Ex. 456 (MAT_GUAM_003886001) at -6011, -6016.

237.    When Matson acquired ownership of the LASH terminal, it changed Samson's lease to a month-to-month tenancy.  Ex. 457 (MAT_GUAM_004336148) at -6148–50; *see also* Ex. 451 (Makarin Dep. Tr.) at 106:13–24.

238.    Samson was not opposed to the month-to-month tenancy.  Ex. 455 (Baggen Dep. Tr.) at 34:11–21, 39:3–13.  At the time, Samson was in the process of setting up a Southeast Alaska division, which "was going very, very badly"—"badly enough that [Samson] might be in business, [it] might not."  Ex. 455 (Baggen Dep. Tr.) at 34:11–21.  So, the prospect of switching from its long-term lease to a month-to-month tenancy was not objectionable to Samson.  Ex. 455 (Baggen Dep. Tr.) at 34:11–21, 39:3–13.

239.    Effective April 1, 2018, APL vacated its sublease of the LASH terminal at Womens' Bay from Samson.  Ex. 451 (Makarin Dep. Tr.) at 110:23–111:2.  Nobody at Matson or Samson ever told APL that Matson's request that APL end its sublease of the LASH dock was because of APL's operations in Guam.  *Id.* 118:3–120:8.

240.    By August 1, 2018, APL executed a five-year terminal operator agreement with the city of Kodiak to access a different part of Pier II to work barges.  Ex. 451 (Makarin Dep. Tr.) at 116:6–117:25.

### (c)    Shop & Office Lease

241.    Beginning July 1, 2017, APL subleased a shop and office space at Pier II from Matson.  Ex. 451 (Makarin Dep. Tr.) at 120:12–121:21.

**REDACTED PUBLIC VERSION**

242.     APL's shop and office sublease at Pier II expired on June 30, 2018 and did not contain an automatic renewal provision.  Ex. 451 (Makarin Dep. Tr.) at 121:18–122:4.  Matson needed more space and used this space for other operations.  Ex. 11 (Matson 30(b)(6) Dep. Tr.) at 193:12–194:10.

243.     Matson did not terminate the shop and office sublease early, nor did it ever ask APL to vacate the premises.  Ex. 451 (Makarin Dep. Tr.) at 129:2–12; 130:8–12.



244.     ████████████████████████████████████████

██████████████████████████████████████████████████

███████. Ex. 451 (Makarin Dep. Tr.) at 127:3–16; 128:4–129:1; 136:12–22.

245.     ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████. Ex. 451 (Makarin Dep. Tr.) at 128:2–22. ███████████

██████████████████████████. *Id.* 135:19–25.

246.     ████████████████████████████████████████

███████████████████████████████████████. Ex. 451 (Makarin Dep. Tr.) at 124:21–25.

**(d)     Dutch Harbor Tug Arrangement**

247.     During the 1990s, APL entered an informal shared tug charter arrangement with Sealand in Dutch Harbor.  Ex. 451 (Makarin Dep. Tr.) at 137:7–18, 138:5–7.  When Matson entered the Alaska trade, it honored that informal arrangement.  *Id.*

248.     Pursuant to that informal arrangement, APL allowed Matson to use its tug when available, and Matson would similarly allow APL to use its tug when available.  *See* Ex. 28 (Cox Dep. Tr.) at 72:10–23.

**REDACTED PUBLIC VERSION**

249.     The purpose of the shared tug charter arrangement was to ensure that APL and Matson would have a second tug available for berthing and unberthing from their respective piers when, for example, there was bad weather or when a large vessel needed the assist of a second tug. Ex. 451 (Makarin Dep. Tr.) at 137:13–18; Ex. 28 (Cox Dep. Tr.) at 72:10–23.

250.     The APL-Matson informal shared tug charter arrangement was never memorialized into a formal contract.  Ex. 451 (Makarin Dep. Tr.) at 137:16–18.

251.     If APL and Matson required use of the shared tug at the same time, the tug would prioritize APL.  Ex. 451 (Makarin Dep. Tr.) at 138:5–10.

252.     There were occasions when APL refused Matson's request to use the tug, and there were occasions when the tug was otherwise unavailable to Matson.  *See* Ex. 451 (Makarin Dep. Tr.) at 139:10–140:13.

