**PUBLIC REDACTED VERSION**

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

AMERICAN PRESIDENT LINES, LLC,
APL MARITIME, LTD., APL MARINE
SERVICES, LTD.,

                        Plaintiffs,

      v.

MATSON NAVIGATION COMPANY,

Civil Action No. 21-2040
Judge: Hon. Christopher R. Cooper

**\*PUBLIC\* REDACTED VERSION
UNDER PROTECTIVE ORDER**

**PLAINTIFFS' MEMORANDUM**

**IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

**AND**

**IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT**

### **TABLE OF CONTENTS**

PRELIMINARY STATEMENT AND FACTUAL BACKGROUND ........................................... 1

CLAIMS AND LEGAL STANDARDS .................................................................................. 3

APL'S OPPOSITION TO SUMMARY JUDGMENT .............................................................. 3

I.      THE RELEVANT ANTITRUST MARKETS ARE CONTAINER CARGO SHIPPING
        SERVICES IN U.S. /GUAM AND U.S./HAWAII ....................................................... 3

        A.      Matson Raised No Material Issue on Relevant Product Market ............................ 4

        B.      U.S./Guam and U.S./Hawaii are Geographic Markets or It is a Factual Dispute ... 4

                1.      Business conduct admits the geographic markets ...................................... 4

                2.      Testimony further confirms the markets ..................................................... 6

                3.      Government regulators treat U.S./Guam and U.S./Hawaii as markets ....... 7

                4.      Expert analysis also supports the markets .................................................. 8

                5.      The markets are consistent with transportation cases .............................. 11

        C.      Conclusory Assertions Fail to Eliminate Geographic Market Issues .................. 11

II.     MATSON'S POWER IS SHOWN BY THE EVIDENCE AND ITS CONCLUSORY
        ASSERTIONS ONLY MAKE JURY ISSUES .............................................................. 14

        A.      Matson has Ability to Lessen or Destroy Competition ........................................ 14

                1.      Matson's 70-80% of U.S./Guam market shows "dangerous probability" 14

                2.      Matson's market share and power is protected by entry barriers ............. 15

                3.      Matson forfeited "dangerous probability" arguments .............................. 17

        B.      There is Both Direct and Indirect Evidence of Matson's Monopoly Power ......... 17

                1.      Direct evidence: Matson controls prices ................................................... 17

                2.      Indirect evidence: Matson has dominant share protected by barriers ....... 18

                3.      Conclusory assertions do not eliminate issues on Matson's power .......... 21

III.    MATSON'S PREDATORY AND EXCLUSIONARY CAMPAIGN ............................ 23

        A.      Summary of Matson's Predatory and Exclusionary Conduct ............................... 23

B.    Evidence of Matson's Predatory and Exclusionary Conduct is Sufficient........... 34

C.    Matson's Acts, Considered Separately, Suffice and It Argues Jury Issues ......... 36

1.    Retaliating Against Customers and Suppliers............................................. 38

2.    Threatening Customers and Suppliers ....................................................... 40

3.    Retaliating in Alaska for APL Competing in Guam................................. 43

4.    Pursuing Slot Proposals to Lessen Guam Competition ........................... 44

5.    Exploiting Hawaii Market and Bundled Market Share............................ 46

6.    Deploying Restrictive Agreements ........................................................... 48

IV.    MATSON'S PREDATORY CONDUCT SHOWS ITS INTENT TO MONOPOLIZE .. 51

V.    BOTH COMPETITION AND APL HAVE BEEN HARMED BY MATSON ............... 52

A.    There is Sufficient Evidence of Harm to Competition ......................................... 52

B.    There is also Sufficient Evidence of Causal Antitrust Injury .............................. 54

C.    APL Can Estimate Damages Reasonable for the Circumstances ......................... 57

VI.    MATSON LOGISTICS ..................................................................................................... 59

APL'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT .................................... 59

ADDITIONAL FACTUAL BACKGOUND....................................................................................... 60

VII.    APL MAY RECOVER ALL ANTITRUST DAMAGES CAUSALLY CONNECTED
TO MATSON'S ANTICOMPETITIVE CONDUCT ...................................................... 64

A.    Matson's Conduct in Alaska Harmed APL ......................................................... 64

B.    Matson's Conduct in Alaska is Connected to Its Anticompetitive Efforts........... 65

C.    The Clayton Act Allows APL to Recover Damages as a Result of Matson's
Alaska Conduct.................................................................................................... 67

CONCLUSION.................................................................................................................................. 69

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*,
    342 F. Supp. 3d 126 (D.D.C. 2018) ........................................................................... 46

*3M v. Appleton Papers, Inc*.,
    35 F. Supp. 2d 1138 (D. Minn. 1999) ....................................................................... 35

*Alexander v. Nat'l Farmers Org.*,
    687 F.2d 1173 (8th Cir. 1982) ........................................................................... 14, 42

*Anderson v. Liberty Lobby, Inc*.,
    477 U.S. 242 (1986) ............................................................................... 3, 39, 51

*APL v. Matson, Inc*.,
    633 F. Supp. 3d 209 (D.D.C. 2022) ............................................................ 15, 47, 52

*Am. Tobacco Co. v. United States*,
    328 U.S. 781 (1946) ...................................................................................... 22, 36

*Ameral v. Connell*,
    102 F.3d 1494 (9th Cir. 1996) .............................................................................. 53

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co*.,
    917 F.2d 1413 (6th Cir. 1990) .............................................................................. 15

*Aspen Highlands v. Aspen Skiing Co.*,
    472 U.S. 585 (1985) ...................................................................................... 39, 51

*Berkey Photo, Inc. v. Eastman Kodak Co*.,
    603 F. 2d 263, 275 (2nd Cir. 1979) ....................................................................... 46

*Bigelow v. RKO Radio Pictures, Inc*.,
    327 U.S. 251 (1946) ............................................................................................ 57

*Bonjorno v. Kaiser Alum. & Co. Corp*.,
    752 F.2d 802 (3d Cir. 1984) ........................................................................ 34, 67, 68

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ................................................................................... 4, 6, 10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*.,
    429 U.S. 477, 489 n.14 (1977) .............................................................................. 52

*Byars v. Bluff City News Co*.,

609 F.2d 843 (6th Cir. 1979) ........................................................................ 18

*Callahan v. A.E.V., Inc.*,
   182 F.3d 237 (3d Cir. 1999) ...................................................................... 58

*Caribbean Broad. Sys. v. Cable & Wireless PLC*,
   148 F.3d 1080, 1087 (D.C. Cir. 1998) ...................................................... 40

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................ 3, 40

*Chase Mfg., Inc. v. Johns Manville Corp.*,
   84 F.4th 1157 (10th Cir. 2023) ............................................................ 41, 43

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ................................................................... 34, 39, 40

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
   290 F.3d 768 (6th Cir. 2002) ............................................................. 35, 36

*Danny Kresky Enter. Corp. v. Magid*,
   716 F.2d 206 (3d Cir. 1983) ..................................................................... 57

*Dolphin Tours v. Pac. Creative Serv.*,
   773 F.2d 1506 (9th Cir. 1985) .................................................................. 67

*Duty Free Ams., Inc. v. Estee Lauder Cos.*,
   797 F.3d 1248, 1268 (11th Cir. 2015) ...................................................... 42

*E. I. du Pont de Nemours & Co., v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) .............................................................. 12, 52

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) .................................................................................. 18

*FTC v. Cardinal Health, Inc.*,
   12 F. Supp. 2d 34 (D.D.C. 1998) ....................................................... *passim*

*FTC v. Coca-Cola Co.*,
   641 F. Supp. 1128 (D.D.C. 1986) ............................................................... 6

*FTC v. Staples*,
   970 F. Supp. 1066 (D.D.C. 1997) ......................................................... 4, 8

*FTC v. Swedish Match*,
   131 F. Supp. 151 (D.D.C. 2000) ........................................................ 11, 13

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015) ................................................................... *passim*

*FTC v. Tronox, Ltd.*,
    332 F. Supp. 2d 187 (D.D.C. 2018) ....................................................................... 5

*Geneva Pharms. Tech. Corp. v. Barr Labs, Inc.*,
    386 F.3d 485 ......................................................................................................... 22

*Gov't of Guam v. Sea-Land Serv.*,
    No. WCC-101 (STB Feb. 1, 2007) ........................................................................ 8

*Greene v. Gen. Foods Corp.*,
    517 F.2d 635 (5th Cir. 1975) ............................................................................... 68

*Greyhound Computer v. IBM*,
    559 F.2d 488 (9th Cir. 1977) ............................................................................... 37

*Hayden Publ'g Co. v. Cox Broad. Corp.*,
    730 F.2d 64 (2d Cir. 1984) .................................................................................. 20

*High Fructose Corn Syrup (HFCS) Antitrust Litig.*,
    295 F.3d 651, 655-56 (7th Cir. 2002) ................................................................. 56

*In re EpiPen Marketing, Sales Practices & Antitrust Litig.*,
    44 F. 4th 959 (10th Cir. 2022) ........................................................................... 38

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ................................................................ 16, 19, 68

*In re Cardizem CD Antitrust Litig.*,
    332 F.3d 896 (6th Cir. 2003) ............................................................................... 53

*In re Rail Freight Fuel Surcharge Antitrust Litig*,
    934 F.3d 619 (D.C. Cir. 2019) ............................................................................ 56

*In re Se. Milk Antitrust Litig.*,
    739 F.3d 262 (6th Cir. 2014) ......................................................................... 52, 55

*In re Se. Milk Antitrust Litig.*,
    801 F. Supp. 2d 705 (E.D. Tenn. 2011) ........................................................... 8, 12

*Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*,
    623 F. 2d 1255 (8th Cir.1980) ............................................................................ 36

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ......................................................................................... 18

*Lafayette Steel Co. v. Nat'l Steel Corp.*,
    87 F.R.D. 612 (E.D. Mich. 1980) ................................................................ 68

*Lee-Moore Oil Co. v. Union Oil Co.*,
    599 F.2d 1299 (4th Cir. 1979) ..................................................................... 54

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
    762 F.3d 1114 (10th Cir 2014) .................................................................... 52

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ........................................................................ 34

*Litton Sys., Inc. v. AT & T Co.*,
    700 F.2d 785 (2d Cir. 1983) ........................................................................ 59

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone*,
    275 F.3d 762 (9th Cir. 2001) ...................................................................... 11

*M & M Med. Supplies & Servs. v. Pleasant Valley Hosp.*,
    981 F.2d 160 (4th Cir. 1992) ............................................................... *passim*

*Malcolm v. Marathon Oil Co.*,
    642 F. 2d 845 (5th Cir. 1981) ............................................................... 54, 55

*Matson Nav. Co.*,
    28 F.M.C. 446 (FMC, June 6, 1986) ............................................................ 8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...................................................................................... 3

*Meijer, Inc. v. Barr Pharms., Inc.*,
    572 F. Supp. 2d 38 (D.D.C. 2008) ............................................................. 14

*Multiflex, Inc. v. Samuel Moore & Co.*,
    709 F.2d 980 (5th Cir. 1983) ...................................................................... 46

*Multistate Legal Studies v. Harcourt Brace Pub.*,
    63 F.3d 1540 (10th Cir. 1995) .................................................................... 35

*Nat'l Farmers Org., Inc. v. Assoc. Milk Prods., Inc.*,
    850 F.2d 1286 (8th Cir. 1988) .................................................................... 34

*Neumann v. Reinforced Earth Co.*,
  786 F.2d 424 (D.C. Cir. 1986) ................................................................. *passim*

*Ningde Amperex Tech. Ltd. v. Zhuhai Cosmx Battery Co., Ltd.*,
  2023 WL 4670490, at *4 (E.D. Tex. July 20, 2023) ................................. 45

*Novak v. United States*,
  795 F.3d 1012 (9th Cir. 2015) ................................................................. 15

*N.Y. v. Meta Platforms*,
  66 F.4th 288 (D.C. Cir. 2023) ................................................................. 38

*NYME v. Intercont'l Exch. Inc.*,
  323 F. Supp. 2d 559 (S.D.N.Y. 2004) ..................................................... 46

*OEM Glass Network Inc. v. Mygrant Glass Co.*,
  2023 WL 2563689 (E.D.N.Y. Mar. 17, 2023) ........................................ 69

*Optronic Techs. v. Ningbo Sunny Elec.*,
  20 F.4th 466 (9th Cir. 2021) ................................................................... 19

*Photovest Corp. v. Fotomat Corp.*,
  606 F. 2d 704 (7th Cir. 1979) ................................................................. 37

*Reazin v. Blue Cross & Blue Shield of Kan.*,
  899 F.2d 951 (10th Cir. 1990) ................................................................. 20

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ................................................................................ 53

*Rivera-Muniz v. Horizon Lines*,
  737 F. Supp. 2d 57 (D.P.R. 2010) .......................................................... 11

*Rossi v. Standard Roofing, Inc.*,
  156 F.3d 452 (1998) ................................................................................ 58

*S. Pac. Commc'ns Co. v. AT&T Co.*,
  556 F. Supp. 825 (D.C.C. 1982) ............................................................ 58

*SC Innovations, Inc. v. Uber Techs., Inc.*,
  2021 WL 2302728, at *1, (N.D. Cal. May 11, 2021) ............................ 69

*Schine Chain Theatres v. United States*,
  334 U.S. 110 (1948) ..................................................................... 36, 40, 42

*Sea-Land Serv., Inc. v. Atl. Pac. Int'l, Inc.*,
   61 F. Supp. 2d 1102 (D. Haw. 1999) .................................................................. 11

*SmithKline Corp. v. Eli Lilly & Co.*,
   575 F.2d 1056 (3d Cir. 1978)........................................................................... 46

*Southern Pac. Comm'ns v. AT&T*,
   740 F.2d 980 (D.C. Cir. 1984)..................................................................... 18, 58

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993)...................................................................................... 3, 14

*Spirit Airlines v. Nw. Airlines*,
   431 F.3d 917 (6th Cir. 2006) ...................................................................... 11, 13

*Swift & Co. v. United States*,
   196 U.S. 375 (1904)........................................................................................... 45

*Tasty Baking Co. v. Ralston-Purina, Inc.*,
   653 F. Supp. 1250, 1271 (E.D. Pa. 1987) ........................................................ 45

*Tele Atlas N.V. v. NAVTEQ Corp.*,
   2008 WL 4809441 (N.D. Cal. Oct. 28, 2008)................................................... 20

*Texaco Inc. v. Hasbrouck*,
   496 U.S. 543 (1990)........................................................................................... 57

*U.S. Football League v. NFL*,
   842 F.2d 1335 (2d Cir. 1988).................................................................... 44, 45

*United Mine Workers of Am. v. Pennington*,
   381 U.S. 657 (1965)........................................................................................... 52

*United States v. Am. Airlines, Inc.*,
   743 F.2d 1114 (5th Cir. 1984) ......................................................................... 45

*United States v. Conn. Nat'l Bank*,
   418 U.S. 656 (1974)............................................................................................. 4

*United States v. Dentsply Int'l*,
   399 F.3d 181 (3d Cir. 2005)...................................................................... *passim*

*United States v. Google LLC*,
   2023 WL 4999901 (D.D.C. Aug. 4, 2023) ..................................................... *38*

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ............................................................................ 4, 42

*United States v. H & R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) ...................................................... 6, 17

*United States v. LTV Corp.*,
  1984 WL 21973, at *14 (D.D.C. Aug. 2, 1984) ...................................... 7

*\*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ......................................................... *passim*

*United States v. Pabst Brewing Co.*,
  384 U.S. 546 (1966) ............................................................................... 4

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963) ........................................................................ 4, 13

*United States v. United Tote, Inc.*,
  768 F. Supp. 1064 (D. Del. 1991) ....................................................... 22

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) .............................................................. 37

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) .................................................................. 43

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*,
  668 F.2d 1014 (9th Cir. 1981) ............................................................ 40

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  395 U.S. 100 (1969) ..................................................................... *passim*

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ................................................................ 16

**Statutes**

Sherman Act § 2, 15 U.S.C. § 2 ................................................... *passim*

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................. 64

*Merger Guidelines* § 4.3 ....................................................................... 10

PUBLIC REDACTED VERSION

## TABLE OF ABBREVIATIONS

| Abbreviations | Definitions |
|---|---|
| APL *Daubert* | APL's Motion to Exclude the Opinions and Testimony of Ashley Langer |
| Cross-Motion | APL's Memorandum in Support of Cross-Motion for Summary Judgment |
| DSJ # | Matson's Summary Judgment Exhibit # |
| DSUF # | Matson's Statement of Undisputed Fact |
| Matson *Daubert* | Matson's Motion to Exclude the Opinions and Testimony of Frederick Warrant-Boulton |
| Motion | Matson's Memorandum in Support of Summary Judgment |
| FAC | APL's First Amended Complaint |
| APL Oppo. *Daubert* | APL's Opposition to Matson's Motion to Exclude the Opinions and Testimony of Frederick Warrant-Boulton |
| PSJ # | APL's Summary Judgment Exhibit # |
| PSUF # | APL's Combined Statement of Disputed Facts in Opposition to Summary Judgment and Undisputed Facts in Support of Cross-Motion for Summary Judgment |
| PSJ Resp. # | Plaintiffs APL's Responses to DSUF # |
| RWB | Dr. Rick Warren-Boulton |

## PRELIMINARY STATEMENT AND FACTUAL BACKGROUND

From 2011 until APL's entry in December 2015, Matson had about 100% of the container cargo shipping services between Guam and the mainland United States ("U.S.") (PSUF ¶¶1-2) and collected increasingly inflated rates from Guam shippers. (PSUF ¶3.) After APL's December 2015 Guam entry, offering shippers lower, fair rates, and then doubling its Guam voyages and opening a Guam office in 2017 (PSUF ¶¶4-7), APL was poised to increase its presence to ███ of the market, in line with its business plans. (PSUF ¶¶4-7.) Recognizing APL as a serious competitive threat, Matson resolved to reduce, if not remove, that threat. (PSUF ¶¶8-13, 293-94, 303-08, 323-25.)

