**REDACTED PUBLIC VERSION**

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

AMERICAN PRESIDENT LINES, LLC,
APL MARITIME, LTD., APL MARINE
SERVICES, LTD.,

              Plaintiffs,

    v.

MATSON NAVIGATION COMPANY,
INC., MATSON LOGISTICS, INC.,

             Defendants.

Civil Action No. 21-2040
Judge: Hon. Christopher R. Cooper

**\*SEALED\*  UNDER  PROTECTIVE
ORDER**

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

<u>**REDACTED PUBLIC VERSION**</u>

<u>**TABLE OF CONTENTS**</u>

**Page**

I.     THE CROSS-MOTION PROPERLY SEEKS PARTIAL JUDGMENT ........................... 1

II.    MATSON ESTABLISHED NO ISSUES PRECLUDING THE CROSS-MOTION ......... 2

    A.    APL May Recover Alaska Damages Connected to Matson's Guam Conduct ....... 2

        1.    Clayton Act damages are not restricted to conduct in relevant markets ..... 2

        2.    Clayton Act damages are not restricted to conduct harming competition in relevant markets ................................................................................. 3

        3.    APL's Alaska damages are connected to Matson's anticompetitive conduct in Guam ..................................................................................... 4

        4.    Discovery complaints are not reason to deny the Cross-Motion ................. 6

    B.    Matson's Alaska Argument Wrongly Presumes No Proven Wrong in Guam ........ 7

        1.    Matson has not proven U.S./Guam cannot be a relevant market ................. 8

        2.    Matson has not proven absence of power .................................................... 9

        3.    Matson has not proven its misconduct did not occur or was harmless ..... 11

            (a)    Matson's extreme foreclosure test should not be adopted ............ 11

            (b)    The effect of Matson's conduct should be viewed in aggregate ... 13

            (c)    Matson's conduct, properly considered, is exclusionary .............. 14

        4.    Matson has not disproven damages with disaggregation speculation ...... 20

    C.    Matson Has Not Established Valid Business Reasons for Its Alaska Acts .......... 21

    D.    Matson's Incomplete Hearsay Argument Does Not Support the Total Exclusion of Statements About Threats and Retaliation ........................................................... 23

CONCLUSION ......................................................................................................................... 25

**REDACTED PUBLIC VERSION**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alexander v. Nat'l Farmers Org.*,
    687 F.2d 1173 (8th Cir. 1982) ..................................................................16, 17

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
    537 F. Supp. 3d 273 (N.D.N.Y. 2021)......................................................14, 16

*Am. Tobacco Co. v. United States*,
    328 U.S. 781 (1946).............................................................................................1

*America v. Mills*,
    654 F. Supp. 2d 28 (D.D.C. 2009) .................................................................7, 23

*\*APL v. Matson Nav. Co.*,
    633 F. Supp. 3d 209 (D.D.C. 2022) .............................................................4, 7, 8

*Apple, Inc. v. Samsung Elecs. Co., Ltd*,
    2012 WL 2571719 (N.D. Cal. June 30, 2012) ................................................19

*Baker's Carpet Gallery, Inc. v. Mohawk Indus.*,
    942 F. Supp. 1464 (N.D. Ga. 1996) ................................................................25

*Bigelow v. RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946).............................................................................................1

*BoDeans Cone Co., LLC v. Norse Dairy Sys.*,
    LLC, 678 F. Supp. 2d 883 (N.D. Iowa 2009) ..............................................24, 25

*Bonjorno v. Kaiser Alum. & Co. Corp.*,
    752 F.2d 802 (3d Cir. 1984)................................................................................1

*Brown Shoe Co. v United States*,
    370 U.S. 294 (1962)........................................................................................8, 9

*Callahan v. A.E.V., Inc.*,
    182 F.3d 237 (3d Cir. 1999)..............................................................................23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..........................................................................................23

*\*Chase Mfg., Inc. v. Johns Manville Corp.*,
    84 F.4th 1157 (10th Cir. 2023) ....................................................................16, 25

**REDACTED PUBLIC VERSION**

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ................................................................................2

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ................................................................................1

*In re EpiPen Mktg. Sales Pracs. & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022) ...............................................................13

*Fed. Prescription* Serv., Inc. v. Am. Pharm. Ass'n,
  663 F.2d 253 (D.C. Cir. 1981) ...............................................................21

*FTC v. Cardinal Health, Inc.*,
  12 F. Supp. 2d 34 (D.D.C. 1998) .........................................................3, 1

*FTC v. Ind. Fed. of Dentists*,
  476 U.S. 447 (1986) ................................................................................3

*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015) ............................................................7

*FTC v. Whole Foods Market, Inc.*,
  548 F. 3d 1029 (D.C. Cir. 2008) ............................................................8

*Hajjar-Nejad v. George Washington Univ.*,
  2013 WL 12407402 (D.D.C. May 13, 2013) .........................................25

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968) ................................................................................4

*Herman Schwabe, Inc. v. United Shoe Mach. Corp.*,
  297 F.2d 906 (2d Cir. 1962) ..................................................................23

*Himes v. Medstar Georgetown Univ. Med. Ctr*,
  753 F. Supp. 2d 89 (D.D.C. 2010) ..........................................................1

*Independent Taxicab Operators*,
  278 F. Supp. 979 (N.D. Cal. 1968) .......................................................13

*Insignia Sys., Inc. v. News Am. Marketing In-Store, Inc.*,
  661 F. Supp. 2d 1039 (D. Minn. 2009) .................................................21

*Jackson v. Finnegan*,
  101 F.3d 145 (D.C. Cir. 2002) ..............................................................25

*Jones v. United States*,
  934 F. Supp. 2d 284 (D.D.C. 2013) ......................................................25

## REDACTED PUBLIC VERSION

*Mardirosian v. AIA*,
474 F. Supp. 628 (D.D.C. 1979) ........................................................................1

*McDermid Printing Printing Soliuons LLC v. Cortron LLC*,
833 F.3d 172 (2d Cir. 2016)...........................................................................10

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
817 F.3d 934 (6th Cir. 2016) ........................................................................23

*Multiflex, Inc. v. Samuel Moore & Co.*,
709 F.2d 980 (5th Cir. 1983) ........................................................................11

*In re Namenda Direct Purchaser Antirtrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018)............................................................4

*Nat'l Farmers Org., Inc. v. Assoc. Milk Prods., Inc.*,
850 F.2d 1286 (8th Cir. 1988) ........................................................................5

*Nat'l Souvenir Ctr. v. Historic Figures, Inc.*,
728 F.2d 503 (D.C. Cir. 1984) ......................................................................13

*NY v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015)...........................................................................23

*NY v. Meta Platforms, Inc.*,
66 F. 4th 288 (D.C. Cir. 2023)................................................................14, 16

*OJ Commerce, LLC v. KidKraft, Inc.*,
34 F.4th 1232 (11th Cir. 2022) ....................................................................15

*\*OEM Glass Network Inc. v. Mygrant Glass Co.*,
2023 WL 2563689 (E.D.N.Y. Mar. 17, 2023) .........................................1, 2

*Omega Ent'v Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) ......................................................................19

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*,
2024 WL 278565 (E.D.N.Y. Jan. 25, 2024) ................................................10

*Rambus v. FTC*,
522 F.3d 456 (D.C. Cir. 2008) .........................................................3, 15, 17

*Reapers Hockey Ass'n Inc. v. Amateur Hockey Ass'n Ill., Inc.*,
412 F. Supp. 3d 941 (N.D. Ill. 2019) .............................................................7

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)........................................................................................3

**REDACTED PUBLIC VERSION**

*SC Inovations, Inc. v. Uber Techs., Inc.*,
  2021 WL 2302728 (N.D. Cal. May 11, 2021) ........................................................................2

*Schine Chain Theatres v. United States*,
  334 U.S. 110 (1948) ...............................................................................................................6

*S. Pac. Comm'ns Co. v. AT&T Co.*,
  740 F.2d 980 (D.C. Cir. 1984) ..............................................................................................21

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1992) ................................................................................................................9

