<u>REDACTED PUBLIC VERSION</u>

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN PRESIDENT LINES, LLC, APL MARITIME, LTD., APL MARINE SERVICES, LTD.,<br><br>    Plaintiffs,<br><br> v.<br><br>MATSON NAVIGATION COMPANY, INC., MATSON LOGISTICS, INC.,<br><br>    Defendants. | Civil Action No. 21-2040<br>Judge: Hon. Christopher R. Cooper |

## REPLY IN FURTHER SUPPORT OF OBJECTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(C)(2) AND <u>MOTION TO STRIKE</u>

Distraction and deflection—this is all Matson offers in its opposition to APL's Objection Pursuant to Federal Rule of Civil Procedure 56(c)(2) and Motion to Strike ("Objection and Motion"). Instead of meaningfully contending with the serious legal defects APL has identified in each of the declarations Matson relies upon to affirmatively advance its Motion for Summary Judgment, Matson tells an exaggerated tale of APL's supposed discovery misconduct, and quotes from the declarations as if they establish undisputed conclusions of fact. Matson's choice to double down on these declarations, using them to make points the plain texts of the declarations do not support, outside of the declarants' personal knowledge, and to rebut allegations APL has not made, merely confirm the reason APL seeks to have these declarations stricken.

Matson has not established multiple declarants' personal knowledge—which in some cases is disclaimed by the declarations themselves. And furthermore, Matson has not proven that the declarations are admissible—much less that their contents could be admissible at trial. Matson even concedes that these declarations should be limited to impeachment only, but nonetheless

seeks to use them to advance its affirmative arguments for summary judgment. Accordingly, APL respectfully requests that the Court strike any portion or all of the declarations Matson improperly relies upon to advance its summary judgment arguments, or decline to rely on their contents.

## I.      BACKGROUND

APL incorporates by reference and fully restates the background included in the Objection and Motion.

### A.      Certain Declarations Show Facial Lack of Personal Knowledge that Cannot Support the "Factual" Assertions Made by Matson

Several of the declarations that Matson affirmatively relies upon, and quotes extensively in its opposition to the Objection and Motion, show the declarants' lack of personal knowledge. The lack of personal knowledge is shown from statements that undermine the declarants' ability to have personal knowledge, statements admitting lack of personal knowledge, and firsthand accounts and documents demonstrating that the selected declarant is not in a position to have personal knowledge of the events subject of the declaration.

First, with respect to the Negri declaration (Macy's), Mr. Negri admits that he has only been in his position for two years, and that a different former Macy's employee—Matt Simone— may have been in a position to have interacted with APL concerning Guam carriage. DSJ 387, MAT_GUAM_MACYS_00000001 ("Negri Decl.") ¶¶ 1, 7. APL interacted with Mr. Simone, and he declined APL business in 2016 and 2018 emails due to "long term contract" and "penalties" with Matson. PSJ 13, 158. Mr. Negri also offers a denial of any "awareness" or personal experience of anticompetitive conduct alleged by APL. *See id.* ¶¶ 7-16. Despite this admitted lack of personal knowledge during the events relevant to Macy's, Matson relies on the Negri Declaration alone to justify its categorical assertion that "customers" do not lock themselves into

long-term exclusive contracts. *See* Matson' Memorandum in Support of Motion for Summary Judgment, ECF No. 116 at 27-28.

Next, with respect to the LeClair declaration (Cost-U-Less), Mr. LeClair disclaims any personal knowledge of the conduct at issue. DSJ 341, MAT_GUAM_NORTHWEST_00000440 ("LeClair Decl.") ¶¶ 6-14. Mr. LeClair was also not the Cost-U-Less individual responsible for Guam carriage decision-making during the relevant time period—the correct person was a former Cost-U-Less employee named Bob Cain. *See* Theberge Decl. ¶ 4. Despite Mr. LeClair's lack of any knowledge relevant to APL's allegations, Matson uses the LeClair's Declaration to disclaim misconduct in the market by Matson. *See* ECF 116 at 11.

The Batchelder Declaration (Toyota) suffers from similar defects. Ms. Batchelder notes

████████████████████████████████████████████████████████████

██████████████████████████████████████████████. DSJ 343,

MAT_GUAM_TOYOTA_ 00000001 ("Batchelder Decl.") ¶ 20. ████████████████

████████████████████████████████████████████████ *Id.*

¶ 5. Despite the declarant's lack of personal knowledge, Matson cites this declaration, among others, to deny APL's allegations of threats retaliation in the market. *See* ECF 116 at 9, 15.

The Harris Declaration (Ross Stores) also disclaims personal knowledge by its text alone. Ms. Harris Admits that she has only held her position for one year. DSJ 342, MAT_GUAM_ROSS_00000016 ("Harris Decl.") ¶ 1. Furthermore, she claims no awareness of Matson's alleged anticompetitive conduct. *Id.* ¶¶ 6-13. Just as Matson did with the Batchelder Declaration, it seeks to use the Harris Declaration's lack of "awareness" to deny the fact of Matson's threats of retaliation in the market—again despite the declarant's admitted lack of personal knowledge of the relevant time period. *See* ECF 116 at 9, 15.

The Wade Declaration (Napa) demonstrates lack of personal knowledge because it disclaims awareness of APL's allegations. MAT_GUAM_NAPA_00000003 ("Wade Decl.") ¶¶ 6-9. Furthermore, Mr. Hermosa's conversations with Napa were conducted with its owner, "Mr. Ven," not Mr. Wade. *See* DSJ 46, Hermosa Tr. 212:17-213:8. Despite this lack of personal knowledge, Matson cites the Wade Declaration, among others, to disclaim all allegations of disparagement and coercive or threatening conduct. *See* ECF 116 at 9, 11, 15, 20.

