**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICAN PRESIDENT LINES, LLC**, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 21-cv-2040 (CRC) |
| **MATSON, INC.**, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

I.     Background ........................................................................................................... 2

   A.   Regulatory Background ................................................................................. 2

   B.   Factual Background ...................................................................................... 4

   C.   Procedural History ........................................................................................ 5

II.    Legal Standards ................................................................................................... 7

III.   Analysis ................................................................................................................ 8

   A.   Cross-Motions for Summary Judgment ....................................................... 8

      1.   Monopoly Power in Relevant Market ................................................. 8

      2.   Exclusionary Conduct ...................................................................... 18

      3.   Attempted Monopolization .............................................................. 56

   B.   Remaining Motions .................................................................................... 60

      1.   Daubert ............................................................................................. 60

      2.   Motions to Strike .............................................................................. 60

IV.    Conclusion ......................................................................................................... 61

The small island of Guam is the westernmost U.S. territory.  It sits virtually alone in the

Pacific Ocean, some 4,000 miles beyond Honolulu and 2,500 miles from Tokyo and Manilla

farther asea.  Due to the island's size and isolation, Guam's 170,000 residents receive almost all

their food and goods in ocean cargo shipping containers.  Only two companies ship these

containers between the mainland United States and Guam: the plaintiff in this case, American

President Lines (APL), and the defendant, Matson Navigation Company, Inc. (Matson).  These

rivals compete fiercely on multiple fronts.  Here, APL filed suit claiming that Matson has

violated Section 2 of the Sherman Act by abusing its dominant position in the U.S.-Guam

shipping market.  Matson has done so, APL asserts, through an array of anticompetitive conduct,

including disparaging APL to customers; threatening retaliation against customers who ship with

APL; unfairly locking in its Guam customers through exclusionary loyalty programs and long-

term contracts; offering APL capacity on its Guam-based vessels in order to force APL out of the

market; and refusing to provide services to APL in Alaska, where both companies also operate.

In September 2022, the Court largely denied Matson's motion to dismiss APL's claims,

concluding that APL had plausibly alleged several species of antitrust violations.  After

protracted discovery, however, APL has failed to deliver the goods on its allegations.  Without

sufficient admissible evidence in the record to support a jury finding that Matson engaged in

conduct that harmed competition in the U.S.-Guam market, the Court will now grant summary

judgment for Matson.  It will also dispose of several associated motions filed by both sides.

## I.    Background

### A.   Regulatory Background

Shipping between the U.S. mainland and Guam is highly regulated.  A 1920 federal

statute known as the Jones Act generally permits only American-made and -owned vessels,

manned by American crews, to transport cargo between any two destinations in the United States.  46 U.S.C. § 55102(b); see id. §§ 12112, 50101(a).  But the Act provides an exception for Guam.  See 46 U.S.C. § 12111(b).  Ships carrying cargo from the U.S. mainland to Guam need only be U.S.-flagged, meaning they must be registered in the United States.  Id. §§ 12103, 12111(a)–(b).  That is relevant here because APL is a subsidiary of the French shipping and logistics conglomerate CMA CGM, so it is foreign owned.

In addition, some commercial vessels that service American ports are eligible for government subsidies through the Maritime Security Program (MSP), which is administered by the U.S. Maritime Administration.  That program aims to maintain "a fleet of active, commercially viable, militarily useful, privately owned vessels to meet national defense and other security requirements and maintain a United States presence in international commercial shipping."  46 U.S.C. § 53102(a).  In exchange for assisting the United States in times of war or other emergencies, the government provides substantial financial payments to owners and operators of MSP vessels.  See Am. Compl. ¶ 32; 46 U.S.C. § 53106(a); see generally id. §§ 53101–53111.  Prior to 2018, ships enrolled in the MSP could call on Guam and other U.S. territories, no matter their nationality or ownership.  In 2018, however, Congress amended the MSP to prohibit new entrants to the program from operating between the United States and its territories.  46 U.S.C. § 53105(a)(2).  Vessels that were enrolled in the MSP prior to that year were grandfathered in and could keep servicing Guam.  See id. § 53105(a)(2), (f).  APL has two vessels registered in the MSP that call on Guam from U.S. ports.  See Defs.' Summ. J. Ex. (DSJ) 13 (Expert Report of Dr. Frederick Warren-Boulton (WB Rpt.)) ¶ 15; Defs.' Stmt. of Uncontested Fact (DSUF) ¶ 37; APL Resp. to DSUF ¶ 37.

B.  Factual Background

Congress's 2018 prohibition of future MSP vessels servicing Guam left only Matson and APL with ships that carry cargo containers between the U.S. mainland and Guam.  APL entered the market in 2015 when it enrolled its first vessel in the MSP.  Its second MSP vessel followed in 2016.  See WB Rpt. ¶ 15.  Before APL's entry, Matson had been the lone shipper in the market following the departure of a previous competitor, Horizon Lines, in 2011.

Container vessels bound for Guam from the U.S. mainland depart from three ports on the west coast:  APL and Matson both ship from Los Angeles and Oakland; Matson alone ships from Seattle.  See WB Rpt. ¶¶ 20–21; DSJ 110 at 16 (internal APL document depicting westbound service from Los Angeles and Oakland).  The market is further segmented by product:  Fresh food is transported in "chilled" containers, frozen food in "frozen" containers, and non-perishable products in "dry" containers.  See WB Rpt. ¶¶ 29–30; DSJ at 3.  Matson serves all three product segments; APL handles dry and frozen cargo but very little chilled cargo.  See WB Rpt. ¶ 49; Am. Compl. at 14 n.6; DSJ 5 (Expert Report of Dr. Ashley Langer (Langer Rpt.)) ¶ 117 & Ex. 9.  Finally, the market consists of both private and U.S. government customers.  See WB Rpt. ¶¶ 8, 10; Oral Arg. Tr. 47:22–23 (APL's expert stating that "the government is in the overall market").  Due to the U.S. military's substantial presence on the island, shipments for government customers are estimated to comprise up to 20% of the U.S.-Guam market by volume.  Oral Arg. Tr. 40:23–25 (estimate by counsel for APL).

Today, Matson is the dominant firm in the market, handling roughly 70% of shipping volumes.  See Oral Arg. Tr. 112:11–12.  The parties offer starkly different explanations for Matson's preeminence.  Matson attributes it to the company's superior service and business model.  Matson's rates tend to be higher than APL's, but the record confirms that its service is

usually faster and its delivery times are more reliable.  <u>See</u> WB Rpt. ¶¶ 22–25.[1]  Matson's

vessels are also fully compliant with the Jones Act, so they call on Hawaii en route to Guam.

Customers who ship to both destinations can therefore work with just one carrier.

APL retorts that Matson maintains its dominance not by offering better service but by

engaging in unfair and anticompetitive business practices.  The Court will elaborate on APL's

allegations as they become relevant.  In short, however, APL claims that Matson has:

- disparaged APL with customers, particularly by telling them that APL would soon lose its MSP subsidies and thus have to leave the market;

- created customer loyalty programs that forced shippers to use Matson exclusively;

- locked up key customers with restrictive long-term contracts;

- sought to punish APL by terminating long-running partnerships the two companies had in Alaska in response to APL's entry into the U.S.-Guam market;

- lobbied Congress to end APL's payments under the MSP; and

- offered APL capacity on its U.S.-Guam vessels in an effort to force APL out of the Guam market.

<u>See</u> Am. Compl. ¶¶ 39–77.

C.  <u>Procedural History</u>

APL filed this suit on July 28, 2021, against Matson, Inc., and two of its subsidiaries.

The amended complaint advances two claims for monopolization and attempted monopolization

under Section 2 of the Sherman Act.

---

[1] For example, Matson's vessels can travel from Los Angeles to Guam four to eight days faster than APL's.  WB Rpt. ¶ 22, tbl.1.  And while, between 2016 and 2021, Matson's vessels arrived on time between 70% and 100% of the time, APL's ships were *late* just as often.  <u>See</u> <u>id.</u> ¶ 25 fig.3.

Matson moved to dismiss for failure to state a claim.  The Court largely denied Matson's motion, holding that APL had plausibly alleged both monopolization and attempted-monopolization claims under several theories.  See Am. President Lines, LLC v. Matson, Inc., 633 F. Supp. 3d 209, 235 (D.D.C. 2022).  The Court did dismiss Matson Navigation's parent company, Matson, Inc., as a defendant, finding that APL had not attributed any illegal conduct specifically to it.  Id. at 234.  The Court also narrowed APL's claims in two respects.  First, it held that Matson's lobbying activity surrounding APL's MSP subsidies "cannot be used to support an inference of anticompetitive conduct" because lobbying is shielded from antitrust liability under the Noerr-Pennington doctrine.  Id. at 232; see United Mine Workers of Am. v. Pennington, 381 U.S. 657, 670 (1965) ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition.").  Second, the Court held that because APL did not plead a market in Alaska, Matson's conduct there "do[es] not constitute a standalone antitrust claim" and is relevant to this case only insofar as it affected competition in the U.S.-Guam market.  APL, 633 F. Supp. 3d at 232; see FTC v. Qualcomm Inc., 969 F.3d 974, 990 (9th Cir. 2020) ("[P]laintiffs are required to prove anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize *the relevant market*.") (emphasis added) (quotation marks omitted)).

The parties then proceeded through a protracted discovery period marked by numerous disputes requiring the Court's intervention.  When the chop finally smoothed, Matson moved for summary judgment on all of APL's claims.  See ECF 107 (Matson MSJ).  APL opposed and filed a cross-motion for partial summary judgment limited to Matson's alleged retaliation against APL in Alaska.  See ECF 158 (APL MSJ).  The parties also filed dueling motions to exclude opinions offered by each party's expert witness: APL's expert, Dr. Frederick Warren-Boulton,

and Matson's rebuttal expert, Dr. Ashley Langer.  See ECF 108 (Matson Daubert Mot.); ECF

147 (APL Daubert Mot.).  Each side also moved to strike declarations filed by the other.  Matson

sought to strike a declaration from Dr. Warren-Boulton offered in response to Matson's motion

to exclude him.  ECF 174-10 at 23.  And APL moved to strike declarations offered by Matson

from various of its shipping customers disclaiming knowledge of any threats or retaliation by

Matson.  ECF 153.  The Court heard argument on all the pending motions on December 10,

2024.

## II.    Legal Standards

To prevail on a motion for summary judgment, the moving party bears the burden of

demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895–96 (D.C. Cir. 2006).  A fact is

"material" if it can affect the outcome of the litigation.  Holcomb, 433 F.3d at 895; Liberty

Lobby, 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury

could return a verdict for the non-moving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007);

Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.

In considering a motion for summary judgment, the Court must resolve all factual

disputes and draw "all justifiable inferences" in favor of the non-moving party.  Liberty Lobby,

477 U.S. at 255; see also Mastro v. Pepco, 447 F.3d 843, 850 (D.C. Cir. 2006).  But the non-

moving party's opposition must consist of more than mere allegations or denials; instead, it must

be supported by affidavits, declarations, or other competent evidence, setting forth specific facts

demonstrating a genuine issue for trial.  Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S.

317, 324 (1986).  "[T]he moving party is entitled to judgment as a matter of law if the non-

moving party 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial.'" Eddington v. Dep't of Def., 35 F.4th 833, 836–37 (D.C. Cir. 2022).

### III. Analysis

The Court begins with the parties' cross-motions for summary judgment before resolving the remaining motions.

### A. Cross-Motions for Summary Judgment

To prevail on its Section 2 monopolization claim, APL must prove at trial that Matson (1) possessed monopoly power in the relevant market and (2) engaged in exclusionary or anticompetitive conduct. United States v. Microsoft Corp., 253 F.3d 34, 50 (D.C. Cir. 2001) (en banc). To establish its attempted-monopolization claim, APL "must prove (1) that [Matson] has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Id. at 80 (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)). As explained below, APL has produced enough evidence to create a genuine dispute of material fact as to Matson's market power in the U.S.-Guam container cargo shipping market. But it has not offered evidence sufficient for a jury to infer that Matson engaged in anticompetitive conduct. The Court will, accordingly, grant summary judgment to Matson and deny APL's cross-motion.

### 1. Monopoly Power in Relevant Market

"Monopoly power is the power to control prices or exclude competition." United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956). A firm therefore has monopoly power in a relevant market "if it can profitably raise prices substantially above the competitive level." Microsoft, 253 F.3d at 51. "[P]roof that a 'firm has in fact profitably'" charged prices

above the competitive level is direct evidence of monopoly power.  FTC v. Facebook, Inc., 560

F. Supp. 3d 1, 12 (D.D.C. 2021) (quoting Microsoft, 253 F.3d at 51).  "Because such direct proof

is only rarely available," however, a plaintiff can also prove market power indirectly—by

showing "a firm's possession of a dominant share of a relevant market that is protected by entry

barriers."  Microsoft, 253 F.3d at 51.

APL has not produced direct evidence of Matson's monopoly power after APL entered

the U.S.-Guam market in 2015.  While it makes a conclusory assertion that Matson was able to

charge supracompetitive prices even after APL's entry, Pls.' Stmt. of Undisputed Material Fact

(PSUF) ¶¶ 62–63, it fails to back this claim up with any actual evidence or data.  Indeed, when

APL's own expert on market definition was asked at his deposition "[w]here in your report do

you look at the effect of Matson's alleged conduct . . . on prices," he conceded that "[i]t's not

something I was specifically asked to do."  See DSJ 354 (Deposition of Dr. Frederick Warren-

Boulton (WB Dep.)) at 57:23–58:11.  APL resorts instead to indirect evidence that Matson

currently has monopoly power—namely, proof that Matson has a dominant share of the relevant

market that is protected by barriers to entry.  The Court will therefore assess Matson's alleged

monopoly power under this framework.

a.  Market Definition

To begin, APL bears the burden of proving the relevant antitrust market.  Neumann v.