253.     When the tug was unavailable to Matson, it caused significant safety issues for vessels entering Dutch Harbor.  Ex. 28 (Cox Dep. Tr.) at 69:6–78:9; *see id.* at 74:25–75:7 (describing shared tug as an "intolerable safety condition").  For example, on at least one occasion, the shared tug was unavailable for Matson when Matson needed to dock an NYK ship.  *Id.* at 70:4–15.

254.     Matson's concerns about those kinds of safety risks led it to lease its own second tug in March of 2017.  Ex. 28 (Cox Dep. Tr.) at 75:13–76:20; 79:15–25.  Around the same time, Matson informed APL that it would no longer be co-leasing the shared tug or honoring the informal shared tug arrangement.  *See* Ex. 451 (Makarin Dep. Tr.) at 141:25–142:6.

### 2.     Slot Charter Proposals

255.     Slot charters are common arrangements in the shipping industry whereby one shipping company purchases space (or slots) on another carrier's vessel.  *See* Ex. 458 (MAT_GUAM_003387196) at -7197–98 (slot charter proposal); Ex. 71 (Saadé Dep. Tr.) at 14:23–

**REDACTED PUBLIC VERSION**

15:6; Ex. 73 (Fafoutis Dep. Tr.) at 278:1–9.  CMA CGM uses slot charters so regularly ▮

██████████████████████████████████████████████████████████████████

███████████████████████. Ex. 71 (Saadé Dep. Tr.) at 14:23–15:6; *see also*, *e.g.*, Ex. 459

(APL003841942) (█████████████████████████████).

     256.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████. Ex. 460 (MAT_GUAM_CCA_00000226) at -0233.

CMA CGM's chairman testified that slot charter agreements are ██████████  because ███████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████ Ex. 71 (Saadé Dep. Tr.) at 27:4–11.  In addition, slot charters ████████

████████████ allowing them to ██████████████████████████████████

████████████████ Ex. 73 (Fafoutis Dep. Tr.) at 283:21–284:20.

     257.    On March 3, 2017, Mr. Saadé, Chairman of CMA CGM, emailed Mr. Cox, CEO

of Matson, and offered to meet in San Francisco while he was in town for a meeting; they were

unable to find a mutually agreeable time to meet.  Ex. 461 (Decl. of M. Cox) ¶ 4, Dkt. 52-15.

     258.    Following a subsequent telephone call between Mr. Cox and Mr. Saadé, Matson,

through outside antitrust counsel, sent on April 3, 2017 its first written proposal for a slot charter

agreement for the Guam trade.   Ex. 462 (MAT_GUAM_0013818) at -3818; Ex. 463

(MAT_GUAM_0013819) at -3819–20; Ex. 71 (Saadé Dep. Tr.) at 25:5–9.

     259.    The proposal included a "90-day term subject to renewal at any time during the

term" and "[c]ancellation on 30 days' notice," "90 weekly slots[] from USWC to Guam subject

to" a "[m]aximum of 60 slots ex Long Beach," a "[m]aximum of 30 slots ex Oakland," and a

"[m]aximum of 15 reefer slots (either USWC origin)," as well as terms for use of equipment, bookings, and rate terms. Ex. 463 (MAT_GUAM_0013819) at -3819. Matson did not propose any minimum number of slots that APL would be required to use. *Id.* at -3819–20; Ex. 71 (Saadé Dep. Tr.) at 25:10–22. APL was not required to pay for slots it did not use. Ex. 463 (MAT_GUAM_0013819) at -3820.

260.    It was "absolutely not part of [Matson's] understanding" in making this proposal "that the APL vessels would not carry the US cargo from the West Coast to Guam." Ex. 29 (Cox Dep. Tr.) at 132:15–133:11. Matson's long-held understanding was that the Guam trade "wants and expects to have two independent carriers serving the market." *Id.* at 144:15–24.

261.    The proposal also did not mention any provision obligating APL to utilize a certain volume of slot or otherwise pay a fee (i.e., a "take-or-pay" provision), said ███████████████ ████████████████████████████████████ and did ████████████████████████████████ Ex. 71 (Saadé Dep. Tr.) at 26:2–15.

262.    Matson's proposal was reviewed and considered by APL executives, including ███ ███████████████████████████████████. Ex. 464 (APL013676108) at -6110–14.

263.    APL "never sent a counteroffer" to Matson's April 2017 proposal. Ex. 86 (Aldridge Dep. Tr.) at 58:7–19.

264.    On June 5, 2018, Mr. Aldridge, APL's then-President, emailed Mr. Cox and asked whether he was ██████████████████████████████████ Ex. 465 (APL006402900) at -2900.