Matson responded to APL with an array of interconnected tactics, shown in evidence omitted or mischaracterized in the Motion, including: threatening and punishing APL's suppliers and customers (PSUF ¶¶113-87, 323-36); using costly retaliation against APL in Alaska to break its competition in Guam (PSUF ¶¶188-259); pursuing "slot" proposals to reduce or remove APL (PSUF ¶¶269-87); leveraging dominance in the Hawaii trade and launching a market share discount that "bundled" Hawaii/Guam cargo to foreclose market segments of the Guam market (PSUF ¶¶288-302); and deploying restrictive agreements to lock up key Guam shippers. (PSUF ¶¶303-22.)

That conduct is not normal or competition on merit. It is predatory and exclusionary for Matson, a dominant incumbent, to use such a campaign of conduct to undercut an entrant and only competitor offering U.S./Guam shippers the only alternative to Matson. The evidence and expert opinion show Matson's predatory and exclusionary acts harmed the competitive process and APL's ability to compete for Guam shippers and grow its business. (PSUF ¶¶ 139-40, 156-57, 290-91, 299-302, 309-19, 325-27, 331, 336-49, 354-58, 361.)

Matson omits those material facts, mischaracterizes evidence, relies on unreliable or non-existing expert opinion, and seeks to profit from deceptive declarations and deficient discovery. This begins with the Introduction, where Matson cites complaints to set the premise of its arguments—shippers *chose* Matson because its service is *better*. That presumption ignores voluminous complaints about Matson (PSUF ¶¶81-108 (shippers referring to Matson as "nightmare," "pathetic," "[t]otally disgusting," "unacceptable," "ridiculous," "outrageous," "gross negligence," "fright," "terrible service," "BS," and "stupidly high" rates).) Matson's presumption also is devoid of evidence or analysis confirming unrestrained shippers would, in fact, choose Matson's inflated rates (sugarcoated as "premium") over APL's lower rates and good customer service. Matson's presentation seeks the Court to overlook material evidence, draw inferences, resolve disputed facts in Matson's favor. Rule 56 requires the opposite.

The Motion also is premised on the incorrect presumption that each act Matson took must be separately judged as independently "actionable" as anticompetitive, to be considered "exclusionary." That sort of disaggregation and *seriatim* review of monopolizing acts is contrary to precedent. Matson counsel convinced another trial court to apply this standard on summary judgment, and the Tenth Circuit recently reversed it as wrong. The bait should not be taken again and a jury, instead, should resolve APL's claims based on a full record of admissible evidence.

Despite Matson's effort to confuse, complicate, and malign, this is a straightforward case, where Matson, previously the sole provider of shipping services in the U.S./Guam market it internally admits, has used a network of plainly predatory and exclusionary acts to restrain and ultimately remove APL, to the detriment of consumers and APL. Doing this while possessing upwards of an admitted 80% of the market, a jury could reasonably conclude, constitutes attempted, if not maintained, monopolization in violation of § 2. The Motion should be denied.

## CLAIMS AND LEGAL STANDARDS

APL claims Matson is attempting to monopolize, or monopolized, container cargo shipping services in U.S./Guam in violation of Sherman Act § 2. (FAC ¶¶ 78-101.)

Attempted monopolization requires: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

Monopolization, in comparison, requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (citation omitted).

## APL'S OPPOSITION TO SUMMARY JUDGMENT

It is Matson's burden to prove "absence of evidence to support [APL's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). For antitrust cases, the Supreme Court observed, summary judgment based on the "record *taken as a whole* could not lead a rational trier of fact to find for the nonmoving party," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citations omitted, emphasis added).

Importantly, all doubts about evidence, inferences drawn from evidence, and issues of credibility are resolved against Matson. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). With everything viewed against Matson, if there is a disputed fact that might affect the outcome of APL's case, summary judgment is precluded. *See id.* at 248.

## I.    THE RELEVANT ANTITRUST MARKETS ARE CONTAINER CARGO SHIPPING SERVICES IN U.S. /GUAM AND U.S./HAWAII

Antitrust markets represent "area of effective competition," "by reference to separate product (the 'line of commerce') and geographic markets (the 'section of the country')." *Brown*

*Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). These markets are mere "analytical tools" for considering effects on competition. *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 49 (D.D.C. 1998). As such, markets need not be defined with "scientific precision," *United States v. Conn. Nat'l Bank,* 418 U.S. 656, 669 (1974), or "by metes and bounds," *United States v. Pabst Brewing Co.,* 384 U.S. 546, 549 (1966), and they are legally sufficient even with "fuzziness." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 48 (D.D.C. 2015) (quotation, citation omitted).

The broadest antitrust markets, APL alleges, are "container cargo shipping services" (FAC ¶ 80) and the geographic shipping routes between (a) the U.S. mainland and Guam and (b) the U.S. mainland and Hawaii. (*Id*. ¶ 87.) APL also alleges narrower submarkets helpful for considering particular effects on competition. (*Id*. ¶¶ 80, 91-94.)

## A.    Matson Raised No Material Issue on Relevant Product Market

Market definition is a threshold issue, *see United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966), but Matson articulated no argument against APL's product market.

## B.    U.S./Guam and U.S./Hawaii are Geographic Markets or It is a Factual Dispute

The Supreme Court describes relevant geographic markets in monopolization cases as "the area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963) (citation omitted). There is ample evidence showing the geographic markets are U.S./Guam and U.S./Hawaii, or, at least, factual disputes precluding summary judgment.

### 1.    Business conduct admits the geographic markets

The documents and conduct of the Parties confirm U.S./Guam and U.S./Hawaii function as geographic markets. Because "economic actors usually have accurate perceptions of economic realities," such evidence is particularly strong for market definition. *FTC v. Staples,* 970 F. Supp. 1066, 1079 (D.D.C. 1997) (quotations and citations omitted).

Matson's entire container shipping business is organized on its recognition of U.S./Guam and U.S./Hawaii as separate and distinct markets. Matson routinely generates corporate "Operating Plans" based on its container shipping lanes between the U.S.-mainland and Hawaii and Guam being separate "markets." (PSUF ¶14 (collection of Matson plans identifying what it considers "Markets" including U.S./Guam, U.S./Hawaii trades); PSUF ¶20 (same in Matson SEC filings).)

Matson management devised different plans and strategies for each of the U.S./Guam and U.S./Hawaii markets, consistent with viewing them as separate markets. (PSUF ¶14 (collection of Matson plans with different corporate strategies for Matson's operations in the Hawaii and Guam markets).) Matson management also set corporate objectives, based on U.S./Guam and U.S./Hawaii as distinct markets. (PSUF ¶19 (separate financial goals for Guam and Hawaii "trade lane contribution").) These objectives include financial incentives for achieving separate share objectives for each of the Guam and Hawaii markets. (PSJ 172 (setting 75% Guam market share as "key objective" for Matson).)

Matson personnel also prepare "weekly market share tracking reports" carefully tracking Matson's "market" share of each of the U.S./Guam and U.S./Hawaii trades. (PSUF ¶¶69-70 (compilation of Hawaii market share reports); (PSUF ¶16 (compilation of Guam/Saipan market share reports).)[1] Matson testified that these reports are accurate, circulated to its management, and relied on for business. (*Id.*)

APL's documents similarly recognize U.S./Guam as a distinct market, separate from other trades like Asia. In 2015, internal APL analysis identifed " ███████████████████ " (PSUF ¶21.) In 2016, when planning to enhance its Guam service, APL viewed " █████████

---

[1] Some Matson market share reports depict only westbound cargo, *i.e.*, cargo from U.S.-mainland to Guam and Hawaii, as Matson did not track eastbound because it is a "small faction." (PSUF ¶17.) APL also separately viewed westbound and eastbound cargo for Guam. (PSUF ¶50.)

Also, whether some Matson market share reports include cargo bound for Saipan is inconsequential. The Saipan volume is comparatively small (PSUF ¶18) and would not affect geographic market definition. *See Sysco*, 113 F. Supp. 3d at 51 (ruling geographic market capturing 75% of customer business was sufficient given markets "need not be defined 'by metes and bounds'") (citation omitted); *FTC v. Tronox, Ltd*., 332 F. Supp. 2d 187, 202 (D.D.C. 2018) (explaining "'fuzziness' is inherent in bounding any market") (citation omitted).

██████████████████████████" as separate trades. (PSUF ¶22.) In 2018, APL considered its shares in U.S./Guam market separate from Asian shipments and APL had different strategies for each. (PSUF ¶¶22-23.)

That the Parties' documents and conduct recognize U.S./Guam and U.S./Hawaii as separate and distinct trades is compelling evidence these areas, in reality, function as markets. *See United States v. H & R Block, Inc*., 833 F. Supp. 2d 36, 52 (D.D.C. 2011) ("courts often pay close attention to the defendants' ordinary course of business documents" for market definition); *Sysco*, 113 F. Supp. 3d at 49 (considering defendant description of business and area of competition when defining geographic market).

### 2.      Testimony further confirms the markets

Witness testimony further confirms U.S./Guam and U.S./Hawaii are each relevant geographic markets, considering "commercial realities" set by *Brown Shoe* and other authorities. *Id*. at 370 U.S. at 336 (explaining markets must "correspond to the commercial realities of the industry" and not be defined with "formal, legalistic" approach") (citation, quotation omitted).

Matson's executive responsible for rates, Chris Dianora, testified it considers different specifics for setting Guam and Hawaii rates. (PSUF ¶27.) Matson's corporate representative testified it generally does not consider rates of other trades, when setting rates for Guam or Hawaii. (PSUF ¶¶25, 27-28.) Both said Matson's Guam and Hawaii rates differ. (PSUF ¶¶25-26.) Matson sets different surcharge amounts for Guam and Hawaii shipments. (PSUF ¶25.) Former APL General Manager Charlie Hermosa testified that Matson, when he worked for it, recognized "██████████████████████" as separate trades. (PSUF ¶32.)

Given this testimony, it is not surprising that Matson's corporate representative referred to U.S./Guam and U.S./Hawaii as "different markets." (PSUF ¶30.) Mr. Dianora similarly admitted. (*Id*.) These admissions alone would raise a jury issue. *See, e.g., FTC v. Coca-Cola Co.,* 641 F. Supp. 1128, 1132 (D.D.C. 1986) (explaining "market is a matter of business reality" and finding nationwide market when evidence showed defendants so viewed and operated their businesses).

APL witnesses similarly testified it operates business based on U.S./Guam and U.S./Hawaii functioning as separate and distinct markets. Chief of Staff Jessica Jellies testified U.S./Guam and Asia to Guam constitute "███████████████████████████" (PSUF ¶31.) APL Director of Pricing Daniel Stefanik testified he would not consider ████ ████████████████████████████████████████████████████████████████ ██████" (PSUF ¶29.)

This testimony further confirming the different considerations and rates for U.S./Guam and U.S./Hawaii shipping is strong evidence that they each function as a separate market. *See Cardinal Health,* 12 F. Supp. 2d at 50 (finding national market when evidence showed defendants negotiated prices on nationwide basis).

### 3. Government regulators treat U.S./Guam and U.S./Hawaii as markets

The government views the U.S./Guam and U.S./Hawaii trades as separate and distinct. Federal regulators, for instance, track and report separately on the Guam and Hawaii trades. (PSUF ¶33.) Also, Matson admits, there are different statutes and regulations applicable to U.S. containership trade with Guam and Hawaii, with U.S./Hawaii restricted to Jones Act vessels while U.S./Guam permits certain non-Jones Act U.S.-flag vessels. (DSUF ¶14.) Such regulations—with different rules limiting different carriers serving Guam and Hawaii—impose commercial realities that make the trades distinct. *See United States v. LTV Corp.*, 1984 WL 21973, at *14 (D.D.C. Aug. 2, 1984) (noting government import quotas affect contours of relevant market); Phillip E. Areeda, *et al.*, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ("*Antitrust Law*") ¶ 572b ("To the extent that regulation limits substitution, it may define the extent of the market.").

Moreover, regulators like the U.S. Surface and Transportation Board and the Federal Maritime Commission,[2] recognize containership transport between domestic ports and Guam and

---

[2] STB is a federal agency charged with "economic regulation of various modes of surface transportation." STB.gov. FMC is a federal agency responsible for "regulating the U.S. international ocean transportation system." FMC.gov/about-the-fmc.

Hawaii as separate geographic areas relevant for analyzing competitive issues. *See, e.g., Gov't of Guam v. Sea-Land Serv.*, No. WCC-101 (STB Feb. 1, 2007) (considering U.S./Guam for assessing reasonableness of carrier rates); *In re Matson Nav. Co*., 28 F.M.C. 446 (FMC, June 6, 1986) (same for U.S./Hawaii).[3] This augments the evidence that U.S./Guam an U.S./Hawaii constitute markets for assessing such issues here. *See In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 723 (E.D. Tenn. 2011) (ruling relevant market could be same area recognized by regulators).

### 4.     Expert analysis also supports the markets

The markets alleged by APL are further confirmed by expert analysis that courts typically consider. *See H & R Block*, 833 F. Supp. 36 at 60 (considering whether expert testimony "tends to confirm" alleged market and finding Dr. Warren-Boulton's analysis did so); *Staples,* 970 F. Supp. at 1075-81 (finding evidence and analysis by Dr. Warren-Boulton supported alleged market).

### (a)     *Analysis confirms "overall" U.S./Guam and U.S./Hawaii markets*

APL's expert, Dr. Warren-Boulton, reviewed the container shipping industry, including trade lanes, volumes, cargo categories, and rates. (DSJ 13, RWB Rpt. 7-39; PSUF ¶¶34-36.) He applied DOJ/FTC *Merger Guidelines* (of which he was an author)[4] to help define relevant markets—including the "SSNIP test" that defines markets by considering whether customers could be expected to switch to other products or services in response to a Small but Significant and Non-transitory Increase in Price. (DSJ 13, RWB Rpt. 18-33.) Based on his analysis and experience as an antitrust economist, he determined the "overall" markets consist of container shipments from the U.S.-mainland to Guam and to Hawaii. (*Id*. 21, 28-32.)[5] His highlighted two confirmatory analyses and findings.

*First,* Dr. Warren-Boulton conducted a "natural experiment," *i.e*., what actually happened in U.S./Guam trade while Matson was sole U.S. container carrier in 2011-16.[6] He found Matson

---

[3] *Available at* https://www.fmc.gov/wp-content/uploads/2019/04/vol28.pdf.
[4] The *Merger Guidelines*' framework is helpful guidance. *See Staples*, 970 F. Supp. at 1081.
[5] Dr. Warren-Boulton refers to U.S. mainland as USWC" because container shipments to Guam and Hawaii depart from West Coast ports.
[6] The *Merger Guidelines* endorse natural experiments. *See id.* § 2.2 (2023).

increased rates by more than a SSNIP (5-10%) without loss of its share of U.S./Guam business, confirming it is a relevant market because other products or trades are not sufficiently close substitutes for customers shipping containers with U.S.-mainland and Guam. (*Id*. 18-21, 34-37.)

*Second*, Dr. Warren-Boulton considered whether, since APL's entry, Matson maintained U.S./Guam rates above a competitive level. He found Matson's rates fell after APL's entry, but they continued to be above the competitive level. (*Id*. 18-21, 34-37.) This further confirms an overall U.S./Guam container shipping market because, Dr. Warren-Boulton reported, "█████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████" (*Id*. 21.)

In addition to these rigorous analyses, Dr. Warren-Boulton determined that *goods* sold from Asia into Guam are not relevant and do not represent reasonable substitutes for customers purchasing *services* to carry domestic cargo from the mainland to Guam. (PSUF ¶¶36-37, 43-44.) *See Microsoft*, 253 F.3d at 52 (defining markets by considering products "reasonably interchangeable *by consumers for the same purposes*") (emphasis added). As he explained: "█████ ████████████████████████████████████████████████████████████████████" (DSJ 13, RWB Rpt. 21.) Similarly, he determined the presence of foreign carriers that bring foreign cargo to Guam, referenced by Matson (Motion 36), is not a potential substitute for customers shipping cargo from the mainland to Guam. (DSJ 13, RWB Rpt. 21 ("█████████████████████████ ████████████████████████████████████")

### (b)   *Analysis identifies submarkets for assessing particular effects*

Dr. Warren-Boulton also analyzed and identified "segments" or "clusters" of the overall markets in which to assess particular competitive effects. These submarkets consist of the sets of shipping route pairs (*e.g*., Los Angeles-Guam) and categories of cargo carried on those routes (*e.g*., household goods, chilled, miliary). (PSUF ¶¶38-39; DSJ 13, RWB Rpt. 22.) To illustrate, to consider any particular effects of Matson's conduct on the household goods category of cargo, the

relevant submarket could consist of shipping services for household goods carried from Los Angeles to Guam. (*Id*. 22-32.)

This use of submarkets is consistent with relevant authorities. *See Brown Shoe*, 370 U.S. at 325 (recognizing "well-defined submarkets may exist" within broader market); *Sysco*, 113 F. Supp. 3d at 50-52 (accepting local markets within national market for foodservice distribution); *Merger Guidelines* § 4.3 ("Within a broad relevant market, however, effective competition often occurs in numerous narrower relevant markets").

The *Merger Guidelines* also provide for "clustering" of multiple products within markets or submarkets for "analytical convenience" when the "competitive conditions" for those products are "reasonably similar." *Id*. § 4.3.D.4. Following the *Merger Guidelines*, Dr. Warren-Boulton analyzed transactional data for individual products at the category levels (lettuce, eggs, and other refrigerated foods in the "chilled" category), determined these category clusters may be put with origin-destination-cargo categories, *e.g*., chilled products from Los Angeles to Guam, because they exhibit similar supply, demand, and competitive conditions due to, among others, same elasticities and limited consumer substitution between products. (PSUF ¶¶38-39; DSJ 13, RWB Rpt. 6-7, 22-32, 40-41; DSJ 411, RWB Rebut. 34-35; DSJ 354, RWB Dep. 133:7-16, 144:25-145:6.)