*Sprint Comm'ns Co. v. APCC Servs., Inc.*,
  554 U.S. 269 (2008) ................................................................................................................7

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
  282 U.S. 555 (1931) ................................................................................................................2

*Talavera v. Shah*,
  638 F.3d 303 (D.C. Cir. 2011) ..............................................................................................23

*Texaco Inc. v. Hasbrouck*,
  496 U.S. 543 (1990) ................................................................................................................4

*United States v. Benton*,
  656 F. Supp. 3d 1 (D.D.C. 2023) ..........................................................................................25

*United States v. Day*,
  591 F.2d 861 (D.C. Cir. 1978) ..............................................................................................24

*\*United States v. Google LLC*,
  687 F. Supp. 3d 48 (D.D.C. 2023) .............................................................................13, 14, 15

*\*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ....................................................................................... *passim*

*United States Football League v. NFL*,
  842 F.2d 1335 (2d Cir. 1988) ..................................................................................................4

*Warner Records, Inc. v. Charter Comm., Inc.*,
  2022 WL 1500780 (D. Colo. 2022) .......................................................................................25

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  395 U.S. 100 (1969) ........................................................................................................2, 4, 21

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  401 U.S. 321 (1971) ................................................................................................................4

<u>**REDACTED PUBLIC VERSION**</u>

**Statutes**

15 U.S.C. 15(a) ...................................................................................................................2

**Rules**

Fed. R. Evid. 801(d)(2)(D) ...............................................................................................22

Fed. R. Evid. 803(3) ..........................................................................................................24

Fed. R. Evid. 807(a) ..........................................................................................................25

**Other Authorities**

Areeda, *et al.*, *Antitrust Law: An Analysis of Antitrust Principles and Their
    Application* ¶ 310c7 ...................................................................................................3

**REDACTED PUBLIC VERSION**

**TABLE OF ABBREVIATIONS**

| Abbreviations | Definitions |
|---|---|
| APL *Daubert* | APL's Motion to Exclude the Opinions and Testimony of Ashley Langer |
| APL SJ Mem. | Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment |
| Cross-Motion | APL's Cross-Motion for Summary Judgment |
| DSJ # | Matson's Summary Judgment Exhibit # |
| DSUF # | Matson's Statement of Undisputed Fact |
| Matson *Daubert* | Matson's Motion to Exclude the Opinions and Testimony of Frederick Warrant-Boulton |
| SJ Opp. | Matson's Reply in Support of Motion for Summary Judgment and Cross-Opposition to Plaintiffs' Motion for Summary Judgment |
| Motion | Matson's Memorandum in Support of Summary Judgment |
| FAC | APL's First Amended Complaint |
| APL Oppo. *Daubert* | APL's Opposition to Matson's Motion to Exclude the Opinions and Testimony of Frederick Warrant-Boulton |
| PSJ # | APL's Summary Judgment Exhibit # |
| PSUF # | APL's Combined Statement of Disputed Facts in Opposition to Summary Judgment and Undisputed Facts in Support of Cross-Motion for Summary Judgment |
| Resp. PSUF | Matson's Response to APL's Combined Statement of Disputed Facts in Opposition to Summary Judgment and Undisputed Facts in Support of Cross-Motion for Summary Judgment |
| PSJ Resp. # | APL's Responses to DSUF # |
| RWB | Dr. Rick Warren-Boulton |

Once APL enhanced its Guam service, Matson retaliated in Alaska, the "crown jewel" of APL's business. (PSUF ¶191.) The Clayton Act provides damages for harm to APL in Alaska, but Matson disagrees. APL's Cross-Motion thus presents issues ripe for resolution. It should be granted because it is procedurally proper and there is no genuine dispute that the Act permits APL to seek Alaska damages and they are connected to Matson's monopolizing conduct in Guam.[1]

## I.    THE CROSS-MOTION PROPERLY SEEKS PARTIAL JUDGMENT

Matson mistakenly brands the Cross-Motion "procedurally improper." (SJ Opp. 47.) But it does not seek resolution of only a "fact or an element of a claim," which Matson's cases found as "piecemeal." (*Id.*) Nor is resolution of the availability of damages under the Clayton Act an "abstract . . . theory." (*Id.*) Instead, the Cross-Motion raises whether a distinct, substantial category of damages is available as a matter of law, which is proper. *See Himes v. Medstar Georgetown Univ. Med. Ctr*, 753 F. Supp. 2d 89 (D.D.C. 2010) (resolving partial summary judgment on "what damages [plaintiff] may recover" under a statute). The Cross-Motion also properly raises the availability of Alaska damages when there is no genuine dispute on their connection to Matson's monopolization scheme. *See Mardirosian v. AIA*, 474 F. Supp. 628 (D.D.C. 1979) (resolving plaintiff's partial summary judgment on liability and whether challenged conduct caused injury).

In declaring these issues undecidable, Matson is not candid in disclosing that courts have decided them on summary judgment—and in APL's favor. *See Bonjorno v. Kaiser Alum. & Co. Corp.*, 752 F.2d 802, 814 (3d Cir. 1984) (affirming partial summary judgment ruling that plaintiff can seek damages "outside of the geographic and product markets for liability purposes"); *OEM Glass Network Inc. v. Mygrant Glass Co.*, 2023 WL 2563689, at *1, *22-23 (E.D.N.Y. Mar. 17, 2023) (ruling on partial summary judgment that plaintiff may seek Clayton Act damages sustained

---

[1] APL objects to Matson's inaccurate conclusion (Resp. PSUF p. 1-2) that PSUF ¶¶1-187, 288-365 relate only to Matson's motion and not also to the Cross-Motion.

REDACTED PUBLIC VERSION

outside geographic market). Matson proved no procedural bar to resolving the Cross-Motion.

## II.   MATSON ESTABLISHED NO ISSUES PRECLUDING THE CROSS-MOTION

On the substance, Matson deploys its usual throw-everything-at-the-wall tactic, complicated by scattering Alaska-related assertions throughout. APL replies in a logical order.

### A.   APL May Recover Alaska Damages Connected to Matson's Guam Conduct

#### 1.   Clayton Act damages are not restricted to conduct in relevant markets

The argument that damages can be recovered only for conduct in relevant markets (SJ Opp. 27, 48) is wrong for multiple reasons. To begin, the text of the Clayton Act, which provides private party damages for Sherman Act violations, does not restrict damages to conduct in relevant markets—to the contrary, it provides damages to anyone injured "by reason of anything forbidden in the antitrust laws." 15 U.S.C. 15(a). This disposes Matson's argument.

No known published court decision interprets the Clayton Act as limiting damages to conduct in relevant markets. Binding decisions go the opposite way, broadly interpreting the Act as permitting damages flowing from violations. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-63 (1931) (explaining damages "resulting" from or "attributable" to violation recoverable); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 702 (1962) (explaining "causal connection" between violation and plaintiff's injury is sufficient); *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n. 9 (1969) ("It is enough that the illegality is shown to be a material cause of the injury").

Matson misrepresents *OEM Glass* and *Uber* as confining damages to conduct "in the relevant market." (SJ Opp. 48.) *OEM Glass* ruled that plaintiffs could recover New Jersey damages connected to defendants' violation, although "suffered outside of the relevant geographic market" (New York). *See* 2023 WL 2563689, at *1, 3-4, 23 (explaining limiting recovery to relevant market would prevent plaintiffs from being made whole.) Likewise, *Uber* expressly did not limit

<u>REDACTED PUBLIC VERSION</u>

recoverable damages to a relevant market. *See* 2021 WL 2302728, at *2 (N.D. Cal. May 11, 2021).[2]

Matson also misuses relevant markets. They do not define damages; they are "analytical tools" to help consider effects on competition generally. *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 49 (D.D.C. 1998). Matson's restriction, if adopted, would lead to unjust results. Some antitrust claims need no relevant markets, *see FTC v. Ind. Fed. of Dentists*, 476 U.S. 447, 461 (1986), and for those claims, there could be no damages. Its restriction also would allow defendants to punish customers and retaliate against competitors without damages liability, if done outside a market construct. Such an outcome would be antithetical to the Clayton Act's purpose of making plaintiffs whole and deterring misconduct. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 343-44 (1979). Matson cites no authority for grafting an "in the relevant market" restriction onto the Act.