The Burrows Declaration (DeWitt) is another flagrant example of a declarant's lack of personal knowledge. Although Mr. Burrows signed a Declaration prepared by Matson counsel which generally denies knowledge of any Matson wrongdoing, DSJ 398, MAT_GUAM_DEWITT_00000001 ("Burrows Decl.") ¶¶ 4-16; ECF 116 at 10, 18, Mr. Burrows later admitted in deposition that he was unaware of Matson's retaliatory conduct in Guam documented by DeWitt executives in Guam (Mr. Burrows resides in California). *See* PSJ 97, 10/3/23 Burrows Tr. 40:15-23. And despite this admitted lack of personal knowledge, confirmed in a deposition, Matson relies on the Burrows Declaration to assert that DeWitt was never the victim on Matson's retaliatory conduct. *See* ECF 116 at 10, 18.

Finally, the Reiman Declaration (Fastenal) similarly displays an astounding lack of personal knowledge. In his declaration, Mr. Reiman disclaims all knowledge of APL's allegations of Matson's conduct involving Mr. Raynaldo Yanger, a Fastenal employee in Guam. *See* DSJ 435, MAT_GUAM_FASTENAL_00000166 ("Reiman Decl.") ¶¶ 6-19. But Fastenal's Declaration confirms Mr. Reiman ███████████████████████████████. *See* PSJ 44, APL_FASTENAL_000001485. Despite this lack of personal knowledge, Matson relies on the Reiman Declaration to deny Matson's coercive efforts to cause Fastenal to cut off parts supply to APL's house trucker, GTW. *See* ECF 116 at 10, 18-19.

**B.    Certain Declaration Statements Matson Seeks to Use as "Undisputed Fact" are Contradicted by Contemporaneous Evidence**

In many cases, the credibility of the declarations are more suspect because they are controverted by other evidence in the record. Witnesses have testified contrary to the assertions in the declarations, and the relevant documents often bely the assertions made in the declarations, which is unsurprising since many of them admittedly lack "awareness" of relevant events.

Beginning with the Butler Declaration (DHX), Matson uses this declaration to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. DSJ 333, MAT_GUAM_DHX_000000001 ("Butler Decl.") ¶¶ 4-14. Contemporaneous documents indicate that DHX in fact has experienced unsatisfactory customer service from Matson. *See* **PSJ 118**, **MAT_GUAM_002524282**; **PSJ 23**; PSJ 43, MAT_GUAM_0033390, at -3396. Matson's own Tasi Peddicord also admitted in deposition testimony that DHX expressed displeasure with Matson's service. DSJ 51, Peddicord Tr. 226:17-227:16.

The Negri Declaration is also contradicted by documentary evidence. Although the Negri Declaration denies the existence of a long-term exclusive contract for carriage to Guam, *see* Negri Decl. ¶ 8, Macy's Mr. Simone, by email, declined APL business in 2016 and 2018 due to "long term contract" and "penalties" with Matson, PSJ 13, 158, Matson produced a long-term contract that restricted Macy's Guam carriage options in discovery. *See* PSJ 158, MAT_GUAM_002455988 ("Matson Navigation Company agrees to the following service and rate terms in exchange for Macy's commitment to ship 100% of ocean cargo moving to Hawaii and Guam via Matson.").

Next, the LeClair declaration is contradicted by other evidence in the record. A contemporaneous email from Bob Cain, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see* **PSJ 28**,

REDACTED PUBLIC VERSION

MAT_GUAM_0079342 at -9342, indicated his displeasure at Matson's conduct in the marketplace.  An APL-internal email also indicated Bob Cain's fear of retaliation if Cost-U-Less were to switch to APL for its Guam carriage.  *See* PSJ 12, APL001388317 at -8355.  These documents are corroborated by APL's Kevin Theberge, who testified about this fear in his deposition.  *See* DSJ 45, Theberge Tr. 75:2-21.

The Batchelder Declaration similarly disclaims ██████████████████████████████████ ███████████████████████████████████████████.  Batchelder Decl. ¶ 20.
But this categorical denial—made without personal knowledge, as addressed *supra*—appears to relate to a contract not the subject of APL's claims and, in any event, is contradicted by the account of Kevin Theberge, who testified that the impetus for Toyota's non-selection of APL was due to fears of Matson's retaliation in the Hawaii trade.  *See* DSJ 45, Theberge Tr. 85:17-86:13.

The Austria Declaration (Aduana) is also undermined by other evidence in the record. Matson relies on the Austria Declaration to assert that its Guam service is superior and/ or preferred by Aduana.  *See* Austria Decl. ¶¶ 5-6.  It also relies on the Aduana declaration to assert that Aduana was never threatened for considering APL for its Guam carriage.  *See id.* ¶¶ 7-10.  But these assertions of superior service quality are undermined by contemporaneous Matson documents that Matson's service for Aduana was poor.  *See* PSJ 165, MAT_GUAM_004784725 at -4726 (leaky container); PSJ 43, MAT_GUAM_0033390 at -3391 (damaged cargo).  And on the threats and retaliation, both Mr. Theberge and Mr. Hermosa testified that Aduana feared retaliation from Matson if it shifted cargo to APL.  *See* DSJ 45, Theberge Tr. 346:2-16; DSJ 46, Hermosa Tr. 136:13-137:9.  In comparison to the generic denials in the declaration prepared by Matson's counsel, Mr. Theberge testified in detail about what happened: when Matson pressured it not to

use APL, who he spoke with at Aduana, and the specific reason Aduana declined to give cargo to APL.  *See* Theberge Tr. 345:2-349:7.