Reinforced Earth Co., 786 F.2d 424, 429 (D.C. Cir. 1986).  An antitrust market "traditionally has

two components: the product market and the geographic market."  Sky Angel U.S., LLC v. Nat'l

Cable Satellite Corp., 947 F. Supp. 2d 88, 102 (D.D.C. 2013).  "To define a market is to identify

those producers providing customers of a defendant firm (or firms) with alternative sources for

the defendant's product or service."  2B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law,

¶ 530(a) (4th ed. 2014) (citation omitted).  Accordingly, the relevant product (or service) market is defined as "all products 'reasonably interchangeable by consumers for the same purposes.'" Microsoft, 253 F.3d at 52 (quoting E.I. du Pont, 351 U.S. at 395).  And the geographic market is "the terrain in which competition takes place."  Facebook, 560 F. Supp. 3d at 13 (quoting Novell, Inc. v. Microsoft Corp., 731 F.3d 1064, 1071 (10th Cir. 2013) (Gorsuch, J.)).

"[T]he process of defining a product market often involves inquiry into economic realities and industry practice."  Nat'l Aviation Trades Ass'n v. Civ. Aeronautics Bd., 420 F.2d 209, 213–14 (D.C. Cir. 1969).  As a result, "[w]hen determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents." United States v. H & R Block, Inc., 833 F. Supp. 2d 36, 52 (D.D.C. 2011); see also FTC v. CCC Holdings, Inc., 605 F. Supp. 2d 26, 38, 41–42 (D.D.C. 2009) (holding that "real-world evidence show[ed] that" products were "not part of the same product market" in part based on "Defendants' internal documents" evaluating "the competitive landscape"); FTC v. Staples, Inc., 970 F. Supp. 1066, 1075 (D.D.C. 1997) (listing "industry recognition" as a factor relevant to defining a submarket).

APL proposes one overall market—that for container cargo shipping services, including both commercial and government shippers, between the U.S. mainland and Guam.  See APL MSJ at 4; WB Rpt. ¶ 7; Oral Arg. Tr. 45–47.  It rests its market definition on, among other evidence, Matson's business conduct and deposition testimony from Matson witnesses.

The record is replete with evidence that Matson treats U.S.-Guam container cargo shipping services as a unified market.  See PSUF ¶¶ 14–32.  For example, Matson's internal business documents recognize shipping services between the United States and Guam as a market.  See PSJ 14 at 23–26 (Matson 2018–2020 Operating Plan identifying "Guam Trade" as a

"market"); PSJ 15 at 36–4- (Matson 2022–2024 Operating Plan listing "Guam" as one of its

"Commercial Division[s]"); PSJ 19 at 18, 23–24 (Matson 2012 Operating Plan organizing

"Ocean Transportation Business Environment" by services, including "service from the U.S. to

Guam"). Matson also sets corporate objectives specific to this market. PSJ 171 at 4 (setting

financial goals by trade lane, including that for Guam); PSJ 172 at 4 (setting objective to

"[a]chieve 75% WB [westbound] market share vs. APL (including Saipan)").[2] And, in a filing

with the Securities and Exchange Commission, Matson described its business as "ocean freight

services," which are organized by destination. PSJ 130 at 2 (Matson 2016 Form 10-K).

Relevant here, its "Guam service" "provides weekly container and conventional freight services

. . . between the U.S. West Coast and Guam." Id.

    Matson's corporate representative also testified in his deposition that Matson views U.S.-

Guam container cargo shipping services as a distinct market. See DSJ 11 (Matson 30(b)(6)

Dep.) at 57:11–23 (when asked whether answers would differ if questions were about Hawaii

rather than Guam, replying "I think they are different markets"), 130:22–131:19 (testifying that

Matson collected separate periodic "market share reports for Hawaii and for Guam"). This

evidence easily creates a question of fact on APL's proposed market.

---

[2] In some business records, Matson focuses specifically on the westbound portion of the
U.S.-Guam market because westbound containers make up the bulk of that market. See DSJ 11
(Matson 30(b)(6) Dep.) at 135:8–16 ("For Guam," eastbound shipments are "a small fraction.");
PSJ 15 at 40 (recording that Matson's 2021 Guam trade comprised 19,589 westbound containers
and 925 eastbound containers). Likewise, Matson ships some cargo through Guam to the nearby
island of Saipan, but this freight also represents a small share of the market. PSJ 20 at 3–4
(documenting that, in 2016, Matson's sales for Guam represented 88% of its revenue from both
islands). But the fact that, in some contexts, Matson viewed the market more narrowly or
broadly is insufficient to defeat APL's evidence that, generally, Matson saw the market as
comprising all routes between the mainland United States and Guam. See PSJ 15 at 40 (treating
westbound and eastbound containers as part of one Guam trade).

Matson mounts three challenges to APL's proposed U.S.-Guam market, but all sail off course. First, Matson argues that APL's U.S.-Guam market definition erroneously excludes goods shipped to Guam from Asia. See Matson MSJ at 36. But Matson's Vice President of Pricing testified that Matson rarely looks to Asian carrier rates when setting its U.S.-Guam rates. DSJ 18 at 29:19–24; see FTC v. Swedish Match, 131 F. Supp. 2d 151, 162 (D.D.C. 2000) (concluding that loose leaf tobacco was a different market from moist snuff tobacco in part based on testimony from industry participants that pricing decisions were made independently for the two products). And Matson's internal documents treat its Asian trades as distinct from its Guam trade. Compare PSJ 14 at 22–25 (Matson 2018–2020 Operating Plan analyzing Guam trade and its volume and rates), with id. at 26–29 (analyzing China trade and its volume and rates); see also PSJ 15 at 2 (listing "Hawaii," "Alaska," "Guam," "China," "Okinawa," and "Micronesia" as different "Commercial Division/Trades"). APL has thus offered sufficient evidence that Asian routes to Guam are separate markets from U.S.-Guam.

Next, Matson contends that APL's proposed geographic market is too broad because it includes shipments to Guam from Seattle. Matson MSJ at 37. As noted, Matson ships to Guam from ports in Los Angeles, Oakland, and Seattle. APL ships from the first two locations but not Seattle. Matson asserts that Seattle is not part of the relevant market because APL chooses not to operate there. Id. But APL introduced evidence that, even though it does not maintain a Seattle port, it still competes for cargo that otherwise would have been shipped through Matson's Seattle facility. APL's Guam trade director submitted a declaration affirming that "APL currently ships cargo [originating] from the Pacific Northwest to Guam, and has since 2018." ECF 150 (Theberge Decl.) ¶ 7. And internal emails and employee testimony indicate that Matson faced competition from APL for customers shipping from the Pacific Northwest. PSJ 162 at 6 (email

from a Matson account executive for the Pacific Northwest stating that Matson had "lost a lot of business to APL" on its Seattle-to-Guam shipping lane); PSJ 58 at 190:18–192:18 (Matson's former Vice President of Pricing acknowledging that customer "saw Oakland as an alternative to Matson's service that would have moved the same" type of cargo "to Guam through the Seattle port"). Matson's former Vice President of Pricing also testified that he had "hear[d] from customers . . . that the . . . Seattle-Tacoma port rate should be adjusted given its differential with the Oakland rate that APL would have at that time[.]" PSJ 58 at 181:11–16. As a result, Matson would sometimes adjust its prices for Pacific Northwest customers according to APL's Oakland prices. Id. at 181:17–25. This evidence suggests that at least some U.S. mainland shippers to Guam viewed Matson's service from Seattle as "reasonably interchangeable" with APL's service from other west-coast ports. Microsoft, 253 F.3d at 52. As did Matson. PSJ 58 at 181:24–182:25 ("[P]eople . . . could source their cargo from multiple origins."). The record thus supports Seattle's inclusion in the U.S.-Guam market and precludes entry of summary judgment for Matson on the issue of market definition.

Finally, Matson objects that the proposed U.S.-Guam shipping market is "an improperly defined 'cluster market' of all shipments from the U.S. to Guam," which "combines services . . . with far different 'supply, demand, and competitive conditions.'" Matson MSJ at 36–37 (quoting WB Rpt. ¶¶ 48–49). This assertion is based on the opinion of APL's market expert, Dr. Warren-Boulton. In addition to identifying the broader U.S.-Guam market as the relevant one for purposes of APL's Sherman Act claims, Dr. Warren-Boulton pointed to narrower "submarkets" of origin-destination-product combinations—e.g., Los Angeles-Guam chilled cargo—"in which to assess particular competitive effects." APL MSJ at 9. Dr. Warren-

Boulton's market opinions are subject to Matson's motion to exclude under <u>Daubert</u>.  <u>Id.</u>; Matson <u>Daubert</u> at 33.

At oral argument, Dr. Warren-Boulton disclaimed using a bottom-up approach of combining the twelve cluster markets to create the overall market.  Oral Arg. Tr. 49 ("The overall market is not simply collecting up a bunch of clusters . . . . The overall market is designed for an entirely different purpose.").  APL's briefing similarly argues that Dr. Warren-Boulton arrived at the proposed market not by aggregating these cluster markets but by conducting a version of the hypothetical monopolist test, which defines a market by asking whether a hypothetical monopolist in that market could impose at least a small but significant non-transitory increase in price.  APL MSJ at 8–9; <u>see also</u> WB Rpt. ¶¶ 39–45.

The Court need not resolve this dispute to conclude that APL has created a question of fact on its market.  Even if, as Matson argues, Dr. Warren-Boulton impermissibly grouped these cluster markets to arrive at his market opinion, his opinion is not APL's sole proof of its proposed market.  Matson's business conduct and witness testimony, as explained above, independently preclude summary judgment for Matson on the proposed market of U.S.-Guam container cargo shipping.

### b.  <u>Monopoly Power</u>

Matson next contends that it is entitled to summary judgment because APL has offered no proof that Matson has monopoly power in APL's proposed market.  Matson MSJ at 38–40. The Court disagrees:  APL has offered sufficient indirect proof of Matson's monopoly power through evidence that Matson has a dominant share of the U.S.-Guam market and that Matson's position is protected by barriers to entry in that market.

i.     Market Share

There does not appear to be a specific numeric threshold for dominant market share for purposes of a Sherman Act claim.  But "[c]ourts generally require a 65% market share to establish a prima facie case of market power," Image Tech. Servs., Inc. v. Eastman Kodak Co. (Eastman Kodak I), 125 F.3d 1195, 1206 (9th Cir. 1997), while the Supreme Court has found 80% "sufficient to survive summary judgment."  Eastman Kodak Co. v. Image Tech. Servs., Inc. (Eastman Kodak II), 504 U.S. 451, 480 (1992); see also Microsoft, 253 F.3d at 54 (accepting that 80% share is predominant and collecting cases); E.I. du Pont, 351 U.S. at 379–80 (75%).

APL's expert charts Matson's share of the overall U.S.-Guam market over the relevant time period.[3]  After Horizon Lines stopped servicing Guam in November 2011, Matson captured 100% of the market, and it maintained that share until APL entered the fray in 2014.  WB Rpt. ¶ 63 fig. 19.  Following APL's entry, Matson's share decreased—to 94% in 2016, 82% in 2017, and 74% in 2018.  Id.  It then fluctuated around 70% until after the COVID pandemic.  Id. ¶ 66 fig. 20.  Matson's own business records validate these figures.  For example, Matson's "Guam & SAIPAN Westbound Container Market Share Tracking Report" listed Matson's overall market share as 79.6% in 2017, 73% in 2018, 75% in 2019, and 73.9% in 2019.  APL MSJ at 14 (citing PSJ 45); see also Matson Reply at 38 ("Matson's share eroded from 94% in 2016 to 72% in 2019 and rebounded only with APL's catastrophic Covid-era service failures.").  Based on this evidence, a jury could reasonably find that, throughout the relevant period, Matson had a market share within the 65% to 80% range generally required by courts to show dominance.

---

[3] Matson moves to exclude Dr. Warren-Boulton's opinions on Matson's monopoly power to the extent they are based on allegations of pricing above competitive levels.  Matson Daubert at 37–40.  But it does not dispute the evidence of Matson's market share cited in his report.

ii.    Barriers to Entry

Market share alone, however, is not enough to prove monopoly power—a dominant market share must be protected by entry barriers.  "Entry barriers are particular characteristics of a market which impede entry by new firms into that market."  Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 968 (10th Cir. 1990).  They "are factors (such as certain regulatory requirements) that prevent new rivals from timely responding to an increase in price above the competitive level."  Microsoft, 253 F.3d at 51 (citing S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co., 740 F.2d 980, 1001–02 (D.C. Cir. 1984)).  APL has offered evidence that legal requirements, high startup costs, and Matson's reputational advantage impede new entry into the U.S.-Guam cargo shipping market.  This evidence is sufficient for a jury to infer that Matson's dominant market share was protected by entry barriers.