**REDACTED PUBLIC VERSION**

265.    Five days later, on June 10, 2018, Mr. Aldridge internally ███████████████

███████████████████████████████████ Ex. 86 (Aldridge Dep. Tr.) at 67:3–5; Ex.

466 (APL009300481) at -0482.

266.    On June 20, 2018, Mr. Aldridge (APL's then-President) and Jesper Stenback

(APL's SVP for the Transpacific trade) had dinner with Mr. Cox (Matson's CEO) and Mr. Lauer

(Matson's COO).  Ex. 467 (APL009677441) at -7441.  At the dinner, ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ and ███████████████████████████████ *Id.*  The

proposal included a term of ██████████████████████████ and ██████████████

█████████████ Ex. 468 (APL011293192) at -3192.

267.    On June 26, 2018, ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████ Ex. 468 (APL011293192) at -3192.

268.    A cost analysis was prepared at Mr. Aldridge's or Mr. Sartini's request.  Ex. 86

(Aldridge Dep. Tr.) at 76:14–19; Ex. 469 (APL011293196) at -3196.

269.    Mr. Sartini told Mr. Aldridge that ███████████████████████████

████████████████████ Ex. 470 (APL010468958) at -8958.

270.    APL never made a counterproposal in writing and declined Matson's proposal.  Ex.

86 (Aldridge Dep. Tr.) at 76:12–13, 77:22–78:5.

**REDACTED PUBLIC VERSION**

271.    APL not only thoroughly considered Matson's offers but also continued to invite

them: ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████.

Ex. 471 (APL013583633) at -3635–36.

272.    On October 8, 2018, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████    Ex. 472 (APL010467166) at -7167.

273.    On October 24, 2018, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████.  Ex. 473 (APL010466843) at -6844–45.

274.    ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████    Ex.  473

(APL010466843) at -6843–44.

275.    On October 31, 2018, Mr. Cox, Mr. Lauer, Mr. Aldridge, and Mr. Saadé met for

lunch in New York and discussed a possible vessel sharing agreement for the Guam trade.  Ex.

461 (Decl. of M. Cox) ¶¶ 12–13, Dkt. 52-15; Ex. 71 (Saadé Dep. Tr.) at 27:12–28:10.

276.    While Mr. Aldridge claims that Mr. Cox said during this meeting that "it all begins

and ends with Guam," including "cooperation in Alaska and other places" (Ex. 86 (Aldridge Dep.

Tr.) at 82:24–83:8), nobody else at the meeting recalls that statement, and Matson denies making

it.  Ex. 28 (Cox Dep. Tr.) at 100:17–101:1; Ex. 33 (Lauer Dep. Tr.) at 172:11–20; ██████████

████████████████████.  In any event, Mr. Saadé testified ████████████████████████

████████████████████████████████████████████████████████████████    Ex. 71

**REDACTED PUBLIC VERSION**

(Saadé Dep. Tr.) at 29:18–22; *see also* Ex. 461 (Decl. of M. Cox) ¶ 13, Dkt. 52-15.  Nor did Matson make any proposal linking an agreement in Guam to any other trade.  *See* Ex. 463 (MAT_GUAM_0013819) at -3819–20; Ex. 468 (APL011293192) at -3192; Ex. 473 (APL010466843) at -6844–45; Ex. 474 (APL013612177) at -2178–79.

277.    Mr. Aldridge thought Matson's proposals were "take or pay"—meaning APL would have to use the slots or pay a penalty—



.  Ex. 86 (Aldridge Dep. Tr.) at 108:1–21, 140:23–141:16.

278.    Mr. Lauer testified that Matson believed its offers gave APL "a lot of potential additional room to grow." Ex. 33 (Lauer Dep. Tr.) at 165:4–14; *see also id.* at 161:19–162:12 (the proposed slots "represented some fairly significant amount . . . more than [Matson] thought [APL was] carrying," which would provide "the ability for them to grow their presence in the market").

279.    On November 13, 2018, Mr. Aldridge informed Mr. Mensing that discussions with Matson were "dead," and he then let Mr. Cox and Mr. Lauer know.  Ex. 86 (Aldridge Dep. Tr.) at 126:1–10; Ex. 475 (APL013462418) at -2418.

280.    On November 7, 2019,



.  Ex. 476 (APL013736311) at -6311.

*Id.*; *see also* Ex. 71 (Saadé Dep. Tr.) at 32:16–19.