These submarket clusters also are consistent with *Brown Shoe's* "practical indicia." 370 U.S. at 325. The Parties sell their container shipping services based on the same route-pair submarkets identified by Dr. Warren-Boulton. (*E.g*., DSUF ¶¶15, 37, 48, 59.) In operating their businesses, the Parties also group cargo into cluster categories as identified by Dr. Warren-Boulton. For example, Matson makes business plans and strategies, separately tracks, and sets rates specific to route-pairs and cargo cluster categories. (PSUF ¶¶39-40.) Indeed, Matson, like Dr. Warren-Boulton, considered origin-destination and cargo cluster categories when it internally assessed the potential competitive impact of APL's Guam entry. (PSUF ¶40.) The fact that Matson internally analyzed the same or similar "submarkets" for competitive effects admits they could be relevant for the same purpose now. *See Sysco*, 113 F. Supp. 3d at 40-41 (pointing to party's internal recognition of "grouping" of customers and products as "compelling evidence" of submarkets).

Although Dr. Warren-Boulton identified submarkets, he explained they are considered apart from the "standalone" overall markets (U.S./Guam and U.S./Hawaii container shipments) for assessing the overall effects of Matson's conduct. (DSJ 354, RWB Dep. 131:21-132:1.)

### 5. The markets are consistent with transportation cases

The U.S./Guam and U.S./Hawaii markets, as well as the submarkets, are consistent transportation cases that approved or acknowledged geographic markets comprised of routes between origin and destination points. *See, e.g., Sea-Land Serv., Inc. v. Atl. Pac. Int'l, Inc.,* 61 F. Supp. 2d 1102 (D. Haw. 1999) (accepting "Hawaii-Mainland ocean carriage" geographic market for antitrust case); *Spirit Airlines v. Nw. Airlines*, 431 F.3d 917 (6th Cir. 2006) (affirming origin-destination routes are geographic markets); *Rivera-Muniz v. Horizon Lines*, 737 F. Supp. 2d 57 (D.P.R. 2010) (denying motion to dismiss claims on "U.S. mainland and Puerto Rico" market); *Matson Nav. Co. v. FMC*, 959 F.2d 1039 (D.C. Cir. 1992) (analyzing rates for "U.S. mainland and Hawaii" trade). None of Matson's assertions provide good basis for a different result here.

### C. Conclusory Assertions Fail to Eliminate Geographic Market Issues

None of Matson's three conclusory assertions on APL's geographic markets can eliminate material fact issues, especially when Matson ignored all the material facts above. *See, e.g., Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone*, 275 F.3d 762 (9th Cir. 2001) (ruling summary judgment was in error when there are factual disputes on parameters of market).

*First*, Matson says APL "refuses to consider" goods carried from Asia to Guam. (Motion 36.) Not true. APL questioned Matson witnesses about Asia and they admitted Asian goods are not considered when setting U.S./Guam rates and/or had insignificant effect on those rates. (PSUF ¶42.) This shows Asian goods do not, in reality, function as part of the U.S./Guam market. *See FTC v. Swedish Match,* 131 F. Supp. 151, 162, 165 (D.D.C. 2000) (finding snuff not part of leaf tobacco market when, among others, snuff sellers did not consider leaf tobacco prices).

Further, Dr. Warren-Boulton analyzed the subject. (*See* § I.B.4.a., *supra*.) He also testified that █████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████ (DSJ 354, RWB Dep. 154:10-157:1.) His conclusion aligns with authorities rejecting the defense "trap" of confusing markets with foreign products or territories without regard to interchangeability. *See Microsoft,* 253 F.3d at 54 (rejecting defense argument to inflate market with product "not reasonably interchangeable by consumers"); *E. I. du Pont de Nemours & Co*., *v. Kolon Indus., Inc*., 637 F.3d 435, 446-47 (4th Cir. 2011) (reviewing cases rejecting defense efforts to confuse markets with foreign products or territories not reasonable substitutes for consumers in candidate markets).

Tellingly, Matson provides *no* evidence or expert analysis to back up its assertion that Asian goods actually are reasonably interchangeable by a significant number of consumers of U.S./Guam cargo services. *See United States v. Microsoft Corp*., 87 F. Supp. 2d 30, 36 (D.D.C. 2000) (explaining "significant percentage" of consumers have to substitute "without incurring substantial costs" to be in market). Matson's only "support" is a few lines of testimony *not* about Guam. (DSJ Ex. 345 at 51:20-52:13 (referring to Hawaii).) Matson references its expert, Prof. Langer, but she did no market analysis of her own, has no relevant experience, and has no market opinion. (PSUF ¶45.) Matson's cite to *Thurman Industries* also is inapt because there, unlike here, the plaintiff "offered no evidence" about substitution. 875 F.2d 1369, 1374 (9th Cir. 1989).[7]

*Second*, Matson's argument that APL "improperly clusters services" is misleading speculation. (Motion 36-37.) Matson's only "support" is Prof. Langer, but her comments about markets—lacking analysis, expertise and actual opinion—is speculation that should be excluded. (APL *Daubert* at 8-13.) Worse, Matson inaccurately portrays Dr. Warren-Boulton as haphazardly "clustering" different services, when he actually followed the *Merger Guidelines*. (*See* § I.A.4.b., *supra*.) These submarkets also are consistent with *Brown Shoe's* practical indicia (*See id*.), which

---

[7] Even if Asian goods were included—contrary to evidence and authorities—adding their volume would only present another jury issue. *See Se. Milk*, 801 F. Supp. 2d at 723 (ruling jury, not judge, decides whether plaintiffs' alleged market was properly defined when it did not include imported products defendants claimed to amount to 40% of the market volume).

Matson omitted. Regardless, APL's claims are centered on "overall" markets (U.S./Guam, U.S./Hawaii), with submarket clusters relevant only for analyzing some effects.

    *Third*, Matson's claimed inconsistency in including "Seattle in [APL's] 'overall market'" with Oakland and Los Angeles ports is contradicted by facts. (Motion 37.) Matson's documents admit APL transports Seattle or Pacific Northwest ("PNW") origin cargo to Guam. (PSUF ¶¶46-48.) Its documents identify "disloyal" PNW shippers that switched to APL. (PSUF ¶48.) Its documents show it adjusted Seattle-Guam rates due to APL's ability to serve those shippers. (PSUF ¶47.) Matson's former executive who set rates testified that PNW customers considered APL's Oakland-Guam service a substitute for Matson's Seattle-Guam service, and Matson considered Oakland and Long Beach (LA) rates when setting Seattle-Guam rates. (PSUF ¶49.) Also, Dr. Warren-Boulton's analysis found that ██████████████████████████ ████████████████████████████████████████████ (DSJ 13, RWB Rpt. 29-33.)[8] This evidence and analyses shows Seattle is in same overall market with Oakland and Los Angeles origin ports, because U.S.-mainland shippers to Guam viewed them as substitutable, *Phila. Nat'l Bank*, 374 U.S. at 359 (looking where "seller operates" and "purchaser can practicably turn"), and market participants, including Matson and shippers, viewed Seattle and Oakland rates as interdependent, *see Swedish Match*, 131 F. Supp. 151 at 165 (considering if prices are independently set for different areas).

    Matson's conclusory arguments, even if supported, would, at most, create a disputed question of fact, as demonstrated in *Spirit Airlines*, where the Sixth Circuit reversed a summary judgment rejection of city-pair markets when, like here, defendant's documents were consistent with those markets and plaintiff offered expert testimony in support of them. 431 F.3d at 932-35.

---

[8] Matson incorrectly asserts Dr. Warren-Boulton's opinions about Asian goods and the U.S./Guam market are "inconsistent." (Motion 37.) As he explained—and Matson mischaracterizes— ████████ ████████████████████████████████████████████████████████

████████████████████████████ (*See* § I.B.4., *supra*.)

## II.    MATSON'S POWER IS SHOWN BY THE EVIDENCE AND ITS CONCLUSORY ASSERTIONS ONLY MAKE JURY ISSUES

There is genuine evidence—omitted by Matson—showing its power in the markets is sufficient to lessen competition, or to maintain monopoly. This precludes summary judgment. *See Meijer, Inc. v. Barr Pharms., Inc.,* 572 F. Supp. 2d 38, 65 (D.D.C. 2008) (concluding factual issues on markets "preclude . . . summary judgment").

### A.    Matson has Ability to Lessen or Destroy Competition

For attempt to monopolize, APL need only show Matson "dangerously threatens" monopoly power. *Spectrum Sports*, 506 U.S. at 459. This is demonstrated by "ability to lessen or destroy competition." *Id*. at 456. It is generally shown by market shares. *See Alexander v. Nat'l Farmers Org.,* 687 F.2d 1173, 1181 (8th Cir. 1982) (explaining dangerous probability "is examined by reference to the offender's share of the relevant market"); *Antitrust Law* § 515 ("courts have typically relied heavily on . . . defendant firm's share of the market").

### 1.    Matson's 70-80% of U.S./Guam market shows "dangerous probability"

Matson's own "weekly container market share tracking reports" show it has at least 70% of U.S./Guam market after APL's 2016 market entry. These Matson reports state the following annual Matson shares of westbound U.S. mainland to Guam container cargo:

### *Matson's Admitted Guam Shares*

| 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|
| 79.6% | 73.5% | 75.6% | 73.9% | 80.3% |

(PSUF ¶50.)[9] Matson testified that its U.S./Guam share in 2022 is up to low 80%. (PSUF ¶51.)

Analyzing the Parties' transactional data, Dr. Warren-Boulton found Matson's U.S./Guam shares to be consistent with Matson's internal reports:

---

[9] As explained at page 5 and footnote 2, Matson reported westbound cargo because a miniscule number of containers move eastbound, and Matson's reports also include an insignificant number of containers that continued from Guam onto Saipan.

*Matson's Guam Shares from Transactional Data*

| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|------|------|------|------|------|------|------|
| ■ | ■ | ■ | ■ | ■ | ■ | ■ |

(PSUF ¶52; DSJ 13, RWB Rpt. at Ex 26.)[10]

Courts find market shares like Matson's—a sustained 70-80%—sufficient to create a jury issue, at least, for attempted monopoly (and monopolization) claims. *See, e.g.*, *M & M Med. Supplies & Servs. v. Pleasant Valley Hosp.*, 981 F.2d 160, 168 (4th Cir. 1992) ("greater than 50% share should be treated as attempts at monopolization when the other elements for attempted monopolization are also satisfied") (quotation, citation omitted); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1443 (6th Cir. 1990) (sustained 58% average market share sufficient to uphold jury verdict).

### 2.     Matson's market share and power is protected by entry barriers

Evidence of barriers, omitted by Matson, shows they are significant. (PSUF ¶¶53-59.) They are "factors (such as certain regulatory requirements) that prevent new rivals from timely responding to an increase in price above the competitive level." *Microsoft*, 253 F.3d at 51. There are several here.

Government regulations, as *Microsoft* recognized, present enormous barriers. Only U.S.-flag vessels may, under U.S. law, carry container cargo between U.S.-mainland and Guam. *See APL v. Matson, Inc.*, 633 F. Supp. 3d 209, 217 (D.D.C. 2022) (citing 46 U.S.C. § 12111(b)). In addition, the Jones Act, 46 U.S.C. § 55101 *et seq.*, prohibits non-U.S. companies from carrying domestic cargo between the mainland and Hawaii. *See Novak v. United States*, 795 F.3d 1012, 1017 (9th Cir. 2015) (explaining Jones Act "limit[s] the domestic shipping market to American companies, excluding foreign competitors"). These laws bar nearly all container vessels—about

---

[10] Dr. Warren-Boulton's analysis excludes containers that continued from Guam onto Saipan, confirming their inclusion in Matson's reports do not meaningfully change its shares.

99%—from carrying U.S. cargo from mainland to Guam or Hawaii. (PSUF ¶53.)

Additional barriers include enormous startup and operational costs for entrants. Matson's documents reflect costs of $200+ million to construct container vessels, and about $10 million/year to operate chartered vessels. (PSUF ¶57.)[11] Entrants also would face Matson, an entrenched incumbent with history of aggressive reaction to entrants, shown by its series of MARAD lawsuits targeting APL. (PSUF ¶¶327-30.) *See, e.g., ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) (describing dominant firm as "barrier . . . [potential rival] would have to confront").

Matson's arrangements with customers (*see* § III.C.6, *infra*) also are barriers, especially in flat-growth island markets. (PSUF ¶58.) *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) ("entry barriers include … entrenched buyer preferences, high capital entry costs and economies of scale"). Matson identified such barriers in its strategic plans. (PSUF ¶58 (identifying "barriers" to include "volume agreements, "aggressive MOU offers").) Matson deployed these barriers—in agreements with minimum quantity commitments ("MQCs"), volume incentive discounts ("VIDs"), bundled Guam-Hawaii commitments. (PSUF ¶¶303-11; DSJ 13, RWB Rpt. 56-59.) Such arrangements, as Matson acknowledged, inhibit entry. *See United States v. Dentsply Int'l*, 399 F.3d 181, 189 (3d Cir. 2005) (citing defendant's exclusionary arrangements as barring potential entrants).

Also, if Matson's claims about "Gold Standard" and "superior" reputation are to be believed (Motion 2-3), it is another entry barrier. *See Cardinal Health*, 12 F. Supp. 2d at 57 (explaining defendant's existing "strength of reputation . . . serve as barriers to competitors"); *H*

---

[11] Dr. Warren-Boulton also identified ███████████████████████████████████████████████████████████ (DSJ 13, RWB Rpt. 35.) Courts agree these are barriers. *See, e.g., Cardinal Health*, 12 F. Supp. 2d at 57.

*& R Block,* 833 F. Supp. 2d at 75 (finding "reputation and brand" limited competitor).

The effectiveness of entry barriers is confirmed by Dr. Warren-Boulton's analysis showing

██████████████████████████████████████████████████████ (PSUF ¶¶59-63; DSJ

13, RWB Rpt. 19-21, 36-38.) ████████████████████████████

████████████████ (*Id*. 43.) Courts agree. *See H & R Block*, 833 F. Supp. 2d at 73 (stating, absent

barriers, "a company probably cannot maintain supracompetitive pricing for any length of time")

(citation omitted).

Accordingly, Dr. Warren-Boulton opined that ████████████████████████████

████████████████████████████████████████ (DSJ 345, RWB Dep. 58:16-25.) The

evidence and expert analysis of Matson's possession of a dominant share, protected by entry

barriers, precludes summary judgment. *See Microsoft*, 253 F.3d at 51.

### 3.      Matson forfeited "dangerous probability" arguments

Matson's sole sentence on "dangerous probability" (Motion 45) cannot allow it to save its

"real" argument until reply. *See Springsteen-Abbott v. SEC*, 989 F.3d 4, 9 (D.C. Cir. 2021).

## B.      There is Both Direct and Indirect Evidence of Matson's Monopoly Power

Matson's monopoly power is shown by both its control over prices (direct evidence) and

its dominant shares within a defined market (indirect evidence). *See Microsoft*, 253 F.3d at 51.

### 1.      Direct evidence: Matson controls prices

In this Circuit, monopoly power may be shown by "direct evidence," including "the power

to control prices or exclude competition." *Id.* at 51.[12] Evidence and analysis shows exactly that.

---

[12] Matson cites *Rebel Oil* and the wrong definition of monopoly power. (Motion 38 (arguing "restricting output and supracompetitive prices").) As previously explained, *Rebel Oil's* statements on *price discrimination* do not apply to this *monopolization* case, and other courts in this Circuit have rejected Matson's misuse of *Rebel Oil. See* ECF 65 at 8-10 (citing cases and explaining *Rebel Oil's* references to output restriction and supracompetitive prices do not apply to monopolization).

Expert analysis shows ███████████████████████████████████████████

█████████ (PSUF ¶¶59-63.) After APL's entry, ██████████████████████████

██████████████████████████████████████, Dr. Warren-Boulton's analysis of

transactional data confirmed. (DSJ 354, RWB Dep. 34:6-16, 103:8-25, 108:23-109:5, 312:15-23.)

This pricing evidence, and Dr. Warren-Boulton's analyses, sufficiently shows Matson's long-term

ability to control prices and, thus, monopoly power. *See, e.g., Jefferson Parish Hosp. Dist. No. 2

v. Hyde,* 466 U.S. 2, 27 n. 46 (1984) ("market power exists whenever prices can be raised above

the levels that would be charged in a competitive market.").

That analysis aligns with evidence showing Matson's control of rates. Based on knowledge

about its rates, Matson's former VP testified it set "██████████████████████████████████

█████████" (PSUF ¶¶64-65, 67.) Similarly, a current VP testified that Matson sometimes concludes

it need not reduce rates in response to competition (PSUF ¶66) and Matson, accordingly, can

ignore rate adjustments requested by large shippers. (PSUF ¶68.) This ability to dictate or ignore

rates reflects Matson's power. *See Byars v. Bluff City News Co.*, 609 F.2d 843, 850 (6th Cir. 1979)

(considering ability to raise prices or exclude competition "when desired to do so").

This direct evidence is sufficient to resist summary judgment on Matson's U.S./Guam

monopoly power. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 477-78 (1992)

("reasonable to infer that Kodak has market power to raise prices . . . since respondents offer direct

evidence that Kodak did so.").

### 2. Indirect evidence: Matson has dominant share protected by barriers

Monopoly power may also be shown by Matson's dominant market shares protected by

entry barriers. *See Microsoft*, 253 F.3d at 51. "Any market condition that makes entry more costly

or time-consuming . . . should be considered a barrier to entry." *Southern Pac. Comm'ns v. AT&T,*

740 F.2d 980, 1001 (D.C. Cir. 1984). These exist for U.S./Guam and U.S./Hawaii markets.

For U.S./Guam market, Matson has possessed between 73-80% of that market. (*See* §
II.A1., *supra.*) Also, Matson's share is trending upward (*id.*), in a highly concentrated, stagnant
market, with only two (2) suppliers of U.S. container carrying services to Guam. (PSUF ¶¶55-56,
74.) With shares that high, a jury could reasonably find that Matson has monopoly power in the
U.S./Guam market. *See Image Tech.*, 125 F.3d at 1206 ("Courts generally require a 65% market
share to establish a *prima facie* case of market power.). This is particularly true here, where, in
addition to high shares, there are market barriers (*see* § II.B.2., *supra*) and history of little entry.
(PSUF ¶74.) *See Optronic Techs. v. Ningbo Sunny Elec.*, 20 F.4th 466, 484 (9th Cir. 2021)
(affirming power based on 47% share of market with barriers and no history of entrants).