**2.    Clayton Act damages are not restricted to conduct harming competition in relevant markets**

Taking a slightly different but equally wrong tack, Matson alleges Alaska damages are not recoverable because the D.C. Circuit "ruled" conduct must "inflict[] 'harm to competition . . . *in the relevant markets.*'" (SJ Opp. 27-28, 48 (purporting to quote *Rambus*).)

This version of Matson's argument is disproved by the Clayton Act permitting damages causally connected to a violation, with no "in the relevant market" requirement as explained above.

To try to support this argument, Matson manufactures the above "ruling" by fusing two irrelevant statements by other courts and attributing them to *Rambus*. (*Id.* 27.) But critically, *Rambus* did not consider the Clayton Act or damages at all. 522 F.3d 456, 466 (D.C. Cir. 2008). Not coincidentally, *Rambus* and Matson's other D.C. Circuit cases are government enforcement actions that, by their nature, did not consider private party damages or limit them to relevant

---

[2] Matson has no response to APL's additional authorities allowing damages outside relevant markets. (APL SJ Mem. 68-69 (citing *Bonjorno*, *Greene*, *Lafayette Steel*, and Jury Instructions).)

markets. (SJ Opp. 27-30 (citing Rambus, Google, Qualcomm, Microsoft).)[3] None of Matson's other cases considered damages in the context of a dominant firm using predatory conduct against an entrant in a related geographic area integrated with its efforts to maintain its dominance. (*See* § II.A.3., *infra* (evidence connecting Matson's Alaska acts to protecting its Guam dominance).) In short, Matson cites no real authority ruling that the Clayton Act limits damages to conduct inflicting harm in relevant markets.

Fundamentally, Matson conflates injury with amount of damages. Antitrust injury considers only whether challenged conduct was anticompetitive and a cause of some damage. *See Zenith Radio*, 395 U.S. at 114 n. 9. The amount of damages, however, is an entirely different subject. *See Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 572-573A (1990) (explaining that, upon "some showing" of antitrust injury, plaintiffs may recover damages connected to violation). Once injury is shown, "courts have allowed antitrust plaintiffs considerable latitude in proving amount of damages." *United States Football League v. NFL*, 842 F.2d 1335, 1378 (2d Cir. 1988). There is no genuine dispute that APL has shown at least some injury from Matson's anticompetitive conduct in the relevant markets (U.S./Guam or U.S./Hawaii). (APL SJ Mem. 64.) With that showing, APL may recover damages causally connected to that conduct.[4]

### 3. APL's Alaska damages are connected to Matson's anticompetitive conduct in Guam

There is no material dispute that Matson's acts in Alaska are connected to its anticompetitive scheme in Guam. Matson witnesses admitted it; APL witnesses confirmed it; and it is the only reasonable explanation for Matson's Alaska conduct that otherwise would be against

---

[3] Matson's misquoted *Namenda* language on Rule 23 class certification factors (SJ Opp. 48) is irrelevant too. 331 F. Supp. 3d 152, 217 (S.D.N.Y. 2018).

[4] The Court's reference to "anti-competitive effects in the relevant market" regarding scope of discovery, *APL v. Matson Nav. Co.*, 633 F. Supp. 3d 209, 232 (D.D.C. 2022), is not interpreted to limit damages inconsistent with the Clayton Act. (SJ Opp. 27.) Also, the issue was not briefed.

its own business and financial interests. (APL SJ Mem. 60-67.) Neither of Matson's responses (SJ Opp. 48) controverts the evidence.

Matson claims its CEO does not recall *some* evidence. Aside from immaterial quibbles, it does not controvert the CEO's *other* admissions about its "ax fight" with APL, fighting it to the end, and linkage of Alaska and Guam in responding to APL. (Resp. PSUF ¶¶13, 264-65.)

Matson next asserts its CCO, Mr. Lauer, "never even discussed Alaska" (SJ Opp. 48); but he actually said he could not recall details of conversations with APL witnesses who testified that he and the CEO connected Matson's Alaska retaliation to APL competing in Guam. (PSUF ¶264; DSJ 86, Aldridge Dep. 82:14-23 (APL's former President: "██████████████████████████████ ██████████████████████████████████████████████████████████████.").)

Matson cannot controvert evidence with claims of no recall, *see America v. Mills*, 654 F. Supp. 2d 28, 31 (D.D.C. 2009) (explaining nonmoving party must adduce competent evidence), particularly when the evidence allows no genuine dispute. For instance, while Matson's CEO denies using the "exact" words "it all begins and ends with Guam" in telling APL that Matson's Alaska retaliation was connected to Guam (and the CCO claims no recall) (Resp. PSUF ¶262), he testified to the same effect. (DSJ 28, Cox Dep. 101:8-11 ("Alaska was raised. . . . we wanted to see if there was an arrangement that could be worked out in Guam. . . . that's where we were focused first.") This is corroborated by APL's former President's contemporaneous emails: "Matson's position remains he same. IT ALL STARTS WITH GUAM. They want us out or to control us and this won't happen." (sic) (7/5/24 Dorn Decl., PSJ 182.) Nor does Matson controvert the bulk of APL and third-party testimony connecting Matson's Alaska acts to Guam. (Resp. PSUF ¶¶204-05, 224, 260-65.) Based on this evidence and fact that Matson's retaliation in Alaska hurt itself (PSUF ¶¶210-14, 253-58, 266-67), a reasonable jury would conclude that APL's attempt to

**REDACTED PUBLIC VERSION**

compete with Matson in Guam was a material cause of Matson's retaliation against APL in Alaska.

### 4.    Discovery complaints are not reason to deny the Cross-Motion

Disclosure complaints designed to distract from Matson's own discovery inadequacies[5] provide no reason to deny the Cross-Motion. Matson falsely accuses APL of not disclosing three third parties in response to interrogatories. (SJ Opp. 9, 14.) But one of them *was* identified in APL's January 2023 interrogatory response (Dkt. 169-14, p. 8 (identifying Royal Hawaiian among parties threatened and punished by Matson)), contrary to Matson's representation. (SJ Opp. 14 (alleging "failure to name" Royal Hawaiian).) For the other two, Matson omits more facts: (a) APL's interrogatory responses served before Matson began depositions identified nearly <u>50</u> third party entities and individuals (7/5/24 Dorn Decl., PSJ 184, p. 8-25); (b) the couple additional third parties about which Matson complains were mentioned in depositions taken by Matson; and (c) neither of those parties are responsive to Matson's interrogatories.[6] Matson's presumption that every third party mentioned in the course of numerous depositions should have been previously known and disclosed—when those parties are neither referenced in APL's claims nor requested by Matson's interrogatories—is impractical and shows no lack of diligence by APL or prejudice to Matson. This "gotcha" game is not reason to deny the Cross-Motion.

Matson's assignment argument is a transparent attempt to walk away from substantial damages it intentionally caused. Through the litigation, Matson has known APL transferred operational assets in Alaska to related entities in 2020, and Matson also knows from Dr. Warren-Boulton's analyses that this internal transfer did not affect operational costs and, as he testified,

---

[5] *See, e.g.,* 8/3/23 Joint Notice p. 1-5, Dkt. 75 (showing Matson's secret use of a "TAR" process, contrary to disclosure and cooperation requirements in ESI Order, excluded millions of documents from production to APL, confirmed by a sampling of excluded documents finding many thousands of responsive documents that Matson had failed to produce).

[6] *See* 7/5/24 APL Reply in Further Support of Objection, p. 19-23 (disproving Matson complaints).

"███████████████████████████████" on the amount of Alaska damages. (DSJ 354, RWB Dep. 48:18-49:18). Faced with this, Matson faults APL for not producing an assignment document (SJ Opp. 47-48), an argument ignoring that the declaration of APL's Mr. Theberge stating his knowledge that APL-related entities in Alaska assigned to APL their claims in this case (PSUF ¶193) is sufficient proof for summary judgment. *See America*, 654 F. Supp. 2d at 35 (explaining evidence that could become admissible may be considered).