The Harris Declaration is similarly contradicted by other evidence.  Matson relies on the Harris Declaration to assert that the reason it stuck with Matson was its overall pleasure with Matson's service and the value Matson provides.  Harris Decl. ¶ 4.  But in discovery, Matson produced ███████████████████████████████████████████████████████

███████████.  *See* PSJ 109, MAT_GUAM_002716383; PSJ 110, MAT_GUAM_003082020. The Harris Declaration also disclaims knowledge of any threats or retaliation.  Harris Decl. ¶¶ 6-13.  But Mr. Theberge and Mr. Hermosa testified about a specific meeting with Ross in February 2017, i.e., years before the beginning of Harris' possible scope of knowledge, a meeting that Mr. Hermosa personally participated in, where Ross personnel stated their fear of losing preferential rates in Hawaii if Ross were to transition any Guam cargo to APL.  *See* DSJ 45, Theberge Tr. 110:13-21, 111:12-22, 113:2-7; DSJ 46, Hermosa Tr. 220:4-221:14.

The Calvo Declaration (MidPac) is also undermined by Mr. Hermosa's testimony.  In the declaration, MidPac signed onto the generic Matson-prepared language that disclaims all of APL's allegations concerning Matson's retaliatory conduct.  DSJ 427, MAT_GUAM_MIDPAC_00000011 ("Calvo Decl.") ¶¶ 4-16.  Mr. Hermosa testified that MidPac required a promise in "blood" that APL would not leave the Guam market—because it feared retaliation from Matson for moving its cargo to APL.  *See* DSJ 46, Hermosa Tr. at 136:13-137:9.

The Wade Declaration is similarly contradicted by Mr. Hermosa's testimony.  Mr. Wade disclaims any knowledge of Matson's anticompetitive conduct.  Wade Decl. ¶¶ 6-9.  But Mr. Hermosa testified that Napa's hesitance to switch to APL was primarily out of fear that Matson

would retaliate with higher rates if APL were ever to leave the Guam market.  DSJ 46, Hermosa Tr. 136:13-137:9, 214:7-20, 214:7-20, 215:13-19, 216:2-6.

Similarly, the Guevara and Wu Declarations (Luen Fung) are contradicted by other evidence.  Both declarations include generic Matson-counsel-prepared language denying the occurrence of any alleged retaliatory or anticompetitive conduct, and also deny ever meeting with APL or its counsel on this subject.  *See* DSJ 425, MAT_GUAM_LFE_00000016 ("Guevara Decl."); DSJ 426, MAT_GUAM_LFE_00000019 ("Wu Decl.").  But that is not accurate: Luen Fung representatives (including Ms. Guevara) met with APL counsel and evidence of the alleged conduct was relayed to Mr. Hermosa.  *See* Hermosa Decl. ¶ 15.  And Mr. Theberge testified about the threats Luen Fung received for shifting some of its cargo to APL.  *See* DSJ 45, Theberge Tr. 45:17-46:3, 53:22-54:14, 55:4-16, 77:12-17.

The Burrows Declaration is also contradicted by other evidence in the record.  In his declaration, Mr. Burrows says that he is not "aware" of any of the threatening or retaliatory conduct Matson exacted against the DeWitt companies for their decision to work with APL, including cutting off DeWitt's trucking business in Guam.  *See* Burrows Decl. ¶¶ 4-16.  But Ms. Berking, a DeWitt employee in Guam, wrote in a contemporaneous email that Matson had retaliated against DeWitt because it was doing business with APL in Guam.  *See* **PSJ 139**, APL_DEWITT_000000022 at -0023.  She confirmed the accuracy of the email under oath.  *See* DSJ 337, 9/28/23 Berking Tr. 22:1-23:2.

The Blackmore Declaration (CFR Rinkens) is also contradicted by deposition testimony.  The Blackmore Declaration denies APL's allegations of Matson's anticompetitive conduct, and denies that CFR Rinkens declined to transition cargo to APL out of fear for Matson's retaliation in the Hawaii trade.  DSJ 25, MAT_GUAM_CFR_00000001 ("Blackmore Decl.").  But Mr.

Theberge testified about CFR Rinkens' fear of retaliation, and referenced Ms. Blackmore as the source of his information. *See* DSJ 45, Theberge Tr. 85:17-86:13.

The Cabrera Declaration (Saipan Shipping) is also inconsistent with documents and testimony. The Cabrera declaration denies that Matson directed it to withhold equipment from and retaliate against customers for their decision to do business with APL. DSJ 441, MAT_GUAM_SS_00000796 ("Cabrera Decl.") ¶¶ 9-14. But Matson's documents show that on at least one occasion, Matson directed Saipan Shipping to withhold equipment from DeWitt in relation. *See* PSJ 40, MAT_GUAM_BVALENCIA_000001047. Matson's Guam manager at that time, Ms. Valencia, also confirmed that she directed Saipan Shipping to deny use of flat racks to customers who chose APL for carriage over Matson. *See* DSJ 10, 9/7/23 Valencia Dep. 164:20-165:7.

Finally, the Pasha Declaration (Pasha) is also called into question by other evidence. In his declaration, Mr. Pasha denies that he held a meeting with APL representatives where they discussed a proposed arrangement to jointly solicit customers in the Hawaii and Guam trades. *See* ECF No. 114-1 ("Pasha Decl."). But APL produced emails surrounding the meeting and Mr. Kastrup's notes from this meeting with Mr. Pasha, *see* PSJ 34, APL013590670, and Mr. Aldridge testified about the meeting in his deposition. *See* DSJ 86, Aldridge Tr. 205:11-21.