Consider first the legal requirements that govern the market for container cargo shipping services between the U.S. mainland and Guam.  As noted, the Jones Act allows only U.S.-flagged and -owned vessels to transport cargo between U.S. ports, with an exception for sailing to and from Guam.  The upshot:  Foreign-owned companies, like APL, can provide service between the United States and Guam.  But, unlike their U.S. competitors (including Matson), they cannot do so via an intermediate U.S. port, such as Hawaii.  Compare DSUF ¶ 15, with id. ¶¶ 27, 36, and APL MSJ at 24.  The Jones Act thus impedes the ability of foreign companies operating U.S.-flagged ships to enter the U.S.-Guam market by dictating the routes—and thereby affecting the types of service—they can offer.  And the Jones Act bars many vessels from the market altogether.  See PSJ 61 (Department of Transportation Report showing that, of the 5,119 privately-owned container ships of 1,000 gross tons and over as of January 1, 2016, only 23 were Jones Act eligible).  Reflecting this regulatory landscape, a 2011–2017 Strategic Plan prepared

for Matson management described one of the company's business challenges as "Operating in an Increasingly Restrictive Environmental/Regulatory Environment" and one of its "[t]ransportation threats" as "challenges to the Jones Act."  PSJ 16 at 5, 10.

Moreover, the costs associated with obtaining, preparing, and maintaining the vessels and facilities necessary for serving the U.S.-Guam market constitute a "major investment[]."  Microsoft, 253 F.3d at 56.  A 2011 Matson internal document, for example, estimated that constructing two new ships would cost some $400 million.  PSJ 16 at 22.  Matson also faces high costs, of course, and "[w]hether costs borne by all market participants should be considered entry barriers is the subject of much debate."  Microsoft, 253 F.3d at 56 (comparing sources).  But at least some authorities deem "high initial investment" to be an entry barrier, even when faced by all market participants.  See Areeda & Hovenkamp ¶¶ 420c, 421b (citing Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vt., Inc., 845 F.2d 404, 408 (2d Cir. 1988) ("[T]he jury could have found that barriers to entry were . . . not at all low" in part because "there was evidence that the cost of entering the market exceeded $300,000.")).

Finally, an incumbent's strong reputation can be a barrier to entry.  See, e.g., U.S. Philips Corp. v. Windmere Corp., 861 F.2d 695, 703 (Fed. Cir. 1988) (finding "the need to have a well-known brand with wide consumer acceptance" to be a substantial entry barrier in the rotary electric shaver market).  In its briefing, Matson extols its positive reputation as an explanation for its success in the market.  See, e.g., Matson MSJ at 6–7 ("Customers rave about Matson's 'superior customer service' and its 'awesome staff.'" (first citing DSJ 56 at 7; and then citing DSJ 53 at 6)).  And its internal documents tout its "brand identity" as one of its "[t]ransportation [s]trengths."  PSJ 16 at 7.  If Matson's reputation is as strong as it suggests, then it could plausibly prevent competitors from gaining a foothold in the market.

17

Matson's main retort—that APL's ability to enter the market proves that there are no entry barriers—is adrift of the mark. The D.C. Circuit effectively rejected a similar argument in Microsoft: "That some developers write applications for other operating systems is not at all inconsistent with the finding that the applications barrier to entry discourages many from writing for these less popular platforms." 253 F.3d at 55. Here, too, APL's ability to enter and gain market share is not inconsistent with the conclusions that it had to overcome entry barriers to do so, and that these barriers might prevent other carriers from entering the market should APL be forced out.

Accordingly, APL has offered enough evidence that legal requirements, high initial costs, and Matson's quality reputation present barriers to entry in its proposed market. And, when paired with Matson's dominant market share, these barriers create a dispute of material fact as to whether Matson has monopoly power in the U.S.-Guam cargo market. Matson therefore is not entitled to summary judgment on this issue.

### 2. *Exclusionary Conduct*

Evidence of Matson's monopoly power only gets APL halfway to port. To survive summary judgment, APL must also produce sufficient evidence for a jury to conclude that Matson engaged in exclusionary conduct. At a high level, exclusionary conduct is conduct other than competition on the merits through which a monopolist acquires or maintains monopoly power and harms competition in the relevant market. United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966). "Whether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition, can be difficult to discern." Microsoft, 253 F.3d at 58. To draw that fine distinction, courts balance the challenged conduct's anticompetitive effects against its procompetitive benefits. Id. at 58–59. The guiding inquiry is whether the allegedly

exclusionary conduct "has little or no value beyond the capacity to protect the monopolist's market power[.]"  Novell, 731 F.3d at 1072 (Gorsuch, J.).

As previously noted, APL alleges that Matson engaged in six forms of exclusionary conduct: (1) threatening and retaliating against Guam shippers and local truck delivery companies that do business with APL; (2) retaliating against APL in Alaska, where both companies operate; (3) making disparaging comments to customers regarding APL's MSP subsidies; (4) locking in shippers through customer loyalty programs; (5) entering into allegedly restrictive agreements with key customers; and (6) offering cargo capacity or "slots" on Matson's ships to APL conditioned on APL leaving the Guam market.  APL has not produced sufficient evidence to show that any of this alleged conduct was exclusionary.

Before plumbing these varied allegations, the Court will first address a threshold dispute: whether it should consider all this conduct together or analyze it piece by piece.  Concluding that binding D.C. Circuit precedent requires the latter approach, the Court will proceed to analyze each allegation of anticompetitive conduct separately.

### a.  Aggregation of Conduct

In its summary judgment papers, APL urges the Court to view Matson's conduct holistically and determine whether Matson's entire course of conduct is anticompetitive.  APL MSJ at 38.  Matson counters that the Court should disaggregate its conduct and analyze each category of anticompetitive conduct independently.  Matson MSJ at 12.  At oral argument, however, the parties largely agreed on the appropriate method of analysis.  Counsel for APL concurred that the Court must "find one of [APL's] alleged categories of conduct anticompetitive before [the Court] can aggregate it," and that "the Court cannot consider competitive conduct in the mix of actions" when determining antitrust liability.  Oral Arg. Tr. 124:8–15.

The parties' agreed-upon approach hews to binding precedent. In <u>Microsoft</u>, the government alleged that Microsoft engaged in multiple types of exclusionary conduct. 253 F.3d at 58. To assess these allegations, the D.C. Circuit applied a burden-shifting test. <u>See id.</u> at 58–59. At the first step, the Circuit asked whether the government had demonstrated that Microsoft's actions had an anticompetitive effect before shifting the burden to Microsoft to demonstrate a procompetitive justification for its conduct. <u>Id.</u> But rather than apply that test to the entire body of conduct alleged by the government, the Circuit applied it to each individual type of anticompetitive conduct that was alleged. For example, the Circuit reviewed five types of alleged conduct by Microsoft as to internet-access providers and concluded that just one of them had an anticompetitive effect. <u>Id.</u> at 67–71. As Judge Mehta observed in a recent case, "only as to that conduct did the burden shift to Microsoft," and "[t]he other four allegations . . . were not considered further." <u>United States v. Google</u>, 687 F. Supp. 3d 48, 68 (D.D.C. 2023). That approach therefore requires courts in this district to "evaluate whether each type of alleged exclusionary practice has the requisite anticompetitive effect." <u>Id.</u> at 68; <u>see also</u> <u>Covad Commc'ns Co. v. Bell Atl. Corp.</u>, 398 F.3d 666, 672–77 (D.C. Cir. 2005) (separately analyzing five categories of allegedly anticompetitive conduct).

The Supreme Court also analyzes anticompetitive conduct piecemeal. In <u>Pacific Bell Telephone Co. v. linkLine Communications, Inc.</u>, 555 U.S. 438 (2009), the Court confronted a novel theory of antitrust liability called a "price squeeze." <u>Id.</u> at 442. The plaintiffs claimed the monopolist had acted anticompetitively by raising the wholesale price of inputs sold to its competitors and lowering the retail price of the finished product made with those inputs. <u>Id.</u> Rather than treat the claim as one form of anticompetitive conduct, the Court broke it into two claims and analyzed each separately. It considered the monopolist's wholesale pricing practices

as a failure-to-deal-with-rivals claim, id. at 450–51, and its retail pricing practices as a predatory-pricing claim, id. at 451. Finding neither half of the claim viable, the Court held that combining the two could not make the monopolist liable. Id. at 452.

Other circuits also use a category-by-category approach. As the Tenth Circuit observed, "[r]eal-world monopolists may engage in allegedly exclusionary conduct which does not fit within a single paradigm . . . . In these situations, the courts disaggregate the exclusionary conduct into its component parts before applying the relevant law." In re EpiPen Mktg., Sales Pracs. & Antitrust Litig., 44 F.4th 959, 982 (10th Cir. 2022). The Fifth Circuit agrees that "[e]ach of [the plaintiff's] theories must be separately analyzed in light of settled principles of antitrust law." Retractable Techs., Inc. v. Becton Dickinson & Co., 842 F.3d 883, 891 (5th Cir. 2016).

The Fourth Circuit, as APL notes in its briefing, has taken a slightly different tack. In Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC, 111 F.4th 337 (4th Cir. 2024), it held that when a plaintiff "alleges that a scheme or course of conduct was anticompetitive, the scheme or conduct must be considered as alleged, not in manufactured subcategories." Id. at 355. But that case offers no ballast here.

First, this Court is obviously bound to follow the D.C. Circuit's more granular approach.

Second, as the D.C. Circuit observed in Microsoft, the Supreme Court has only ever applied a "course of conduct" theory in cases involving "conspiracies among multiple firms," where "the course of conduct is the conspiracy itself, for which all participants may be held liable." 253 F.3d at 78 (quotation marks omitted); Google, 687 F. Supp. 3d at 69. Under those circumstances, it makes sense to look at the conspiracy as a whole, rather than the conduct of each individual participant. See Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690,

699 (1962) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

It would be "unworkable" to extend that rule beyond conspiracies and hold that "business conduct that does not offend that antitrust laws may violate the Sherman Act once it is combined with other lawful business conduct." Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp., 826 F. Supp. 2d 705, 710 (S.D.N.Y. 2011); see New York v. Facebook, Inc., 549 F. Supp. 3d 6, 47 (D.D.C. 2021) (collecting similar cases). Courts would have to identify a tipping point at which the plaintiff has strung together enough lawful acts to make the entire series unlawful. The Court is unaware of any case that undertook such an exercise in futility. Even the Fourth Circuit did not do so in Duke Energy. While it repeatedly described the conduct alleged by the plaintiffs as a "scheme," it nonetheless divided the scheme into two prongs and found each to be anticompetitive on its own. See Duke Energy, 111 F.4th at 356, 362, 366.

For these reasons, the Court agrees with the parties that it must analyze each form of allegedly exclusionary conduct on its own before it can aggregate them. If none of Matson's acts were exclusionary, then it is entitled to summary judgment. See linkLine, 555 U.S. at 457 ("Two wrong claims do not make one that is right.").[4]

___

[4] Even aggregating all the alleged conduct might not be enough to raise a genuine dispute of material fact over whether Matson's conduct was exclusionary. For certain types of exclusionary conduct, a plaintiff must show that the challenged conduct substantially foreclosed it from the market. New York v. Meta Platforms, Inc., 66 F.4th 288, 304 (D.C. Cir. 2023). Courts presume foreclosure of less than 30% of the market to be insubstantial. See In re EpiPen, 44 F.4th at 988 (rejecting substantial foreclosure where defendant foreclosed 31% of the market); Sterling Merchandising, Inc. v. Nestle, S.A., 656 F.3d 112 (1st Cir. 2011) ("[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent[.]") (quoting Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 68 (1st Cir. 2004)). As will be discussed later, APL's own expert opines that Matson's alleged conduct affected at most 29% of shipping volumes between the United States and Guam. ECF 146, Ex. A (WB Decl.) ¶ 84. That figure, however, excludes shipments for government customers, even though government

b.  <u>The Conduct at Issue</u>

Throughout this case, APL has taken a blunderbuss approach to claiming anticompetitive conduct on Matson's part.  In an effort to focus the fire in light of discovery, the Court asked APL's counsel at oral argument for his "best evidence" of anticompetitive conduct.  Oral Arg. Tr. 124:22–24.  Counsel identified two things: (1) deposition testimony that Matson had threatened to retaliate against a major shipping customer—Home Depot—if it shipped with APL to Guam and (2) Matson's purportedly retaliatory actions against APL in Alaska, where both companies operate.  Oral Arg. Tr. 124:22–125:13, 126:21–127:2.  The Court will therefore begin with APL's allegations that Matson threatened Home Depot and other companies that shipped with APL to Guam.  It will then address Matson's alleged retaliation against APL in Alaska before analyzing the remaining scatter of allegedly anticompetitive conduct: (1) making disparaging comments to shipping customers regarding APL's MSP subsidies; (2) creating loyalty programs for customers that ship to Guam; (3) entering into allegedly restrictive agreements with Guam customers; and (4) offering APL cargo "slots" on Matson's vessels as a means to force APL out of the Guam market.

i.  Threats and Retaliation Against Shipping Customers and Vendors in Guam

To begin, APL alleges that Matson threatened and retaliated against companies that did, or considered doing, business with APL.  APL points to a slew of instances where, it claims,

---

shipping is part of APL's proposed market.  <u>See</u> Oral Arg. Tr. 47:12–17 (Dr. Warren-Boulton agreeing that he "excluded the government portion of the market . . . in arriving at that 29 percent [figure]").  When government shipping, which makes up about 10% to 20% of Guam shipping, is included in the foreclosure ratio, it falls even further below the 30% threshold.  <u>See</u> <u>infra</u> Part III.A.2.c.iv; Oral Arg. Tr. 20:12–17.  That said, it is unclear whether substantial foreclosure is required for each form of conduct alleged by APL.  To the extent that it is, APL has not introduced evidence from which a jury could infer that Matson substantially foreclosed it from competing in the U.S.-Guam market.