281.    On November 14, 2019, Mr. Lauer sent Mr. Aldridge

.  Ex. 477 (APL010473857) at -3857; Ex. 474

**REDACTED PUBLIC VERSION**

(APL013612177) at -2178–79.  The proposal included a ███████████████████

███████████████████████████.  Ex. 474 (APL013612177) at -2178–79.

    282.   The proposal had ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████  Ex. 71 (Saadé Dep. Tr.) at 35:23–36:25.  Mr. Aldridge testified that the impression

that Matson's proposal sought to "remove [APL] iron from" Guam was only "in [his] head."  Ex.

86 (Aldridge Dep. Tr.) at 140:8–10.

    283.   On November 16, 2019, ████████████████████████████

████████████████████████████████████████████████████████████

█████████████████  Ex. 478 (APL013612169) at -2169–70.  Mr. Saadé asked for a call to discuss

Mr. Aldridge's recommendation on January 8, 2020.  Ex. 479 (APL013612162) at -2162; Ex. 86

(Aldridge Dep. Tr.) at 136:5–137:25.  On January 7, 2020, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.  Ex. 480 (APL013759830) at -9830; Ex. 87

(APL013759832) at -9832–45; Ex. 481 (APL013759846) at -9846; Ex. 86 (Aldridge Dep. Tr.) at

146:6–25.  On January 8, 2020, ██████████████████████████████████████

██████████████████████.  Ex. 482 (APL013611937) at -1937.

    284.   On January 10, 2020, Mr. Aldridge emailed Mr. Cox and rejected the proposal,

noting that APL "analyzed [Matson's] recent Guam proposal in great detail" and a "very thorough

due diligence was undertaken, followed by discussions at the highest level of our company."  Ex.

483 (MAT_GUAM_0013811) at -3812.

**REDACTED PUBLIC VERSION**

285.    Both APL's and Matson's economists agree that ██████████████████████
█████████████████████████████████. Ex. 354 (Warren-Boulton Dep.

Tr.) at 232:11–17; Ex. 75 (Langer Rebuttal Rpt.) ¶ 83.

### 3.    Other Untimely And Unalleged Complaints

286.    After the close of written discovery, some of APL's witnesses claimed at their

depositions that Matson engaged in misconduct at the ports in Guam and Oakland. *See, e.g.*, Ex.

15 (APL 30(b)(6) Dep. Tr.) at 121:12–122:12. This conduct allegedly occurred prior to the filing

of this lawsuit. *See* Ex. 45 (Theberge Dep. Tr.) at 250:23–255:25 (Oakland port allegations

allegedly occurred in early 2021); Ex. 46 (Hermosa Dep. Tr.) at 85:3–8 (Guam port allegations

were discovered in late 2020). Nonetheless, it is not pled in APL's Complaint or Amended

Complaint. *See generally* Compl. & Am. Compl.

287.    These witnesses admitted their assertions were hearsay. Ex. 9 (Pangelinan Dep.

Tr.) at 279:8–13 ("A. Did I personally ever witness? Q. Yeah. A. No. I just heard about it."); Ex.

45 (Theberge Dep. Tr.) at 253:1–255:5 (testifying that he heard of the alleged Oakland conduct

through others); Ex. 73 (Fafoutis Dep. Tr.) at 297:25–298:16 (█████████████████████

████████████████████████); Ex. 49 (Magnusson Dep. Tr.) at 86:25–87:9

(admitting to having no personal knowledge of the alleged conduct); Ex. 46 (Hermosa Dep. Tr.)

at 93:14–17 ("Q. And you saw Matson submit, personally, an erroneous NOA? A. I did not

physically see them. I was advised by the Port Authority.").

288.    APL did not mention these allegations in any interrogatory response served in this

case, nor did it disclose any employees of any port in its initial disclosures.

### 4.    No Evidence Implicates Matson Logistics

289.    In its Amended Complaint, APL did not attribute any conduct to Matson Logistics

specifically. Dkt. 33 at 34.

**REDACTED PUBLIC VERSION**

290.    The Court found it could be reasonably inferred from APL's Amended Complaint that Matson Logistics undertook, or was involved in, alleged threats and retaliatory acts implicating the ground-support portion of Matson's shipping business, including Matson's alleged retaliation "against a trucking company in Guam," punishment of a "warehouse and trucking company in Guam," coercion of "a parts distributor in Guam," prohibition on the "use of terminal, docks, and storage areas in Alaska in retaliation against APL," and termination of "a shop and pier lease in Alaska." Dkt. 33 at 34.