For U.S./Hawaii market, Matson has maintained 62-65% share since 2016. Its "weekly
container market share tracking reports," which Matson compiles and uses for business (PSUF
¶69), report following annual Matson shares of the westbound mainland-Hawaii container cargo:

### *Matson's Admitted Hawaii Shares*

| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|------|------|------|------|------|------|------|
| 65.1% | 64.4% | 64.1% | 63.5% | 63.6% | 62.9% | 62.2% |

(PSUF ¶70 (2016-2022 reports).)[13] Like the U.S./Guam market, the U.S./Hawaii market is highly
concentrated—only two (2) companies (Matson and Pasha) carry U.S. container cargo between
the mainland and islands. (PSUF ¶54.)

Matson's sustained 62-65% share of U.S./Hawaii market is sufficient to raise a jury issue
on *full* monopoly power in that highly concentrated market with substantial entry barriers and a
history of no entry (PSUF ¶¶53-54, 57-58, 75.) *See, e.g., Dentsply*, 399 F.3d at 187 (considering
"market structures" including "size and strength of competing firms" and "pricing trends and

---

[13] Like Guam, Matson reported westbound Hawaii cargo only because eastbound is "a small
amount," with most eastbound containers "backhauled" without cargo. (PSUF ¶71.)

practices in the industry"); *Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984) (explaining "monopoly power" may exist "in a particular market" despite market share less than 50%). To illustrate, the Tenth Circuit affirmed a jury finding of monopoly power based on 47-60% share of a market that, like here, had little entry and a long-entrenched incumbent relying on its reputation and some restrictive contractual arrangements with customers. *See Reazin v. Blue Cross & Blue Shield of Kan.*, 899 F.2d 951, 969, 970-73 (10th Cir. 1990).

But APL need not establish *full* monopoly power by Matson in U.S./Hawaii market for a § 2 monopolization claim affecting Guam. APL is not claiming ordinary monopolization of U.S./Hawaii market, but that Matson has sufficient power to make shippers to both Hawaii and Guam refrain from shipping with APL to Guam and/or accept Matson's bundling arrangement for both markets. (FAC ¶¶ 7-8.) Courts—including *Microsoft*— do not require full monopoly power in a "tying" market (*e.g.*, Hawaii), when it is used for predatory or exclusionary conduct in a "tied" market (*e.g.*, Guam). Thus, the D.C. Circuit ruled that Microsoft's tying of Windows to Explorer can be exclusionary for a § 2 claim, even though Microsoft's power in the tying market was not full monopoly power sufficient for an "actionable" tying claim. *Microsoft*, 253 F.3d at 66, 89, 95-96 (cautioning against applying "off the shelf" claim elements in monopolization context); *see also Tele Atlas N.V. v. NAVTEQ Corp.* 2008 WL 4809441, at *16-17, 23 (N.D. Cal. Oct. 28, 2008) (denying motion on § 2 monopolization claim, even though there was not full monopoly power, because tying-like conduct could also "thwart" entry into allegedly monopolized market).

Dr. Warren-Boulton's analyses also found Matson has sufficient power in the U.S./Hawaii market to effect competition in Guam. (PSUF ¶¶ 72-73.) He explained:



20

██████████████████████████████████████████████████████████

(DSJ 13, RWB Rpt. 50-51.)

### 3.    Conclusory assertions do not eliminate issues on Matson's power

None of Matson's assertions eliminate genuine issues. The assertion that Dr. Warren-Boulton "disclaimed" power by Matson is false. (Motion 35.) For U.S./Guam market, he identified ████████████████████████████████ (*see* II.B.1., *supra*), showing power consistent with *Microsoft*, and he also testified that ██████████████████████████ ████████ (DSJ 345, RWB Dep. 58:16-25.) For U.S./Hawaii, he concluded that ████████ ██████████████████ as APL alleges. (*See* II.B.2., *supra*.) Matson's assertion that its rates might be inflated because of "superior product" (Motion 39, n.10), rests entirely on disputed facts about Matson's quality (*see* V.B.1., *infra*), is contradicted by Dr. Warren-Boulton's finding of ████████████████████ and is not supported by Prof. Langer. (PSUF ¶45.) (Matson expert performed no econometric analyses on competitiveness of its rates.)

Matson mostly relies on supposed lack of entry barriers. (Motion 39.) But this ignores the evidence of barriers (*see* II.B.2., *supra*) and is disproved by reality. Only one U.S. container carrier (APL) entered the U.S./Guam market in past 25 years (PSUF ¶74), and only one such carrier entered U.S./Hawaii market (Pasha) in past 25 years. (PSUF ¶75.) Now, the likelihood of entry is less, if not nil, with 2018 legislation, pursued by Matson, barring some future U.S.-flag entrants serving Guam. (PSUF ¶¶76-77.) As *Cardinal Health* explained: "The history of entry into the relevant market is *a central factor* in assessing the likelihood of entry in the future." 12 F. Supp. 2d at 56 (emphasis added). Such a "paltry" history of market entry here, as the Third Circuit stated, is "refutation of theory by tangible and measurable results in the real world." *Dentsply*, 399 F.3d at 194; *Antitrust Law* ¶ 402(b) (explaining evidence of significant barriers "becomes even stronger if no entry has occurred for several years").

The absurd assertion about APL avoiding regulatory barriers by causing its foreign parent to undergo a total corporate reconfiguration to be a U.S. Jones Act-eligible company (Motion 39) illustrates how existing barriers make entry *not* easy, timely, or likely. *See Cardinal Health*, 12 F. Supp. 2d at 56 (considering easiness, timeliness, likeliness, and sufficiency of potential entrants). The similar assertion that APL could "sail directly from the U.S. to Guam but *chose* not to" (Motion 39) is more theory over reality.[14] These assertions defy authorities and entry principles. *See United States v. United Tote, Inc*., 768 F. Supp. 1064, 1072 (D. Del. 1991) (considering "market realities" for firms "ready and willing to enter"); *Antitrust Law* ¶ 422(a) (explaining entry "likely" only if expected to be "profitable" enough for entrant to forego other opportunities).

Matson relies on sleight-of-hand in asserting APL "quickly acquired 39% of its alleged 'overall' market" (Motion 38-39) to imply lack of entry barriers. But that "39%" is not for the "alleged" market as Matson represents—it is an ambiguous "international" area alluded to by Matson's expert. (DSJ 5, Langer Rebut. ¶ 137.) Moreover, she did no analysis to confirm relevance of that area and has no opinion on markets. (PSUF ¶45.) Matson's assertion fails, nonetheless, because a single entrant gaining 20% market share after years of effort does not disprove barriers or power. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (explaining monopoly can be established when competitors have 44% of market); *Geneva Pharms. Tech. Corp. v. Barr Labs, Inc*., 386 F.3d 485, 502 (ruling defense arguments about 10 potential competitors raised fact issues precluding summary judgment); *Dentsply,* 399 F.3d at 184 (ruling Dentsply had monopoly power despite existence of seven competitors with 20-25% of market).[15]

There is at least a jury issue on Matson's monopoly power.

---

[14] APL analyzed and concluded ████████████████████████████ (PSUF ¶7.) Matson agrees, because it, like APL, serves Guam indirectly. Matson's vessels stop in Honolulu before continuing to Guam. (DSUF ¶45.) In any event, "bad business decisions" do not excuse a monopolist's conduct. *Dentsply*, 399 F.3d at 196.

[15] Matson's cite to *Rebel Oil* (Motion 39) is misplaced as explained in footnote 13, and convoluted because it presumes another company (CMA) would increase "output," when APL's Guam vessels are sailing with "████████" (PSUF ¶80.)

III.    **MATSON'S PREDATORY AND EXCLUSIONARY CAMPAIGN**

There is a factual issue, at least, on the predatory and exclusionary nature of Matson's conduct, and its incomplete and slanted presentation of evidence, pretextual excuses, and assertion that everything is "non-actionable" misapplies precedent and fails to eliminate genuine issues.

A.    **Summary of Matson's Predatory and Exclusionary Conduct**

Matson's retaliation began immediately after APL's Guam service launched in December 2015 (PSUF ¶4), by Matson cutting off Guam Transport and Warehouse ("GTW"), a 37-year Matson "house carrier" that "drayed" containers by truck between the Guam port and customer locations. (PSUF ¶118.) In December 2015, GTW contracted to provide APL maintenance and repair services for its Guam equipment, including chassis. (PSUF ¶119.) Matson knew GTW was supporting APL. (PSUF ¶120.) In February 2016, Paul Blas, a Matson manager, told GTW's co-owner and CEO, James Honda, to stop business with APL:

> And he told me, Mr. Blas told me, that they don't want me to do anything for APL. Don't do any work for them. Don't assist them. And I tell him, Why? And I said, I'm just doing maintenance and repair for their chassis. And he told me that he does not want me to help them at all.

(PSUF ¶¶121-22.) Mr. Honda offered to support Matson too, but it instead cut off GTW:

> And he's, like, No, I don't want you to do any business with APL. I don't want you to help them or we're going to cut you off. And of course, I was really angry.

(*Id*.) GTW's records show consistent Matson business until February 8, 2016. (PSUF ¶130.)

Matson's internal documents, verified for an audit prior to APL's lawsuit, admit cutting off GTW. (PSUF ¶¶124-25.)[16] Matson's trucking supervisor testified that Matson's management ordered the punishment (PSUF ¶126), with no other reason given internally or to GTW. (PSUF ¶¶123, 127-29, 131.)

_____
[16] Matson's internal auditors investigated the cut off in 2019 and Matson prepared additional documents, but it refused to produce them in discovery.

Mr. Honda informed Guam shippers of the retaliation. (PSUF ¶130.) To punish more, weeks later, Matson and two Matson-related entities (DGS Expedited and Paul's Roving with ownership by the Angocos (PSUF ¶136)), began obstructing GTW's access to chassis supplies at Fastenal, a Guam supplier of parts GTW needed to perform for APL. He testified:

> But I do remember it was a phone call with Fastenal and Mr. Yanger. . . . And he told me about this incident where somebody from Matson told him that he cannot sell to GTW anymore.
>
> And so I asked him, What do you mean? And he's like, Well, they -- they threatened me and said that if they -- if I wanted more business with Fastenal that he needed to stop selling to GTW.

(PSUF ¶133.) Mr. Yanger is a former Matson employee. (PSUF ¶¶134.) Thereafter, parts needed by GTW were "bought out" and "unavailable" for GTW. (PSUF ¶¶132-33.) Fastenal's records show Matson exponentially increased, DGS Expedited and Paul's Roving began, parts purchases in March 2016. (PSUF ¶¶135-38.)

This further retaliation interfered with GTW's maintenance of APL's equipment (PSUF ¶139), and impeded APL's ability to deliver customer cargo in Guam. (PSUF ¶140.) Employees of Matson-related Angoco companies took full advantage, ███████████████████ ████████████████████████████████████████████ (PSUF ¶¶354-55.) ███████████████████████████████████████████████ ██████████████████████████████████████ (PSUF ¶¶356.)

Also in early 2016, ████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████ (PSUF ¶¶182-85.)

Shippers declined or limited business with APL in Guam, conveying concern Matson would retaliate by cutting off carriage of their much larger Hawaii cargo (Matson, but not APL, serves Hawaii per Jones Act). After months of soliciting DHX business, its president informed

APL of "retribution," suggesting Matson told him not to use APL for Guam "or else." (PSUF ¶¶289.) Other DHX personnel reported the same several times. (PSUF ¶290.) ███████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████

Shippers were concerned for good reason. In mid-2016 when APL proposed to replace Matson as a wastepaper carrier for Guam Movers (PSUF ¶¶167-70), a Matson executive told its Guam sales staff to make Guam Movers understand, "once they break the relationship with Matson the rate immediately goes to market level" (PSUF ¶171), which meant an increase. (PSUF ¶174.) The threat was delivered (PSUF ¶172) and after Guam Movers gave APL cargo (PSUF ¶175), Matson increased Guam Movers rates about 30% in 2017. (PSUF ¶¶173, 176.)

Matson's contracts and MOUs also began blocking APL's access to key shippers in 2016. Home Depot, the largest commercial shipper to Guam, could do almost no business with APL, due to a 94% volume commitment with Matson. (PSUF ¶312.) ████████████████████

███████████████████████████████████ (PSUF ¶314.) ████████████████

█████████████ (PSUF ¶315.) ████████████████████████████████████

████████████████████████████ (*Id.*)

APL ended its first year with less than 10% of U.S./Guam market (PSUF ¶52), within Matson's pre-entry estimates. (PSUF ¶5.) But with APL's enhanced service starting early 2017—doubling its Guam sailings, opening a Guam office, and offering lower rates to customers unhappy with Matson (PSUF ¶¶4, 7-8, 81-108)—Matson recognized the threat and amped up its tactics.

In early 2017, Matson management resolved to keep all of its outsized U.S./Guam share without "eroding" its inflated margins (PSUF ¶9), an impossible outcome on competition alone. Matson also adopted corporate "key objectives" for 2017 which ordered its CEO to "limit losses"

to APL. (PSUF ¶10.)

In February 2017, Matson began its years-long campaign of trying to reverse the federal government's MSP-enrollment of APL's Guam vessels (PSUF ¶328), on the premise APL would withdraw from Guam without MSP-enrollment.[17] (PSUF ¶336; Resp. DSUF ¶ 35.) Matson's executives issued repeated directions for the Guam sales team to tell shippers the false narrative that Matson received no government benefits, and Matson was seeking to end APL's "unfair" MSP "subsidy" that APL needed to continue its Guam service to convey APL would leave Guam. (PSUF ¶¶323-25)—implying, and in most cases directly stating, APL would leave.

Matson's team delivered the false narrative (PSUF ¶336), and its effectiveness was sharpened by many shippers already having experienced retribution, with Matson charging "disloyal" Horizon shippers relatively higher rates after Horizon exited in 2011, leaving Matson the only U.S./Guam carrier. (PSUF ¶¶1-2.) This made Guam shippers averse to APL, requiring a ███████████████████████████████████████████████ (PSUF ¶337-43.)

At the same time, obviously not stopping APL in Guam, Matson expanded its relatiation to Alaska, threatening APL in March 2017 with ending a critical connecting carrier agreement ("CCA") (*see* page 60-64), which Matson admitted it did in response to APL's "intensifying competition," including in Guam. (*See* page 66-68.)

A few weeks later, in April 2017, Matson began its tactical use of "slot" proposals, an arrangement for Matson to carry on its regularly scheduled vessels APL customer cargo to Guam. (PSUF ¶¶269.) APL regarded Matson's proposal as an effort ████████████████████████ ███████████████████████████████████████████████

---

[17] MSP provides payments to owners of "commercially viable, militarily useful" vessels to be on call for government use during times of conflict or national emergency. (PSUF ¶327.) Matson is a recipient of Jones Act benefits and subsidies, and its vessels are not enrolled in MSP. (PSUF ¶322.)

███████████████████████████████████████████████████████████

████ (PSUF ¶279.)

Matson's three-year business plan prepared in 2017 omitted the CCA with APL in Alaska (PSUF ¶198), which "[n]egatively impacts volumes and rates as APL is higher rated than other CCA's." (PSJ 14 at '7257.) Ending the CCA also upset Matson's customers. (PSUF ¶210.) Matson anticipated in 2017 that ending CCA would cost it about $5 in million in lost annual revenues. (PSJ 14 at '7258, '7260.) Matson had no plan in 2017 for replacing those revenues (PSUF ¶212), also confirmed by its 2018 documents referring to need to make a plan. (PSUF ¶213; PSJ 171.)

████████████████████████████████████████████████████ (PSUF ¶¶202-03.)

As APL's enhanced service appeared to be gaining momentum in Guam (PSUF ¶8), in mid-2017 Matson management decided to pursue a new strategy of using shipper agreements to "lock in" the 20 largest Guam shippers, with objective of securing 80% of volume. (PSUF ¶¶304, 307.) This was a deviation from Matson's routine practice of using public tariffs for Guam shipping terms. (PSUF ¶303.) Matson pursued its new strategy by using a variety of restrictive agreement terms it recognized as "barriers" (PSUF ¶58), including long-term duration, exclusivity obligations, commitments to give Matson minimum quantities of cargo ("MQCs"), volume incentive discount schemes ("VIDs"), and "cross-trade" commitments that tied use of Matson's Hawaii service with shipping with Matson to Guam. (DSJ 13, RWB Rpt. Ex. 6.)

In pursuing agreements, Matson continued its false MSP narrative insisting ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ (PSUF ¶¶336-43), For instance, ████████████████████████████████████████████████████████

████████████████████████████████████████████ (PSUF ¶¶344-45.) In 2017,

███████████████████████████████████████████████████████████

████████ (PSUF ¶¶315, 338.) In 2017, █████████████████████████

█████████████████████████████████████████████████████████

████████ (PSUF ¶341.) █████████████████████████████████████ (*Id.*)

Matson executives admitted these strategies helped "lock in" Guam shippers. (PSUF ¶¶309-13.) By August 2017, Matson identified more than 20 Guam or Hawaii shippers with agreements. (PSUF ¶¶320-21; PSJ 144.) Matson locked up the largest Guam shippers during various times, the "anchor" accounts, including, Home Depot, Macy's, Ross Stores, PHV, Pay-Less, Kmart, Xerox, GE, General Mills, Kimberly-Clark, Ambros, and Cost-U-Less. (PSUF ¶¶309-13; DSJ 13, RWB Rpt. Ex. 6.)

While APL eventually gained some business from some of those shippers, the agreements produced to APL,[18] plus Matson's other conduct, erected barriers to APL and locked up "anchor" accounts (PSUF ¶315), with Dr. Warren-Boulton finding that ██████████████████

█████████████████████████████████████████████ (*See* APL Oppo. *Daubert* Ex, A, RWB Decl. 34.) Expanding that analysis to shippers to both Guam and Hawaii,

█████████████████████████████████████████ (*Id.* 34.)