Matson's "best evidence" argument and case involving an assignment of *patent* rights is irrelevant because such rights are required by 35 U.S.C. § 261 to be in writing. (SJ Opp. (citing *Allegria*).) In contrast, APL's claims may be assigned without writing. *See Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 949-50 (N.D. Ill. 2019) (explaining assignments can take any form, absent statutory requirements). Similarly, Matson's argument and cases about standing to pursue damages (SJ Opp. 47 (citing *Diesel System* and *Picture Lake*)) are inapplicable when, as here, there is an assignment. *See Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008) (reviewing "strong tradition" of recognizing standing for assignees).

APL has always prosecuted the case for all Alaska damages,[7] and put this in writing in April 2024, expecting Matson's present argument. Its late-raised argument would not eliminate APL's damages (with or without assignment) and is not grounds for denying the Cross-Motion.

### B.      Matson's Alaska Argument Wrongly Presumes No Proven Wrong in Guam

Matson's argument that Alaska damages are unrecoverable because they did not "result from [the proven] wrong" in "the relevant market" (SJ Opp. 48) is erroneous as explained in §§ II.A.2-3., and because it presumes Matson did no wrong in Guam.

---

[7] Matson also mistakenly presumes it requested the assignment when (a) Matson served no request reasonably interpreted to call for it and (b) it was created after the July 28, 2021 cut off Matson generally set for documents. (7/5/24 APL Reply in Further Support of Objection, p. 19-23.)

### 1.   Matson has not proven U.S./Guam cannot be a relevant market

Matson's incredible claim that there is "no economic analysis or factual support" for a U.S./Guam market (SJ Opp. 30) disregards voluminous evidence and expert analyses. (APL SJ Mem. 4-13.) Its assertion that U.S./Guam cannot be a geographic market because it is assembled from "clusters." (SJ Opp. 31) is neither true nor relevant. APL's alleged and established geographic market is U.S./Guam as a whole. (APL SJ Mem. 4), and this market is supported by Matson's documents (*id*. 4-6), admissions (*id*. 6-7), government regulations (*id*. 7-8), judicial recognition (*id*. 8), and expert analyses, including shipper substitution (*id*. 8-9). Matson ignores (or misrepresents) this as it cannot disprove it.

With more obfuscation, Matson asserts submarkets or "clusters" identified by Dr. Warren-Boulton are "different" so they cannot be in same "overall market." (SJ Opp. 31-32.) But Matson's flawed logic was already rebuffed by this Court;[8] and Matson overlooks that markets and submarkets are defined different ways for different purposes and need not be precisely delineated. *See FTC v. Sysco Corp.,* 113 F. Supp. 3d 1, 48 (D.D.C. 2015). Overall markets are defined by what relevant consumers view as reasonable substitutes, *see United States v. Microsoft,* 253 F.3d 34, 52 (D.C. Cir. 2001), and submarkets are identified with "practical indicia" like "peculiar characteristics and uses" to distinguish particular parts of an overall market. *FTC v. Whole Foods Market, Inc.,* 548 F. 3d 1029, 1037-38 (D.C. Cir. 2008). The Supreme Court thus held that "footwear" can be an overall market, with submarket clusters of "men's, women's, and children's" shoes. *Brown Shoe Co. v United States*, 370 U.S. 294, 297, 324-27 (1962). Ignoring these principles, Matson fails to controvert APL's evidence showing the overall U.S./Guam container

---

[8] Matson used the same flawed logic in moving to dismiss. (6/22/21 Hearing Tr. 7:25-8:10, Dkt. 28.) The Court rejected the argument then, *see APL*, 633 F. Supp. 3d at 233 ("antitrust markets can and often do include submarkets"), and should do so again.

cargo market can include submarket clusters like industry-recognized "chilled" and "household goods" types of cargo carried in distinct ways, on distinct terms, and/or for distinct customers. (APL SJ Mem. 9-11) (explaining practical indicia for submarket clusters).

Matson's effort to dilute its market share by (a) excluding shipments between Seattle/Guam and (b) including foreign cargo sent from "Asia" to Guam misapplies market definition law. (SJ Opp. 32-35.) Matson's criticism that APL did not apply *Brown Shoe* submarket indicia in defining the overall market inclusive of Seattle mismatches market/submarket analyses (*Id*. 33.) APL considered reasonable substitution consistent with *Microsoft*, in confirming Seattle is part of the overall market. (APL SJ Mem. 9-10.) Matson's speculation that not enough shippers were considered ignores Dr. Warren-Boulton's market-wide analyses and finding that Matson's Seattle/Guam rates decreased when APL began serving Guam from other mainland ports. (*Id*. 13.)

Matson also misapplies law to add undefined "Asia" to the U.S./Guam market. (SJ Opp. 34-35.) Both the evidence and economic analyses show mainland shippers do not view "Asia" as a reasonable substitute for shipping services to Guam. (APL SJ Mem. 11-12.) While Matson, predictably, denigrates Dr. Warren-Boulton's analysis confirming Asia is not part of overall market, his intuitive conclusion still stands: Matson adduced no evidence that mainland shippers relocated to "Asia" to ship to Guam, or otherwise began shipping their U.S. cargo on services with "Asia" instead of the mainland.

### 2.      Matson has not proven absence of power

For APL's attempt to monopolize claim, Matson waived argument that it lacks ability to "lessen or destroy competition." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 459 (1992). Matson provided no basis for dismissing APL's attempt claim for lack of Matson's power.

For APL's monopolization claim, Matson incorrectly argues its inflated rates cannot be

"direct" evidence of monopoly power because Dr. Warren-Boulton did not calculate the amount by which Matson's rates exceed a so-called "baseline." (SJ Opp. 36.) But Dr. Warren-Boulton analyzed more than Matson portrays. (APL SJ Mem. 17-18; DSJ 13, RWB Rpt. 39-44 (analyzing Matson's margins, rates, and changes over time).) And because his analyses found Matson's rates to be elevated by at least a SSNIP, *i.e.*, 5%, it was unnecessary to quantify the amount further. (DSJ 354, RWB Dep. 125:3-126:8, 127:15-128:1, 313:24-321:12.)[9] This empirical evidence of elevated margins and rates is sufficient to withstand summary judgment on power. *See In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 2024 WL 278565, at *19-20 (E.D.N.Y. Jan. 25, 2024).

Neither of Matson's cases addressed, much less mandated, quantification of a "baseline." *Mylan Pharmaceuticals* turned on an expert doing *no* empirical analysis. 838 F.3d 421, 434 (3d Cir. 2016). *McDermid Printing* held *speculated* increases, as opposed to empirical analyses, were insufficient. 833 F.3d 172, 184 (2d Cir. 2016).[10] Courts actually considering Matson's argument reject it. *See Payment Card*, 2024 WL 278565, at *20-21 (rejecting "baseline" argument and explaining plaintiffs need only show through analysis that "prices would have been lower" and case law "is not so stringent as to demand an exact number").

Matson's speculation that its rates are higher because its service is "better" (SJ Opp. 37) cannot create a genuine issue because (a) it relies on Matson's expert whose "quality" assessment did not analyze rates, the most important service component (APL *Daubert* 16-17) and (b) Dr. Warren-Boulton's regression analyses, adjusted for Matson's quality components, found its

---

[9] Matson's expert also did not quantify a "baseline" price which, according to Matson, precludes her from repeating its story about offering "competitive" rates. (PSJ 60, Langer Dep. 26:23-27:2.)

[10] Matson's assertions about APL needing to prove "output reduction" and disprove "excess capacity" (SJ Opp. 37-39) is wrong in this Circuit. *See Microsoft*, 253 F.3d at 51 (explaining power is shown by ability to "control prices *or* exclude competition") (emphasis added).

market share to be inflated. (RWB Rebut. 24-25.) Matson's refrain also improperly disregards voluminous and undisputed evidence of Matson's terrible service, broken equipment, victimized customers, and complaints about "stupidly high rates." (APL SJ Mem. 2, 18; PSUF ¶¶81-108.)