## C.   Certain Declarations are Procedurally Improper and Should not be Permitted

Finally, several of the declarations are procedurally improper from Matson's gamesmanship in discovery. The most egregious example is the Butler Declaration, which Matson obtained while the parties were in Guam for depositions but was withheld by Martson until after the parties departed the island. And several other third-party declarations were executed and produced after the close of discovery.

Beginning with the Butler Declaration, it was executed on September 25, 2023.  However, the declaration was not produced to APL until October 2, 2023.  *See* PSJ 179 (production letter from Matson's counsel to APL).  This gap in timing violated the parties' agreement (and the Court's scheduling orders) concerning the taking of depositions in Guam, whereby the parties agreed to work transparently and collaboratively to identify potential Guam depositions and take all of them in-person in Guam during the last two weeks of September 2023, so as to alleviate the burden of requiring deposition teams to travel halfway around the globe.  We now know Matson had the Butler Declaration in hand in Guam during September, but waited to disclose it until APL counsel departed. By disclosing the declaration late, Matson violated the party agreement and denied APL the opportunity to take the deposition of Mr. Butler—which is would have done given the nature of the declaration assertions—because by the time it was disclosed, the parties had already left Guam (and fact discovery closed a few days later).

Finally, the Ayuyu Declaration (McDonald's), the Shimizu Declaration (Ambros), and the Pasha Declaration were not executed or produced to APL until well after the discovery cutoff.  *See* ECF No. 114-2 ("Ayuyu Decl."); ECF No. 114-3 ("Shimizu Decl."); ECF No. 114-1.

## II.    MATSON'S DECLARATIONS SHOULD BE STRICKEN OR DISREGARDED

Matson's opposition to the Objection and Motion paints an alternate reality where APL is somehow guilty of discovery misconduct, and quotes from the declarations *ad nauseum*, as if they actually prove undisputed facts.  But this is all a distraction and fails to cure the defects with the declarations that APL has identified.  First, nothing in Matson's opposition cures APL's objection that several of the declarants have no personal knowledge.  Matson also unsuccessfully attempts to rebut APL's position that neither the declarations, nor their content, will be admissible into evidence at trial and thus cannot form the basis of the Court's summary judgment opinion.  With

REDACTED PUBLIC VERSION

respect to the Butler Declaration, Matson effectively concedes it engaged in procedural gamesmanship—but tries to pardon itself with a severely misrepresented the timeline. And Matson's opposition—as well as its other summary judgment submissions—confirms that it will continue to use the declarations for impermissible purposes: to advance positions that are outside of the scope of the declarants' personal knowledge or to rebut allegations not alleged. Finally, Matson makes procedural concessions that limit the usefulness of its declarations.

### A.    Multiple Declarations Demonstrate a Lack Personal Knowledge

Seven of the declarations Matson relies upon demonstrate that the declarant has a lack of personal knowledge of the facts and circumstances that are the subject of the declaration. *See supra* § I.A. Personal knowledge is a prerequisite to the admissibility of a declaration—a requirement so integral that it "cannot be circumvented." *See Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir, 1981).

Matson inaccurately claims that these seven declarants have gained personal knowledge from a review of business records sufficient to meet the Rule 56(c)(4) personal knowledge standard. *See* Opp. at 21-22 (citing *Akers v. Beal Bank*, 845 F. Supp. 2d 238, 242 (D.D.C. 2012)). But the declarants here did not claim that they gained personal knowledge following a review of business records. The Negri Declaration does not reference review of any business records—it merely notes that a reasonable search for documents was undertaken without any responsive results. Negri Decl. ¶ 5. Mr. Negri goes on to deny any "awareness" of Matson's challenged conduct, demonstrating a facial lack of knowledge of the Macy's-related documents in the record. *See id.* ¶¶ 12-16. The same is true of the LeClair, Harris, Burrows, and Reiman Declarations: the declarants state that they did not review any responsive business records. *See* LeClair Decl. ¶ 6; Harris Decl. ¶ 3; Burrows Decl. ¶ 3; Reiman Decl. ¶ 5. ████████████████████

████████████████████████████████████

REDACTED PUBLIC VERSION

▮▮▮   *See* Batchelder Decl. ¶ 5.   And the Wade declaration does not reference review of any business records whatsoever. *See generally* Wade Decl.

Accordingly, Matson has not established that the declarants have personal knowledge *of the facts relevant to this case*.  Indeed, these declarants are all individuals who it seems Matson selected because they are not, or were not in the relevant time period, in positions to have personal knowledge of the events.  And they also admittedly did not fill their lack of personal knowledge with an adequate review business records, or admitted that the examination of business records was likely too incomplete to provide knowledge relevant to this case.

Matson attempts to use each declaration's boilerplate claim of a fruitless "reasonable search" for responsive documents to mean a review of business records—but this sleight of hand is not supported by the very case Matson relies on for the proposition that a review of business records is sufficient to establish personal knowledge.  In *Akers*, the third-party declarant reviewed actual responsive business records, such as "account statements and bills" that were then attached as exhibits to the declaration. *See* 845 F. Supp. 2d at 242.  None of the declarants here reviewed responsive records, and none of the declarations attach documentary exhibits.  This is not the case where business practices come into the personal knowledge of the declarant because these declarants have not reviewed anything, in stark contrast to the declarant held to have personal knowledge in *Akers*. *See id*.