Matson successfully intimidated customers by cutting off, or increasing the rates charged to, companies that did business with APL and threatening to impose similar sanctions on those that continued to ship with APL.  See APL MSJ at 23–30 (summarizing threats and retaliation and other allegedly exclusionary conduct); PSUF ¶¶ 118–187 (describing threats or retribution against eight different companies).  APL trains its summary judgment briefing on five companies: Approved Freight, DeWitt Guam, Guam Trucking and Warehouse, Guam Movers, and Royal Hawaiian.  See APL MSJ at 38; see also APL Reply at 14.  And, as mentioned above, it highlighted a sixth company at oral argument: Home Depot.  Yet its evidence as to these six companies comes up short for at least one of three reasons: (1) APL's proof of the conduct rests entirely on inadmissible hearsay; (2) Matson's conduct falls outside the statute of limitations; and (3) APL has failed to show that the conduct is anticompetitive.

Start with Home Depot.  APL's allegations rest entirely on inadmissible hearsay.  At summary judgment, APL must produce evidence that (1) creates a genuine dispute of material fact and (2) is "capable of being converted into admissible evidence."  Gleklen v. Dem. Cong. Campaign Comm., 199 F.3d 1365, 1369 (D.C. Cir. 2000).  Here, APL offers deposition testimony from three witnesses to support its allegation that Matson threatened to retaliate against Home Depot if it shipped products to Guam with APL.  Ed Aldridge, APL's former president, testified that he spoke with Tony Bonaparte, a now-deceased Home Depot executive, about Matson's purported threats against Home Depot.  Aldridge testified that Bonaparte told him that "if [Home Depot] gave too much business to APL in Guam, there would be ramifications on [Home Depot's] business to Hawaii, which was substantial."  DSJ 86 (Aldridge Dep.) at 232:24–233:14.  Another APL executive similarly testified that he heard from Bonaparte that Matson informed Home Depot that APL "would be leaving the market very soon"

and that "if you ship with APL, you better be careful."  DSJ 45 (Theberge Dep.) at 62:18–63:2.

And a third APL employee testified that Bonaparte told him that Matson employees would

"hassle" Home Depot employees if they saw non-Matson containers in Home Depot's freight

yard.  PSUF ¶ 345; DSJ 46 (Hermosa Dep.) at 204:13–16.

    None of that deposition testimony is admissible to show that Matson engaged in

exclusionary conduct.  Each contains three levels of hearsay: (1) the APL declarants' statements

in their depositions; (2) Bonaparte's statements to the APL declarants; and (3) the Matson

employees' statements to Home Depot.  The first and third levels are admissible (or potentially

so), as APL presumably would call the declarants to testify, and the Matson employees'

statements are statements by a party opponent when offered by APL under Federal Rule of

Evidence 801(d)(2)(D).

    That leaves the second level of hearsay: Bonaparte's statements to the APL declarants.

In its opposition to Matson's motion for summary judgment, APL dismissed the potential

hearsay problems by arguing that Matson "incorrectly presumes no claim could be supported

unless APL was 'in the room' with Matson."  APL MSJ at 41.  Not so.  APL could rely on

documentary evidence of these threats or call the threatened Home Depot employees to testify in

support of its claims.

    APL also mistakenly relies on Chase Manufacturing, Inc. v. Johns Manville Corp., 84

F.4th 1157 (10th Cir. 2023).  There, the defendant argued that emails the plaintiff offered to

show that the defendant threatened customers were hearsay.  Id. at 1176.  But the district court

held, and defendant did not dispute, that the emails might be admissible under hearsay

exceptions.  Id.  Given the defendant's concession, the Tenth Circuit brushed aside the

defendant's hearsay arguments.  Id.

APL's summary judgment brief, however, does not mention a single hearsay exception under which the Home Depot employees' statements could be admitted.  See APL MSJ at 41.  In its reply brief in support of its motion, APL argues for the first time that the statements are not hearsay because they are being offered for their effect on the listener or, in the alternative, fall under the state-of-mind or residual exceptions.  See APL Reply at 23–25.  "Generally, arguments raised for the first time in a reply are waived."  Alston v. Dist. of Columbia, 561 F. Supp. 2d 29, 37 (D.D.C. 2008)).  Out of an abundance of caution, the Court will nevertheless address—and reject—APL's belated arguments.

First, APL's effect-on-the-listener argument is dead in the water.  APL must prove that Matson in fact made these threats to Home Depot.  Here, APL's only evidence that Matson threatened Home Depot is the three APL employees' deposition testimony.  See PSUF ¶¶ 344–45 (citing only deposition testimony as evidence of Matson's threats).  So, if APL is offering these statements purely for their effect on the listener and not for the truth of the matter asserted, then APL has no evidence that Matson made threats.  On the other hand, if APL wishes to offer them to prove that Matson threatened Home Depot, then it must demonstrate that they are admissible for that purpose under a hearsay exception.

Second, these statements are only partially admissible under Rule 803(3), the state-of-mind exception.  The statements could be admissible to prove that customers were generally afraid to do business with APL.  See 2 McCormick on Evidence § 274 (8th ed. July 2022 Update) ("[S]tatements showing fear" are admissible under Rule 803(3)).  But Rule 803(3) goes no further.  It cannot be used to prove that the event that caused the state of mind actually occurred.  United States v. Slatten, 395 F. Supp. 3d 45, 87 (D.D.C. 2019) (Rule 803(3) "does not permit the declarant to relate what caused the state of mind."); see 2 McCormick on Evidence

§ 274 ("[T]he normal practice is to admit the statement and direct the jury to consider it only as proof of the state of mind and to disregard it as evidence of the other issues.").  As the Advisory Committee explained, it would "destr[oy]" the hearsay rule to allow the declarant's "state of mind . . . to serve as the basis for an inference of the happening of the event which produced the state of mind."  Fed. R. Evid. 803 Advisory Committee Notes (1972).

Courts have applied this limitation on Rule 803(3) in a number of antitrust cases to exclude evidence of *why* customers had a state of mind.  For example, the Third Circuit held that hearsay evidence was admissible under Rule 803(3) to prove customers' motives for not dealing with the plaintiffs, but not to prove "the facts recited as furnishing the motives."  Callahan v. A.E.V., Inc., 182 F.3d 237, 252 (3d Cir. 1999) (quoting J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1535 n.11 (3d Cir. 1990)); see also New York v. Microsoft Corp., No. 98-cv-1233 (CKK), 2002 WL 649951, at *3 (D.D.C. Apr. 12, 2022) (holding that hearsay was inadmissible under Rule 803(3) to prove that Microsoft conditioned its dealing).  Likewise here, the customers' statements cannot be admitted under Rule 803(3) to prove what Matson said or did to Home Depot, or even that it said or did anything at all.

Third, Rule 807, the residual exception, is also unavailing.  That exception is to be used "only in the most exceptional circumstances" to admit hearsay that does not fall under any other exception where the evidence is both "very important and very reliable."  United States v. Slatten, 865 F.3d 767, 807 (D.C. Cir. 2017) (quotation marks omitted).  Courts consider (1) whether the evidence "is supported by sufficient guarantees of trustworthiness"; (2) whether the evidence "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts"; and (3) whether the party provided sufficient notice.  Fed. R. Evid. 807; 2 McCormick on Evidence § 324.

APL's evidence flunks all three considerations. To begin, the evidence is not supported by sufficient guarantees of trustworthiness. There is no other non-hearsay evidence in the record corroborating APL's claims that Matson employees made these alleged threats to Home Depot. See Fed. R. Evid. 807(a)(1) (requiring courts to consider "evidence, if any, corroborating the statement"). If anything, record evidence suggests that Mr. Bonaparte of Home Depot may have told APL that Matson threatened Home Depot as an excuse to avoid doing further business with APL. For example, internal Home Depot documents suggest that its employees were reluctant to ship large volumes of cargo with APL because of APL's slower and less reliable service rather than any potential retaliation by Matson. See, e.g., DSJ 394 ("Due to [APL's] new service and extended lead time, only 10% of [Home Depot's] Guam volume will be awarded to APL[.]"); DSJ 396 ("We did not have issues like this with Matson shipping to Guam. . . . I'm at a bit of a loss on how to proceed with APL[.]"). Even Mr. Bonaparte himself expressed frustration with APL's service, writing in an email that Home Depot "need[ed] to load on Matson Equipment until [it had] a more definite execution from APL." DSJ 395.

APL analogizes to BoDeans Cone Co. LLC v. Norse Dairy Systems, LLC, 678 F. Supp. 2d 883 (N.D. Iowa 2009), where the court admitted a customer survey offered by the plaintiff under Rule 807 to show that consumers felt they could not switch to doing business with the plaintiff instead of the defendant. Id. at 903–05. But the deposition testimony at issue here is nothing like the survey evidence in BoDeans. That survey was commissioned by and offered against the defendant and was conducted by "a sophisticated market-research firm using appropriate methodology[.]" Id. at 904. Here, the customers' statements were recounted by the plaintiff's employees and are being offered against the defendant. And APL's employee

28

declarants are not market-research experts, nor did they apply any kind of systematic methodology to gather the reported statements.

APL also fails to show that it could not discover admissible evidence of Matson's threats against Home Depot.  This prerequisite for the residual exception "has the effect of imposing a rough 'best evidence' requirement[.]"  2 McCormick on Evidence § 324.  As APL admits, it did not subpoena Home Depot or any of its employees or disclose any potential witnesses from Home Depot during discovery.  APL Resp. to DSUF ¶ 164.  While APL claims that it planned to depose a Home Depot witness whom Matson subpoenaed but ultimately did not depose, id., that does not change the fact that APL also could have subpoenaed that witness or others.  Similarly, that Mr. Bonaparte unfortunately died before this case began, DSUF ¶ 164, does not excuse APL's apparent lack of efforts to discover alternative, first-hand evidence of Matson's purported threats against Home Depot during the extensive discovery process in this case.  APL's omission is even more glaring considering that APL places the Home Depot threats among its "best evidence" of anticompetitive conduct.  Oral Arg. Tr. 124:22–125:13.

Finally, APL does not mention Rule 807's notice requirement, let alone argue that it was satisfied here.  See APL Reply at 24–25.  While APL may have been able to cure any deficiency by providing notice prior to trial, the omission does little to persuade the Court of the merits of APL's belated and half-hearted invocation of the residual exception.

To sum up, APL's "best evidence" of threats against Home Depot "counts for nothing" because it consists exclusively of inadmissible hearsay that APL has not shown can be converted

into admissible evidence. <u>Gleklen</u>, 199 F.3d at 1369. APL therefore cannot rely on its Home Depot-related allegations to avoid summary judgment.[5]

APL's allegations as to Approved Freight, a California-based freight forwarder, also rest on inadmissible hearsay. APL alleges that Matson threatened to lower its rates to one of Approved Freight's competitors if Approved Freight shipped Guam-bound cargo with APL. PSUF ¶ 183. It claims further that Matson retaliated against Approved Freight by once leaving its cargo off a Matson ship. <u>Id.</u> ¶ 185. APL's only support for those allegations, however, comes from deposition testimony by an APL executive recounting what an Approved Freight manager reportedly told him about the alleged retribution. <u>See id.</u> (citing DSJ 45 (Theberge Dep.)); <u>see also</u> DSJ 45 (Theberge Dep.) at 116:1–8, 118:13–23 (testifying that "Randy" and "Troy" at Approved Freight told him of the threats). For the reasons just discussed, those statements are inadmissible for the purposes of proving what Matson said or did and they cannot be considered at summary judgment.

Next up: Guam Trucking and Warehouse, which transports cargo on Guam by truck, and Guam Movers, which had a contract with Matson to carry wastepaper from Guam to China. APL's allegations as to both companies fall outside the applicable statute of limitations. Section 2 claims have a four-year statute of limitations. 15 U.S.C. § 15b. Here, that means that APL must produce potentially admissible evidence of anticompetitive conduct that occurred after July 28, 2017. APL claims that Matson stopped giving local delivery business to Guam Trucking and Warehouse after the company started doing business with APL. <u>See</u> APL MSJ at 23–24, 38. It

---

[5] Even if the evidence regarding Home Depot were admissible, it would not be enough for APL to survive summary judgment. For the reasons discussed later, APL would have no other admissible evidence that Matson's conduct was anticompetitive. And APL does not offer any evidence that Matson's alleged comments to Home Depot foreclosed it from a sufficiently large segment of the Guam market to impose Section 2 liability.

further alleges that Matson raised Guam Movers's shipping rates after the company began shipping some cargo with APL. Id. at 25, 38. But Matson's alleged actions against both companies occurred before July 2017. See PSUF ¶ 121 ("In February 2016 . . . Matson[] . . . cut off GTW[.]"); id. ¶ 176 ("In January 2017, [Matson] increased the rates available to Guam Movers[.]"). These actions therefore cannot be the sole basis for imposing Section 2 liability.