291.    APL did not depose any witness from Matson Logistics.  Brass Decl. ¶ 15.

292.    APL sought no document discovery concerning Matson Logistics' alleged provision of intermodal transportation, cargo origin, and related rates and terms.  Matson served an interrogatory on APL asking APL to "Identify and Describe all facts regarding any conduct by Matson Logistics, Inc. that You contend gives rise to a violation of the antitrust laws or otherwise relates to Your allegations."  Ex. 392 (Fourth Supp. Interrog. Resp.) at 50–51.

293.    In its Response and Supplemental Response, APL did not identify any facts regarding any conduct by Matson Logistics, Inc. that APL contended gives rise to a violation of the antitrust laws.  Ex. 392 (Fourth Supp. Interrog. Resp.) at 50–51.

294.    APL did not further supplement its interrogatory response to identify any facts regarding any conduct by Matson Logistics, Inc. that APL contended gives rise to a violation of the antitrust laws.  Brass Decl. ¶ 2.

295.    APL's expert ███████████████████████████████████████
████████████████████████████████████████████████████████. *See* Ex. 354 (Warren-Boulton Dep. Tr.) at 409:3–7 ███████████████████████████
████████████████████████████████████████████████████████

**REDACTED PUBLIC VERSION**

██████████ ; *id.* 409:20–25 ████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████ .

**V.      Even Aggregated, The Cargo Implicated By APL's Allegations Is Not Substantial**

296.    APL's economist ████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 75 (Langer Rebuttal Rpt.)

¶ 10.  However, aggregating all of the customers and market segments APL's economist identified

as potentially subject to foreclosure entails no more than ██████ of cargo in the alleged U.S. West

Coast to Guam market.  Ex. 75 (Langer Rebuttal Rpt.) ¶ 29.

297.    Only ██████ of the alleged U.S. West Coast to Guam market is implicated after

excluding customers who signed declarations disavowing APL's allegations.  Ex. 75 (Langer

Rebuttal Rpt.) ¶ 29.

<u>REDACTED PUBLIC VERSION</u>

**APPENDIX A**

**<u>Party Witnesses</u>**

| Name | Corporate Affiliation | Title (2015–Present) |
|---|---|---|
| **Current and Former Matson Employees** | | |
| Vic Angoco Jr. | Matson | Senior Vice President, Pacific (2015–2022); Senior Vice President, Alaska (2022–Present) |
| Matt Cox | Matson | Chairman and CEO (2015–Present) |
| Chris Dianora | Matson | Director Sales and Marketing, Pacific Northwest Region (2015–2022); Vice President, Pricing (2022–Present) |
| Tom Good | Matson (Retired) | Vice President, North American Domestic Sales (2015–2023) |
| Tim Kirchhoff | Matson | Director of Sales and Marketing, Southwest Region (2016–Present) |
| John Lauer | Matson | Senior Vice President, Ocean Services (2015–2017); Senior Vice President and Chief Commercial Officer (2017–2021); Executive Vice President and Chief Commercial Officer (2021–Present) |
| Tasi Peddicord | Matson (Former) | Manager, Sales and Customer Service (2016–2021) |
| Steve Rubin | Matson (Former) | Vice President, Pricing (2015–2020) |
| Phil Santos | Matson | Senior Sales Account Executive, Guam (2015–Present) |
| Bernie Valencia | Matson | General Manager, Guam and Micronesia (2015–2022); Vice President Sales, Hawaii (2022–Present) |
| **Current and Former APL and APL Affiliate Witnesses** | | |
| Ed Aldridge | APL & CMA CGM (Former) | Chief Operating Officer, APL (2016–2017); President, APL North America (2017–2022); President, CMA CGM North America (2020–2022) |
| Nick Fafoutis | APL & CMA CGM | Senior Vice President and Chief Commercial Officer, CMA CGM (2015–2021); Executive Vice President Government Trade, APL (2021–2023); Chief Commercial Officer, CMA CGM (2023–Present) |
| Charlie Hermosa | APL (Former) | General Manager, Guam (2016–2023) |
| Henrik Holm | CEVA Freight | Country Head of Ocean Freight, U.S. West (2018–Present) |
| Jerry Jameson | APL | Director, Projects and Military Household Goods (2016–Present) |
| Jessica Jellies | APL | HAZMAT Compliance and Container Management (2015–2018); Manager, Business Analysis and Marketing (2018–2023); Chief of Staff to the President and Chief Executive Officer (2023–Present) |