In  2017 █████████████████████████████████████████████████

████████████████████████████████████████ (PSUF ¶¶182-83.) ██████████

██████████████████████████████████████████ ("rolled" refers to cargo left off a vessel. (PSUF ¶¶184-85.)

During mid-2017, Matson was particularly concerned by APLs' momentum carrying

---

[18] Matson's internal documents refer to agreements not produced in discovery, despite repeated requests by APL. (PSUF ¶¶320-22.) APL's analysis of a subset of agreements understates the effects of all of them.

containers in the household goods ("HHG") submarket. (PSUF ¶¶8, 292.) By September 2017, Matson decided to leverage its Hawaii dominance to bundle its U.S./Hawaii and U.S./Guam services for HHG shippers—not to offer lower shipper rates, but to halt APL's momentum. (PSUF ¶293.) Matson devised a "Loyalty Program" that offered a 25% discount for HHG shippers who shipped at least 90% of their Guam *and* Hawaii cargo with Matson. (PSUF ¶294.)[19] Matson had not previously bundled different trades or set a 90% shipping requirement (PSUF ¶295), a percent arbitrarily set "to secure as much freight as we possibly can." (PSUF ¶¶296-98.)

Before launching its "Loyalty Program," Matson retaliated against disloyal shippers, again. In October 2017, Matson cut off its business with Royal Hawaiian Movers, a sister entity of DeWitt Guam. (PSUF ¶160.) Prior to APL's Guam entry, Royal Hawaiian drayed containers for Matson. (PSUF ¶161.) Matson knew DeWitt Guam began doing HHG business with APL in 2017. (PSUF ¶147.) So, in retaliation, Matson stopped giving trucking business to Royal Hawaiian, as Matson documents and witnesses admit. (PSUF ¶¶162-64.) The business is cut through at least October 2023. (PSUF ¶165.)

The next month, Matson retaliated against DeWitt Guam, a shipper and trucking supplier that Matson knew had begun business with APL (PSUF ¶¶142-49), confirmed in a November 14, 2017 email written by its President, Corine Berking:

> A week ago, I was advised ***Matson has cut DeWitt trucking off*** from all trucking drays effective immediately. We went from doing 30% of their military hauls to 15% and now reduced down to 0%. ***This is in retaliation to our partnership with APL*** and our lack of support with them in the entire year.

(PSJ 139 (emphasis added); PSUF ¶150.) She testified that her email is accurate (PSUF ¶150) and she received no "out of the ordinary" complaints prior to cut off. (PSUF ¶151), and told APL

---

[19] The HHG Loyalty Program also offered a 20% discount to shippers giving Matson at least 90% of their cargo for Guam or Hawaii. (PSUF ¶294.)

employees about the retaliation. (PSUF ¶152.) A former senior Matson executive, Tom Good, confirmed Matson's tactic of ending business with companies giving containers to APL. (PSUF ¶146.) Ms. Ramos, Matson's employee who assigned trucking work, testified Matson management told her "[n]ot to give business to DeWitt." (PSUF ¶154.) The few documents on the subject produced by Matson confirm retaliation. (PSJ 34 (recommending no trucking business for DeWitt until it "demonstrated behaviors of alliance"); PSJ 34 (Bernie Valencia: "No Military trucking"); PSJ 37 ("since their working with APL on the HHG's I think Bernie pulled that business").)

Matson's retaliation against shippers was known in the business community (PSUF ¶¶156) and it, plus Matson's other conduct like the false MSP campaign and continuing prediction that APL not remaining in Guam, ████████████████████████████████████████

████████████████████████████████████████████████ (PSUF ¶¶157, 289-91, 323-26, 336-58.) ████████████████████████████████████████████

██████████████████████████ (PSUF ¶358.)

By the end of 2017, Matson's tactics had contained APL to about 20% of the U.S./Guam market (PSUF ¶¶50-52), better than Matson's "worst case" scenario. (PSUF ¶5.) To further incent, Matson adopted a new Guam market share-based compensation for management for 2018, compensating them if Matson kept its dominant position. (PSUF ¶¶12, 19.)

In January 2018 Matson launched its 90% market share discount bundle, dubbed "Loyalty Program." (PSUF ¶294.) It effectively limited APL to a 10% sliver of the HHG cargo for shippers to both Hawaii and Guam because, under the terms devised by Matson, those shippers forfeited the entirety of their 25% discount if they shipped even one container short of Matson's 90% requirement. (PSUF ¶¶299-300.) During the following years, 45 of the 46 "Loyalty Program"

participants shipping to both Hawaii and Guam shipped at least 75% of their Guam cargo with Matson, and its share of the HHG submarket (Los Angeles-to-Guam) increased from about 20% to more than 70% in 2023. (PSUF ¶301; DSJ 13, RWB Rpt. 44, 25.)

Also in January 2018, back in Alaska, Matson cancelled APL's office and shop lease in Alaska with no plan at the time for replacing Matson's lost lease revenue or other use of the property. (*See* page 63.) Three months later, in March 2018, Matson ejected APL from its long-time Alaskan "hub" terminal, with no plan at that time for alternative use (*see* page 61-62), and Matson then terminated a shared tug arrangement. (*See* page 63.) On May 5, 2018, Matson's CEO said the "axe fight" with APL would "continue until it stops." (PSUF ¶13.)

Matson's retaliation and ending of "operational cooperation" in Alaska in 2018 (PSUF ¶257) █████████████████████████████████████, as well as millions in lost revenues and costs on Matson. (*See* page 43.) Matson admitted these Alaskan acts were in response to APL's competition in Guam. (*See* page 65-68.)

Still intent on competing, in August 2018, APL announced another service enhancement, reconfiguring vessel routes to shorten planned U.S.-mainland-to-Guam transit time by two days. (PSUF ¶270.) Matson responded with another "slot" proposal (PSUF ¶270), ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ (DSJ 473), at ███████████████ (SUF ¶274.) APL viewed this proposal ███████████████████ ████████████" (*Id.*) APL determined this proposal, like the prior, ████████████████████████████████████████████████████████████ ██████████████████████ (SUF ¶¶274-75; PSJ 4.)

A couple weeks later, during an October 31, 2018 lunch meeting (SUF ¶271), Matson

executives, including the CEO, conveyed ███████████████████████████████

████████████████████████████████████████████████████████████

(SUF ¶271; DSJ 86, Aldridge Dep. 83:1-9 (Matson CEO stated: "You fix Guam, you get out of Guam, you get those ships out of Guam, you get your iron out of Guam, and then we can talk about cooperation in Alaska and other places."); DSJ 71, Saadé Dep. 87:25-88:5 (Matson CEO stated ████████████████████████████████████████████████"); DSJ 19, Mensing Dep. 314:20-314:1 (Matson CEO stated ████████████████████).

Considering market structure and economic incentives, ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████ (DSJ 13, RWB Rpt. 7, 70-83; DSJ 411, RWB Rebut. 4, 34.)

During 2018 Matson continued its challenge of APL's MSP enrollment, including a federal court challenge filed in November 2018 (SUF ¶328) and its "full force" false MSP campaign in Guam. (SUF ¶¶323-26, 332-36.) The effectiveness of Matson's campaign was perfected in 2018, when the National Defense Authorization Act ("NDAA"), pursued by Matson, began to prohibit additional, non-replacement U.S.-flag vessels serving Guam with support of MSP funding. (SUF ¶¶76-78, 331.)

That campaign and leveraging of its Hawaii dominance to keep Hawaii/Guam shippers from giving Guam cargo to APL, hindered APL's customer acquisition: ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



(SUF ¶¶338-49.)

(SUF ¶¶312-16, 338.)

Going into 2019, Matson's tactics had limited APL to about 25% of the U.S./Guam market (SUF ¶¶50, 52.) And Matson continued the same conduct. In 2019, when DeWitt was awarded FEMA work, and Matson understood DeWitt to be working with APL, Matson's Guam manager issued instructions to withhold from DeWitt shipping equipment that Matson had provided in the past. (SUF ¶¶177-81.) Matson's manager also instructed Saipan Shipping, Matson's agent, to withhold equipment from DeWitt. (SUF ¶179.)

Matson pursued another slot proposal in 2019, with terms APL regarded as "

" (PSUF ¶¶278-83.) If there were any doubt, in November 2019, Matson's CEO followed up it slot proposal with an offer to purchase APL's U.S.-flag business. (PSUF ¶276.)                                        (PSUF ¶283), and Matson's CEO then offered again in 2020 to buy APL's U.S.-flag business. (PSUF ¶287.)

In early 2021, as the shipping industry was dealing with Covid-related delays, Matson interfered with APL's access to ports and berths at the Oakland International Container Terminal ("OICT"), 30% owned by Matson, by

(SUF ¶¶359-64.)

(SUF ¶361.) In the interim, instead of priority access,

(*Id.*)

By 2021, Matson's tactics has succeeded in it regaining share, and limiting APL to about

20% of the U.S./Guam market (SUF ¶¶50, 52.) Since APL filed its complaint in 2021, Matson has continued its misconduct. Without the benefit of discovery (Matson refused to provide post-complaint documents), Matson has, at least once, threatened Guam shippers.



(SUF ¶346.)

## B.    Evidence of Matson's Predatory and Exclusionary Conduct is Sufficient

The package of actions to undercut and hinder APL's entry and growth in Guam, to protect Matson's dominance and margin, considered in whole as is routine in federal courts across the country,[20] is predatory and exclusionary.

"Predatory" conduct, for attempted monopolization, is the "seeking of monopoly power by means other than superior efficiency, by means that would not be employed in the normal course of competition." *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 427 (D.C. Cir. 1986). "Exclusionary" conduct that supports monopolization, the D.C. Circuit explained, is conduct with "'an anticompetitive effect.' That it must harm competitive *process* and thereby consumers." *Microsoft*, 253 F.3d at 58 (citation omitted).

Matson's punishment of customers and suppliers because they did business with its competitor, APL is neither normal nor merit based. *See, e.g., Nat'l Farmers Org*., 850 F.2d at 1290 ("blatantly predatory" for defendant to cut off supplier for doing business with competitor).

---

[20] *See, e.g., LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation"); *Nat'l Farmers Org., Inc. v. Assoc. Milk Prods., Inc.*, 850 F.2d 1286, 1302 (8th Cir. 1988) (challenged acts "cannot be viewed in isolation from the context in which they occurred") (citing *Cont'l Ore*, 370 U.S. at 699); *Bonjorno v. Kaiser Alum. & Co. Corp.*, 752 F.2d 802, 808 (3d Cir. 1984) (considering "combination of the threats" with other evidence).

Threats of retaliation, even if unexecuted, also are predatory and exclusionary. *See Microsoft*, 253 F.3d at 77-78 (affirming Microsoft's threats of retaliation was unlawful conduct).

Retaliation against a competitor, like ██████████████████████████████████ ██████, also is obviously predatory and exclusionary. *See Bonjorno*, 752 F.2d at 808 (ruling anticompetitive for defendant to threaten and then stop business with plaintiff in retaliation for it competing). And that is further confirmed by Matson ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ None of this is efficiency enhancing and, instead, would further harm competition for shippers in the two U.S. carrier market. *See, e.g., Microsoft*, 253 F.3d at 58 (explaining exclusionary acts harm competitive process").

In that context, Matson's obstruction at OICT is predatory and exclusionary because it ████████████████████████████████████████—timeliness Matson claims to be important for APL's ability to compete (Motion 1)—for reasons other than competition on merit. *See Multistate Legal Studies v. Harcourt Brace Pub.*, 63 F.3d 1540, 1553 (10th Cir. 1995) (finding competitor's interference with rival's schedule anticompetitive when it "discouraged" business).

Matson's use of its Hawaii dominance to sharpen threats, pressure Hawaii/Guam shippers from APL, and deploy the market share discount bundle that forecloses APL from about 90% of the Hawaii/Guam HHG shippers, buttressed by retaliation, threats, and misleading MSP campaign, is the collective sort of conduct that is anticompetitive when taken by a dominant firm to exclude a rival. *See, e.g., M & M Med.*, 981 F.2d at 167 (dominant firm "pressuring," threatening, and misleading customers to block entrant exclusionary); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) (affirming § 2 verdict based on dominant distributor using exclusive agreement discount, misleading information, and interfering with rival's display racks).

Similarly, the pursuit of restrictive agreements by Matson, to lock in key shippers in response to APL's entry, is predatory and exclusionary means for a dominant firm to block a Guam entrant—especially when buttressed by retaliation, threats, and Matson-induced concern APL will pull out of Guam. *See, e.g., 3M v. Appleton Papers, Inc*., 35 F. Supp. 2d 1138, 1146 (D. Minn. 1999) (finding exclusionary conduct in combination of initiating restrictive agreements, starting rumors, and persuading merchants to stop business with rival).

The self-reinforcing effect of Matson's acts—*e.g*., threats, concerns about Hawaii carriage, MSP-induced concern APL will leave Guam, combined with shipper agreements and bundling—has distorted the competitive process, with shippers conveying to APL, repeatedly, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (SUF ¶¶291, 313-15, 336-49, 354-58.) The evidence of Matson's collective action is more than enough to raise a jury issue on whether it is predatory and exclusionary, with courts affirming verdicts on lesser acts. *See, e.g., Conwood*, 290 F.3d at 775-80; *Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.,* 623 F. 2d 1255 (8th Cir.1980) (affirming § 2 verdict based on dominant firm using veiled threats and false, deceptive ads discouraging patronage of rival).

### C.    Matson's Acts, Considered Separately, Suffice and It Argues Jury Issues

The Motion's *seriatim* presentation of some evidence, and consideration of whether each piece is "non-actionable," violates binding precedent; but even if this course were followed, there would be sufficient evidence that Matson acted for predatory or exclusionary means.

Matson's presumption that only "actionable" conduct qualifies as exclusionary for § 2 monopolization claims (Motion 12) is contrary to decades of precedent. When holding threats—like Matson's here—can support monopolization claims, the Supreme Court explained: "Even an otherwise lawful device may be used as a weapon . . . in an effort to monopolize." *Schine Chain Theatres v. United States,* 334 U.S. 110, 119 (1948); *see also Am. Tobacco*, 328 U.S. at 801 ("It is

not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful."); *id*. at 814 (explaining that limiting conduct supportive of § 2 violation to "manoeuvres not honestly industrial" would "emasculate the Act") (citation omitted). This is why, of course, *Microsoft* refers to exclusionary conduct as acts "which reduce social welfare," not which violate specific laws. 253 F.3d at 58-59. The D.C. Circuit accordingly ruled that Microsoft's threats to retaliate against Intel "were exclusionary" for § 2 monopolization. *Id.* at 77-78. If Matson's approach were correct, those threats would have been discarded as "non-actionable."[21]

Certainly, courts sometimes consider whether alleged exclusionary conduct *resembles* established antitrust violations to aid assessment of uncertain effects[22]—but such a step is unnecessary here, with Matson's tactics plainly predatory and exclusionary. Even if analogous claims were considered for guidance, predatory and exclusionary conduct is not confined to only those acts meeting technical elements of a cause of action. Thus, in *Chase Manufacturing*, the Tenth Circuit recently reversed summary judgment by the trial court that assumed, at the urging of Matson's counsel, conduct could not be exclusionary unless it satisfied claims elements. That was wrong, the Tenth Circuit held, because anticompetitive conduct comes in too many forms to be analyzed "under any solitary framework." *Id.* at 1173 (explaining trial court should measure conduct by looking "to the reality" of market and the "practical effect" of defendant's conduct); *see also Microsoft*, 253 F.3d at 58 (reminding, means of exclusion are "myriad").

---

[21] Circuits across the country, in addition to *Microsoft*, have long recognized that § 2 claims may be supported by non-actionable conduct. *See, e.g., Photovest Corp. v. Fotomat Corp*., 606 F. 2d 704, 719 (7th Cir. 1979) (stating "lawful practices may become unlawful" if part of monopolization); *Greyhound Computer v. IBM,* 559 F.2d 488, 498 (9th Cir. 1977) (explaining "predatory" conduct and that a firm with monopoly power would be precluded from otherwise lawful practices that exclude competition).
[22] Categorizing conduct, the Seventh Circuit said, can help spot "presence of absence or harmful effects." *Viamedia, Inc. v. Comcast Corp*., 951 F.3d 429, 453 (7th Cir. 2020) (citation omitted).

Matson's *seriatim* consideration of whether each of its individual acts is "actionable" further violates precedent. (Motion 12-35.) It is literally textbook: "When evaluating different instances of conduct, courts evaluate whether the conduct as a whole is anticompetitive rather than each individual act because antitrust is concerned with the impact on consumer welfare." ABA, Vol. 1, ANTITRUST LAW DEVS. § 2-F-1; *see also Antitrust Law* § 310c7 ("In a monopolization case, conduct must always be analyzed 'as a whole'. A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices.").

Matson's heavy reliance on *Google, Meta,* and *EpiPen* (Motion 14-15) is misplaced, as they considered exclusive dealing elements because, unlike here, the use of exclusivity was the only, or primary, challenged conduct. *See United States v. Google LLC*, 2023 WL 4999901, at *2 (D.D.C. Aug. 4, 2023); *N.Y. v. Meta Platforms*, 66 F.4th 288, 301 (D.C. Cir. 2023); *In re EpiPen Marketing, Sales Practices & Antitrust Litig.*, 44 F. 4th 959, 972 (10th Cir. 2022). Their unremarkable consideration of exclusive dealing elements in cases focused on exclusive dealing does not support Matson's effort to convert all marketplace threats, for instance, into exclusive dealing and then judge them "non-actionable" if they do not meet exclusive dealing's elements.

Even if Matson's acts were considered individually, there is sufficient evidence that they are predatory and/or exclusionary, and Matson's arguments do not eliminate material fact.