The argument that Matson's near 80% U.S./Guam market share is insufficient "indirect" evidence of power is equally flawed. (SJ Opp. 38-40.) Courts reject Matson's conclusion that some decline in its dominant share—here, 94% in 2016 to 80% in 2022 (PSUF ¶¶50-51)—disproves power. *See, e.g., Am. Tobacco Co. v. United States*, 328 U.S. 781, 795 (1946) (monopolization found despite decline in share from 90% to 68%); *Multiflex, Inc. v. Samuel Moore & Co.,* 709 F.2d 980, 992-93 (5th Cir. 1983) (dangerous probability not negated by decrease from 80% to 38%).

Matson's bid for the Court to disregard all entry barrier facts because Matson allegedly "expected" another carrier (SJ Opp. 39) should be rejected too. Barriers are based on market realities, not corporate imaginations. *See Cardinal Health*, 12 F. Supp. 2d at 49, 55-58. Evidence showing Matson's 80% U.S./Guam share sustained through 2022 in a market with substantial barriers—including enormous entry costs, legislation pursued by Matson to block entrants, and history of little entry (APL Mem. 15-18; PSUF ¶¶53, 56-57, 74-80)—is sufficient to resist judgment on power. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 477-78 (1992) (explaining evidence of 80% market share is "sufficient to survive summary judgment").

### 3.     Matson has not proven its misconduct did not occur or was harmless

Matson's use of extreme and erroneous tests and belittlement and disregard of the evidence fails to disprove its anticompetitive actions in Guam (and consequently Alaska damages).

### (a)     Matson's extreme foreclosure test should not be adopted

Matson's revised argument[11] rests on its erroneous theory that no individual act is

---

[11] Matson abandoned its erroneous argument that only "actionable" conduct can be exclusionary.

**REDACTED PUBLIC VERSION**

exclusionary unless it forecloses 30% or more of a market. (SJ Opp. 2-4.) Based on this, Matson purports to measure the effect of each of its challenged acts and deems each non-exclusionary for lack of foreclosure. (*Id*. 6, 12, 17, 21, 23, 25.) Matson asserts it can apply this test to <u>all</u> forms of challenged conduct—and not only exclusive dealing claims—because no authority says otherwise. (*Id*. 7 ("Nothing in the cases" limits foreclosure test to exclusive dealing).)

But Matson's main case, *Google*, expressly says foreclosure does <u>not</u> apply to <u>all</u> conduct:

> "***The 'substantial foreclosure' test applies only to exclusive dealing contracts***" . . . . ***Plaintiffs are not required to proffer evidence of substantial foreclosure*** resulting from Google's SA360 conduct ***because it is not an exclusive dealing contract***.

687 F. Supp. 3d 48, 85, n.20 (D.D.C. 2023) (emphasis added). Accordingly, Judge Mehta did not require or measure foreclosure for conduct other than exclusive dealing contracts. *See id*. at 54, 85 (finding Google's delayed implementation of search engine features (SA360) could be exclusionary without considering foreclosure). Also, the D.C. Circuit did not require or measure foreclosure when considering the exclusionary nature of Microsoft's conduct, except for exclusive dealing contracts. *See Microsoft*, 253 F.3d at 64, 77, 78 (finding deception, threats, and use of pre-installed internet browsers exclusionary without measuring foreclosure). Matson misquotes *Microsoft* to conceal this. (SJ Opp. 2-3 (omitting the text limiting *Microsoft* quote to "courts considering antitrust challenges to ***exclusive contracts***…") (emphasis added).)

Extending its erroneous test, Matson argues each challenged act (or each Matson-made category) must be individually analyzed and measured for anticompetitive effects, *i.e*., foreclosure. (*Id*. 6-7.) Matson is wrong again. Conduct is exclusionary for § 2 purposes when it harms the competitive process; it need not affect 30% or some market measure. *See Microsoft*, 253 F.3d at 58. Even *Google* recognized conduct need only be "minimally" anticompetitive to be exclusionary for § 2. 687 F. Supp. 3d at 68. Matson's monopolist-friendly foreclosure test, if adopted, would neuter the Sherman Act. For instance, a monopolist could use repeated predatory acts to maintain

<u>REDACTED PUBLIC VERSION</u>

power with Sherman Act immunity, as long as each act is designed to foreclose 29% of a market.

**(b)      The effect of Matson's conduct should be viewed in aggregate**

In considering the exclusionary effect of Matson's conduct, it should be viewed in the aggregate. This is consistent with Matson's authority, *Google*. It explained that courts can aggregate all acts at least "minimally" anticompetitive in nature. *Id*. Aggregation is especially appropriate for this case, challenging a variety of acts taken as part of same monopolizing scheme:

> The fact finder should be permitted to consider the entire sum of unlawful exclusionary practices and their impact. . . . One can imagine a case in which a half dozen independently unlawful acts each had an impact insufficient to warrant antitrust relief, but the impact of the aggregation was substantial. . . . In a monopolization case conduct must always be analyzed "as a whole." A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices. Each one viewed in isolation might be viewed as de minimis or an error in judgment, but the pattern gives increased plausibility to the claim.

Areeda, *et al*., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 310c7. Matson's acts—threatening and retaliation, pursuing slot proposals to lessen competition, using bundled market share, and deploying restrictive agreements—are each at least minimally anticompetitive when undertaken by an 80% market-share firm in the two carrier U.S./Guam market. (APL SJ Mem. 36-51.)

Matson gives no reason to depart from *Google*. Matson misrepresents *Microsoft* as rejecting a wholistic view of anticompetitive effect (SJ Opp. 6), when it actually passed on deciding "course of conduct" as unnecessary to its decision. 253 F.3d at 78. Also, Matson's heavy reliance on language in exclusive dealing cases addressing the "substantial foreclosure" claim element not in APL's non-exclusive dealing claims (SJ Opp. 6-8 (citing *EpiPen*, *Meta*, *Microsoft*, *Google*)), provides no persuasive rationale not to consider the totality of Matson's conduct, like *Google* says may be done, and other courts across the country do (APL SJ Mem. 34, 37 (citing cases and authorities).)

**REDACTED PUBLIC VERSION**

(c)      **Matson's conduct, properly considered, is exclusionary**

***Retaliation against customers and suppliers***: The statute of limitations is no basis for excluding evidence of retaliation. (SJ Opp. 11.) This evidence is relevant to proof of liability and damages recoverable in the limitations period. Matson bears the burden of proving this affirmative defense, but neither of its cases support its position. *Meta* considered laches, not limitations. 66 F. 4th 288, 300 (D.C. Cir. 2023). Matson's out-of-circuit case, *Independent Taxicab Operators*, actually allowed pre-limitations evidence. 278 F. Supp. 979, 986 (N.D. Cal. 1968).

Matson's argument also conflicts with the Supreme Court's teaching that the Clayton Act permits recovery of all damages suffered during the limitations period, including damages resulting from pre-limitations conduct. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 333 (1971). Further, because Matson's misconduct admittedly began before, and continued into the limitations period (SJ Opp. 14), Matson's argument is wholly inapplicable. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp*., 392 U.S. 481, 502 & n.15 (1968) (recognizing that pre-limitation conduct continuing into limitations period is relevant).[12]

The fallback argument that retaliation evidence is insufficient is unavailing. (SJ Opp. 15-16.) APL presented admissible testimony and contemporaneous documents—including Matson admissions—showing Matson retaliated against at least GTW, Guam Movers, Approved Freight, Royal Hawaiian, and DeWitt (APL SJ Mem. 23, 25, 27-30.) This evidence, viewed in APL's favor, raises a jury issue. Any holes in the evidence should be construed against Matson. (*See* Fn. 5.)

Nor can Matson sidestep the evidence by asserting its retaliation cannot be exclusionary because it was not in the relevant market. (SJ Opp. 17-18.) Even if there were an "in market"

---

[12] Matson's limitation defense should be precluded for withholding its interrogatory explaining it until late on the last day of fact discovery. (7/5/24 Dorn Decl., PSJ 183, p. 20-21.