Matson's reliance on 28 U.S.C. § 1746 does not cure the problem Matson faces concerning these seven declarations' facial lack of personal knowledge.  While true that each of the declarations contains an "under the penalty of perjury" boilerplate statement, as required by § 1746, such a statement is a necessary condition—not a sufficient condition—to admissibility.  This is because the purpose of § 1746 is to provide a backstop, to ensure that declarations are made on

personal knowledge. *See Noble v. Sombrotto*, 84 F. Supp. 3d 11, 17 n.3 (D.D.C. 2015) (§ 1746 "seek[s] to ensure that evidence admitted—and specifically, evidence admitted via affidavit—is within the personal knowledge of the declarant, would require a sufficient foundation for a finding that the matters discussed were within the declarants' personal knowledge"; admitting declarations only to the extent statements therein were supported by sufficient "foundation" to demonstrate personal knowledge). Even after determining that a declaration meets the letter of § 1746, a court will still look to ensure that declarations are made on personal knowledge. *See Elzeneiny v. D.C.*, 125 F. Supp. 3d 18, 29-30 (D.D.C. 2015) (examining declaration for personal knowledge despite compliance with § 1746; admitting declarations only to the extent statements therein "clearly indicate" personal knowledge). Thus, Matson's reliance on § 1746 is a red herring—because APL does not contest that the declarations are purportedly made under penalty of perjury. But even accepting that the declarations comply with § 1746, they still do not demonstrate personal knowledge, and nonetheless fail to meet the requirements of Rule 56(c)(4).

### B. The Declarations are Hearsay and Matson has not Shown their Content Would be Admissible at Trial

Matson's arguments concerning hearsay are similarly unavailing. Matson attacks APL's position on hearsay by citing to numerous cases that hold a declaration itself need not be admissible, but the proponent of a declaration must make a showing that its contents could be admissible at trial. *See* Opp. at 23 (collecting cases). However, this is precisely what APL explained in the Motion and Objection: a "declaration fails to meet the requirements of Federal Rule of Civil Procedure 56(c)(4) if its proponent cannot show that its contents would be admissible into evidence." Mot. & Obj. at 23.

Although Matson claims that the declarations at issue here show indicia of reliability because they are executed by high-ranking individuals within businesses or made on purported

personal knowledge, *see* Opp. at 23-24 (citing *White Coat Waste Project v. U.S. Dep't of Veterans Affairs*, 404 F. Supp. 3d 87, 106 (D.D.C. 2019)), this argument glosses over the issues and results in a conclusory assertion that the contents of the declarations are all admissible.  But as addressed above, multiple of the declarations facially demonstrate a complete lack of personal knowledge. *See supra* § II.a.  Matson also takes liberties with the content of the declarations, and uses their assertions to make impermissible statements in furtherance of its summary judgment arguments. *See infra* § II.d.  And furthermore, the declarations' reliability is questionable, at best, because other evidence that contradicts the statements made therein, *see supra* § I.b.,[1] and the declarants likely are unavailable for trial. None of the declarants selected by Matson are within the Court's subpoena power.

Matson's assertion that APL has waived an argument concerning witness unavailability is laughable.  Two pages of APL's Objection and Motion addressed the declarants' distant and disparate geographies and questioned the veracity of the declarants' promises to appear in this Court to testify "if called to do so."  *See* Obj. & Mot. at 25-26.  Omission of a specific term of art does not invoke waiver.  *See United States v. Mauro*, 436 U.S. 340, 364 (1978) (no waiver where issue was raised without invocation of specific terms).  APL's argument clearly raised the purported availability of the declarants to testify at trial, and showed that these declarants likely will not appear to provide live testimony if called by APL.

### C. Matson Effectively Concedes Procedural Gamesmanship with the Butler Declaration

---

[1]  Matson conclusorily dismisses APL's other evidence as "hearsay within a smattering of documents APL construes differently from the actual customers" without explaining the bases for its assertions.  *See* Opp. at 26.  Even if these positions were supported by any authority, such assertions are incorrect, as APL cites a healthy mix of documentary and testimonial evidence that contradicts critical aspects of the declarations, as detailed above.

**REDACTED PUBLIC VERSION**

Matson's attempt to explain away its procedural gamesmanship with respect to DHX falls flat and, in fact, proves APL's point that Matson intentionally delayed disclosure of the Butler Declaration until the parties left Guam, thus denying APL the opportunity to depose him on his declaration.   First, Matson chides APL for choosing to use its limited depositions on other witnesses—but also notes that APL did not use all of the depositions allotted to it.  *See* Opp. at 18. Then, Matson falsely complains that APL "hid" Mr. Butler.  *See id.*  Next, Matson admits that even though the Butler Declaration was executed while the parties were in Guam, it was not produced until after the parties left, on October 2.  *See id.* at 19.  Finally, Matson claims APL had ample opportunity to depose Mr. Butler between October 2 and the discovery cutoff.  *See id.*  This series of events, as told by Matson, strains credulity.

Matson's critique of who APL deposed in Guam misses the mark.  At the time, APL had depositions available within the Court's 20 deposition limit.  If Matson's had abided by the party agreement and had not deprived APL of a meaningful opportunity to depose Mr. Butler, it would have taken Mr. Butler's deposition.  The other depositions are irrelevant.