Somewhat confusingly, APL argues that Matson's conduct need not fall within the limitations period for APL to survive summary judgment because time-barred conduct can be used as "proof of a violation." APL MSJ at 40. APL might be correct that conduct outside the limitations period could be relevant to proving that Matson engaged in some kind of ongoing campaign of threats and retaliation that began outside the limitations period but continued within it. But see Meta Platforms, 66 F.4th at 300 n.13 (rejecting argument that conduct outside the limitations period can be challenged on a course-of-conduct theory). But even if that were so, APL still must identify at least *some* admissible evidence of anticompetitive threats or retaliation within the statute of limitations. See Meijer, Inc. v. Biovail Corp., 533 F.3d 857, 867 (D.C. Cir. 2008) (Plaintiff "must allege the defendants injured them during the four[-]year [limitations] period[.]"). If not, then Matson could potentially be held liable for conduct that occurred entirely outside the limitations period.

That leaves two companies as to which APL's allegations are supported by non-hearsay evidence of conduct within the limitations period: DeWitt Guam and Royal Hawaiian. Both DeWitt Guam and Royal Hawaiian—along with Approved Freight and Guam Movers, discussed above—are affiliated with the DeWitt Companies, a group of companies that provide moving and shipping services, including between the U.S. mainland and Guam. PSUF ¶¶ 142, 160. As relevant here, the two companies provide ground trucking services on Guam and the Hawaiian

Islands.  Id.  Before APL entered the Guam market, DeWitt (the parent) shipped goods to Guam using Matson, and both DeWitt Guam and Royal Hawaiian provided Matson with trucking services on Guam and the Hawaiian Islands.  Id. ¶¶ 144–45, 161.  After APL entered the market, DeWitt began shipping goods to Guam with APL.  Id. ¶ 146.  In response, Matson stopped using both DeWitt Guam and Royal Hawaiian for local deliveries.  Id. ¶¶ 149–50, 162–64.  Emails and deposition testimony suggest that Matson's decisions to cut off DeWitt Guam and Royal Hawaiian were motivated by DeWitt's decision to switch to APL and a desire to work with companies deemed more loyal to Matson.  See, e.g., PSJ 38 (Matson employee recommending no trucking business for DeWitt Guam until they have "demonstrated behaviors of alliance"); DSJ 345 at 137:24–138:24 (Matson employee testifying that DeWitt's switch to APL was "not well-received" and Matson chose to stop giving trucking business to Royal Hawaiian and work instead with "supportive shippers").

For its part, Matson musters a declaration from the CEO of DeWitt Guam, who counters that "Matson has never threatened retaliation against the DeWitt Companies as a result of the DeWitt Companies conducting business with APL."  DSJ 398 ¶ 4 (Burrows Decl.).  He adds that, to his knowledge, "Matson has never expressly refused to do business with the DeWitt Companies on account of the DeWitt Companies' relationship with APL[.]"  Id. ¶ 6.

That declaration, however, does not paper over a genuine dispute of material fact.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment[.]"  Anderson, 477 U.S. at 255.  Here, the parties present conflicting evidence over whether Matson in fact cut off DeWitt Guam and Royal Hawaiian due to DeWitt's dealings with APL.  The Court cannot resolve that factual dispute at summary judgment.

That said, APL has not demonstrated that Matson's decision to stop using DeWitt Guam and Royal Hawaiian was anticompetitive for two independent reasons. First, DeWitt Guam and Royal Hawaiian do not compete in the Guam ocean cargo shipping market. Again, APL must demonstrate that Matson's actions harmed competition in the relevant market. See Qualcomm, 969 F.3d at 992. As a result, APL must produce evidence from which a jury could conclude that Matson's actions in the local Guam and Hawaii *trucking delivery* markets harmed competition in the U.S.-Guam *ocean shipping* market. But APL has produced no evidence of such a connection. It has not identified any evidence, for instance, that DeWitt as a whole stopped doing business with APL on U.S.-Guam routes because Matson ceased using its local trucking affiliates.

Second, APL's allegations at most describe a lawful refusal to deal. Monopolists have a broad right not to deal. See United States v. Colgate & Co., 250 U.S. 300, 307 (1919). As part of that right, "[a] retail dealer has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself, and may do so because he thinks such dealer is acting unfairly in trying to undermine his trade." Id. at 307 (quoting E. States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 614 (1914)); see NYNEX Corp. v. Discon, Inc. 525 U.S. 128, 137 (1998) ("The freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage."). Applying that principle here, Matson, as a retailer of shipping services, may choose from whom it will purchase local delivery services.

APL nods to Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985), which created a narrow exception to the refusal-to-deal principle. APL MSJ at 39. The Court will discuss that case in greater depth below when analyzing APL's Alaska allegations. For now, it is enough to say that APL does not even try to satisfy the Aspen Skiing exception. Nor is

it clear that APL could do so, because the exception has only ever been employed when a monopolist refuses to deal with its rivals. See linkLine, 555 U.S. at 448 (Aspen Skiing held that "a firm's unilateral refusal to deal *with its rivals* can give rise to antitrust liability." (emphasis added)). Matson, however, does not compete with DeWitt Guam or Royal Hawaiian; they are its vendors. And APL identifies no case in which a court has held that a monopolist's decision to take its business to a different vendor or supplier was anticompetitive.

To sum up, APL aimed six shots across Matson's bow but misfired each time. It produced only inadmissible hearsay as to Home Depot and Approved Freight. It identified only time-barred conduct as to Guam Movers and Guam Trucking and Warehouse. And it failed to show that Matson's conduct as to DeWitt Guam and Royal Hawaiian was anticompetitive. APL therefore has not produced sufficient evidence for a jury to conclude that Matson engaged in anticompetitive conduct by threatening or retaliating against companies that did business with APL.

ii.  Alaska

APL's other "best evidence" of anti-competitive conduct—Matson's actions in Alaska— also stalls short of the harbor. Some context first on Alaska's surprising starring role in this Guam-focused case. Both APL and Matson provide shipping and other logistical services in Alaska. See PSUF ¶¶ 188–90. APL alleges that after it entered the Guam market, Matson retaliated against APL's Alaska operations as reprisal for competing against Matson in Guam. Specifically, APL claims that Matson (1) ended agreements by which Matson would transport cargo from locations in Alaska to APL's ships, id. ¶¶ 194–95; (2) ejected APL from a leased shipping terminal in Kodiak, Alaska, id. ¶ 222; (3) terminated APL's shop and office leases, id. ¶¶ 237–38; (4) suspended arrangements under which the two companies would lend each other a

tugboat when two were required, id. ¶ 249; and (5) ceased other lesser forms of cooperation, such as sharing spare parts, id. ¶ 253. APL claims those actions caused it to incur about $45 million in additional costs, including purchasing a new tug, leasing new office space, and relocating APL's Alaska operations. Id. ¶ 268.

As the Court explained in its motion-to-dismiss ruling, these allegations "do not constitute a standalone antitrust claim" because APL has not pled an independent Alaska market or that Matson possessed monopoly power in that market. APL, 633 F. Supp. 3d at 232; see also Rambus Inc. v. FTC, 522 F.3d 456, 466 (D.C. Cir. 2008) (A § 2 monopolization claim requires the defendant to possess "monopoly power in the relevant market[.]"). Instead, APL's market and monopoly-power allegations are steered exclusively at Guam. As a result, for APL to defeat summary judgment based on its Alaska-related allegations, it must produce sufficient evidence for a jury to conclude that Matson's conduct in Alaska harmed competition in the U.S.-Guam market. See APL, 633 F. Supp. 3d at 232. It must also show that Matson's Alaska conduct was anticompetitive. APL has not made either showing.

First, APL has produced no evidence to support a conclusion that Matson's Alaska actions harmed competition in Guam. As the Court previously explained, harm to competition may include "reduced output (i.e., fewer shipping choices), increased prices, and diminished quality of service compared to a market in which APL could fully compete absent Matson's alleged conduct." APL, 633 F. Supp. 3d at 221. There is no evidence in the record that Matson's Alaska conduct had any of those effects in Guam. APL has not, for example, connected its increased costs in Alaska to increases in its Guam rates. Nor has it shown that those costs caused it to offer an inferior shipping service in Guam. To the contrary, APL's corporate representative confirmed at his deposition that Matson's actions in Alaska did not

affect the Guam trade.  DSUF ¶ 212.  He testified that Matson's decision to stop transporting

cargo to APL's ships in Alaska had "no direct impact on the Guam trade" and that APL's

"pricing [in Guam] didn't get affected directly."  DSJ 15 (APL 30(b)(6) Dep.) at 322:20–323:14.

He further stated that Matson's termination of APL's Alaska leases did not affect APL's Guam

prices or its carrying capacity to Guam.  Id. at 324:18–325:5.  And he acknowledged that

Matson's decision to eject APL from certain terminals in Alaska did not affect Guam pricing

either, or cause any of APL's customers to stop shipping with APL.  Id. at 325:14–326:6.  That

testimony "is a sworn corporate admission that is binding on the corporation."  United States ex

rel. Fargo v. M&T Mort. Corp., 235 F.R.D. 11, 24 (D.D.C. 2006).

    APL primarily relies on statements made by Matson employees to draw a connection

between Alaska and Guam.  See PSUF ¶¶ 261–65.  For example, APL's former president

testified at his deposition that when he raised Matson's behavior in Alaska with Matson's CEO,

he responded that "it all begins and ends with Guam."  PSUF ¶ 262.  Matson's chief commercial

officer similarly testified that Matson's actions in Alaska were due to, among other things, an

"intensifying level of competition in various parts of the world," including Guam.  PSUF ¶ 264.

    That evidence, however, does not prove that Matson's conduct in Alaska harmed

competition in Guam.  As an initial matter, those quotes most obviously suggest that Guam

affected Alaska, not the other way around.  But even when viewed in the light most favorable to

APL, the quotes at best suggest that Matson *intended* to harm APL in Guam through its Alaska

conduct.  Intent alone, however, is not enough to incur antitrust liability.  Microsoft, 253 F.3d at

59.  As the Tenth Circuit has put it, "[w]ere intent to harm a competitor alone the marker of

antitrust liability, the law would risk retarding consumer welfare by deterring vigorous

competition[.]"  Novell, 731 F.3d at 1078.  To be sure, courts may consider intent "to the extent

36

it helps . . . understand the likely effect of the monopolist's conduct." <u>Microsoft</u>, 253 F.3d at 59. But without any evidence of how Matson's Alaska conduct actually harmed competition in Guam, there is no effect to understand. As a result, APL cannot use this Guam-focused lawsuit to recover any damages it may have suffered because of Matson's Alaska conduct.

As APL points out, courts have permitted plaintiffs to recover out-of-market damages when the defendant's conduct in one market harms competition in another. <u>See</u> <u>SC Innovations, Inc. v. Uber Techs, Inc.</u>, No. 18-cv-7440-JCS, 2021 WL 2302728, at *1 (N.D. Cal. May 11, 2021) ("[A]t least one court has allowed damages outside the relevant product market, so long as a plaintiff establishes cognizable injury within the relevant market and the additional out-of-market damages are a consequence of that injury.") (citing <u>Bonjorno v. Kaiser Aluminum & Chem. Corp.</u>, 752 F.2d 802, 814 (3d Cir. 1984)); <u>O.E.M. Glass Network, Inc. v. Mygrant Glass Co.</u>, No. 19-cv-742 (NGG) (LB), 2023 WL 2563689, at *22–23 (E.D.N.Y. Mar. 17, 2023) (agreeing with <u>SC Innovations</u>). That rule makes sense because "[a] party harmed inside the relevant market may also operate elsewhere and the anticompetitive effects inflicted in the relevant market may impact the party's operations outside of that market." <u>O.E.M. Glass Network</u>, 2023 WL 2563689, at *23. Applying that rule here, APL potentially could recover damages it suffered in Alaska if it were able to show that Matson's conduct in Guam spilled over to Alaska and harmed APL there. But APL is pressing a very different theory of the case here. APL's theory is not that Matson's Guam conduct spilled over to Alaska, but that APL's own conduct in Guam caused Matson to take further actions against APL in Alaska. APL identifies no case that supports that attenuated theory of liability.

Second, Matson's alleged Alaska conduct is not anticompetitive. Matson's cessation of cooperation with APL, its competitor, falls under the Supreme Court's refusal-to-deal caselaw.

See linkLine, 555 U.S. at 449; Chase Mfg., 184 F.4th at 1173. Such refusal is actionable only

when the defendant is a monopolist in the relevant market. linkLine, 555 U.S. at 448; see

Microsoft, 253 F.3d at 50 (requiring a Section 2 plaintiff to demonstrate the defendant possesses

"monopoly power in the relevant market"). Here, however, APL does not even allege an

independent Alaska market, let alone that Matson is a monopolist within that market.

Even if Matson were a monopolist in Alaska, APL still has not shown that Matson's

Alaska conduct is anticompetitive. "[A]s a general matter, the Sherman Act does not restrict the

long recognized right of a trader or manufacturer engaged in an entirely private business, freely

to exercise his own independent discretion as to parties with whom he will deal." Verizon

Commc'ns, Inc. v. Curtis V. Trinko, LLP, 540 U.S. 398, 408 (2004) (cleaned up). That right

means that a monopolist may refuse to cooperate with a rival for whatever reason it sees fit, even

when it "wants to prevent that rival from competing with it." Facebook, 549 F. Supp. 3d at 24;

see id. (collecting authorities). Accordingly, Matson had no duty to cooperate with its

competitor in Alaska unless APL can identify some exception to Matson's right not to deal.

APL identifies no such exceptions in its summary judgment briefing. It argues instead

that (1) the refusal-to-deal framework does not apply and (2) Matson's procompetitive

justifications for its actions are pretextual. APL MSJ at 42–43. Neither argument floats.