**REDACTED PUBLIC VERSION**

| Name | Corporate Affiliation | Title (2015–Present) |
|---|---|---|
| Lars Magnusson | APL | Senior Director, Government Trade (2015–2023); Chief Operating Officer (2023–Present) |
| Gene Makarin | APL (Former) | General Manager, Alaska (2015–2021) |
| Eric Mensing | APL & APL Maritime (Former) | Chairman and Chief Executive Officer, APL (2015–2021); President and Chief Executive Officer, APL Maritime (2015–2021) |
| Haydee Metzger | APL | Senior Account Manager, Guam (2017–Present) |
| Karl Pangelinan | APL (Former) | Director of Business and Market Development, Guam (2019–2023) |
| Rodolphe Saadé | CMA CGM | Chairman and Chief Executive Officer (2017–Present) |
| John Selleck | APL (Former) | Former General Manager, Guam (2015–2017); Director Strategic Development, Pacific (2017–2018) |
| Daniel Stefanik | APL | Pricing Manager, Guam (2015–Present) |
| Kevin Theberge | APL | Account Manager (2015–2020); Trade Director, Guam (2020–Present) |
| Chris Thomas | APL | Managing Director Customer Service (2015–2018); Senior Director, Sales and Trade (2018–Present) |

**Non-Party Witnesses**

| Name | Corporate Affiliation | Title |
|---|---|---|
| Gina Angoco | V. Angoco Trucking ("Angoco Trucking") | Operations Manager |
| Maria Lourdes Austria | Aduana Brokerage and International Freight Forwarding Services ("Aduana") | President |
| Joe Ayuyu Sr. | McDonald's of Guam and Saipan | Owner and Operator |
| George Baggen | Samson Tug & Barge ("Samson") | President |
| Genevieve González Batchelder | Toyota North America ("Toyota") | Procurement Logistics Manager |

**REDACTED PUBLIC VERSION**

| Name | Corporate Affiliation | Title |
|------|----------------------|-------|
| Cori Berking | DeWitt Guam | President |
| Michele Blackmore | CFR Rinkens ("CFR") | Director of Compliance and Carrier Contracts |
| Tony Bonaparte (Deceased 2021) | Home Depot | General Manager of West Coast Distribution |
| John Burrows | DeWitt Guam, DeWitt Move Worldwide, Approved Freight Forwarders, and Royal Hawaiian Movers ("DeWitt Companies") | Chief Executive Officer of DeWitt Guam and President of DeWitt Move Worldwide |
| Paje Butler | Dependable Hawaiian Express ("DHX") | General Manager |
| Darlene Cabrera | Saipan Shipping Company ("Saipan Shipping") | General Manager |
| John Calvo | MidPacific Distributors ("MidPac") | President and General Manager |
| Jonathan DeNight | Pepsi-Cola Bottling Company of Guam ("Pepsi Guam") | General Manager |
| Cindy Guevara | Luen Fung Enterprises ("Luen Fung") | Administration Manager |
| Alex Hammett | Atkins Kroll | Managing Director for the Southeast Asia and Pacific Region |
| Janet Harris | Ross Stores ("Ross") | Vice President, Transportation, Strategy and Support |
| James Honda | Guam Transport and Warehouse ("GTW") | President |
| Matthew LeClair | The North West Company d/b/a Cost.U.Less ("Cost.U.Less") | Director of Logistics and Distribution |

**REDACTED PUBLIC VERSION**

| Name | Corporate Affiliation | Title |
|---|---|---|
| Mark Negri Sr. | Macy's Corporate Services ("Macy's") | Director of Transportation |
| George Pasha IV | The Pasha Group ("Pasha") | President and Chief Executive Officer |
| Dustin Reiman | Fastenal | General Manager |
| Tom Shimizu | Ambros, Inc. ("Ambros") | General Manager |
| Craig Wade | BMI Automotive LLC d/b/a NAPA Auto Parts ("NAPA Auto Parts") | Chief Financial Officer |
| Joly Wu | Luen Fung Enterprises ("Luen Fung") | Chief Financial Officer |

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Civil Rule 5.3, I hereby certify that, on March 1, 2024, I caused to be served on Plaintiffs the foregoing Statement of Undisputed Material Fact via CM/ECF.

Dated:    March 1, 2024                    */s/ Rachel S. Brass*
                                           Rachel S. Brass, *pro hac vice*