### 1.      Retaliating Against Customers and Suppliers

Matson's retaliation against GTW, Guam Movers, Royal Hawaiian, DeWitt Guam, and Approved Freight for doing business with APL is predatory and exclusionary because it is not competition on merit. *See Microsoft*, 253 F.3d at 77. Matson retaliated *because* these suppliers and customers "supported" APL; such acts "have little or no value beyond the capacity to protect the monopolist's market power." This evidence alone is sufficient for summary judgment, demonstrated in *Chase Manufacturing's* ruling that hearsay marketplace threats by a dominant

incumbent—including a threat to stop business with distributor if it "supports" the competitor—is sufficient to raise jury issue. *See id.* at 1165, 1171.

Downplaying the evidence, Matson is silent on Royal Hawaiian, Approved Freight, Guam Movers.[23] For GTW, Matson lamely claims its retaliation is outside the statute of limitations. (Motion 10, 18.) Matson conflates proof with recoverable damages, and ignoring evidence of its pre-limitations conduct is wrong. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 710 (1962) (ruling trial court erred in excluding evidence of pre-limitations exclusionary conduct). Matson's further assertion that it has "unquestioned right" to choose its dealers is wrong too. (Motion 19.) A plethora of authorities impose strict limitations on Matson's purported "right" due to its market dominance. *E.g., Aspen Highlands v. Aspen Skiing Co.*, 472 U.S. 585, 601 (1985) (stating monopolists do *not* have "unqualified" right to refuse to deal). Matson's own antitrust guidelines acknowledge that otherwise permissible conduct could "raise antitrust concerns if done by Matson" due to its "unique" position as a "major provider." (PSJ 201 at '7966.)

For DeWitt Guam, Matson only offers a competing version of "fact," sidestepping the contemporaneous admissions of retaliation. (PSUF ¶¶150-53.) Matson asserts, misleadingly, that DeWitt "disclaimed" retaliation. (Motion 10, 18.) But there is no admissible evidence of "disclaimer": It is an unreliable declaration written by Matson counsel (*see* APL Resp. DSUF 183; APL Objection & Motion Strike) and a couple snippets of ambiguous testimony that is contrary to contemporaneous documents (PSJ 139 ("Matson has cut DeWitt trucking off . . . in retaliation to our partnership with APL")) and testimony of Matson's employees. (SUF ¶¶148, 153-54.) Matson's spin on cherry-picked evidence cannot be credited and cannot eliminate material fact

---

[23] Matson is aware of these incidents, discovered in Matson-produced documents, reviewed during multiple depositions and disclosed in expert reports cited in DSUF.

issues. *See Liberty Lobby*, 477 U.S. at 248.

### 2.    Threatening Customers and Suppliers

Matson's threats—from threats of rolling shipper cargo if they do business with APL to its MSP campaign to dissuade shippers from business with APL[24]—serve no competitive purpose, and are plainly predatory and exclusionary when, as here, they are used by the dominant incumbent to recover or maintain its dominance. *See, e.g., Schine Chain Theatre*, 334 U.S. at 119 (explaining dominant firm's threats to obstruct entry of competitor, even when ambiguous in form, support unlawful use of power); *Microsoft*, 253 F.3d at 77-78 (exclusionary for Microsoft to threaten retaliation against Intel if it supported a potential Microsoft competitor); *Dentsply*, 399 F.3d at 194 (defendant's threats to cut off distributors who refused to carry their products sufficient to support a monopolization claim).

Lesser conduct was ruled as predatory by the D.C. Circuit in *Caribbean Broadcasting System v. Cable & Wireless PLC*, where defendant made misrepresentations about its competitor's radio signal, based on "sham" objections to regulators. 148 F.3d 1080, 1087 (D.C. Cir. 1998) (explaining misrepresentations and sham objections "well within" anticompetitive conduct). Even deceptive conduct, the D.C. Circuit ruled, can be exclusionary. *Microsoft*, 253 F.2d at 76-77 (ruling it was exclusionary for Microsoft to "deceive" Java to help protect monopoly).

None of Matson's conclusory assertions proves the "absence of evidence" of threats that a jury could find predatory or exclusionary. *Celotex*, 477 U.S. at 325. *First*, the statute of limitations does not save Matson from threats it made prior to July 2017 (Motion 17),[25] because they are admissible at least for proof of a violation. *See, e.g., William Inglis & Sons Baking Co. v. ITT*

---

[24] The Motion splits its MSP campaign from its of threats. APL considers them together here.

[25] Matson's sole authority, *Meijer*, considered only whether an action was timely filed, which is no support for its assertion that conduct before the damages period should be ignored *in toto*.

*Cont'l Baking Co., Inc.*, 668 F.2d 1014, 1056 (9th Cir. 1981) (agreeing with trial court admitting pre-limitations evidence for proof antitrust violation); *Cont'l Ore*, 370 U.S. at 710.

*Second*, Matson, once again, offers alternative "fact" (Motion 14-15, 20), based exclusively on accepting the truth of inadmissible declarations to which APL objects. (*See* APL Objection & Motion to Strike.)[26] Most of those declarations are refuted by contemporaneous evidence, leading to a jury issue even if admitted. Viewed in APL's favor, the evidence of threats, outlined above and at PSUF ¶¶118-87, 290, 323-49, 356-58, is sufficient to raise a jury issue, when D.C. Circuit ruled that only three (3) instances of "threats" by Microsoft was exclusionary. *Microsoft*, 253 F.3d at 77-78.

*Third*, Matson's argument about "hearsay" incorrectly presumes no claim could be supported unless APL was "in the room" with Matson. (Motion 15.) But, as *Chase Manufacturing* recently held, a jury may reasonably infer from APL's first-hand experience with shippers that Matson's threats they referenced, together with its other conduct like retaliation known in the shipper community (PSUF ¶¶130, 156-57, 337) influenced shippers to avoid business with APL. *See Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1171-72 (10th Cir. 2023) (explaining, despite no direct evidence from customers, jury could infer from an entrant's "paltry" success that threats caused customers not to purchase entrant's products).

*Fourth*, the argument that Matson's threats were not threatening enough (Motion 16) is another improper recast of facts in Matson's favor—ignoring the evidence and import of shipper apprehension following Horizon's departure; Matson's known retaliation and discriminatory

---

[26] Matson's complaint about APL relying on "self-serving hearsay" is rich (Motion 15-16), when Matson seeks to rely heavily on declarations prepared by Matson counsel. (*See* APL Objection & Motion to Strike.).

treatment of "disloyal" Horizon shippers (PSUF ¶¶1-2, 284-85, 336, 341-43, 347-48);[27] and Matson's top-down, "full force" campaign of telling shippers about its legal challenges to end APL's "unfair" MSP that it needs to stay in Guam (PSUF ¶¶323-36); all of which, APL experienced, ███████████████████████████████████████████ (PSUF ¶337, 358.) This efficacy of Matson's threats, both explicit and implicit, is a jury issue at least. *See, e.g., Alexander*, 687 F.2d at 1198 (finding threats of supply cutoffs "plainly predatory").

*Fifth*, asserting that APL acknowledged the value of MSP payments (Motion 21-22) only punctuates the efficacy of Matson's disparaging threat to end them.[28] Matson's similar reliance on its expert's conjecture about market effect (*id*. 23), when she did no analyses to define a market for measuring any such effect (APL *Duabert* 8-15), even if admissible, would only present a difference of opinions.

*Finally*, Matson's assertion that threats cannot be exclusionary unless independently "actionable" as a cause of action (Motion 14-15) is wrong as explained in § III.C.A., *supra*. For this reason, Matson's argument that disparagement cannot "give rise" to an antitrust claim misses the mark (Motion 19-20), when there are additional forms of predatory/exclusionary conduct. Matson's two cases (*Duty Free* and *Walgreen*) suggest a six-element disparagement action test when—Matson omits—there is *no* evidence of competitive harm. *See Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1268 (11th Cir. 2015) (dismissing disparagement-based § 1 claim for no alleged false statement and competitive harm). But here, there is evidence from which a jury could infer competitive harm (*see* § III.V., *infra*) and, moreover, neither *Caribbean Broadcasting*

---

[27] Dr. Warren-Boulton's analysis of transactional data found that ████████████ ██████████████ (DSJ 13, RWB Rpt. 71-72 & Ex. 7.)
[28] Whether Matson believed it was telling the truth about APL's enrollment in MSP would be fact issue. (Motion 20-22.)

nor *Microsoft* followed Matson's ill-conceived "actionable" six-element test.

### 3.    Retaliating in Alaska for APL Competing in Guam

Once APL enhanced its Guam service in 2017, Matson began retaliating against APL in Alaska. (Pages 60-64.) The predatory and exclusionary nature of retaliation is obvious. *LePage's*, 324 F.3d at 147 (competition "on some basis other than the merits") (citation omitted). The Supreme Court identifies threatened, let alone completed, retaliation as predatory or exclusionary. *See Grinnell*, 384 U.S. at 570 (threatened retaliation against potential entrants); *Schine Chain Theatres*, 334 U.S. at 117-19. So do appellate courts. *See e.g., W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109-10 (3d Cir. 2010) (defendant threats to build nearby facilities to compete with hospitals doing business with defendant's competitors).

That Alaska is far away with different customers and prices is irrelevant. (Motion 31-32.) Matson hurt APL in Alaska in retaliation for it infringing Matson's Guam monopoly. (Pages 64-67.) APL's Alaska damages are causally connected to Matson's § 2 violation in Guam and, therefore, recoverable under the Clayton Act. (Pages 67-69.)

Matson's resort to arguing retaliation is "inactionable" is inapt (Motion 32-33) because predatory or exclusionary conduct need not be "actionable." (*See* § III.C.5., *supra*.) Matson's repacking of APL's complaint as "refusals to deal" claims—with elements exceeding what is needed for an act to be merely predatory or exclusionary—is precisely why the Tenth Circuit rejected the same gambit by Matson counsel. *See Chase Mfg*., 84 F.4th at 1173 (ruling trial court erroneously relied on refusal-to-deal claim framework for assessing exclusionary conduct).

Matson's *ex post facto* excuses for its Alaska retaliation are pretextual. *See Microsoft*, 253 F.3d at 59 (explaining justifications must be "nonpretextual"). Matson ejected APL from the LASH Dock (PSUF ¶¶216-31), and the Motion proved no procompetitive plan, at that time, for the ejection. Matson terminated APL's office and warehouse lease (PSUF ¶¶235-42), and

Matson's corporate representative designated for this topic identified no plan, at the time of termination, for alternative use of that space. (PSUF ¶243.) Matson ended the CCA (PSUF ¶¶194-216), and its lawyerly characterization of it as "expir[ing] on its own terms" is gobbledygook. (Motion 33.) Ending the CCA cost Matson millions of dollars in lost revenue because it had no plan at that time which replaced revenue lost. (PSUF ¶¶211-13.)[29] Matson also cut the Matson-APL tug arrangement, imposing more costs on itself (PSUF ¶¶245-51); the assertion it was for "safety and reliability" is not credible (Motion 33) because Matson identified no changes in conditions that necessitated ending the arrangement at that time. Drawing inferences against Matson, a jury would not accept these unsupported excuses as "legitimate good business practices." *U.S. Football League v. NFL*, 842 F.2d 1335, 1361 (2d Cir. 1988) (reviewing "settled precedent" for justifying dominant firm conduct).

### 4.    Pursuing Slot Proposals to Lessen Guam Competition

A jury could reasonably conclude that Matson's pursuit of slot proposals was for limiting, not promoting, competition in Guam, when: Matson made then only after APL entered and enhanced its service; ████████████████████████████████████

████████████ (PSUF ¶¶268-82.) This use of slots is predatory, as the D.C. Circuit explained, because it is aggression to "chasten" APL to abandon competition threatening Matson. *Neumann*, 786 F.2d at 427. Matson would not have imposed large Alaskan costs on *itself*, when punishing APL, absent an expectation they would be recovered in lessened competition in Guam.

---

[29] Because Matson acted without a plan in 2017, Matson's Alaska Team *recommended that Matson resume CCA arrangement with APL*, to staunch losses Matson inflicted to itself by retaliating. (PSUF ¶214.)

Any doubt on the predatory objective is removed, with Matson's willingness to reverse its costly punishment in Alaska, for reduced competition in Guam. (PSUF ¶¶262-67.)[30] ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (DSJ 345, RWB Dep. 58:16-25.) Such an effort by Matson to remove its only U.S. container cargo competitor is well within the myriad of conduct that is predatory or exclusionary, exemplified by the Second Circuit affirming that the NFL increasing the number of football players it drafted was a predatory means of depriving an upstart rival league of players. *See NFL*, 842 F.2d at 1349, 1353; *see also Neumann*, 786 F.2d at 427 (defining "predatory" as conduct seeking monopoly power by means other than "superior efficiency," outside "the normal course of competition").

Matson's slot scheme is not invariably "procompetitive." (Motion 34.) That assessment must be done in context of the competitive landscape, considering potential market effects. *See Microsoft*, 253 F.3d at 58-59. APL's reviews of Matson's proposals, received after APL threatened competition, ████████████████████████████████████████ (PSUF ¶¶268-82.) Lessening competition in a two-carrier market is not procompetitive, and Matson proved no justifications outweighing the testimony and expert analysis showing that effect.

Asserting "unconsummated proposals" cannot be "anticompetitive" ignores APL's attempt to monopolize claim. (Motion 34.) That claim, by nature, is directed against "dangerous probability." *Swift & Co. v. United States*, 196 U.S. 375, 396, 402 (1904). Conduct with a probability of lessening competition at the time pursued can be predatory in support of attempted monopolization. *See United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1118-19 (5th Cir. 1984).

---

[30] Matson falsely says this was "invented" at Dr. Warren-Boulton's deposition (Motion 32), when it was twice previously disclosed. (DSJ 13, RWB Rpt. 7, 70-83; DSJ 411, RWB Rebut. 4, 34.)

Courts, thus, have rejected Matson's broad assertion that "unconsummated proposals" cannot be predatory. *See, e.g., id.; Tasty Baking Co. v. Ralston-Purina, Inc.*, 653 F. Supp. 1250, 1271 (E.D. Pa. 1987) (ruling dominant firm's yet-to-be-completed plan to acquire competitors supported attempt to monopolize claim); *Ningde Amperex Tech. Ltd. v. Zhuhai Cosmx Battery Co., Ltd.*, 2023 WL 4670490, at *4 (E.D. Tex. July 20, 2023) (rejecting argument that "unconsummated proposal" cannot support attempt to monopolize).[31]

### 5.     Exploiting Hawaii Market and Bundled Market Share

Matson is the dominant U.S./Hawaii carrier (*see* § II.B.2., *supra*) and the only U.S. mainland container carrier serving both Hawaii and Guam. (PSUF ¶¶54, 74-75.) Exploiting its Hawaii dominance,[32] Matson conveyed to shippers ██████████████████████████████ ██████████████████████████████████████████████████████████████████████ This is reflected in contemporaneous documents (PSUF ¶¶288-91), economic analysis showing ████████ ████████████████████████████████████████████████████████████████████ (DSJ 13, RWB 53-54), is consistent with ███████████████████████████████████████████ █████████████████████ (PSUF ¶¶337-43, 358.)

The leveraging of Matson's power in Hawaii, whether implicit or express threats, to influence customers away from APL in Guam is not competition on merit. Using threats to pressure Guam shippers from APL is predatory and exclusionary. *See Microsoft*, 253 F.3d at 77-78. That

---

[31] *3Shape* is not contrary because, unlike APL's evidence, it merely considered allegations, and determined they did not plausibly state harm from unaccepted proposals. 2019 WL 384209, at *6 (D. Del. Aug. 15, 2019). Matson incorrectly assumes there can be no attempted monopolization claim without proof of actual anticompetitive effect (Motion 34); but this claim "need merely *threaten to produce* the type of market damage contemplated in the antitrust laws." *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 994 (5th Cir. 1983) (emphasis added).

[32] While not claiming a leveraging cause of action, it involves use of monopoly power in one market to gain advantage in another. *See 2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126 (D.D.C. 2018). Some courts require dangerous probability of success in second market. *See NYME v. Intercont'l Exch. Inc.*, 323 F. Supp. 2d 559 (S.D.N.Y. 2004).

competitive effect in Guam is the same, whether threats are premised on power in Hawaii or Guam. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F. 2d 263, 275 (2nd Cir. 1979) ("there is no reason to allow the exercise of such power to the detriment of competition, in either the controlled market or any other").

Matson also leveraged its Hawaii dominance in devising a market share discount bundle, offering shippers 25% discounts if they give Matson at least 90% of their Hawaii and Guam cargo, the HHG "Loyalty Program." (PSUF ¶294.) Demonstrating its foreclosure efficacy, Dr. Warren-Boulton found that ███████████████████████████████████████████████ ████████████████████ (DSJ 411, RWB Rebut. 44), and ███████████████████ ████████████████████████████████████████████████████████████████ ██████████████████ (DSJ 13, RWB 48.) Bundling/discount regimes like this, used by a dominant firm, are predatory and exclusionary because, the D.C. Circuit explained, they represent a dominant firm using its dominance to protect itself by blocking rivals from "cost-efficient" means of competing. *Microsoft*, 253 F.3d at 64. That is the upshot here, with Matson bundling a product on which APL cannot compete (HHG cargo with Hawaii) to squelch competition in a competitive product, HHG cargo to Guam. *See SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978) (anticompetitive for defendant to link product in which it faced no competition with competitive product, and then sell them in a bundle on a non-competitive basis).

Responding that its HHG Program cannot be anticompetitive because APL carried HHG cargo (Motion 25, 27), Matson evades the issue of its bundle distorting the competitive process and foreclosure of APL. That the HHG Program does not *require* shippers do business with Matson (Motion 24) disregards the practical effect of the Program, *see APL*, 633 F. Supp. 3d at 227, and APL's practical foreclosure from Guam shippers that also shipped to Hawaii. (DSJ 13, RWB Rpt.

48.) Matson's reference to APL's general success attracting Guam HHG shippers (Motion 25, 27) further demonstrates APL could, and would, carry more HHG cargo for those shippers that also have Hawaii cargo, but for the effectiveness of Matson foreclosing them.