**REDACTED PUBLIC VERSION**

distinction (and there is not, *see* §§ II.A.2-3., *supra*), the above entities admittedly operated in the container shipping business in Guam or Hawaii (Resp. PSUF ¶¶118, 133, 142, 160, 167), and Matson's allusion to "China" and "trucking" is a diversion. The evidence viewed in APL's favor shows Matson's retaliation adversely affected these companies, shippers, and APL (*e.g.*, *id.* ¶¶139-40, 150, 155-57, 185-86); thus, at least minimally harming the competitive process. *See Microsoft*, 253 F.3d at 58; *Google*, 687 F. Supp. 3d at 68. This is exclusionary conduct under § 2. *See Nat'l Farmers Org., Inc. v. Assoc. Milk Prods., Inc.*, 850 F.2d 1286, 1290 (8th Cir. 1988) ("blatantly predatory" to cut off supplier for doing business with competitor).

   ***Threatening customers and suppliers***: Matson's barrage of arguments to bury evidence of threats, including its MSP threats (SJ Opp. 8-14, 18-21),[13] fails to eliminate the issues.

   *First*, the statute of limitations provides no basis for excluding relevant evidence as explained above. *Second*, the evidence should not allegedly incomplete interrogatory responses. (*See* § II.A.4., *supra*.) *Third*, Matson incorrectly presumes all hearsay evidence of its threats is inadmissible. (SJ Opp. 9-11.). This evidence should not be ignored, *see* § II.D. *Fourth*, the declarations Matson procured do not disprove APL's claims (*id.* 9), as Matson wildly exaggerates what those declarants know and state. (7/5/24 APL Reply in Further Support of Objection.)

   *Fifth*, Matson erroneously presumes each threat is excused for not "foreclosing" the market (SJ Opp. 12, 20-21), using its extreme test. But that test is contrary to law (*see* § II.B.3(a), *supra*), confirmed by the Tenth Circuit expressly outright rejecting use of the test proposed by Matson, *see Chase Mfg, Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1174 (10th Cir. 2023), and the D.C.

---

[13] Matson persists in splitting its MSP threats into another "category," to try to apply elements of a standalone disparagement claim APL did not make. (SJ Opp. 18-21.) The D.C. Circuit did not apply disparagement claim elements in considering whether threats are exclusionary in *Microsoft* and *Caribbean Broadcasting*. (APL SJ Mem. 42-23.)

Circuit finding a couple threats by Microsoft to be exclusionary without regard to share of foreclose. *See Microsoft*, 253 F.2d at 77-78. Matson's case, *OJ Commerce*, is inapt (SJ Opp. 13): It reviewed an exclusive dealing, not monopolization, claim and considered foreclosure as an element of exclusive dealing. 34 F.4th 1232, 1247 (11th Cir. 2022). Foreclosure is irrelevant outside exclusive dealing. *See Google*, 687 F. Supp. 3d at 85, n. 20.

*Sixth*, Matson's argument that all threats are excused if they do not make customers "capitulate" or "withhold shipments" (SJ Opp. 13-14, 20) is contrary to the Supreme Court and others recognizing that even unfulfilled threats are predatory and exclusionary because they influence market conduct. *See, e.g., Schine Chain Theatres v. United States,* 334 U.S. 110, 119 (1948) (threats to punish customers considered for support of jury verdict); *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1195-1204 (8th Cir. 1982) (threats, including unfulfilled ones, recognized as "plainly predatory"). *Microsoft* is not properly read as giving dominant firms a pass on unfulfilled threats; it describes Microsoft's "threat of retaliation," not Intel's eventual capitulation, as exclusionary conduct. 253 F.3d at 78.  In any event, Matson demands a degree of proof that is unnecessary at this stage because, as *Chase Manufacturing* explained, on summary judgment, effects of threats may be inferred. 84 F.4th at 1175-76.

*Seventh*, Matson's argument that all threats must be disregarded unless "causation" is proven (SJ Opp. 13, 19-20) appears to be more conflation of injury and damages. (*See* § II.A.2., *supra.*) Threats are exclusionary in support of § 2 violations when they, together with other anticompetitive conduct, harm the competitive process. *See Microsoft*, 253 F.3d at 58; *Google*, 687 F. Supp. 3d at 68. Such conduct "causes" harm in this context when it "tend[s] to bring about or protect" power in a market. *Rambus*, 522 F.3d at 464. Nothing more is needed to be exclusionary, and any further "*effect* of threatening conduct goes to the question of damages."

REDACTED PUBLIC VERSION

*Alexander*, 687 F.2d at 1202.

*Finally*, Matson's "causation" argument above is premised on the Court fully crediting Matson's interpretation of the evidence, *i.e.*, no admissible threats and no effects. But the evidence viewed in APL's favor is more than sufficient. (APL SJ Mem. 23-34, 40-43 (summarizing evidence, authorities).) By dismembering APL's claims and evidence, Matson did not, and cannot, properly dispute that the evidence is sufficient to show at least minimal harm to the competitive process, or that it tended to bring about or protect Matson's power in U.S./Guam.

***Pursuing slot proposals to lessen competition***: Matson's conclusory assertions do not eliminate the issues with it using a series of so-called "slot" proposals to remove APL from Guam. (*Id.* 26-27, 31-33, 44-45.) The facile argument that Matson's proposals did not expressly "require" APL to exit is form over function (SJ Opp. 49), when the evidence (ignored by Matson) shows that was the obvious, practical effect. (*E.g.,* PSUF ¶283 (APL's former President testifying that Matson's slot terms were "all about getting APL to take the iron out of Guam").)

The comments by a non-APL witness about one of Matson's multiple slot proposals (SJ Opp. 49) do not override the extensive evidence of APL's analyses and conclusions on Matson's "████████████████" proposals, designed to ███████████████████" APL from Guam. (PSUF ¶¶274-83.) The self-serving assertion that Matson did not intend to remove APL from Guam (SJ Opp. 50) is refuted by its actual conduct: (a) Matson paired a proposal with it chartering an APL Guam vessel in another trade, recognizing the proposal would remove APL from Guam; and (b) Matson's made repeated offers during that time to buy out the APL business. (PSUF ¶¶273, 276, 287.) That slots were being pursued to protect Matson's dominance is further supported by its offer to reverse its costly Alaska retaliation, if APL were to accede to slot. (*Id.* ¶¶262-67.)

***Exploiting Hawaii market and bundled market share***: Matson's repeat appeal for this

**REDACTED PUBLIC VERSION**

Court to adopt a "below cost" price test (SJ Opp. 21-22) should be declined again. *See APL*, 633 F. Supp. 3d at 229 (finding no authority for Matson's requested below cost price test).

Arguing about Matson's so-called Loyalty Program for HHG cargo not being "coercive" (SJ Opp. 22) dodges the relevant issue: Whether the Program's *practical effect* was *exclusionary*. *See APL*, 633 F. Supp. 3d at 227. The evidence confirms it was, including: (a) customers fear of disrupting their Matson-reliant Hawaii shipments if they were to ship to Guam with APL (PSUF ¶¶288-91); (b) the Program's "first-dollar discount" design effectively locking out about 90% of HHG shippers to both Hawaii and Guam, because they would forfeit the entire Matson discount by shipping more than 10% of their Guam cargo with APL (*id.* ¶299); and (c) Dr. Warren-Boulton's analyses finding that a majority of HHG shippers to both Hawaii and Guam do 100% of their Guam cargo with Guam, and the remainder also do substantially all their Guam business (75%) with Matson. (*Id.* ¶¶300-01; DSJ 411, RWB Rebut. 44.) Matson admittedly performed no contemporaneous analysis to justify any procompetitive benefits for an 80% market share carrier bundling discounts with an unprecedented 90% cargo requirement. (Resp. PSUF ¶¶295-97.)