There is no merit to Matson's contention that APL "hid" Mr. Butler by failing to list him in its interrogatory responses.  *See id.* at 18.  Tellingly, Matson does not identify the interrogatory and response at issue—because it does not exist.  But if Matson is referring to Interrogatory No. 24, which requested that APL "Identify all customers that you know or believe to have shipped cargo to Guam with APL and around the same time also shipped cargo to Hawaii."  Matson's 4th Set of Interrogatories, Interrogatory No. 24.  This interrogatory only requested identification of *customers*, not individuals who interacted with APL.  *See id.*  In its Responses and Objections, APL listed DHX, among numerous other entities.  *See* APL's Responses and Objections to Matson's 4th Set of Interrogatories, Response to Interrogatory No. 4.  APL's response to

Interrogatory No. 24 was complete to the best of its knowledge and belief, and APL is unaware of any Matson contentions that its response was incomplete—that is, until Matson needed to muster a defense for failing to disclose Mr. Butler's declaration.

The timeline surrounding the execution and production of the Butler Declaration also admits gamesmanship and lack of candor.  The Butler declaration was executed on September 25. *See* Butler Decl.  This is two days ***before*** the deposition in which Matson now claims it ***first learned*** of Mr. Butler's identity.  And in that deposition, ***Matson's counsel***, not Mr. Hermosa, brought up Mr. Butler's full name—exposing the lie that APL somehow "hid" Mr. Butler from it. *See* DSJ 46, Hermosa Tr. 281:3-10 ("Q. And who at DGX told you they would not give you business because of the retaliation against DeWitt or Approved Freight, or DGX by Matson? A. The local manager on Guam. Q. And who's that? A. Paige [sic]. **Q. Paige** [sic] **Butler?** A. Yes, Ma'am.").  The claim that Mr. Butler was unknown to Matson prior to Mr. Hermosa's September 27 deposition is not credible, where the declaration itself was executed (and its contents presumably crafted with Matson's counsel) ***before*** the deposition in which Matson claims to have first learned of him, and Matson's counsel *knew his name* in that same deposition.

Finally, with respect to Matson's contention that APL should have deposed Mr. Butler remotely after the parties left Guam, such a proposition flies in the face of the parties' agreement concerning the conduct of depositions.  In the joint stipulation pursuant to Local Civil Rule 16.3, the parties agreed that they would "work together to schedule any and all depositions to be taken of witnesses located in Guam, Hawaii or Alaska, to limit the amount of travel necessary to complete such deposition discovery."  ECF No. 36 at 4-5.  And this sentiment was further memorialized in the Court's Scheduling Order, as well as its Amended Scheduling Order: "The Parties shall work together to schedule any and all depositions to be taken of witnesses located in

Guam, Hawaii, or Alaska, to limit the amount of travel necessary to complete such deposition discovery." ECF No. 37 ¶ 4; ECF No. 68 ¶ 4. The expectation, and in fact the practical effect of the stipulation and orders, was that all of the depositions were conducted in-person. To wit, only one deposition—a continuation of the 30(b)(6) deposition of Mr. Hermosa permitted by the Court after the close of discovery—was taken remotely. Matson's actual conduct also confirms this as an empty promise—because Matson withheld Mr. Butler's declaration until October 2, so any deposition would have had to occur after the fact discovery deadline—Matson strenuously opposed APL's request to depose Mr. Butler's former supervisor after the discovery deadline. *See* ECF 124 (Matson's telephonic oral arguments preceding court order).

Respectfully, the Court should not be persuaded by Matson's fictitious rendition of events surrounding Mr. Butler and his declaration. The parties had an agreement to disclose and collaborate on potential Guam witnesses like Mr. Butler, and Matson flouted the agreement to shield what it believes to be a key declarant.

### D.  Matson Uses Declarations for Impermissible Purposes

Even if the Court finds the declarations are admissible, the Court should still strike or disregard them because Matson uses them for inadmissible purposes: to deny allegations APL does not make, or to make categorical denials outside of the scope of the declarations and the personal knowledge of the declarant. The use of declarants' hearsay accounts to broadly dispel allegations should not be permitted to establish "undisputed" fact or to rebut APL's evidence.

One example of this impermissible use comes from the Negri Declaration. In the Negri Declaration, using generic Matson counsel language, numerous allegations from APL's First Amended Complaint ("Complaint") are denied. These denials include: (1) denial of the "conduct" alleged in the Complaint; (2) denial of threats or coercion alleged in the Complaint; (3) denial of threats to charge higher rates for Hawaii and Guam if a shipper transitioned some Guam cargo to

APL; (4) denial of threats to degrade quality of service if a shipper transitioned some cargo to APL; and (5) denial of threats to lower rates of a shipper's competitors. *See* Negri Decl. ¶¶ 10, 12-16.

However, as it pertains to Macy's, APL's primary allegation was that Matson effectively locked it into a long-term contract that limited its options when choosing a provider for Guam carriage. *See* Compl. ¶ 42. But Matson uses the Negri declaration to argue that customers were never on the receiving end of the conduct APL alleged. *See* Opp. at 14.

And as it pertains to long-term agreements, Matson cites the Negri declaration to assert that "customers" generally do not accept long-term contracts—despite the fact that the Macy's long-term carriage contract was produced in discovery. *Compare* ECF 116 at 27-28 *with* PSJ 158, MAT_GUAM_002455988.   Matson inappropriately takes the same approach—making categorical assertions in reliance on declarations outside of the declarants' personal knowledge—to disclaim APL's allegations. *See* ECF 116 at 11 (citing the LeClair and Wade declarations to disclaim allegations of disparagement); *id.* at 9, 15 (citing the Batchelder, Harris, and Wade Declarations to disclaim allegations of threats of retaliation); *id.* at 10, 18 (denying concrete accounts of retaliatory conduct).