To begin, courts have long employed the refusal-to-deal framework in cases where the

defendant allegedly stopped providing services to, or sharing resources with, the plaintiff. For

example, in Trinko, the Supreme Court applied that framework to Verizon's refusal to provide

support services to its rivals to enable them to connect to Verizon's network. 540 U.S. at 410.

The Tenth Circuit later applied Trinko to allegations that Microsoft had unlawfully ceased

sharing parts of its Windows operating system with companies developing applications that

competed with Microsoft applications. Novell, 731 F.3d at 1068, 1079. Matson's alleged Alaska conduct fits the mold of these two cases. APL is Matson's competitor. Like the plaintiff in Trinko, APL is complaining that a competitor refused to provide it certain services—*i.e.*, transporting cargo or leasing terminal and office space. And like the plaintiff in Novell, APL is also alleging that a competitor refused to share resources with it—*i.e.*, spare parts and a tugboat. As a result, the refusal-to-deal cases apply squarely to Matson's Alaska conduct and thus require APL to identify an exception to the general rule that competitors are not obligated to do business with their rivals.

Unfortunately for APL, the Supreme Court has recognized just one exception to this rule—and it does not apply here. In Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985), the defendant owned three of four ski resorts in Aspen, Colorado, and the plaintiff owned the fourth. Id. at 589–91. For decades, the companies jointly offered customers an all-access pass to all four resorts. Id. The defendant ended the arrangement and did all it could to block the plaintiff from recreating the pass. Id. at 592–93. For example, the plaintiff offered to buy its customers tickets for the defendant's resorts, only for the defendant to refuse to sell tickets to the plaintiff. Id. at 593–94. Based on these facts, the Supreme Court concluded that a jury could find that the defendant "was not motivated by efficiency concerns and . . . was [instead] willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." Id. at 610–11. The plaintiff's monopolization claim was therefore allowed to proceed.

"Aspen Skiing is at or near the outer boundary of § 2 liability," Trinko, 540 U.S. at 409, leaving open only a "narrow-eyed needle" for plaintiffs to thread. Novell, 731 F.3d at 1074; Facebook, 549 F. Supp. 3d at 26. Courts apply a three-step test when evaluating an Aspen

Skiing claim. First, the plaintiff must demonstrate the monopolist and its rival had a "voluntary (and thus presumably profitable) course of dealing[.]" Trinko, 540 U.S. at 409; Novell, 731 F.3d at 1074; Facebook, 549 F. Supp. 3d at 24. Second, the plaintiff must show that "the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers." Qualcomm; 968 F.3d at 994; Facebook, 549 F. Supp. 3d at 24. And third, the plaintiff must show that the monopolist's refusal to deal "suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end." Trinko, 540 U.S. at 409.

Even assuming *arguendo* that APL has met the first two requirements, it is high and dry at the third. This last step is "demanding[.]" Facebook, 560 F. Supp. 3d at 24. A plaintiff must demonstrate that "the [monopolist's] *only* conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." Aerotec Int'l, Inc. v. Honeywell Int'l, Inc., 836 F.3d 1171, 1184 (9th Cir. 2016) (quotation marks omitted, emphasis added); accord Novell, 731 F.3d at 1076 (requiring that "the monopolist's conduct must be irrational but for its anticompetitive effect"); Areeda & Hovenkamp ¶ 772d3 ("[T]he refusal [to deal] must be 'irrational' in the sense that the defendant sacrificed an opportunity to make a profitable sale only because of the adverse impact the refusal would have on a rival.").

Matson executives provided deposition testimony indicating that the company refused to deal with APL in Alaska for procompetitive reasons. Several explained that Matson terminated or declined to renew its agreements with APL and stomached the associated losses because it intended to launch an Alaskan shipping service that competed with APL's and needed the facilities it had previously leased to APL for its own purposes. Matson MSJ at 33–34; see DSJ 33 (Lauer Dep.) at 146:9–21 (testifying that renewing an agreement with APL would have been

"incompatible" with Matson's new service); DSJ 28 (Cox Dep.) at 54:23–55:8 ("We were planning on . . . launching our own international service in competition with . . . APL[.]"); <u>see also</u> DSJ 11 (Matson 30(b)(6) Dep.) at 193:12–20 (testifying Matson ended a lease with APL because "our terminal is very congested" and Matson "subsequently used this much-needed space for other operations"). Matson ultimately launched that service in 2020. DSJ 33 (Lauer Dep.) at 147:7–10. One executive also explained that it ended the tug-sharing arrangement due to an incident where APL's tug was unavailable to help Matson dock a ship, creating safety issues. DSJ 28 (Cox Dep.) at 69:6–78:9.

In light of Matson's evidence, the burden shifts to APL to produce evidence disputing those justifications. It has not done so. Instead, APL argues that Matson produced no contemporaneous evidence documenting the justifications offered in discovery. APL MSJ at 43–44. That may be so, but it does not change the fact that there is no evidence in the record contradicting Matson's justifications. The only record evidence instead reveals that, regardless of whether Matson documented its thinking at the time, Matson did in fact (1) launch a competing shipping service and (2) stop the tug-sharing arrangement after a safety incident. On that record, no reasonable jury could conclude that "the only conceivable rationale" for Matson's Alaska conduct was to exclude APL from the Guam market.

Finally, while <u>Trinko</u> left a door open to recognizing other exceptions to a monopolist's right to refuse to deal, <u>see</u> 540 U.S. at 408, APL does not argue for a new exception. And the Court will not create one. <u>See id.</u> (The Supreme Court "ha[s] been very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm.").

Because APL has not produced evidence that Matson's Alaska conduct adversely affected competition in Guam or demonstrated that Matson's conduct fits the narrow <u>Aspen Skiing</u> exception, the Court will deny APL summary judgment and grant Matson summary judgment as to APL's Alaska-related allegations.

iii.  MSP-related comments

Next, APL accuses Matson of unfairly telling customers that APL depends on MSP subsidies to compete in the Guam market and that APL would soon be leaving the market following the end of the subsidies.  Matson's implicit message, APL says, was that customers should not do business with APL, lest they face adverse consequences down the line.  APL claims this messaging strategy discouraged shipping customers from doing business with APL. This attack sails off course in several respects.

For starters, much of the evidence supporting these allegations runs into a familiar obstacle: the hearsay rule.  Specifically, APL's evidence that Matson told customers APL would soon be leaving the market consists primarily of deposition testimony from current or former APL employees.  Those employees testified that APL customers told them that Matson employees had predicted APL's imminent departure from the market.  <u>See</u>, <u>e.g.</u>, DSJ 45 (Theberge Dep.) at 54:24–25 ("Matson told [customers], you better be careful if APL leaves the market."); DSJ 46 (Hermosa Dep.) at 137:3–16, 138:18–141:7 (testifying that customers told him that Matson employees were "making comments in the marketplace about APL leaving" and how "it was just a matter of time before APL would leave the market").  The APL employees did not personally witness any Matson employees making the remarks reported by the customers. DSJ 45 (Theberge Dep.) at 47:14–16 ("Customers shared the information" with APL.); DSJ 46 (Hermosa Dep.) at 139:1–3 ("I was advised that [Matson] salespeople were making comments in

the marketplace about APL leaving."); <u>id.</u> at 140:2–5 (testifying that he did not "ever personally witness a salesperson from Matson making a comment in the marketplace about APL leaving").

For the reasons discussed previously, customers' purported statements to APL are inadmissible to show that Matson employees said that APL would be leaving the market soon. That evidence therefore "counts for nothing," <u>Gleklen</u>, 199 F.3d at 1369, leaving APL's allegations based on those statements bereft of evidentiary support.

APL does offer some internal Matson communications documenting Matson's messaging strategy around MSP subsidies. For example, Matson executives wrote in an email chain that their "message" to customers was that "[i]t is not fair for one carrier to receive a subsidy from the U.S. Government to compete with other carriers that do not receive any subsidy," and that Matson is "request[ing] a level playing field." PSJ 18. Matson higher-ups instructed their sales teams to deliver that message to customers. <u>See</u> PSUF ¶¶ 324–25. A Matson manager also sent a text message to employees that read: "The governor says something really stupid that APL needs the subsidy in order to call Guam. You guys can use that statement and develop good arguments with your customers." PSJ 120; DSJ 14 (Santos Dep.) at 146:21–147:22.

But those communications, while not hearsay when offered by APL, are not enough for a reasonable jury to infer that Matson's MSP-related messaging was anticompetitive. The D.C. Circuit applies a four-step test to determine whether conduct is anticompetitive. At step one, the Court must consider whether the monopolist's conduct causes harm to the competitive process, rather than harm to a competitor. <u>Microsoft</u>, 253 F.3d at 58. At step two, the plaintiff must demonstrate that the conduct had the requisite effect. <u>Id.</u> at 58–59. At step three, the defendant must produce a procompetitive justification—"a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or

enhanced consumer appeal[.]"  Id. at 59.  And finally, the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit.  Id.

APL's MSP subsidy allegations falter at the first step.  At most, a jury could infer that Matson made statements in the market about the subsidies that, combined with Matson's campaign to eliminate those subsidies, made customers wary of doing business with APL.  But any such wariness is an injury to a competitor, not an injury to competition that the Sherman Act was intended to prevent.  As the Ninth Circuit has colorfully put it, "[c]ompetitors are not required to engage in a lovefest[.]"  Honeywell, 836 F.3d at 1184; see Abcor Corp. v. AM Int'l, Inc., 916 F.2d 924, 927 (4th Cir. 1990) ("A desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not sufficient" for antitrust liability.).  As a result, a firm does not injure the competitive process simply by trying to dissuade customers from buying from its competitors.  After all, firms routinely compete on the merits by criticizing their competitors.  Matson's MSP messaging strategy falls well within that time-honored practice.  It is not anticompetitive to point out that a competitor's presence in the market rests on uncertain footing, or that the competitor depends on subsidies that another competitor deems unfair.  See U.S. Football League v. NFL, 634 F. Supp. 1155, 1183 (S.D.N.Y. 1986) ("[T]he mere dissemination of unflattering opinion or information about a competitor, unaccompanied by misstatements of fact, simply does not amount to a violation of the antitrust laws.").

To be sure, false statements about a competitor can be anticompetitive.  See Walgreen Co. v. AstraZeneca Pharms. L.P., 534 F. Supp. 2d 146, 152 (D.D.C. 2008).  Courts generally do not impose antitrust liability for such statements, however, and presume them to be harmless.  See Areeda & Hovenkamp ¶ 782d ("We would . . . suggest that such claims [for disparagement]

should presumably be ignored."); Walgreen, 534 F. Supp. 2d at 152 (same). And here, a reasonable jury could not find Matson's statements about the MSP program false. Matson's description of APL's MSP subsidies as "unfair" is an opinion. And APL itself has repeatedly acknowledged that it needs MSP payments to keep serving Guam. DSUF ¶ 204. For example, in an email to a senior military officer, APL's President and CEO wrote that "if we don't have MSP to Guam we will not be able to service it and [APL's] 2 ships will be moved out of the Pacific." DSJ 446. APL's president reiterated the point in a declaration filed in a lawsuit brought by Matson challenging APL's participation in the MSP: "APL's service in the Guam-Pacific trade is only viable with MSP payments. Discontinuation of [MSP] payments to [APL] . . . would thus force APL to potentially suspend or discontinue its service[.]" Decl. of Eric L. Mensing, Matson v. Dep't of Transp., No. 18-cv-2751 (RDM) (D.D.C. filed June 5, 2020), ECF 43-1.

In short, Matson was well within safe harbors to opine to customers that APL needed MSP subsidies to continue serving Guam and that they might soon end—due in no small part to Matson's active litigation and lobbying efforts. Matson is therefore entitled to summary judgment on APL's claims in this area.

### iv. Household Goods Loyalty Program

APL tries to right the ship by next challenging Matson's loyalty program for shippers of household goods (HHG) as a form of predatory conduct. APL has been somewhat imprecise as to how this challenge should be framed under the antitrust laws. At the motion-to-dismiss stage, the Court considered the program as de facto exclusive dealing but gave APL leeway to pitch it as an anticompetitive bundle, tie, or leveraging arrangement. MTD Op. at 21–24, 25 n.12. In its present briefing, APL explicitly rejects "a leveraging cause of action." APL MSJ at 46 n.32.

Accordingly, the Court will evaluate the HHG loyalty program under exclusive dealing, tying, and bundling theories.

First, some factual background:  Matson piloted its HHG loyalty program in 2016 to compete with the Pasha Group—its main competitor on routes between the mainland United States and Hawaii—for customers who were shipping household goods on those routes.  DSUF ¶ 133.  Under this initial program, Matson offered customers who shipped 90% of their Hawaii HHG cargo with Matson a 15% discount on that cargo.  Id.  In 2018, Matson expanded the loyalty program following APL's entry into the Guam market.  Id. ¶ 134.  It began offering a 20% discount to customers who shipped 90% of *either* their Hawaii or Guam HHG cargo with Matson and a 25% discount to customers who shipped 90% of *both* their Hawaii and Guam HHG cargo with Matson.  See DSJ 403 (Matson 2018 HHG Loyalty Program Announcement).