The unbelievable foreclosure figure Matson cites (███) is not reliable. (Motion 25.) It is diluted by including all "███████" to Guam and Hawaii (DSUF136)—including products not in relevant market. Examining the HHG submarket, the appropriate market for considering effects of Matson's HHG bundle, ████████████████████████████████████ ███████████████████████████████ (*See* APL Oppo. *Daubert* Ex, A, RWB Decl. 32-33.)

None of Matson's loose claims and authorities establish "procompetitive" benefits (Motion 23, 28), because *none* deal with the issue here: A dominant firm in a two-carrier market utilizing a market share bundle, along with other acts. In this situation, a jury could reasonably conclude that Matson responding to APL by leveraging its Hawaii dominance to offer a market share bundle APL cannot match, foreclosing APL from ███ of HHG submarket, together with Matson's other anticompetitive conduct, is predatory or exclusionary. *See, e.g., APL*, 633 F.3d at 229 (noting foreclosure of 35% is not defective as a matter of law).

### 6.    Deploying Restrictive Agreements

In response to APL added a second vessel in 2017, Matson pivoted from using tariffs to an aggressive pursuit of contracts and memoranda of understanding for "locking in" key Guam shippers. Dr. Warren-Boulton's economic analysis of Guam market structure found ███████ ████████████████████████████████████████████████████ (DSJ 13, RWB Rpt. 43, 56)—the "anchor" accounts crucial for APL. (PSUF ¶315.) He also found Matson's strategy of ██████████████████████████████████████ ████████████████████████████████████████████████

███████████████████████████████████████████████████████ (DSJ 13, RWB

Rpt. 69-70.) Responding to Matson's misleading *Daubert* statements, he determined ██████

████████████████████████████████████████████████████████████████████████

██████ (*See* APL Oppo. *Daubert* Ex, A, RWB Decl. 34.) Expanding that analysis to shippers to

both Guam and Hawaii, ██████████████████████████████████████████ (*Id*.

34.)

Drawing inferences in APL's favor, a jury could find that Matson's agreement strategy,

deployed by dominant incumbent to "lock in" shippers in response to APL, and foreclosing APL

in range of ██████%, constitutes a predatory or exclusionary tactic. This is confirmed by the D.C.

Circuit's ruling that Microsoft's exclusive deal with Apple, affecting only 5-20% of relevant

market, was exclusionary because it restricted Microsoft's rivals without justification. *Id*. 253 F.3d

at 73-74; s*ee also APL*, 633 F.3d at 229.

Matson's resort to rigid exclusive dealing cause of action elements to judge its acts

"competitive" (Motion 25-27) is wrong (*see* § III.C., *infra*) and contrary to *Microsoft* judging

exclusivity terms exclusionary despite *not* meeting exclusive dealing elements. 253 F.3d at 72-73

(holding as exclusionary agreements representing a "relatively small channel" and "not

insignificant" (5-20%) market share). Instead of Matson's approach, the D.C. Circuit focused on

competitive impacts of the agreements, considering their importance in the markets. *Id*. The key

customers Matson targeted and locked in—large retailers with consistent cargo moves—are the

"anchor" accounts ██████████████████████████████████████████████

██████ (PSUF ¶¶310-15.) Like in *United States v. Dentsply International*, Matson's pursuit

of anchor accounts anticompetitively locked up the "gateway" channel for APL to most viable,

with the impact "amplified" in a stagnant market. 399 F.3 181, 194-96 (3d Cir. 2005).

Even if some agreements are not fully "exclusive" or could be "terminable at will" as Matson claims (Motion 25), this does not make them procompetitive. To the contrary, *Dentsply* held a dominant firm's use of agreements to be exclusionary, even though they were not exclusive, terminatable at will, and some not signed, *id*. 399 F.3d at 191, based on "economic incentive to continue" *id*. at 195, enforced by threats to cut supply. *Id*. at 194. Considering all the conduct here, as in *Dentsply*, the context by which Matson used agreements—dominant firm, key accounts, with threats and leveraging of Hawaii for some shippers—sufficiently shows exclusionary effects.

The misleading claim that Matson's agreements applied to ██% of the market is another non-credible figure, generated by Matson's expert ████████████████████████ ████████ (DSJ Ex. 75 ¶ 40), based on ████████████████████████ (*see* Objection to Declaration & Motion to Strike). Worse, Matson counts only the agreements produced to APL, though there are more than 10 referenced in Matson's documents but not produced to APL. (PSUF ¶322; PSJ 144, 163.) Regardless, Matson's expert acknowledges the actual share is much more than ██% (DSJ Ex. 75 ¶ 40), consistent with Dr. Warren-Boulton finding of ██% foreclosure range.

Assertions that "no customer" was "precluded" by Matson's agreements is false (Motion 27), demonstrated by ████████████████████████████████ ████████ (PSUF ¶¶313-15.) Even the largest Guam shipper, Home Depot, was foreclosed from APL for critical years, locked in with Matson's 94% minimum Guam and Hawaii volume requirement. (PSUF ¶312.) Matson's related assertion of "no competitive harm" (Motion 28-29) is refuted (a) by above evidence of its agreements ████████████████████, (b) locked in Matson shippers ████████████████████████ (DSJ 13, RWB Rpt. 54), and Matson's Guam rates ████████████████████

(*See* § XX., *supra*.) Matson's arguments, at best, raises fact issues for the jury.[33]

## IV.    MATSON'S PREDATORY CONDUCT SHOWS ITS INTENT TO MONOPOLIZE

Courts and juries may infer "specific intent" for attempted monopolization from a defendant's predatory conduct. *See M & M Med.*, 981 F.2d at 166. The D.C. Circuit described such conduct as:

> [T]he use of business practices that would not be considered profit maximizing except for the expectation that (1) actual rivals will be driven from the market, or the entry of potential rivals blocked or delayed, so that the predator will gain or retain a market share sufficient to command monopoly profits, or (2) rivals will be chastened sufficiently to abandon competitive behavior the predator finds threatening to its realization of monopoly profits.

*Neumann*, 786 F.2d at 427. That is consistent with the Supreme Court describing predatory conduct as "attempting to exclude rivals on some basis other than efficiency." *Aspen Skiing*, 472 U.S. at 605 (quotation, citation omitted).

Matson's predatory and exclusionary conduct above (*see* § III., *supra*) sufficiently shows its intent to monopolize. It includes Matson self-inflicting millions of dollars of harm in retaliating against APL in Alaska. (*See* pages 60-64.) *See M & M Med.*, 981 F.2d at 167 (finding "self-induced injury" significant for inferring intent). That also is not "profit maximizing," unless done to lessen APL competition in Guam and resume the collection of full monopoly rates.[34] *Neumann*, 786 F.2d at 427. And Matson ████████████████████████████████████████████

████ (*See* pages 65-67.) Likewise, Matson cutting off two of the few transportation vendors it relied on in Guam (*see* § III.C.1., *supra*) and threatening and retaliating against shippers (*see* §

---

[33] Matson's passing references to "procompetitive benefits" about exclusive dealing in general (Motion 28) are not appliable to Matson, a dominant firm using contracting tactics for the admitted purpose of undercutting its only market competitor.

[34] The Motion floats excuses for some (but not all) conduct, but they are not supported by evidence and cannot be drawn in Matson's favor. *See Liberty Lobby*, 477 U.S. at 248.

III.C.2., *supra*) is not profit maximizing unless done with expectation those companies would have no alternative to Matson in future.

A reasonable jury, as have courts, could infer intent from other acts by Matson. The Fourth Circuit found the use of restrictive agreements with customers, similar to Matson's restrictive agreements and continued inflated rates (*see* §§ II.B.1., III.C.6., *supra*), supports an inference of intent. *See M & M Med.*, 981 F.2d at 168. The Third Circuit held that marketplace threats to lure customers from a competitor, similar to Matson's threats and leveraging of Hawaii (*see* §§ III.B.1, 5., *supra*), supports an attempt claim. *See W. Penn*, 627 F.3d at 110. The Tenth Circuit ruled that disparagement, similar to Matson's false and misleading statements to shipping customers (*see* § III.C.5., *supra*), implies intent. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1126, 1130 (10th Cir 2014). The Fourth Circuit concluded that use of litigation and government trade restrictions to stymie competition, as Matson with the MSP and NDAA (*see* § III.C.2., *supra*), evinces intent. *See Kolon Indus.*, 637 F.3d at 453; *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670, n.3 (1965) (explaining trial court could admit evidence of lobbying efforts to show "purpose").

## V.     BOTH COMPETITION AND APL HAVE BEEN HARMED BY MATSON

### A.     There is Sufficient Evidence of Harm to Competition

There is sufficient anticompetitive harm based on expert analyses and evidence of threatened and diminished competition. *See APL*, 633 F. Supp. 3d at 220-21 (explaining anticompetitive harm as a reduction of output, increase in price, or deterioration in quality in the market); *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 n.14 (1977) (explaining injury arises when competition is *threatened*, and is "strongest" when *diminished*).

Expert analyses show competitive harm. *See In re Se. Milk Antitrust Litig.*, 739 F.3d 262 (6th Cir. 2014) (ruling expert analysis of market prices sufficient to preclude summary judgment

on competitive harm). *First*, Matson has █████████████████████████████████

███████████████████████ (DSJ 354, RWB Dep. 34:6-16, 103:8-25, 108:23-109:5, 312:15-23.)

*Second*, Matson's ████████████████████████████████████████████████████████

████████████████ (DSJ 13, RWB Rpt. 89.) *Third*, Dr. Warren-Boulton's analyses found ███

█████████████████████████████████████████████████████████ (*Id*.) *Fourth*, he

concluded, based on review of evidence and data, that Matson's █████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████ (DSJ 13, RWB Rpt. 89.81-83, 89; DSJ 354, RWB

Dep. 58:12-25, 59:20-62:9.) *Fifth*, he opined that Matson's rates ███████████████████

█████████████████████████████████████████ (DSJ 13, RWB Rpt. 89.) In addition

to expert analysis, the voluminous evidence of Matson's █████████████████████████

████████████████████ (PSUF ¶¶118-87, 323-49), consumer complaints about Matson's

excessive rates and poor service (PSUF ¶¶81-108 (sample)), and Matson's persistent efforts to

███████████████████████████████████████████ (PSUF ¶¶269-322, 359-64)

also shows harm.

Shippers and suppliers in the U.S./Guam market getting punished, paying more, and enjoying fewer options, and potentially no options, for reasons attributable to Matson's anticompetitive practices, is antitrust injury. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) (overpaying is essence of antitrust injury); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 910 (6th Cir. 2003) (depriving consumers of less expensive product is antitrust injury); *Ameral v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1996) (antitrust injury includes "[c]oecive activity that prevents its victims from making free choices.") (citation, quotation omitted).

Matson's few assertions, at best, raise fact issues. (Motion 40-41.) Asserting "prices fell"

ignores the analysis and evidence showing ██████████████████████, with unhappy shippers. Matson's out-of-context cite to Dr. Warren-Boulton and claim he "did not do the analysis" about market harm is false. (DSJ 354, RWB Dep. 42:7-25, 56:23-57:22, 241:2-242:15, 246:18-248:7, 312:15-314:3, 320:7-322:10, 329:23-330:19.) Matson's expert's theories about its inability to cause harm because ███████████████████████████████████████ ████████████████████████████████████—even if they were admissible and credible (*see* APL *Daubert* 13-15 (showing Matson's expert did no market or customer analyses to support theories))—would only be dueling expert opinion and fact issues that preclude summary judgment. *See Appleton Papers*, 35 F. Supp. at 1147 (denying summary judgment when "existence of antitrust injury" based on dueling expert opinion "is a hotly disputed issue of fact").

### B.     There is also Sufficient Evidence of Causal Antitrust Injury

For causal antitrust injury, the Supreme Court instructs: "It is enough that the illegality is shown to be a material cause of the injury." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9 (1969). Courts applying *Zenith Radio* observe that challenged conduct need not be the *sole* cause of alleged injuries, it need only be *a* material cause of *some* damage. *See Malcolm v. Marathon Oil Co*., 642 F. 2d 845, 861 (5th Cir. 1981).

APL claims it would have greater U.S./Guam market share and related profit, but for Matson's anticompetitive conduct (FAC ¶ 73)—a long-recognized form of injury. *See Zenith Radio*, 395 U.S. at 119. APL also claims Matson's anticompetitive retaliation increased APL's costs in Alaska (FAC ¶ 62; Page 60-64)—another well-established form of injury. *See, e.g., Lee-Moore Oil Co. v. Union Oil Co*., 599 F.2d 1299, 1306 (4th Cir. 1979) (allowing recovery of increased costs as "no difference in principle" than other forms of antitrust injury).

Contemporaneous documents and testimony show Matson's anticompetitive conduct was a material limitation on APL's U.S./Guam business. For instance, as reviewed, upon APL's entry,

████████████████████████████████; Matson told shippers APL was receiving

"unfair" "subsidies" that Matson was challenging and APL would not continue to serve Guam;

Matson threatened and cut off APL's service providers , interfering with APL's equipment and

Matson's retaliation was communicated to other Guam businesses; Matson's related entity,

Angoco Trucking, ████████████████████████; Matson cut off two additional service

providers (Royal Hawaiian and DeWitt Trucking) as punishment for "supporting" APL; Matson

punished Guam Movers by increasing its rates; and ██████████████████████████

████████████████████████████████████████████████████████

████████████[35] In this environment, APL witnesses identified █████████████

██████████████████████████████████ The documents and

testimony similarly show that Matson retaliated against APL in Alaska for having entered the

Guam trade.

Dr. Warren-Boulton's analysis of both the evidence and transactional data found that

████████████████████████████████████ He applied the Bass diffusion model

("Bass Model") to predict APL's U.S./Guam market share, based on market projections prepared

by APL consultants prior to its entry. (DSJ 13, RWB Rpt. 83-85.) He then performed regression

analyses to adjust APL's estimated share, to account for differences in APL's and Matson's

relative rates, quality, and changes in cargo mix. (*Id*. 86-87.) He also specifically tested for

correlation between APL's and Matson's relative "quality," and found "a small but statistically

significant impact on shares (0.11)." (*Id*. 87.) The use of these econometric models, Dr. Warren-

Boulton explained, ████████████████████████████████████

---

[35] Dr. Warren-Boulton's regression analyses confirm customers shipping to Hawaii, or targeted by
Matson's contracting strategy, were less likely to ship with APL. (DSJ 13, RWB Rpt. 69-70.)

███████████████████████████████████████ (DSJ 354, RWB Rpt. 55:4-21,

178:21-180:8-188:2, 194:13-196:9.)

Each the evidence and expert analysis—and certainly both together—is more than enough

to raise a genuine issue on whether Matson's conduct was *a* material cause of *some* damage

claimed by APL. *See Malcolm*, 642 F. 2d at 845; *Se. Milk*, 739 F.3d at 286 (ruling regression

analysis sufficient to preclude summary judgment on antitrust injury).

Ignoring the evidence, Matson relies on an inapt class action case[36] and its expert's own

rejiggered, and unreliable Bass Model variant to surmise that ███████████████████████████

█████████████ (APL *Daubert* at 23-25 (explaining how Matson's expert altered Dr. Warren-

Boulton's Bass Model inputs, resulting in unreliable outputs.) Based on its expert's unreliable

work, Matson asserts APL's causal injury must fail as a matter of law. (Motion 41.) Matson's

preference for its expert's opinion, if admissible, creates an expert battle.

The remainder of Matson's argument rests entirely on the Court crediting Matson's self-

serving "fact:" That shippers actually prefer paying Matson's inflated rates instead of using APL's

less expensive and overall better service. (Motion 42-43.) Matson constructs this "fact" by cherry-

picking negative comments about APL in the millions of documents it produced—while ignoring

*all* the numerous complaints on Matson's service. (PSUF ¶¶ 81-108), as well as *all* of the numerous

compliments about APL. (PSUF ¶109-115.) ██████████████████████████████████████

████████████████████████████████████████████ (and Matson's use of it)

████████████████████████ (APL *Daubert* at 15-23.) Resolving Matson's asserted "fact" that

---

[36] *In Rail Freight*, 934 F.3d 619, 624 (D.C. Cir. 2019), cited by Matson, addressed expert opinion
support of common evidence for class-wide injury—an issue not in this case.

shippers actually prefer Matson over APL, is beyond summary judgment. *See High Fructose Corn Syrup (HFCS) Antitrust Litig.*, 295 F.3d 651, 655-56 (7th Cir. 2002).

Matson further errs by presuming causation "fails" if any customer ships with Matson for reasons other than its unlawful conduct. (Motion 42.) That defense trap misapplies law, which requires only that Matson's conduct be *a* cause of *some* harm. *See Zenith Radio*, 395 U.S. at 114 n. 9 ("a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury"). Matson's cited cases involved extreme circumstances or trial proof not applicable here: *Argus* considered a "*thoroughly implausible*" claim; there was *no evidence* of causal harm in *Taylor Publishing*; and *H & B Equipment* addressed proof of damages *at trial*. (Motion 42-43.)

### C.      APL Can Estimate Damages Reasonable for the Circumstances

The measure of antitrust damages need only be a "just and reasonable estimate," based on available information, that is not "speculation or guesswork." *Zenith Radio*, 395 U.S. at 124 (cite, quote omitted). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim," *Bigelow v. RKO Radio Pictures, Inc.*, 327 US 251, 264 (1946).

Plaintiffs are afforded great latitude on how to measure damages. *See, e.g., Danny Kresky Enter. Corp. v. Magid*, 716 F.2d 206, 213 (3d Cir. 1983). Estimating "but for" market share and related lost profit—as APL does here—is a well-accepted method, approved in *Zenith Radio*. 395 U.S. 116, n. 11, 118. The Supreme Court also has approved such estimates based on expert testimony. *See Texaco Inc. v. Hasbrouck,* 496 U.S. 543, 572 (1990).