Matson's bare assertion that there was no foreclosure cannot be credited (*see supra*) and questioning the "provenance" of APL's analyses of the 90% foreclosure rate is deflection. It is a component of Matson's own Program (*id.* ¶294) and Dr. Warren-Boulton's reports explain how his analyses confirmed that Matson achieved its desired foreclosure of HHG shippers to both Hawaii and Guam. (DSJ 411, RWB Rebut. 44; DSJ 13, RWB Rpt. 48.)

The retort that APL showed "nothing" about the Program's anticompetitive effects is mind-boggling (SJ Opp. 23), when APL presented fact-based analyses of the Program's bundling of market share discounts causing increased and discriminatory rates for shippers, and reduced competition among carriers, by bundling a product on which APL cannot compete (HHG cargo

with Hawaii) to squelch competition in a competitive product, HHG cargo to Guam. (APL SJ Mem. 46-48 (citing facts, analyses, and authorities).) Matson has been peddling supposed overall benefits since its 2021 motion to dismiss (Dkt. 15-1, p. 15), and it still remains theoretical (SJ Opp. 23 (citing no evidence)) and incapable of controverting APL's evidence.

*Deploying restrictive agreements*: APL need not prove all elements of an exclusive dealing contract claim to show Matson's agreements harmed the competitive process, as Matson presumes. (SJ Opp. 24.) Matson asserts this is required by *Microsoft*, but the D.C. Circuit actually found ISV contracts exclusionary for § 2 purposes despite *not* satisfying rigid exclusive dealing claim elements, as some were non-exclusive and covered a sliver of the market. 253 F.3d at 72-73 (describing contracts as "preferential" and making Explorer a "default," rather than exclusive, browser). Matson's acknowledgement that the D.C. Circuit did so because the practical effect of those non-exclusive agreements was "amplified" by other conduct (SJ Opp. 4-5) only further confirms Matson is wrong to assess the effects of its agreements separate from its other acts.

The evidence that Matson's contracts "locked in" key shippers critical for entrants (APL SJ Mem. 48), and its conduct covering 29-52% of the market (*id*. 48), is sufficient "foreclosure" to show harm to competitive process for summary judgment. *See Microsoft*, 253 F.3d at 73-74 (finding agreements affecting 5-20% of relevant market exclusionary) Matson's *Omega* case is inapplicable because it is a § 3 challenge to a "distributor" contract that requires "a higher standard of proof" than customer contracts like Matson's, 127 F.3d 1157, 1163 (9th Cir. 1997) (citation omitted). *Omega* also involved no additional misconduct that "amplifies" the practical effects of Matson's agreements, *id*. 1163-65, which is why Matson admits in a footnote that its exclusive dealing argument presumes "no evidence" of any other misconduct. (SJ Opp. 25, n. 8).

Matson's repetitious assertion that it never had truly exclusive contracts is controverted by

at least their practical effect of "locking in" shipper business. (APL SJ Mem. 48-50; PSUF ¶¶314-19.) The assertion that its agreements were "easily terminable" is also disputed, with evidence showing shippers like Macy's effectively could not do business with APL due to Matson's contracts. (PSUF ¶¶314-16.) The claim that Matson's conduct affected only 7.4% of the market—a number generated by its expert uncritically accepting every one of Matson's defense theories, including its extreme foreclosure test—is hotly disputed (APL SJ Mem. 50), subject to challenge (APL *Daubert* 23-25), and incapable of resolving summary judgment in Matson's favor.

The evidence does not support spinning Matson's agreements as merely "competition." (SJ Opp. 26.) It designed and launched a contracting strategy to "lock in" large, critical Guam shippers to block APL's entry. (PSUF ¶¶307-09.) That effect, paired with Matson's threats and retaliation (APL SJ Mem. 23-34 (summarizing evidence)), is not ordinary competition on merit. None of Matson's cases inferred exclusive contracts are "procompetitive" when such other conduct is present. Nor should Matson's inadequate discovery response be awarded with an inference against APL (SJ Opp. 25.) Matson failed to produce relevant contracts by filtering out documents in violation of the Court's Discovery Order (*see* fn. 5, *supra*), and the "lists" Matson produced refer to executed contracts Matson failed to produce (*e.g.*, PSJ 163), not only "targets" as it claims.

### 4. Matson has not disproven damages with disaggregation speculation

Matson admits summary judgment on abstract theories is not proper (SJ Opp. 6), but it nonetheless seeks dismissal based on layers of damages conjecture. *If* the jury disagrees with some unknown aspect of APL's claims, *and if* a verdict requires an adjustment of damages, *and if* Dr Warren-Boulton's model cannot perform such yet-to-be-determined adjustment, Matson speculates damages *might* not be measurable so judgment should be entered now. (*Id*. 45-46.)

Judgment is not properly decided now, based on layers of conjecture. *See, e.g., Insignia Sys., Inc. v. News Am. Marketing In-Store, Inc*., 661 F. Supp. 2d 1039 (D. Minn. 2009) (denying

summary judgment based on alleged inability to disaggregate); *Apple, Inc. v. Samsung Elecs. Co., Ltd*, 2012 WL 2571719, at *28 (N.D. Cal. June 30, 2012) (denying summary judgment because, among other reasons, juries may award nominal damages even if plaintiffs cannot estimate amount). This is why Matson's few in-Circuit cases (*Southern Pacific* and *Federal Prescription*) considered disaggregation in <u>post</u>-trial arguments about what actually occurred during trials.

Matson's speculations about the future also incorrectly presume APL would never be able to adjust damages. Dr. Warren-Boulton did not testify that his model "cannot" disaggregate as Matson represents. (SJ Opp. 45.) To the contrary, Matson omits his testimony explaining his model can estimate "█████████████████████████████████████████████████ █████████." (DSJ 354, RBW Dep. 180:14-16.) He further testified (and Matson further omitted): "█ ███████████████████████████████████████████████████████████." (*Id*. 180:21-181:1.) He also testified that he had tested and verified his model's capabilities to isolate the effects of some types of challenged conduct. (*E.g., id*. 49:19-53:21.)

Estimating—or disaggregating—damages to the extent reasonably possible with the data available is all that is required of plaintiffs. *See Zenith Radio*, 395 U.S. at 123-25. Matson should not be rewarded with dismissal now, even if, *arguendo*, the data it provided cannot support some future adjustments. *See Bigelow v. RKO Radio Pictures, Inc*., 327 U.S. 251, 263-65 (1946).

### C.   Matson Has Not Established Valid Business Reasons for Its Alaska Acts

Matson asserts its challenged conduct in Alaska is excused for business reasons. (SJ Opp. 29-30.) Matson bears the burden of proving this. *See Microsoft*, 253 F.3d at 59. It did not do so because its alleged reasons are unsupported, pretextual, and too restrictive. *See id*.

Whether Matson's counsel musters some excuse in litigation is not material: What matters is Matson's actual reasons at the time of its acts. *See id*. But Matson admitted it had no

contemporaneous valid reasons (or failed to disclose them in discovery) for (a) ejecting APL from LASH Dock, (b) terminating the APL office and warehouse lease, and (c) ending the APL CCA. (APL SJ Mem. 43-44; Resp. PSUF ¶¶198, 212, 215, 243-44.)[14]

Matson's contortions to generate *ex post hoc* business reasons is demonstrated by its excuses for ending the connecting carrier agreement (CCA) with APL in 2017. In this litigation, Matson's CEO said it ended the CCA because Matson's "international" business would be incompatible with carrying cargo for "international" competitors. (DSJ 28, Cox Dep. 62:12-64:1.) But at the time of the cut off, there was no "international" business, or even a real plan for it. (*Id*. 59:14-60:22.) Matson also continued to carry for other "international" competitors (NYK and Maersk) in Alaska for years after it cut carrying for APL. (*Id*. 62:12-64:1.) By ending the CCA without a plan at the time, Matson hurt itself by forfeiting millions of dollars in CCA payments from APL. (PSUF ¶¶211-13.) In fact, Matson's business development team advised it to resume a CCA with APL to recover revenue losses. (*Id*. ¶214) And the "international" business Matson references did not begin until years <u>after</u> ending the CCA. (DSJ 28, Cox Dep. 64:11-21.) No reasonable jury would find Matson's excuses to be valid reasons in 2017 for ending the CCA.