Matson's decisions to loosely cite declarations to dispel allegations not made, by declarants who are in no position to dispel allegations for Matson, should be stricken or disregarded for matters depending on evidence.

### E.  Matson's Procedural Concession Limits the Use of the Declarations

Matson insists that the procedurally improper declarations are permissible pursuant to the Rule 26 exception that permits non-disclosure of evidence of evidence to be used "solely for impeachment." *See* FRCP 26(a)(1)(A)(i). But such a concession limits the applicability of those declarations to "impeachment only"—which Matson has not done.

Matson asserts that it intends to use these declarations for the purpose of "impeaching APL's *claims*[.]"  *See* Opp. at 20 (emphasis added).  But the case it cites, *Standley v. Edmonds-Leach*, 783 F.3d 1276, 1281 (D.C. Cir. 2015), stands for the proposition that evidence "solely for impeachment" is useable without prior disclosure only *at trial*.  Furthermore, in *Standley*, the D.C. Circuit made clear that impeachment evidence means something that is "offered to discredit a witness," or "to attack the credibility of witnesses by the presentation of evidence showing that facts asserted or relied upon in their testimony are false[.]"  *See id.* at 1282.  Additionally, "solely for impeachment" has been defined as either having "no potential utility other than impeachment," or that if the evidence has some substantive qualities "is strictly used to impeach."  *See Williams v. Devlin*, 142 F. Supp. 3d 76, 78-79 (D.D.C. 2015).

Here, Matson impermissibly asserts that it is using the declarations to impeach APL's *position*, *see* Opp. at 20, but this is not what Rule 26 means by "impeachment" because Matson is not impeaching the testimony of a witness at trial.  *C.f. Standley*, 783 F.3d at 1282 (undisclosed evidence admissible to impeach witness testimony at trial).  Moreover, such an assertion is false—Matson relies on these declarations affirmatively to advance its summary judgment arguments.  *See* ECF 116 at 1, 15.  Even if Matson is correct—that these declarations are admissible for "solely for impeachment"—Matson has far exceeded that limitation with its use of the declarations in support of its affirmative arguments for summary judgment, and in using them to try to rebut APL's claims.  Matson's novel claim impeachment theory is not supported by authority and, in any event, is an inaccurate portray of Matson's actual use of the declarations.

### F.  Misstatements of Procedural History and Discovery Conduct are not Relevant

In a further attempt to deflect, Matson's opposition presents seven pages of grievances about APL's discovery responses, which boil down to an accusation that ***three*** of the nearly ***50*** third parties identified by APL should have been disclosed in a different format.  These sorts of

**REDACTED PUBLIC VERSION**

Matson grievances have been aired before; APL has debunked them before; and they are entirely irrelevant to Matson's misuse of declarations. To spare the Court, APL will respond overall, rather than show point-by-point the inaccuracies running throughout Matson's complaints.

*First*, Matson's complaints about APL's initial disclosures allegedly omitting information ignores Matson's *agreement* to limit Rule 26(a)(1) disclosures. Matson counsel even drafted the document filed with the Court. *See* Dkt. 36 at 4 (limiting disclosures to "(a) identification of the Parties' employees likely to have discoverable information and (b) identification of the *third-party entities* referenced in the Complaint or otherwise likely to have discoverable information.") (emphasis added).[2] Matson's current complaints that APL did not identify "each individual" and "explain what discoverable information any of those entities was likely to have" Opp. 4, disregards Matson's *agreement* the APL need *not* identify that information. APL disclosed in accordance with Matson's agreement and its complaints have no merit.

*Second*, Matson's argument is premised on Interrogatory No. 2 asking APL "to identify ***all*** third parties it claimed were 'threatened.'" Opp. At 3 (emphasis added). But Matson's Interrogatory actually asked APL to identify third parties referenced in a ***few*** complaint paragraphs referring to ***specific*** threats, *see* Opp. Ex. 2 at Inter. No. 2 (inquiring on paragraphs 9, 10, 11, 45, 46, and 48)—which, of course, is not "all" third parties as Matson now inflates its interrogatory to be. APL timely identified the third parties referenced in the complaint paragraphs at issue in November 2022, as Matson concedes. *See* Opp. 3-4.

*Third*, most of the rest of Matson's interrogatory grievances are premised on the fiction that its interrogatories required APL to identify every third party mentioned in the case, when they

---

[2] Matson trumpets that it chose to identify selected third parties via initial disclosures, *see* Opp. Ex. B, even though not required by agreement. *See* Opp. 10. Those disclosures, however, were not timely and used the same broad and ambiguous categories to describe third parties, like "operations, sales and customer service," which disclosures nothing meaningful.

**REDACTED PUBLIC VERSION**

expressly did not do so.  The Court resolved Matson's needless motion to compel APL to identify contact information for Matson's own customers—a motion brought when Matson's own interrogatory responses failed to identify the relevant entities, let alone their contact information— by instructing APL to identify individuals or entities it will rely on to "shore up" allegations of Matson's threats, *see* 2/2/23 Tr. 6:9-16, ***and*** by instructing Matson to supplement its responses to mirror what it was demanding of APL.  *See id*. 39:18-19.

During the following months, APL supplemented its interrogatory responses multiple times to disclose what it reasonably knew, and what it learned as discovery continued, in accordance with the Court's instructions and August 11 Order.  And APL supplemented its responses to identify nearly 50 third party entities and individuals.  *See* PSJ 184, p. 8-25.  Matson's effort to spin such supplements as somehow nefarious is confounding when, presumably for the same reasons, Matson was supplementing its responses during the same time.