Matson's HHG loyalty program has no term, nor is it mandatory; customers may decline to participate but still ship with Matson at published tariff rates.  See id.  Customers who choose to participate but do not meet the requisite volume requirement simply will not receive the discount.  DSJ 33 (Lauer Dep.) at 24:6–25:12; see also DSUF ¶ 137.  Matson's Chief Operating Officer testified in his deposition that Matson had "no mechanism to . . . know" whether a customer is actually shipping 90% of their cargo with Matson and that, with the exception of losing eligibility for the discount, customers who do not meet the volume requirement face no penalty.  DSJ 33 (Lauer Dep.) at 16:1–10.

APL's original theory was that this program—by requiring participants to commit 90% of their cargo shipments to Matson to receive the discount—constitutes anticompetitive exclusive dealing.  An exclusive-dealing theory is viable even though the challenged arrangement requires less than 100% commitment, so long as its "practical effect" is to prevent customers from

dealing with the plaintiff.  Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 324 (1961); see also ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 284 (3d Cir. 2012) (allowing exclusive dealing claim "although no agreement was completely exclusive," because "the foreclosure that resulted was no different than it would be in a market with many customers where a dominant supplier enters into complete exclusive dealing arrangements with 90% of the customer base").

Still, an exclusive-dealing arrangement violates the Sherman Act only if "the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected."  Tampa Elec., 365 U.S. at 327.  While the caselaw is imprecise as to the degree of foreclosure required, the range falls somewhere between 30% and 50%, with less foreclosure necessary when the defendant is a monopolist.  See Microsoft, 253 F.3d at 70 ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation.").  As previously noted, less than 30% foreclosure is "presumptively harmless."  Areeda & Hovenkamp ¶ 1821c.

The parties agree that Matson's HHG loyalty program has not substantially foreclosed APL from the entire U.S.-Guam cargo market.  Matson presents undisputed evidence that the HHG segment makes up only 4% of the U.S.-Guam market, and "[c]ustomers who ship household goods with Matson to both Guam and Hawaii were responsible for only 1.3% of all U.S. West Coast to Guam commerce between 2018 and 2022."   DSUF ¶¶ 127, 136; see also DSJ 399 (Matson's expert's workpaper showing that, of the 160,070 containers APL and Matson transported from the United States to Guam between 2016 and 2022, only 6,396 carried HHG cargo); APL Resp. to DSUF ¶¶ 127, 136 (challenging Matson's figures without offering any alternatives of its own); DSJ 411 (Rebuttal Report of Dr. Frederick Warren-Boulton (WB

47

Rebuttal Rpt.)) ¶ 127 (stating only what percentage of *APL sales* HHG shipments comprised). Accordingly, "Matson's HHG Loyalty Program's cross-trade discounts affected (and thus theoretically foreclosed) at most 1.3% of APL's alleged market." DSUF ¶ 136; APL MSJ at 48 (appearing to concede that 1.3% is the appropriate foreclosure figure if the market consists of all containers between the United States and Guam). And, given the HHG segment's small share of the overall market, APL's own expert admits that the program could not possibly foreclose APL from the U.S.-Guam market. WB Rebuttal Rpt. ¶ 127 ("[N]o one is arguing that the loyalty program excluded APL from so much of the total Guam market as to make its continued participation in the market problematic . . . no one has suggested or would seriously propose that Matson's HHG bundle program could be sufficient to actually drive APL out of the entire market for shipments from the USWC to Guam."). All of this is fatal to APL's attempt to rest its Section 2 claim on Matson's loyalty program.

Unable to show substantial foreclosure of its proposed market, APL takes a different tack: It asserts that the proper question is whether the loyalty program substantially foreclosed APL from the "HHG submarket" of "Hawaii/Guam shippers." APL MSJ at 48. But the law does not support this approach. Even if the program substantially foreclosed such a submarket, that would not be enough to prove an illegal monopoly in the broader U.S.-Guam cargo market that APL identifies as the relevant one in this case. See Areeda & Hovenkamp ¶ 533 ("[T]he 'market' for antitrust purposes is the *one* relevant to the legal issue at hand."). At most, it might support a monopoly claim in that submarket. But APL has not even proven substantial foreclosure of the alleged HHG submarket.

APL asserts that Matson's loyalty program has "foreclosed [it] from about 90% of the Hawaii/Guam shippers in the HHG submarket." E.g., APL MSJ at 48. Yet it provides no actual

evidence to support this statistic; instead, APL reasons that it is "cabin[ed]" into 10% of the Guam household goods submarket because the structure of the loyalty program requires participants to ship 90% of their cargo with Matson.  See PSUF ¶ 299.  But the fact that those customers who *choose* to participate in the loyalty program would need to ship 90% of their cargo with Matson to get the discount says nothing about what percent of the "HHG submarket" of "Hawaii/Guam shippers" has actually opted into that program.

APL baldly maintains that "nearly all HHG shippers to both Hawaii and Guam do substantially all their Guam business with Matson."  APL MSJ at 47.  But nothing in the record substantiates that assertion.  What evidence there is shows that 46 shippers opted into the program for both Guam and Hawaii, and, of these 46 shippers, 27 used Matson exclusively. Matson Reply at 22; WB Rebuttal Rpt. ¶ 125.  Of the remaining 19 customers who opted into the program for Guam and Hawaii, APL's expert found that 18 used Matson for at least 75% of their Guam shipments.  WB Rebuttal Rpt. ¶ 125.  But APL does not explain how these numbers add up to substantial foreclosure of its purported Hawaii/Guam HHG submarket.  It has not indicated the total number of shippers in the Hawaii/Guam HHG submarket.  It therefore cannot show what percentage of the market the 46 participants in the program represent.  And even if those 46 shippers represented 90% of the market, as APL appears to suggest, it obviously was not foreclosed from competing for the 18 program participants that used Matson for as little as 75% of their business.  Cf. Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP, 592 F.3d 991, 996–97 (9th Cir. 2010) (concluding that the market-share discounts and sole-source agreements at issue were not exclusive dealing because they "did not contractually obligate . . . customers to purchase anything" but "provided only for substantial discounts to customers that actually purchased a high percentage" of their requirements from the defendant).  Therefore,

Matson's household goods program cannot support an exclusive dealing theory of anticompetitive conduct, even in the small HHG submarket that APL identifies.

Nor can it serve as the basis for a tying or bundling claim. APL repeatedly charges that Matson "tied" its Hawaii service to its Guam service by "launching a market share discount that 'bundled' Hawaii/Guam cargo to foreclose market segments of the Guam market." APL MSJ at 1. The gist of this argument is that the loyalty program is per se anticompetitive because it exploits Matson's market power in the larger U.S.-Hawaii market (the tying market) to explicitly or effectively require shippers to use Matson's services in the smaller U.S.-Guam market (the tied market).

The D.C. Circuit has identified four elements of a per se tying violation: "(1) [T]he tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a substantial volume of commerce." Microsoft, 253 F.3d at 85. Matson's HHG loyalty program most obviously fails the third element because APL has not offered evidence that consumers who opted into the Hawaii loyalty program had "no choice but to" ship with Matson to Guam. Id. To the contrary, it was voluntary. At best for APL, the loyalty program made shipping to Guam with Matson the financially wise decision for customers who also shipped to Hawaii.

As a result, it is more appropriate to analyze this program as a bundled discount, rather than an explicit tie. But that framing does not get APL far. For a bundle to be anticompetitive, it must substantially foreclose the relevant market. See LePage's Inc v. 3M, 324 F.3d 141, 155 (3d Cir. 2003) ("The principal anticompetitive effect of bundled rebates . . . is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not

manufacture an equally diverse group of products and who therefore cannot make a comparable offer."). APL thus encounters the same headwinds in proving substantial foreclosure as it did in the exclusive-dealing context. The U.S.-Guam household good shipments make up only 4% of the relevant market. See DSUF ¶¶ 127, 136; DSJ 399. So even if the loyalty program foreclosed APL from competing for customers in that submarket, the foreclosure was nowhere near "substantial."[6]

Accordingly, under any of these three theories, APL has failed to provide evidence from which a jury could infer that Matson's HHG loyalty program was anticompetitive.

### v.   Customer Agreements

Next up, APL challenges Matson's alleged "pursuit of restrictive agreements . . . to lock in key shippers in response to APL's entry." APL MSJ at 36. In APL's telling, these agreements are a "predatory and exclusionary means for a dominant firm to block a Guam entrant." Id. APL does not specify how to categorize the agreements at issue. It states only that they should not be judged under the "rigid exclusive dealing cause of action elements" because Microsoft instructed courts to focus more broadly on the "competitive impact of the agreements, considering their importance in the markets." APL MSJ at 49. And it reasons that "[t]he key customers Matson targeted and locked in—large retailers with consistent cargo moves—are the 'anchor' accounts APL sought with importance greater than their market share in a low growth Guam market." Id. at 49 (citing PSUF ¶¶ 310–15).

---

[6] Matson further asserts that a plaintiff seeking to establish an anticompetitive bundling claim must show that lower prices resulting from the challenged arrangement are below the defendant's costs. At least one circuit court has rejected this proposition. See LePage's, 324 F.3d at 152 (holding that Supreme Court precedent did not "adopt[] the proposition that a monopolist does not violate § 2 unless it sells below cost"). Regardless, the Court need not reach this issue because APL has not shown substantial foreclosure.

As background, Guam is a "tariff trade," which means that companies offering shipping services to Guam generally post their prices, or rates, in publicly filed tariffs. DSUF ¶ 83; PSUF ¶ 303. That rate is the "list price for shipping a container of a particular commodity from a given origin to a destination." WB Rpt. ¶ 125. But carriers can also enter into memoranda of understanding (MOUs) with customers that offer negotiated rates. See DSUF ¶ 92. Both Matson and APL have these MOUs with their Guam customers. Some of the MOUs provide for a discounted rate, or a tariff rate with a rebate paid to the customer, in exchange for the customer hitting certain volume thresholds over a designated period. Id.

During discovery, Matson produced a list of 37 MOUs with 28 different customers between the years of 2013 and 2022. WB Rpt., Ex. 6; DSUF ¶¶ 110–11. Matson disputes whether one of these MOUs (with the retailer Pay-Less) was ever finalized, but the parties agree that at least 36 of the MOUs were effective.[7] See WB Rpt., Ex. 6. APL focuses on ten agreements that covered Guam and were in effect when it entered the market in 2015 or formed after its entry. See id.; Oral Arg. Tr. at 47–48; APL Resp. to DSUF ¶ 108. These agreements were with retailers 3M, Cost.U.Less, Haworth, Home Depot, Macy's, Office Depot, Pay-Less, PVH, Ross Stores, and Xerox. WB Rpt., Ex. 6. The Pay-Less and PVH agreements applied only to Guam, while the rest covered Guam and Hawaii. Id.

---

[7] APL argues that these MOUs are not exhaustive because Matson did not produce others reflected in an internal list of contracts provided in discovery. PSUF ¶ 322 (first citing PSJ 163; and then citing PSJ 144). Matson responds that APL "points to a list of *targets*, not, as APL asserts, a catalogue of 'MOUs in effect.'" Matson Reply at 25. Regardless, APL has neither moved to compel production of these purportedly missing MOUs nor alleged that their omission supports an adverse inference as to their existence or content. As a result, it has not introduced contradictory evidence of other MOUs.

As for specific content, several of these MOUs had exclusivity requirements. DSJ 362 (committing Macy's to ship 100% of its ocean cargo to Guam and Hawaii via Matson from 2/1/2015 to 1/31/2018); DSJ 363 (committing Office Depot to "route all shipments to Hawaii" and "all shipments to Guam" via Matson from 1/5/2014 to 12/31/2016). Some were not exclusive but still required significant volume commitments expressed in terms of percentage shares of the shipper's business. DSJ 359, 360 (requiring Home Depot to ship 70% of Hawaii cargo and 94% of Guam cargo during an 18-month period). Others had volume discounts based on a minimum number of containers, rather than a percentage of cargo. DSJ 361 (enabling Cost-U-Less to receive a dollar incentive per container based on annual shipping volume from 4/1/2020 to 3/31/2023).

APL contends, based on the opinion of its expert Dr. Warren-Boulton, that these ten relevant MOUs were exclusionary because—when viewed alongside the effects of Matson's HHG loyalty program and retaliatory threats against shippers—they foreclosed APL from competing in 29% of the U.S.-Guam market. APL MSJ at 28. This contention founders on multiple shoals.

For starters, the 29% percent figure is outside the summary judgment record. APL offered the figure for the first time in a belated declaration from Dr. Warren-Boulton. See id. (citing ECF 146, Ex. A (WB Decl.)). As discussed below, the Court will grant Matson's motion to strike that and other new opinions offered in the declaration as untimely. See infra Part III.B.2.a. With no other record evidence to support the 29% foreclosure figure, APL cannot rely on it to overcome summary judgment.

Even if the figure were properly before the Court, the Court would discount it because it aggregates the alleged effects of other aspects of Matson's conduct that the Court has found not

to be anticompetitive or exclusionary, as explained above.  See supra Part III.A.2.a.  Any foreclosure owing to the MOUs would have to stand on its own.

Finally, Dr. Warren-Boulton's foreclosure estimate is inflated when assessed relative to the entire U.S.-Guam market.  APL's proposed market includes military and other government cargo.  See WB Rpt. ¶¶ 8, 10; Oral Arg. Tr. 45–47.  But Dr. Warren-Boulton's 29% foreclosure estimate admittedly excludes government customers from the market.  Oral Arg. Tr. 47.  If government shipping volume is added to the denominator of the foreclosure ratio, the percentage of the market impacted by the MOUs, loyalty program, and threats—none of which are alleged to implicate government customers—necessarily falls.  Based on the Court's math, if government cargo comprises about 10% to 20% of the overall market, as the parties represented at oral argument, then Dr. Warren-Boulton's foreclosure figure would drop to somewhere between 23% and 26% of the total market.  Oral Arg. Tr. 20–21, 40–41.  That is well below the 30% threshold courts have established for presumptively harmless foreclosure.[8]  Accordingly, APL's foreclosure estimate cannot support a finding that Matson engaged in anticompetitive conduct even if the Court were to consider it.