For APL's Guam trade damage, Dr. Warren-Boulton calculated APL's "████████████

████████████████████████████████████████████████████████████████

████████████████████████████████         (*See* § V.B., *supra*.) ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ (DSJ 13, RWB Rpt. 89-92.)[37] These methodologies

and estimates, based on voluminous evidence, data, and Dr. Warren-Boulton's expertise, are

reasonable, and easily clear the "speculation and guesswork" threshold for antitrust damages.

*Zenith Radio*, 395 U.S. at 124.

Matson's complaint about Dr. Warren-Boulton aggregating Guam damages is premised on

crediting Matson's version of facts. (Motion 43-44.) Matson presumes, contrary to evidence and

summary judgment procedure, that its Guam conduct is lawful and, based on this presumption,

asserts that Dr. Warren-Boulton's estimate must include "false positives." Matson's cart-before-

the-horse argument relies on its expert who uses a flawed methodology to opine that APL should

have no more market share at most creates another expert dispute for the jury.

Matson also misrepresents Dr. Warren-Boulton's analyses, to conjure non-existing issues.

His Bass Model assumes ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ (DSJ 354, RWB Dep. 194:13-196:9, 199:21-200:10, 212:12-214:9) which,

████████████████████████████████████████████████████████████

████████████████████████████, removes the future-forecasting variables and potential

for "false positives" that Matson conjects without elaboration. (APL *Daubert* 38-44.)

Matson also relies on shaky authority for its erroneous argument that damages estimates

must be rejected "as a matter of law" if "*any* of the challenged conduct is unproven or lawful."

(Motion 43) (emphasis in original) (citing *S. Pac. Commc'ns Co. v. AT&T Co.*, 556 F Supp. 825

(D.C.C. 1982)). The D.C. Circuit reviewed that case, calling it a "nightmare," and expressly did

---

[37] Matson articulated no issue with APL's Alaska damages estimate.

not consider or affirm its damages analysis. 740 F.2d 980, 983, 999, n. 18 (D.C. Cir. 1984). But other courts have concluded that Matson, and its case, misstate antitrust damages law.[38]

Contrary to Matson's argument, even if, hypothetically, some of its challenged conduct were found lawful, that outcome would not automatically be "fatal" to APL's damages estimate. "[S]uch a rule would ignore the Supreme Court's repeated recognition that, once the fact of injury is established, the plaintiff need only present evidence as to the amount of its damages sufficient to allow the finder of fact to make a just and reasonable estimate not based on speculation or guesswork." *Nat'l Farmers Org.*, 850 F.2d at 1306 (explaining, "if an antitrust plaintiff alleges that the defendant engaged in unlawful acts A, B, C, and D, and acts C and D are later rejected as a basis of liability, it does not automatically follow that the damage award must be reduced") (citation omitted). Moreover, Dr. Warren-Boulton testified that his model could be adjusted to account for a finding of lawful conduct (*e.g.*, RWB Dep. 180:9-25), exposing Matson's argument as much ado about nothing.

## VI.    MATSON LOGISTICS

With Defendants refusing to produce documents from any Matson Logistics person requested by APL, APL is not in position to, and will not resist the Motion as to Matson Logistics.

## **APL'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

After APL enhanced its Guam service in 2017, Matson responded against APL in Alaska—including by Matson ending decades-long agreements and cooperative arrangements that ███████
████████████████ (as well as hurting Matson). Multiple witnesses testified that

---

[38] *See Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 485 (1998) (rejecting defense citation to *Southern Pacific* and argument that "all 'but for' models should be precluded as a matter of law"); *Callahan v. A.E.V., Inc.*, 182 F.3d 237 (3d Cir. 1999) (same); *Nat'l Farmers Org.*, 850 F.2d at 1306 (rejecting defense argument that no damages can be awarded if the model cannot remove effects of any lawful conduct); *Litton Sys., Inc. v. AT & T Co.*, 700 F.2d 785, 823 n. 49 (2d Cir. 1983) (explaining unlawful conduct need only be a "materially contributing factor" to estimate).

59

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ There is no genuine dispute that Matson's

damaging acts in Alaska are connected to Matson's anticompetitive conduct in Guam. With this

connection, the Clayton Act permits APL to seek damages for harm sustained in both areas.

APL accordingly requests that the Court enter summary judgment on two narrow but

important issues: (1) APL may seek damages resulting from Matson's conduct  relating to

operations  in Alaska identified in APL's Memorandum in Support of Plaintiffs' Cross-Motion for

Summary Judgment to extent it is  causally connected to Matson's alleged anticompetitive conduct

in Guam; and (2) there is no genuine dispute as to any material  fact that Matson's damaging

conduct  against APL in Alaska is  causally connected to Matson's allegedly anticompetitive

conduct in Guam.

### ADDITIONAL FACTUAL BACKGOUND

████████████████████████████████████████████████████████,

(PSUF ¶¶188-89), ████████████████████████████████ (PSUF ¶¶191.)[39]

███████████████████████████████████████████████████████████

████████ (PSUF ¶¶190, 194 235, 245), which mutually benefitted their business operations in

Alaska. (PSUF ¶254.) Matson ended all such cooperation beginning in 2017.

*Ending CCA.* ████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[39] In 2020 APL's Alaskan trade was transferred to entities owned by its parent, CMA CGM (PSUF ¶192) which assigned to APL claims for damages in Alaska. (PSUF ¶193.)

(PSUF ¶¶194-95.)

The CCA benefitted both APL and Matson. (PSUF ¶¶196-99.) For decades, ███ ████████████ (PSUF ¶¶206.) In early 2017 ██████████ ██████████████████████████ (PSUF ¶¶200-02.)

████████████████████████████

(PSUF ¶¶202-06; DSJ 451 Makarin Dep. 166:20-167:4 ("████████████ ██████████████████████"); *id.* 63:10-14 ("████████ ████████████████████"); *id.* 63:24-25 ("████████ █████████").)

████████████████████████████

█████████ (PSUF ¶206; DSJ 451 Makarin Dep. 71:23-24 ("████ ██████████████████").) Ending the CCA forced APL to rely entirely on Samson's less frequent, slower barge service, which ████████████████ ████████████████████████████ ██████████████ (PSUF ¶¶208-09.) Matson's termination also caused concern among Matson's customers that also shipped with APL. (PSUF ¶210; DSJ 18, Dianora Dep. 103:4:12 (agreeing Matson customer Trident "had issues with the cancelation or the ending of the CCA" which put Matson's customer "in a pinch").

The CCA was significantly profitable source for Matson, (PSUF ¶211) and Matson's CCA container volumes fell from 7,302 to 3,517 and its CCA revenue per container fell from $1,743 to $1,168. (*Id.*; DSJ 13, RWB Rpt. 79.) At the time Matson ended the CCA, Matson had no written plan for replacing APL's container volumes and revenues. (PSUF ¶¶212-13.) About two years after ending the CCA, Matson's Alaska Team analyzed the situation and determined resuming the

CCA business with APL was the best way for Matson to recover its lost revenues and profits. (PSUF ¶214.) ("the best path for Matson to increase earnings in Alaska runs through APL")

*Ejecting APL from LASH Terminal.* █████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████ (PSUF ¶¶216-17.)  In 2015, APL and Samson entered into a formal sublease for APL's use of a portion of LASH terminal. (PSUF ¶218.)

Matson acquired the LASH terminal in 2016 for about $14.5 million. (PSUF ¶219.) Steve Rubin, a former Matson Vice President, testified ████████████████████████████

███████████████████████ (PSUF ¶220.) Samson's owner, Mr. Baggen, also understood Matson acquired the terminal "to keep AML out of Kodiak." (PSUF ¶221.) Matson then changed Samson's long-term terminal lease to month-to-month (PSUF ¶222) and, on March 12, 2018, Matson's Kenny Gill told Mr. Baggen to "*get the APL operation out of the Kodiak yard*" and "also stop the same cargo from crossing the terminal/dock going forward." (*Id.*)

After 50 years in the industry, Mr. Baggen had never heard of "a dock owner kick[ing] out the tenant in two weeks' notice," as Matson directed Samson to do to APL. (PSUF ¶223.) Matson's directive also surprised Mr. Baggen as he did not expect to be affected by Matson's "big Guam dispute" with APL. (PSUF ¶224.)

Samson took Matson's directive as an "ultimatum," forced to remove APL as its subtenant to preserve Samson's own business. (PSUF ¶225.) APL vacated the LASH terminal by the end of March 2018. (PSUF ¶225.) This "had quite a bad affect" on Samson because, as an alternative to the LASH terminal, Samson had to handle APL's containers on other piers, "which just multiplied your cost off the planet." (PSUF ¶227.)

APL also was affected by being thrown off its "hub" terminal. ███████████████████

███████████████████████████████████████████ (PSUF ¶232.) Without

APL's business there, Samson vacated the terminal in approximately March 2021. (PSUF ¶231.)

At the time Matson ejected APL and consequently lost Samson as a tenant at LASH

terminal, Matson's 30(b)(6) representative admitted, Matson had no plan for alternative use of the

terminal that it had paid $14.5 million to acquire to block competition. (PSUF ¶232.)

***Terminating APL's Shop and Office Lease.*** For more than 30 years, █████████

████████████████████████████ (PSUF ¶235.) Throughout that time,

███████████████████████ (PSUF ¶236.) █████████████████

██████████████████████ (PSUF ¶237.)

████████████████████████████████ (PSUF

¶238.) After Matson refused a short lease extension, █████████████████

█████ (PSUF ¶¶240-41.) ███████████████████████████

███████████████████████████████████

█████████████ (PSUF ¶239.) █████████████████████ (PSUF

¶242.)

Matson's 30(b)(6) witness identified no plan, in existence at the time of terminating APL's

lease, for the use of the shop and lease space. (PSUF ¶243.)

***Cutting Tug Arrangement.*** Since the 1990s, ██████████████████

████████████████████████ (PSUF ¶245.) █████████

███████████████████████████████████

███████████████████████ (PSUF ¶246.) █████████████

██████████████████████████ (PSUF ¶247.) ███

██████████████████████ (PSUF ¶248.)

███████████████████████████████████ (PSUF ¶249.) ████████████████

████████████████████████████████████████████████████████

████████ (PSUF ¶250-51.) At that time, there were no safety issues with the arrangement communicated by Matson or known by APL. (PSUF ¶252.)

**Stopping Operational Cooperation.** APL and Matson (and its predecessors) had for many years cooperated operationally in Alaska. (PSUF ¶253.) Matson's Mr. Lauer admitted this cooperation was in the interest of both companies. (PSUF ¶254; PSJ 65 ("is best for our companies and our customers").) But Mr. Lauer informed APL on April 6, 2018 that "Matson is no longer willing to work with APL on operational matters." (PSUF ¶256.) This change was contrary to Matson's business interests. (PSUF ¶255-58.) Matson thereafter refused to carry "stranded" cargo for APL which was for a common customer. (*Id*.) Matson also refused APL's request to carry "hot loads" for the U.S. military at spot rates. (*Id*.)

## VII. APL MAY RECOVER ALL ANTITRUST DAMAGES CAUSALLY CONNECTED TO MATSON'S ANTICOMPETITIVE CONDUCT

Summary judgment is appropriate because "there is no genuine dispute as to any material fact and [APL] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. Matson's Conduct in Alaska Harmed APL

APL suffered significant losses resulting from Matson's actions in Alaska:





Dr. Warren-Boulton estimated the amount of additional costs to APL.

(DSJ 13, RWB Rpt. 81 & Ex. 11.)

(2015-17). (*Id.* 81 & Ex. 10.)

(*Id.* 98 & Table 6, Ex. 12.)

## B.   Matson's Conduct in Alaska is Connected to Its Anticompetitive Efforts

There is no material dispute of fact that Matson's acts against APL in Alaska are connected to Matson's anticompetitive efforts against APL in Guam. Matson witnesses admitted it; APL witnesses testified about it; and third parties confirmed it. It is also the only reasonable explanation for Matson's conduct that otherwise would be against its own economic interests.

When APL and Matson met about the CCA in March 2017—shortly after APL enhanced its Guam service, causing concern in Matson management (*e.g.*, PSUF ¶¶5-11)—



(PSUF ¶261.)

(PSUF ¶205.)

(PSUF ¶204.)

Based on his frequent interactions with Matson's representatives during 2017-18, including

Messrs. Lauer and Gill, 

(PSUF ¶¶260.)

APL's former President Ed Aldridge testified about conversations with Matson executives, including Mr. Lauer and Matson CEO Matt Cox. Summarizing them, Mr. Aldridge explained:

(DSJ 86, Aldridge Dep. 129:24-130:2.) Specific to Mr. Lauer, Mr. Aldridge explained:

(*Id*. 82:14-23.)

Mr. Lauer admitted Matson's acts against APL in Alaska are connected to Guam. He and Matson's CEO, Mr. Cox, decided to stop its mutually beneficial cooperation with APL in Alaska due to, among other things, "intensifying level of competition in various parts of the world," which, he testified, included Guam. (PSUF ¶264; DSJ 33, Lauer Dep. 123:7-124:20 ("We felt the level of competition was getting more and more intense and in that kind of general framework we made this decision").)

During an October 31, 2018 lunch meeting of APL and Matson executives (PSUF ¶271), Mr. Aldridge testified,

(PSUF ¶272.) He further described Mr. Cox as admitting:

"

" (*Id*.) This is corroborated by testimony of two other attendees. (*Id*.; DSJ 71, Saadé Dep. 87:25-88:5 (Mr. Cox said APL "

"); (PSUF ¶272; DSJ 19,

Mensing Dep. 313:20-314:1 (Mr. Cox said "█████████████████████████").)

Mr. Cox's testimony is not inconsistent, as he also connected Guam and Alaska. (PSUF ¶264; DSJ 28, Cox Dep. 120:10-121:2 ("Guam was most important to us, that there's a linkage between that, we wanted our first priority to be addressed before we talked about cooperating or—or resuming what we did before.") Mr. Lauer's testimony cannot be inconsistent either, because he cannot recall details of the October meeting or discussions with Messrs. Makarin or Aldridge regarding APL and Alaska. (PSUF ¶263.)

The connection also is confirmed by Matson conveying 

(PSUF ¶262, 272.) Mr. Cox likewise admitted ████████████████████ ███████████████████████████ (PSUF ¶¶264-65.) ██████████████ █████████████████████████████ (*see* § III.C.4., *supra*)—████████ ████████████████████████████ (PSUF ¶272.)

This evidence leaves no reasonable, material factual dispute as to whether Matson's anticompetitive response to APL is causally connected to damages to APL in Alaska. *See Zenith Radio,* 395 U.S. at 114 n.9. That is all a jury would need determine to award damages—or for summary judgment to be granted. *See, e.g., Dolphin Tours v. Pac. Creative Serv.*, 773 F.2d 1506 (9th Cir. 1985) (explaining plaintiffs need only show "anticompetitive activities were a material cause of some of its injury"); *Bonjorno*, 752 F.2d at 812 (explaining once a jury finds antitrust injury, damages "may be determined without strict proof of what act caused which injury").

C.    **The Clayton Act Allows APL to Recover Damages as a Result of Matson's Alaska Conduct**

**PUBLIC REDACTED VERSION**

The Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained. . . ." 15 U.S.C. § 15(a). The only constraint on a plaintiff's recovery it that damages be sustained "by reason of" defendant's conduct that violates the antitrust laws. Otherwise stated: "It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury." *Zenith Radio*, 395 U.S. at 114 n.9.

There is no rule confining antitrust damages to the relevant market where the anticompetitive conduct occurred. The ABA Model Jury Instructions—widely used by federal courts—make this clear: "The law provides that plaintiff should be fairly compensated for ***all damages to its business or property*** that were a direct result or likely consequence of the conduct that you have found to be unlawful." ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 6.B.1. (2016) (citing authorities) (emphasis added).

Nothing in the Clayton Act, jury instructions, or other legal authority narrowly confines an antitrust plaintiff to damages in only the geographic market where the challenged conduct took place. This is no mistake or oversight because, it is well settled, once an antitrust violation is established, the proof for antitrust damages is relaxed, and a defendant may be held liable for all losses traceable to its anticompetitive conduct. *See, e.g.*, *Image Tech. Servs.*, 125 F.3d at 1221 (explaining relaxed standard because "market uncertainties often preclude a precise showing of 'where' the plaintiff would have been absent the proven antitrust violation.").

Courts specifically addressing the issue have uniformly held that an antitrust plaintiff's traceable damages are not limited to the relevant market. Instead, a plaintiff can seek damages "outside of the geographic and product markets [that are recognized] for liability purposes." *Bonjorno*, 752 F.2d at 814; *see also Greene v. Gen. Foods Corp.*, 517 F.2d 635, 663-64 (5th Cir.

1975) (allowing damages outside alleged antitrust market); *Lafayette Steel Co. v. Nat'l Steel Corp.*, 87 F.R.D. 612, 613-14 (E.D. Mich. 1980) (damages in steel supply market were recoverable despite fact that antitrust injury occurred in separate market).

There is no matter of law prohibition on recovering damages for losses sustained outside relevant markets. While, to recover damages, a plaintiff must first demonstrate injury to competition in the relevant markets where the specifically challenged anticompetitive conduct took place (here, U.S./Guam container shipping services), but once that injury is established, the law is clear that damages are not narrowly confined. Two district courts, thus, recently allowed antitrust plaintiffs to seek Clayton Act damages sustained outside relevant markets, to extent they could traced to some degree to unlawful acts. *See OEM Glass Network Inc. v. Mygrant Glass Co*., 2023 WL 2563689, at *23 (E.D.N.Y. Mar. 17, 2023) (ruling plaintiff could seek damages sustained outside geographic market because, among other reasons, "[l]imiting recovery to the relevant geographic market would prevent such a party from being made whole"); *SC Innovations, Inc. v. Uber Techs., Inc*., 2021 WL 2302728, at *1, (N.D. Cal. May 11, 2021) (ruling plaintiff could recover damages outside relevant market).

## CONCLUSION

Matson's Motion should be denied because there are genuine material issues of fact. However, there is no genuine dispute that APL may seek recovery for "all damages" causally connected to Matson's anticompetitive conduct, including its damaging conduct in Alaska. APL's Cross-Motion should be granted.