Even if, contrary to evidence, Matson had valid reasons for ending longstanding, mutually beneficial "operational cooperation" with APL in Alaska (PSUF ¶254), it could have done so by means less prejudicial to APL and competition. (*Id*. ¶¶196, 198, 210-11, 228-27, 240, 250, 257-58, 266-68 (collecting evidence of harm to APL, Matson, and customers).) For example, instead of totally ending the CCA, Matson could have continued to carry some APL cargo like it did for other competitors, until Matson's "international" business began many years later.

---

[14] Matson's focus on one act—ending the tug sharing arrangement—cannot justify all its other conduct and also is genuinely disputed. Matson's theory about "safety" reasons from APL allegedly not sharing a tug (SJ Opp. 30) is contrary to the testimony. (PSUF ¶¶245-48, 252.)

**REDACTED PUBLIC VERSION**

Matson has not met its burden of establishing, on the evidence, that all its Alaskan conduct hurting both itself and APL was for legitimate business reasons and with procompetitive effects on balance. *See, e.g., New York v. Actavis PLC*, 787 F.3d 638, 659 (2d Cir. 2015) (affirming rejection of procompetitive justification arguments disputed by evidence, particularly when defendant's acts hurt itself, which "is indicative of anticompetitive behavior").

### D.    Matson's Incomplete Hearsay Argument Does Not Support the Total Exclusion of Statements About Threats and Retaliation

Matson's circular argument that inadmissible hearsay is not admissible does not support the wholesale exclusion of all Alaska and other evidence Matson labels hearsay. It omits controlling law recognizing (a) not all hearsay is "inadmissible" and (b) hearsay may be considered for summary judgment if it could be offered at trial in admissible form. *See America*, 654 F. Supp. 2d at 35. APL's evidence would be admissible under hearsay exceptions, or admissibility should be determined in trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (explaining evidence need not be "in a form that would be admissible at trial in order to avoid summary judgment").

Threatening or retaliatory statements by Matson would be admissible under FRE 801(d)(2)(D) as statements by an agent or employee of an opposing party. *See Talavera v. Shah*, 638 F.3d 303, 309 (D.C. Cir. 2011) ("evidence that the statements were made during the existence of the employment relationship and [that the statements] relate to the challenged action, is sufficient to allow the statements into evidence as party admissions"). The specific Matson employee or agent need not be identified. *See Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934, 944-45 (6th Cir. 2016). Here, nearly all statements with threats and retaliation originate from Matson and appear admissible under FRE 801(d)(2)(D).

In turn, statements from customers and service providers relaying to APL statements by Matson about threats and retaliation squarely fit under FRE 803(3) statement-of-mind evidence.

**REDACTED PUBLIC VERSION**

*See* Fed. R. Evid. 803(3) (a statement "of the declarant's then-existing state of mind (such as motive, intent, or plan)" is excepted from the rule against hearsay). These hearsay statements are permitted "to show the state of mind of the declarant at that time if that is the issue in the case." *United States v. Day*, 591 F.2d 861, 882 (D.C. Cir. 1978) (quotations and citation omitted).

In antitrust litigation, and in cases involving threats and retaliation in particular, customer and service provider statements as to their reasons for dealing or not dealing with plaintiffs are routinely recognized as admissible for proving those reasons. Consistent with this, the Third Circuit ruled it was error not to admit plaintiffs' testimony about their customers' explanations for not dealing. *See Callahan v. A.E.V., Inc.*, 182 F.3d 237, 252; *see also BoDeans Cone Co., LLC v. Norse Dairy Sys.*, LLC, 678 F. Supp. 2d 883, 902-03 (N.D. Iowa 2009) (admitting documents reflecting customers' statements as relevant to relationship with defendant, its market power, injury to competition, and lack of business justification); *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 319 (N.D.N.Y. 2021) (explaining it is well-established that statements of a customer as to reasons for not dealing are fall within FRE 803(3)).

Even if the statements were not admissible under FRE 801(d)(2)(D) and FRE 803(3), they can be admissible under the residual hearsay exception, because statements by customers and service providers relaying threats made against them are probative, trustworthy, and material. *See* Fed. R. Evid. 807(a). Here, APL's offered statements are both "very necessary" and "very reliable" because most of the hearsay statements occurred contemporaneously when the threats and retaliation were received (and, understandably, no customer or service provider would want to publicly come forward and face retaliation), and all were not made in anticipation of litigation which precludes any reason for doubting the trustworthiness of statements. *See, e.g., United States v. Benton*, 656 F. Supp. 3d 1, 10 (D.D.C. 2023); *BoDeans*, 678 F. Supp. 2d 883 at 903 (admitting

surveys reflecting customer statements about defendant under FRE 807 when defendant had commissioned and used the surveys and they were not conducted for litigation).

Finally, many of the statements about threats and retaliation would still be admissible to demonstrate the effect of the statement on the person who heard it, because the statement is not being offered for its truth. *See Jones v. United States*, 934 F. Supp. 2d 284, 290 (D.D.C. 2013) (permitting the use of hearsay statements at trial because they not offered for the truth of the matter asserted but to demonstrate their effect on the person who heard them). Evidence of threats and retaliation with customers and service providers are admissible as nonhearsay statements because they show what was heard and the effect of the statements. *See, e.g., Bakers Carpet Gallery, Inc. v. Mohawk Indus., Inc*., 942 F. Supp. 1464, 1475 (N.D. Ga. 1996) (admitting statements by employees of carpet seller to show what it understood about anticompetitive conduct and its effect on seller); *Warner Records, Inc. v. Charter Comm., Inc.*, 2022 WL 1500780, 2-3 (D. Colo. 2022) (admitting statements made by defendant's customers to effect statements had on defendant).

The evidence is potentially admissible and may be used for summary judgment, *see Chase Mfg.*, 84 F.4th at 1176, and specific admissibly issues can be determined in lead up to trial, *see AngioDynamics*, 537 F. Supp. 3d at 321, instead of simply presuming all of it inadmissible.[15]

## CONCLUSION

The Cross-Motion should be granted and entered for the foregoing reasons.

---

[15] APL objects to Matson's unnoticed, unauthorized 10-page motion to strike. (Resp. PSUF, p. 2-11.) It is not authorized by the Court's Order for this briefing. *See* Dkt. 106. It is improper under LCvR 7(h), which is strictly applied to exclude legal argument. *See Jackson v. Finnegan*, 101 F.3d 145, 153 (D.C. Cir. 2002). And it exceeds the 50-page limit for Matson's Reply/Opposition set by the Court's Order. *See Hajjar-Nejad v. George Washington Univ.*, 2013 WL 12407402, at *1 (D.D.C. May 13, 2013) (declining to permit party to "circumvent the page limit for responsive memoranda" to include "legal argument"). Matson's "motion" has no merit and misstates many material facts. APL lacks page capacity to respond and does not want to honor a "rogue" pleading. The issues Matson raises will be ripe in the run-up to trial.

**REDACTED PUBLIC VERSION**

Dated:  July 5, 2024

Respectfully submitted,

_/s/John R. Fornaciari_
John R. Fornaciari (DC Bar 152801)
Danyll Foix (DC Bar 475503)
Sally Qin (DC Bar 1011432)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC  20036-5403
Tel:    202.861.1500
Fax:    202.861.1783
Email: JFornaciari@Bakerlaw.com
          DFoix@Bakerlaw.com
          SQin@Bakerlaw.com


_Counsel for Plaintiffs American President Lines, LLC, APL Maritime, Ltd., and APL Marine Services, Ltd._

## <u>CERTIFICATE OF SERVICE</u>

I, John R. Fornaciari, certify that on this 5th day of July, 2024, I caused to be served on

Defendants via the Court's CM/ECF the foregoing PLAINTIFFS' REPLY MEMORANDUM IN

SUPPORT OF THEIR CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT.


Dated:  July 5, 2024

*/s/ John R. Fornaciari*
John R. Fornaciari (DC Bar 152801)
BAKER & HOSTETLER LLP

*Attorneys for Plaintiffs*