*Fourth*, to the extent Matson accuses APL of not supplementing interrogatories quickly enough, the accusation is not well taken.  Matson highlights Aduana, *see* Opp. 9, but omits information undercutting its accusation.  In September 2023, Matson deposed APL's Kevin Theberge, and he explained a June 2023 meeting with Aduana, where it relayed a Matson threat.  DX 45, Theberge Dep. 344:18-345:21.  Obviously a 2023 threat was not referenced in APL's 2021 complaint (and responsive to Matson's interrogatories) and, even with reasonable diligence, APL counsel were unaware of the threat sufficiently in advance to supplement interrogatories before Mr. Theberge's deposition (even presuming it was necessary).  It is the same with references to McDonald's and Ambrose mentioned in two other depositions taken by Matson counsel.

*Fifth*, Matson's grievances here—like its motion to compel addresses of its own customers—elevates form over substance to an extreme, inefficient degree.  Matson does not

<u>REDACTED PUBLIC VERSION</u>

establish that APL failed to disclose third parties responsive to Matson's discovery requests. Instead, it quibbles with timing and form of disclosure—complaining some third parties identified in initial disclosures should also be in interrogatory responses and *vice versa*; and third parties mentioned in depositions should also be disclosed in other discovery responses (regardless of responsiveness or relevance).  But notably, Matson's complaints do not include that it is unaware of third parties because they were not identified by APL in at least one form.

*Finally*, Matson's self-serving description of its discovery overlooks omits its inadequacies, causing actual prejudice to APL.  This includes Matson's interrogatory responses still missing the same types of information it complains about APL not providing:

- Matson has not identified the individuals with knowledge relevant to each of its affirmative defenses.  *See* PSJ 183, 10/11/23 Matson 5th Supp. Resp. Interog. Nos. 3(b), 3(d), 3(f), 3((h), 3(i), 3(j).

- For Matson's responses identifying some individuals with knowledge, they are admittedly incomplete.  *See id*. No. 3(c) (identifying a person as an "example"); *id.* No. 3(g) (example only); *id.* No. 3(e) (same).

- Matson withheld the identification of the "other" affirmative defenses asserted in its Answer, until the last day of fact discovery, *see id*. 3(k), precluding APL from discovery on them.  And Matson still has not confirmed the identifies of individuals with relevant knowledge.

- Matson's responses on its relevant market defense—which the Court told Matson to answer, *see* 2/2/23 Tr. 32:17-24—refer to exemplar third parties and individuals only.  *See* PSJ 183, 10/11/23 Matson 5th Supp. Resp. Interog. No. 4 (saying knowledgeable sources "include" and "such as" a few identified entities and individuals).  For the few entities Matson listed, it does not identify their employees with knowledge (or provide their contact information), contrary to what Matson demanded of APL, and what the Court instructed Matson do too.  *See* 2/2/23 Tr. 39:18-19.

- In another relevant market related interrogatory, Matson refers to "customers," without identifying them or their employees, in asserting that some ship cargo to Guam via airliner. PSJ. 183, 10/11/23 Matson 5th Supp. Resp. Interog. No. 13.

- Matson's responses on its market power defense identified some entities but none of their employees with knowledge (or provided their contact information), *id*. No. 5, contrary to what Matson demanded of APL and what the Court instructed Matson do too.  *See* 2/2/23 Tr. 39:18-19.

Matson's inadequate interrogatory responses pale in comparison to the documents it failed to disclose, Matson's secret use of a "TAR" process to screen out three to four *million* documents from production to APL was done in violation of the Court's Discovery Order that required disclosure and prior agreement for TAR as used by Matson.  *See* 8/3/23 Joint Notice at 1-5, Dkt. 75.  This resulted in an incomplete and inadequate production of responsive, relevant documents to APL, demonstrated by a "sampling" of Matson's process, which Matson did only by compulsion of the Court, *see* 6/23/23 Minute Order, finding hundreds of thousands of additional documents for production.  *See* 8/3/23 Joint Notice at 4.

Matson's complaints should be disregarded as irrelevant, and because its grievances elevate form over substance, it showed no prejudice, and its responses would fail the same standards it seeks to apply to APL, particularly Matson's document production process to shield an enormous volume of documents from discovery.

## III.   CONCLUSION

For the foregoing reasons, APL respectfully requests that the Court sustain the Objection and strike the declarations from the record, or otherwise make plain that the Court declines to consider the statements therein for the purpose of adjudicating Matson's motion for summary judgment.

<u>**REDACTED PUBLIC VERSION**</u>

Dated:  July 5, 2024

Respectfully submitted,

<u>*/s/ John R. Fornaciari*</u>
John R. Fornaciari (DC Bar 152801)
Danyll Foix (DC Bar 475503)
Sally Qin (DC Bar 1011432)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC  20036-5403
Tel:    202.861.1500
Fax:    202.861.1783
Email: JFornaciari@Bakerlaw.com
         DFoix@Bakerlaw.com
         SQin@Bakerlaw.com


*Counsel for Plaintiffs American President Lines, LLC, APL Maritime, Ltd., and APL Marine Services, Ltd.*

REDACTED PUBLIC VERSION

## CERTIFICATE OF SERVICE

I, John R. Fornaciari, certify that on this July 5, 2024, I caused to be served on Defendants via the Court's CM/ECF the foregoing Reply.

Dated:  July 5, 2024

*/s/ John R. Fornaciari*
John R. Fornaciari
BAKER & HOSTETLER LLP

*Attorneys for Plaintiffs*