APL launches other lines of attack on the MOUs as well.  It gestures at a tying or bundling theory by suggesting that the MOUs were part of Matson's strategy of "conditioning its Hawaii service, or Guam shippers' 'must have' cargo, on shipping with Matson to Guam."  APL MSJ at 48.  But it does not point to any specific MOUs that, by their terms, conditioned an agreement for shipments to Hawaii on an agreement for shipments to Guam.  Nor does APL

---

[8] APL's 29% figure is obviously below the 30% threshold as well.  Yet the Court hesitates to conclude that such a near miss could never constitute substantial foreclosure under any circumstances.

draw an explicit connection between the MOUs and Matson's HHG loyalty program, *i.e.*, to suggest that a shipper agreed to an MOU as part of its participation in the loyalty program.

APL also repeatedly contends that the agreements "locked in" key shippers, e.g., APL MSJ at 50, but the evidence suggests the opposite: None of these agreements prevented customers from considering other options. See, e.g., DSJ 364 (pre-APL-entry MOU with Ross Stores that was terminable upon 30 days' prior notice); DSJ 387 (Declaration of Mark Negri, Macy's Director of Transportation) ("In the shipping context, Macy's does not and would not lock itself into a longterm exclusive agreement that forecloses alternative options, especially those at 'substantially lower rates.'"). In fact, APL itself entered into several two- to three-term contracts with Guam shippers—including some of the same shippers that had MOUs with Matson, like Cost-U-Less. DSJ 41 (Deposition of Daniel Stefanik, APL's Pricing Manager for Guam) at 267, 288:8–20 (testifying that APL had MOUs with discounts with Dewitt and Capstone Coleman); WB Rpt. ¶ 152 n.157 (Cost-U-Less).

Nor were the MOUs the sole reason why some shippers continued to do business with Matson. See DSJ 394 (internal Home Depot documents from January 2017 noting that "[t]he new service via APL has a 7 day longer transit time . . . versus Matson's Hawaii to Guam service, but is a ~40% reduction in rates over existing service . . . [and] [d]ue to the new service and extended lead time, only 10% of the Guam volume will be awarded to APL").

In sum, APL has failed to provide evidence that Matson's MOUs with Guam customers substantially foreclosed APL from accessing the market or caused other anticompetitive harm. Therefore, it has not created a genuine issue of material fact as to whether Matson engaged in exclusionary conduct by entering into the challenged MOUs.

vi.  Slot-Charter Proposals

Finally, APL challenges Matson's proposed "slot-charter" agreements as an attempt to force APL out of the U.S.-Guam cargo market.  APL MSJ at 44–46.  As explained more fully below, Matson on several occasions offered APL space for its cargo on Matson's ships bound for Guam.  APL says these proposals were a disguised attempt to choke it out of the market.  Matson and APL never reached a slot-charter agreement, so this allegation is only relevant in the context of APL's attempted-monopolization claim, a point APL effectively concedes.  See APL MSJ at 46 (citing only attempt-to-monopolize cases in support of the proposition that unconsummated proposals can be predatory).  As a result, the Court will consider Matson's slot-charter proposals solely in that context.

* * *

APL alleged six anticompetitive practices but failed to offer sufficient admissible evidence that any was exclusionary or caused harm to competition.  Because APL has not created a genuine issue of material fact regarding anticompetitive conduct, Matson is entitled to summary judgment on APL's monopolization claim.

3.  *Attempted Monopolization*

Voyaging on to APL's attempted-monopolization claim, APL must show that Matson "(1) engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize." Microsoft, 253 F.3d at 80 (quoting Spectrum Sports, Inc., 506 U.S. at 456).

a.  Anticompetitive Conduct

The anticompetitive conduct alleged to support APL's attempted-monopolization claim is largely the same as that alleged for its monopolization claim, see APL MSJ at 51, so the claim runs aground for the same reasons.  The one additional form of potentially anticompetitive

conduct under this claim is Matson's various slot-charter proposals.  Under a slot-charter

agreement, one shipping company purchases cargo space (or "slots") on another carrier's vessel.

At issue here are three offers Matson made to APL for slots on Matson's ships from the U.S.

west coast to Guam.  First, in April 2017, Matson proposed a 90-day agreement for 90 weekly

slots.  DSJ 463.  This agreement would be subject to renewal at any time and could be cancelled

on 30 days' notice.  Id.  It capped the number of slots from certain ports (*e.g.*, a maximum of 60

from Los Angeles).  Id.  Next, in October 2018, Matson offered APL a three-year contract for

175 weekly slots, also with the number of slots from some ports capped.  DSJ 473.  One hundred

twenty-five of these slots would be "take or pay," meaning if APL did not end up using the slot,

it still would have to pay a fee.  Id. at 4.  Matson made a final offer in November 2019: 150

weekly westbound slots for a five-year term, with one year's notice of non-renewal by either

party.  DSJ 474.

  On Matson's telling, these proposals were part of an extensive back-and-forth negotiation

with a keenly interested APL about the possibility of cooperation in Guam.  DSUF ¶¶ 255–85.

APL, by contrast, paints the discussions as a concerted campaign by Matson to "cap and control

APL" and force the "withdrawal of APL's vessels and it[s] service."  APL MSJ at 44.

  APL does not identify any legal authority holding that slot proposals are inherently

anticompetitive.  Indeed, Rodolph Saade, the Chairman and Chief Executive Officer of CMA

CGM, the global shipping and logistics conglomerate that owns APL, testified at his deposition

that CMA CGM had "around 50 to 75" slot-charter agreements with other shipping lines.  DSJ

71 at 15:5–6.  Saade explained such arrangements could be "beneficial" because they allow

carriers "to deploy bigger ships to benefit from economics and offer a better service to

customers."  Id. at 27:6–9.  And he acknowledged having been "interested in reaching an

agreement" with Matson.  Id. at 33:1–3.  These admissions, and CMA CGA's considerable use of slot-charter agreements itself, strongly suggest they are not anticompetitive in the normal course.

APL nevertheless characterizes Matson's specific proposals as "ridiculous" because of their volume caps and lengths, as well as the costs they would impose (particularly via the take-or-pay provision in the second proposal).  PSUF ¶ 275.  These features, APL says, indicate that the actual purpose behind the proposals was to force APL out of Guam.  But APL's only "proof" of this intent are opinions expressed in deposition testimony by Ed Aldridge, the former president of CMA CGM North America and APL North America, who was APL's point of contact for these proposals.  See PSUF ¶¶ 269–87 (quoting DSJ 86).  Nothing in the agreements themselves—or any other record evidence—reveals such an intent.  To the contrary, the offers look like commercial arrangements APL felt free to take or leave.  Indeed, APL never got on board.

APL maintains that "unconsummated proposals" can still be predatory.  APL MSJ at 45–46.  True, a defendant's offer to "form[] . . . [a] cartel[]" violates section 2 "when the unlawful scheme[] [is] proposed" to "deter the formation of monopolies at their outset."  United States v. Am. Airlines, Inc., 743 F.2d 1114, 1122 (5th Cir. 1984).  But at least one court has concluded that "a mere offer to enter into a business deal—absent something more, like a threat that might affect the offeree's conduct—does not amount to anticompetitive conduct."  3Shape Trios A/S v. Align Tech., Inc., No. 18-cv-1332-LPS, 2019 WL 3824209, at *6 (D. Del. Aug. 15, 2019).  The Court has rejected APL's threats arguments.  As a result, APL has not provided actual evidence from which a jury could infer that Matson tried to improperly coerce it into accepting these proposals.

APL thus has not created a question of fact on whether Matson's slot-charter proposals were intended to force APL out of the market or were otherwise exclusionary. As a result, it has not supported its attempted-monopolization claim with evidence of anticompetitive conduct.

### b. Specific Intent to Monopolize

Moving to the second element of an attempt-to-monopolize claim, "[s]pecific intent may be inferred from the defendant's anticompetitive practices." M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 166 (4th Cir. 1992). Because the evidence of Matson's anticompetitive practices is lacking, it cannot anchor an inference of specific intent to monopolize. And APL does not proffer independent evidence of specific intent.

### c. Dangerous Probability

The third prong of an attempted-monopolization claim—dangerous probability of achieving monopoly power—is informed by the evidence of the first two prongs. Thus, even if Matson's market share is enough to suggest dangerous probability, without evidence of the other two elements, APL's attempted-monopolization claim cannot survive summary judgment. See id. at 168 ("[C]laims involving greater than 50% share should be treated as attempts at monopolization *when the other elements for attempted monopolization are also satisfied*." (emphasis added)). And the fact that Matson's market share fell after APL's entry undercuts any dangerous probability of monopolization. Id. ("A rising share may show more probability of success than a falling share."); WB Rpt. ¶ 63 fig. 19 (showing that, after APL entered the market in 2015, Matson's share decreased from 100% in 2014 to 74% in 2018).

The Court will, accordingly, also grant summary judgment to Matson on APL's attempted-monopolization claim.

B.  Remaining Motions

      *1. Daubert Motions*

The Court will deny as moot the parties' dueling <u>Daubert</u> motions to exclude the opinions

and testimony of the other side's expert.  Even if the challenged opinions of APL's expert, Dr.

Warren-Boulton, were credited, they would not change the outcome.  And the Court did not rely

on the opinions of Matson's expert, Dr. Ashley Langer, other than those that rebut Dr. Warren-

Boulton's non-dispositive opinions.  As a result, neither expert's opinions are integral to the

Court's resolution of the summary judgment motions.

      *2. Motions to Strike*

      a.  <u>Motion to Strike Dr. Warren-Boulton's Declaration</u>

As presaged above, the Court will grant Matson's motion to strike the new opinions in

APL's belated expert declaration.  "A party must make [expert] disclosures at the times and in

the sequence that the court orders."  <u>Artis v. Yellen</u>, 307 F.R.D. 13, 22 (D.D.C. 2014) (quoting

Fed. R. Civ. P. 26(a)(2)(D)).  "The purpose of that Rule is to 'prevent[] experts from lying in

wait to express new opinions at the last minute, thereby denying the opposing party the

opportunity to depose the expert on the new information or closely examine the expert's new

testimony.'"  <u>Id.</u> (quoting <u>Minebea Co. v. Papst</u>, 231 F.R.D. 3, 5 (D.D.C. 2005)).

Dr. Warren-Boulton's declaration violates this prohibition.  Expert discovery closed

February 1, 2024, <u>see</u> ECF 68 (Amended Scheduling Order), but the declaration was not

submitted until April 26, 2024.  While styled as a "respon[se] to certain assertions made by"

Matson in its motion to exclude his opinions, WB Decl. ¶ 4, the declaration contains "new

opinions," <u>Artis</u>, 307 F.R.D. at 22.  Most obvious, it marks the first time Dr. Warren-Boulton

estimates what share of the U.S.-Guam market was foreclosed by Matson's allegedly

anticompetitive conduct.  Therefore, APL does not (and cannot) argue that the declaration was "for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of initial report" so as to excuse its tardiness under Federal Rule of Civil Procedure 26(e).  Id.  As a result, the foreclosure figures in the declaration must be stricken.

b.  Motion to Strike Matson's Declarations

APL seeks to strike several declarations offered by Matson in which various customers attest that Matson never threatened or retaliated against them.  See ECF 153.  APL argues that the declarations should be stricken because Matson failed to disclose them in accordance with the discovery rules and the parties' agreed discovery protocols.  Id. at 4.  APL also argues that the declarations are inadmissible because the declarants lack personal knowledge and/or cannot be compelled to testify at trial because they reside outside the Court's jurisdiction.  Id.

The Court will deny APL's motion as moot because it did not rely on Matson's declarations except to point out that they would not change the summary judgment calculus even if they were credited.  See supra at 32.

IV.  **Conclusion**

With APL's allegations gone by the board, the Court grants summary judgment to Matson and denies APL's cross-motion.  It also denies the parties' remaining motions as moot, save for Matson's motion to strike Dr. Warren-Boulton's rebuttal declaration, which the Court grants.

Finally, the Court previously permitted the parties to file documents provisionally under seal.  See Minute Order of April 29, 2024.  Parts of this opinion rely on those provisionally sealed documents.  But given that the parties consented to a public hearing on their cross-motions where some of the sealed information was discussed, the Court does not expect that

much, if any, of the opinion will need to be sealed.  Out of an abundance of caution, however, the Court will release this opinion temporarily under seal and direct the parties to meet and confer and propose any targeted redactions within seven days, after which the Court will issue a public version.

       The Court will also direct the parties meet and confer as to whether any of the provisionally sealed record materials may be unsealed, especially in light of the Court's reliance on them in this opinion.  See United States v. Hubbard, 650 F.2d 293, 321 (D.C. Cir. 1980) ("The single most important element" in the unsealing analysis is "the purpose[] for which the documents were introduced." (capitalization modified)).  If they cannot reach agreement, the Court will direct the parties to brief the issue.

       A separate Order follows.

                                                                            _____
                                                                       CHRISTOPHER R. COOPER
                                                                       United States District Judge

Date: March 11, 2025